REGARDED AS REPRESENTATIONS BY THE DEBTORS OR ANY OTHER PERSON THAT THE PROJECTED FINANCIAL CONDITION OR RESULTS WILL BE ACHIEVED.

THE FINANCIAL INFORMATION CONTAINED IN OR INCORPORATED BY REFERENCE INTO THE DISCLOSURE STATEMENT HAS NOT BEEN AUDITED, EXCEPT AS SPECIFICALLY INDICATED OTHERWISE. THE FINANCIAL PROJECTIONS, ATTACHED HERETO AS **EXHIBIT D-2,** WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE, MAY NOT ULTIMATELY BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET, AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL.  THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE AS TO THE ACCURACY OF THESE PROJECTIONS OR TO THE ABILITY TO ACHIEVE THE PROJECTED RESULTS.

INFORMATION INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT SPEAKS AS OF THE DATE OF SUCH INFORMATION OR THE DATE OF THE REPORT OR DOCUMENT IN WHICH SUCH INFORMATION IS CONTAINED OR AS OF A PRIOR DATE AS MAY BE SPECIFIED IN SUCH REPORT OR DOCUMENT. ANY STATEMENT CONTAINED IN A DOCUMENT INCORPORATED BY REFERENCE HEREIN SHALL BE DEEMED TO BE MODIFIED OR SUPERSEDED FOR ALL PURPOSES TO THE EXTENT THAT A STATEMENT CONTAINED IN THIS DISCLOSURE STATEMENT OR IN ANY OTHER SUBSEQUENTLY FILED DOCUMENT WHICH IS ALSO INCORPORATED OR DEEMED TO BE INCORPORATED BY REFERENCE, MODIFIES OR SUPERSEDES SUCH STATEMENT. ANY STATEMENT SO MODIFIED OR SUPERSEDED SHALL NOT BE DEEMED, EXCEPT AS SO MODIFIED OR SUPERSEDED, TO CONSTITUTE A PART OF THIS DISCLOSURE STATEMENT.

SOME ASSUMPTIONS MAY NOT MATERIALIZE.  FURTHER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE FINANCIAL PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND, THUS, THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER.  THEREFORE, THE FINANCIAL PROJECTIONS DOES NOT CONSTITUTE, AND SHALL NOT BE CONSTRUED AS, A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

CONFIDENTIAL                                                            LEGENDS0051547

# INTRODUCTION

Louisiana Riverboat Gaming Partnership ("Riverboat Gaming"), Legends Gaming of Louisiana-1, LLC ("Legends LA-1"), Legends Gaming of Louisiana-2, LLC ("Legends LA-2"), Legends Gaming, LLC ("Legends Gaming"), Legends Gaming of Mississippi, LLC ("Legends MS"), and Legends Gaming of Mississippi RV Park, LLC ("Legends MS RV") (each a "Debtor" and collectively, the "Debtors") have filed a Joint Chapter 11 Plan for Louisiana Riverboat Gaming Partnership and Affiliates as of [                ], 2012 (together with any modification, amendment or supplement that may be filed thereto, the "Plan").  The Debtors submit this Joint Disclosure Statement for Joint Chapter 11 Plan for Louisiana Riverboat Gaming Partnership and Affiliates as of [            ], 2012 (the "Disclosure Statement") pursuant to Section 1125 of title 11 of the United States Code (the "Bankruptcy Code") to holders of Claims against and Interests in the Debtors. The Disclosure Statement is submitted in connection with (i) the solicitation of acceptances or rejections of the Plan filed by the Debtors with the United States Bankruptcy Court for the Western District of Louisiana, Shreveport Division (the "Bankruptcy Court"), and (ii) the hearing to consider approval of the Plan (the "Confirmation Hearing") scheduled for the date set forth in the accompanying notice.   Unless otherwise defined in this Disclosure Statement, all capitalized terms contained herein have the meanings ascribed to them in the Plan. In the event of a conflict or difference between the definitions used in the Disclosure Statement and the Plan, the definitions contained in the Plan shall control.

CONFIDENTIAL                                                                    LEGENDS0051548

13-01007 - #99-4  File 10/23/13  Enter 10/23/13 15:34:37  Exhibit -F- (part 3) Pg 2 of 50

# I.    PURPOSES AND SUMMARY OF PLAN

**THE DESCRIPTION OF THE PLAN SET FORTH BELOW CONSTITUTES A SUMMARY ONLY.  CREDITORS, HOLDERS OF INTERESTS AND OTHER PARTIES IN INTEREST ARE URGED TO REVIEW AND ANALYZE THE PLAN IN ITS ENTIRETY**.

The primary purposes of the Plan are to:

- Provide for the sale of substantially all of the Debtors' assets (the "Purchased Assets") to Global Gaming Legends, LLC ("Global Legends"), a Delaware limited liability company, Global Gaming Vicksburg, LLC ("Global Vicksburg"), a Delaware limited liability company and Global Gaming Bossier City, LLC ("Global Louisiana"), a Delaware limited liability company (collectively, the "Purchasers"), pursuant to a certain Purchase Agreement dated as of July 25, 2012 (the "Purchase Agreement");
- Provide for the assumption and/or timely payment of the Assumed Liabilities and LRGP Retained Liabilities (as defined in, and subject to the terms of, the Purchase Agreement); and
- Provide for payments and distributions to creditors.

## A.    OVERVIEW OF THE PURCHASE AGREEMENT AND THE PLAN

After careful review of the Debtors' current business operations and various liquidation and recovery scenarios, the Debtors have concluded that the recovery for holders of Allowed Claims and Interests will be maximized by the Debtors' sale of their assets as a going concern. After extensive negotiations, Legends Gaming, LLC, Legends Gaming of Louisiana-1, LLC, Legends Gaming of Louisiana-2, LLC, and Legends Gaming of Mississippi, LLC, as Sellers, and Louisiana Riverboat Gaming Partnership, entered into the Purchase Agreement.  The Purchase Agreement permitted the Debtors to market their assets to other parties for a sixty-day period. Pursuant to the Bankruptcy Court's August 23, 2012 *Order (A) Approving Bidding Procedures; and (B) Granting Certain Bid Protections* [P-140], parties had until September 24, 2012 at 11:59 p.m. prevailing Central Time to submit qualified bids.  No party submitted a qualified bid, and by notice filed with the Bankruptcy Court on September 28, 2012 [P-202], the Debtors

CONFIDENTIAL                                                                    LEGENDS0051549

announced that the Purchasers were the successful bidders and that the Debtors accordingly would forego the auction.

The Purchase Agreement and the Plan provide that Legends Gaming shall sell, transfer, assign and convey, and Global Legends shall acquire and assume, all of the rights, title and interest of Legends Gaming in the Purchased Assets; Legends MS shall sell, transfer, assign and convey, and Global Vicksburg shall acquire and assume, all of the rights, title and interest of Legends MS in the Purchased Assets; and Legends LA-1 and Legends LA-2 shall sell, transfer, assign and convey, and Global Louisiana shall acquire and assume, all of the rights, title and interests of Legends LA-1 and Legends LA-2, respectively, in the Purchased Assets, including Legends LA-1 and Legends LA-2's partnership interests in Riverboat Gaming. The Purchasers and Riverboat Gaming, as applicable, shall also assume and/or timely perform and discharge in accordance with their terms the Assumed Liabilities and the LRGP Retained Liabilities (as defined in the Purchase Agreement).

The Purchase Agreement provides for the Purchasers to purchase the Purchased Assets for the aggregate price of $125.0 million (the "Purchase Price"), and to assume certain of the Debtors' liabilities, including (i) all trade payables reflected or reserved for on the Closing Date Balance Sheet (as defined in the Purchase Agreement), and (ii) all Consumer Liabilities (as defined in the Purchase Agreement), in each case subject to the terms and conditions set forth in the Purchase Agreement.

Under the Purchase Agreement, the consideration to be provided by the Purchasers will take two forms: cash and "take back" debt to be issued to the First Lien Lenders. The Purchase Agreement, together with the exhibits thereto that set forth the terms of such financing, provides for the First Lien Lenders to receive $61.5 million in new first lien debt and $36.0 million of new

CONFIDENTIAL                                                                     LEGENDS0051550

second lien debt, to be issued by in each case by Global Gaming Legends, LLC, and guaranteed by GGL Holdings, LLC ("Holdings") and each subsidiary of Holdings. The remainder of the Purchase Price (less the deposit in the amount of $6.25 million that the Stalking Horse Bidder has already placed into escrow) will be paid in cash at the Closing, subject to a post-closing adjustment as set forth in the Purchase Agreement.

The Plan provides that the First Lien Lenders' Secured Claims (Class 4) would be Allowed in the amount of $181,182,013.83 as of July 31, 2012 (the "Petition Date").  The Plan also provides that in full satisfaction of the secured portion of the First Lien Lenders' Secured Claims (but not the First Lien Lenders' deficiency claim), the First Lien Lenders shall receive *pro rata* (i) the Adjusted Cash Purchase Price, the Deposit Escrow Funds, any Post-Closing Net Working Capital Excess (each of the foregoing capitalized terms as defined in the Purchase Agreement), and all other amounts that are or become due from the Purchasers pursuant to the Purchase Agreement, after (A) distributions to holders of Allowed Claims and payment or reserve for other expenses to be paid in accordance with the Plan and (B) the payment of the Transaction Fees directly to Houlihan Lokey Capital, Inc. (the financial advisor to Latham & Watkins LLP as counsel for the First Lien Agent and the First Lien Ad Hoc Group) and Seaport Group Securities, LLC; plus (ii) the obligations of the borrower and guarantors under, and all payments under, the New First Lien Credit Agreement; plus (iii) the obligations of the borrower and guarantors under, and payments under, the New Second Lien Credit Agreement; plus (iv) any value that the Debtors' Estates may receive or possess before or after the Effective Date (including through litigation) in connection with the Debtors' Assets that are subject to the Liens securing the First Lien Lenders' Secured Claim and any Liens granted in favor of the First Lien Agent or the First Lien Lenders by order of the Bankruptcy Court.  The foregoing amounts will

CONFIDENTIAL                                                                                    LEGENDS0051551

be paid directly to the Wilmington Trust Company or any successor thereto, as First Lien Agent for the benefit of itself and the First Lien Lenders, and will not be paid to the Debtors, the Liquidating Debtors or the Debtors' Estates.

The Plan further provides that the First Lien Agent and the First Lien Lenders will retain all of their Liens and security interests in the Purchased Assets and the LRGP Retained Assets as provided in the Purchase Agreement, the New First Lien Credit Agreement, the New Second Lien Credit Agreement and all agreements and other documents in any way relating thereto or in furtherance thereof. The First Lien Agent and the First Lien Lenders shall retain all of their Liens and security interests in the Debtors' Assets that are not Purchased Assets and the LRGP Retained Assets, until such Assets are sold or liquidated (at which time such Liens shall attach to the proceeds of such sales or liquidations). The Plan also provides that section 552 of the Bankruptcy Code shall not apply to limit any of the First Lien Lenders' Liens and security interests.

The Plan provides that the Second Lien Lenders' Secured Claims (Class 5) would be Allowed in the amount of $116,252,898.38 as of the Petition Date. The Plan further provides that the Second Lien Lenders will receive no distribution on account of the Second Lien Lenders' Secured Claims. Because the Allowed First Lien Lenders' Secured Claims will not be paid in full under the Plan, the Second Lien Lenders' Secured Claims have no value under section 506 of the Bankruptcy Code. Accordingly, the entirety of the Second Lien Lenders' Secured Claims will be treated as Class 8 General Unsecured Claims for purposes of voting and distribution under the Plan and the Second Lien Lenders will receive no distribution on account of their Class 5 Second Lien Lenders' Secured Claims. The Plan further provides that the

CONFIDENTIAL                                                    LEGENDS0051552

Second Lien Lenders' Liens and security interests in the Debtors' Assets shall be cancelled terminated and erased and have no further effect as of the Effective Date.

To the extent Allowed Priority Tax Claims (Class 1), Allowed Priority Claims (Class 2), Allowed Secured Tax Claims (Class 3) and Allowed Other Secured Claims (Class 6) are Assumed Liabilities or LRGP Retained Liabilities under the Purchase Agreement, the Purchasers and/or Riverboat Gaming, as applicable, shall assume and/or timely perform and discharge such claims in accordance with their respective terms and to the extent provided for in the Purchase Agreement.   To the extent Allowed Priority Tax Claims, Allowed Priority Claims, Allowed Secured Tax Claims and Allowed Other Secured Claims are not Assumed Liabilities or LRGP Retained Liabilities under the Purchase Agreement and are not otherwise paid during the Chapter 11 Cases, such claims will receive the treatment in accordance with the Plan that is selected by the Debtors and the First Lien Ad Hoc Group.

Assumed Liabilities and LRGP Retained Liabilities (Class 7) shall be assumed and/or timely performed and discharged by the Purchasers or Riverboat Gaming, as applicable, in accordance with their respective terms.

