Exhibit -F-

HDPH DRAFT 10/25/2012
**FOR DISCUSSION PURPOSES ONLY**

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF LOUISIANA**
**SHREVEPORT DIVISION**

```
-------------------------------------------------x
```
| | | |
|---|---|---|
| **In re** | : | **Case No. 12- 12013** |
| | : | |
| **LOUISIANA RIVERBOAT GAMING** | : | **Chapter 11** |
| **PARTNERSHIP,** *et al.*[1] | : | |
| | : | **Jointly Administered** |
| **Debtors.** | : | |
```
-------------------------------------------------x
```

# JOINT CHAPTER 11 PLAN
# FOR LOUISIANA RIVERBOAT GAMING PARTNERSHIP AND
# AFFILIATES AS OF OCTOBER 26 , 2012

HELLER, DRAPER,  PATRICK
 & HORN, L.L.C.
William H. Patrick, III (La. Bar No. 10359)
Tristan E. Manthey (La. Bar No. 24539)
650 Poydras Street, 25th Floor
New Orleans, LA 70130-6103
Telephone: (504) 299-3300
Facsimile: (504) 299-3399

Counsel for Debtors and Debtors in Possession

JENNER & BLOCK LLP

Marc B. Hankin
919 Third Ave.
37th Floor
New York, NY 10022
Tel: (212) 891-1600
Fax: (212) 891-1699

Special Counsel to the Debtors
and Debtors in Possession

---

[1] Legends Gaming of Louisiana-1, LLC (12-12014); Legends Gaming of Louisiana-2, LLC (12-12015); Legends Gaming, LLC (12-12017); Legends Gaming of Mississippi, LLC (12-12019); and Legends Gaming of Mississippi RV Park, LLC (12-12020) are being jointly administered with Louisiana Riverboat Gaming Partnership pursuant to order of this Court [P-6].

{00328380-22}

**HDPH DRAFT 10/25/2012**
**FOR DISCUSSION PURPOSES ONLY**

## EXHIBITS

Exhibit "A":   Purchase Agreement (Excluding Exhibits)

Exhibit "B":   Form of New First Lien Credit Agreement

Exhibit "C":   Term Sheet Relating to New Second Lien Credit Agreement

Exhibit "D":   Retained Causes of Action (Including Causes of Action transferred to
Purchasers)

{00328380-22}

HDPH DRAFT 10/25/2012
FOR DISCUSSION PURPOSES ONLY

Louisiana Riverboat Gaming Partnership, Legends Gaming of Louisiana-1, LLC, Legends Gaming of Louisiana-2, LLC, Legends Gaming, LLC, Legends Gaming of Mississippi, LLC,  and Legends Gaming of Mississippi RV Park, LLC, as debtors and debtors-in-possession (each a "Debtor" and collectively, the "Debtors"), propose the following Joint Chapter 11 Plan with respect to each of their Chapter 11 Cases.

# ARTICLE 1

## DEFINITIONS AND CONSTRUCTION OF TERMS

Unless the context requires otherwise, each term stated in either the singular or the plural will include the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender will include the masculine, the feminine and the neuter. Unless the context requires otherwise, the following words and phrases will have the meanings set forth below when used in the initially-capitalized form in this Plan: An initially capitalized term used herein that is not defined herein shall have the meaning ascribed to such term, if any, in the Bankruptcy Code, unless the context shall otherwise require.   The words "in this Plan", "this Plan", "hereto", "hereof," "herein," or "hereunder" and other words of similar import, unless specifically stated otherwise, refer to the entirety of the Plan, and not to a particular section of the Plan.   The words "Article," "section," "subsection," "clause" or "sentence" refer to particular provisions of the Plan and not to the entirety thereof. The word "including" (and with correlative meaning, the word "include") means including, without limiting or restricting the generality of any description preceding the word "including" or "include," and shall mean "including, but not limited to."   The use of the word "any" shall mean "any and

1

{00328380-23}

all," and the use of the word "all" shall also mean "any and all."  The words "shall" and "will" are used interchangeably and have the same meaning.   Unless the context requires otherwise or unless otherwise defined within the Purchase Agreement (as defined herein), the following words and phrases shall have the meanings set forth below when used in initially capitalized form in this Plan:

1.1      *"Adjusted Cash Purchase Price"* means (a) the Cash Purchase Price, minus (b) the Deposit Escrow Funds, plus (c) the Estimated Working Capital Excess Amount, if any, minus (d) the Estimated Working Capital Shortfall Amount, if any.

1.2      *"Administrative Expense Claim"* shall mean a Claim for any cost or expense of administration of any Debtor's Chapter 11 Case entitled to priority in accordance with the provisions of Sections 503(b), 507(b) or 1114(e)(2) of the Bankruptcy Code, including, without limitation, (a) actual and necessary expenses of preserving the Estates and operating the Debtors' businesses (including, without limitation, the Cure Costs with respect to executory contracts and unexpired leases assumed by the Debtors pursuant to Section 365 of the Bankruptcy Code) and Wind Down Expenses, (b) fees and expenses of Professionals to the extent allowed by a final order under Sections 328, 330 and 503 of the Bankruptcy Code, (c) fees and charges properly assessed against the Debtors in Possession under Section 1930 of title 28 of the United States Code, (d) all unpaid post-petition payments authorized and payable under the Final Cash Collateral Order; and (e) any personal injury claims or workers compensation claims that arose between the Petition Date and the Effective Date.

1.3      *"Allowed"* shall mean with respect to any Claim against or Interest in any Debtor, a Claim or Interest (a) proof of which is timely Filed (or by order of the

2

{00328380-23}

Bankruptcy Court or as otherwise provided herein is not required to be Filed), (b) that is listed by such Debtor in its Schedules as liquidated in amount, non-disputed and non-contingent and for which no proof of claim has been Filed, or (c) expressly allowed pursuant to this Plan; and, in each case with respect to (a) and (b) above, either (i) no objection (or an amendment of the Schedules with respect thereto) to its allowance, amount, or classification has been interposed within the applicable period for filing same fixed by this Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, or (ii) such objection (or an amendment of the Schedules with respect thereto), if so interposed, has been determined and fixed by a Final Order (but only to the extent so determined and fixed and not where fixed and allowed solely for purposes of voting to accept or reject the Plan).  Claims that are not Allowed or are disallowed by Final Order or otherwise, including those disallowed under Section 502(d) of the Bankruptcy Code, shall not be Allowed Claims.

1.4     *"Allowed Amount"* shall mean, with respect to each Claim:

(a) the dollar amount of an Allowed Claim as determined by a Final Order or as set forth in this Plan;

(b) in the event that no such determination of the Allowed Amount of a Claim is made pursuant to subsection (a), the dollar amount agreed to by the Claimant and the applicable Debtor or, after the Effective Date, the applicable Liquidating Debtor;

(c) in the event that no Allowed Amount is determined pursuant to clause (a) or agreed to pursuant clause (b) above, the amount estimated by a Final Order of the Bankruptcy Court for purposes of distribution pursuant to Section 502 of the Bankruptcy Code; or

(d)  in the event that an Allowed Amount is not determined, agreed to or estimated pursuant to clauses (a), (b) or (c) above, the dollar amount as to which no objection to the allowance, amount or classification thereof has been

3

CONFIDENTIAL

LEGENDS0051651

interposed within the applicable period fixed by this Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court.

Unless otherwise specified herein or in a Final Order, the Allowed Amount of any Claim shall not include interest accruing on such Claim from and after the Petition Date.

1.5 *"Allowed Claim"* shall mean a Claim to the extent that it has been Allowed.

1.6 *"Applicable Laws"* means all domestic or foreign statutes, laws, regulations, rules, ordinances and orders of any Governmental Authority having jurisdiction over an applicable Person or its properties, including any Gaming Regulations (as defined in the Purchase Agreement).

1.7 *"Assets"* shall mean all property of the Debtors as defined in Section 541(a) of the Bankruptcy Code, including but not limited to, all of the Debtors' rights, title and interests in and to all immovable and real property and appurtenances thereto, improvements thereon, cash, deposits, telephone numbers, trade names, trade secrets, trademarks, copyrights, business "know how," goodwill, bank accounts of any and all types of any kind, tangible personal property, furniture, fixtures, equipment, machinery, inventory, general intangibles, general accounts, accounts receivable, intellectual property of all types and kinds, contract rights, licenses and permits, contracts and agreements, privileges of any and all kinds, and any and all other property and rights of the Debtors and their estates, including any and all Avoidance Claims and Causes of Action and any and all defenses, which could be exercised by or on behalf of a Chapter 11 trustee or a debtor in possession.

4

{00328380-23}

CONFIDENTIAL
LEGENDS0051652

1.8     *"Assumed Agreements"* means the agreements that are assigned to the Purchasers pursuant to Section 365 of the Bankruptcy Code, the Confirmation Order or other order of the Bankruptcy Court, as applicable, and that are listed on Schedule 1.1(a) or Schedule 6.1(b) of the Purchase Agreement or otherwise designated by the Purchasers as Assumed Agreements pursuant to <u>Section 2.6(e)</u> of the Purchase Agreement.

1.9     *"Assumed Leases"* means the leases that are assumed by the Sellers and assigned to the Purchasers pursuant to Section 365 of the Bankruptcy Code, the Confirmation Order, or other order of the Bankruptcy Court, as applicable, and that are listed on Schedule 1.1(b) of the Purchase Agreement.

