EXECUTION COPY

Exhibit -A-

---

# PURCHASE AGREEMENT

---

**BY AND AMONG**

**LEGENDS GAMING, LLC,**

**LEGENDS GAMING OF LOUISIANA-1, LLC,**

**LEGENDS GAMING OF LOUISIANA-2, LLC,**

**and**

**LEGENDS GAMING OF MISSISSIPPI, LLC,**

**AS SELLERS**

**and**

**LOUISIANA RIVERBOAT GAMING PARTNERSHIP**

**and**

**GLOBAL GAMING LEGENDS, LLC,**

**GLOBAL GAMING VICKSBURG, LLC**

**and**

**GLOBAL GAMING BOSSIER CITY, LLC**

**AS PURCHASERS**

**and**

**GLOBAL GAMING SOLUTIONS, LLC**

**AS GUARANTOR**

**Dated as of July 25, 2012**

2096143.16

**TABLE OF CONTENTS**

**Page**

ARTICLE I DEFINITIONS .................................................................................................. 1

    Section 1.1.    Definitions.............................................................................. 1

    Section 1.2.    Other Terms .......................................................................... 20

    Section 1.3.    Headings ............................................................................... 20

    Section 1.4.    Interpretation ........................................................................ 21

    Section 1.5.    Time ...................................................................................... 21

ARTICLE II AGREEMENT OF PURCHASE AND SALE.......................................... 21

    Section 2.1.    Purchase and Sale ................................................................ 21

    Section 2.2.    Riverboat Gaming ............................................................... 22

    Section 2.3.    Purchase Price ...................................................................... 24

    Section 2.4.    Post-Closing Adjustment of Purchase Price ....................... 25

    Section 2.5.    Escrow Funds ....................................................................... 27

    Section 2.6.    Assumption and Assignment of Agreements........................ 28

    Section 2.7.    Allocation of Purchase Price ............................................... 29

    Section 2.8.    Nontransferable Assets ....................................................... 29

ARTICLE III BANKRUPTCY COURT APPROVAL ................................................. 30

    Section 3.1.    Qualified Bids ...................................................................... 30

    Section 3.2.    Bankruptcy Court Action .................................................... 30

    Section 3.3.    Bankruptcy Court Approval of Bid Procedures.................. 31

    Section 3.4.    Overbid Procedures.............................................................. 31

    Section 3.5.    Purchasers' Rights to Comment........................................... 32

ARTICLE IV REPRESENTATIONS AND WARRANTIES ...................................... 33

    Section 4.1.    Representations and Warranties of the Legends Entities.................. 33

    Section 4.2.    Representations and Warranties of the Purchaser............................ 37

ARTICLE V COVENANTS........................................................................................ 39

    Section 5.1.    Covenants of the Legends Entities....................................... 39

    Section 5.2.    Covenants of the Purchasers ............................................... 40

    Section 5.3.    Joint Obligations ................................................................. 42

    Section 5.4.    Approvals.............................................................................. 43

i

## TABLE OF CONTENTS
### (continued)

Page

Section 5.5.    Risk of Condemnation and Eminent Domain .................................. 43

Section 5.6.    Damage Before Closing ................................................................ 44

Section 5.7.    Break-Up Fee and Expense Reimbursement .................................. 44

ARTICLE VI EMPLOYEE MATTERS ......................................................... 44

Section 6.1.    Employment .................................................................................. 44

Section 6.2.    Employee Benefit Matters. ............................................................ 45

Section 6.3.    Defined Contribution Plans .......................................................... 46

Section 6.4.    Compliance with the WARN Act .................................................. 46

Section 6.5.    Employee Rights ........................................................................... 47

ARTICLE VII CONDITIONS TO CLOSING ................................................. 47

Section 7.1.    Conditions for the Purchasers ...................................................... 47

Section 7.2.    Conditions for the Legends Entities .............................................. 48

ARTICLE VIII CLOSING ............................................................................ 49

Section 8.1.    Closing Arrangements .................................................................. 49

Section 8.2.    Legends Entities' Deliveries ......................................................... 49

Section 8.3.    Purchaser's Deliveries .................................................................. 50

Section 8.4.    Tax Matters ................................................................................... 50

ARTICLE IX TERMINATION OF AGREEMENT ......................................... 52

Section 9.1.    Termination Rights ....................................................................... 52

Section 9.2.    Effect of Termination ................................................................... 54

ARTICLE X MISCELLANEOUS .................................................................. 55

Section 10.1.    As-Is/Where-Is Transaction; Survival ......................................... 55

Section 10.2.    Obligations as Covenants ............................................................. 56

Section 10.3.    Relationship of the Parties ............................................................ 56

Section 10.4.    Amendment of Agreement ............................................................ 56

Section 10.5.    Notices ......................................................................................... 56

Section 10.6.    Specific Performance .................................................................... 57

Section 10.7.    Fees and Expenses ....................................................................... 57

Section 10.8.    Governing Law; Jurisdiction; Service of Process ........................... 57

ii

## TABLE OF CONTENTS
### (continued)

|  |  | Page |
|---|---|---|
| Section 10.9. | Further Assurances | 58 |
| Section 10.10. | Entire Agreement | 58 |
| Section 10.11. | Waiver | 58 |
| Section 10.12. | Assignment | 58 |
| Section 10.13. | Successors and Assigns | 58 |
| Section 10.14. | Counterparts | 58 |
| Section 10.15. | Guarantee | 58 |

**List of Exhibits**

| | |
|---|---|
| Exhibit A: | Form of Assignment and Assumption Agreement |
| Exhibit B: | Form of Assignment and Assumption of Leases |
| Exhibit C: | Form of Bill of Sale |
| Exhibit D: | Form of First Lien Credit Agreement |
| Exhibit E-1: | Description of LRGP Real Property |
| Exhibit E-2: | Description of Seller Real Property |
| Exhibit F: | Sample Statement of Net Working Capital |
| Exhibit G: | Term Sheet for Second Lien Credit Agreement |
| Exhibit H: | Form of Deposit Escrow Agreement |
| Exhibit I: | Form of Working Capital Escrow Agreement |

**List of Schedules**

| | |
|---|---|
| Schedule 1.1(a) | Assumed Agreements |
| Schedule 1.1(b) | Assumed Leases |
| Schedule 1.1(c) | Seller Excluded Insurance Policies |
| Schedule 1.1(d) | LRGP Assumed Agreements |
| Schedule 1.1(e) | LRGP Excluded Insurance Policies |
| Schedule 1.1(f) | LRGP Transferred Permits |
| Schedule 1.1(g) | Permitted Encumbrances |
| Schedule 1.1(h) | Purchased Intellectual Property Rights |
| Schedule 1.1(i) | Transferred Permits |
| Schedule 1.1(j) | Purchased Claims |
| Schedule 4.1(a) | Subsidiaries |
| Schedule 4.1(c) | No Conflicts |
| Schedule 4.1(d) | Pending Litigation |
| Schedule 4.1(l) | Intellectual Property |
| Schedule 4.1(m) | Insurance |
| Schedule 4.1(n)(i) | Seller Benefit Plans |

## TABLE OF CONTENTS
### (continued)

**Page**

| | |
|---|---|
| Schedule 4.1(n)(ii) | Non-Compliance of Benefit Plans |
| Schedule 4.1(n)(v)(i) | COBRA Beneficiaries |
| Schedule 4.1(n)(v)(ii) | 2011 COBRA Claims |
| Schedule 4.1(n)(vii) | Transaction Bonuses |
| Schedule 4.1(p) | Taxes |
| Schedule 4.1(q) | Non-Compliance regarding Applicable Laws |
| Schedule 4.1(r) | Financial Statements |
| Schedule 4.1(s) | Brokers |
| Schedule 4.1(t) | Material Contracts |
| Schedule 6.1(a) | Certain Company Employees |
| Schedule 6.1(b) | Employment Agreements |

## PURCHASE AGREEMENT

This PURCHASE AGREEMENT (this "Agreement"), dated as of July 25, 2012, is made by and among Legends Gaming, LLC, a Delaware limited liability company ("Legends Gaming"), Legends Gaming of Louisiana-1, LLC, a Louisiana limited liability company ("Legends LA-1"), Legends Gaming of Louisiana-2, LLC, a Louisiana limited liability company ("Legends LA-2"), Legends Gaming of Mississippi, LLC, a Mississippi limited liability company ("Legends MS" and collectively with Legends Gaming, Legends LA-1 and Legends LA-2, the "Sellers" and each a "Seller"), as sellers, and Louisiana Riverboat Gaming Partnership, a Louisiana general partnership ("Riverboat Gaming"), and Global Gaming Legends, LLC, a Delaware limited liability company ("Global Legends"), Global Gaming Vicksburg, LLC, a Delaware limited liability company ("Global Vicksburg") and Global Gaming Bossier City, LLC, a Delaware limited liability company ("Global Louisiana" and collectively with Global Legends and Global Vicksburg, the "Purchasers" and each a "Purchaser"), as purchasers, and solely for purposes of Section 10.15 hereof, Global Gaming Solutions, LLC, a Delaware limited liability company (the "Guarantor"), as guarantor.  The Purchasers, the Sellers, Riverboat Gaming and the Guarantor are sometimes referred to in this Agreement collectively as the "Parties" and individually as a "Party" and the Sellers and Riverboat Gaming are sometimes referred to in this Agreement collectively as the "Legends Entities" and individually as a "Legends Entity."

### RECITALS:

A.     The Legends Entities own and operate the gaming facilities located in Bossier City, Louisiana and Vicksburg, Mississippi operating under the DiamondJack's trade name.

B.     The Parties have entered into this Agreement to set forth the terms and conditions of a transaction in which (i) Global Legends would acquire certain assets and assume certain liabilities of Legends Gaming, (ii) Global Vicksburg would acquire certain assets and assume certain liabilities of Legends MS and (iii) Global Louisiana would acquire certain assets and assume certain liabilities of Legends LA-1 and Legends LA-2, including all of the issued and outstanding partnership interests of Riverboat Gaming (the "LRGP Partnership Interests").

C.     This Agreement provides, among other things, that it is a condition precedent to the obligations of the Parties that the United States Bankruptcy Court (the "Bankruptcy Court") that will have jurisdiction over the Legends Entities' chapter 11 bankruptcy cases (collectively, the "Bankruptcy Case") approve the bidding protections for the Purchasers and the transactions contemplated by this Agreement, and that the order approving such transactions shall have become a Final Order (as defined herein).

### AGREEMENT

The Parties, intending to be legally bound, agree as follows:

### ARTICLE I
### DEFINITIONS

Section 1.1.     Definitions.  The following definitions apply to this Agreement and all

Exhibits and Schedules attached hereto:

"Accounts Receivable" means any and all (a) accounts receivable, notes receivable and other amounts receivable owed to a Legends Entity (whether current or non-current), together with all security or collateral therefor and any interest or unpaid financing charges accrued thereon, including all Actions pertaining to the collection of amounts payable, or that may become payable, with respect to products sold or services performed prior to the Closing Date, (b) construction allowances and other amounts due from landlords to a Legends Entity (including in respect of prior overcharges and insurance recoveries), (c) license and royalty receivables owed to a Legends Entity, (d) rebate receivables due from suppliers to a Legends Entity, and (e) insurance claims receivables owed to a Legends Entity.

"Acquired Employees" has the meaning set forth in Section 6.1(a).

"Action" means any action, complaint, suit, litigation, arbitration, appeal, petition, hearing or legal proceeding whether civil, criminal, administrative or otherwise, at law or in equity, by or before any Governmental Authority.

"Adjusted Cash Purchase Price" means (a) the Cash Purchase Price, minus (b) the Deposit Escrow Funds, plus (c) the Estimated Working Capital Excess Amount, if any, minus (d) the Estimated Working Capital Shortfall Amount, if any.

"Affiliate" means a Person that directly or indirectly, through one or more intermediaries, Controls or is Controlled by, or is under common Control with, the Person specified.

"Agreement" has the meaning set forth in the Preamble.

"Allocation Schedule" has the meaning set forth in Section 2.7.

"Alternative Transaction" means a transaction or series of related transactions (whether by way of merger, reorganization, consolidation, share exchange, business combination, recapitalization, joint venture, partnership, tender or exchange offer, asset sale or otherwise) involving (a) all or a material portion of the Purchased Assets, (b) the acquisition of fifty percent (50%) or more of the outstanding voting securities of (x) Legends Gaming, (y) Legends LA-1, Legends LA-2 and Legends MS, collectively or (z) Riverboat Gaming and Legends MS, collectively (or, in each case, any successor resulting from the Bankruptcy Case), or (c) the ability to otherwise direct or cause the direction of the management or policies of the Legends Entities (or any successor resulting from the Bankruptcy Case), whether through ownership of voting securities, by contract or otherwise; provided, however, that (i) the transfer or assignment of any such voting securities by William J. McEnery to (x) any one or more of his immediate family members by testamentary or intestate disposition or (y) any one or more of his creditors pursuant to his bankruptcy case, and (ii) the disposition, transfer or assignment of such voting securities by G. Dan Marshall to any other Person, in each case, shall not be, and shall not be deemed to be, an "Alternative Transaction."

"Applicable Laws" means all domestic or foreign statutes, laws, regulations, rules, ordinances and orders of any Governmental Authority having jurisdiction over an applicable Person or its properties, including any Gaming Regulations.

"Assignment and Assumption Agreement" means an agreement for the assignment by the Sellers and the assumption by the Purchasers of the Sellers' right, title and interest in and to the Assumed Agreements and the Sellers' Liabilities under the Assumed Agreements that constitute Assumed Liabilities, substantially in the form attached hereto as Exhibit A.

"Assignment and Assumption of Leases" means an agreement for the assignment by the Sellers and the assumption by the Purchasers of all of the Sellers' right, title and interest in and to the Assumed Leases and the Sellers' Liabilities under the Assumed Leases that constitute Assumed Liabilities, substantially in the form attached hereto as Exhibit B.

"Assumed Agreements" means the agreements that are assigned to the Purchasers pursuant to Section 365 of the Bankruptcy Code, the Confirmation Order or other order of the Bankruptcy Court, as applicable, and that are listed on Schedule 1.1(a) or Schedule 6.1(b) or otherwise designated by the Purchasers as Assumed Agreements pursuant to Section 2.6(e).

"Assumed Leases" means the leases that are assumed by the Sellers and assigned to the Purchasers pursuant to Section 365 of the Bankruptcy Code, the Confirmation Order, or other order of the Bankruptcy Court, as applicable, and that are listed on Schedule 1.1(b).

"Assumed Liabilities" means the following Liabilities (to the extent not paid prior to the Closing):

(a)     all trade payables of the Sellers to the extent reflected or reserved for on the Closing Date Balance Sheet;

(b)     all Consumer Liabilities of the Sellers;

(c)     any other Liabilities with respect to the Business and the Purchased Assets to the extent such Liabilities relate to the conduct of the Business from and after the Closing;

(d)     all Liabilities of the Sellers arising under the Assumed Agreements and the Assumed Leases, except for (i) Cure Costs arising under such Assumed Agreements and Assumed Leases and (ii) Liabilities arising from any breach under any such Assumed Agreement or Assumed Lease occurring prior to the Closing;

(e)     the Liabilities of the Sellers arising in the Ordinary Course of Business under purchase orders with suppliers open as of the Closing Date;

(f)     (i) all Liabilities arising out of or relating to any Transferred Employee, including those Liabilities set forth in Section 5.2(e), and all Liabilities arising out of or relating to any consultant, independent contractor or contract employee of the Business who performs services for any Purchaser on and after the Closing and (ii) all employee benefit Liabilities for any such Transferred Employee and any such consultant, independent contractor

3

or contract employee of the Business (including, in each case, their dependents and beneficiaries) to the extent provided in Article VI hereof;

(g)   without duplication (i) all Liabilities identified and reflected or reserved for on the Recent Balance Sheet to the extent not satisfied on or prior to the Closing Date or (ii) all Liabilities reflected or reserved for on the Closing Date Balance Sheet; and

(h)   (i) all Liabilities for Taxes relating to the Purchased Assets for all Pre-Closing Tax Periods to the extent reflected or reserved for on the Closing Date Balance Sheet (including all Liabilities for ad valorem Taxes relating to the Seller Real Property for all Pre-Closing Tax Periods), and (ii) all Liabilities for Taxes relating to the Purchased Assets for all taxable periods ending on or after the Closing Date, including ad valorem Taxes and assessments and other Taxes allocated to the Purchasers pursuant to Section 2.3(c) or Section 8.4.

"Auction" has the meaning set forth in Section 3.3.

"Bankruptcy Case" has the meaning set forth in the Recitals.

"Bankruptcy Code" means Title 11 of the United States Code.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Bidding Procedures Motion" means the motion requesting the Bankruptcy Court's entry of the Bidding Procedures Order.

"Bidding Procedures Order" has the meaning set forth in Section 3.3.  Nothing in the Bidding Procedures Order shall contravene or limit the terms of any cash collateral order that is entered in the Bankruptcy Case.

"Bill of Sale" means a bill of sale for the sale, transfer, assignment and conveyance by the Sellers and the acquisition and assumption by the Purchasers of all of the Sellers' right, title and interest in the Purchased Assets and for the Purchasers' assumption of Assumed Liabilities, substantially in the form attached hereto as Exhibit C.

"Break-Up Fee" has the meaning set forth in Section 5.7.

"Business" means the gambling, gaming, hospitality, entertainment and related businesses of the Legends Entities, as conducted by the Legends Entities, in Bossier City, Louisiana and Vicksburg, Mississippi.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks in New York City, New York are authorized or obligated to close under Applicable Laws.

"Cash" means the sum of (a) the Seller Cash and (b) the LRGP Cash.

"Cash Purchase Price" means Twenty Seven Million Five Hundred Thousand Dollars ($27,500,000).

"Closing" means the consummation of the Transaction in accordance with the terms set forth in Article VIII.

"Closing Date" means the first practical date, but no later than the fifth (5th) Business Day, following the satisfaction or waiver of all the conditions set forth in Article VII (other than such conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions) or such other date as the Sellers and the Purchasers shall mutually agree upon in writing.

"Closing Date Balance Sheet" has the meaning set forth in Section 2.4(a).

"Closing Date Financial Statements" has the meaning set forth in Section 2.4(a).

"Closing Date Net Working Capital" has the meaning set forth in Section 2.4(a).

"Closing Documents" means any agreements, instruments and other deliveries to be delivered at the Closing pursuant to Sections 8.2 and 8.3.

"Closing Report" has the meaning set forth in Section 2.4(a).

"COBRA" means the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended and Section 4980B of the IRC.

"Confidentiality Agreement" means that confidentiality agreement, dated March 26, 2012, between Legends Gaming and Global Gaming Solutions, LLC.

"Confirmation Order" means the order of the Bankruptcy Court, in form and substance reasonably satisfactory to the Purchasers, confirming the chapter 11 plan for the Legends Entities pursuant to Section 1129 of the Bankruptcy Code and which shall, among other things, (a) approve this Agreement and the sale of the Purchased Assets to the Purchasers on the terms and conditions set forth in this Agreement and authorize and direct the Sellers to proceed with the Transaction, (b) include a specific finding that the Purchasers are good faith purchasers of the Purchased Assets, (c) state that the Purchased Assets shall be sold and transferred to the Purchasers free and clear of all Encumbrances and Liabilities (other than Permitted Encumbrances and Assumed Liabilities), including any Encumbrance or Liability that is or may be asserted (before or after the Closing) by the Pension Benefit Guaranty Corporation or any other Person with respect to any pension plan of the Sellers or any Affiliate of the Sellers, all successor liability claims, and other Liabilities of every kind or description, to the fullest extent permitted by the Bankruptcy Code and applicable non-bankruptcy law, (d) state that the interest in and claims and rights under the Assumed Agreements and the Assumed Leases sold to the Purchasers under this Agreement shall be assumed and assigned or transferred to the Purchasers pursuant to Section 365 of the Bankruptcy Code notwithstanding a provision in any such Assumed Agreement or Assumed Lease or Applicable Law that prohibits, restricts or conditions the assignment or transfer of such Assumed Agreement or Assumed Lease and notwithstanding any default in such Assumed Agreements or Assumed Leases that shall have been cured prior to the Closing by the Sellers or otherwise in accordance with Section 365 of the Bankruptcy Code and the procedures set forth in the Bidding Procedures Order; (e) contain a finding that the Purchasers have not engaged in any of the acts prohibited by Section 363(n) of the Bankruptcy

5

Code; and (f) contain such other findings of fact, conclusions of law and orders reasonably required by the Purchasers and their counsel.

"Consent" means any approval, consent, ratification, permission, waiver or authorization.