With respect to General Unsecured Claims (Class 8), which class includes any Rejection Damage Claims and the deficiency claims of the First Lien Lenders and the Second Lien Lenders, if the Class of Allowed General Unsecured Claims accepts the Plan pursuant to section 1126(c) of the Bankruptcy Code, the holders of Allowed General Unsecured Claims shall be paid *pro rata* from the sum of $40,000 from sale proceeds otherwise payable to the First Lien Lenders. If, however, the Class of Allowed General Unsecured Claims does not accept the Plan pursuant to section 1126(c), the holders of Allowed General Unsecured Claims will receive no distribution under the Plan.

CONFIDENTIAL                                                                                LEGENDS0051553

The Debtors' Interests in Riverboat Gaming (Class 9) will be transferred to the Purchasers in accordance with the Purchase Agreement.  The Debtors will not retain any Interests in Riverboat Gaming.

The holders of Preferred Interests (Class 10) and Common Interests (Class 11) in Legends Gaming shall have their Interests cancelled on the Effective Date. As of the Effective Date, all Preferred Interests and Common Interests will be deemed automatically canceled, terminated and of no further force or effect without any further act or action under any applicable agreement, law, regulation, order, or rule of law.

## B.    MANAGEMENT OF THE DEBTORS

### 1.       Legends

The senior corporate management of Legends is as follows:

- William J. McEnery, Chairman, Chief Executive Officer and Manager
- G. Dan Marshall, Manager
- Raymond C. Cook, President – Chief Financial Officer & Chief Information Officer

### 2.       Louisiana Property – Shreveport/Bossier

The senior management of the Debtor Riverboat Gaming, which operates the Debtors' hotel and gaming facility in Bossier City, Louisiana (the "Louisiana Property"), is as follows:

- Domenic Ricciardelli, Executive Vice President and General Manager

### 3.       Mississippi Property – Vicksburg

The senior management of the Debtor, Legends MS, which operates the Debtors' hotel and gaming facility in Vicksburg, Mississippi (the "Mississippi Property" and, together with the Louisiana Property, the "Properties"), is as follows:

CONFIDENTIAL                                                                                      LEGENDS0051554

- Felicia Gavin, Executive Vice President, General Manager and Vice President of Finance

## C.   MANAGEMENT OF THE DEBTORS

To provide continuity of management, Raymond C. Cook, Felicia Gavin, Dominic Ricciardelli, Dan Marshall and William J. McEnery are continuing to serve throughout the Chapter 11 Cases at their current level of compensation and benefits until the Effective Date.

## II.   SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

The following is a Summary of Classification and Treatment of Claims and Interests:

| CLASS | TREATMENT |
|---|---|
| **Unclassified.  Allowed Administrative Expense Claims.** **The total estimate of Administrative Expense Claims as of Effective Date is approximately $3.5 million.** | **Unimpaired.  Not entitled to vote.** *Allowed Administrative Expense Claims.* Subject to section 2.1.2 of the Plan, to the extent Allowed Administrative Expense Claims (a) are not paid by the Purchasers or LRGP in connection with the Purchase Agreement or (b) are not otherwise paid during the Chapter 11 Cases, each Allowed Administrative Expense Claim shall be paid (x) in full, in Cash, by the Debtors on the Effective Date or as soon practicable thereafter; or (y) in accordance with the terms of the underlying Allowed Administrative Expense Claim; or (z) upon such other terms as may be agreed upon by the holder of such Allowed Administrative Expense Claim and the Debtors or, as applicable, the Liquidating Debtors or otherwise established pursuant to an order of the Bankruptcy Court; *provided, however,* that Administrative Expense Claims representing liabilities incurred in the ordinary course of business by any Debtor in Possession shall be paid by the applicable Debtor in accordance with the terms and conditions of the particular transactions, the applicable non-bankruptcy law, and any agreements relating thereto or any order of the Bankruptcy Court. For the avoidance of doubt, all unpaid post-petition amounts authorized and payable under the Final Cash Collateral Order shall be deemed to be Allowed Administrative Expense Claims under the Plan. *Compensation of Professionals of Debtors.* All Professionals of the Debtors who seek compensation or who have been compensated from the estates of the Debtors in Possession during the Chapter 11 Cases, or who seek compensation from the estates of the Debtors in Possession for services rendered or reimbursement of expenses incurred from the Petition Date through and including the Effective Date, pursuant to Sections 327, 328, 330, 503(b), or 1103 of the Bankruptcy Code, shall (a) File final applications for allowance of compensation for services and reimbursement of expenses incurred from the Petition Date through the Effective Date by no later than the date that is forty-five (45) days after the |

CONFIDENTIAL                                                                    LEGENDS0051555

Effective Date, and (b) if granted such an award by the Bankruptcy Court, be paid in full by the Debtors or, as applicable, the Liquidating Debtors or as otherwise provided in the Plan in such amounts as are Allowed by the Bankruptcy Court (i) on the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is practicable, or (ii) when mutually agreed upon by such holder of an Administrative Expense Claim and the Liquidating Debtors.  For the avoidance of doubt, no professional retained or employed by or for the benefit of the First Lien Agent or the First Lien Ad Hoc Group shall be required to File any motion or application for allowance or payment of any of its fees and expenses.

*Substantial Contribution Claims; Deadline for Filing.*

To the extent any Entity is seeking payment or reimbursement of compensation for services rendered or reimbursement of expenses incurred in connection with or during the Chapter 11 Cases under Section 503(b)(3)(D) of the Bankruptcy Code, such Entity shall File its application or request for such payment on or before the deadline established by the Bankruptcy Court for the filing of the objections to the confirmation of the Plan, and any such application or request shall be heard and determined at the Confirmation Hearing; otherwise, any such application or request for compensation or reimbursement of expenses under Section 503(b)(3)(D) shall be forever barred from assertion against the Debtors, their respective Estates, the Liquidating Debtors, and the Purchasers, and the holders of any such Claims are barred from recovering any distributions under the Plan on account thereof.

To the extent not already paid by the Effective Date, the Second Lien Agent, any Second Lien Lender and any of their respective counsel, advisors, agents and professionals shall be entitled to receive only the amount that has already been specifically authorized by the Final Cash Collateral Order (*i.e.*, a total of $40,000 for the Second Lien Agent), and shall have no other Administrative Expense Claim or Substantial Contribution Claim.

*Bar Date for Filing Administrative Expense Claims.*  Except with respect to any Administrative Expense Claims (a) that are Allowed under the Plan or payable pursuant to an order of the Bankruptcy Court or (b) for which a different deadline is established by this Article 2, Administrative Expense Claims must be Filed no later than thirty (30) days after the Effective Date or any such Administrative Expense Claim is and shall be deemed to be forever barred and unenforceable against the Debtors, their respective Estates, their Assets, the Liquidating Debtors, and the Purchasers, and the holders of any such Claims are barred from recovering any distributions under the Plan on account thereof.

**Estimated percentage recovery: 100%**

CONFIDENTIAL                                                                LEGENDS0051556

| Class 1. Allowed Priority Tax Claims.<br><br>The total estimate of Allowed Priority Tax Claims as of the Effective Date is $0.00.[2] | Impaired. Entitled to vote.<br><br>    (a)    To the extent Allowed Priority Tax Claims are Assumed Liabilities or LRGP Retained Liabilities under the Purchase Agreement, the Purchasers and/or Riverboat Gaming, as applicable, shall assume and/or timely perform and discharge such Allowed Priority Tax Claims in accordance with their respective terms and to the extent provided for in the Purchase Agreement.<br><br>    (b)    To the extent Allowed Priority Tax Claims (i) are not Assumed Liabilities or LRGP Retained Liabilities under the Purchase Agreement to be paid by the Purchasers or (ii) are not otherwise paid during the Chapter 11 Cases, each holder of such Allowed Priority Tax Claim shall be paid the Allowed Amount of such Allowed Priority Tax Claim, at the option of the Debtors (or, as applicable, the Liquidating Debtors) and the First Lien Ad Hoc Group: (x) in full, in Cash, by the Debtors or, as applicable, the Liquidating Debtors, on the Effective Date; or (y) in accordance with the terms of the underlying Allowed Priority Tax Claim; or (z) upon such other terms as may be agreed upon by the holder of such Allowed Priority Tax Claim and the Debtors or, as applicable, the Liquidating Debtors or otherwise established pursuant to a Final Order of the Bankruptcy Court, in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest at such rate as required by Section 511 of the Bankruptcy Code or otherwise as required by Section 1129(a)(9)(C) or (D) of the Bankruptcy Code.<br><br>**Estimated percentage recovery: 100%** |
| Class 2. Priority Claims.<br><br>The estimated Allowed Amount of the Priority Claims is approximately $0.00. | Impaired. Entitled to vote.<br><br>    (a)    To the extent Allowed Priority Claims are Assumed Liabilities or LRGP Retained Liabilities under the Purchase Agreement, the Purchasers and/or Riverboat Gaming, as applicable, shall assume and/or timely perform and discharge such Allowed Priority Claims in accordance with their respective terms and to the extent provided for in the Purchase Agreement.<br><br>    (b)    To the extent Allowed Priority Claims (i) are not Assumed Liabilities or LRGP Retained Liabilities under the Purchase Agreement to be paid by the Purchasers or (ii) are not otherwise paid during the Chapter 11 Cases, each holder of such Allowed Priority Claim shall be paid the Allowed Amount of such Allowed Priority Claim, at the option of the Debtors (or, as applicable, the Liquidating Debtors) and the First Lien Ad Hoc Group: (x) in full, in Cash, by the Debtors or, as applicable, the Liquidating Debtors, on the Effective Date, or (y) in accordance with the terms of the underlying Allowed Priority Claim; or (z) upon such other terms as may be agreed upon by the holder of such Allowed Priority Claim and the Debtors or, as applicable, the Liquidating Debtors or otherwise established pursuant to a Final Order of the Bankruptcy Court.<br><br>**Estimated percentage recovery: 100%** |

---

[2] Priority Tax Claims that would normally fall under Class 2 have been included in Class 7 Assumed Liabilities and LRGP Retained Liabilities since the Purchasers are assuming and paying these Priority Tax Claims pursuant to the Purchase Agreement.

CONFIDENTIAL    LEGENDS051557

13-01007 - #99-4 File 10/23/13 Enter 10/23/13 15:34:37 Exhibit -F- (part 3) Pg 11 of 50

| Class 3.  Secured Tax Claims. | **Impaired. Entitled to vote.** |
|---|---|
| **The estimated Allowed Amount of the Secured Tax Claims is approximately $0.00.**[3] | *Treatment.*<br><br>(a)    To the extent Allowed Secured Tax Claims are Assumed Liabilities or LRGP Retained Liabilities under the Purchase Agreement, the Purchasers and/or Riverboat Gaming, as applicable, shall assume and/or timely perform and discharge such Allowed Secured Tax Claims in accordance with their respective terms and to the extent provided for in the Purchase Agreement.<br><br>(b)   To the extent Allowed Secured Tax Claims (i) are not Assumed Liabilities or LRGP Retained Liabilities under the Purchase Agreement to be paid by the Purchasers or (ii) are not otherwise paid during the Chapter 11 Cases, each holder of such Allowed Secured Tax Claim shall be paid the Allowed Amount of such Allowed Secured Tax Claim, at the option of the Debtors (or, as applicable, the Liquidating Debtors) and the First Lien Ad Hoc Group: (x) in full, in Cash, on the Effective Date or as soon as practicable thereafter; or (y) in accordance with the terms of the underlying Allowed Secured Tax Claim; or (z) upon such other terms as may be agreed upon by the holder of such Allowed Secured Tax Claim and the Debtors or, as applicable, the Liquidating Debtors or otherwise established pursuant to a Final Order of the Bankruptcy Court, in an aggregate amount equal to such Allowed Secured Tax Claim, together with interest at such rate as required by Section 511 of the Bankruptcy Code or otherwise as required by Section 1129(a)(9)(C) or (D) of the Bankruptcy Code.<br><br>*Collateral.* Each holder of an Allowed Secured Tax Claim that has a Permitted Encumbrance shall retain the Permitted Encumbrance on the Debtors' Assets with the same validity, priority and extent that existed on the Petition Date until paid in full under the Plan or the Purchase Agreement. Those Encumbrances granted to the holders of Allowed Secured Tax Claims that are not Permitted Encumbrances shall be cancelled, terminated and erased and have no further effect as of the Effective Date. Each holder of (i) Secured Tax Claims that are not Allowed, (ii) Allowed Secured Tax Claims with Encumbrances that are not Permitted Encumbrances; or (iii) Allowed Secured Tax Claims with Permitted Encumbrances after the payment in full of such Allowed Secured Tax Claim under the Plan or the Purchase Agreement, shall execute any and all documents reasonably necessary to effectuate the cancellation, termination and erasure of such Encumbrances (and the Debtors, the Liquidating Debtors and the Purchasers each are hereby authorized to execute, file and deliver any documents reasonably necessary to effectuate the cancellation, termination and erasure of such Encumbrances in the event any such holder declines to do so).<br><br>**Estimated percentage recovery: 100%** |

---

[3] Secured Tax Claims that would normally fall under Class 3 have been included in Class 7 Assumed Liabilities and LRGP Retained Liabilities since the Purchasers are assuming and paying these Secured Tax Claims pursuant to the Purchase Agreement.