1.10    *"Assumed Liabilities"* means the following Liabilities (to the extent not paid prior to the Closing):

(a)     all trade payables of the Sellers to the extent reflected or reserved for on the Closing Date Balance Sheet;

(b)     all Consumer Liabilities of the Sellers;

(c)     any other Liabilities with respect to the Business and the Purchased Assets to the extent such Liabilities relate to the conduct of the Business from and after the Closing;

(d)     all Liabilities of the Sellers arising under the Assumed Agreements and the Assumed Leases, except for (i) Cure Costs arising under such Assumed Agreements and Assumed Leases and (ii) Liabilities arising from any breach under any such Assumed Agreement or Assumed Lease occurring prior to the Closing;

(e)     the Liabilities of the Sellers arising in the Ordinary Course of Business under purchase orders with suppliers open as of the Closing Date;

(f)     (i) all Liabilities arising out of or relating to any Transferred Employee, including those Liabilities set forth in <u>Section 5.2(e)</u> of the Purchase Agreement, and all Liabilities arising out of or relating to any consultant, independent contractor or contract employee of the Business who performs services for any Purchaser on and after the Closing and (ii) all employee benefit Liabilities for any such Transferred Employee and any such consultant, independent contractor or contract employee of the

5

CONFIDENTIAL                                                                    LEGENDS0051653

Business (including, in each case, their dependents and beneficiaries) to the extent provided in Article VI of the Purchase Agreement;

(g)     without duplication (i) all Liabilities identified and reflected or reserved for on the Recent Balance Sheet to the extent not satisfied on or prior to the Closing Date or (ii) all Liabilities reflected or reserved for on the Closing Date Balance Sheet; and

(h)     (i) all Liabilities for Taxes relating to the Purchased Assets for all Pre-Closing Tax Periods to the extent reflected or reserved for on the Closing Date Balance Sheet (including all Liabilities for ad valorem Taxes relating to the Seller Real Property for all Pre-Closing Tax Periods), and (ii) all Liabilities for Taxes relating to the Purchased Assets for all taxable periods ending on or after the Closing Date, including ad valorem Taxes and assessments and other Taxes allocated to the Purchasers pursuant to Section 2.3(c) or Section 8.4 of the Purchase Agreement.

1.11    *"Avoidance Claim"* shall mean all rights, claims, causes of action, avoiding powers, suits and proceedings of or brought by or which may be asserted by a debtor in possession or a person under chapter 5 of the Bankruptcy Code, including by way of illustration and not limitation, under Sections 510, 541, 544, 547, 548, 549, 550, 553 and 554 of the Bankruptcy Code, together with any claims, rights, remedies or demands that may be asserted by a creditor or representative of creditors under similar applicable state or other laws, and claims in the nature of substantive consolidation, successor liability, veil piercing, or alter ego.

1.12    *"Bankruptcy Code"* shall mean title 11 of the United States Code, as amended from time to time.

1.13    *"Bankruptcy Court"* shall mean the United States Bankruptcy Court for the Western District of Louisiana, Shreveport Division; having jurisdiction over the Chapter 11 Cases, or if such court ceases to exercise jurisdiction over the Chapter 11 Cases, such other court having jurisdiction under Title 28 of the United States Code over the Chapter 11 Cases.

6

{00328380-23}

1.14    *"Bankruptcy Rules"* shall mean the Federal Rules of Bankruptcy Procedure, the applicable Federal Rules of Civil Procedure, and the Local Rules of the Bankruptcy Court, in each case as amended from time to time during the Chapter 11 Cases.

1.15    *"Business"* means the gambling, gaming, hospitality, entertainment and related businesses of the Legends Entities, as conducted by the Legends Entities, in Bossier City, Louisiana and Vicksburg, Mississippi.

1.16    *"Business Day"* shall mean any day that is not a Saturday, Sunday or "legal holiday" as defined in Bankruptcy Rule 9006(a).

1.17    *"Cash"* shall mean legal tender of the United States of America, cash equivalents, and readily marketable securities or instruments, including but not limited to, bank deposits, accounts, certified or cashiers checks, timed certificates of deposit issued by any bank, commercial paper, and readily marketable direct obligations of the United States of America or agencies or instrumentalities thereof.

1.18    *"Causes of Action"* shall mean, without limitation, any and all of the Debtors' and the Estates' actions, causes of action, rights, suits, claims, accounts, debts, sums of money, damages, judgments, claims and demands, actions, defenses, offsets, powers (including all police, regulatory, and enforcement powers and actions that may be taken), privileges, licenses, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment and claims, whatsoever, whether known or unknown, suspected or unsuspected, whether arising prior to, on or after the Petition Date, in contract or tort, in law, equity or otherwise, whether or not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed,

7

{00328380-23}

CONFIDENTIAL

LEGENDS0051655

secured, unsecured and whether asserted or assertable, accruing to and in favor of the Debtors or Debtors in Possession pursuant to the Bankruptcy Code or any applicable statute or law or legal theory.  For avoidance of doubt, Causes of Action include, but are in no way limited to (a) rights of setoff, counterclaim or recoupment, and claims on contracts or for breaches of duties imposed by law, (b) claims pursuant to Section 362 of the Bankruptcy Code, (c) such claims and defenses as fraud, mistake, duress, and usury, (d) all Avoidance Claims, (e) all Causes of Action that are assertable by or may be directly or derivatively asserted by the Debtors, their Estates, the Liquidating Debtors, or a representative of the Estate on behalf of creditors of the Debtors or the Estate and (f) any claims, rights or causes of action which constitute Purchased Assets under the Purchase Agreement.

1.19    *"Chapter 11 Cases"* shall mean the chapter 11 cases of the Debtors pending before the Bankruptcy Court.

1.20    *"Claim"* shall have the meaning set forth in Section 101(5) of the Bankruptcy Code.

1.21    *"Claimant"* or *"Creditor"* shall mean the holder of a Claim, together with any predecessor or successor in interest with respect to such Claim.

1.22    *"Class"* shall mean any group of Claims or Interests classified together by this Plan pursuant to Section 1122 of the Bankruptcy Code.

1.23    *"Closing"* means the consummation of the Transaction in accordance with the terms set forth in Article VIII of the Purchase Agreement.

1.24    *"Closing Date"* means the first practical date, but no later than the fifth (5th) Business Day, following the satisfaction or waiver of all the conditions set forth in

{00328380-23}

CONFIDENTIAL

Article VII of the Purchaser Agreement (other than such conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions) or such other date as the Sellers and the Purchasers shall mutually agree upon in writing.

1.25    *"Closing Date Balance Sheet"* has the meaning set forth in Section 2.4(a) of the Purchase Agreement.

1.26    *"Common Interests"* shall mean all of the common units in Legends Gaming currently issued and outstanding immediately prior to the Effective Date of the Plan.

1.27    *"Confirmation Date"* shall mean the date of entry on the docket of the Bankruptcy Court of the Confirmation Order.

1.28    *"Confirmation Hearing"* shall mean the hearing before the Bankruptcy Court regarding confirmation of this Plan and related matters under Section 1128 of the Bankruptcy Code.

1.29    *"Confirmation Order"* shall mean the order signed by the Bankruptcy Court confirming this Plan.

1.30    *"Consenting First Lien Lender"* shall mean any First Lien Lender who submits a vote to accept this Plan by the voting deadline, provided that such accepting vote is not later withdrawn or modified.

1.31    *"Consumer Liabilities"* means all Liabilities of the Legends Entities with respect to returns of goods or merchandise, store or customer credits, gift cards and certificates, customer prepayments and overpayments, customer loyalty obligations or

9

{00328380-23}

**HDPH DRAFT 10/25/2012**
**FOR DISCUSSION PURPOSES ONLY**

programs, customer refunds, warranty obligations with respect to goods or merchandise or returns of goods sold by licensees.

1.32    *"Contracts"* means any contracts and agreements, whether written or oral, entered into by a Legends Entity, or by which a Legends Entity is bound.

1.33    *"Cramdown"* shall mean the confirmation of this Plan pursuant to 11 U.S.C. § 1129(b) notwithstanding any rejection by an Impaired Class or Classes of holders of Claims or Interests of this Plan.

1.34    *"Cure Costs"* means any and all costs, expenses or actions that the Legends Entities are required to pay or perform to assume and/ or assume and assign any of the Assumed Agreements, the Assumed Leases and the LRGP Assumed Agreements pursuant to Section 365(f) of the Bankruptcy Code.

1.35    *"Cure Dispute"* has the meaning given to it in <u>section 5.3(d)</u> of this Plan.

1.36    "*Debtors*" shall mean Louisiana Riverboat Gaming Partnership, Legends Gaming of Louisiana-1, LLC, Legends Gaming of Louisiana-2, LLC, Legends Gaming, LLC, Legends Gaming of Mississippi, LLC, and Legends Gaming of Mississippi RV Park, LLC, collectively.

1.37    *"Debtor in Possession or Debtors in Possession"* shall mean the Debtors between the Petition Date and the Effective Date.

1.38    *"Deposit Escrow Funds"* has the meaning set forth in <u>Section 2.5(a)</u> of the Purchase Agreement.

1.39    *"Disclosure Statement"* means the Disclosure Statement Filed in connection with the Plan, as modified or amended, approved by the Bankruptcy Court on _____, 2012 [P-_____].

10

CONFIDENTIAL
13-01007 - #99-6  File 10/23/13  Enter 10/23/13 15:34:37  Exhibit -F- (part 5) Pg 12 of 50
LEGENDS0051658

1.40     *"Disputed Claim"* shall mean any Claim that is not an Allowed Claim.  In the event that any portion of a Claim is not an Allowed Claim, such Claim in its entirety shall be deemed to constitute a Disputed Claim for purposes of distribution under this Plan until entry of a Final Order fixing and determining the Allowed Amount thereof. Without limiting any of the foregoing, a Claim that is the subject of or part of a pending objection, motion, complaint, counterclaim, setoff, recoupment, Avoidance Claim, litigation claim or defense, or any other proceeding seeking to disallow, subordinate or estimate such Claim, shall be deemed a Disputed Claim, unless the Plan or the Confirmation Order expressly provides otherwise.

1.41     *"Disputed Claims Reserve"* shall mean the reserve established pursuant to section 8.3 of the Plan with respect to Disputed Claims.