"Consumer Liabilities" means all Liabilities of the Legends Entities with respect to returns of goods or merchandise, store or customer credits, gift cards and certificates, customer prepayments and overpayments, customer loyalty obligations or programs, customer refunds, warranty obligations with respect to goods or merchandise or returns of goods sold by licensees.

"Continuing Employees" has the meaning set forth in Section 6.1(a).

"Contracts" means any contracts and agreements, whether written or oral, entered into by a Legends Entity, or by which a Legends Entity is bound.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise, and "Controlling" and "Controlled" have meanings correlative thereto.

"Cost Of Repair" means, with respect to a material loss or damage to any of the Purchased Assets or the LRGP Retained Assets that occurs prior to the Closing, the cost to repair, restore or replace (as determined in the sole business judgment of the Legends Entities) such Purchased Asset or LRGP Retained Asset in a manner that, (a) in the case of any repair or restoration, would return such Purchased Asset or LRGP Retained Asset to a substantially similar condition as such Purchased Asset or LRGP Retained Asset had immediately prior to such loss or damage, and (b) in the case of any replacement, would allow the applicable Legends Entity to acquire a substantially similar asset in a substantially similar condition.

"Credit Agreements" means, collectively, the First Lien Credit Agreement and the Second Lien Credit Agreement.

"Cure Costs" means any and all costs, expenses or actions that the Legends Entities are required to pay or perform to assume any of the Assumed Agreements, the Assumed Leases and the LRGP Assumed Agreements pursuant to Section 365(f) of the Bankruptcy Code.

"Current Employees" means all employees of the Sellers employed immediately prior to the Closing Date.

"Deposit Escrow Agreement" has the meaning set forth in Section 2.5(a).

"Deposit Escrow Funds" has the meaning set forth in Section 2.5(a).

"Disclosure Schedules" means the disclosure schedules delivered by the Legends Entities to the Purchasers as provided herein; all references to Schedules in this Agreement, refer to schedules or parts of the Disclosure Schedules.

6

"Dispute Notice" has the meaning set forth in Section 2.4(c).

"Effective Time" means 12:01 a.m. on the Closing Date.

"Encumbrances" means all mortgages, pledges, charges, liens, debentures, trust deeds, claims, assignments by way of security or otherwise, security interests, conditional sales contracts or other title retention agreements or similar interests or instruments charging, or creating a security interest in the Purchased Assets or any part thereof or interest therein, and any agreements, leases, licenses, occupancy agreements, options, easements, rights of way, restrictions, executions or other encumbrances affecting title to the Real Property or any part thereof or interest therein.

"Environmental Laws" means all applicable federal, state, municipal and local laws, statutes, regulations and other legal requirements relating to the protection of the environment or natural resources.

"Environmental Permits" means all material licenses, permits, approvals, consents, certificates, registrations and other authorizations issued pursuant to Environmental Laws in respect of the Real Property.

"Environmental Reports" means accurate and complete copies of any material reports, studies, analyses, evaluations, assessments or monitoring data that have been performed with regard to the Real Property and which are in the possession or control of the Legends Entities.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any Person under common control within the meaning of Section 414(b), (c), (m) or (o) of the IRC, and the Treasury Regulations issued thereunder.

"Escrow Agent" has the meaning set forth in Section 2.5(a).

"Estimated Closing Date Balance Sheet" has the meaning set forth in Section 2.3(d).

"Estimated Closing Date Net Working Capital" has the meaning set forth in Section 2.3(d).

"Estimated Closing Report" has the meaning set forth in Section 2.3(d).

"Estimated Working Capital Excess Amount" means the amount, if any, by which the Estimated Closing Date Net Working Capital is greater than $5,550,000.

"Estimated Working Capital Shortfall Amount" means the amount, if any, by which the Estimated Closing Date Net Working Capital is less than $5,150,000.

"Excluded Assets" means:

(a)      (i) all Accounts Receivable owed by William J. McEnery to any Seller and (ii) all Accounts Receivable owed by any Seller or Riverboat Gaming, on the one hand, to any Seller, on the other hand;

(b)      any records, documents or other information relating to Excluded Employees, and any materials containing information about any Transferred Employee, disclosure of which would violate any Applicable Law;

(c)      the Sellers' (i) minute books and other corporate books and records relating to their organization and existence and the Sellers' books and records relating to Taxes of the Sellers, including Tax Returns filed by or with respect to the Sellers; provided, however, that the Purchasers shall have the right to make copies of any portions of such books and records related to the Purchased Assets, and (ii) books, records, information, files, data and plans (whether written, electronic or in any other medium), advertising and promotional materials and similar items relating to any Excluded Assets or Excluded Liabilities (including any books, records, information, files, data and plans prepared in connection with the transactions contemplated by this Agreement, including proposals received from other parties);

(d)      the Sellers' rights under this Agreement, the Closing Documents to which any Seller is a party and the other documents entered into in connection herewith, and all consideration payable or deliverable to the Sellers or their designees pursuant to the terms and provisions hereof;

(e)      other than the Assumed Agreements and the Assumed Leases, all Contracts of any Seller (the "Seller Excluded Contracts"), and all prepaid assets relating to the Seller Excluded Contracts;

(f)      any prepaid Tax, Tax receivable or Tax refund of the Sellers with respect to any period ending prior to the Closing;

(g)      except for the employment agreements set forth on Schedule 6.1(b), any Seller Benefit Plan or any right, title or interest in any assets of or relating to any Seller Benefit Plan;

(h)      any assets relating to Excluded Liabilities;

(i)      all limited liability company interests and other equity interests of the Sellers, except the Sellers' LRGP Partnership Interests;

(j)      all avoidance and recovery claims and Actions of the Sellers arising under Section 544, 547, 548, 549, or 550 of the Bankruptcy Code;

8

(k)      all Actions that any of the Sellers may have against any Person solely with respect to any Excluded Assets or that relate to any Excluded Liability;

(l)      premium refunds or other amounts payable in respect of any insurance contracts and/or policies (other than proceeds and rights to proceeds payable in respect of Purchased Assets, in each case, to the extent provided under clause (j) of the definition of Purchased Assets or Section 5.6) under which the Sellers are a party, a named insured or a beneficiary, including those set forth on Schedule 1.1(c), all of which will be cancelled by the Sellers effective as of the Closing Date, except for the stop loss insurance coverage for self-funded plans of the Sellers as provided in Section 6.2(d).

(m)      all Permits of the Sellers granted by any Governmental Authority, including any Gaming Authority, which, pursuant to Applicable Law, may not be transferred or otherwise assigned, including any liquor licenses and Permits issued by the Alcohol Beverage Control Division of the Mississippi Department of Revenue; and

(n)      all of the LRGP Excluded Assets.

"Excluded Employees" means all Current Employees and Former Employees, other than the Transferred Employees.

"Excluded Liabilities" means all Liabilities of the Sellers, whether existing on the Closing Date or arising thereafter to the extent such Liabilities result from any act, omission or circumstance taking place prior to the Closing, other than the Assumed Liabilities, including the following Liabilities of the Sellers:

(a)      all Liabilities of the Sellers relating to legal services, accounting services, financial advisory services, investment banking services or any other professional services performed in connection with this Agreement and the Transaction;

(b)      except to the extent expressly assumed by the Purchasers pursuant to Section 2.1(c), all Liabilities arising out of, relating to, or with respect to any Seller Benefit Plan (including, without limiting the foregoing, any Liabilities related to any Seller Benefit Plan which is an "employee pension benefit plan" (as defined in Section 3(2) of ERISA) that is subject to Section 302 or Title IV of ERISA or Section 412 of the IRC);

(c)      all Liabilities with respect to any Excluded Employee with respect to any period;

(d)      all Liabilities under the Seller Excluded Contracts (including for the avoidance of doubt all Liabilities under those Contracts listed on Schedule 6.1(b) that are not assumed by Purchasers as a result of the provisions of Section 2.6(f)), whether accruing or relating to a period of time as of, before or after the Closing;

(e)      (i) all Liabilities under the Assumed Agreements and the Assumed Leases for Cure Costs arising under such Assumed Agreements and Assumed Leases and (ii) all Liabilities arising from any breach under any such Assumed Agreements or Assumed Leases occurring prior to the Closing;

9

(f)     all Liabilities to the extent related to Excluded Assets;

(g)     except to the extent expressly assumed by the Purchasers pursuant to Section 2.1(c), all Liabilities of the Sellers arising as a result of any Action initiated at any time, to the extent related to the Sellers or the Purchased Assets prior to the Closing Date;

(h)     all Liabilities arising in connection with any violation of any Applicable Law or Order by any of the Sellers to the extent relating to the period prior to the Closing;

(i)     except to the extent expressly assumed by the Purchasers pursuant to Section 2.1(c), all Liabilities for Taxes to the extent relating to taxable periods ending prior to the Closing Date;

(j)     all accounts payable owed by any Seller, on the one hand, to any Seller or Riverboat Gaming, on the other hand; and

(k)     all of the LRGP Excluded Liabilities.

"Existing First Lien Credit Agreement" means that certain Amended and Restated Credit Agreement, dated as of August 31, 2009, among Legends Gaming, LLC as borrower, Wilmington Trust Company as administrative agent, and the lenders party thereto.

"Expense Reimbursement" has the meaning set forth in Section 5.7.

"Final Order" means an order entered by the Bankruptcy Court (a) that has not been reversed, modified or withdrawn and that remains in full force and effect, and (b) that is not the subject of a stay.

"First Lien Credit Agreement" means that First Lien Credit Agreement, substantially in the form attached hereto as Exhibit D, to be executed by the Purchasers and Riverboat Gaming, as borrowers, on the Closing Date, in favor of the administrative agent and the lenders party thereto in the principal amount of Sixty One Million Five Hundred Thousand Dollars ($61,500,000).

"Former Employees" means all individuals who have been employed by a Seller who are not Current Employees.

"GAAP" means United States generally accepted accounting principles in effect from time to time.

"Gaming Approvals" means all Consents, permits, registrations, franchises, waivers and exemptions issued by any Gaming Authority required to permit the Parties to consummate the Transaction or necessary to permit the Purchasers to acquire the Purchased Assets, assume the Assumed Liabilities and operate the Business after the Closing, including (a) the final approval by the Mississippi Gaming Commission of the issuance of the gaming license for the operation of the riverboat casino of the Sellers located in Vicksburg, Mississippi, (b) the final approval by the Louisiana Gaming Control Board of the transfer of the LRGP Partnership Interests to Global Louisiana, (c) a finding of suitability or similar license or approval by each of the Mississippi Gaming Commission and the Louisiana Gaming Control Board as to each of the

10

necessary Persons affiliated with the Purchasers as required by such Gaming Authorities and (d) all other approvals necessary to consummate the Transaction and for the execution and delivery of the Credit Agreements, such approvals to be issued by each of the Mississippi Gaming Commission and the Louisiana Gaming Control Board.

"Gaming Authorities" means all Governmental Authorities with regulatory control or jurisdiction over the conduct of lawful gaming or gambling, including the Mississippi Gaming Commission, the Louisiana Gaming Control Board, the Riverboat Gaming Enforcement Division of the Louisiana State Police and, in each case, the staff of each of the foregoing.

"Gaming Regulations" means any domestic or foreign statutes, laws, regulations, rules, ordinances and orders of any Governmental Authority (including (a) the Mississippi Gaming Control Act and the rules and regulations promulgated thereunder, including the policies, interpretations and administration thereof by the Mississippi Gaming Commission, and (b) the Louisiana Gaming Control Law and the rules and regulations promulgated thereunder, including the policies, interpretations and administration thereof by the Louisiana Gaming Control Board), and any Order or other federal, state, local or foreign Permit, Consent, registration, finding of suitability or other authorization, including any condition or limitation placed thereon, governing or relating to casino and gaming activities and operations, including the current casino and gaming activities and operations of the Business, the Legends Entities, the Purchasers or any of their respective Affiliates, as the case may be.

"Global Legends" has the meaning set forth in the Preamble.

"Global Louisiana" has the meaning set forth in the Preamble.

"Global Vicksburg" has the meaning set forth in the Preamble.

"Governmental Authority" means any domestic, foreign or local government, quasi-governmental authority, regulatory authority, government department, agency, commission, board, or other tribunal or court.  For the avoidance of doubt, any tribal council or similar governing body of the Chickasaw Nation shall not be, and shall not be deemed to be, a Governmental Authority for any purpose under this Agreement.

"Guarantor" has the meaning set forth in the Preamble.

"IBNR Claims Liabilities" means (a) for purposes of calculating the Estimated Closing Date Net Working Capital, the aggregate amount of accrued current liabilities of the Legends Entities for Pre-Closing IBNR Claims, which amount will be calculated in accordance with GAAP and determined on a basis consistent with the accounting methods, policies, practices and procedures, and in the same manner, with consistent classification and estimation methodology, employed by the Legends Entities in the preparation of the Recent Balance Sheet, and (b) for purposes of calculating the Closing Date Net Working Capital and notwithstanding anything to the contrary in this Agreement, the aggregate amount of all Pre-Closing IBNR Claims actually paid, or determined to be payable in accordance with the Legends Entities' past custom and practice, by the Purchasers during the ninety (90) day period immediately after the Closing Date.

"<u>Independent Accounting Firm</u>" means an independent U.S. nationally recognized accounting firm, as reasonably and mutually agreed upon by Legends Gaming and Global Legends.

"<u>Intellectual Property Rights</u>" means all trade or brand names, business names, trademarks (including logos), trademark registrations and applications, service marks, service mark registrations and applications, copyrights, copyright registrations and applications, issued patents and pending applications and other patent rights, industrial design registrations, pending applications and other industrial design rights, trade secrets, proprietary information and know-how, equipment and parts lists and descriptions, instruction manuals, inventions, inventors' notes, research data, blue prints, drawings and designs, formulae, processes, technology and other intellectual property, together with all rights under licenses, registered user agreements, technology transfer agreements and other agreements or instruments relating to any of the foregoing.

"<u>IRC</u>" means the Internal Revenue Code of 1986, as amended.

"<u>Knowledge of the Legends Entities</u>" means the actual knowledge of Raymond Cook, Felicia Gavin or Domenic Ricciardelli.

"<u>Legends Entity</u>" or "<u>Legends Entities</u>" have the meanings set forth in the Preamble.

"<u>Legends Gaming</u>" has the meaning set forth in the Preamble.

"<u>Legends LA-1</u>" has the meaning set forth in the Preamble.

"<u>Legends LA-2</u>" has the meaning set forth in the Preamble.

"<u>Legends MS</u>" has the meaning set forth in the Preamble.

"<u>Liability</u>" means any debt, obligation or liability of any nature, whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due.

"<u>LRGP Assumed Agreements</u>" means the agreements, including real property leases, that are assumed by Riverboat Gaming pursuant to Section 365 of the Bankruptcy Code and that are listed on <u>Schedule 1.1(d)</u> or <u>Schedule 6.1(b)</u> or otherwise designated by the Purchasers as LRGP Assumed Agreements pursuant to <u>Section 2.6(e)</u>.

"<u>LRGP Cash</u>" means the sum of (a) the aggregate cash and cash equivalents of Riverboat Gaming determined in accordance with GAAP, including cash contained in bank deposits or accounts (both restricted and unrestricted), the cage, TITO (Ticket-In, Ticket-Out) exchange devices, slot booths, count rooms and drop boxes, plus (b) the aggregate cash and cash equivalents held by third parties as security deposits or other forms of collateral or security in respect of payment or performance obligations of Riverboat Gaming.

"<u>LRGP Excluded Assets</u>" has the meaning set forth in <u>Section 2.2(b)</u>.

12

"LRGP Excluded Contracts" means, other than the LRGP Assumed Agreements, all Contracts of Riverboat Gaming.

"LRGP Excluded Liabilities" means all Liabilities of Riverboat Gaming, whether existing on the Closing Date or arising thereafter to the extent such Liabilities result from any act, omission or circumstance taking place prior to the Closing, other than the LRGP Retained Liabilities.

"LRGP Partnership Interests" has the meaning set forth in the Recitals.

"LRGP Real Property" means the real property described on Exhibit E-1 to this Agreement, together with (a) all of Riverboat Gaming's right, title and interest in all rights, easements and interests appurtenant thereto, including any streets or other public ways adjacent thereto and any development rights, water or mineral rights owned by, or leased to, Riverboat Gaming; and (b) all improvements located thereon.

"LRGP Regulatory Cash" means the minimum cash reserve requirement for Riverboat Gaming under the Louisiana Administrative Code Title 42, Section 2713 (Cash Reserve and Bonding Requirements), which amount shall be calculated in accordance with Riverboat Gaming's procedure for calculating its cash reserve requirement.

"LRGP Retained Assets" means all of Riverboat Gaming's right, title and interest in and to all of its assets and properties (whether tangible or intangible), including the LRGP Real Property, the LRGP Assumed Agreements, the LRGP Cash (including the LRGP Regulatory Cash) and the LRGP Transferred Permits, in each case, as the same may exist immediately after the consummation of the transactions contemplated by Section 2.2(b), excluding the LRGP Excluded Assets.

"LRGP Retained Liabilities" has the meaning set forth in Section 2.2(c).

"LRGP Transferred Permits" means, to the extent transferrable in connection with the consummation of the Transaction, all rights under all Permits of Riverboat Gaming used in, held for use in, necessary to or primarily related to the Business, including to the extent transferrable in connection with the consummation of the Transaction, those described on Schedule 1.1(f).

"Marketing Period" has the meaning set forth in Section 3.1(a).

"Material Adverse Effect" means a material adverse effect on the Purchased Assets and LRGP Retained Assets, taken as a whole, other than such effect arising out of or resulting from (a) general changes in the U.S. economy, (b) general changes in the industries or markets in which the Legends Entities operate the Business, (c) war, major armed conflicts, national emergencies and acts of terrorism, (d) changes in Applicable Law or GAAP, (e) changes in the financial, banking, securities or capital markets, (f) the execution and delivery of this Agreement or public announcement of the Transaction (including any facts or circumstances relating to the Purchasers, their equity owners or investors or their respective Affiliates (including their respective identities)), and any adverse change so attributable in customer, employee, distributor, supplier, licensor, licensee, sub-licensee, co-promotion or joint venture

13

partner or similar relationships, including as a result of the identity of the Purchasers or their Affiliates, (g) changes to the Purchased Assets or the LRGP Retained Assets that are cured in all material respects as of the Closing Date, (h) any failure by the Legends Entities to meet any internal or published industry analyst projections or forecasts or estimates of revenues or earnings for any period (it being understood that the exception in this clause (h) shall not prevent a determination that the underlying cause of any such failure (if not otherwise falling within any of the other exceptions of this definition) is a Material Adverse Effect), (i) any change to, or effect on, any of the Excluded Assets or Excluded Liabilities or (j) the commencement of operations in respect of the Margaritaville casino in Bossier City, Louisiana; provided, however, that for purposes of the definition of Permitted Encumbrances, "Material Adverse Effect" shall be measured with respect to each parcel of Real Property owned by any of the Legends Entities. Further, no effect or change that arises out of or results from any action taken by any of the Legends Entities in connection with or as a result of the Bankruptcy Case shall be deemed to have, individually or in the aggregate, a Material Adverse Effect.

"Minimum Cash Liquidity Amount" means the sum of (a) $3,500,000 plus (b) the Regulatory Cash.

"Net Working Capital" means the positive or negative difference between (a) the sum of the aggregate (i) Cash and cash equivalents, (ii) Accounts Receivable (less applicable reserves) and (iii) prepaid expenses and other current assets, in each case included in the Purchased Assets and the LRGP Retained Assets, minus (b) the sum of the aggregate (i) accounts payable, (ii) payroll and related accrued liabilities, (iii) other accrued current liabilities (other than IBNR Claims Liabilities) and (iv) IBNR Claims Liabilities, in each case included in the Assumed Liabilities and the LRGP Retained Liabilities, and in the case of each of clause (a) and clause (b), calculated in accordance with GAAP and determined on a basis consistent with the accounting methods, policies, practices and procedures, and in the same manner, with consistent classification and estimation methodology, employed by the Legends Entities in the preparation of the Recent Balance Sheet. Notwithstanding anything herein to the contrary, Net Working Capital (A) shall be calculated in accordance with the calculation of the sample statement of Net Working Capital attached hereto as Exhibit F (and in the event of any conflict or inconsistency between GAAP and/or the accounting methods, policies, practices and procedures of the Legends Entities, on the one hand, and the sample statement of Net Working Capital attached hereto as Exhibit F, on the other hand, the sample statement of Net Working Capital shall control) and (B) shall not include (x) any Accounts Receivable owed by William J. McEnery to any Legends Entity or by any Legends Entity, on the one hand, to any other Legends Entity, on the other hand, (y) current maturities of long-term debt or (z) any current or deferred Tax assets.

"Notice" means any notice, request, consent, acceptance, waiver or other communication required or permitted to be given pursuant to this Agreement.