CONFIDENTIAL                                                                                      LEGENDS0051558

13-01007 - #99-4  File 10/23/13  Enter 10/23/13 15:34:37  Exhibit -F- (part 3) Pg 12 of 50

| Class 4. First Lien Lenders' Secured Claims.[4]<br><br>The estimated Allowed Amount of the First Lien Lenders' Claims is approximately $181,182,013 as of the Petition Date. | Impaired. Entitled to vote.<br><br>    (a)    *General Terms.* In full satisfaction of the First Lien Lenders' Secured Claims but not the deficiency claim set forth in section 3.4.2(e) of the Plan, the First Lien Lenders shall receive *pro rata* (i) the Adjusted Cash Purchase Price, the Deposit Escrow Funds, any Post-Closing Net Working Capital Excess (each of the foregoing capitalized terms as defined in the Purchase Agreement), and all other amounts that are or become due from the Purchasers pursuant to the Purchase Agreement, after (A) distributions to holders of Allowed Claims and payment or reserve for other expenses to be paid in accordance with the Plan and (B) the payment of the Transaction Fees directly to Houlihan Lokey Capital, Inc. and Seaport Group Securities, LLC; plus (ii) the obligations of the borrower and guarantors under, and all payments under, the New First Lien Credit Agreement; plus (iii) the obligations of the borrower and guarantors under, and payments under, the New Second Lien Credit Agreement; plus (iv) any value that the Debtors' Estates may receive or possess before or after the Effective Date (including through litigation) in connection with the Debtors' Assets that are subject to the Liens securing the First Lien Lenders' Secured Claim and any Liens granted in favor of the First Lien Agent or the First Lien Lenders by order of the Bankruptcy Court. The amounts above shall be paid directly to the First Lien Agent for the benefit of itself and the First Lien Lenders, and shall not be paid to the Debtors, the Liquidating Debtors or the Debtors' Estates. From and after the Effective Date, the Existing First Lien Credit Agreement shall continue in effect solely for purposes of allowing the First Lien Agent to make distributions to the First Lien Lenders in accordance with the Purchase Agreement and the Plan, and permitting the First Lien Agent to maintain any rights or liens it may have for fees, costs and expenses under the Existing First Lien Credit Agreement.<br><br>    (b)    *Payment of the Transaction Fees From the Proceeds of the Transaction.* The Transaction Fees shall be paid in cash directly to Houlihan Lokey Capital, Inc. and Seaport Group Securities, LLC, respectively, on the Effective Date or as soon as practicable thereafter from the proceeds of the Transaction. Houlihan Lokey Capital, Inc. shall not be required to File any motion or application with the Bankruptcy Court for approval of the Transaction Fees.<br><br>    (c)    *Collateral.* The First Lien Agent and the First Lien Lenders shall retain all of their Liens and security interests in the Purchased Assets and the LRGP Retained Assets as provided in the Purchase Agreement, the New First Lien Credit Agreement, the New Second Lien Credit Agreement and all agreements and other documents in any way relating thereto or in furtherance thereof. The First Lien Agent and the First Lien Lenders shall retain all of their Liens and security interests in the Debtors' Assets that are not Purchased Assets and the LRGP Retained Assets, until such Assets are sold or liquidated (at which time such Liens shall attach to the proceeds of such sales or liquidations). Section 552 of the Bankruptcy Code shall not apply to limit any of the First Lien Lenders' Liens and security interests. |

---

[4] Payments to the First Lien Lenders are estimates only and will be (i) affected by adjustments to the Purchase Price as provided in the Purchase Agreement and (ii) reduced by distributions to holders of Allowed Claims and payment of or reserve payment for other expenses to be paid in accordance with the Plan.

CONFIDENTIAL        LEGENDS0051559
13-01007 - #99-4 File 10/23/13 Enter 10/23/13 15:34:37 Exhibit -F- (part 3) Pg 13 of 50

| | |
|---|---|
| | (d) *Documentation.* The Confirmation Order shall constitute Bankruptcy Court approval of the New First Lien Credit Agreement, the New Second Lien Credit Agreement and all agreements and other documents in any way relating thereto or in furtherance thereof, each of which as agreed upon by the borrower and the guarantors under the New First Lien Credit Agreement and the New Second Lien Credit Agreement, the First Lien Agent and the holders of at least 50.01% of the amount of the First Lien Lenders' Secured Claims outstanding as of the Petition Date, without any further action, formality or order of the Bankruptcy Court and without execution of such documents by any other First Lien Lenders.  The New First Lien Credit Agreement, the New Second Lien Credit Agreement and all agreements and other documents in any way relating thereto or in furtherance thereof that are executed or otherwise approved by the borrower and the guarantors, the First Lien Agent and the holders of at least 50.01% of the amount of the First Lien Lenders' Secured Claims outstanding as of the Petition Date shall, from and after the Effective Date, be binding and enforceable as to all First Lien Lenders (and any successors thereto and transferees and assignees thereof), including those First Lien Lenders that do not execute those agreements and documents.  <br><br> (e) *Deficiency Claim.* The First Lien Lenders shall have an Allowed General Unsecured Claim in the amount of (i) $181,182,013.83 less (ii) the sum of the Adjusted Cash Purchase Price, the Deposit Escrow Funds, any Post-Closing Net Working Capital Excess (each of the foregoing capitalized terms as defined in the Purchase Agreement), and all other amounts that are or become due from the Purchasers pursuant to the Purchase Agreement, which deficiency claim shall be classified in Class 8.  <br><br> **Estimated percentage recovery:  67%** |
| **Class 5.  Second Lien Lenders' Claims.** <br><br> **The estimated Allowed Amount of the Second Lien Lenders' Claims is approximately $116,252,898.38 as of the Petition Date.** | **Impaired.   Not entitled to vote in Class 5, but entitled to vote in Class 8.** <br><br> (a) *General Terms.* Because the Allowed First Lien Lenders' Secured Claims will not be paid in full under the Plan, the Second Lien Lenders' Secured Claims have no value under Section 506 of the Bankruptcy Code.  Accordingly, the entirety of the Second Lien Lenders' Secured Claims shall be treated as Class 8 General Unsecured Claims for all purposes, including voting and distributions under the Plan, and the Second Lien Lenders will receive no distribution on account of the Class 5 Second Lien Lenders' Secured Claims.  From and after the Effective Date, the Existing Second Lien Credit Agreement shall continue in effect solely for purposes of allowing the Second Lien Agent to make any distributions to the Second Lien Lenders on account of their Class 8 General Unsecured Claims in accordance with the Plan, and permitting the Second Lien Agent to maintain any rights it may have against the Second Lien Lenders for fees, costs and expenses under the Existing Second Lien Credit Agreement.  <br><br> (b) *Collateral.* The Second Lien Lenders' Liens and security interests in the Debtors' Assets shall be cancelled, terminated and erased and have no further effect as of the Effective Date.  The Second Lien Agent or Second Lien Lenders shall execute any and all documents reasonably necessary to effectuate the cancellation, termination and erasure of any liens and security interests (and the Debtors, the Liquidating Debtors and the Purchasers each are hereby authorized to execute, file and deliver any documents reasonably necessary to effectuate the cancellation, termination and erasure of such Encumbrances in the event the Second Lien Agent and the |

CONFIDENTIAL

| | |
|---|---|
| | Second Lien Lenders decline to do so). |
| | **Estimated percentage recovery: 0%** |
| **Class 6. Other Secured Claims.**<br><br>**The estimated Allowed Amount of the Other Secured Claims is approximately $0.00.[5]** | **Impaired. Entitled to vote.**<br><br>    (a)   To the extent Allowed Other Secured Claims are Assumed Liabilities or LRGP Retained Liabilities under the Purchase Agreement, the Purchasers and/or Riverboat Gaming, as applicable, shall assume and/or timely perform and discharge the Allowed Other Secured Claims in accordance with their respective terms and to the extent provided for in the Purchase Agreement.<br><br>    (b)  To the extent any Allowed Other Secured Claims are not Assumed Liabilities or LRGP Retained Liabilities under the Purchase Agreement, at the option of the Debtors (or, as applicable, the Liquidating Debtors) and the First Lien Ad Hoc Group, either (i) the legal, equitable, and contractual rights of the holder of such Allowed Other Secured Claim shall be reinstated as of the Effective Date in accordance with Section 1124(2) of the Bankruptcy Code; (ii) the holder of such Allowed Other Secured Claim against a Debtor shall (A) retain the Encumbrances securing such Allowed Other Secured Claim and (B) receive regular installment payments in Cash having a total value, as of the Effective Date (reflecting an interest rate determined as of the Effective Date under 26 U.S.C. § 6622), equal to such Allowed Other Secured Claim, over a period ending not later than five (5) years after the Petition Date; (iii) the collateral securing such Allowed Other Secured Claim shall be surrendered to the holder of such Allowed Other Secured Claim on the Effective Date or as soon as practicable thereafter; or (iv) the holder of such Allowed Other Secured Claim shall be paid in full in Cash on the Effective Date or as soon as practicable thereafter.<br><br>    (c)    *Collateral.* Each holder of an Allowed Other Secured Claim that has a Permitted Encumbrance shall retain the Permitted Encumbrance on the Debtors' Assets with the same validity, priority and extent that existed on the Petition Date until paid in full under the Plan or the Purchase Agreement. Those Encumbrances granted to the holders of Allowed Other Secured Claims that are not Permitted Encumbrances shall be cancelled, terminated and erased and have no further effect as of the Effective Date. Each holder of (i) Other Secured Claims that are not Allowed, (ii) Allowed Other Secured Claims with Encumbrances that are not Permitted Encumbrances; or (iii) Allowed Other Secured Claims with Permitted Encumbrances after the payment in full of such Allowed Other Secured Claim under the Plan or the Purchase Agreement, shall execute any and all documents reasonably necessary to effectuate the cancellation, termination and erasure of such Encumbrances (and the Debtors, the Liquidating Debtors and the Purchasers each are hereby authorized to execute, file and deliver any documents reasonably necessary to effectuate the cancellation, termination and erasure of such Encumbrances in the event any such holder declines to do so).<br><br>**Estimated percentage recovery: 100%** |

---

[5] Other Secured Claims that would normally fall under Class 6 have been included in Class 7 Assumed Liabilities and LRGP Retained Liabilities since the Purchasers are assuming and paying these Other Secured Claims pursuant to the Purchase Agreement.

CONFIDENTIAL
LEGENDS0051561

| | |
|---|---|
| **Class 7.  Assumed Liabilities and LRGP Retained Liabilities**<br><br>**The estimated Allowed Amount of the Assumed Liabilities and LRGP Retained Liabilities is approximately \$9,074,678.00.[6]** | Impaired.  Entitled to vote.<br><br>The Purchasers and Riverboat Gaming, as applicable, shall assume and/or timely perform and discharge the Assumed Liabilities and LRGP Retained Liabilities, respectively, in accordance with their respective terms.<br><br><br><br><br>**Estimated recovery: 100%** |
| **Class 8.  General Unsecured Claims  (Including  Rejection Damage Claims, and Deficiency Claims  of  the  First  Lien Lenders  and  Second  Lien Lenders).**<br><br>**The estimated Allowed Amount of  the  General  Unsecured Claims is approximately \$177 million.** | **Impaired. Entitled to vote.**<br><br>If the Class of Allowed General Unsecured Claims accepts the Plan pursuant to Section 1126(c) of the Bankruptcy Code, the holders of Allowed General Unsecured Claims shall be paid *pro rata* from the sum of \$40,000 from sale proceeds otherwise payable to the First Lien Lenders. If, however, the Class of Allowed General Unsecured Claims does not accept the Plan pursuant to Section 1126(c) of the Bankruptcy Code, Class 8 General Unsecured Claims shall receive no distribution under the Plan.<br><br>**Estimated recovery: .00002% if Class 8 accepts the Plan; 0% if Class 8 rejects the Plan** |
| **Class 9.   Interests in Riverboat Gaming.** | **Impaired.  Deemed to Reject; Not entitled to vote.**<br><br>The Debtors' Interests in Riverboat Gaming shall be transferred to the Purchasers in accordance with the Purchase Agreement.  The Debtors will not retain any Interests in Riverboat Gaming.<br><br>**Estimated recovery: 0%** |
| **Class 10.    Preferred Interests** | **Impaired.  Deemed to Reject; Not entitled to vote.**<br><br>Holders of any and all Preferred Interests shall receive no distribution under the Plan and all Preferred Interests shall be cancelled on the Effective Date. As of the Effective Date, all Preferred Interests shall be deemed automatically canceled, terminated and of no further force or effect without any further act or action under any applicable agreement, law, regulation, order, or rule of law.<br><br>**Estimated recovery: 0%** |

---

[6] The Class 7 Assumed Liabilities and LRGP Retained Liabilities includes Claims that would normally fall under other Classes, such as Class 1 Priority Tax Claims, Class 2 Priority Claims, Class 3 Other Secured Claims, Class 6 Other Secured Claims and Class 8 General Unsecured Claims; however, since the Purchasers are assuming and paying these Claims pursuant to the Purchase Agreement, these Claims have been included in the Class 7 Assumed Liabilities and LRGP Retained Liabilities. The Class 7 Assumed Liabilities and LRGP Retained Liabilities also includes an estimate of any and all post-petition taxes, including property taxes, that will be due and owing as of the Effective Date.