1.42     *"Distribution Date"* shall mean each date any payment of Cash or distribution of Assets is due to the holders of Allowed Claims or Allowed Interests under this Plan.

1.43     *"Effective Date"* shall mean a Business Day on which all of the conditions precedent to the effectiveness of the Plan specified in the Plan have been satisfied or waived in accordance with the Plan and which is specified as the "Effective Date" in the notice of occurrence of the Effective Date Filed in the record of the Bankruptcy Court pursuant to section 10.2 of the Plan.

1.44     *"Effective Time"* means 12:01 a.m. on the Closing Date.

1.45     *"Encumbrances"* means all mortgages, pledges, charges, liens, debentures, trust deeds, claims, assignments by way of security or otherwise, security interests, conditional sales contracts or other title retention agreements or similar interests

11

CONFIDENTIAL
LEGENDS0051659

**HDPH DRAFT 10/25/2012**
**FOR DISCUSSION PURPOSES ONLY**

or instruments charging, or creating a security interest in the Purchased Assets or any part thereof or interest therein, and any agreements, leases, licenses, occupancy agreements, options, easements, rights of way, restrictions, executions or other encumbrances affecting title to the Real Property or any part thereof or interest therein.

1.46    *"Entity"* shall mean an individual, corporation, limited liability company, partnership, association, joint stock company, joint venture, estate, trust, unincorporated organization, government, governmental unit (as defined in the Bankruptcy Code) or any political subdivision thereof, or other person.

1.47    *"Estate"* shall mean the estate of each Debtor, as defined in Section 541 of the Bankruptcy Code.

1.48    *"Estimated Closing Date Net Working Capital"* has the meaning set forth in Section 2.3(d) of the Purchase Agreement.

1.49    *"Estimated Working Capital Excess Amount"* means the amount, if any, by which the Estimated Closing Date Net Working Capital is greater than $5,550,000.

1.50    *"Estimated Working Capital Shortfall Amount"* means the amount, if any, by which the Estimated Closing Date Net Working Capital is less than $5,150,000.

1.51    *"Existing First Lien Credit Agreement"* means that certain Amended and Restated Credit Agreement, dated as of August 31, 2009, among Legends Gaming, LLC as borrower, the First Lien Agent, and the First Lien Lenders, as it may have been amended, supplemented or otherwise modified from time to time, together with all agreements and other documents in any way relating thereto or in furtherance thereof.

1.52    *"Existing Second Lien Credit Agreement"* means that certain Amended and Restated Second Lien Credit Agreement, dated as of August 31, 2009, among

12

{00328380-23}

Legends Gaming, LLC, as borrower, the Second Lien Agent, and the Second Lien Lenders, as it may have been amended, supplemented or otherwise modified from time to time, together with all agreements and other documents in any way relating thereto or in furtherance thereof.

1.53     *"File"* or *"Filed"* means properly filed with the clerk of court of the Bankruptcy Court in the Chapter 11 Cases, as reflected on the official docket of the clerk of court of the Bankruptcy Court for the Chapter 11 Cases.

1.54     *"Final Cash Collateral Order"* means the Final Cash Collateral Order Pursuant to Sections 361, 362 and 363 of the Bankruptcy Code and Bankruptcy Rule 4001; (1) Authorizing Use of Cash Collateral; (2) Granting Adequate Protection; (3) Modifying the Automatic Stay; and (4) Providing Related Relief [P-193], together with any modification, renewal or extension thereof.

1.55     *"Final Order"* means (i) with respect to the Confirmation Order and the Transaction, an order entered by the Bankruptcy Court or other court of competent jurisdiction (a) that has not been reversed, modified or withdrawn and that remains in full force and effect, and (b) that is not the subject of a stay, and (ii) with respect to any other order, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction (a) which has become final for purposes of 28 U.S.C. § 158 or such analogous law or rule in the case of an order of a state court and (b)(i) as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, reargue, or rehear shall have been waived in writing in form and substance satisfactory to

13

CONFIDENTIAL

LEGENDS051661

the Debtors (or, if after the Effective Date, by the Liquidating Debtors) or, (ii) in the event that an appeal, writ of certiorari, or reargument or rehearing thereof has been sought, (x) such order or judgment of the Bankruptcy Court or other applicable court shall have been affirmed by the highest court to which such order or judgment was appealed with no modifications thereof, or (y) certiorari, reargument or rehearing has been denied, and (z) the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired with no such further appeal, petition for certiorari or motion for reargument or rehearing having been sought or pending; *provided, however,* that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or Bankruptcy Rule 9024 or other analogous rules of state courts governing procedures in cases before other courts may be filed with respect to such order or judgment shall not render such order or judgment not to be a Final Order.

1.56    *"First Lien Ad Hoc Group"* shall mean the Ad Hoc Group of First Lien Lenders.

1.57    *"First Lien Agent"* shall mean Wilmington Trust Company or any successor thereto, solely in its capacity as the administrative and/or collateral agent for the First Lien Lenders.

1.58    *"First Lien Lenders"* shall mean the lenders from time to time party to the Existing First Lien Credit Agreement.

1.59    *"First Lien Lenders' Secured Claims"* shall mean (a) the Secured Claims of the First Lien Lenders in respect of, in connection with, or arising out of the Existing First Lien Credit Agreement in the aggregate Allowed amount of approximately $181,182,013.83 as of the Petition Date, (which amount includes matured and unpaid

14

CONFIDENTIAL

**HDPH DRAFT 10/25/2012**
**FOR DISCUSSION PURPOSES ONLY**

interest thereon as of the Petition Date) and (b) any and all other unpaid fees, expenses, disbursements, indemnifications, and charges or claims of whatever nature, whether or not contingent, whenever arising, due or owing under the Existing First Lien Credit Agreement, related agreements and documents, or applicable law.

1.60     *"Gaming Regulators"* shall mean the Louisiana Gaming Control Board, the Mississippi Gaming Commission and the Colorado Division of Gaming, as applicable.

1.61     *"General Unsecured Claim"* means any Claim that is not an Administrative Claim, Priority Claim, Secured Claim, Assumed Liability, LRGP Retained Liability, or a Claim otherwise specifically classified in another Class in this Plan.  The term *"General Unsecured Claim"* also includes the deficiency claims of the First Lien Lenders and the Second Lien Lenders.

1.62     *"Global Legends"* shall mean Global Gaming Legends, LLC, a Delaware limited liability company.

1.63     *"Global Louisiana"* shall mean Global Gaming Bossier City, LLC, a Delaware limited liability company.

1.64     *"Global Vicksburg"* shall mean Global Gaming Vicksburg, LLC, a Delaware limited liability company.

1.65     *"Governmental Authority"* shall mean any domestic, foreign or local government, quasi-governmental authority, regulatory authority, government department, agency, commission, board, or other tribunal or court.  For the avoidance of doubt, any tribal council or similar governing body of the Chickasaw Nation shall not be, and shall not be deemed to be, a Governmental Authority for any purpose under this Plan.

15

{00328380-23}

CONFIDENTIAL

1.66    *"Impaired"* shall mean, with respect to any Class, that such Class is "impaired" under the Plan within the meaning of Section 1124 of the Bankruptcy Code.

1.67    *"Interests"* shall mean, collectively, any and all "equity securities" (as defined in Section 101(16) of the Bankruptcy Code) in a Debtor, and includes both Common Interests and Preferred Interests.

1.68    *"Intercompany Claim"* shall mean any Claim against a Debtor held by another Debtor.

1.69    *"Intellectual Property Rights"* means all trade or brand names, business names, trademarks (including logos), trademark registrations and applications, service marks, service mark registrations and applications, copyrights, copyright registrations and applications, issued patents and pending applications and other patent rights, industrial design registrations, pending applications and other industrial design rights, trade secrets, proprietary information and know-how, equipment and parts lists and descriptions, instruction manuals, inventions, inventors' notes, research data, blue prints, drawings and designs, formulae, processes, technology and other intellectual property, together with all rights under licenses, registered user agreements, technology transfer agreements and other agreements or instruments relating to any of the foregoing.

1.70    *"Liability"* means any debt, obligation or liability of any nature, whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due.

1.71    *"Lien"* shall have the meaning set forth in Section 101(37) of the Bankruptcy Code.

16

{00328380-23}

**HDPH DRAFT 10/25/2012**
**FOR DISCUSSION PURPOSES ONLY**

1.72    *"Liquidating Debtors"* means the Debtors, except for Riverboat Gaming, from and after the Effective Date, which for purposes of the Plan, shall effectuate the Wind Down.

1.73    *"Legends Entities"* shall mean the Sellers and Riverboat Gaming.

1.74    *"Legends Gaming"* shall mean Legends Gaming, LLC, a Delaware limited liability company.

1.75    *"Legends LA-1"* shall mean, Legends Gaming of Louisiana-1, LLC, a Louisiana limited liability company.

1.76    *"Legends LA-2* shall mean Legends Gaming of Louisiana-2, LLC, a Louisiana limited liability company.

1.77    *"Legends MS"* shall mean Legends Gaming of Mississippi, LLC, a Mississippi limited liability company.

1.78    *"LRGP Assumed Agreements*" means the agreements, including real property leases, that are assumed by Riverboat Gaming pursuant to Section 365 of the Bankruptcy Code and that are listed on Schedule 1.1(d) or Schedule 6.1(b) of the Purchase Agreement or otherwise designated by the Purchasers as LRGP Assumed Agreements pursuant to Section 2.6(e) of the Purchase Agreement.

1.79    *"LRGP Cash"* means the sum of (a) the aggregate cash and cash equivalents of Riverboat Gaming determined in accordance with GAAP, including cash contained in bank deposits or accounts (both restricted and unrestricted), the cage, TITO (Ticket-In, Ticket-Out) exchange devices, slot booths, count rooms and drop boxes, plus (b) the aggregate cash and cash equivalents held by third parties as security deposits or

17

{00328380-23}

other forms of collateral or security in respect of payment or performance obligations of Riverboat Gaming.