"Notifying Party" has the meaning set forth in Section 5.3(c).

"OFAC" has the meaning set forth in Section 4.1(i).

"Order" means any order, writ, judgment, injunction, decree, rule, ruling, directive, determination or award made, issued or entered by or with any Governmental

Authority, whether preliminary, interlocutory or final, including any order entered by the Bankruptcy Court in connection with the Bankruptcy Case.

"Ordinary Course of Business" means the operation and conduct of the affairs of the Legends Entities in the ordinary course of business, consistent with past practice (it being understood that the operation and affairs of the Legends Entities may take place while the Legends Entities are in bankruptcy).

"Outside Date" means (a) if there is an Auction, the date that is six (6) months after the date on which the Auction is concluded and (b) if there is no Auction, the date that is eight (8) months after the date of this Agreement; provided, however, that in the case of clause (a) or clause (b), as applicable, such date shall be extended for an additional ninety (90) days so long as Purchasers (i) deliver to the Sellers on such date a certificate executed by an executive officer of the Purchasers representing and certifying that all of the conditions set forth in Section 7.2 (other than the conditions set forth in Sections 7.2(g) and 7.2(h) and the portion of the condition set forth in Section 7.2(a) that the Purchasers make the deliveries required under Section 8.3) have been fulfilled as of such date and (ii) are, as of such date, continuing to use their commercially reasonable efforts to obtain the Gaming Approvals as promptly as practicable.

"Partners" means, collectively, Legends LA-1 and Legends LA-2.

"Party" has the meaning set forth in the Preamble.

"Permits" means any and all licenses, franchises, approvals, development rights and permits issued or granted by any Governmental Authority or pursuant to any Applicable Law.

"Permitted Encumbrances" means (a) all defects, exceptions, restrictions, easements, rights of way and encumbrances disclosed in policies of title insurance or surveys; provided that such items do not and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect; (b) statutory liens for current Taxes, assessments or other governmental charges not yet delinquent or the amount or validity of which is being contested in good faith by appropriate proceedings and for which the Legends Entities have established sufficient reserves; (c) mechanics', carriers', workers', repairers' and similar liens arising or incurred in the Ordinary Course of Business with respect to amounts not yet due (provided that such amounts arising or accruing prior to the Closing and not otherwise constituting Assumed Liabilities remain Excluded Liabilities); (d) laws, regulations, resolutions or ordinances, including those related to building, zoning and environmental protection, as to the use, occupancy, subdivision, development, conversion or redevelopment of the Real Property imposed by any Governmental Authority; (e) other imperfections in title, charges, easements, restrictions and Encumbrances, provided that such items do not and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect; (f) rights reserved to or vested in any Governmental Authority by Applicable Law to control or regulate, or obligations or duties under Applicable Law to any Governmental Authority with respect to, the use of any Real Property; (g) rights reserved to or vested in any Governmental Authority by Applicable Law to control or regulate, or obligations or duties under Applicable Law to any Governmental Authority with respect to, any right, power, franchise, grant, license or permit; (h)

15

maritime Encumbrances on ships, barges or other vessels for wages of a stevedore, when employed directly by a Person listed in 46 U.S.C. § 31341, crew's wages, salvage and general average, whether now existing or hereafter arising and other maritime Encumbrances which arise by operation of Applicable Law during the normal operations of such ships, barges or other vessels which (i) are paid in the Ordinary Course of Business and (ii) have not been recorded on the General Index or Abstract of Title (U.S.C.G. 1332) of such ships, barges or other vessels or judicially asserted; and (j) Encumbrances set forth on <u>Schedule 1.1(g)</u>.

"<u>Person</u>" means an individual, partnership, limited liability company, corporation, trust, unincorporated organization, government, or any department or agency thereof, and the successors and assigns thereof or the heirs, executors, administrators or other legal representatives of an individual.

"<u>Petition Date</u>" has the meaning set forth in <u>Section 3.2</u>.

"<u>Post-Closing Net Working Capital Excess</u>" means that amount, if any, by which (a) the Cash Purchase Price, plus (b) the Estimated Working Capital Excess Amount, if any, minus (c) the Estimated Working Capital Shortfall Amount, if any, is *less than* (i) the Cash Purchase Price, plus (ii) the amount, if any, by which the Closing Date Net Working Capital, as finally determined pursuant to <u>Section 2.4</u>, is greater than $5,550,000 minus (iii) the amount, if any, by which the Closing Date Net Working Capital, as finally determined pursuant to <u>Section 2.4</u>, is less than $5,150,000.

"<u>Post-Closing Net Working Capital Shortfall</u>" means that amount, if any, by which (a) the Cash Purchase Price, plus (b) the Estimated Working Capital Excess Amount, if any, minus (c) the Estimated Working Capital Shortfall Amount, if any, is *greater than* (i) the Cash Purchase Price, plus (ii) the amount, if any, by which the Closing Date Net Working Capital, as finally determined pursuant to <u>Section 2.4</u>, is greater than $5,550,000 minus (iii) the amount, if any, by which the Closing Date Net Working Capital, as finally determined pursuant to <u>Section 2.4</u>, is less than $5,150,000.

"<u>Pre-Closing IBNR Claims</u>" means all claims incurred but not reported prior to the Closing Date under the Seller Benefit Plans that are self-funded and that provide health benefits coverage or reimbursement of health claims to Acquired Employees and their dependents and beneficiaries.  For purposes of this definition, a claim is incurred when the services that are the subject of such claim are performed or provided.

"<u>Pre-Closing Tax Period</u>" means (a) any taxable period ending before, but not including, the Closing Date, and (b) the portion of any Straddle Period ending before, but not including, the Closing Date.

"<u>Prepaid Expenses</u>" means, as of the Effective Time, the aggregate amount of prepaid expenses and other prepayments of the Legends Entities determined in accordance with GAAP, except to the extent related to, or constituting, an Excluded Asset.

"<u>Purchase Price</u>" means (a) $125,000,000, as such amount may be adjusted pursuant to the definition of Adjusted Cash Purchase Price and <u>Section 2.4(e)</u> hereof, plus (b) the assumption of the Assumed Liabilities.

"Purchased Assets" means each of the following assets, but excluding any such assets that are Excluded Assets:

(a)     all Seller Cash (including all Seller Regulatory Cash) as of the Effective Time;

(b)     all tangible personal property owned by the Sellers as of the Closing Date (whether or not located on the Sellers' premises), including all machinery, equipment and tools, furniture and furnishings, computers and computer supplies, telephone, telecommunications, networking and Internet equipment and infrastructure, office materials and supplies, inventories of any kind or nature, raw materials and supplies, manufactured and purchased goods, and all goods in process and finished goods owned by the Sellers as of the Closing Date and used in, held for use in, necessary to or primarily relating to the Business;

(c)     the Seller Real Property;

(d)     all books, records, ledgers, files, documents, correspondence, customer, supplier, advertiser, circulation and other lists (including subscribers), invoices and sales data, creative, advertising and other promotional materials, studies, reports and other printed or written materials or data used in, held for use in, necessary to or primarily relating to the Business;

(e)     to the extent not prohibited under Applicable Law, all files and data related to the Transferred Employees;

(f)     all Intellectual Property Rights owned by the Sellers as of the Closing Date, goodwill associated therewith, licenses and sublicenses granted and obtained with respect thereto, rights thereunder, remedies against infringements thereof, and rights to protection of interests therein under the Applicable Laws, in each case used in, held for use in, necessary to or primarily relating to the Business, including those described on Schedule 1.1(h);

(g)     to the extent assignable, all rights under all Permits of any Seller used in, held for use in, necessary to or primarily relating to the Business, including to the extent assignable those described on Schedule 1.1(i) hereto;

(h)     all claims, Actions, Prepaid Expenses, prepayments, refunds, causes of action, choses in action, rights of recovery, rights of set off, and rights of recoupment of any kind or character of any Seller that have arisen from the operation of the Business or primarily relating to the Business, including those described on Schedule 1.1(j);

(i)     all rights under the Assumed Agreements and the Assumed Leases from and after the Effective Time;

(j)     all insurance proceeds and rights thereto derived from any loss, damage or destruction of or to any of the Purchased Assets occurring after the Closing and insurance proceeds and rights thereto derived from any loss, damage or destruction of or to any of the Purchased Assets occurring prior to the Closing to the extent such proceeds and rights were to be used to repair any of the Purchased Assets, but for which such repairs have not been made;

17

(k)      except as provided in the definition of Excluded Assets, all Accounts Receivable of the Sellers existing as of the Effective Time;

(l)      the riverboat vessel and barge housing the casino located in Vicksburg, Mississippi and any related barges and staging areas owned by the Sellers as of the Closing Date;

(m)      all of the LRGP Partnership Interests; and

(n)      the goodwill associated with the Business.

"Purchaser" and "Purchasers" have the meanings set forth in the Preamble.

"Purchaser Benefit Plans" has the meaning set forth in Section 6.2(b).

"Qualified Bid" has the meaning set forth in Section 3.3(b).

"Real Property" means, collectively, the Seller Real Property and the LRGP Real Property.

"Recent Balance Sheet" means the audited consolidated balance sheet of the Legends Entities as of December 31, 2011.

"Regulatory Cash" means the Seller Regulatory Cash and the LRGP Regulatory Cash, collectively.

"Representations" means the representations, warranties and certifications made or to be made pursuant to this Agreement and all agreements, documents and instruments entered into in connection herewith.

"Representatives" has the meaning set forth in Section 3.1(a).

"Riverboat Gaming" has the meaning set forth in the Preamble.

"Second Lien Credit Agreement" means that Second Lien Credit Agreement, substantially consistent with the terms and conditions set forth in the term sheet attached hereto as Exhibit G, to be executed by the Purchasers and Riverboat Gaming, as borrowers, on the Closing Date, in favor of the administrative agent and the lenders party thereto in the principal amount of Thirty Six Million Dollars ($36,000,000).

"Seller" and "Sellers" have the meanings set forth in the Preamble.

"Seller Benefit Plan" means any "employee benefit plan" (as defined in Section 3(3) of ERISA); any employment, consulting, retention, or change in control agreements or arrangements; and any other employee benefit arrangements or payroll practices, including bonus plans, incentive, equity or equity based compensation, or deferred compensation arrangements, termination or severance plans or arrangements, stock purchase, sick leave, vacation pay, salary continuation for disability, hospitalization, medical insurance, and life insurance plans and programs, (i) that are sponsored, maintained by, contributed to by or required to be contributed to by the Sellers or Riverboat Gaming for the benefit of Current

Employees, Former Employees or current or former employees of Riverboat Gaming, or (ii) with respect to which the Sellers or Riverboat Gaming may otherwise have any Liability, whether direct or indirect.

"Seller Cash" means the sum of (a) the aggregate cash and cash equivalents of the Sellers determined in accordance with GAAP, including cash contained in bank deposits or accounts (both restricted and unrestricted), the cage, TITO (Ticket-In, Ticket-Out) exchange devices, slot booths, count rooms and drop boxes, plus (b) the aggregate cash and cash equivalents held by third parties as security deposits or other forms of collateral or security in respect of payment or performance obligations related to the Purchased Assets.

"Seller Excluded Contracts" has the meaning set forth in clause (e) of the definition of Excluded Assets.

"Seller Real Property" means the real property described on Exhibit E-2 to this Agreement, together with (a) all of the Sellers' right, title and interest in all rights, easements and interests appurtenant thereto, including any streets or other public ways adjacent thereto and any development rights, water or mineral rights owned by, or leased to, Sellers; and (b) all improvements located thereon

"Seller Regulatory Cash" means the minimum bankroll requirements established pursuant to Mississippi Gaming Commission Regulation III – Operations, A – In General, Section 13 – Minimum Bankroll Requirements.

"Separate Tax Returns" has the meaning set forth in Section 8.4(b).

"Specified Reserve Adjustments" means the net amount by which the reserves with respect to the current assets and current liabilities specified in the Estimated Closing Date Balance Sheet (other than such reserves for IBNR Claims Liabilities) are adjusted in the Closing Date Balance Sheet (which Closing Date Balance Sheet shall otherwise be prepared in accordance with GAAP on a basis consistent with the accounting methods, policies, practices and procedures, and in the same manner, with consistent classification and estimation methodology, employed by the Legends Entities in the preparation of the Recent Balance Sheet), which (i) in the case of net adjustments having the effect of increasing Net Working Capital, shall be given effect in an amount equal to the amount by which such increase exceeds $300,000 and (ii) in the case of net adjustments having the effect of decreasing Net Working Capital, shall be given effect in an amount equal to the amount by which such decrease exceeds $300,000, and for the avoidance of doubt, no other changes to the Purchase Price shall be made with respect to reserve adjustments reflected in the Closing Date Balance Sheet.

"Straddle Period" means any taxable period that commences prior to and includes (but does not end on) the Closing Date.

"Tax" or "Taxes" means any federal, state, local or foreign net income, gross income, gross receipts, windfall profit, severance, property, production, sales, use, license, excise, franchise, employment, payroll, withholding, alternative or add on minimum, ad valorem, value added, transfer, stamp, or environmental tax, escheat payments or any other tax, custom,

duty, governmental fee or other like assessment or charge (together with any and all interest, penalties and additions to tax imposed with respect thereto).

"Tax Contest" has the meaning set forth in Section 8.4(f).

"Tax Return" or "Tax Returns" means all material returns, declarations of estimated tax payments, reports, estimates, information returns and statements, including any related or supporting information with respect to any of the foregoing, filed or to be filed with any taxing authority in connection with the determination, assessment, collection or administration of any Taxes.

"Termination Payment" has the meaning set forth in Section 5.7.

"Transaction" means the transactions contemplated herein.

"Transfer Taxes" means any transfer, documentary, sales, use, stamp, registration and other such taxes, any conveyance fees, any recording charges and any other similar fees and charges (including penalties and interest in respect thereof).

"Transferred Employees" has the meaning set forth in Section 6.1(a).

"Triggering Event" has the meaning set forth in Section 6.4.

"WARN Act" means the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 *et seq.* (1988) and any similar "mass layoff" or "plant closing" laws.

"Working Capital Escrow Agreement" has the meaning set forth in Section 2.5(b).

"Working Capital Escrow Funds" means, as applicable, the Estimated Working Capital Excess Amount, if any, or the Estimated Working Capital Shortfall Amount, if any.

Section 1.2.   Other Terms.  Other terms may be defined elsewhere in this Agreement and, unless otherwise indicated, shall have such meaning throughout this Agreement.  As used in this Agreement, any reference to any federal, state, local, or foreign law, including any Applicable Law, will be deemed also to refer to such law as amended and all rules and regulations promulgated thereunder, unless the context requires otherwise. The words "*include*", "*includes*", and "*including*" will be deemed to be followed by "*without limitation*". Pronouns in masculine, feminine, or neuter genders will be construed to include any other gender, and words in the singular form will be construed to include the plural and vice versa, unless the context otherwise requires.  The words "*this Agreement*", "*herein*", "*hereof*", "*hereby*", "*hereunder*", and words of similar import refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited.  References in this Agreement to Articles, Sections, Schedules or Exhibits are to Articles or Sections of, Schedules or Exhibits to, this Agreement, except to the extent otherwise specified herein.

Section 1.3.   Headings.  The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and are not part of this Agreement and do not in any way limit or modify the terms or provisions of this Agreement and shall not affect the

interpretation hereof.

Section 1.4.    Interpretation.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  If an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the Parties and no presumption or burden of proof will arise favoring or disfavoring any Party because of the authorship of any provision of this Agreement.

Section 1.5.    Time.    Time shall be of the essence in this Agreement.   Except as expressly set out in this Agreement, the computation of any period of time referred to in this Agreement shall exclude the first day and include the last day of such period.  If the time limited for the performance or completion of any matter under this Agreement expires or falls on a day that is not a Business Day, the time so limited shall extend to the next following Business Day. Whenever action must be taken (including the giving of notice, the delivery of documents or the funding of money) under this Agreement, prior to the expiration of, by no later than or on a particular date, unless otherwise expressly provided in this Agreement, such action must be completed by 5:00 p.m. on such date.  The time limited for performing or completing any matter under this Agreement may be extended or abridged by an agreement in writing by the Parties or by their respective attorneys.  Except as otherwise specifically stated herein, all references herein to time are references to Central Standard or Central Daylight time, as applicable.

## ARTICLE II
## AGREEMENT OF PURCHASE AND SALE

Section 2.1.    Purchase and Sale.

(a)    Purchased Assets.  Subject to the terms and conditions of this Agreement, at the Closing, the Sellers shall sell, transfer, assign and convey, and the Purchasers shall acquire and assume, all right, title and interest of the Sellers in the Purchased Assets, as follows:

(i)    Legends Gaming shall sell, transfer, assign and convey, and Global Legends shall acquire and assume, all of the rights, title and interest of Legends Gaming in the Purchased Assets;

(ii)    Legends MS shall sell, transfer, assign and convey, and Global Vicksburg shall acquire and assume, all of the rights, title and interest of Legends MS in the Purchased Assets; and

(iii)    Legends LA-1 and Legends LA-2 shall sell, transfer, assign and convey, and Global Louisiana shall acquire and assume, all of the rights, title and interests of Legends LA-1 and Legends LA-2, respectively, in the Purchased Assets.

(b)    Excluded Assets.  Notwithstanding anything to the contrary contained in this Agreement, the Excluded Assets are not part of the sale and purchase contemplated by this Agreement, are excluded from the Purchased Assets and will remain the property of the Sellers after the Closing.

(c)    Assumed Liabilities.  Subject to the terms and conditions of this Agreement, at the Closing, the Purchasers shall assume and timely perform and discharge in accordance with

21

their respective terms, the Assumed Liabilities.

(d)   Excluded Liabilities.  The Excluded Liabilities will remain the responsibility of the Sellers.  The Purchasers shall not assume the Excluded Liabilities.

(e)   Condition of Conveyance.   The Purchased Assets shall be sold, conveyed, assigned and transferred by each Seller to the applicable Purchaser by appropriate instruments of transfer, bills of sale, deeds, endorsements, and assignments, all in form and substance reasonably satisfactory to the Purchasers and the Sellers, free and clear of any and all Encumbrances, other than the Permitted Encumbrances.

Section 2.2.   Riverboat Gaming.

(a)   LRGP Retained Assets.  The Parties acknowledge and agree that the LRGP Retained Assets shall not be transferred, assigned or conveyed to the Partners and Riverboat Gaming shall retain the LRGP Retained Assets as of the Closing.

(b)   LRGP Excluded Assets.  Immediately prior to the Closing, LRGP shall transfer, assign and convey to the Partners, and the Partners shall accept the assignment of, all of Riverboat Gaming's right, title and interest in and to the following (collectively, the "LRGP Excluded Assets"):

(i)   (A) all Accounts Receivable owed by William J. McEnery to Riverboat Gaming and (B) all Accounts Receivable owed by any Seller to Riverboat Gaming;

(ii)   any records, documents or other information relating to employees of Riverboat Gaming that will not be Continuing Employees, if any, and any materials containing information about any Continuing Employee, disclosure of which would violate any Applicable Law;

(iii)   all LRGP Excluded Contracts, and all prepaid assets relating to the LRGP Excluded Contracts;

(iv)   any prepaid Tax, Tax receivables or Tax refunds of Riverboat Gaming with respect to any period ending prior to the Closing;

(v)   except for the employment agreements set forth on Schedule 6.1(b), any Seller Benefit Plan or any right, title or interest in any assets of or relating to any Seller Benefit Plan;

(vi)   any assets relating to LRGP Excluded Liabilities;

(vii)   all avoidance and recovery claims and Actions of Riverboat Gaming arising under Section 544, 547, 548, 549, or 550 of the Bankruptcy Code;

(viii)   all Actions that Riverboat Gaming may have against any Person solely with respect to any LRGP Excluded Asset or LRGP Excluded Contract or that relates to any LRGP Excluded Liability;

22

(ix)   premium refunds or other amounts payable in respect of any insurance contracts and/or policies (other than proceeds and rights to proceeds payable in respect of LRGP Retained Assets, in each case, to the extent provided under <u>Section 5.6</u> or are derived from any loss, damage or destruction of or to any of the LRGP Retained Assets occurring prior to the Closing to the extent such proceeds and rights were to be used to repair any of the LRGP Retained Assets, but for which such repairs have not been made) under which Riverboat Gaming is a party, a named insured or a beneficiary, including those set forth on <u>Schedule 1.1(e)</u>, all of which will be cancelled by Riverboat Gaming effective as of the Closing Date, except for the stop loss insurance coverage for self-funded plans of Riverboat Gaming as provided in <u>Section 6.2(d)</u>; and

(x)   all Permits of Riverboat Gaming granted by any Governmental Authority, including any Gaming Authority, other than the LRGP Transferred Permits.