CONFIDENTIAL                                                                                          LEGENDS051562
13-01007 - #99-4  File 10/23/13  Enter 10/23/13 15:34:37  Exhibit -F- (part 3) Pg 16 of 50

| Class 11.  Common Interests | Impaired.   Deemed to Reject; Not entitled to vote. |
|---|---|
| | The holders of Class 11 Common Interests shall receive no distribution under the Plan and all Common Interests shall be cancelled on the Effective Date. As of the Effective Date, all Common Interests shall be deemed automatically canceled, terminated and of no further force or effect without any further act or action under any applicable agreement, law, regulation, order, or rule of law. |
| | **Estimated recovery: 0%** |

## III.   GENERAL OVERVIEW AND BACKGROUND INFORMATION

### A.   BACKGROUND AND GENERAL INFORMATION

#### 1.   Overview

Debtor Legends Gaming was incorporated in May of 2004 under the laws of the State of Delaware.  Legends Gaming was incorporated as a vehicle to purchase and operate casinos and related non-gaming amenities.  On July 31, 2006, after a significant development stage, Legends acquired hotels and casinos in Bossier City, Louisiana and Vicksburg, Mississippi from Isle of Capri Casinos, Inc. ("Isle of Capri") for approximately $240 million with approximately $40 million of equity contributions provided by William McEnery. Legends Gaming and its affiliates commenced gaming activities under the "DiamondJacks" brand name at the newly acquired, former Isle of Capri facilities on the evening of August 1, 2006 (the day after the purchase from Isle of Capri closed). Legends Gaming continues to own and operate these facilities through its wholly-owned subsidiaries, Debtors Riverboat Gaming and Legends MS.

CONFIDENTIAL                                                                     LEGENDS0051563

Together, the Properties contain approximately 60,000 square feet of gaming space with 1,922 slot machines, 52 table games and 693 hotel rooms.  At each Property, the Debtors offer extensive guest amenities, including state of the art meeting and entertainment spaces and pool. The Properties operate in significant gaming markets and are well established within their markets, each having been in operation for more than fifteen years.  The Debtors have received numerous prestigious awards for their business operations and community involvement.

### a.    The Louisiana Property

Debtor Riverboat Gaming operates the Debtors' gaming facility in Bossier City, Louisiana. The Louisiana Property opened as a gaming facility in 1994. The Bossier City/Shreveport gaming market is the fourth largest casino market in the southeastern U.S. Bossier City and Shreveport are located in northwest Louisiana, approximately 20 miles from the Texas border. In fiscal year 2011, the Louisiana Property generated $99.8 million of gross revenues.

### b.    The Mississippi Property

Debtor Legends MS operates the Debtors' gaming facility in Vicksburg, Mississippi. The Mississippi Property opened as a gaming facility in 1993. The Vicksburg gaming market is one of the largest local gaming markets in the southeastern United States. Vicksburg is located on the eastern bank of the Mississippi River in west-central Mississippi, just off Interstate 20. In fiscal year 2011, the Mississippi Property generated $39.7 million of gross revenues.

### c.    Capital Reinvestment

Since purchasing the two Isle of Capri properties in mid-2006, Legends Gaming has rebranded and refreshed the overall décor and product.  In 2006, the properties were overly themed with a tropical flair and possessed a non-competitive food product and in some cases still

CONFIDENTIAL                                                                                        LEGENDS0051564

utilized slot tokens on their casino floor as opposed to fully utilizing ticket in ticket out technology (TITO).

Since 2006, Legends Gaming has invested approximately $30.3 million in renovating, upgrading and rebranding both Properties. The Properties today have a contemporary feel and have lost much of the previous "Isle theme."  Both casino floors have been totally remodeled with new carpeting, wall coverings, lighting, and in the case of the Louisiana Property, new restrooms and casino bars.   The casino management systems and slot products have been upgraded and/or replaced and both casinos are utilizing 100% TITO technology.   All seven of the Debtors' restaurants (4 at the Louisiana Property and 3 at the Mississippi Property) have been renovated and new menu offerings put in place.

Also, all public spaces at both Properties, including front desk, reception, pavilions and meeting spaces, have been renovated as well.

**2.        The Debtors' Corporate Structure**

Debtor Legends Gaming is a Delaware limited liability corporation with its principal place of business in Las Vegas, Nevada. Legends Gaming is the ultimate parent of each of the other Debtors. Legends Gaming owns 100% of the equity of Legends LA-1, Legends LA-2 and Legends MS. Legends LA-1 and Legends LA-2 are both limited liability corporations organized under the laws of the State of Louisiana. Each holds fifty percent (50%) of the equity interests of Riverboat Gaming. Riverboat Gaming is a general partnership organized under the laws of the State of Louisiana. Legends MS is organized under the laws of the State of Mississippi and holds 100% of the equity of Legends MS RV, an entity organized under the laws of the State of Delaware. Other than the Interests in Riverboat Gaming held by Legends LA-1 and Legends LA-2, Legends LA-1, Legends LA-2 and Mississippi RV Park have no assets and conduct no operations.

CONFIDENTIAL                                                                                   LEGENDS0051565

3.        **Employment Contracts**

There are ten employment contracts outstanding with current management. The employment contracts have various expiration dates, with five contracts expiring in 2013 and five contracts expiring in 2014. Five of these contracts have change in control and/or severance provisions which provide for payments equal to the remainder of the contract plus six to twelve months salary and bonuses.

On the Effective Date, the Debtors shall assume and assign to the Purchasers the Contracts of the employees listed in Schedule 6.1(b) of the Purchase Agreement; however, the Purchasers shall not be obligated to assume the Contract of any employee who does not agree to waive any change of control payments or similar benefits that would otherwise accrue solely as a result of the consummation of the Transaction.

B.        **OPERATIONAL RESULTS PRIOR TO FILING CHAPTER 11**

1.        **Properties Receive National Awards**

During the quarter ended September 30, 2011, three gaming magazines, Casino Player, Strictly Slots and Southern Gaming & Destinations, each published their respective "Best of 2011 Awards". DiamondJacks was the most recognized brand in the Mid-South region garnering a combined 95 awards with DiamondJacks Bossier City being named "Best Overall Casino," "Best Rooms," "Best Restaurant," "Best Casino Floor," Best Players Club," and "Best Casino Personnel," by Southern Gaming.

2.        **General Community Impact**

In 2006, the Debtors implemented the following mission statement:

*"Legends Gaming is committed to providing a fun and exciting gaming experience for our guests, an enriching work environment for our team members, and we will be an active member of the communities in which we operate."*

CONFIDENTIAL                                                                                    LEGENDS0051566
13-01007 - #99-4  File 10/23/13  Enter 10/23/13 15:34:37  Exhibit -F- (part 3) Pg 20 of 50

DiamondJacks, during the past year, truly has been an active member in both the Shreveport-Bossier and Vicksburg-Jackson communities.  The Debtors believe that in order to have a strong, viable gaming business, they need to reach out into the communities where their team members and guests reside, and help strengthen the community through active involvement in terms of both its time and financial resources.

During the past year the Debtors and their team members have been active in numerous endeavors, which have included:

### Shreveport - Bossier

- Partnership with Shreveport's Life Share Blood Center and The Radio Group to sponsor a special blood drive to donate the "perfect gift."

- Saluted and expressed gratitude for our soldiers by donating playing cards and dice to the 539th Military Police stationed in Salerno, Afghanistan.

- Participated in the Ronald McDonald Pop Tab Program.  The pop tabs are recycled in exchange for money to help with cancer research and benefit St. Jude Children's Research Hospital.

- Donated hotel nights to the American Cancer Society's Mid-South Division Guest Room Program for cancer patients and their family.

- Sponsored company basketball teams with Shreveport's Public Assembly and Recreation league to foster team building and camaraderie.

- Attended the NAACP Freedom Fund Banquet to support, foster and strengthen our relationships with current and potential minority vendors.

- Donated bottled water for the Prevention and Treatment of HIV/AIDS and Substance Abuse Walk and National Testing Day Campaign.

- Donated bottled water to the Epilepsy Foundation for the Seize the Road Bike Tour and Awareness Walk.

- Donated 2,000 plastic buckets to the Bossier Parish School Board for use at schools and facilities.

- Sponsored a special lunch buffet at Legend's Buffet on Mother's Day for the resident mothers of Providence House.

CONFIDENTIAL                                                                    LEGENDS051567

- Sponsored the Taste of Culture fundraising event for the Multicultural Center of the South to celebrate 26 cultures in the Shreveport-Bossier area.

- Sponsored the Taste of Home Cooking Show.

- Sponsored the Best of Times-2012 Poker Rally and assisted the Food Bank of Northwest Louisiana in collection of canned and food donations for their pantry.

- Sponsored the Great Texas Balloon Race.

- Sponsored Cinco de Mayo Fiesta, Inc in celebration of our community's Hispanic culture.

- Sponsored Mudbug Madness to celebrate Louisiana's rich Cajun heritage.

- Sponsored MDA/KTAL Golf Tournament to raise awareness and funds to find a cure for muscular dystrophy, ALS and related diseases.

- Sponsored the 2012 State Fair of Louisiana to promote agriculture and livestock.

## Vicksburg – Jackson

- DiamondJacks hosted an event for the community for the re-opening of the Washington Street Bridge.

- DiamondJacks team members participated in the Chili Cook Off with the proceeds benefiting MS Children Home Services Warren County Children's Shelter.

- Sponsored the annual United Way Banquet.

- DiamondJacks and Team Members contributed $51,831 to the United Way Campaign.

- Sponsored Biggest Loser Winner Patrick House as he raised funds to benefit the American Liver Foundation.

- DiamondJacks helped sponsor the Vicksburg Police Department Summer Youth Basketball Program as well as donated cases of water for the program.

- Donated DJ's Seafood and Steakhouse Appetizer coupons for the Teachers Appreciation event throughout the school district.

- Member of the Friends of Vicksburg National Military Park which is committed to preserve the tangible reminders of the bravery and perseverance of those that fought at Vicksburg.

CONFIDENTIAL LEGENDS0051568
13-01007 - #99-4 File 10/23/13 Enter 10/23/13 15:34:37 Exhibit -F- (part 3) Pg 22 of 50

- Donated to the Jackie Curtis Barnett (former deceased team member) Benefit which helps raise money for scholarships for children.

- Donated to Tower Loan of Vicksburg to help raise awareness for Juvenile Diabetes.

- Donated to the Main Street Vicksburg Program for the 3rd Annual Bricks & Spokes Bicycle Event.  Vicksburg Main Street Program is a non-profit organization.

- Donated old linen and newspapers to the Vicksburg Humane Society.

- Sponsored the 22nd Anniversary Scholarship/Mentoring Banquet for 100 Black Men of Jackson.

- Donated to the Food Bank of Northwest Louisiana/Empty Bowls Fundraiser.

- Participate in the Vicksburg Relay for Life events by hosting a booth and donating money and manpower.

- Donated cases of water to the 3rd Annual Walk against Crime sponsored by the Vicksburg Police Department.

- Sponsored the VSA Gator Bait Triathlon & Open Water Swim.

- Donated to the Bike for MS which is a fundraiser for Multiple Sclerosis.

- Donated to the Mississippi Division of Medicaid United Way Campaign.

- Donated cases of water to Revert Community Coalition Center Fun Day and to the Central Mississippi Prevention Services Annual Summer Leadership Camp.

- Sponsored Teddy Bearfest 2012 which is a historical celebration in Madison Parish.

- Sponsored a team in a 2-Man Golf Scramble at the Vicksburg Country Club.

- Donated to the Rally Round the River 5th Annual Bike Ride all proceeds from the event went to the American Cancer Society.

- Donated to the Vicksburg Homecoming Benevolent Club which raises scholarship funds for local high school students.

- Donated to the Laverne Russell Memorial Golf Tournament.

- Donated to the Canton Lions Club.

CONFIDENTIAL                                                                LEGENDS051569
13-01007 - #99-4  File 10/23/13  Enter 10/23/13 15:34:37  Exhibit -F- (part 3) Pg 23 of 50

- Donated to the Vicksburg Moose Lodge 1581.

- Donated to Bringing Gospel to the Bottom event which focuses on reaching those with needs with positive and uplifting events and providing scholarship funds for the youth of Vicksburg.

- Donated to the Vicksburg & Warren Central High School 20th Class Reunion.

- Donated door prizes for the Benefit for the Price Family.  All proceeds went to the Price Family.

- Donated to the Jackson 48 Hour Film Project.