1.80    *"LRGP Excluded Assets"* has the meaning set forth in <u>Section 2.2(b)</u> of the Purchase Agreement.

1.81    *"LRGP Excluded Contracts"* means, other than the LRGP Assumed Agreements, all Contracts of Riverboat Gaming.

1.82    *"LRGP Partnership Interests"* shall mean all of the issued and outstanding partnership interests of Riverboat Gaming.

1.83    *"LRGP Real Property"* means the real property described on <u>Exhibit E-1</u> of the Purchase Agreement, together with (a) all of Riverboat Gaming's right, title and interest in all rights, easements and interests appurtenant thereto, including any streets or other public ways adjacent thereto and any development rights, water or mineral rights owned by, or leased to, Riverboat Gaming; and (b) all improvements located thereon.

1.84    *"LRGP Regulatory Cash"* means the minimum cash reserve requirement for Riverboat Gaming under the Louisiana Administrative Code Title 42, Section 2713 (Cash Reserve and Bonding Requirements), which amount shall be calculated in accordance with Riverboat Gaming's procedure for calculating its cash reserve requirement.

1.85    *"LRGP Retained Assets"* means all of Riverboat Gaming's right, title and interest in and to all of its assets and properties (whether tangible or intangible), including the LRGP Real Property, the LRGP Assumed Agreements, the LRGP Cash (including the LRGP Regulatory Cash) and the LRGP Transferred Permits, in each case, as the same

18

CONFIDENTIAL

LEGENDS0051666

may exist immediately after the consummation of the transactions contemplated by Section 2.2(b) of the Purchase Agreement, excluding the LRGP Excluded Assets.

1.86    *"LRGP Transferred Permits"* means, to the extent transferrable in connection with the consummation of the Transaction, all rights under all Permits of Riverboat Gaming used in, held for use in, necessary to or primarily related to the Business, including to the extent transferrable in connection with the consummation of the Transaction, those described on Schedule 1.1(f) of the Purchase Agreement.

1.87    *"Michael Kelly"* means Michael E. Kelly, the former Chief Executive Officer, Secretary, member and Manager of Legends Gaming and/or its subsidiaries.

1.88    *"Michael Kelly Claims"* has the meaning given to it in section 7.8(a) of this Plan.

1.89    *"Michael Kelly Claims Settlement Consideration"* means the payment in cash in the amount of $150,000, which shall be paid to the Debtors' Estates on or before the Effective Date to settle the Michael Kelly Claims.

1.90    *"New First Lien Credit Agreement"* means a new first lien credit agreement, which will be substantially in the form attached to this Plan as Exhibit B but subject to definitive documentation, in the principal amount of Sixty One Million Five Hundred Thousand Dollars ($61,500,000), together with all agreements and other documents in any way relating thereto or in furtherance thereof.

1.91    *"New Second Lien Credit Agreement"* means a new second lien credit agreement, which will be substantially consistent with the terms and conditions set forth in the term sheet attached to this Plan as Exhibit C but subject to definitive documentation, in the principal amount of Thirty Six Million Dollars ($36,000,000),

19

CONFIDENTIAL

**HDPH DRAFT 10/25/2012**
**FOR DISCUSSION PURPOSES ONLY**

together with all agreements and other documents in any way relating thereto or in furtherance thereof.

1.92    *"Ordinary Course of Business"* means the operation and conduct of the affairs of the Legends Entities in the ordinary course of business, consistent with past practice (it being understood that the operation and affairs of the Legends Entities may take place while the Legends Entities are in bankruptcy).

1.93    *"Other Secured Claim"* shall mean a Secured Claim against any Debtor, other than Secured Tax Claims, the First Lien Lenders' Secured Claims, and the Second Lien Lenders' Secured Claims.

1.94    *"Partners"* means, collectively, Legends LA-1 and Legends LA-2.

1.95    *"Permits"* means any and all licenses, franchises, approvals, development rights and permits issued or granted by any Governmental Authority or pursuant to any Applicable Law.

1.96    *"Permitted Encumbrances"* means (a) all defects, exceptions, restrictions, easements, rights of way and encumbrances disclosed in policies of title insurance or surveys; provided that such items do not and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect (as defined in the Purchase Agreement); (b) statutory liens for current Taxes, assessments or other governmental charges not yet delinquent or the amount or validity of which is being contested in good faith by appropriate proceedings and for which the Legends Entities have established sufficient reserves; (c) mechanics', carriers', workers', repairers' and similar liens arising or incurred in the Ordinary Course of Business with respect to amounts not yet due (provided that such amounts arising or accruing prior to the Closing and not otherwise

20

CONFIDENTIAL

HDPH DRAFT 10/25/2012
FOR DISCUSSION PURPOSES ONLY

constituting Assumed Liabilities remain Excluded Liabilities); (d) laws, regulations, resolutions or ordinances, including those related to building, zoning and environmental protection, as to the use, occupancy, subdivision, development, conversion or redevelopment of the Real Property imposed by any Governmental Authority; (e) other imperfections in title, charges, easements, restrictions and Encumbrances, provided that such items do not and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect (as defined in the Purchase Agreement); (f) rights reserved to or vested in any Governmental Authority by Applicable Law to control or regulate, or obligations or duties under Applicable Law to any Governmental Authority with respect to, the use of any Real Property; (g) rights reserved to or vested in any Governmental Authority by Applicable Law to control or regulate, or obligations or duties under Applicable Law to any Governmental Authority with respect to, any right, power, franchise, grant, license or permit; (h) maritime Encumbrances on ships, barges or other vessels for wages of a stevedore, when employed directly by a Person listed in 46 U.S.C. § 31341, crew's wages, salvage and general average, whether now existing or hereafter arising and other maritime Encumbrances which arise by operation of Applicable Law during the normal operations of such ships, barges or other vessels which (i) are paid in the Ordinary Course of Business and (ii) have not been recorded on the General Index or Abstract of Title (U.S.C.G. 1332) of such ships, barges or other vessels or judicially asserted; and (j) Encumbrances set forth on Schedule 1.1(g) of the Purchase Agreement.

     1.97 *"Person"* means an individual, partnership, limited liability company, corporation, trust, unincorporated organization, government, or any department or agency

21

CONFIDENTIAL

LEGENDS0051669

**HDPH DRAFT 10/25/2012**
**FOR DISCUSSION PURPOSES ONLY**

thereof, and the successors and assigns thereof or the heirs, executors, administrators or other legal representatives of an individual.

1.98     *"Petition Date"* shall mean July 31, 2012.

1.99     *"Plan"* shall mean this Joint Chapter 11 Plan in its present form or as it may, from time to time, be modified, amended or supplemented in accordance with the terms hereof, together with any exhibits thereto.

1.100    *"Plan Support Agreement"* shall mean the agreement dated as of July 25, 2012 entitled Restructuring and Plan Support Agreement by and among the Debtors, except Legends Gaming RV, the Consenting First Lien Lenders and any other Consenting Holders as defined therein, as it may be amended or supplemented pursuant to the terms thereof.   The Plan Support Agreement (with appropriate redactions) is attached to the Disclosure Statement as [Exhibit D-4].

1.101    *"Pre-Closing Tax Period"* means (a) any taxable period ending before, but not including, the Closing Date, and (b) the portion of any Straddle Period ending before, but not including, the Closing Date.

1.102    *"Preferred Interests"* shall mean all of the Preferred Units of Legends Gaming currently issued and outstanding immediately prior to the Effective Date of the Plan.

1.103    *"Priority Claim"* shall mean any Claim entitled to priority pursuant to Section 507(a)(1), (a)(4), (a)(5), (a)(6), or (a)(7) of the Bankruptcy Code, other than Priority Tax Claims.

1.104    *"Priority Tax Claim"* shall mean any Claim entitled to priority pursuant to Section 507(a)(8) of the Bankruptcy Code.

22

{00328380-23}

CONFIDENTIAL

1.105   *"Professional"* shall mean any professional (a) retained by the Debtors in the Chapter 11 Cases and (b) to be compensated pursuant to Sections 327, 328, 330, 503(b), or 1103 of the Bankruptcy Code.

1.106   *"Purchase Agreement"* shall mean that certain Purchase Agreement, dated as of July 25, 2012, made by and among Legends Gaming, Legends LA-1, LLC, Legends LA-2, LLC, Legends MS, as sellers, and Riverboat Gaming, and the Purchasers, as purchasers, attached hereto as Exhibit "A". [Exhibits to the Purchase Agreement are filed in the record of the Chapter 11 Cases as [P-23-2].