(c)   <u>LRGP Retained Liabilities</u>.   The Parties acknowledge and agree that the following Liabilities of Riverboat Gaming (collectively, the "<u>LRGP Retained Liabilities</u>") shall not be transferred or assigned to the Partners and Riverboat Gaming shall retain, be liable for, and shall timely perform and discharge in accordance with their respective terms the following:

(i)   all trade payables of Riverboat Gaming to the extent reflected or reserved for on the Closing Date Balance Sheet;

(ii)   all Consumer Liabilities of Riverboat Gaming;

(iii)   any other Liabilities with respect to the Business and the LRGP Retained Assets to the extent such Liabilities relate to the conduct of the Business from and after the Closing;

(iv)   all Liabilities of Riverboat Gaming arising under the LRGP Assumed Agreements, except for (A) Cure Costs arising under such LRGP Assumed Agreements and (B) Liabilities arising from any breach under any such LRGP Assumed Agreement occurring prior to the Closing;

(v)   the Liabilities of Riverboat Gaming arising in the Ordinary Course of Business under purchase orders with suppliers open as of the Closing Date;

(vi)   (A) all Liabilities arising out of or relating to any Continuing Employee and all Liabilities arising out of or relating to any consultant, independent contractor or contract employee of the Business who performs services for Riverboat Gaming on and after the Closing and (B) all employee benefit Liabilities for any such Continuing Employee and any such consultant, independent contractor or contract employee of the Business (including, in each case, their dependents and beneficiaries) to the extent provided in <u>Article VI</u> hereof;

(vii)   without duplication (A) all Liabilities identified and reflected or reserved for in Recent Balance Sheet to the extent not satisfied on or prior to the Closing Date or (B) all Liabilities reflected or reserved for on the Closing Date Balance Sheet; and

(viii)   (A) all Liabilities for Taxes relating to the LRGP Retained Assets for all Pre-Closing Tax Periods to the extent reflected or reserved for on the Closing Date

23

Balance Sheet (including all Liabilities for ad valorem Taxes relating to the LRGP Real Property for all Pre-Closing Tax Periods), and (B) all Liabilities for Taxes relating to the LRGP Retained Assets for all taxable periods ending on or after the Closing Date, including ad valorem Taxes and assessments and other Taxes allocated to the Purchasers pursuant to Section 2.3(c) or Section 8.4.

(d)        LRGP Excluded Liabilities.  Except to the extent that the LRGP Excluded Liabilities shall be discharged upon the Closing Date pursuant to a chapter 11 plan for the Sellers, immediately prior to the Closing, LRGP shall transfer and assign to the Partners, and the Partners shall assume, the LRGP Excluded Liabilities.

Section 2.3.        Purchase Price.  At the Closing:

(a)        Global Legends shall pay the Purchase Price (i) by wire transfer of the Adjusted Cash Purchase Price (other than the Estimated Working Capital Excess Amount, if any) in immediately available funds to an account designated in writing by the administrative agent under the Existing First Lien Credit Agreement, (ii) by depositing the Estimated Working Capital Excess Amount, if any, with the Escrow Agent in accordance with Section 2.5(b) below, (iii) by disbursement of the Deposit Escrow Funds to an account designated in writing by the administrative agent under the Existing First Lien Credit Agreement, and in connection therewith Global Legends and Legends Gaming shall deliver joint written instructions to the Escrow Agent to cause the Escrow Agent to release and deliver to the Sellers the Deposit Escrow Funds pursuant to the terms and conditions of the Escrow Agreement, and (iv) by execution and delivery to the respective administrative agent of each of the Credit Agreements, with the obligations thereunder to be established in accordance with the terms and conditions set forth in the Credit Agreements; and

(b)        (i) Global Legends shall assume, perform, pay and discharge the Assumed Liabilities of Legends Gaming, (ii) Global Vicksburg shall assume, perform, pay and discharge the Assumed Liabilities of Legends MS and (iii) Global Louisiana shall assume, perform, pay and discharge the Assumed Liabilities of Legends LA-1 and Legends LA-2.

(c)        Allocation of Ad Valorem Taxes.  Except to the extent expressly assumed by the Purchasers pursuant to Section 2.1(c) or retained by Riverboat Gaming pursuant to Section 2.2(c), the Sellers shall pay any Liability for ad valorem Taxes and assessments (including any special or supplemental assessments) on any Purchased Asset or LRGP Retained Asset allocable to any Pre-Closing Tax Period (without regard to when such Taxes are assessed or payable).  The Purchasers shall pay all other Liabilities for ad valorem Taxes and assessments (including (i) those that are assumed by the Purchasers pursuant to Section 2.1(c), (ii) those that are retained by Riverboat Gaming pursuant to Section 2.2(c) and (iii) any special or supplemental assessments) on any Purchased Asset or LRGP Retained Asset (without regard to when such Taxes are assessed or payable).  In either case, the amount of  Tax allocable to a Pre-Closing Tax Period of a Straddle Period shall be deemed to be the amount of such Tax for the entire Straddle Period multiplied by a fraction, the numerator of which is the number of days in the Pre-Closing Tax Period and the denominator of which is the number of days in the Straddle Period.  If one Party remits to the appropriate Governmental Authority payment for Taxes that are subject to this Section 2.3(c) and such payment includes the other Party's share of such Taxes, such other Party shall promptly reimburse the remitting Party for its share of such Taxes upon written notice from

24

such paying Party.

(d)     Estimated Net Working Capital.  At least three (3) Business Days prior to the Closing Date, Legends Gaming will deliver to Global Legends (i) an estimated unaudited consolidated balance sheet of the Business as of the Effective Time (the "Estimated Closing Date Balance Sheet") and (ii) a report (the "Estimated Closing Report") setting forth a reasonably detailed computation of the estimated Net Working Capital as of the Effective Time (the "Estimated Closing Date Net Working Capital"), and the resulting adjustment to the Adjusted Cash Purchase Price, if any, together with copies of all work papers of Legends Gaming, its Affiliates and their Representatives reasonably relating to the item or items resulting in such adjustment and an explanation of the rationale for such adjustment.  The Estimated Closing Date Balance Sheet will be prepared in good faith and in accordance with GAAP on a basis consistent with the accounting methods, policies, practices and procedures, and in the same manner, with consistent classification and estimation methodology, employed by the Legends Entities in the preparation of the Recent Balance Sheet; provided, however, that the Estimated Closing Date Balance Sheet shall reflect no changes in reserves (regardless of whether any such reserve is recorded as an offset to an asset's carrying value or is an accrued liability or otherwise) from amounts contained in the Recent Balance Sheet, other than changes therein attributable to changes in facts and circumstances occurring during the period beginning on the day immediately following the date of the Recent Balance Sheet and ending at the Effective Time.  The Estimated Closing Date Net Working Capital will be derived from the Estimated Closing Date Balance Sheet, and the Estimated Closing Report will be prepared in a format consistent with the sample statement of Net Working Capital set forth in Exhibit F.  In connection with the review of the Estimated Closing Report by Global Legends, Global Legends and its Representatives shall have reasonable access during normal business hours to (A) all work papers, schedules, memoranda and other documents prepared by Legends Gaming, its Affiliates or their Representatives in connection with their preparation of the Estimated Closing Report and the calculation of the Estimated Closing Date Net Working Capital, and (B) the books and records, finance personnel and any other information of Legends Gaming and its Affiliates, and Legends Gaming shall, and shall cause its Affiliates (including Riverboat Gaming) to, cooperate reasonably with Global Legends and its Representatives in connection therewith.  The parties will cooperate in good faith to reach agreement regarding the Estimated Closing Date Net Working Capital; provided, however, that if no such agreement is reached, the Estimated Closing Date Net Working Capital, as set forth in the Estimated Closing Report shall be final and binding on all Parties.

Section 2.4.     Post-Closing Adjustment of Purchase Price.

(a)     As soon as practicable after Global Legends receives the report from the third party administrator of the Seller Benefit Plans that are self-funded listing the IBNR Claims Liabilities actually paid, or determined to be payable in accordance with the Legends Entities' past custom and practice, by the Purchasers during the ninety (90) day period immediately after the Closing Date (and in any event, not later than five (5) Business Days after Global Legends receives such report), Global Legends shall prepare and deliver to Legends Gaming (i) an unaudited consolidated balance sheet of the Business as of the Effective Time (the "Closing Date Balance Sheet") and (ii) a report (the "Closing Report" and, together with the Closing Date Balance Sheet, the "Closing Date Financial Statements"), setting forth a reasonably detailed computation of the Net Working Capital as of the Effective Time (the "Closing Date Net

25

Working Capital"), and the resulting adjustment to the Adjusted Cash Purchase Price, if any, in accordance with this Section 2.4, together with copies of all work papers of Global Legends, its Affiliates and their Representatives relating to the item or items resulting in such adjustment and an explanation of the rationale for such adjustment.  Except with respect to IBNR Claims Liabilities and Specified Reserve Adjustments, the Closing Date Balance Sheet will be prepared in good faith and in accordance with GAAP on a basis consistent with the accounting methods, policies, practices and procedures, and in the same manner, with consistent classification and estimation methodology, employed by the Legends Entities in the preparation of the Recent Balance Sheet; provided, however, that, except with respect to IBNR Claims Liabilities and Specified Reserve Adjustments, the Closing Date Balance Sheet shall reflect no changes in reserves (regardless of whether any such reserve is recorded as an offset to an asset's carrying value or is an accrued liability or otherwise) from amounts contained in the Estimated Closing Date Balance Sheet.  Notwithstanding anything in this Agreement to the contrary, in no event shall the calculation of the Closing Date Net Working Capital be affected by (A) the consummation of the Transaction (other than consummation of the transactions expressly contemplated in Section 2.2 of this Agreement), (B) any financing transaction in connection the consummation of the Transaction, (C) any impact of purchase accounting or (D) changes arising from or related to the filing of the Bankruptcy Case.  The Closing Date Net Working Capital will be derived from the Closing Date Balance Sheet, and the Closing Report will be prepared in a format consistent with the sample statement of Net Working Capital set forth in Exhibit F.

(b)     In connection with the review of the Closing Date Financial Statements by Legends Gaming, Legends Gaming and its Representatives shall have reasonable access during normal business hours to (i) all work papers, schedules, memoranda and other documents prepared by Global Legends, its Affiliates or their Representatives in connection with their preparation of the Closing Date Financial Statements and the calculation of the Closing Date Net Working Capital, and (ii) the books and records, finance personnel and any other information of Global Legends and its Affiliates, and Global Legends shall, and shall cause its Affiliates (including Riverboat Gaming) to, cooperate reasonably with Legends Gaming and its Representatives in connection therewith.

(c)     Unless Legends Gaming notifies Global Legends in writing that Legends Gaming disagrees with any aspect of the Closing Date Financial Statements (such written notice, the "Dispute Notice") within thirty (30) days after Legends Gaming's receipt thereof, the Closing Date Financial Statements shall be conclusive and binding on the Parties.  Any Dispute Notice shall specify in reasonable detail any adjustment to the Closing Date Financial Statements proposed by Legends Gaming and the basis therefor.  The Parties will attempt in good faith to reach an agreement as to any matters identified in such Dispute Notice within fifteen (15) days after the Global Legend's receipt of the Dispute Notice.  If Legends Gaming and Global Legends resolve their differences with respect to the Closing Date Financial Statements within such fifteen (15) day period, then the Closing Date Financial Statements, with such modifications necessary to reflect such agreement, shall be conclusive and binding on the Parties.

(d)     Any disputes not resolved by Legends Gaming and Global Legends within such fifteen (15) day period regarding the Closing Date Financial Statements shall be resolved by an Independent Accounting Firm jointly retained by Legends Gaming and Global Legends.  The Independent Accounting Firm shall make a determination only on the disputes so submitted as well as such modifications, if any, to the Closing Date Financial Statements necessary to reflect

26

such determination, and the same shall be conclusive and binding upon the Parties.  Legends Gaming and Global Legends shall request the Independent Accounting Firm to promptly (and in any event, within thirty (30) days thereafter) render such determination in writing; provided, however, that the determination of the Independent Accounting Firm for any item in dispute shall not be in excess of, nor less than, the greatest or lowest value, respectively, claimed for that particular item in either the Closing Date Financial Statements or the Dispute Notice.  The fees and expenses of the Independent Accounting Firm shall be shared equally by Legends Gaming and Global Legends.

(e)     Within five (5) Business Days following the final determination of the Closing Date Net Working Capital in accordance with this Section 2.4, (i) if a Post-Closing Net Working Capital Shortfall exists, then Global Legends will be entitled to receive, within such five (5) Business Day period, the amount of the Post-Closing Net Working Capital Shortfall by wire transfer of immediately available funds to the account designated by Global Legends or (ii) if a Post-Closing Net Working Capital Excess exists, then Legends Gaming will be entitled to receive the amount of the Post-Closing Net Working Capital Excess by wire transfer of immediately available funds to an account designated in writing by the administrative agent under the Existing First Lien Credit Agreement.  All amounts owing to Global Legends pursuant to clause (i) above will be paid (x) first, through distributions from the Working Capital Escrow Funds in accordance with this Agreement and the Working Capital Escrow Agreement if, and only if, Estimated Closing Date Net Working Capital was greater than $5,550,000 as of the Closing and the Estimated Working Capital Excess Amount was deposited with the Escrow Agent at the Closing and (y) second, after the exhaustion of the Working Capital Escrow Funds (if any), by Legends Gaming; provided, however, that if Estimated Closing Date Net Working Capital was not greater than $5,550,000 as of the Closing and there was no Estimated Working Capital Excess Amount to be deposited with the Escrow Agent, then Global Legends may proceed directly against Legends Gaming for any amounts owed to Global Legends pursuant to clause (i) above.  All amounts owing to Legends Gaming pursuant to clause (ii) above will be paid (A) first, through distributions from the Working Capital Escrow Funds in accordance with this Agreement and the Working Capital Escrow Agreement if, and only if, Estimated Closing Date Net Working Capital was less than $5,150,000 as of the Closing and the Estimated Working Capital Shortfall Amount was deposited with the Escrow Agent at the Closing and (y) second, after the exhaustion of the Working Capital Escrow Funds (if any), by Global Legends; provided, however, that if Estimated Closing Date Net Working Capital was not less than $5,150,000 as of the Closing and there was no Estimated Working Capital Shortfall Amount to be deposited with the Escrow Agent, then Legends Gaming may proceed directly against Global Legends (and the Guarantor) for any amounts owed to Legends Gaming pursuant to clause (ii) above.  After the Petition Date, the obligation of Legends Gaming to make a payment, if any, under this Section 2.4(e) shall have super-priority administrative expense status, senior to all other administrative expense claims under Section 364(c)(1) of the Bankruptcy Code, until such payment is made.  Any payment pursuant to this Section 2.4 will be treated by the Parties as an adjustment to the Adjusted Cash Purchase Price.

Section 2.5.     Escrow Funds.

(a)     In connection with the execution and delivery of this Agreement and concurrent with the same, Global Legends, Legends Gaming and JPMorgan Chase Bank, N.A., as escrow agent (the "Escrow Agent") have entered into the Deposit Escrow Agreement attached hereto as

Exhibit H (the "Deposit Escrow Agreement"), pursuant to which Global Legends has deposited $6,250,000 (the "Deposit Escrow Funds") with the Escrow Agent in a non-interest bearing account that is maintained by the Escrow Agent. The Deposit Escrow Funds will be released by the Escrow Agent and delivered to either Global Legends or an account designated in writing by the administrative agent under the Existing First Lien Credit Agreement, in accordance with the provisions of this Agreement and the Deposit Escrow Agreement.

(b)     At the Closing, if Estimated Closing Date Net Working Capital is greater than $5,550,000 or less than $5,150,000, Global Legends will deposit the Estimated Working Capital Excess Amount or the Estimated Working Capital Shortfall Amount, as applicable, with the Escrow Agent in a non-interest bearing account to satisfy any post-closing adjustment obligation of Global Legends or Legends Gaming, as the case may be, pursuant to and in accordance with Section 2.4 and the Working Capital Escrow Agreement. If the Working Capital Escrow Funds are to be deposited at the Closing with the Escrow Agent pursuant to the immediately preceding sentence, at the Closing, Global Legends and Legends Gaming will, and they will cause the Escrow Agent to, enter into the Working Capital Escrow Agreement attached hereto as Exhibit I (the "Working Capital Escrow Agreement"). For the avoidance of doubt, if the Estimated Closing Date Net Working Capital is not greater than $5,550,000 or less than $5,150,000, Global Legends will not make any deposit with the Escrow Agent at the Closing pursuant to this Section 2.5(b) and none of Global Legends, Legends Gaming and the Escrow Agent will enter into the Working Capital Escrow Agreement.

Section 2.6.     Assumption and Assignment of Agreements.     Pursuant to the Confirmation Order to the extent permitted by Applicable Law, (x) the Sellers shall assume and assign to the Purchasers, and the Purchasers shall accept assignment from the Sellers, the Assumed Agreements and the Assumed Leases and (y) Riverboat Gaming shall assume the LRGP Assumed Agreements, in each case, in accordance with this Section 2.6.

(a)     At the Closing, (i) the Sellers shall assign to the Purchasers the Assumed Agreements and the Assumed Leases and (ii) Riverboat Gaming shall assume the LRGP Assumed Agreements and reject the LRGP Excluded Contracts.

(b)     The Legends Entities shall request that, by virtue of a non-debtor party to a Contract failing to timely and properly object to the assumption and assignment of such Contract (or in the case of Riverboat Gaming, the assumption of such Contract), the Bankruptcy Court deem the non-debtor party to such Contract to have given any required Consent to the assumption of the Contract by the applicable Legends Entity and as applicable, the assignment to the applicable Purchaser if, and to the extent that, pursuant to the Confirmation Order or other Bankruptcy Court Order, as applicable, the Legends Entities are authorized to assume the Contract and assign such Contract to the Purchaser, and the Purchaser is authorized to accept assignment of such Contract pursuant to Section 365 of the Bankruptcy Code.

(c)     To the extent that any Assumed Agreement, Assumed Lease or LRGP Assumed Agreement is subject to Cure Costs pursuant to Section 365 of the Bankruptcy Code, the Legends Entities shall be responsible for such Cure Costs and shall pay such Cure Costs on or prior to the Closing.

(d)     Upon Closing, pursuant to Section 365(k) of the Bankruptcy Code, the

assumption and assignment of the Assumed Agreements and Assumed Leases shall relieve the Sellers and their estates from any Liability for any breach of such Assumed Agreements or Assumed Leases occurring after the Closing Date. The Purchasers agree that the Sellers shall have no further Liability with respect to such Assumed Agreements and Assumed Leases pursuant to Section 365(k) of the Bankruptcy Code. The Purchasers hereby agree to indemnify and hold the Sellers harmless from any and all claims, Liabilities, damages and causes of action asserted by third parties against any of the Sellers arising from any of the Assumed Agreements or the Assumed Leases related to the period from and after the Closing Date, including attorney fees and expenses related thereto.

(e)     Not later than twenty-five (25) days prior to the first hearing in the Bankruptcy Court for confirmation of the Legends Entities' plan of reorganization, the Purchasers shall provide written notice to the Legends Entities identifying (i) any Contract of the Legends Entities (other than the employment agreements set forth on Schedule 6.1(b)) that the Purchasers (A) do not elect to assume or (B) do not wish Riverboat Gaming to assume and (ii) any Contract of the Legends Entities not previously listed on Schedule 1.1(a) or Schedule 1.1(d) that the Purchasers elect to designate as an Assumed Agreement or LRGP Assumed Agreement, as applicable.

(f)     Notwithstanding anything in this Agreement to the contrary, with respect to the Contracts listed on Schedule 6.1(b), the Purchasers shall not be obligated to assume the Contract of any employee who does not agree to waive any change of control payments or similar benefits that would otherwise accrue solely as a result of the consummation of the Transaction.

Section 2.7.     Allocation of Purchase Price.   Within fifteen (15) days after the final determination of the Closing Date Net Working Capital in accordance with Section 2.4, Global Legends shall provide the Sellers with a schedule (the "Allocation Schedule") setting forth the Purchasers' allocation of the Purchase Price among the Purchased Assets (other than the LRGP Partnership Interests) and the LRGP Retained Assets for the purposes of, and in accordance with, Section 1060 of the IRC and the Treasury Regulations promulgated thereunder and any applicable provision of Applicable Law, among the various classes of assets listed on Internal Revenue Service Form 8594.  Such allocation shall be deemed final unless the Sellers have notified the Purchasers in writing of any disagreement with the Allocation Schedule within thirty (30) Business Days after submission thereof by the Purchasers.  If the allocation is deemed final or the Purchasers and the Sellers reach such agreement, the Purchasers, Riverboat Gaming and the Sellers shall execute and file all required Tax Returns in a manner consistent with the allocation determined pursuant to this Section 2.7.  In the event that the Parties do not agree to a purchase price allocation in accordance with this Section 2.7, then the Sellers and the Purchasers shall each prepare its own allocation of the Purchase Price to be used by such Party and its Affiliates.