- DiamondJacks team members participated in the Chill in the Hill event.  All proceeds from the event went to the Greater Christian Counseling Center.

- The University of Southern MS donated an auction item to support the Casino, Hospitality and Tourism Management Department.

- DiamondJacks supports the Southern Cultural Heritage Foundation with an annual donation as well as teams in the Over The River Run.

- DiamondJacks supports the Minority Contractors Association of MS.

- DiamondJacks supports the CAP Center of Vicksburg, a United Way Agency teaching parenting skills to parents at risk of abuse/neglect.

- DiamondJacks proudly support events that benefited the Sickle Cell Anemia Research such as The Nine Iron Golf Club, INC.

- DiamondJacks supports Jackson State University by contributing to their Scholarship Awards.

In addition to the many charities and events mentioned above, many of the Debtors' team members serve on the boards of local charities in order to better the community.

### 3.   Washington Street Bridge Closure and Construction Disrupts Mississippi Property

In early 2009, the 80-year old Washington Street Bridge located adjacent to the Mississippi Property, was closed to all vehicular traffic.  Washington Street is the city's main north-south thoroughfare and connects downtown Vicksburg to I-20.  The closure of this

{00328179-10}

CONFIDENTIAL                                                                                    LEGENDS0051570

13-01007 - #99-4  File 10/23/13  Enter 10/23/13 15:34:37  Exhibit -F- (part 3) Pg 24 of 50

thoroughfare and the erection of street barricades announcing that "the road and bridge ahead are both closed" approximately 75 yards before the entrance to DiamondJacks significantly impacted access to the Mississippi Property.

DiamondJacks, working closely with the City of Vicksburg and State Transportation Authorities, jointly developed a temporary bypass solution that was fully funded by the City of Vicksburg and was opened to traffic in mid-December 2010.   The construction of both the temporary bypass and a permanent roadway topped rail tunnel began in earnest in August 2010. During the construction of the bypass, the property endured intermittent disruptions to its entrance area. The temporary bypass expanded the previous two-lane entrance road to DiamondJacks to three lanes and allowed local traffic to traverse the parking lot and cross the railroad tracks at grade.   While this bypass greatly improved traffic flow, the Mississippi Property continued to be impacted by the traffic traversing the parking facilities and the construction of the permanent roadway topped rail tunnel.

The Department of Transportation completed the bridge in February of 2012 at a cost of approximately $8.0 million. Although the bridge is now open to local traffic, in March of 2012, the roadway at the bridge site collapsed due to an underground water leak and remained under construction with non-local traffic being directed away from DiamondJacks until October 2012.

### 4.   Operational Strategies

In order to create value and revenue, the Debtors focus on the mid-level gamer and incorporate the following operational strategies: (1) provide market leading guest services, (2) utilize proprietary marketing techniques, (3) exceed guest expectations with product offerings, (4) leverage technology to maximize resources, and (5) create value through competitive pricing.

### C.   FINANCIAL RESULTS

### 1.   Revenues

CONFIDENTIAL                                                                                          LEGENDS0051571

For the three month period ended June 30, 2012 compared to the prior year's period ended June 30, 2011, the casino revenues for the Mississippi Property increased due to the property being closed thirty-seven days in 2011 during the historic Mississippi River flooding. With respect to the Louisiana Property, the casino revenues declined primarily due to increased competition and an overall weak economic environment.

Consolidated gross operating revenues were approximately $33.9 million for the three month period ended June 30, 2012 compared to approximately $32.2 million in the prior year's period ended June 30, 2011, an increase of approximately $1.7 million, or 5.2%.   Gross operating revenues at the Mississippi Property increased approximately $4.0 million or 56.0% while the Louisiana Property decreased approximately $2.3 million or 9.0% over prior year's period.

Consolidated casino revenues, which comprise 79.6% of consolidated gross operating revenues, decreased approximately $1.1 million, or 4.2%, to approximately $27.0 million, in the three month period ended June 30, 2012, compared to the prior year's period ended June 30, 2011.

Casino revenues at the Louisiana Property for the three month period ended June 30, 2012 were approximately $17.8 million compared to $20.0 million in the prior year's period ended June 30, 2011, a decrease of approximately $2.2 million or 10.9%. The win per slot unit for the three month period ended June 30, 2012 was approximately $159 per unit compared to approximately $170 per unit in the prior year's period ended June 30, 2011. Other data points of interest related to the Louisiana Property include an average daily hotel rate of $71.11 per day compared to $71.99 per day in the prior year and a hotel occupancy rate of 60.5% compared to 58.9% in the prior year.

CONFIDENTIAL                                                          LEGENDS0051572
13-01007 - #99-4  File 10/23/13  Enter 10/23/13 15:34:37  Exhibit -F- (part 3) Pg 26 of 50

Casino revenues at the Mississippi Property were approximately $9.2 million for the three month period ended June 30, 2012 compared to $5.9 million in the prior year period, an increase of $3.3 million or 55.4%.  The win per slot unit for the three month period ended June 30, 2012 was approximately $112 per unit compared to approximately $118 per unit in the prior year's period ended June 30, 2011. Other data points for the Mississippi Property include an average daily hotel rate of $59.79 compared to $57.01 per day in the prior year's period ended June 30, 2011 coupled with an occupancy rate of approximately 88.0% versus 77.1% in the prior year.

Net operating revenues were approximately $26.0 million for the three month period ended June 30, 2012 compared to approximately $25.3 million in the prior year's period ended June 30, 2011, an increase of approximately $600,000, or 2.4%.

Consolidated gross operating revenues were approximately $71.2 million for the six month period ended June 30, 2012 compared to approximately $70.5 million in the prior year's period ended June 30, 2011, an increase of approximately $683,000, or 1.0%.  The increase in gross operating revenues at the Mississippi Property was approximately $3.1 million or 15.6%, while the Louisiana Property decreased approximately $2.4 million or 4.7% over the prior year's period.  Consolidated casino revenues, which comprise 80.2% of consolidated gross operating revenues, decreased $3,000, or 0.0% to $57.1 million.

### 2.    Operating Expenses

In the three month period ended June 30, 2012, operating expenses were approximately $26.1 million compared to $25.6 million in the prior year period, an increase of $512,000. Gaming taxes, which include gross gaming revenue taxes and other gaming device fees, totaled approximately $5.6 million or 21.27% of operating expenses compared to $5.8 million in the

CONFIDENTIAL    LEGENDS0051573
13-01007 - #99-4  File 10/23/13  Enter 10/23/13 15:34:37  Exhibit -F- (part 3) Pg 27 of 50

prior year's period, a decrease of approximately $272,000 or 4.7%. The State of Louisiana, the City of Bossier City, various Parishes and other agencies impose a combined total tax rate of approximately 26% on gaming revenues compared to the State of Mississippi with a total tax rate of approximately 12%. Marketing and administrative expenses which consist of advertising, direct mail, administrative costs including insurance, property management, security and corporate expenses totaled approximately $6.6 million or 25.3% of operating expenses compared to $5.9 million in the prior year's period, an increase of approximately $682,000 or 11.5%. Room operating expenses totaled approximately $570,000 or 2.2% of operating expenses compared to approximately $508,000 in the prior year's period, an increase of approximately $62,000 or 12.1%. Casino operating expenses totaled approximately $8.0 million or 30.7% of operating expenses compared to approximately $7.3 million in the prior year's period, an increase of approximately $738,000 or 10.1%. Depreciation and amortization expenses decreased approximately $1.0 million or 33.3% to $2.1 million, or 7.9% of operating expenses.

During the three month period ended June 30, 2012, other non-operating (including interest) expenses of approximately $9.8 million were recorded compared to approximately $8.3 million in the prior year period. Interest and waiver fee expense for the three month period was approximately $9.8 million. The net loss, for the three month period ended June 30, 2012 was approximately $10.0 million compared to a loss of $8.5 million in the prior year's period.

### 3. Cash

As of June 30, 2012 the Debtors had approximately $11.0 million in cash and cash equivalents which amount includes $652,000 in restricted cash posted in conjunction with the Debtors' Worker Compensation Policies. For the three month period ended June 30, 2012, the net cash used by financing activities was approximately $1.2 million.

CONFIDENTIAL                                                                    LEGENDS0051574
13-01007 - #99-4 File 10/23/13 Enter 10/23/13 15:34:37 Exhibit -F- (part 3) Pg 28 of 50

### D.    GAMING REGULATION OVERVIEW

The Debtors operate both Properties subject to certain local, state and federal regulatory authorities and bodies that govern gaming concerns.  The Debtors hold valid licenses to conduct gaming operations, and must meet stringent standards established and enforced by various federal, state and local government agencies, the Louisiana Gaming Control Board, the Mississippi Gaming Commission and the Colorado Division of Gaming[7] (collectively, the "Gaming Regulators").  The Gaming Regulators require, among other things, that the Debtors must maintain a minimum level of cash located in their bank accounts and at each Property.  The Gaming Regulators also restrict and regulate the manner in which the Debtors' ownership interests are held or transferred.  The Debtors' gaming licenses are subject to the continued review by Gaming Regulators and may be revoked for failing to follow certain regulations, guidelines and requirements.  The Gaming Regulators also require that the Debtors pay gaming fees and taxes in Louisiana and Mississippi, periodically renew their gaming licenses in the states of Louisiana, Mississippi and Colorado, and maintain state and local licenses to sell alcoholic beverages and tobacco.

The Gaming Regulators have broad authority and discretion to require the Debtors and their officers, directors, managers, members, employees and certain security holders (creditors) to obtain and maintain various licenses, registrations, permits, findings of suitability and other approvals.  To enforce applicable laws and regulations, Gaming Regulators may, among other things, limit, suspend or revoke the Debtors' licenses, levy fines against the Debtors, or direct that the Debtors forfeit certain assets.  In addition, the actions of persons associated with the Debtors and their management and employees are strictly scrutinized. The Debtors' management

---

[7] Even though the Debtors do not operate a casino in Colorado, Legends holds a valid license in the state of Colorado.

CONFIDENTIAL                                                                    LEGENDS0051575

13-01007 - #99-4  File 10/23/13  Enter 10/23/13 15:34:37  Exhibit -F- (part 3) Pg 29 of 50

teams continually work to assure compliance with all guidelines and requirements established and enforced by the Gaming Regulators. The Debtors also have a compliance committee with an independent chairperson for the purpose of assuring compliance with the gaming regulations. William P. Curran, former Chairman of the Nevada Gaming Commission, for approximately nine (9) years, past Chairman of the International Association of Gaming Regulators and current managing partner of Ballard Spahr Andrews and Ingersoll, LLP in Las Vegas, serves as Legends Gaming's Independent Chairman of the Company's Gaming Compliance Committee.

E.     2008 BANKRUPTCY CASES

On March 11, 2008, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court. The cases were jointly administered under Louisiana Riverboat Gaming Partnership, Case No. 08-10824 (the "2008 Bankruptcy Cases"). The Debtors filed for relief under Chapter 11 of the Bankruptcy Code when they breached a leverage covenant in their loan agreements with the First Lien Lenders and the Second Lien Lenders, and were unable to negotiate forbearance agreements, which the Debtors believed protected their assets from seizure.

On June 9, 2009, the Debtors filed the *Amended Joint Chapter 11 Plan of Reorganization for Louisiana Riverboat Gaming Partnership and Affiliates as of June 5, 2009* (the "2009 Plan") [P-705, Case No. 08-10824], which is the plan of reorganization the Bankruptcy Court announced in open court on June 7, 2009 that it would confirm. On June 17, 2009, the Bankruptcy Court signed the *Order Confirming Amended Joint Chapter 11 Plan of Reorganization for Louisiana Riverboat Gaming Partnership and Affiliates as of June 5, 2009* (the "Confirmation Order") [P-709, Case No. 08-10824], and the Confirmation Order was entered by the Clerk of Court on June 18, 2009.

The 2009 Plan went effective on September 18, 2009. Under the 2009 Plan, the Debtors

CONFIDENTIAL                                                                                    LEGENDS051576
13-01007 - #99-4  File 10/23/13  Enter 10/23/13 15:34:37  Exhibit -F- (part 3) Pg 30 of 50

retained ownership of and continued to operate their two "Diamond Jacks" hotels and casinos located in Bossier City, Louisiana and Vicksburg, Mississippi.  The 2009 Plan provided that the approximately $162.1 million of outstanding First Lien Lenders' Secured Claims and the approximately $75 million of Second Lien Lenders' Secured Claims were to be capitalized and paid in full, with interest, over time. Specifically, the First Lien Lenders' Claims were capitalized and paid in full, with interest at a rate of LIBOR plus 6.75% with a LIBOR floor of 2%. The $162.1 million claim was to be reduced to $158.1 million after a $15 million equity contribution was to be made by William J. McEnery, the Chairman and a manager and member of Legends, as discussed more fully below. The Second Lien Lenders' Secured Claims were divided into two tranches. The first tranche, consisting of $48.7 million, would be paid interest at a rate of LIBOR plus 10.5%, with a LIBOR floor of 2% and a LIBOR cap of 4%. The second tranche, consisting of approximately $26.3 million, plus any additional fee and charges allowed under Section 506(b) of the Bankruptcy Code, would be paid interest at a rate of 17%.  Under the 2009 Plan, the annual aggregate required payments of interest to the First Lien Lenders and the Second Lien Lenders was capped at $22 million.  This cap meant that the maximum "cash pay" interest, which must be paid annually to the First Lien Lenders and Second Lien Lenders, would not exceed $22 million.  Any interest owed to the Second Lien Lenders over the $22 million annual cap would be paid in kind (i.e., "PIK"). The principal and all unpaid interest due to the First Lien Lenders and the Second Lien Lenders would balloon and be due and payable in five years.