1.107   *"Purchased Assets"* means each of the following assets, but excluding any such assets that are Excluded Assets:

(a) all Seller Cash (including all Seller Regulatory Cash) as of the Effective Time;

(b) all tangible personal property owned by the Sellers as of the Closing Date (whether or not located on the Sellers' premises), including all machinery, equipment and tools, furniture and furnishings, computers and computer supplies, telephone, telecommunications, networking and Internet equipment and infrastructure, office materials and supplies, inventories of any kind or nature, raw materials and supplies, manufactured and purchased goods, and all goods in process and finished goods owned by the Sellers as of the Closing Date and used in, held for use in, necessary to or primarily relating to the Business;

(c) the Seller Real Property;

(d) all books, records, ledgers, files, documents, correspondence, customer, supplier, advertiser, circulation and other lists (including subscribers), invoices and sales data, creative, advertising and other promotional materials, studies, reports and other printed or written materials or data used in, held for use in, necessary to or primarily relating to the Business;

(e) to the extent not prohibited under Applicable Law, all files and data related to the Transferred Employees;

(f) all Intellectual Property Rights owned by the Sellers as of the Closing Date, goodwill associated therewith, licenses and sublicenses granted and obtained with respect thereto, rights thereunder, remedies against infringements

23

CONFIDENTIAL

**HDPH DRAFT 10/25/2012**
**FOR DISCUSSION PURPOSES ONLY**

thereof, and rights to protection of interests therein under the Applicable Laws, in each case used in, held for use in, necessary to or primarily relating to the Business, including those described on <u>Schedule 1.1(h)</u> of the Purchase Agreement;

(g) to the extent assignable, all rights under all Permits of any Seller used in, held for use in, necessary to or primarily relating to the Business, including to the extent assignable those described on <u>Schedule 1.1(i)</u> of the Purchase Agreement;

(h) all claims, Actions, Prepaid Expenses, prepayments, refunds, causes of action, choses in action, rights of recovery, rights of set off, and rights of recoupment of any kind or character of any Seller that have arisen from the operation of the Business or primarily relating to the Business, including those described on <u>Schedule 1.1(j)</u> of the Purchase Agreement;

(i) all rights under the Assumed Agreements and the Assumed Leases from and after the Effective Time;

(j) all insurance proceeds and rights thereto derived from any loss, damage or destruction of or to any of the Purchased Assets occurring after the Closing and insurance proceeds and rights thereto derived from any loss, damage or destruction of or to any of the Purchased Assets occurring prior to the Closing to the extent such proceeds and rights were to be used to repair any of the Purchased Assets, but for which such repairs have not been made;

(k) except as provided in the definition of Excluded Assets, all Accounts Receivable of the Sellers existing as of the Effective Time;

(l) the riverboat vessel and barge housing the casino located in Vicksburg, Mississippi and any related barges and staging areas owned by the Sellers as of the Closing Date;

(m) all of the LRGP Partnership Interests; and

(n) the goodwill associated with the Business.

1.108   *"Purchasers"* shall mean Global Legends, Global Vicksburg and Global Louisiana.

1.109   *"Real Property"* means, collectively, the Seller Real Property and the LRGP Real Property.

24

CONFIDENTIAL

1.110   *"Recent Balance Sheet"* means the audited consolidated balance sheet of the Legends Entities as of December 31, 2011.

1.111   *"Rejection Damages Claims"* means Claims alleged to arise from the rejection of an executory contract or unexpired lease.

1.112   *"Released Parties"* shall mean (i) the Debtors, Debtors in Possession and Liquidating Debtors, and their respective financial advisors, attorneys and accountants whose retention has been approved by the Bankruptcy Court, and all past, present and future officers, directors, servants, shareholders, members, managers, partners, employees, agents, representatives and consultants thereof, *provided* that Michael Kelly shall not be a Released Party to the extent set forth in section 7.8 of this Plan unless and until the Michael Kelly Claims Settlement Consideration is paid in full and in cash to the Debtors' Estates; (ii) the Consenting First Lien Lenders, the First Lien Agent, the First Lien Ad Hoc Group, and each of their divisions, affiliates, and their former, present and future officers, directors, servants, shareholders, members, affiliates, managers, partners, employees, agents, representatives, professionals and consultants; and (iii) the Purchasers, and each of their divisions, affiliates, and their former, present and future officers, directors, servants, shareholders, members, affiliates, managers, partners, employees, agents, representatives, professionals and consultants.

1.113   *"Riverboat Gaming"* shall mean Louisiana Riverboat Gaming Partnership, a Louisiana general partnership.

1.114   *"Schedules"* shall mean the schedules of assets and liabilities and the statement of financial affairs filed by the Debtors as required by Section 521 of the

25

CONFIDENTIAL
LEGENDS0051673

Bankruptcy Code and Bankruptcy Rule 1007, as amended or supplemented through the Confirmation Date.

1.115   *"Second Lien Agent"* shall mean Wells Fargo Bank, N.A., or any subsequent successor thereto, solely in its capacity as the administrative and/or collateral agent for the Second Lien Lenders.

1.116   *"Second Lien Lenders"* shall mean the lenders from time to time party to the Existing Second Lien Credit Agreement.

1.117   *"Second Lien Lenders' Secured Claims"* shall mean (a) the Secured Claims of the Second Lien Lenders in respect of, in connection with, or arising out of the Second Lien Loan Documents in the aggregate Allowed Amount of approximately $116,252,898.38 (which amount includes matured and unpaid interest thereon as of the Petition Date) and (y) any and all other unpaid fees, expenses, disbursements, indemnifications, and charges or claims of whatever nature, whether or not contingent, whenever arising, due or owing under the Existing Second Lien Credit Agreement, related agreements and documents, or applicable law.

1.118   *"Secured Claim"* shall mean any Allowed Claim of any Claimant secured by a Lien on the Debtors' interest in any Assets as set forth in the Plan or as determined by the Bankruptcy Court pursuant to Section 506(a) of the Bankruptcy Code.

1.119   *"Secured Tax Claim"* shall mean any Claim in favor of a federal, state, parish, county, local, or special governmental taxing authority, whether or not entitled to priority pursuant to Section 507(a)(8) of the Bankruptcy Code, that is secured by a lien or other security interest on any Assets of the Debtors.

26

{00328380-23}

**HDPH DRAFT 10/25/2012**
**FOR DISCUSSION PURPOSES ONLY**

1.120 *"Seller Cash"* means the sum of (a) the aggregate cash and cash equivalents of the Sellers determined in accordance with GAAP, including cash contained in bank deposits or accounts (both restricted and unrestricted), the cage, TITO (Ticket-In, Ticket-Out) exchange devices, slot booths, count rooms and drop boxes, plus (b) the aggregate cash and cash equivalents held by third parties as security deposits or other forms of collateral or security in respect of payment or performance obligations related to the Purchased Assets.

1.121 *"Seller Excluded Contracts"* means all Contracts of any Seller other than the Assumed Agreements and the Assumed Leases.

1.122 *"Seller Real Property"* means the real property described on Exhibit E-2 to the Purchase Agreement, together with (a) all of the Sellers' right, title and interest in all rights, easements and interests appurtenant thereto, including any streets or other public ways adjacent thereto and any development rights, water or mineral rights owned by, or leased to, Sellers; and (b) all improvements located thereon

1.123 *"Seller Regulatory Cash"* means the minimum bankroll requirements established pursuant to Mississippi Gaming Commission Regulation III – Operations, A – In General, Section 13 – Minimum Bankroll Requirements.

1.124 *"Sellers"* shall mean Legends Gaming, Legends LA-1, Legends LA-2, and Legends MS.

1.125 *"Straddle Period"* means any taxable period that commences prior to and includes (but does not end on) the Closing Date.

1.126 *"Tax"* or *"Taxes"* means any federal, state, local or foreign net income, gross income, gross receipts, windfall profit, severance, property, production, sales, use,

27

CONFIDENTIAL                                                                 LEGENDS0051675

license, excise, franchise, employment, payroll, withholding, alternative or add on minimum, ad valorem, value added, transfer, stamp, or environmental tax, escheat payments or any other tax, custom, duty, governmental fee or other like assessment or charge (together with any and all interest, penalties and additions to tax imposed with respect thereto).

1.127    *"Transaction"* means the transactions contemplated in the Purchase Agreement, the New First Lien Credit Agreement and the New Second Lien Credit Agreement.

1.128    *"Transaction Fees"* shall mean (1) the cash fee payable by Legends Gaming, LLC to Houlihan Lokey Capital, Inc. upon the consummation of a Transaction (as defined in, and subject to the terms of, that certain engagement letter dated as of March 29, 2012, among Houlihan Lokey Capital, Inc., Latham & Watkins LLP, and Legends Gaming, LLC); and (2) the cash fee payable by Legends Gaming, LLC to Seaport Group Securities, LLC upon the consummation of a Transaction (as defined in, and subject to the terms of, that certain engagement letter dated as of December 16, 2011, as amended, among Seaport Group Securities, LLC and Legends Gaming, LLC).

1.129    *"Transferred Employees"* has the meaning set forth in Section 6.1(a) of the Purchase Agreement.

1.130    *"Unimpaired"* shall mean, with respect to any Class, that such Class is not Impaired.

1.131    *"Wind Down"* means the wind down and liquidation of the Liquidating Debtors in accordance with the Plan after the Effective Date.

{00328380-23}

CONFIDENTIAL

LEGENDS0051676

1.132   *"Wind Down Budget"* has the meaning given to it in <u>section 7.6</u> of this Plan.

1.133   *"Wind Down Expenses"* has the meaning given to it in <u>section 7.6</u> of this Plan.

# ARTICLE 2

# PROVISIONS FOR PAYMENT OF <u>ADMINISTRATIVE EXPENSES</u>

**2.1**   *Payment of Allowed Administrative Expense Claims.*

2.1.1   *Allowed Administrative Expense Claims.*

Subject to <u>section 2.1.2</u> below, to the extent Allowed Administrative Expense Claims (a) are not paid by the Purchasers or LRGP in connection with the Purchase Agreement or (b) are not otherwise paid during the Chapter 11 Cases, each Allowed Administrative Expense Claim shall be paid (x) in full, in Cash, by the Debtors on the Effective Date or as soon practicable thereafter; or (y) in accordance with the terms of the underlying Allowed Administrative Expense Claim; or (z) upon such other terms as may be agreed upon by the holder of such Allowed Administrative Expense Claim and the Debtors or, as applicable, the Liquidating Debtors or otherwise established pursuant to an order of the Bankruptcy Court; *provided, however,* that Administrative Expense Claims representing liabilities incurred in the ordinary course of business by any Debtor in Possession shall be paid by the applicable Debtor in accordance with the terms and conditions of the particular transactions, the applicable non-bankruptcy law, and any agreements relating thereto or any order of the Bankruptcy Court. For the avoidance of doubt, all unpaid post-petition amounts authorized and payable under the Final Cash

29

Collateral Order shall be deemed to be Allowed Administrative Expense Claims under this Plan.