Section 2.8.     Nontransferable Assets.  If the transfer of the Purchased Assets, Assumed Agreements or Assumed Leases as contemplated by this Agreement (a) would violate any law, regulation or order of any Governmental Authority or (b) requires the consent of any Person or Governmental Authority that cannot be obtained, the Sellers and the Purchasers shall cooperate in a mutually agreeable arrangement under which the Purchasers would obtain the benefits and assume the obligations of such Purchased Assets, Assumed Agreements or Assumed Leases. Such arrangements may include subcontracting, sublicensing, or subleasing to the Purchasers. From and after the Closing, the Sellers shall promptly upon receipt pay to the Purchasers all

monies received by the Sellers with respect to any Purchased Asset, Assumed Agreement or Assumed Lease that is the subject of an arrangement under this <u>Section 2.8</u> or pursue or enforce, at the Purchasers' request and at the Purchasers' sole cost and expense, any claim or right or any benefit arising with respect thereto, and the Purchasers shall promptly pay, perform and discharge when due all Liabilities that would constitute Assumed Liabilities thereunder.

## ARTICLE III
## BANKRUPTCY COURT APPROVAL

Section 3.1.    <u>Qualified Bids</u>.

(a)    Notwithstanding anything to the contrary set forth in this Agreement, during the period commencing with the execution of this Agreement and continuing until 12:01 a.m. on any date designated by Legends Gaming, in its sole discretion, that is on or prior to the sixtieth (60th) day after the date of execution of this Agreement (such period, the "<u>Marketing Period</u>"), without limitation of the activities permitted by the Bidding Procedures Order, the Legends Entities and their respective officers, managers, directors, employees, accountants, consultants, legal counsel, financial advisors and agents and other representatives (collectively, "<u>Representatives</u>") shall have the right, directly or indirectly, pursuant to a confidentiality agreement that contains confidentiality provisions that are not materially less favorable in the aggregate to the Legends Entities than those contained in the Confidentiality Agreement: (i) to initiate, solicit and/or encourage the submission of one or more Qualified Bids from one or more Persons and/or their Affiliates or Representatives, including (A) by furnishing to any Person and/or its Affiliates or Representatives any non-public information relating to the Legends Entities, the Purchased Assets or the LRGP Retained Assets, including a copy of this Agreement or (B) by affording to any Person and/or its Affiliates or Representatives access to the business, properties, assets, books, records or other non-public information, or to the personnel, of the Legends Entities, (ii) to enter into, participate in and/or engage in any discussions or negotiations with one or more Persons and/or their Affiliates or Representatives with respect to one or more Qualified Bids or any other proposals that could lead to a Qualified Bid and (iii) to otherwise cooperate with, assist or take any action to facilitate any Qualified Bids or any other proposals that could lead to any Qualified Bids.

(b)    Neither the Purchasers nor any of their respective Affiliates shall make or enter into any formal or informal arrangements or understandings (whether or not binding) with any Person, or have any discussions or other communications with any other Person, in any such case with respect to any Qualified Bid involving the Legends Entities, the Purchased Assets or the LRGP Retained Assets.

Section 3.2.    <u>Bankruptcy Court Action</u>.  In addition to the other conditions set forth in <u>Article VII</u>, the Parties acknowledge and agree that the consummation of the Transaction is subject to (i) the commencement of the Bankruptcy Case (such commencement date, the "<u>Petition Date</u>"), on or before the fifth (5th) Business Day after the execution and delivery of this Agreement by all of the Parties (unless extended by the Purchasers in their sole discretion), (ii) the entry of the Bidding Procedures Order by the Bankruptcy Court on or before the thirtieth (30th) day after the Petition Date (unless extended by the Parties), and (iii) the entry of the Confirmation Order by the Bankruptcy Court on or before the two hundred tenth (210th) day after the Petition Date (unless extended by the Parties).

30

Section 3.3.   <u>Bankruptcy Court Approval of Bid Procedures</u>.  As soon as practicable after the Petition Date, the Legends Entities shall file a motion with the Bankruptcy Court requesting the Bankruptcy Court to enter an order (such order, the "<u>Bidding Procedures Order</u>") that (i) would approve the amount and terms of the Break-Up Fee and the Expense Reimbursement, and the payment thereof in accordance with the terms hereof, and (ii) in light of the possibility that an auction for the Purchased Assets may be conducted after the commencement of the Bankruptcy Case (the "<u>Auction</u>"), would:

(a)   set forth the manner and timing for all notices with respect to the time, date and location for the Auction;

(b)   approve the procedures for the Auction, including providing that the Legends Entities, subject to the exercise of their fiduciary duties, shall not entertain or accept any bid unless such bid:

(i)   is submitted to the Legends Entities in writing on or prior to the deadline established in accordance with the Bidding Procedures Order;

(ii)   is accompanied by a duly executed acquisition agreement that is marked to reflect variations from this Agreement;

(iii)   is on terms, as determined in the Legends Entities' business judgment (after consultation with the administrative agent under the Existing First Lien Credit Agreement and its counsel), no less favorable (and no more burdensome or conditional) to the Legends Entities, taken as a whole, than the terms of this Agreement;

(iv)   remains open until (A) the Closing if such bid is determined to be the prevailing bid upon the conclusion of the Auction or (B) ninety (90) days after the Auction if such bid is determined to be the next-highest bid upon the conclusion of the Auction;

(v)   does not include any material contingency relating to due diligence or financing, or any other material conditions precedent to the bidder's obligation to close that exist as of the Auction and that are not otherwise contained in this Agreement;

(vi)   designates the executory contracts and unexpired leases that the bidder may request the Legends Entities to have assumed and assigned to the bidder and any other assets of the Legends Entities that are subject to the bid;

(vii)   is made by a bidder who can demonstrate that it is financially able to consummate the transaction contemplated by such bid on the terms contemplated therein; and

(viii)   is for an aggregate purchase price at least equal to the Purchase Price plus the amount of the Termination Payment plus $250,000 (any bid that meets the qualifications set forth in this paragraph, a "<u>Qualified Bid</u>"); <u>provided</u> that if the Legends Entities do not receive a Qualified Bid, there shall be no Auction and the Legends Entities shall report the same to the Bankruptcy Court and will proceed to consummate this Agreement in accordance with its terms.

Section 3.4.   <u>Overbid Procedures</u>.  If an Auction is conducted, the Parties agree to the

31

following overbid procedures:

(a)    at the Auction, the Purchase Price shall be the first bid, and qualified bidders, including the Purchasers and the administrative agent under the Existing First Lien Credit Agreement, will be permitted to increase their bids above such first bid.  The bidding will start with the Qualified Bid that, in the Legends' Entities' business judgement, is deemed to be the highest and best proposal, and will continue in increments of at least $250,000 in cash, subject to the right of the Purchasers to credit the Termination Payment to their bid during any round of bidding; provided that such credit shall not be counted more than once;

(b)    the Legends Entities and the Purchasers agree that, if the Purchasers are not the winning bidders at the Auction, if and only if (i) the Purchasers submit the highest bid below the winning bidder's bid at the Auction, and (ii) the Legends Entities give written notice to the Purchasers on or before the date that is ninety (90) days after the date the Auction was completed stating that the Legends Entities (x) failed to consummate the sale with the winning bidder, and (y) terminated the purchase agreement with the winning bidder, the Purchasers agree to consummate the Transaction upon the terms and conditions as set forth herein (as the same may be amended, modified or supplemented at the Auction), including the Purchase Price, as the same may be increased by the Purchasers at the Auction (but excluding any credit bid of the Termination Payment, unless the Termination Payment has been paid by or on behalf of the Legends Entities to the Purchasers);

(c)    notwithstanding anything to the contrary in this Agreement, the administrative agent under the Existing First Lien Credit Agreement may fully participate in the Auction and submit any bid (including any credit bid) during the Auction, and shall not be required to submit a bid that complies with Section 3.3 hereof.  Nothing herein shall prohibit or restrict the administrative agent under the Existing First Lien Credit Agreement from credit bidding up to the entire amount outstanding under the Existing First Lien Credit Agreement as of the date of the Auction; and

(d)    the Legends Entities and the Purchasers agree, and the Confirmation Order shall reflect that, the provisions of this Agreement, including this Section 3.4 and Section 5.7, are reasonable, were a material inducement to the Purchasers to enter into this Agreement and are designed to achieve the highest or best price for the Purchased Assets.  As part of the Bidding Procedures Motion, the Legends Entities shall seek approval by the Bankruptcy Court of this Section 3.4 (and that the substance of this Section 3.4 shall be included in the proposed Bidding Procedures Order that the Legends Entities submit to the Bankruptcy Court), which may be approved by the Bankruptcy Court separately from the remainder of this Agreement.

Section 3.5.    Purchasers' Rights to Comment.  The Legends Entities will provide the Purchasers with a reasonable opportunity to review and comment upon all motions, applications, and supporting papers prepared by the Legends Entities to be filed with the Bankruptcy Court and that relate to this Agreement (including forms of orders and notices to interested parties) prior to filing thereof in the Bankruptcy Case.

32

# ARTICLE IV
## REPRESENTATIONS AND WARRANTIES

Section 4.1.    <u>Representations and Warranties of the Legends Entities</u>.    Except as disclosed in the attached Disclosure Schedules, the Legends Entities, jointly and severally, represent and warrant to the Purchasers, as follows:

(a)    <u>Organization, Existence</u>.    Each of the Legends Entities is duly organized, validly existing and in good standing under the laws of the state of its formation and has all requisite power and authority to own and operate its property and to carry on the Business as now conducted.  Each Legends Entity is duly licensed or qualified to do business and is in good standing in each jurisdiction where the failure to be so qualified would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  Except as set forth on <u>Schedule 4.1(a)</u>, the Legends Entities have no subsidiaries.  None of the Legends Entities' subsidiaries listed on <u>Schedule 4.1(a)</u> own any assets.

(b)    <u>Authorization</u>.  Subject to the Confirmation Order, each of the Legends Entities has the requisite power and authority to enter into and perform this Agreement and the Transaction as contemplated herein.  The execution, delivery and performance of this Agreement by each Legends Entity has been duly and validly authorized and approved by all necessary limited liability company (or equivalent) action by such Legends Entity.  Assuming the due authorization, execution and delivery by the Purchasers, this Agreement constitutes, and the other documents required to be executed by each Legends Entity under this Agreement, upon execution and delivery thereof, will constitute, the legal, valid and binding obligations of such Legends Entity, enforceable against such Legends Entity in accordance with their terms, subject to the effects of bankruptcy, insolvency, reorganization, moratorium, and similar laws, as well as to principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

(c)    <u>No Conflicts</u>.  Except as set forth on <u>Schedule 4.1(c)</u>, and assuming the entry of the Confirmation Order and the receipt of the Gaming Approvals, the execution, delivery and performance by each Legends Entity of this Agreement and the consummation of the Transaction contemplated by this Agreement will not (i) conflict with, violate or result in a breach of any provision of the organizational or other governing documents of such Legends Entity, (ii) result in a default or the creation of any Encumbrance or give any right of termination, cancellation or acceleration under any of the terms, conditions or provisions of any Assumed Agreement, Assumed Lease or LRGP Assumed Agreements or (iii) violate any law, regulation or order of any Governmental Authority applicable to such Legends Entity or its property; other than, in the case of clauses (ii) and (iii), such conflicts, violations, terminations, cancellations, accelerations or defaults that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(d)    <u>Litigation</u>.  Except as set forth on <u>Schedule 4.1(d)</u>, as of the date of this Agreement, there is no lawsuit, action, administrative or arbitration proceeding or litigation by any Person before any Governmental Authority or arbitrator pending or, to the Knowledge of the Legends Entities, threatened against any Legends Entity or any of its Purchased Assets (i) arising in connection with the Business, (ii) with respect to its ownership or operation of the Purchased Assets, or (iii) that questions the validity of this Agreement or seeks to prohibit, enjoin or

33

otherwise challenge the consummation of the Transaction, and in the case of clauses (i) and (ii), except any such lawsuit, action, proceeding or litigation that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(e)     Consents.  Except for the Confirmation Order and any consents or approvals required under the Gaming Regulations, there are no prohibitions on assignment or requirements to obtain consents from any Governmental Authority, in each case, that would be applicable in connection with the execution, delivery and performance of this Agreement by the Legends Entities or the consummation of the Transaction by the Legends Entities, the failure of which to obtain, file or notify would reasonably be expected to materially impair the ability of the Legends Entities to consummate the Transaction. No Person (other than the Purchasers under this Agreement) has any written or oral agreement for the purchase or acquisition of all or any of the Purchased Assets or any rights thereunder.

(f)     Permits.  Each Legends Entity possesses all material Permits required for the conduct of its business and the ownership of its properties.  No proceeding is pending or, to the Knowledge of the Legends Entities threatened to revoke or limit any such Permit.

(g)     Assumed Agreements. As of the date hereof, none of the Sellers (i) is in material default under any of the Assumed Agreements, Assumed Leases or LRGP Assumed Agreements or (ii) has, within the last twelve (12) months, given or received written notice of any material default under any of the Assumed Agreements, Assumed Leases or LRGP Assumed Agreements. Each of the Assumed Agreements, Assumed Leases and LRGP Assumed Agreements is in full force and effect and is the enforceable obligation of the parties thereto.

(h)     Foreign Person. None of the Legends Entities is a "foreign corporation", "foreign partnership", "foreign trust", "foreign estate", "foreign person", "affiliate" of a "foreign person" or a "United States intermediary" of a "foreign person" within the meaning of the IRC Sections 897 and 1445, the Foreign Investments in Real Property Tax Act of 1980, the International Foreign Investment Survey Act of 1976, the Agricultural Foreign Investment Disclosure Act of 1978, or the regulations promulgated pursuant to such Acts or any amendments to such Acts.

(i)     OFAC. None of the Legends Entities or any Person owning any interest in any of the Legends Entities is:  (i) identified on the "Specially Designated Nationals or Blocked Persons List" maintained by the Office of Foreign Purchased Assets Control, Department of Treasury (the "OFAC") or any other similar list maintained by the OFAC or the United States Department of Commerce, Bureau of Industry and Security or any other United States Governmental Authority pursuant to Applicable Laws, or (ii) a Person with whom a United States Person is prohibited to engage in transactions pursuant to any trade embargo, economic sanction, or other prohibition of Applicable Laws, or executive order of the President of the United States or United Nations decree or resolution.

(j)     Environmental. None of the Legends Entities has entered into or is a party (directly or as successor in interest) to, any agreement with, plea, diversion agreement or consent, order, decree or judgment of, any Governmental Authority that (i) is in existence as of the date of this Agreement, (ii) is based on any Environmental Laws that relate to the present or future use of any of the Purchased Assets or the LRGP Retained Assets and (iii) requires any

34

material remediation or change in the present conditions of any of the Purchased Assets or the LRGP Retained Assets.  No Legends Entity has received written notice from any Person of any release, spill, disposal, event, condition, circumstance, activity, practice or incident concerning any land, facility, asset or property included in the Purchased Assets or the LRGP Retained Assets that: (x) materially interferes with or prevents compliance by such Legends Entity with any Environmental Law or the terms of any Environmental Permits or (y) gives rise to or results in material liability of such Legends Entity to any Person.  As of the date of this Agreement, the Legends Entities have made available to the Purchasers all Environmental Reports.

(k)     Eminent Domain. As of the date of this Agreement, none of the Legends Entities has received any written notice of any, and, to the Knowledge of the Legends Entities, there is no threatened or pending eminent domain, condemnation or rezoning proceedings with respect to the Real Property or any part of the Real Property.

(l)     Intellectual Property.  The Legends Entities own, or have the right to use, all of the Intellectual Property Rights that are necessary for the operation of the Business.  Schedule 4.1(l) lists (i) each issued patent and each registered trademark and copyright owned by the Legends Entities and (ii) each material contract, license and agreement with respect to Intellectual Property Rights pursuant to which the Legends Entities have granted to or received from any Person the right to reproduce, distribute, market or exploit Intellectual Property Rights. As of the date of this Agreement, there is no action pending, or to the Knowledge of the Legends Entities, threatened that challenges the validity of ownership or use of any material Intellectual Property Rights of any of the Legends Entities. To the Knowledge of the Legends Entities, no third party's operations or products infringe on the Intellectual Property Rights of the Legends Entities in any material respect.  None of the Legends Entities' operations and products infringe in any material respect on the Intellectual Property Rights of any other Person.  None of the Legends Entities has received during the preceding two (2) years any written claim of infringement with respect to any Intellectual Property Rights used by such Legends Entity.

(m)     Insurance.  Schedule 4.1(m) hereto sets forth a complete list of all material insurance policies of each of the Legends Entities or to which any of the Legends Entities is a beneficiary.

(n)     ERISA.

(i)     Schedule 4.1(n)(i)  sets forth a complete and correct list of each Seller Benefit Plan.

(ii)     Except as set forth on Schedule 4.1(n)(ii), the Seller Benefit Plans intended to qualify under Section 401 of the IRC are so qualified and the trusts maintained pursuant thereto are exempt from federal income taxation under Section 501 of the IRC, and nothing has occurred with respect to the operation of the Seller Benefit Plans which could cause the loss of such qualification or exemption or the imposition of any material liability, penalty or tax under ERISA or the IRC.

(iii)     No Seller Benefit Plan provides retiree health or life benefits, except as may be required by COBRA or similar state law.

35

(iv)     None of the Legends Entities has been involved in any transactions that could cause the Purchasers or any of their ERISA Affiliates to be subject to liability under Section 4069 or 4212 of ERISA.

(v)     Schedule 4.1(n)(v)(i) sets forth a true and accurate list of all qualified beneficiaries (A) who have elected COBRA continuation coverage under a Legend Entity's group medical plan and (B) who are receiving COBRA benefits under such Seller Benefit Plan as of the date hereof.  Schedule 4.1(n)(v)(ii) sets forth a true and accurate list of the aggregate monthly amount of claims for calendar year 2011 for all qualified beneficiaries who have received COBRA continuation coverage benefits under a Legends Entity's group medical plan during such period.

(vi)     Sellers and Riverboat Gaming has complied in all material respects with COBRA.

(vii)     Except as set forth on Schedule 4.1(n)(vii), neither the execution and delivery of this Agreement and the documents contemplated to be executed in connection with this Agreement nor the consummation of the Transaction will (A) result in any payment becoming due to any current or former employee or director of any Legends Entity, (B) increase any benefits under any Seller Benefit Plan, or (C) result in the acceleration of the time of payment, vesting or other rights with respect to any such benefits.

(viii)     No Seller Benefit Plan is subject to Title IV of ERISA, or is a multi-employer plan within the meaning of Section 3(37)(A) of ERISA.

(o)     Labor Matters.  None of the Legends Entities is a party to any labor or collective bargaining agreement.  There are no (i) strikes, work stoppages, work slowdowns or lockouts pending or threatened against or involving any of the Legends Entities or (ii) material unfair labor practice charges, grievances or complaints pending or threatened by or on behalf of any employee or group of employees of any of the Legends Entities.

(p)     Tax Returns.  All material Tax Returns required to be filed by the Legends Entities or with respect to the Purchased Assets and the LRGP Retained Assets have been timely filed (taking into account valid extensions of the time for filing) and all such Tax Returns are complete and accurate in all material respects.  Each of the Legends Entities has paid, or caused to be paid, all Taxes shown as due on such Tax Returns.  Except as set forth on Schedule 4.1(p), there are no examinations or other administrative or court proceedings relating to Taxes in progress or pending with respect to the Business, the Purchased Assets or the LRGP Retained Assets, and to the Knowledge of the Legends Entities, there is no existing, pending or threatened in writing claim, proposal or assessment against any of the Legends Entities for Taxes owed by such Legends Entity or with respect to the Purchased Assets or the LRGP Retained Assets.

(q)     No Violation of Laws. Except as set forth on Schedule 4.1(q), and except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, no Legends Entity is in violation of any Applicable Laws.

(r)     Financial Information.  Schedule 4.1(r) contains true and complete copies of (i) the audited consolidated and consolidating balance sheets, statements of income and cash flows

of the Legends Entities for the twelve (12) month period ending December 31, 2011 and (ii) the unaudited consolidated and consolidating balance sheets, statement of income and cash flows of the Legends Entities for the quarterly period ending March 31, 2012.

(s)   Broker.  Except as set forth on Schedule 4.1(s), the Legends Entities have not engaged or become liable to any broker in respect of this Agreement or the Transaction.