The 2009 Plan also provided that the Priority Tax Claims, the Other Secured Claims, the General Unsecured Claims and all other creditors would be paid in full, with interest. Legends Management, a non-Debtor affiliate, wholly owned by William J. McEnery, accepted preferred equity interests in lieu of payment of its unsecured claim. William J. McEnery agreed to

{00328179-10}                                            D-33

contribute $15 million in additional equity funds to the Debtors in return for Common and Preferred Interests in Legends Gaming.   Although William J. McEnery complied with his obligation to contribute $6 million to the Debtors on the effective date of the 2009 Plan, he defaulted in his obligation to pay the remaining $9 million for the benefit of the lenders under the Existing First Lien Credit Agreement (as defined below).[8]   The existing holders of Interests in the Debtors retained their Interests subject to dilution to take into account the new investment by William J. McEnery and the conversion of Legends Management's unsecured claim into equity.

Pursuant to the 2009 Plan, Legends, as borrower, entered into certain Amended and Restated Credit Agreement dated as of August 31, 2009 (as amended from time to time, the "Existing First Lien Credit Agreement") by and among Legends, as borrowers, the First Lien Lenders, and Wilmington Trust Company (as administrative agent) ("the First Lien Agent").   As of the Petition Date, the total amount outstanding under the Existing First Lien Credit Agreement was approximately $181,182,013.81 ("First Lien Lenders' Secured Claim").   The First Lien Lenders' Secured Claim is secured by a first lien on substantially all of the Debtors' assets.

Legends, as borrower, also entered into that certain Amended and Restated Second Lien Credit Agreement dated as of August 31, 2009 among Legends, Wells Fargo Bank, N.A. (as administrative agent) and various lenders (collectively, the "Second Lien Lenders") and various other parties (as amended from time to time, the "Existing Second Lien Credit Agreement" and, together with the Existing First Lien Credit Agreement, the "Existing Secured Credit Agreements").   As of the Petition Date, the total amount outstanding under the Existing Second

---

[8]   Mr. McEnery's default resulted in an Event of Default under the Existing First Lien Credit Agreement and the First Lien Lenders' $162.1 million claim accordingly was not reduced to $158.1 million.   The Event of Default was waived in accordance with the terms and conditions of that certain First Lien Credit Agreement Waiver Agreement dated as of January 12, 2011, which, *inter alia*, provided for an annual waiver fee payable to the administrative agent under the Existing First Lien Credit Agreement for the benefit of the lenders thereunder.   The First Lien Lenders' Secured Claim (as defined herein) includes waiver fees that had accrued but had not been paid as of the Petition Date.

CONFIDENTIAL                                                                LEGENDS051578
13-01007 - #99-4  File 10/23/13  Enter 10/23/13 15:34:37  Exhibit -F- (part 3) Pg 32 of 50

Lien Credit Agreement was approximately $116,252,898.38 ("Second Lien Lenders' Secured Claim").  The Second Lien Lenders' Secured Claim is secured by a second lien on substantially all of the Debtors' assets.

## F.    EVENTS LEADING TO THESE CHAPTER 11 CASES

Unfortunately, the projections by the Debtors (and the Second Lien Lenders' financial advisors) which supported the confirmation of the 2009 Plan were not realized, and the Debtors' revenues were unable to support the repayment of the total amount of debt to the First Lien Lenders and the Second Lien Lenders. Set forth below is the Debtors' Consolidated Income Statement reflecting the decrease in revenues Adjusted EBITDAM:

*Income Statement*

| ($ in millions) | | | Twelve Months Ended | | | | LTM |
|---|---|---|---|---|---|---|---|
| | 12/31/06 | 12/31/07 | 12/31/08 | 12/31/09 | 12/31/10 | 12/31/11 | 06/30/12 |
| **OPERATING REVENUES:** | | | | | | | |
| Casino | $62.3 | $159.1 | $148.8 | $133.3 | $126.9 | $111.8 | $111.8 |
| Rooms | 5.3 | 13.1 | 12.9 | 11.4 | 11.6 | 10.3 | 10.5 |
| Food, beverage and other | 9.1 | 23.4 | 21.2 | 20.9 | 20.1 | 17.3 | 17.8 |
| Gross revenues | $76.8 | $195.6 | $182.9 | $165.6 | $158.5 | $139.4 | $140.1 |
| Less promotional allowances | (16.4) | (42.0) | (38.7) | (38.4) | (35.5) | (30.6) | (31.7) |
| Net operating revenues | $60.4 | $153.6 | $144.2 | $127.2 | $123.1 | $108.9 | $108.4 |
| **OPERATING COSTS AND EXPENSES:** | | | | | | | |
| Casino | $15.4 | $39.9 | $37.6 | $35.1 | $35.7 | $32.3 | $32.8 |
| Rooms | 1.1 | 2.1 | 2.3 | 2.5 | 2.6 | 2.2 | 2.3 |
| Food, beverage and other | 2.7 | 5.1 | 5.1 | 4.9 | 4.7 | 4.2 | 4.4 |
| Gaming taxes | 12.8 | 32.4 | 30.8 | 27.7 | 26.3 | 23.7 | 23.4 |
| Marine and facilities | 4.1 | 9.8 | 9.8 | 8.9 | 8.4 | 8.5 | 8.6 |
| Marketing and administrative | 12.3 | 30.3 | 28.7 | 24.4 | 24.2 | 25.4 | 26.1 |
| Management Fees | 1.2 | 3.3 | 3.0 | 1.8 | 0.0 | 0.0 | 0.0 |
| Depreciation and amortization | 4.5 | 12.0 | 14.9 | 14.8 | 12.2 | 10.7 | 8.7 |
| Business interruption, net | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | (0.9) | (0.9) |
| Total operating costs and expenses | $54.0 | $134.9 | $132.2 | $120.1 | $114.1 | $106.1 | $105.5 |
| Operating income (loss) | $6.4 | $18.7 | $12.0 | $7.1 | $9.0 | $2.8 | $2.9 |
| **Adjusted EBITDAM Calculation** | | | | | | | |
| Operating income | $6.4 | $18.7 | $12.0 | $7.1 | $9.0 | $2.8 | $2.9 |
| Depreciation | 4.5 | 12.0 | 14.9 | 14.8 | 12.2 | 10.7 | 8.7 |
| Management fees | 1.2 | 3.3 | 3.0 | 1.8 | 0.0 | 0.0 | 0.0 |
| Weather | 0.0 | 0.0 | 0.0 | 0.0 | 0.4 | 3.2 | 0.0 |
| Severance | 0.0 | 0.0 | 0.0 | 0.0 | 0.4 | 2.0 | 2.0 |
| Waiver fees | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.2 | 0.0 |
| Restructuring fees | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 1.7 |
| Non-operating payroll and insurance | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.4 | 0.2 |
| Other | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.6 |
| Adjusted EBITDAM | $12.1 | $34.1 | $29.9 | $23.6 | $22.0 | $19.3 | $16.1 |

CONFIDENTIAL                                                                 LEGENDS0051579
13-01007 - #99-4  File 10/23/13  Enter 10/23/13 15:34:37  Exhibit -F- (part 3) Pg 33 of 50

The decreases in both gross revenues and Adjusted EBITDAM were the result of a variety of factors. The decrease in gross revenues at the Louisiana Property was primarily the result of increased competition from the Oklahoma market's newer gaming facilities, as well as the loss of fair share to other competitors due to liquidity constraints on marketing and capital expenditure initiatives. Furthermore, the decrease in gross revenues  at the Mississippi Property was primarily the result of the following events: (a) the DiamondJacks property was closed for 37 days due to the Mississippi River flooding in May and June of 2011 (longer than any of its local competitors, some of which opened within one week); (b) the Washington Street Bridge, a main route of access to the property, continued to be closed throughout 2011, not reopening until February 2012, and (c) the severe winter weather in January 2011.

Instead of increasing revenues and profits, as anticipated at the confirmation hearing in 2009, the performance of the Debtors' properties has been disappointing, and will clearly not sustain the ability of the Debtors to make the required payments to the First Lien Lenders and Second Lien Lenders. After the effective date of the 2009 Plan, during the course of 2010 and 2011, the Debtors' financial condition deteriorated, and the Debtors ultimately failed to make a regularly scheduled interest payment to the First Lien Lenders that was due on January 3, 2012. The Debtors' failure to make that payment after receiving written demand for payment from the First Lien Agent resulted in the occurrence of an Event of Default under the Existing First Lien Credit Agreement.  It also resulted in the occurrence of a cross-default under the Existing Second Lien Credit Agreement.  The Debtors also have not made any of the interest payments that have become due under the Existing First Lien Credit Agreement after January 3, 2012.

Given their inability to make their scheduled interest payments, competitive pressures and the Debtors' lack of resources to remain fully competitive in an increasingly difficult and

CONFIDENTIAL                                                                                    LEGENDS0051580

13-01007 - #99-4  File 10/23/13  Enter 10/23/13 15:34:37  Exhibit -F- (part 3) Pg 34 of 50

competitive market, the Debtors determined that a sale of substantially all of their assets would maximize the value of their enterprise.

The First Lien Agent and an *ad hoc* group of First Lien Lenders (the "First Lien Ad Hoc Group") retained Latham & Watkins LLP ("Latham") and Phelps Dunbar LLP ("Phelps Dunbar") as their counsel during the 2008 Bankruptcy Cases, and Latham continued to represent the First Lien Agent and the First Lien Ad Hoc Group after the effective date of the 2009 Plan. Upon the occurrence of the Event of Default under the Existing First Lien Agreement, the Debtors and their advisors maintained regular communications with the First Lien Ad Hoc Group and Latham. Latham engaged Houlihan Lokey Capital, Inc. ("Houlihan Lokey") as its financial advisor in connection with the Debtors, pursuant to the terms of a certain engagement letter dated as of March 29, 2012 (the "Houlihan Lokey Engagement Letter") among Latham, Houlihan and Legends Gaming, LLC. The Houlihan Lokey Engagement Letter provides, *inter alia*, that the Debtors would pay Houlihan Lokey (a) a non-refundable cash fee of $50,000 per month (which increased to $75,000 per month upon the filing of these chapter 11 cases), and (b) a deferred fee of $500,000 cash (the "Houlihan Lokey Deferred Fee") upon the consummation of a "Transaction" (as defined in the Houlihan Lokey Engagement Letter) subject to certain specified exclusions. The consummation of the transaction with the Purchasers under the Purchase Agreement and the Plan would entitle Houlihan Lokey to the Houlihan Lokey Deferred Fee (which the Plan provides would be paid directly to Houlihan Lokey on the Effective Date from the proceeds of the sale transaction). Latham and Phelps Dunbar represent the First Lien Agent and the First Lien Ad Hoc Group in these chapter 11 cases, and Houlihan Lokey continues to serve as Latham's financial advisor.

CONFIDENTIAL                                                                                    LEGENDS0051581

Also, the Debtors engaged Seaport as its financial advisor, pursuant to the terms of a certain engagement letter dated as of December 16, 2011, as amended ("Seaport Engagement Letter"), among Seaport Group Securities, LLC and Legends Gaming, LLC.   The Seaport Engagement Letter provides, *inter alia*, that the Debtors would pay Seaport (a) a cash fee of $87,500 per month, and (b) a deferred fee of $1,500,000 cash (collectively with the Houlihan Lokey Deferred Fee, the "Transaction Fees") upon the consummation of a "Transaction" (as defined in the Seaport Engagement Letter) subject to certain specified exclusions.

The consummation of the transaction with the Purchasers under the Purchase Agreement and the Plan would entitle Houlihan Lokey and Seaport to the Transaction Fees (which the Plan provides would be paid directly to Houlihan Lokey and Seaport on the Effective Date from the proceeds of the sale transaction).

## G.    SALE OF THE DEBTORS' ASSETS

The Debtors, after taking into account (i) their financial condition and resources, (ii) the views of the First Lien Lenders, (iii) the views of the Second Lien Lenders, (iv) the current and projected state of the Debtors' business performance, and (v) the competitive pressures impacting gaming in each of the Debtors' markets (as well as competitive pressures from geographically adjacent markets), concluded that a sale of their assets under the supervision of the Bankruptcy Court would maximize the value of their estates, while ensuring that the interests of the First Lien Lenders and Second Lien Lenders are considered and treated in accordance with their respective rights and priorities, and that the interests of the Debtors' trade creditors, employees and communities in which the businesses operate are protected.