2.1.2   *Compensation of Professionals of Debtors.*

All Professionals of the Debtors who seek compensation or who have been compensated from the estates of the Debtors in Possession during the Chapter 11 Cases, or who seek compensation from the estates of the Debtors in Possession for services rendered or reimbursement of expenses incurred from the Petition Date through and including the Effective Date, pursuant to Sections 327, 328, 330, 503(b), or 1103 of the Bankruptcy Code, shall (a) File final applications for allowance of compensation for services and reimbursement of expenses incurred from the Petition Date through the Effective Date by no later than the date that is forty-five (45) days after the Effective Date, and (b) if granted such an award by the Bankruptcy Court, be paid in full by the Debtors or, as applicable, the Liquidating Debtors or as otherwise provided in this Plan in such amounts as are Allowed by the Bankruptcy Court (i) on the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is practicable, or (ii) when mutually agreed upon by such holder of an Administrative Expense Claim and the Liquidating Debtors.  For the avoidance of doubt, no professional retained or employed by or for the benefit of the First Lien Agent or the First Lien Ad Hoc Group shall be required to File any motion or application for allowance or payment of any of its fees and expenses.

2.1.3   *Substantial Contribution Claims; Deadline for Filing.*

To the extent any Entity is seeking payment or reimbursement of compensation for services rendered or reimbursement of expenses incurred in connection

30

{00328380-23}

HDPH DRAFT 10/25/2012
FOR DISCUSSION PURPOSES ONLY

with or during the Chapter 11 Cases under Section 503(b)(3)(D) of the Bankruptcy Code, such Entity shall File its application or request for such payment on or before the deadline established by the Bankruptcy Court for the filing of the objections to the confirmation of the Plan, and any such application or request shall be heard and determined at the Confirmation Hearing; otherwise, any such application or request for compensation or reimbursement of expenses under Section 503(b)(3)(D) shall be forever barred from assertion against the Debtors, their respective Estates, the Liquidating Debtors, and the Purchasers, and the holders of any such Claims are barred from recovering any distributions under the Plan on account thereof.

To the extent not already paid by the Effective Date, the Second Lien Agent, any Second Lien Lender and any of their respective counsel, advisors, agents and professionals shall be entitled to receive only the amount that has already been specifically authorized by the Final Cash Collateral Order (*i.e.*, a total of $40,000 for the Second Lien Agent), and shall have no other Administrative Expense Claim or Substantial Contribution Claim.

2.1.4   *Bar Date for Filing Administrative Expense Claims.*  Except with respect to any Administrative Expense Claims (a) that are Allowed under this Plan or payable pursuant to an order of the Bankruptcy Court or (b) for which a different deadline is established by this Article 2, Administrative Expense Claims must be Filed no later than thirty (30) days after the Effective Date or any such Administrative Expense Claim is and shall be deemed to be forever barred and unenforceable against the Debtors, their respective Estates, their Assets, the Liquidating Debtors, and the Purchasers, and the

31

{00328380-23}

holders of any such Claims are barred from recovering any distributions under the Plan on account thereof.

# ARTICLE 3

## CLASSIFICATION AND TREATMENT
## OF CLAIMS AND INTERESTS

**3.1**     *Class 1.  Priority Tax Claims.*

   3.1.1   *Classification.*

   Class 1 consists of all Allowed Priority Tax Claims.

   3.1.2   *Treatment*

   (a)     To the extent Allowed Priority Tax Claims are Assumed Liabilities or LRGP Retained Liabilities under the Purchase Agreement, the Purchasers and/or Riverboat Gaming, as applicable, shall assume and/or timely perform and discharge such Allowed Priority Tax Claims in accordance with their respective terms and to the extent provided for in the Purchase Agreement.

   (b)     To the extent Allowed Priority Tax Claims (i) are not Assumed Liabilities or LRGP Retained Liabilities under the Purchase Agreement to be paid by the Purchasers or (ii) are not otherwise paid during the Chapter 11 Cases, each holder of such Allowed Priority Tax Claim shall be paid the Allowed Amount of such Allowed Priority Tax Claim, at the option of the Debtors (or, as applicable, the Liquidating Debtors) and the First Lien Ad Hoc Group: (x) in full, in Cash, by the Debtors or, as applicable, the Liquidating Debtors, on the Effective Date; or (y) in accordance with the terms of the underlying Allowed Priority Tax Claim; or (z) upon such other terms as may be agreed upon by the holder of such Allowed Priority Tax Claim and the Debtors or, as applicable,

32

CONFIDENTIAL

the Liquidating Debtors or otherwise established pursuant to a Final Order of the Bankruptcy Court, in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest at such rate as required by Section 511 of the Bankruptcy Code or otherwise as required by Section 1129(a)(9)(C) or (D) of the Bankruptcy Code.

3.1.3   *Impairment and Voting.*

Class 1 is Impaired by the Plan.  The holders of Class 1 Claims are entitled to vote to accept or reject the Plan.

**3.2**   ***Class 2.  Priority Claims.***

3.2.1   *Classification.*

Class 2 consists of all Allowed Priority Claims.

3.2.2   *Treatment.*

(a)      To the extent Allowed Priority Claims are Assumed Liabilities or LRGP Retained Liabilities under the Purchase Agreement, the Purchasers and/or Riverboat Gaming, as applicable, shall assume and/or timely perform and discharge such Allowed Priority Claims in accordance with their respective terms and to the extent provided for in the Purchase Agreement.

(b)      To the extent Allowed Priority Claims (i) are not Assumed Liabilities or LRGP Retained Liabilities under the Purchase Agreement to be paid by the Purchasers or (ii) are not otherwise paid during the Chapter 11 Cases, each holder of such Allowed Priority Claim shall be paid the Allowed Amount of such Allowed Priority Claim, at the option of the Debtors (or, as applicable, the Liquidating Debtors) and the First Lien Ad Hoc Group: (x) in full, in Cash, by the Debtors or, as applicable, the Liquidating Debtors, on the Effective Date, or (y) in accordance with the terms of the

33

{00328380-23}

underlying Allowed Priority Claim; or (z) upon such other terms as may be agreed upon by the holder of such Allowed Priority Claim and the Debtors or, as applicable, the Liquidating Debtors or otherwise established pursuant to a Final Order of the Bankruptcy Court.

### 3.2.3   *Impairment and Voting.*

Class 2 is Impaired by the Plan.  The holders of Class 2 Claims are entitled to vote to accept or reject the Plan.

### 3.3   *Class 3.  Secured Tax Claims.*

### 3.3.1   *Classification.*

Class 3 consists of all Allowed Secured Tax Claims.

### 3.3.2   *Treatment.*

(a)     To the extent Allowed Secured Tax Claims are Assumed Liabilities or LRGP Retained Liabilities under the Purchase Agreement, the Purchasers and/or Riverboat Gaming, as applicable, shall assume and/or timely perform and discharge such Allowed Secured Tax Claims in accordance with their respective terms and to the extent provided for in the Purchase Agreement.

(b)     To the extent Allowed Secured Tax Claims (i) are not Assumed Liabilities or LRGP Retained Liabilities under the Purchase Agreement to be paid by the Purchasers or (ii) are not otherwise paid during the Chapter 11 Cases, each holder of such Allowed Secured Tax Claim shall be paid the Allowed Amount of such Allowed Secured Tax Claim, at the option of the Debtors (or, as applicable, the Liquidating Debtors) and the First Lien Ad Hoc Group: (x) in full, in Cash, on the Effective Date or as soon as practicable thereafter; or (y) in accordance with the terms of the underlying Allowed

34

HDPH DRAFT 10/25/2012
FOR DISCUSSION PURPOSES ONLY

Secured Tax Claim; or (z) upon such other terms as may be agreed upon by the holder of such Allowed Secured Tax Claim and the Debtors or, as applicable, the Liquidating Debtors or otherwise established pursuant to a Final Order of the Bankruptcy Court, in an aggregate amount equal to such Allowed Secured Tax Claim, together with interest at such rate as required by Section 511 of the Bankruptcy Code or otherwise as required by Section 1129(a)(9)(C) or (D) of the Bankruptcy Code.

(c) *Collateral.* Each holder of an Allowed Secured Tax Claim that has a Permitted Encumbrance shall retain the Permitted Encumbrance on the Debtors' Assets with the same validity, priority and extent that existed on the Petition Date until paid in full under the Plan or the Purchase Agreement. Those Encumbrances granted to the holders of Allowed Secured Tax Claims that are not Permitted Encumbrances shall be cancelled, terminated and erased and have no further effect as of the Effective Date. Each holder of (i) Secured Tax Claims that are not Allowed, (ii) Allowed Secured Tax Claims with Encumbrances that are not Permitted Encumbrances; or (iii) Allowed Secured Tax Claims with Permitted Encumbrances after the payment in full of such Allowed Secured Tax Claim under the Plan or the Purchase Agreement, shall execute any and all documents reasonably necessary to effectuate the cancellation, termination and erasure of such Encumbrances (and the Debtors, the Liquidating Debtors and the Purchasers each are hereby authorized to execute, file and deliver any documents reasonably necessary to effectuate the cancellation, termination and erasure of such Encumbrances in the event any such holder declines to do so).

35

{00328380-23}

CONFIDENTIAL

LEGENDS0051683

### 3.3.3   *Impairment and Voting.*

Class 3 is Impaired by the Plan. The holders of Class 3 Claims are entitled to vote to accept or reject the Plan.

**3.4   Class 4.   First Lien Lenders' Secured Claims.**

### 3.4.1   *Classification.*

Class 4 consists of the First Lien Lenders' Secured Claims, which shall be Allowed in the amount of $181,182,013.83 as of the Petition Date.