(t)   Contracts.  Schedule 4.1(t) sets forth a complete and correct list, as of the date of this Agreement, of each of the following Contracts to which a Legends Entity is a party:

(i)   Contracts for the employment of any officer, consultant or employee whose annual base compensation exceeds $100,000;

(ii)   Contracts for the purchase, sale or lease of goods or services not capable of being fully performed or not terminable by such Legends Entity within a period of sixty (60) days and involving annual payments in excess of $500,000;

(iii)   Contracts relating to any partnership or joint venture involving payments by such Legends Entity in excess of $250,000 in the aggregate;

(iv)   Contracts that contain a non-compete or customer non-solicitation covenant or similar obligation;

(v)   Contracts that contain any material indemnification obligation; and

(vi)   Contracts relating to material indebtedness of such Legends Entity (including guarantees of indebtedness).

(u)   Title to the Purchased Assets.  As of the Closing, the Legends Entities own, lease, or hold other rights to possess or use all of the Purchased Assets, including the LRGP Partnership Interests.

Section 4.2.   Representations and Warranties of the Purchaser.  The Purchasers, jointly and severally, represent and warrant to the Sellers, as follows:

(a)   Organization, Existence.  Each of the Purchasers is duly organized, validly existing and in good standing under the laws of the state of its formation and has all requisite power and authority to own and operate its property and to carry on its business as now conducted.  Each Purchaser is duly licensed or qualified to do business and is in good standing in each jurisdiction in which either the ownership or use of its properties, or the nature of its activities, requires such qualification, except where the failure to be so qualified or licensed and in good standing would not materially affect or delay such Purchasers' ability to perform its obligations under this Agreement or consummate the Transaction contemplated by this Agreement.

(b)   Authorization. Each of the Purchasers has the requisite power and authority to enter into and perform this Agreement and the Transaction as contemplated herein.  The execution, delivery and performance of this Agreement by each Purchaser has been duly and validly authorized and approved by all necessary limited liability company action by such

37

Purchaser.  Assuming the due authorization, execution and delivery by the Legends Entities, this Agreement constitutes, and the other documents required to be executed by each Purchaser pursuant to this Agreement, upon execution and delivery hereof, will constitute, the legal, valid and binding obligations of such Purchaser, enforceable against such Purchaser in accordance with their terms, subject to the effects of bankruptcy, insolvency, reorganization, moratorium, and similar laws, as well as to principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

(c)      No Conflicts.   The execution, delivery and performance by each Purchaser of this Agreement and the consummation of the Transaction contemplated by this Agreement will not (i) conflict with, violate or result in a breach of any provision of the organizational or other governing documents of such Purchaser, (ii) result in a default or the creation of any encumbrance or give any right of termination, cancellation or acceleration under any of the terms, conditions or provisions of any note, bond, mortgage, indenture or license to which such Purchaser is a party or by which such Purchaser or any of its property may be bound or (iii) violate any law, regulation or order of any Governmental Authority applicable to such Purchaser or its property; other than, in the case of clauses (ii) and (iii), such conflicts, violations, terminations, cancellations, accelerations or defaults that would not materially affect or delay such Purchaser's ability to perform its obligations under this Agreement or consummate the Transaction contemplated by this Agreement.

(d)      Consents.   Except for the Confirmation Order and any consents or approvals required under the Gaming Regulations, there are no prohibitions on assignment or requirements to obtain consents from any Governmental Authority, in each case, that would be applicable in connection with the execution, delivery and performance of this Agreement by the Purchasers or the consummation of the Transaction by the Purchasers, the failure of which to obtain, file or notify would reasonably be expected to materially impair the ability of the Purchasers to consummate the Transaction.

(e)      Litigation.   As of the date of this Agreement, there is no lawsuit, action, administrative or arbitration proceeding or litigation by any Person before any Governmental Authority or arbitrator pending or, to the Purchasers' knowledge, threatened against any Purchaser or any director or officer of the Purchasers in his or her capacity as such, which questions the validity of this Agreement or seeks to prohibit, enjoin or otherwise challenge the consummation of the Transaction.

(f)      Sufficient Funds. The Purchasers have, or will have prior to the Closing, sufficient funds to enable them (i) to pay all amounts payable by them hereunder, including payment of the Adjusted Cash Purchase Price at the Closing as contemplated herein, (ii) to make all other necessary payments of fees and expenses in connection with the Transaction contemplated by this Agreement, and (iii) to perform and discharge their respective obligations under this Agreement and the Transaction contemplated hereby. The Purchasers expressly acknowledge that their obligations hereunder are not subject to any conditions, express or implied, regarding the Purchasers' ability to obtain financing for the consummation of the transactions contemplated hereby.

# ARTICLE V
# COVENANTS

Section 5.1.    Covenants of the Legends Entities.  From and after the date hereof until the Closing or earlier termination of this Agreement, each of the Legends Entities covenants and agrees as follows:

(a)    Information. The Legends Entities shall deliver, or make available, to the Purchasers:

(i)    copies of Assumed Agreements and the LRGP Assumed Agreements and each notice of default, if any, received or sent by or on behalf of the Legends Entities in respect of any Assumed Agreements or any LRGP Assumed Agreements;

(ii)    copies of any Environmental Report;

(iii)    copies of all Assumed Leases and a copy of each notice of default, if any, received or sent by or on behalf of the Legends Entities in respect of any Assumed Lease; and

(iv)    any other written information, correspondence and documentation of the Business reasonably requested by Purchaser.

(b)    Conduct of Business. From and after the date hereof until the Closing or earlier termination of this Agreement, the Legends Entities shall conduct the Business in the Ordinary Course of Business and shall not, except (i) as required or expressly permitted pursuant to the terms hereof, (ii) as required by any Applicable Law, (iii) as the Purchasers shall consent in writing (which consent shall not be unreasonably withheld, conditioned or delayed), (iv) in connection with the Bankruptcy Case, or (v) as may be approved by Order of the Bankruptcy Court, (A) enter into or terminate any material agreement or transaction other than in the Ordinary Course of Business, (B) transfer, sell, pledge or encumber any material Purchased Asset or LRGP Retained Asset other than in the Ordinary Course of Business, (C) with respect to the Purchased Assets and the LRGP Retained Assets, settle any suit or litigation or waive any material claims or rights of material value, or (D) fail to pay any undisputed trade obligation in accordance with its terms on or prior to the date such obligation becomes due.  The Legends Entities shall maintain their books of account and records in the Ordinary Course of Business. Notwithstanding anything in this Agreement to the contrary, from and after the date hereof until the Closing or earlier termination of this Agreement, the Legends Entities shall not, without the prior written consent of the Purchasers, enter into any Contract that would constitute a Material Contract if such Contract were in existence as of the date of this Agreement.

(c)    Purchaser's Representative.  In the event that either the Purchasers are the successful bidder at the Auction or no Auction is held, from and after the completion of the Auction (or the expiration of the Marketing Period, if no Auction is held) until the Closing or earlier termination of this Agreement, upon reasonable advanced written notice to the Legends Entities, Purchasers shall have the right to have a representative of Purchasers physically located on the Seller Real Property and the LRPG Real Property during reasonable business hours to be mutually agreed upon by the Parties solely for the purpose of observing and reviewing the

39

conduct of the Business and financial performance of the Legends Entities; provided, such representative (i) shall have no authority to direct any activities of the Legends Entities or their employees and (ii) shall not disrupt or otherwise interfere with the operations of the Legends Entities or the conduct of the Business.

(d)      Title Commitments. The Legends Entities shall deliver to the Purchasers, at the Purchasers' sole cost and expense, commitments from a title insurance company reasonably satisfactory to the Purchasers, with respect to the Real Property, pursuant to which title policies may be issued at the Closing insuring title thereto vested in Global Vicksburg (with respect to the Seller Real Property) and Riverboat Gaming (with respect to the LRGP Real Property) subject only to Permitted Encumbrances.  Without limitation of additional title insurance companies, the Purchasers hereby agree that either First American Title Insurance Company or Chicago Title Insurance Company constitute acceptable title insurance companies hereunder.

(e)      Surveys.  The Legends Entities shall deliver to the Purchasers, at the Purchasers' sole cost and expense, current as-built surveys of the Real Property.  The surveys of the Real Property should be prepared in accordance with the February 23, 2011 Minimum Standard Detail Requirements for ALTA/ACSM Land Title Surveys for the applicable survey class by land use and location. The surveys must bear the caption "ALTA/ACSM Land Title Survey" and contain a certification by a civil engineer or registered surveyor, licensed in the state in which the Real Property is located and acceptable to the Purchasers and the Legends Entities. The surveys shall include or show the following items from Table A of the Standards: 1, 2, 3, 6(b), 7(a), 7(b)(1), 7(c), 8, 9, 11(a), 13, 16, 17, 18, and 21.

Section 5.2.      Covenants of the Purchasers.

(a)      Second Lien Credit Agreement.  The Purchasers shall proceed diligently and in good faith to negotiate and document the terms and conditions of the Second Lien Credit Agreement with the administrative agent and the lenders party thereto and to complete such negotiations as promptly as practicable after the date hereof (and in any event, prior to the Closing Date).

(b)      Adequate Assurance. The Purchasers shall provide, upon the Legends Entities' request, such information reasonably necessary pursuant to Sections 365(b) and 365(f)(2) of the Bankruptcy Code to demonstrate that (i) the applicable Purchasers, beginning as of the Closing Date, shall have the resources to timely perform all of their obligations under the Assumed Agreements or Assumed Leases, and (ii) LRGP, beginning as of the Closing Date, shall have the resources to timely perform all of its obligations under the LRGP Assumed Agreements.  In addition, the applicable Purchasers shall provide such other information that shall be reasonably requested by any Person that is a party to any of the Assumed Agreements, Assumed Leases or LRPG Assumed Agreements.

(c)      Gaming Approvals. The Purchasers shall use their commercially reasonable efforts to obtain the Gaming Approvals and all applicable liquor licenses and similar Permits necessary for the operation of the Business as promptly as practicable after the date hereof and in any event not later than the Outside Date.  The Purchasers and their Affiliates, directors and officers (and if required by the Gaming Authorities or any other Governmental Authority, the officers, directors, members of governing bodies and owners of the Affiliates) shall (i) file within

40

thirty (30) days after the date of this Agreement all required initial applications and documents in connection with obtaining the Gaming Approvals under the Gaming Regulations, (ii) as soon as reasonably practicable after the date hereof, file all required initial applications and documents in connection with all Consents and Permits of Governmental Authorities other than those required under clause (i), including such applications and documents related to any applicable liquor licenses and similar Permits necessary for the operation of the Business, and (iii) diligently and promptly respond thereafter to additional requests and comments therewith and pursue all such Consents and Permits as promptly as possible.

(d)      <u>Assistance</u>. After the Closing Date, each Purchaser and Riverboat Gaming shall (i) provide to the Sellers and their Representatives such records and information and (ii) make available to the Sellers and their Representatives such employees or other personnel of the Purchasers and Riverboat Gaming, in each case as may be reasonably requested by the Sellers or their Representatives, for the purpose of (A) financial, accounting or tax reporting, (B) any actions deemed necessary or advisable by such Seller to be taken by it in connection with the Bankruptcy Case, (C) assisting the Sellers in responding to governmental inquiries, making required governmental filings or defending or prosecuting any Action or other proceeding involving any Person; <u>provided</u>, <u>however</u>, that neither the Purchasers nor Riverboat Gaming shall be required to incur any out-of-pocket expenses or take any action that in such Purchaser's or in Riverboat Gaming's reasonable determination unreasonably interferes with its business.

(e)      <u>Transferred Employees</u>.  All Liabilities arising from or related to the Transferred Employees arising or accruing on, prior or after the Closing Date, including wages, earned vacations, employee benefit Liabilities to the extent provided in <u>Article VI</u>, Liabilities under any collective bargaining agreements, WARN Act Liabilities, workers compensation Liabilities, COBRA Liabilities, severance and bonus payments, withholding and reporting obligations, all Applicable Laws relating to the employment of labor and the employer's share of payroll or other employment Taxes and other obligations shall be assumed by the Purchasers and such obligations shall be the sole obligation of the Purchasers.

(f)      <u>Reservations</u>.  Following the Closing, the Purchasers shall honor the terms and rates of all pre-Closing reservations (in accordance with their terms) with respect to the Business by customers, including advance reservation cash deposits, for services confirmed by the Legends Entities for any time subsequent to the Closing.  Prior to the Closing Date, the Legends Entities may continue to accept reservations for periods after the Closing in the Ordinary Course of Business in operating the Business.  The Purchasers recognize that such reservations may include discounts or other benefits, including benefits extended under the Legends Entities' player loyalty program or any other frequent player or casino awards programs, group discounts, or other discounts or requirements that food, beverage or other benefits be delivered by the Legends Entities to the guest or guests, as the case may be, holding such reservations, all of which shall only be provided in a manner consistent with the Ordinary Course of Business.  The Purchasers shall honor all banquet facility and service agreements that have been granted to groups, persons or other customers for periods after the Closing Date at the rates and on the terms provided in such agreements.  The Purchasers agree that the Legends Entities cannot and do not make any representation or warranty that any party holding a reservation or agreement for facilities or services shall utilize such reservation or honor such agreement.  The Purchasers, by the execution hereof, solely assume the risk of non-utilization of reservations and non-performance of such agreements from and after the Closing.

41

(g)     <u>Destruction of Chips</u>.  From and after (i) the date that is one hundred eighty (180) days after the Closing Date, the Purchasers and Riverboat Gaming shall cease to issue or use and shall not reissue or reuse any of the Legends Entities' gaming chips, tokens or plaquemines used by the Legends Entities at any time prior to the Closing and (ii) the Closing Date, the Purchasers and Riverboat Gaming shall be solely responsible and liable for compliance with all Applicable Laws or any applicable Order with respect to any of such gaming chips, tokens or plaquemines.  During the one hundred eighty (180) day period described in clause (i) of the immediately preceding sentence, the Purchasers and Riverboat Gaming shall (x) redeem all of the Legends Entities' gaming chips, tokens and plaquemines used by the Legends Entities at any time prior to the Closing pursuant to a plan of redemption of discontinued chips, tokens or plaquemines approved by the applicable Governmental Authorities, and (y) destroy all of such gaming chips, tokens and plaquemines pursuant to a plan of destruction approved by the applicable Governmental Authorities.

Section 5.3.     <u>Joint Obligations</u>.

(a)     <u>Closing Documents</u>.  The Parties shall proceed diligently and in good faith to attempt to settle, on or before the Closing Date or such earlier date as may be expressly set forth herein, the contents of all Closing Documents to be executed and delivered by the Legends Entities and the Purchasers.

(b)     <u>Closing Conditions</u>.  Subject to the terms and conditions herein provided, each of the Parties shall take, or cause to be taken, all action and shall do, or cause to be done, all things necessary, appropriate or desirable under any Applicable Law so as to cause the conditions and covenants applicable to the Transaction to be performed or satisfied as soon as practicable and to enable the Closing to occur as soon as reasonably practicable. Each of the Parties will cause all documents it is responsible for filing with any Governmental Authority under this <u>Section 5.3(b)</u> to comply in all material respects with all Applicable Laws.

(c)     <u>Assistance</u>.   Each of the Parties shall furnish the other Party with such information and reasonable assistance as such other Party and its respective Representatives may reasonably request in connection with their preparation of any filings with any Governmental Authorities.   The Parties acknowledge that this Agreement and the transactions contemplated hereby are subject to the review and approval of the Gaming Authorities.  The Legends Entities, on the one hand, and the Purchasers, on the other hand, shall have the right to reasonably consult with the other on, in each case subject to Applicable Laws relating to the exchange of information (including the Gaming Regulations), all the information relating to the other Party and any of its Affiliates that appears in any filing made with, or written materials submitted to, any third Person or Gaming Authority in connection with the Transaction.  Without limiting the foregoing, the Legends Entities, on the one hand, and the Purchasers, on the other hand (the "<u>Notifying Party</u>") shall notify the other Party promptly of the receipt of comments or requests from any Gaming Authority relating to the Gaming Approvals or any Governmental Authority relating to any liquor license or similar Permit necessary for the operation of the Business and shall supply the other Party with copies of all correspondence between the Notifying Party or any of its Representatives and the Gaming Authority with respect to the Gaming Approvals or the Governmental Authorities with respect to any such liquor licenses or similar Permits; <u>provided</u>, <u>however</u>, that neither the Legends Entities nor the Purchasers shall be required to supply the other Party with copies of communications relating to the personal applications of individual

42

applicants (except for evidence of filing) or with any documents that are the subject of a confidentiality agreement barring the same; provided further that the Legends Entities and the Purchasers shall promptly notify the other Party upon receiving any communication from any Gaming Authority or other Governmental Authority that causes such Party to reasonably believe that there is a reasonable likelihood that any of the Gaming Approvals or liquor licenses or similar Permits will not be obtained or that the receipt of any such Gaming Approvals, liquor licenses or similar Permits will be materially delayed.

(d)     Orders.   Each of the Parties shall use its commercially reasonable efforts to avoid the entry of, or to have vacated or terminated, any decree, order, ruling or injunction that would restrain, prevent or delay the Closing. Furthermore, if any Governmental Authority shall have issued any order, decree, ruling or injunction, or taken any other action, that would have the effect of restraining, enjoining or otherwise prohibiting, delaying or preventing the consummation of the Transaction, each of the Parties shall use its commercially reasonable efforts to have such order, decree, ruling or injunction or other action declared ineffective as soon as practicable.

(e)     Notice of Developments.   Each of the Parties shall give prompt notice to the other Parties upon obtaining knowledge of any of the following: (i) any Representation made by such Party being untrue or inaccurate when made, (ii) the occurrence of any event or development that would cause (or could reasonably be expected to cause) any Representation made by such Party to be untrue or inaccurate at any time on or before the Closing Date, or (iii) any failure of such Party to comply with or satisfy any covenant, condition, or agreement to be complied with or satisfied by it hereunder.

(f)     Publicity.   Unless otherwise required by or reasonably necessary to comply with Applicable Law, and except for disclosure of matters that become a matter of public record as a result of the Bankruptcy Case and any filings or notices related thereto, the Purchasers, on the one hand, and the Legends Entities, on the other hand, shall consult with each other before issuing any press release or otherwise making any public statement with respect to this Agreement, the Transaction or the activities and operations of the other Parties and shall not issue any such release or make any such statement without the prior written consent of the Legends Entities or the Purchasers, respectively.

(g)     Confidentiality.   Each Party acknowledges that the Evaluation Material (as defined in the Confidentiality Agreement) provided by or on behalf of the other Party to it and its Representatives in connection with this Agreement and the contemplation and consummation of the Transaction, is subject to the terms of the Confidentiality Agreement, the terms of which are incorporated herein by reference.   Effective upon the Closing, the Confidentiality Agreement shall terminate.

Section 5.4.   Approvals.   Whenever in this Agreement it is stated that the approval or consent of a Party is required, it is understood that, except where otherwise specifically so stated, such approval or consent shall be in writing, and shall not be unreasonably withheld, conditioned or delayed.

Section 5.5.   Risk of Condemnation and Eminent Domain.   The Legends Entities shall promptly notify the Purchasers in writing if it receives a written notice of condemnation and/or

43

exercise of eminent domain in respect of all or any material part of the Purchased Assets, and such notice shall include a copy of the notice of condemnation and/or exercise of eminent domain and copies of all correspondence relating thereto.

Section 5.6.     Damage Before Closing.  The interest of the Legends Entities in and to the Purchased Assets and the LRGP Retained Assets shall be at the risk of the Legends Entities until Closing.  The Legends Entities shall insure the Purchased Assets and the LRGP Retained Assets until the Closing as they currently insure such assets.  If material loss or damage occurs to the Purchased Assets or the LRGP Retained Assets, then the Legends Entities shall promptly deliver a written notice to the Purchasers specifying the nature and extent of the loss or damage and estimating the Cost Of Repair.  The Sellers shall pay any insurance deductibles in respect of such loss or damage (and shall pay to the Purchasers an amount equal to the amount, if any, by which the Cost Of Repair of such loss or damage exceeds the amount of property insurance proceeds payable to the Purchasers as hereinafter contemplated), and the Purchasers shall be entitled to all proceeds of property insurance in respect of such loss or damage (except that portion, if any, required to reimburse the Sellers for repair or restoration work it has done prior to the Closing and insurance for the loss of income prior to the Closing, all of which shall be paid to the Sellers).

Section 5.7.     Break-Up Fee and Expense Reimbursement.  If this Agreement is terminated pursuant to Section 9.1(f),  the Legends Entities shall concurrently with and conditioned on the consummation of the Alternative Transaction pay to the Purchasers in immediately available funds a cash fee equal to (a) $3,750,000 (the "Break-Up Fee") plus (b) the amount of the reasonable and documented expenses of the Purchasers, including expenses of outside counsel, accountants, and financial advisers, collectively up to an aggregate amount of $500,000 (the "Expense Reimbursement" and, together with the Break-Up Fee, the "Termination Payment").  After the Petition Date, the Legends Entities' obligation to make such Termination Payment shall have super-priority administrative expense status, senior to all other administrative expense claims under Section 364(c)(1) of the Bankruptcy Code, until such payment is made.