CONFIDENTIAL                                                                        LEGENDS0051582

1.      **Global Gaming**

Global Gaming Solutions, LLC's ("Global Gaming"), the guarantor under the Purchase Agreement, primary business focus is pursuing entertainment, gaming and racing related opportunities in emerging jurisdictions in the United States and overseas, as well as the acquisition of regional gaming and entertainment assets. Global Gaming is owned by the Division of Commerce of the Chickasaw Nation, and as the operator of thirteen casinos and gaming centers in Oklahoma, is a market leader in the $3.5 billion Oklahoma gaming market. Global Gaming owns Remington Park, Racetrack and Casino in Oklahoma City. Also, Global Gaming, through a subsidiary, operates Lone Star Park in Grand Prairie, Texas. In addition, the Chickasaw Nation is engaged in a wide variety of commercial enterprises (through a number of wholly-owned subsidiaries), ranging from information technology and construction, to aviation and aerospace technologies. Accordingly, Global Gaming is an experienced gaming operator with substantial financial resources.

2.      **Purchase Agreement**

In late 2010, the Debtors determined, in light of increased competitive pressures and the general economic climate, that it was prudent to explore a strategic transaction with a well-capitalized and experienced gaming operator. As the Debtors had worked with the financial restructuring professionals who are now at Seaport during the 2008 Bankruptcy Cases, the Debtors reached out to the professionals at Seaport and commenced discussions with respect to a potential transaction.

Early in 2011, as such discussions were continuing, the Debtors were approached directly by Global Gaming. Global Gaming expressed a strong interest in the Debtors' assets and devoted

CONFIDENTIAL                                                                    LEGENDS0051583

13-01007 - #99-4  File 10/23/13  Enter 10/23/13 15:34:37  Exhibit -F- (part 3) Pg 37 of 50

a substantial amount of time pursuing a transaction over the course of 2011. Although the discussions that took place at that time did not result in an agreement or transaction, the process afforded Global Gaming an opportunity to undertake substantial due diligence with respect to the Debtors' assets and business.

In 2012, the Debtors approached Global Gaming as a potential stalking horse bidder in view of the parties' prior negotiations and Global Gaming's due diligence of the Debtors' business. After Global Gaming executed a letter of intent with respect to a transaction, the Debtors established an electronic data room and Global Gaming engaged in due diligence, which included site visits to the Debtors' facilities in Louisiana and Mississippi.

Through the process discussed above, and after extensive negotiations, the Sellers, and Riverboat Gaming, entered into a Purchase Agreement with the Purchasers and Global Gaming, as Guarantor, (collectively, such Global Gaming entities, the "Stalking Horse Bidder" or "Purchaser"), dated as of July 25, 2012 (the "Purchase Agreement"), a copy of which is attached to the Plan as Exhibit A.

The Purchase Agreement, subject to the approval of the Bankruptcy Court, provides for the Stalking Horse Bidder to purchase substantially all of the Debtors' Assets for the aggregate price of $125.0 million (the "Purchase Price"), and to assume certain of the Debtors' liabilities, including (i) all trade payables reflected or reserved for on the Closing Date Balance Sheet (as defined in the Purchase Agreement), and (ii) all Consumer Liabilities (as defined in the Purchase Agreement), in each case subject to the terms and conditions set forth in the Purchase Agreement. Through the assumption of such liabilities, the Purchase Agreement limits the impact of the sale, and these bankruptcy cases, on the Debtors' suppliers and customers. In addition, the sale of the Debtors' business as a going concern and the continued operation of the

CONFIDENTIAL                                                                    LEGENDS0051584
13-01007 - #99-4  File 10/23/13  Enter 10/23/13 15:34:37  Exhibit -F- (part 3) Pg 38 of 50

Debtors' gaming facilities in Louisiana and Mississippi will benefit the communities in which such facilities operate.

Under the Purchase Agreement, the consideration to be provided by the Stalking Horse Bidder will take two forms: cash and "take back" debt to be issued to the First Lien Lenders. The Purchase Agreement, together with the exhibits thereto that set forth the terms of such financing, provides for the First Lien Lenders to receive $61.5 million in new first lien debt, and $36.0 million of new second lien debt, to be issued in each case by Global Gaming Legends, LLC, and guaranteed by GGL Holdings, LLC ("Holdings") and each subsidiary of Holdings.[9] The remainder of the Purchase Price (less the deposit in the amount of $6.25 million that the Stalking Horse Bidder has already placed into escrow) will be paid in cash at the Closing, subject to a post-closing adjustment as set forth in the Purchase Agreement. As the Purchase Agreement provides for a purchase price ($125.0 million) that is considerably below the amount due to the First Lien Lenders (approximately $181.2 million) and includes "take back" financing, the terms of the Purchase Agreement and the "take back" financing have been fully discussed and negotiated with the First Lien Ad Hoc Group, who supports the proposed process and entered into that certain Restructuring and Plan Support Agreement (the "Plan Support Agreement") along with certain other First Lien Lenders, as discussed more fully below.

**3.     Bid Procedures and Marketing of Debtors' Assets**

On the Petition Date, the Debtors filed the *Motion Pursuant to 11 U.S.C. §§ 105(A) & 363(B) and Federal Rules of Bankruptcy Procedure 2002 & 6004 for Entry of an Order (A) Approving Bidding Procedures and (B) Granting Certain Bid Protections* [P-23], seeking approval of the proposed bid procedures ("Bid Procedures") for the sale of the Debtors' Assets

---

[9] The new first lien credit agreement is attached as Exhibit D to the Purchase Agreement, and the term sheet with respect to the new second lien debt is attached as Exhibit G to the Purchase Agreement.

CONFIDENTIAL                                                                      LEGENDS0051585

and certain bid protections for the Stalking Horse Bidder in the event the Stalking Horse Bidder was not the Successful Bidder at the auction for the Debtors' Assets. On August 23, 2012, the Bankruptcy Court entered an order [P-140] approving the Bid Procedures and the bid protections to the Stalking Horse Bidder.

The Bid Procedures outlined the bid procedures for the proposed sale of the Assets and provided the opportunity for the Debtors to obtain a higher and better offer for their Assets, and to consummate an Alternative Transaction (as defined in the Purchase Agreement) with respect to such offer. The Bid Procedures also established that should the Debtors not be able to obtain a higher and better offer, then the Debtors' estates and their creditors were still protected as the Stalking Horse Bidder remained obligated to consummate the transaction pursuant to the Purchase Agreement.

In order to maximize the value of the Debtors' Assets for the benefit of the Debtors' estates and their respective creditors, the Debtors implemented a competitive bidding process through the Bid Procedures. The Bid Procedures provided interested parties with ample opportunity to formulate bids for the Debtors' Assets and facilitate the solicitation, submission and evaluation of significant bids for such Assets in a manner that would maximize the value of the Debtors' estates.

The Bankruptcy Court-approved Bid Procedures constituted a reasonable and effective method of maximizing a return on the Debtors' Assets through a competitive sale process. The Bid Procedures fully described, among other things, the manner in which prospective bidders could gain access to due diligence materials concerning the Debtors' Assets, the manner in which bidders and bids become Qualified Bidders and Qualified Bids, respectively, the conduct

CONFIDENTIAL                                                                                           LEGENDS0051586

of any subsequent Auction, the ultimate selection of the Successful Bidder, among other aspects of the Auction process.

Furthermore, the Bid Procedures incorporated certain deadlines for the completion of the Debtors' marketing process. In light of such deadlines, the Debtors and their advisors undertook several steps prior to the commencement of the Debtors' cases to expedite the marketing process in accordance with the overall objective of enhancing the opportunity to obtain Qualified Bids to maximize distributions to creditors.

Immediately following the signing of the Purchase Agreement and for approximately two months, Seaport vigorously marketed the Debtors' Assets in an attempt to obtain the highest and best offer for the Assets. Seaport contacted ninety-five potential purchasers, including 35 financial buyers and 60 strategic buyers concerning the prospect of purchasing the Debtors' Assets.  The prospects included domestic and international casino operators and owners, private equity and hedge fund buyers and other family office funds.   The companies contacted by Seaport were "prospects" generated from their internal resources, investor databases, and companies that contacted Seaport regarding the opportunity.  Seaport also invited several parties into the process that were suggested to them by Houlihan Lokey.

Of the ninety-five overall prospects, twenty-four parties requested non-disclosure agreements and seventeen parties executed these agreements. Detailed discussions and conversations were had with these seventeen potential buyers. Seaport was involved in numerous telephone conferences with the interested prospects and, along with officials of the Debtors, complied with due diligence requests from those parties.

In order to expedite the due diligence process, Seaport worked with the Debtors to establish an electronic data room which was made available to any prospective bidder who

CONFIDENTIAL                                                                                                   LEGENDS0051587

executed a Confidentiality Agreement. The data room contained over four hundred documents, analyses, forecasts and budgets providing detailed information to prospective buyers such as, Global Gaming's Purchase Agreement including new Credit Agreements terms, the Bid Procedures, a Confidential Information Memorandum describing the Debtors' Assets, the Debtors' historical financial statements on both an individual and consolidated basis, employee benefit plans and many other topics. In addition, any prospective bidder had the ability to quickly come "up to speed" as to any potential transaction by reviewing the Purchase Agreement, together with all of its exhibits and schedules.

Seaport also held site tours for interested parties touring each of the casino locations in Bossier City, Louisiana and Vicksburg, Mississippi. Two groups toured the properties with Seaport, and one additional group toured the properties separately.

Under the Bid Procedures, any Potential Bidders had until September 7, 2012 to submit a preliminary letter of intent and certain other information necessary for the Debtors to assess the Potential Bidders' interest in, and ability to consummate, a transaction regarding the Debtors' Assets. In accordance with the deadlines set forth in the Bid Procedures, Seaport received two Letters of Intent for the purchase of the Assets on September 7, 2012. One Letter of Intent was for substantially all of the Debtors' Assets, but did not offer to pay the minimum overbid amount required by the Bid Procedures Order. The other Letter of Intent was for the Debtors' Vicksburg, Mississippi asset solely, in contravention of the Bid Procedures Order.

Seaport discussed both Letters of Intent with the Debtors and neither was deemed to be a Qualified Bid as defined by the Bid Procedures Order. Seaport reengaged in discussions with both parties that submitted Letters of Intent and advised them accordingly and encouraged each to modify their bids.

CONFIDENTIAL                                                                      LEGENDS0051588

Those Potential Bidders that were designated as Qualified Bidders had until September 24, 2012 at 11:59 p.m. (CST) ("Bid Deadline") to submit to the Debtors their definitive bid materials, which must have included, among other things, a duly authorized and executed purchase agreement with a copy marked to show all changes from the form of Purchase Agreement that would serve as an irrevocable offer pending the Debtors' selection of a Successful Bidder for such assets. *See*, Bid Procedures, Section L(2). As of the Bid Deadline, the Debtors had not received any Qualified Bids for the Debtors' Assets.  As of the date of this Disclosure Statement, the Debtors still have not received any Qualified Bids.

In accordance with Section N of the Bid Procedures, the Debtors filed a *Notice of the Stalking Horse Bidder as the Successful Bidder for the Debtors' Assets* [P-202], notifying the Court that since the Debtors did not receive any Qualified Bids other than the Stalking Horse Bid as of the Bid Deadline, the Debtors were not going to conduct an Auction, and pursuant to the Bid Procedures, the Stalking Horse Bid was deemed the Successful Bid.

Pursuant to the Plan, the Debtors are now seeking approval of the sale of the Purchased Assets to the Purchasers as the Successful Bidder. The closing of the sale pursuant to the Bid Procedures is contingent upon confirmation of the Plan. In addition, the closing of any sale may involve additional intermediate steps or transactions to facilitate consummation of such sale.

**G.      PLAN SUPPORT AGREEMENT**

On July 25, 2012, the Debtors entered into the Plan Support Agreement with holders of approximately 62% of the outstanding first lien claims against the Debtors (the "Consenting First Lien Lenders").  A copy of the Plan Support Agreement (with appropriate redactions) is annexed hereto as Exhibit D-4.

**IV.** The Plan Support Agreement set forth a clear path for the Debtors' exit from bankruptcy, i.e., for the sale of the Debtors' assets and payment of Claims and Interests under the

CONFIDENTIAL                                                                                 LEGENDS0051589

Plan. Pursuant to the Plan Support Agreement, the parties agreed to the terms of a pre-negotiated consensual plan to be filed with the Bankruptcy Court, and the Debtors have filed the Plan in accordance with the Plan Support Agreement. Further, to expedite and ensure the implementation of the Plan, each of the Consenting First Lien Lenders agreed to commit, on the terms and subject to the conditions of the Plan Support Agreement and applicable law, if and when solicited in accordance with applicable bankruptcy law, to accept the plan and support its confirmation.

A.      **SIGNIFICANT POST-PETITION EVENTS**

On July 31, 2012, all Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. Immediately after filing the voluntary petitions, the Debtors filed a *Motion for Order Under Fed.R.Bankr.P. 1015(b) Directing Joint Administration of Chapter 11 Cases* [P-2]. The Court entered an order [P-6] directing consolidation of the cases for procedural purposes and joint administration.