### 3.4.2   *Treatment of Class 4 First Lien Lenders' Secured Claims*

(a)    *General Terms.* In full satisfaction of the First Lien Lenders' Secured Claims but not the deficiency claim set forth in section 3.4.2(e) of the Plan, the First Lien Lenders shall receive *pro rata* (i) the Adjusted Cash Purchase Price, the Deposit Escrow Funds, any Post-Closing Net Working Capital Excess (each of the foregoing capitalized terms as defined in the Purchase Agreement), and all other amounts that are or become due from the Purchasers pursuant to the Purchase Agreement, after (A) distributions to holders of Allowed Claims and payment or reserve for other expenses to be paid in accordance with the Plan and (B) the payment of the Transaction Fees directly to Houlihan Lokey Capital, Inc. and Seaport Group Securities, LLC; plus (ii) the obligations of the borrower and guarantors under, and all payments under, the New First Lien Credit Agreement; plus (iii) the obligations of the borrower and guarantors under, and payments under, the New Second Lien Credit Agreement; plus (iv) any value that the Debtors' Estates may receive or possess before or after the Effective Date (including through litigation) in connection with the Debtors' Assets that are subject to the Liens securing the First Lien Lenders' Secured Claim and any Liens granted in favor of the

36

CONFIDENTIAL

**HDPH DRAFT 10/25/2012**
**FOR DISCUSSION PURPOSES ONLY**

First Lien Agent or the First Lien Lenders by order of the Bankruptcy Court. The amounts above shall be paid directly to the First Lien Agent for the benefit of itself and the First Lien Lenders, and shall not be paid to the Debtors, the Liquidating Debtors or the Debtors' Estates. From and after the Effective Date, the Existing First Lien Credit Agreement shall continue in effect solely for purposes of allowing the First Lien Agent to make distributions to the First Lien Lenders in accordance with the Purchase Agreement and the Plan, and permitting the First Lien Agent to maintain any rights or liens it may have for fees, costs and expenses under the Existing First Lien Credit Agreement.

(b)      *Payment of the Transaction Fees From the Proceeds of the Transaction.* The Transaction Fees shall be paid in cash directly to Houlihan Lokey Capital, Inc. and Seaport Group Securities, LLC, respectively, on the Effective Date or as soon as practicable thereafter from the proceeds of the Transaction. Houlihan Lokey Capital, Inc. shall not be required to File any motion or application with the Bankruptcy Court for approval of the Transaction Fees.

(c)      *Collateral.* The First Lien Agent and the First Lien Lenders shall retain all of their Liens and security interests in the Purchased Assets and the LRGP Retained Assets as provided in the Purchase Agreement, the New First Lien Credit Agreement, the New Second Lien Credit Agreement and all agreements and other documents in any way relating thereto or in furtherance thereof. The First Lien Agent and the First Lien Lenders shall retain all of their Liens and security interests in the Debtors' Assets that are not Purchased Assets and the LRGP Retained Assets, until such Assets are sold or liquidated (at which time such Liens shall attach to the proceeds of

37

{00328380-23}

**HDPH DRAFT 10/25/2012**
**FOR DISCUSSION PURPOSES ONLY**

such sales or liquidations).  Section 552 of the Bankruptcy Code shall not apply to limit any of the First Lien Lenders' Liens and security interests.

(d)  *Documentation*.  The Confirmation Order shall constitute Bankruptcy Court approval of the New First Lien Credit Agreement, the New Second Lien Credit Agreement and all agreements and other documents in any way relating thereto or in furtherance thereof, each of which as agreed upon by the borrower and the guarantors under the New First Lien Credit Agreement and the New Second Lien Credit Agreement, the First Lien Agent and the holders of at least 50.01% of the amount of the First Lien Lenders' Secured Claims outstanding as of the Petition Date, without any further action, formality or order of the Bankruptcy Court and without execution of such documents by any other First Lien Lenders.  The New First Lien Credit Agreement, the New Second Lien Credit Agreement and all agreements and other documents in any way relating thereto or in furtherance thereof that are executed or otherwise approved by the borrower and the guarantors, the First Lien Agent and the holders of at least 50.01% of the amount of the First Lien Lenders' Secured Claims outstanding as of the Petition Date shall, from and after the Effective Date, be binding and enforceable as to all First Lien Lenders (and any successors thereto and transferees and assignees thereof), including those First Lien Lenders that do not execute those agreements and documents.

(e)  *Deficiency Claim*.  The First Lien Lenders shall have an Allowed General Unsecured Claim in the amount of (i) $181,182,013.83 less (ii) the sum of the Adjusted Cash Purchase Price, the Deposit Escrow Funds, any Post-Closing Net Working Capital Excess (each of the foregoing capitalized terms as defined in the Purchase

38

{00328380-23}

HDPH DRAFT 10/25/2012
FOR DISCUSSION PURPOSES ONLY

Agreement), and all other amounts that are or become due from the Purchasers pursuant to the Purchase Agreement, which deficiency claim shall be classified in Class 8.

3.4.3   *Impairment and Voting.*

Class 4 is Impaired by the Plan.  The holders of Class 4 Claims are entitled to vote to accept or reject the Plan.

**3.5**     ***Class 5: Second Lien Lenders' Secured Claims.***

3.5.1   *Classification.*

Class 5 consists of the Second Lien Lenders' Secured Claims, which shall be Allowed in the amount of $116,252,898.38 as of the Petition Date.

3.5.2   *Treatment.*

(a)     *General Terms.* Because the Allowed First Lien Lenders' Secured Claims will not be paid in full under the Plan, the Second Lien Lenders' Secured Claims have no value under Section 506 of the Bankruptcy Code.  Accordingly, the entirety of the Second Lien Lenders' Secured Claims shall be treated as Class 8 General Unsecured Claims for all purposes, including voting and distributions under the Plan, and the Second Lien Lenders will receive no distribution on account of the Class 5 Second Lien Lenders' Secured Claims.  From and after the Effective Date, the Existing Second Lien Credit Agreement shall continue in effect solely for purposes of allowing the Second Lien Agent to make any distributions to the Second Lien Lenders on account of their Class 8 General Unsecured Claims in accordance with the Plan, and permitting the Second Lien Agent to maintain any rights it may have against the Second Lien Lenders for fees, costs and expenses under the Existing Second Lien Credit Agreement.

39

{00328380-23}

CONFIDENTIAL
LEGENDS0051687

HDPH DRAFT 10/25/2012
FOR DISCUSSION PURPOSES ONLY

(b)      *Collateral.* The Second Lien Lenders' Liens and security interests in the Debtors' Assets shall be cancelled, terminated and erased and have no further effect as of the Effective Date.  The Second Lien Agent or Second Lien Lenders shall execute any and all documents reasonably necessary to effectuate the cancellation, termination and erasure of any liens and security interests (and the Debtors, the Liquidating Debtors and the Purchasers each are hereby authorized to execute, file and deliver any documents reasonably necessary to effectuate the cancellation, termination and erasure of such Encumbrances in the event the Second Lien Agent and the Second Lien Lenders decline to do so).

3.5.3  *Impairment and Voting.*

Class 5 is not a voting Class.  The holders of Class 5 Claims are entitled to vote to accept or reject the Plan solely as Class 8 General Unsecured Creditors.

**3.6    *Class 6.  Other Secured Claims.***

3.6.1  *Classification.*

Class 6 consists of all Allowed Other Secured Claims. Class 6 consists of separate sub-Classes for each separate Allowed Other Secured Claim.

3.6.2  *Treatment.*

(a)  To the extent Allowed Other Secured Claims are Assumed Liabilities or LRGP Retained Liabilities under the Purchase Agreement, the Purchasers and/or Riverboat Gaming, as applicable, shall assume and/or timely perform and discharge the Allowed Other Secured Claims in accordance with their respective terms and to the extent provided for in the Purchase Agreement.

40

{00328380-23}

(b)   To the extent any Allowed Other Secured Claims are not Assumed Liabilities or LRGP Retained Liabilities under the Purchase Agreement, at the option of the Debtors (or, as applicable, the Liquidating Debtors) and the First Lien Ad Hoc Group, either (i) the legal, equitable, and contractual rights of the holder of such Allowed Other Secured Claim shall be reinstated as of the Effective Date in accordance with Section 1124(2) of the Bankruptcy Code; (ii) the holder of such Allowed Other Secured Claim against a Debtor shall (A) retain the Encumbrances securing such Allowed Other Secured Claim and (B) receive regular installment payments in Cash having a total value, as of the Effective Date (reflecting an interest rate determined as of the Effective Date under 26 U.S.C. § 6622), equal to such Allowed Other Secured Claim, over a period ending not later than five (5) years after the Petition Date; (iii) the collateral securing such Allowed Other Secured Claim shall be surrendered to the holder of such Allowed Other Secured Claim on the Effective Date or as soon as practicable thereafter; or (iv) the holder of such Allowed Other Secured Claim shall be paid in full in Cash on the Effective Date or as soon as practicable thereafter.

(c)   *Collateral.* Each holder of an Allowed Other Secured Claim that has a Permitted Encumbrance shall retain the Permitted Encumbrance on the Debtors' Assets with the same validity, priority and extent that existed on the Petition Date until paid in full under the Plan or the Purchase Agreement. Those Encumbrances granted to the holders of Allowed Other Secured Claims that are not Permitted Encumbrances shall be cancelled, terminated and erased and have no further effect as of the Effective Date. Each holder of (i) Other Secured Claims that are not Allowed, (ii) Allowed Other Secured Claims with Encumbrances that are not Permitted Encumbrances; or (iii)

41

{00328380-23}

HDPH DRAFT 10/25/2012
FOR DISCUSSION PURPOSES ONLY

Allowed Other Secured Claims with Permitted Encumbrances after the payment in full of such Allowed Other Secured Claim under the Plan or the Purchase Agreement, shall execute any and all documents reasonably necessary to effectuate the cancellation, termination and erasure of such Encumbrances (and the Debtors, the Liquidating Debtors and the Purchasers each are hereby authorized to execute, file and deliver any documents reasonably necessary to effectuate the cancellation, termination and erasure of such Encumbrances in the event any such holder declines to do so).

3.6.3   *Impairment and Voting.*

Class 6 is Impaired by the Plan. The holders of Class 6 Claims are entitled to vote to accept or reject the Plan.