**ARTICLE VI**
**EMPLOYEE MATTERS**

Section 6.1.     Employment.

(a)      The Purchasers will offer to employ each Current Employee (other than the Current Employees listed on Schedule 6.1(a)) in the same or substantially comparable position with the Purchasers as provided by the Sellers as of the Closing Date.  The Purchasers' offer of employment will be made prior to the Closing Date and in a format reasonably acceptable to the Sellers.  The employees of the Sellers who commence employment with the Purchasers as of the Closing Date are collectively referred to as the "Transferred Employees."  For the avoidance of doubt, the employment of the employees of Riverboat Gaming will continue with Riverboat Gaming or one of the Purchasers as of the Closing Date.  Such employees of Riverboat Gaming are referred to as "Continuing Employees."  Transferred Employees and Continuing Employees are collectively referred to as "Acquired Employees."  Notwithstanding the foregoing, nothing in this Agreement will, after the Closing Date, impose on the Purchasers any obligation to retain any Acquired Employee in its employment.

44

(b)     The Purchasers will assume all of the employment agreements set forth on Schedule 6.1(b) and the Sellers shall have no further obligations or responsibilities with respect to such employment agreements from and after the Closing Date.

Section 6.2.     Employee Benefit Matters.

(a)     On or prior to the Closing, the Legends Entities shall take all actions necessary to terminate all of the Seller Benefit Plans (other than the employment agreements set forth on Schedule 6.1(b) and the stop loss policy set forth in Section 6.2(d)) effective as of the Closing Date, including without limiting the foregoing, any notice required to be given to participants in the Seller Benefit Plans or required by any contract with a third party providing services to the Seller Benefit Plans.  On or prior to the Closing Date, the Legends Entities shall take all actions necessary to amend the self-funded health plans of the Legends Entities to provide no more than a ninety (90) day period beginning on the Closing Date for run-out claims incurred prior to the Closing Date to be submitted for payment.  The Legends Entities shall provide advance notice to participants in the self-funded health plans of the Legends Entities, no later than thirty (30) days immediately preceding the Closing Date, of the planned amendment and termination of such plans as provided in this Section 6.2(a).

(b)     As of the Closing Date, the Acquired Employees will cease participation in all Seller Benefit Plans (other than the employment agreements set forth on Schedule 6.1(b)). Effective as of the Closing Date and continuing for a period ending no earlier than the first anniversary of the Closing Date, the Purchasers will provide to Acquired Employees remaining employed with Riverboat Gaming or one of the Purchasers through employee benefit plans and fringe benefit programs provided by the Purchasers  (collectively, "Purchaser Benefit Plans"), employee and fringe benefits which are consistent with employee and fringe benefit plans available to other similarly situated employees of Purchasers' Affiliates.

(c)     As of the Closing Date, Acquired Employees will be entitled, under the Purchasers' leave policies, to all time accrued, but unused before the Closing Date, for paid time off, vacation, sick time or other leave under the applicable policies of the Sellers and Riverboat Gaming as of the Closing Date.  Further, to the extent the Sellers incur any Liability as a result of the Purchasers' assumption of all Liabilities for paid time off, vacation, sick leave or other leave as set forth in Section 5.2(e), the Purchasers shall indemnify and hold the Sellers harmless for any such Liabilities. Prior to the Closing Date, Sellers and Riverboat Gaming shall provide the Purchasers with a list of the accrued but unused vacation and sick leave of each Acquired Employee, which shall include a computation of the total dollar value of such accrued but unused vacation and sick leave based on the current rate of compensation for such Acquired Employee.

(d)     As of the Closing Date, the Purchasers shall assume and solely be responsible for all Liabilities for Pre-Closing IBNR Claims. After the Closing, the Sellers shall have no further obligation or responsibility with respect to such Liabilities.  Notwithstanding the foregoing, Sellers and Riverboat Gaming shall, prior to the Closing, secure and prepay each carrier of stop loss insurance coverage for the self-funded health plans of the Legends Entities the premiums necessary to maintain the stop loss coverage existing prior to the Closing for a run-out period of ninety (90) days immediately after the Closing.

(e)     In accordance with Treasury Regulation Section 54.4980B-9 Q&A-7, as of the

45

Closing Date, the Purchasers will assume all Liabilities for providing and administering all required notices and benefits under the COBRA to all Acquired Employees and their respective dependents.  The Sellers will have no COBRA Liability or obligations to such Acquired Employees and their respective dependents after the Closing Date.  On the Closing Date, the Legends Entities will provide the Purchasers with an updated Schedule 4.1(n)(v)(i) setting forth all qualified beneficiaries (i) who have elected COBRA continuation coverage under a Legend Entity's group medical plan and (ii) who are receiving COBRA benefits under such Seller Benefit Plan as of the Closing Date

       (f)      Solely for purposes of eligibility and vesting under the Purchaser Benefit Plans, including any severance plan or policy of the Purchasers, the Purchasers will cause each Acquired Employee to be credited with his or her years of service with the Sellers or Riverboat Gaming (and any of their Affiliates or any predecessor entities thereof) as of the Closing Date, to the same extent as Current Employees or employees of Riverboat Gaming were entitled, as of the Closing Date, to credit for such service under any similar Seller Benefit Plan, including any severance plan or policy of the Sellers.

       (g)      From and after the Closing Date, the Purchasers will (i) waive any pre-existing condition limitation under any applicable Purchaser Benefit Plan in which Acquired Employees and their eligible dependents participate and (ii) provide each Acquired Employee and their eligible dependents with credit for any co-payments and deductibles incurred by any of them on or prior to the Closing Date in order to satisfy any applicable deductible or out-of-pocket requirements under any Purchaser Benefit Plans in which any of the Acquired Employees and their eligible dependents participate after the Closing Date.  Prior to the Closing Date, the Legends Entities will provide the Purchasers and, to the extent requested by the Purchasers, the administrators of the Purchasers' medical plans, with the information necessary to credit the Acquired Employees and their eligible dependents with any co-payments and deductibles incurred by them prior to the Closing Date under the Seller Benefit Plans.

       Section 6.3.    <u>Defined Contribution Plans</u>.  As of the Closing Date, with respect to any Seller Benefit Plan that is a defined contribution plan intended to be qualified under Section 401(a) of the IRC and is maintained by or for the benefit of any of the Acquired Employees, such Acquired  Employees will cease to participate in such defined contribution plan.  As of the Closing Date or as soon as practicable thereafter, each Acquired Employee will be permitted to elect a distribution of his or her account balance in the Legends Entities' defined contribution plan and will be permitted to roll over his or her account balances in the Legends Entities' defined contribution plan (or any portion thereof) to the Purchasers' defined contribution plan, including the ability to rollover any existing loans under such plan of the Legends Entities for sixty (60) days after the Closing Date to the extent permitted by the terms of Purchaser's defined contribution plan.

       Section 6.4.    <u>Compliance with the WARN Act</u>.  With respect to all employment losses experienced by Acquired Employees and all other persons employed by the Purchasers which take place on or after the Closing Date, the Purchasers will have full responsibility and all Liability under the WARN Act, and all other statutes, ordinances and regulations of any jurisdiction which impose advance notice or other requirements concerning any such employment losses.  If any such employment losses are deemed to cause a plant closing, mass layoff or other event requiring advance notice or other actions by the Sellers and/or its Affiliates

46

under the WARN Act or other statutes, ordinances or regulations of any jurisdiction (a "Triggering Event"), then the Purchasers will have full responsibility and all Liability arising from any such Triggering Event, including responsibility and Liability pertaining to employees of the Sellers or Riverboat Gaming who were employed in connection with the Business prior to the Closing Date but were not Current Employees or employees of Riverboat Gaming as of the Closing Date. For purposes of this Section 6.4, a Triggering Event will be deemed to have been caused by such employment losses if the Triggering Event would not have occurred but for the employment losses which take place on or after the Closing Date, and "employment loss" has the same meaning as defined in the WARN Act and includes any other employment action giving rise to notice or other obligations under other statutes, ordinances and regulations of any jurisdiction.

Section 6.5.    Employee Rights.    Nothing in this Article VI or elsewhere in this Agreement will be deemed to make any Transferred Employee or Continuing Employee, or any other employee of any Seller or Riverboat Gaming or any Affiliate of any Seller or Riverboat Gaming, a third party beneficiary of this Agreement, or confer upon any employee of any Seller or Riverboat Gaming any rights of employment or continued employment.

## ARTICLE VII
## CONDITIONS TO CLOSING

Section 7.1.    Conditions for the Purchasers.    Notwithstanding any other provision of this Agreement to the contrary, the obligation of the Purchasers to complete the Transaction shall be subject to the satisfaction, on or prior to the Closing Date, of the following conditions (any or all of which may be waived by the Purchasers in writing in whole or in part to the extent permitted by Applicable Law):

(a)    The Legends Entities shall have performed or complied, in all material respects, with all agreements and covenants required by this Agreement to be performed or complied with by them on or prior to the Closing Date, including all deliveries required to be made by the Legends Entities pursuant to Section 8.2 hereof.

(b)    The representations and warranties of the Legends Entities set forth in Section 4.1 hereof shall be true and correct (without giving effect to any "materiality" or "Material Adverse Effect" qualifiers contained therein) on and as of the date hereof and as of the Closing Date (except to the extent such representations and warranties shall have been made with respect to an earlier date, in which case such representations and warranties shall have been true and correct (without giving effect to any "materiality" or "Material Adverse Effect" qualifiers contained therein) as of such earlier date), except in each case where the failure of such representations and warranties to be so true and correct, taken as a whole, has not had and would not reasonably be expected to have a Material Adverse Effect.

(c)    No Order shall be in effect that enjoins, restrains or prohibits the consummation of the Transaction.

(d)    The Confirmation Order shall have been entered by the Bankruptcy Court and shall have become a Final Order.

(e)      The Credit Agreements shall have been executed and delivered by the parties thereto other than the Purchasers and Riverboat Gaming.

(f)      *[Reserved]*

(g)      The Gaming Authorities shall have granted the Gaming Approvals, and the applicable Governmental Authorities shall have granted all of the liquor licenses and similar Permits necessary for the operation of the Business.

(h)      There shall not have occurred and be continuing any Material Adverse Effect between the date hereof and the Closing Date.

(i)      The Purchasers shall have received the title commitments contemplated by Section 5.1(d) and the surveys contemplated by Section 5.1(e) and the same shall be reasonably satisfactory to the Purchasers in all material respects.

(j)      Immediately prior to the Effective Time, the aggregate Cash of the Legends Entities as set forth in the Estimated Closing Date Balance Sheet shall equal or exceed the Minimum Cash Liquidity Amount; provided, that in the event the aggregate Cash of the Legends Entities as of immediately prior to the Effective Time is less than the Minimum Cash Liquidity Amount, the Sellers may elect to reduce the Adjusted Cash Purchase Price by an amount equal to such difference, in which case this condition shall be deemed to have been satisfied.

Section 7.2.      Conditions for the Legends Entities.  Notwithstanding any other provision of this Agreement to the contrary, the obligation of the Legends Entities to complete the Transaction shall be subject to the satisfaction or waiver of the following conditions (any or all of which may be waived by the Legends Entities in writing in whole or in part to the extent permitted by Applicable Law):

(a)      The Purchasers shall have performed or complied, in all material respects, with all agreements and covenants required by this Agreement to be performed or complied with by them on or prior to the Closing Date, including all deliveries required to be made by the Purchasers pursuant to Section 8.3 hereof.

(b)      The representations and warranties of the Purchasers set forth in Section 4.2 hereof shall be true and correct (without giving effect to any "materiality" or "material adverse effect" qualifiers contained therein) on and as of the date hereof and as of the Closing Date (except to the extent such representations and warranties shall have been made with respect to an earlier date, in which case such representations and warranties shall have been true and correct (without giving effect to any "materiality" or "material adverse effect" qualifiers contained therein) as of such earlier date), except in each case where the failure of such representations and warranties to be so true and correct, taken as a whole, has not materially affected or delayed, and would not reasonably be expected to materially affect or delay, the ability of the Purchasers to perform their obligations under this Agreement or to consummate the Transaction.

(c)      No Order shall be in effect that enjoins, restrains or prohibits the consummation of the Transaction.

(d)      The Confirmation Order shall have been entered by the Bankruptcy Court and

48

such Order shall have become a Final Order.

(e)     If an Auction is held, the Purchasers shall be the successful bidder at the Auction in accordance with the Bidding Procedures Order, subject to Section 3.4(b) hereof.

(f)     *[Reserved]*

(g)     The Credit Agreements shall have been executed and delivered by the parties thereto, and all conditions thereto shall have been satisfied or waived.

(h)     The Gaming Authorities shall have granted the Gaming Approvals, and the applicable Governmental Authorities shall have granted all of the liquor licenses and similar Permits necessary for the operation of the Business.

## ARTICLE VIII
## CLOSING

Section 8.1.     Closing Arrangements.  The Closing shall take place on the Closing Date, at 10:00 a.m., local time, at the offices of McAfee & Taft A Professional Corporation, 211 North Robinson, Oklahoma City, Oklahoma or at such other time or place as may be mutually agreed to by the Parties.  For all purposes under this Agreement, the Closing shall be deemed effective as of the Effective Time.

Section 8.2.     Legends Entities' Deliveries.  On or before the Closing Date, the Legends Entities shall deliver or cause to be delivered the following items and documents to the Purchasers, with each such document to be effective as of the Effective Time:

(a)     a certificate executed on behalf of the Legends Entities representing and certifying that the conditions set forth in Section 7.1(a) and (b) have been fulfilled;

(b)     the Bill of Sale, duly executed by the Sellers;

(c)     a special or limited warranty deed (or equivalent deed in the state in which the Seller Real Property is located), in customary form, for the Seller Real Property, duly executed by the applicable Seller;

(d)     a certificate of non-foreign status of the Sellers pursuant to Section 1445 of the IRC and Section 1.1445-2(b) of the Treasury Regulations promulgated thereunder;

(e)     a certified copy of the Confirmation Order;

(f)     the Assignment and Assumption of Leases, duly executed by the Sellers;

(g)     the Assignment and Assumption Agreement, duly executed by the Sellers;

(h)     evidence of the assignment and transfer of the LRGP Partnership Interests to Global Louisiana, in a form reasonably satisfactory to the Purchasers, effective as of the Closing;

(i)     written resignation letters or other evidence of termination, effective as of the

49

Closing, from all officers of Riverboat Gaming who will not be Acquired Employees;

(j)      written evidence reasonably satisfactory to the Purchasers that the Legends Entities have taken the actions required under Article VI to be taken by the Legends Entities on or prior to Closing;

(k)      if Estimated Closing Date Net Working Capital is greater than $5,550,000 or less than $5,150,000 as of the Closing, Legends Gaming will deliver to the Purchasers a duly executed counterpart to the Working Capital Escrow Agreement;

(l)      the minute book of Riverboat Gaming; and

(m)      all other conveyances and other documents that are required and that the Purchasers have reasonably requested on or before the Closing Date to give effect to this Transaction, including the proper transfer, assignment and conveyance of the Purchased Assets by the Sellers to the Purchasers, free and clear of all Encumbrances except the Permitted Encumbrances.

Section 8.3.      Purchaser's Deliveries.  On or before the Closing Date, the Purchasers shall deliver or cause to be delivered the following items and documents to the Sellers, with each such document to be effective as of the Effective Time:

(a)      a certificate executed on behalf of the Purchasers representing and certifying that the conditions set forth in Section 7.2(a) and (b) have been fulfilled;

(b)      the Bill of Sale, duly executed by the Purchasers;

(c)      the Adjusted Cash Purchase Price (other than the Estimated Working Capital Excess Amount, if any) and the Deposit Escrow Funds, in immediately available funds;

(d)      if Estimated Closing Date Net Working Capital is greater than $5,550,000 or less than $5,150,000 as of the Closing, Global Legends will (i) deposit the Working Capital Escrow Funds with the Escrow Agent, and (ii) deliver to the Sellers a duly executed counterpart to the Working Capital Escrow Agreement;

(e)      the Assignment and Assumption of Leases, duly executed by the applicable Purchasers;

(f)      the Assignment and Assumption Agreement, duly executed by the applicable Purchasers;

(g)      evidence reasonably satisfactory to the Sellers that the Credit Agreements have been duly executed and delivered by the parties thereto and are in full force and effect; and

(h)      all other documents that are required and that the Sellers have reasonably requested on or before the Closing Date to give effect to this Transaction.

Section 8.4.      Tax Matters.

(a)     The Purchasers shall furnish Tax information to the Sellers for inclusion in the consolidated, combined and unitary Tax Returns for the period (or a portion thereof) that includes the Closing Date at the Sellers' cost.

(b)     With respect to Tax Returns relating to the Purchased Assets or the LRGP Retained Assets, for any Tax that is imposed on a periodic basis and is payable for the Tax period ending before, but not including, the Closing Date (the "Separate Tax Returns"), the Sellers shall prepare such Separate Tax Returns in accordance with past practice.  The Purchasers shall timely execute and file, or cause to be timely executed and filed, the Separate Tax Returns with the appropriate taxing authorities, provided that the Sellers shall pay, three (3) days prior to the filing of such Separate Tax Returns, to the Purchasers the portion of the Tax shown due on the Separate Tax Returns, but solely to the extent such Tax was not assumed by the Purchasers pursuant to Section 2.1(c) or was not retained by Riverboat Gaming pursuant to Section 2.2(c).

(c)     In the case of any Taxes relating to the Purchased Assets or the LRGP Retained Assets that are imposed on a periodic basis and are payable for a taxable period that includes, but does not end on, the Closing Date, the portion of such Tax which relates to the portion of such taxable period ending on the Closing Date shall (i) in the case of any Taxes, other than Taxes based upon or related to income or receipts, be deemed to be the amount of such Tax for the entire taxable period multiplied by a fraction the numerator of which is the number of days in the taxable period ending on the Closing Date and the denominator of which is the number of days in the entire taxable period, and (ii) in the case of any Tax based upon or related to income or receipts, be deemed equal to the amount which would be payable if the relevant taxable period ended as of the end of the Closing Date.

(d)     On the Closing Date, and solely to the extent not exempt in accordance with Section 1146 of the Bankruptcy Code, the Purchasers shall have the responsibility of payment of all state and local Transfer Taxes, if any, including those payable in connection with the conveyance of the Purchased Assets from the Sellers to the Purchasers, as well as any notary fees incurred in connection therein; provided, however, that the Parties shall reasonably cooperate in availing themselves of any available exemptions from any collection of (or otherwise reduce) any such Transfer Taxes, including a request that the Sellers' sale of the Purchased Assets be exempted from Transfer Taxes pursuant to Section 1146 of the Bankruptcy Code.

(e)     Any refunds (and any interest received thereon) of any Tax relating to the Purchased Assets or the LRGP Retained Assets, and any equivalent benefit through a reduction of Tax Liabilities for a post-Closing period, received by the Purchasers or Riverboat Gaming for any period (or portion thereof) ending on or before the Closing Date shall belong to the Sellers, provided that the Tax at issue either was paid on or before the Closing Date or was paid by the Sellers (or any Affiliate thereof (other than Riverboat Gaming)) after the Closing Date. Such refunds or equivalent amounts, if received by the Purchasers or Riverboat Gaming, shall be paid over to the Sellers within five (5) Business Days of the earlier of receipt or entitlement thereto. The Purchaser and Riverboat Gaming shall, if the Sellers so request and at the Sellers' expense, file and obtain any refunds or equivalent amounts to which the Sellers are entitled under this Section 8.4(e).  The Purchasers and Riverboat Gaming shall permit the Sellers to control (at the Sellers' expense) the prosecution of any such refund claim; provided, however, that the Sellers shall not take any action in the prosecution of such refund claims that would be reasonably

51

expected to be materially detrimental to any of the Purchasers or Riverboat Gaming.

(f)     After the Closing, the Purchasers shall promptly notify the Sellers in writing upon the commencement of any Tax audit, suit, action or proceeding (each a "Tax Contest") relating to a Tax issue of the Sellers or with respect to the Purchased Assets or the LRGP Retained Assets for any period (or a portion thereof) ending prior to the Closing Date and for which the Sellers are primarily liable under this Agreement.  The Sellers shall have control over such Tax Contests, which control shall include, for the avoidance of doubt, the right to settle, compromise and/or concede any such Tax Contest and the right to employ counsel of their choice at their expense; provided that the Sellers shall keep the Purchasers apprised of all developments relating to the Tax Contests, provide the Purchasers with copies of all correspondence from any taxing authority relating to any such Tax Contest, and conduct the defense of such Tax Contest diligently and in good faith.  In the case of a Tax Contest that relates to Straddle Periods, the Purchasers shall control the conduct of such Tax Contest, but the Sellers shall have the right to participate in such Tax Contest at their own expense, and the Purchasers shall not settle, compromise or concede such Tax Contest without the consent of the Sellers, which consent shall not be unreasonably withheld or delayed.