1.      **First Day Motions**

On July 31, 2012, the Debtors filed the following "first day" motions and pleadings:

(a)      Motion to Limit Notice [P-3];

(b)      Emergency Motion for Entry of an Order Under 11 U.S.C. §§ 105, 363, 364, 1107 and 1108 Authorizing Maintenance of Existing Bank Accounts, Continued Use of Existing Business Forms, Continued Use of Existing Cash Management System and for Related Relief [P-4];

(c)      Emergency Motion for Order Under 11 U.S.C. §§ 105, 363 and 1108 and 28 U.S.C. § 959(b) Authorizing Debtors to Honor Customer Deposits, Gaming Operation Liabilities and All Obligations Under Gaming Acts and the Regulations [P-5];

(d)      Application for Authority to Employ and Compensate Certain Professionals Utilized in the Ordinary Course of the Debtors' Business [P-14];

(e)      Motion for Administrative Order Under Sections 105(a) and 331 of the Bankruptcy Code Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals [P-15];

CONFIDENTIAL                                                                                    LEGENDS0051590
13-01007 - #99-4  File 10/23/13  Enter 10/23/13 15:34:37  Exhibit -F- (part 3) Pg 44 of 50

(f)     Motion of the Debtors Pursuant to Rule 1007(c) of the Federal Rules of Bankruptcy Procedure for an Extension of Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases and Statements of Financial Affairs [P-16];

(g)     Motion for Authority to Pay Employees' Pre-petition Wages, Related Expenses, Benefits and Taxes [P-17];

(h)     Motion for an Order Authorizing the Debtors to Pay Certain Prepetition Taxes [P-18];

(i)     Motion for Authority to (A) Pay Post-petition Installments on Insurance Policies and (B) Pay Premiums, if any, Necessary to Maintain Insurance Coverage in Current Effect [P-19];

(j)     Motion for Authority to Approve Compensation and Payments to Insiders [P-21];

(k)     Motion for Interim and Final Orders: (A) Prohibiting Utilities from Altering, Refusing or Discontinuing Services to, or Discriminating Against, the Debtors on Account of Prepetition Invoices; (B) Determining that the Utilities are Adequately Assured of Future Payment; (C) Establishing Procedures for Determining Requests for Additional Assurance; and (D) Permitting Utility Companies to Opt Out of the Procedures Established Herein [P-22];

(l)     Motion Pursuant to 11 U.S.C. §§ 105(A) & 363(B) and Federal Rules of Bankruptcy Procedure 2002 & 6004 for Entry of an Order (A) Approving Bidding Procedures and (B) Granting Certain Bid Protections [P-23];

(m)     Emergency Motion for Entry of Order Pursuant to Sections 361 and 363 of the Bankruptcy Code and Bankruptcy Rule 4001 for Interim and Final Orders: (1) Authorizing Use of Cash Collateral; (2) Granting Adequate Protection; (3) Modifying the Automatic Stay; (4) Scheduling and Approving the Method of Notice for the Final Hearing; and (4) Providing Related Relief [P-24]; and

(n)     Motion for an Order Authorizing the Debtors to Pay Prepetition Claims of Certain Critical Vendors in the Ordinary Course of Business [P-25].

## 2.     Operational First Day Orders

On August 3, 2012, the Bankruptcy Court held a hearing on the first day motions and pleadings.  After the hearing, the Bankruptcy Court entered the following first day orders which enabled the Debtors to continue their operations on an uninterrupted basis:

CONFIDENTIAL                                                                          LEGENDS0051591

(a)     Order Granting Motion for Authority to Pay Employees' Pre-Petition Wages, Related Expenses, Benefits and Taxes [P-52];

(b)     Order Authorizing the Debtors to Pay Certain Pre-Petition Taxes [P-53];

(c)     Order Granting Motion for Authority to (A) Pay Post-Petition Installments on Insurance Policies and (B) Pay Premiums, if any, Necessary to Maintain Insurance Coverage in Current Effect [P-54];

(d)     Order Granting Motion Authorizing the Debtors to Pay Pre-Petition Claims of Certain Critical Vendors [P-55];

(e)     Interim and Proposed Final Order, Pursuant to Section 366 of the Bankruptcy Code: (A) Prohibiting Utilities Form Altering, Refusing or Discontinuing Services to, or Discriminating Against, the Debtors on Account of Prepetition Invoices; (B) Determining that the Utilities are Adequately Assured of Future Payment; (C) Establishing Procedures for Determining Requests for Additional Assurance; and (D) Permitting Utility Companies to Opt Out of the Procedures Established Herein [P-56];

(f)     Final Order Authorizing Debtors to Honor Customer Deposits, Gaming Operation Liabilities and all Obligations Under Gaming Acts and Regulations [P-91]; and

(g)     Interim Order Approving Compensation and Payments to Insiders and Scheduling Final Hearing [P-98].

**3.      Other First Day Orders**

In addition to the operational first day orders referenced above, the Bankruptcy Court also entered the following orders:

(a)     Order Granting Motion to Limit Notice [P-9];

(b)     Interim Order Authorizing Maintenance of Existing Bank Accounts, Continued Use of Existing Business Forms, Continued Use of Existing Cash Management System and for Related Relief [P-10];

(c)     Interim Order Authorizing Debtors to Honor Customer Deposits, Gaming Operation Liabilities and all Obligations under Gaming Acts and Regulations [P-11];

(d)     Interim Order Authorizing Employment and Compensation of Certain Professionals Utilized in the Ordinary Course of the Debtors' Business [P-94];

(e)     Interim Administrative Order Under §§ 105(a) and 331 of the Bankruptcy Code Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals and Official Committee Members [P-95];

CONFIDENTIAL                                                                              LEGENDS0051592

(f)     Order Pursuant to Bankruptcy Rule 1007(c) of the Federal Rules of Bankruptcy Procedure Granting Extension of Time to File Schedules of Assets and Liabilities, Schedule of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases and Statements of Financial Affairs [P-96]; and

(g)     Order Granting Motion Pursuant to  11 U.S.C. §§ 105(A) & 363(B) and Federal Rules of Bankruptcy Procedure 2002 & 6004 for Entry of an Order (A) Approving Bidding Procedures and (B) Granting Bid Protections [P-140].

Certain of the orders initially entered by the Bankruptcy Court were interim orders [P-10, 11, 56, 94, 95, and 98].  The Court held a final hearing on those matters on September 13, 2012, and, after that hearing, entered the following final orders:

(a)     Final Order Authorizing Employment and Compensation of Certain Professionals Utilized in the Ordinary Course of Debtors' Business [P-196];

(b)     Final Administrative Order Under §§ 105(a) and 331 of the Bankruptcy Code Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals and Official Committee Members [P-197]; and

(c)     Final Order Approving Compensation and Payment to Insiders [P-199].

**4.     Cash Collateral Orders**

After an interim hearing on August 3, 2012, the Bankruptcy Court entered an interim order [P-57] on the Debtors' *Emergency Motion for Entry of Order Pursuant to Sections 361 and 363 of the Bankruptcy Code and Bankruptcy Rule 4001 for Interim and Final Orders: (1) Authorizing Use of Cash Collateral; (2) Granting Adequate Protection; (3) Scheduling and Approving the Form and Method of Notice for Final Order; and (4) for Related Relief* [P-24] ("Cash Collateral Motion").   As a result of this order, the Debtors were allowed to use their ongoing revenue and cash on hand to pay their operating and administrative expenses (as detailed in a budget) on an interim basis until a final hearing could be held on the Cash Collateral Motion.

CONFIDENTIAL                                                                 LEGENDS0051593

The final hearing on the Cash Collateral Motion was held on September 21, 2012.  After the hearing, the Bankruptcy Court entered its *Final Cash Collateral Order Pursuant to Sections 361, 362 and 363 of the Bankruptcy Code and Bankruptcy Rule 4001: (1) Authorizing Use of Cash Collateral; (2) Granting Adequate Protection; (3) Modifying the Automatic Stay; and (4) Providing Related Relief* [P-193] (the "Final Cash Collateral Order").  Pursuant to the Final Cash Collateral Order and the budget attached thereto, the Debtors were authorized to use cash collateral until December 31, 2012.

### 5.    Employment of Professionals of Debtors

On August 8, 2012, the Bankruptcy Court entered an order approving the employment of Heller, Draper, Patrick & Horn, L.L.C. [P-90] as bankruptcy counsel for the Debtors.  On the same day, the Bankruptcy Court entered an interim order granting the application to employ Marc B. Hankin and Jenner & Block LLP [P-92] as special counsel for the Debtors. On August 23, 2012, the Bankruptcy Court entered a final order granting the application to employ Marc B. Hankin and Jenner & Block LLP [P-138] as special counsel for the Debtors.

### 6.    Other Professionals Employed by the Debtors

On July 31, 2012, the Debtors filed an Application to Employ Kurtzman Carson Consultants, LLC ("KCC") to serve as their claims, noticing and balloting agent [P-20]. On August 8, 2012, the Bankruptcy Court entered an interim order [P-97] appointing KCC as claims, noticing, soliciting and balloting agent. On September 26, 2012 the Bankruptcy Court entered a final order granting the application to employ KCC [P-198].

On July 31, 2012, the Debtors filed an Application for Entry of an Order Authorizing the Employment and Retention of Seaport as financial advisor to the Debtors [P-13].  On August 8, 2012, the Bankruptcy Court entered an interim order [P-93] authorizing the employment and

CONFIDENTIAL                                                                                 LEGENDS0051594

retention of Seaport as financial advisor to the Debtors.  On August 23, 2012, the Bankruptcy Court entered a final order granting the application to employ Seaport [P-139].

### 7. Monthly Operating Reports, Schedules, Statement of Financial Affairs, Meeting of Creditors, and Bar Date

The Debtors have filed their monthly operating reports on a timely basis and complied with all requests for information by the United States Trustee.

On August 24, 2012, in compliance with the Court's order [P-96], the Debtors filed their schedules and statements of financial affairs for all of the Debtors.  On September 12, 2012, the initial meeting of creditors pursuant to Section 341 of the Bankruptcy Code was held in Shreveport, Louisiana.

On October 5, 2012 this Court entered an order [P-216] approving the Debtors' *Ex Parte Motion for an Order (A) Establishing a Bar Date Bar Date and Governmental Bar Date for Filing of Proofs of Claim, (B) Approving the Bar Date Notice (C) Authorizing the Debtors to Provide Notice of the Bar Date and (D) Providing for Other Relief Sought Herein* [P-208].  The Debtors served the Notice of the Claims Bar Date of November 15, 2012 at 4:30 P.M. prevailing Central Time (the "Bar Date") and the Governmental Bar Date of January 28, 2013 at 4:30 prevailing Central Time.   The Debtors estimate that the Claims against the Debtors are essentially in the amounts set out in the Summary of Classification and Treatment of Creditors and Interest Holders set forth in Section II of this Disclosure Statement, subject to any rights and defenses thereto.

{00328179-10}                                               D-51

# V.   THE PLAN

## A.   BUSINESS MODEL UNDER THE PLAN

Attached as Exhibit <u>D-2</u> to this Disclosure Statement, entitled "<u>Financial Projections</u>," is information reflecting the Purchasers projected cash flow from business operations under the Plan.

## B.   IMPLEMENTATION OF THE PLAN

### 1.   Purchase and Sale.

Section 7.1 of the Plan provides:

(a)   *Purchased Assets.*  In accordance with the terms and conditions of the Purchase Agreement, at the Closing, the Sellers shall sell, transfer, assign and convey, and the Purchasers shall acquire and assume, all right, title and interest of the Sellers in the Purchased Assets, pursuant to Sections 105(a), 363, 365, 1123(b)(4), 1129 and 1146(a) of the Bankruptcy Code, as follows:

(i)   Legends Gaming shall sell, transfer, assign and convey, and Global Legends shall acquire and assume, all of the rights, title and interest of Legends Gaming in the Purchased Assets;

(ii)   Legends MS shall sell, transfer, assign and convey, and Global Vicksburg shall acquire and assume, all of the rights, title and interest of Legends MS in the Purchased Assets; and

(iii)   Legends LA-1 and Legends LA-2 shall sell, transfer, assign and convey, and Global Louisiana shall acquire and assume, all of the rights, title and interests of Legends LA-1 and Legends LA-2, respectively, in the Purchased Assets.

(b)   *Excluded Assets.*  The Excluded Assets are not part of the sale and purchase contemplated by the Purchase Agreement, are excluded from the Purchased Assets and will vest in the Liquidating Debtors at the Closing.

(c)   *Assumed Liabilities.*  Subject to the terms and conditions of the Purchase Agreement, at the Closing, the Purchasers shall assume and timely perform and discharge in

CONFIDENTIAL                                                                                      LEGENDS0051596
13-01007 - #99-4  File 10/23/13  Enter 10/23/13 15:34:37  Exhibit -F- (part 3) Pg 50 of 50