**3.7   *Class 7. Assumed Liabilities and LRGP Retained Liabilities***

3.7.1   *Classification*

Class 7 consists of all Claims against the Debtors or Estates which constitute Assumed Liabilities and/or LRGP Retained Liabilities.

3.7.2   *Treatment*

The Purchasers and Riverboat Gaming, as applicable, shall assume and/or timely perform and discharge the Assumed Liabilities and LRGP Retained Liabilities, respectively, in accordance with their respective terms.

3.7.3   *Impairment and Voting.*

Class 7 is Impaired by the Plan. The holders of Class 7 Claims are entitled to vote to accept or reject the Plan.

42

{00328380-23}

CONFIDENTIAL

**3.8** ***Class 8. General Unsecured Claims (Including Rejection Damage Claims and Deficiency Claims of the First Lien Lenders and Second Lien Lenders).***

3.8.1  *Classification*

Class 8 consists of all Allowed General Unsecured Claims, including any Rejection Damage Claims, the deficiency Claims of the First Lien Lenders and Second Lien Lenders, and Allowed Other Secured Claims that are not Assumed Liabilities or LRGP Retained Liabilities under the Purchase Agreement.

3.8.2  *Treatment*

If the Class of Allowed General Unsecured Claims accepts the Plan pursuant to Section 1126(c) of the Bankruptcy Code, the holders of Allowed General Unsecured Claims shall be paid *pro rata* from the sum of $40,000 from sale proceeds otherwise payable to the First Lien Lenders. If, however, the Class of Allowed General Unsecured Claims does not accept the Plan pursuant to Section 1126(c) of the Bankruptcy Code, Class 8 General Unsecured Claims shall receive no distribution under the Plan.

3.8.3  *Impairment and Voting*

Class 8 is Impaired by the Plan. The holders of Class 8 Claims are entitled to vote to accept or reject the Plan.

**3.9** ***Class 9.  Interests in Riverboat Gaming.***

3.9.1  *Classification.*

Class 9 consists of the Debtors' Interests in Riverboat Gaming.

43

{00328380-23}

### 3.9.2 *Treatment.*

The Debtors' Interests in Riverboat Gaming shall be transferred to the Purchasers in accordance with the Purchase Agreement. The Debtors will not retain any Interests in Riverboat Gaming.

### 3.9.3 *Impairment and Voting*

Class 9 is Impaired by the Plan. The Holders of the Class 9 Allowed Interests will not retain any Interests under the Plan and are deemed to reject the Plan and are not entitled to vote to accept or reject the Plan.

**3.10 *Class 10. Preferred Interests*.**

### 3.10.1 *Classification.*

Class 10 consists of the Preferred Interests.

### 3.10.2 *Treatment.*

Holders of any and all Preferred Interests shall receive no distribution under the Plan and all Preferred Interests shall be cancelled on the Effective Date. As of the Effective Date, all Preferred Interests shall be deemed automatically canceled, terminated and of no further force or effect without any further act or action under any applicable agreement, law, regulation, order, or rule of law.

### 3.10.3 *Impairment and Voting.*

Class 10 is Impaired by the Plan. The holders of Class 10 Preferred Interests are deemed to reject the Plan and are not entitled to vote to accept or reject the Plan.

44

{00328380-23}

**3.11**   *Class 11.  Common Interests.*

3.11.1 *Classification.*

Class 11 consists of the Common Interests.

3.11.2 *Treatment.*

The holders of Class 11 Common Interests shall receive no distribution under this Plan and all Common Interests shall be cancelled on the Effective Date. As of the Effective Date, all Common Interests shall be deemed automatically canceled, terminated and of no further force or effect without any further act or action under any applicable agreement, law, regulation, order, or rule of law.

3.11.3 *Impairment and Voting.*

Class 11 is Impaired by the Plan.  The holders of Class 11 Common Interests are deemed to reject the Plan and are not entitled to vote to accept or reject the Plan.

# ARTICLE 4

# ACCEPTANCE OR REJECTION OF THE PLAN

**4.1**   *Impaired Classes Vote.*  Each holder of a Claim or Interest in an impaired Class receiving or retaining anything under this Plan is entitled to vote to accept or reject this Plan to the extent and in the manner provided in the Plan, the Bankruptcy Code and the Bankruptcy Rules, or in any voting procedures order.

**4.2**   *Acceptance by Impaired Classes of Claims.*  Acceptance of this Plan by any Impaired Class entitled to vote shall be determined in accordance with the Bankruptcy Code, the Bankruptcy Rules and any voting procedures order entered by the Bankruptcy Court.

45

{00328380-23}

4.3     *Designation of Classes Entitled to Vote.* Classes 1, 2, 3, 4, 6, 7, 8, 9, 10, and 11 are Impaired, and the holders of Claims in Classes 1, 2, 3, 4, 6, 7 and 8 are entitled to vote on the Plan. The holders of Interests in Classes 9, 10 and 11 are deemed to reject the Plan and are not entitled to vote, and Class 5 is not a voting Class.

4.4     *Nonconsensual Confirmation.*  With respect to any Impaired Class, including any Class of Claims or Interests created pursuant to amendments or modifications to this Plan, that does not accept the Plan or that is deemed to reject the Plan, the Debtors will request that the Bankruptcy Court confirm this Plan by Cramdown with respect to any such non-accepting Class or Classes at the Confirmation Hearing, and the filing of this Plan shall constitute a motion for such relief.

# ARTICLE 5

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

5.1     *General Treatment.*

(a)     As of and subject to the occurrence of the Effective Date, all executory contracts and unexpired leases of the Debtors, including but not limited to the Seller Excluded Contracts and the LRGP Excluded Contracts, shall be deemed to be rejected by the applicable Debtor as of the Effective Date, except for any executory contract or unexpired lease that: (i) previously has been assumed or assumed and assigned pursuant to an order of the Bankruptcy Court; (ii) is designated in the Purchase Agreement as a contract or lease to be assumed or assumed and assigned to Purchaser (such list of contracts and leases to be assumed, including post-petition contracts and leases assigned to Purchasers, as are described within the "Schedules of Assumed Contracts and Leases" attached to the Purchase Agreement as Schedules 1.1(a), 1.1(b), 1.1(d), 6.1(b) or as

46

CONFIDENTIAL                                                                                              LEGENDS0051694

**HDPH DRAFT 10/25/2012**
**FOR DISCUSSION PURPOSES ONLY**

otherwise designated by the Purchasers pursuant to <u>Section 2.6(e)</u> of the Purchase Agreement); or (iii) is the subject of a separate motion to assume or assume and assign or to reject under Section 365 of the Bankruptcy Code approved by the Purchasers and pending on the Effective Date. For the avoidance of doubt, with the consent of the Purchasers, the Debtors may add any executory contract or unexpired lease to the Schedule of Assumed Contracts and Leases, thereby providing for the assumption or assumption and assignment of such executory contract or lease pursuant to the terms hereof, or move to reject any executory contract or unexpired lease (including any such contracts or leases on the Schedule of Assumed Contracts and Leases), thereby providing for its rejection pursuant to the terms hereof, at any time prior to the Effective Date. Listing a contract or lease in the Schedule of Assumed Contracts and Leases or rejecting any contract or lease shall not constitute an admission by the applicable Debtor that the applicable Debtor or the Purchaser has any liability thereunder.

(b)      Subject to <u>section 5.2</u> of this Plan and to the occurrence of the Effective Date, entry of the Confirmation Order shall, subject to the occurrence of the Effective Date, constitute: (i) the approval, pursuant to Sections 365(a) and 1123(b) of the Bankruptcy Code, of the assumption and/or assumption and assignment of the executory contracts and unexpired leases assumed and/or assigned and the post-petition contracts and leases assigned pursuant to <u>section 5.1(a)</u> and <u>section 5.1(b)</u> of this Plan; and (ii) the approval, pursuant to Sections 365(a) and 1123(b) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected pursuant to <u>section 5.1(a)</u> and <u>section 5.1(b)</u> of this Plan. In addition, the Confirmation Order shall constitute a finding of fact and conclusion of law that: (i) all defaults of the Debtors under each

47

{00328380-23}

LEGENDS0051695
13-01007 - #99-6  File 10/23/13  Enter 10/23/13 15:34:37  Exhibit -F- (part 5) Pg 49 of 50

such assumed or assumed and assigned executory contract or unexpired leases shall be deemed cured with respect to each such assumed or assumed and assigned executory contract or unexpired leases, (ii) no remaining Cure Costs are due and owing and there is no compensation due for any actual pecuniary loss other than as may be established at the Cure Dispute Hearing (defined below) or set forth in the Assumption Notice (defined below), (iii) there is adequate assurance of future performance with respect to each such assumed or assumed and assigned executory contract or unexpired leases, (iv) such assumption or assumption and assignment is in the best interest of the applicable Debtor and its estate, (v) upon the Effective Date, the assumed or assumed and assigned executory contracts or unexpired leases constitute legal, valid, binding and enforceable contracts in accordance with the terms thereof, (vi) the counter party to each assumed or assumed and assigned executory contract or unexpired lease is required to and ordered to perform under and honor the terms of the assumed or assumed and assigned executory contract or unexpired lease; and (vii) the performance of each such assumed or assumed and assigned executory contract or unexpired lease after the Effective Date will be the responsibility of the Purchasers or Riverboat Gaming, as applicable, pursuant to 11 U.S.C. §363(k) and the Sellers shall have no further obligations thereunder. All executory contracts and unexpired leases assumed or assumed and assigned under the Plan or during the Chapter 11 Cases constitute valid contracts and leases, as applicable, enforceable by the Debtors or the Purchasers, as applicable, against the non-Debtor counterparties regardless of any cross-default or change of control provisions in any contracts or leases assumed, assumed or assigned, or rejected under the Plan or during the Chapter 11 Cases.

{00328380-23}

CONFIDENTIAL
LEGENDS0051696