(g)     Neither the Purchasers, Riverboat Gaming nor the Sellers will settle a Tax liability or compromise any Tax claim relating to the Business, the Purchased Assets or the LRGP Retained Assets which may affect the liability for Taxes hereunder of the Purchasers, on the one hand, or the Sellers, on the other hand, without the other Party's consent.

(h)     The Parties agree to treat the Transaction as a taxable purchase and sale of the Purchased Assets (other than the LRGP Partnership Interests) and the LRGP Retained Assets for all federal, state, municipal, local and foreign income Tax purposes, to report the Transaction as such for all income Tax purposes, and to take no action inconsistent with such treatment.  Except as otherwise provided in this Agreement, each Party shall be responsible for the preparation and filing of all required Tax Returns and payment of Taxes attributable to the time periods of their respective ownership of the Purchased Assets, including ad valorem Taxes.

(i)     The Purchasers and the Sellers shall furnish or cause to be furnished to each other, as promptly as practicable, such information and assistance relating to the Purchased Assets and the Assumed Liabilities as is reasonably necessary for the preparation and filing of any Tax Return, claim for refund or other filings relating to Tax matters, for the preparation for any Tax audit, for the preparation for any Tax protest, or for the prosecution or defense of any suit or other proceeding relating to Tax matters. The Sellers shall retain in their possession all Tax Returns and Tax records relating to the Business, Purchased Assets and the Assumed Liabilities until the relevant statute of limitations has expired or, with respect to any then pending Tax audit or judicial or administrative proceeding until final resolution thereof. After such time, the Sellers may dispose of such materials; provided that prior to such disposition the Sellers shall give the Purchasers a reasonable opportunity to take possession of such materials.

## ARTICLE IX
## TERMINATION OF AGREEMENT

Section 9.1.   Termination Rights.   This Agreement may be terminated and the Transaction may be abandoned at any time prior to the Closing Date upon the occurrence of any

of the following:

    (a)     by mutual written consent of the Purchasers and the Legends Entities;

    (b)     by either the Purchasers or the Legends Entities, if consummation of the Transaction contemplated hereby is restrained, enjoined or otherwise prohibited by any nonappealable final order, decree or judgment of the Bankruptcy Court or any Governmental Authority having competent jurisdiction, other than any failure of the Purchasers to obtain the Gaming Approvals or any liquor licenses or similar Permits necessary for the operation of the Business;

    (c)     (i) by the Legends Entities, if the Transaction shall not have been consummated on or before the Outside Date in a situation where the failure to consummate the Transaction on or before the Outside Date was due to the failure of the Purchasers to obtain the Gaming Approvals or any liquor licenses or similar Permits necessary for the operation of the Business; or (ii) by either of the Parties, if the Transaction shall not have been consummated on or before the Outside Date in a situation where the failure to consummate the Transaction on or before the Outside Date was due to a reason other than the failure of the Purchasers to obtain the Gaming Approvals or any liquor licenses or similar Permits necessary for the operation of the Business; provided, that, in the case of each of clause (i) and clause (ii), the right to terminate pursuant to this Section 9.1(c) shall not be available to a Party whose failure to perform or comply in all material respects with the covenants and agreements of such Party set forth in this Agreement shall have been the principal cause of or resulted in the failure of the Closing to occur by such date;

    (d)     by the Legends Entities, if (i) there shall have been a breach by any Purchaser of any of its covenants, agreements, representations or warranties set forth in this Agreement which breach, either individually or in the aggregate, would result, if occurring or continuing at the Outside Date, in the failure of the conditions set forth in Sections 7.2(a) or 7.2(b), as the case may be, and which is not cured on or before the earlier of the Outside Date and the thirtieth (30th) day following written notice to the Purchasers, or which by its nature cannot be cured within such time period; provided that the Legends Entities shall not have the right to terminate this Agreement pursuant to this Section 9.1(d) if the Legends Entities are then in material breach of any of their covenants or agreements contained in this Agreement or (ii) any condition to the obligations of the Legends Entities set forth in Section 7.2 shall have become incapable of fulfillment (including failure of the Purchasers to be the successful bidders at the Auction) other than as a result of a breach by the Legends Entities of any covenant or agreement contained in this Agreement, and such condition is not waived by the Legends Entities;

    (e)     by the Purchasers, if (i) there shall have been a breach by any Legends Entity of any of its respective covenants, agreements, representations or warranties set forth in this Agreement which breach, either individually or in the aggregate, would result, if occurring or continuing at the Outside Date, in the failure of the conditions set forth in Sections 7.1(a) or 7.1(b), as the case may be, and which is not cured on or before the earlier of the Outside Date and the thirtieth (30th) day following written notice to the Legends Entities, or which by its nature cannot be cured within such time period; provided that the Purchasers shall not have the right to terminate this Agreement pursuant to this Section 9.1(e) if the Purchasers are then in material breach of any of their covenants or agreements contained in this Agreement or (ii) any

53

condition to the obligations of the Purchasers set forth in Section 7.1 shall have become incapable of fulfillment other than as a result of a breach by the Purchasers of any covenant or agreement contained in this Agreement, and such condition is not waived by the Purchasers;

(f)        on or after the Petition Date, automatically, contemporaneously with the Legends Entities' consummation of an Alternative Transaction, at which time the Termination Fee required to be paid pursuant to Section 9.2(c) shall be immediately due and payable;

(g)        [Reserved];

(h)        by either the Purchasers or the Sellers, if the Confirmation Order is not entered by the Bankruptcy Court on or prior to the two hundred tenth (210th) day after commencement of the Bankruptcy Case (or such Order shall be vacated or stayed as of such date); provided that the right to terminate pursuant to this Section 9.1(h) shall not be available to any Party whose failure to perform or comply in all material respects with the covenants and agreements of such Party set forth in this Agreement shall have been the principal cause of or resulted in the failure of the Confirmation Order to be entered by the Bankruptcy Court by such date;

(i)        by the Purchasers or the Legends Entities, if the Bankruptcy Case is dismissed in whole or in part or converted to Chapter 7 of the Bankruptcy Code for any reason; and

(j)        by the Purchasers, if (i) the Bankruptcy Case is not commenced on or before the fifth (5th) Business Day after the execution and delivery of this Agreement by all of the Parties or (ii) the Bankruptcy Court shall not have entered the Bidding Procedures Order on or before the thirtieth (30th) day after commencement of the Bankruptcy Case (or such Order shall be vacated or stayed as of such date).

Section 9.2.    Effect of Termination.

(a)        Except as otherwise provided herein, in the event of termination of this Agreement, this Agreement shall become null and void and be deemed of no force and effect, with no liability on the part of any Party (or of any of its Representatives), and no Party shall have any obligations to any other Party arising out of this Agreement; provided, however, that no such termination shall relieve or release any Party from any liabilities or damages resulting from any willful or intentional breach by a Party of any of its representations, warranties, covenants or agreements set forth in this Agreement.   Notwithstanding the foregoing, in the event this Agreement is terminated pursuant to Section 9.1, the provisions contained in this Section 9.2 and those contained in Article I and Sections 10.7 (Fees and Expenses), 10.8 (Governing Law; Jurisdiction; Service of Process) and 10.15 (Guarantee) shall survive any termination of this Agreement without limitation as to time.

(b)        If this Agreement is terminated (i) by the Legends Entities pursuant to Section 9.1(c)(i), Global Legends and Legends Gaming shall deliver joint written instructions to the Escrow Agent to cause the Escrow Agent to release and pay $3,750,000 out of the Deposit Escrow Funds to Legends Gaming, in accordance with the terms of the Deposit Escrow Agreement, and in the case of a termination by the Legends Entities pursuant to Section 9.1(c)(i), such payment shall be the sole and exclusive remedy of the Legends Entities, (ii) by the Legends Entities pursuant to Section 9.1(d)(i), Global Legends and Legends Gaming shall deliver joint

54

written instructions to the Escrow Agent to cause the Escrow Agent to release and pay the Deposit Escrow Funds to Legends Gaming, in accordance with the terms of the Deposit Escrow Agreement, or (iii) by any Party pursuant to any provisions under <u>Section 9.1</u> other than <u>Sections 9.1(c)(i)</u> or <u>9.1(d)(i)</u>, Global Legends and Legends Gaming shall deliver joint written instructions to the Escrow Agent to cause the Escrow Agent to release and pay the Deposit Escrow Funds to Global Legends.

(c)     In the event this Agreement is terminated pursuant to <u>Section 9.1(f)</u>, then the Legends Entities shall concurrently with the consummation of the applicable Alternative Transaction pay to the Purchasers by wire transfer of immediately available funds to an account designated by the Purchasers, an amount equal to the Termination Payment. The Legends Entities' payment of the Termination Payment pursuant to this <u>Section 9.2(c)</u> shall be the sole and exclusive remedy of the Purchasers against the Legends Entities with respect to the occurrences giving rise to such payment.

(d)     The Legends Entities acknowledge that the agreements contained in <u>Section 9.2(c)</u> are an integral part of the Transaction.  In the event that the Legends Entities shall fail to pay the Termination Payment (or any portion thereof) when due, the Legends Entities shall reimburse the Purchasers for all reasonable costs and expenses actually incurred or accrued by the Purchasers (including reasonable fees and expenses of counsel) in connection with the collection under and enforcement of <u>Section 9.2(c)</u>, together with interest on the amount of such amount or portion thereof at the rate specified as the Prime Rate in The Wall Street Journal (Northeast Edition) in effect on the date such payment was required to be made, plus two percent (2%), until the date all such amounts are paid to the Purchasers.

## ARTICLE X
## MISCELLANEOUS

Section 10.1.   <u>As-Is/Where-Is Transaction; Survival</u>.

(a)     Notwithstanding anything contained in this Agreement to the contrary, the Purchasers hereby acknowledge and agree that the Legends Entities are not making any representations or warranties whatsoever, express or implied, oral or written, at law or in equity, beyond those expressly given by the Legends Entities in this Agreement (as modified by the Schedules hereto as supplemented or amended), and the Purchasers acknowledge and agree that, except for the representations and warranties contained herein, the Purchased Assets and the LRGP Retained Assets are being transferred on an "as-is," "where is" basis and "with all faults." The Purchasers further acknowledge and agree that the Purchasers have had adequate opportunities to conduct an independent inspection, investigation of the Purchased Assets, the Assumed Liabilities, the LRGP Retained Assets, the LRGP Retained Liabilities and the Business and all such other matters relating to or affecting the Purchased Assets, the Assumed Liabilities, the LRGP Retained Assets, the LRGP Retained Liabilities and the Business.  Any claims the Purchasers may have for breach of Representation shall be based solely on the representations and warranties of the Legends Entities set forth in this Agreement (as modified by the Schedules hereto as supplemented or amended).  EXCEPT AS SET FORTH IN THIS AGREEMENT, THE LEGENDS ENTITIES MAKE NO EXPRESS WARRANTY, NO WARRANTY OF MERCHANTABILITY, NO WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE, NOR ANY IMPLIED OR STATUTORY WARRANTY WHATSOEVER (AND EXPRESSLY

55

DISCLAIM ALL SUCH WARRANTIES) WITH RESPECT TO ANY OF THE PURCHASED ASSETS, THE ASSUMED LIABILITIES, THE LRGP RETAINED ASSETS, THE LRGP RETAINED LIABILITIES OR THE BUSINESS.

(b)     The Representations contained in this Agreement shall terminate at the Effective Time.

Section 10.2.   Obligations as Covenants.  Each agreement and obligation of each Party in this Agreement, even though not expressed as a covenant, shall be considered for all purposes to be a covenant.

Section 10.3.   Relationship of the Parties.  Nothing in this Agreement shall be construed so as to make any of the Purchasers a partner of any of the Sellers.

Section 10.4.   Amendment of Agreement.  This Agreement may not be supplemented, modified or amended except by a written agreement executed by each Party.

Section 10.5.   Notices.  Any Notice shall be in writing and shall be deemed to have been duly given or made (a) when personally delivered, (b) on the first Business Day after being delivered to a recognized national overnight courier service, or (c) on the fifth (5th) Business Day after being mailed by registered or certified mail, postage prepaid, return receipt requested, addressed as follows, or to such other addresses as may be furnished hereafter by notice, in writing, to the other Party on at least three (3) Business Days' prior notice, to the following Parties:

(a)     If to the Purchasers, to:

> Global Gaming Legends, LLC
> c/o Global Gaming Solutions, LLC
> 210 N. Broadway
> Ada, OK  74820
> Attention:  John Elliott, Chief Executive Officer
> Telecopy:  (580) 559-0809
>
> with a copy given in like manner to:
>
> McAfee & Taft A Professional Corporation
> 211 N. Robinson
> Two Leadership Square, 10th Floor
> Oklahoma City, OK 73102
> Attention:  Messrs. Martin N. Stringer and Louis J. Price

(b)     If to the Legends Entities, to:

> Legends Gaming, LLC
> 7670 West Lake Mead Boulevard
> Suite 145
> Las Vegas, NV 89128-6651

Attention: Raymond C. Cook, Acting President
Telecopy: (702) 255-0648

with a copy given in like manner to:

Jenner & Block LLP
353 N. Clark Street
Chicago, IL 60654
Attention: Brian S. Hart
Telecopy: (312) 923-2718

Any Notice that is delivered or is sent by telecopy shall be deemed to have been validly and effectively given and received on the date it is delivered or sent, unless it is delivered or sent after 5:00 p.m. on any given day or on a day which is not a Business Day, in which case it shall be deemed to have been validly and effectively given and received on the Business Day next following the day it was delivered or sent, provided that, in the case of a Notice sent by telecopy it shall not be deemed to have been sent unless there has been confirmation of transmission.

Section 10.6.   Specific Performance.   It is understood and agreed by the Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party and each non-breaching Party should be entitled to specific performance and injunctive or other equitable relief as a remedy of such a breach.  The rights set forth in this Section 10.6 shall be in addition to any other rights that a Party may have at law or in equity pursuant to this Agreement.

Section 10.7.   Fees and Expenses.   Subject to Section 9.2, the Parties agree that all costs and expenses of the Parties relating to the Transaction shall be paid by the Party incurring such expenses.

Section 10.8.   Governing Law; Jurisdiction; Service of Process.   This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without giving effect to any principles of conflicts of law.  By its execution and delivery of this Agreement, each of the Parties irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding between the Legends Entities, on the one hand, and the Purchasers, on the other hand, with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, shall be brought (a) prior to the Petition Date, solely and exclusively in the State of New York and the state or federal courts located in the State and County of New York and (b) on or after the Petition Date, in the Bankruptcy Court for that purpose only, and, by execution and delivery of this Agreement, each hereby irrevocably accepts and submits itself to the jurisdiction of such courts, generally and unconditionally, with respect to any such action, suit or proceeding.  If any such action, suit or proceeding is commenced, the Parties hereby agree and consent that service of process may be made, and personal jurisdiction over any Party in any such action, suit or proceeding may be obtained, by service of a copy of the summons, complaint and other pleadings required to commence such action, suit or proceeding upon the Party at the address of such Party set forth in Section 10.5 hereof, unless another address has been designated by such Party in a notice given to the other Parties in accordance with the provisions of Section 10.5 hereof.

Section 10.9.  Further Assurances.  Each of the Parties shall from time to time hereafter and upon any reasonable request of the other Party and at such requesting Party's cost, execute and deliver, make or cause to be made all such further acts, deeds, assurances and things as may be required or necessary to more effectually implement and carry out this Agreement and the Transaction contemplated hereby.

Section 10.10.  Entire Agreement.  This Agreement constitutes the full and entire agreement between the Parties pertaining to the Transaction and supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written, with respect thereto made by any Party, including the letter agreement, dated March 26, 2012, between Global Gaming Solutions, LLC and Legends Gaming, as the same has been amended, and there are no other warranties or representations and no other agreements between the Parties in connection with the Transaction except as specifically set forth in this Agreement.

Section 10.11.  Waiver.  No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision (whether or not similar) nor shall any waiver constitute a continuing waiver unless otherwise expressed or provided.  All waivers hereunder must be in writing to be effective and executed by the Party making such waiver.

Section 10.12.  Assignment.  No Party shall assign (whether by operation of law or otherwise) its respective rights and/or obligations hereunder (or agree to do so) without the prior written consent of the other Parties, which consent may be withheld by such Party in its sole and absolute discretion.

Section 10.13.  Successors and Assigns.  All of the covenants and agreements set forth in this Agreement are intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns and be enforceable by the Parties and their respective successors and their permitted assigns pursuant to the terms and conditions of this Agreement.

Section 10.14.  Counterparts.  This Agreement may be executed in multiple counterparts, each of which shall be deemed an original hereof, and all of which shall constitute a single agreement effective as of the date hereof.  Any delivery of an executed copy of this Agreement by way of telecopy shall constitute delivery hereof, provided that any Party delivering by way of telecopy shall, upon the request of any other Party, deliver an originally executed counterpart of this Agreement to the other Parties.

Section 10.15.  Guarantee.  The Guarantor hereby unconditionally and absolutely guarantees to the Legends Entities the due and punctual full payment, performance and discharge of all covenants, agreements and other obligations of the Purchasers hereunder.  The foregoing guarantee shall be direct, absolute, irrevocable, and unconditional and shall not be impaired irrespective of any assignment, modification, waiver, release, supplement, extension or other change in the terms of all or any of the obligations of the Purchasers hereunder.  The Guarantor and the Purchasers hereby waive any requirement of promptness, diligence or notice with respect to the foregoing guaranty and any requirement that any of the Legends Entities exhausts any right or take any action against the Guarantor or the Purchasers in respect of any of their obligations hereunder or otherwise.  The Parties agree that there are no third party beneficiaries to this guarantee, and no one other than the Legends Entities shall be entitled to rely on, or shall be entitled to enforce the provisions of, this Section.

58

[Signature Page Follows.]

59

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the day and year first above written.

SELLERS:

LEGENDS GAMING, LLC

By: _____
Name:  Raymond C. Cook
Title:  President, Chief Financial Officer and Secretary

LEGENDS GAMING OF LOUISIANA-1, LLC

By: _____
Name:  Raymond C. Cook
Title:  President, Chief Financial Officer and Secretary

LEGENDS GAMING OF LOUISIANA-2, LLC

By: _____
Name:  Raymond C. Cook
Title:  President, Chief Financial Officer and Secretary

LEGENDS GAMING OF MISSISSIPPI, LLC

By: _____
Name:  Raymond C. Cook
Title:  President, Chief Financial Officer and Secretary

LOUISIANA RIVERBOAT PARTNERSHIP

By: _____
Name:  Raymond C. Cook
Title:  President, Chief Financial Officer and Secretary

*[Signature Page to Purchase Agreement]*

PURCHASERS:                    GLOBAL GAMING LEGENDS, LLC

                               By: _____
                               Name: John Elliott
                               Title:   Chief Executive Officer


                               GLOBAL GAMING VICKSBURG, LLC

                               By: _____
                               Name: John Elliott
                               Title:   Chief Executive Officer


                               GLOBAL GAMING BOSSIER CITY, LLC

                               By: _____
                               Name: John Elliott
                               Title:   Chief Executive Officer



GUARANTOR:                     GLOBAL GAMING SOLUTIONS, LLC
(solely for the purposes       By: _____
of Section 10.15)              Name: _____
                               Title: _____




*[Signature Page to Purchase Agreement]*

# EXHIBIT A

**FORM OF ASSIGNMENT AND ASSUMPTION OF AGREEMENT**

**EXHIBIT B**

**FORM OF ASSIGNMENT AND ASSUMPTION OF LEASES**

## **EXHIBIT C**

## **FORM OF BILL OF SALE**

# **EXHIBIT D**

## **FORM OF FIRST LIEN CREDIT AGREEMENT**

**EXHIBIT E-1**

**DESCRIPTION OF LRGP REAL PROPERTY**

# EXHIBIT E-2

**DESCRIPTION OF SELLER REAL PROPERTY**

**<u>EXHIBIT F</u>**

**SAMPLE STATEMENT OF NET WORKING CAPITAL**

# EXHIBIT G

## TERM SHEET FOR SECOND LIEN CREDIT AGREEMENT

**EXHIBIT H**

**FORM OF DEPOSIT ESCROW AGREEMENT**

**EXHIBIT I**

**FORM OF WORKING CAPITAL ESCROW AGREEMENT**