1

Exhibit - B-

1          UNITED STATES BANKRUPTCY COURT
           WESTERN DISTRICT OF LOUISIANA
2                 SHREVEPORT DIVISION

3

4

 IN RE:                    : CASE NO. 12-12013
5  LOUISIANA RIVERBOAT GAMING, et  : Chapter 11
 al                        : Jointly Administered with
6                          : 12-12014, 12-12015, 12-12017,
                           : 12-12019, and 12-12020
7

8

9   Transcript of proceeding for *Motion for Entry of an Order (A)*
    *Approving Bidding Procedures, and (B) Granting Certain Bid*
10                       *Protections*
            before the Honorable Stephen V. Callaway
11              United States Bankruptcy Judge

12

13

14

15                   22 AUGUST 2012

16

17

18

19

20

21

22

 Transcribed by:   Richard Simpson
23                  1120 Hallmark Dr.
                    Shreveport, LA 71118
24                  318-688-1860
 Proceedings recorded by FTR, electronic sound recording;
25  transcript produced by transcription service.

```
 1                        A-P-P-E-A-R-A-N-C-E-S

 2

 3   For Louisiana Riverboat     : TRISTAN E. MANTHEY
       Gaming                    : WILLIAM H. PATRICK, III
 4              Debtor           : ALIDA WIENTJES
                                 : Heller, Draper, Patrick & Horn
 5                               : 650 Poydras St., Suite 2500
                                 : New Orleans, LA 70130
 6

 7   For Gerald Schiff, Chapter 11 : LOUIS M. PHILLIPS
          trustee               : Gordon, Arata, McCollam,
 8                               :    Duplantis & Eagan
                                 : 201 Main Street, Suite 1600
 9                               : Baton Rouge, LA 70801-1916

10

11   For Office of U.S. Trustee  : FRANCES E. HEWITT
                                 : Assistant U.S. Trustee
12                               : 300 Fannin Street, Suite 3196
                                 : Shreveport, LA 71101
13

14   For Capital One             : BRENT WYATT
                                 : Lemle & Kelleher, L.L.P.
15                               : 601 Poydras St., Suite 2200
                                 : New Orleans, LA 70130
16

17   For Wilmington Trust Company : PAUL HARNER
                                 : Latham & Watkins
18                               : 885 Third Avenue
                                 : New York, NY 10022-4834
19

20            ALSO PRESENT:

21              With Global Gaming : J. Cary Kinetic
                                   : B. Gabbard
22                                 : S. Seeley
                                   : J. Elliott
23
                With Seaport     : R. Richards
24                               : E. Pearson

25              With Legends Gaming : R. Cook
```

```
 1                  22 AUGUST 2012, 2:07 P.M.

 2            THE COURT:  We have on the afternoon docket a motion

 3    that's been filed -- we've been referring to this as the

 4    Legends case, but it's the Louisiana Riverboat Gaming

 5    Partnership cases that have been consolidated for

 6    administrative purposes.  If you will all bear with me just a

 7    moment and I'll get my computer running and then we'll get this

 8    process, these proceedings started.

 9         Okay.  I think we had a sign-in that was passed around;

10    but for the record, let's see if we can get everyone to make

11    their appearance of record at this time.

12            MR. PATRICK:  Your Honor, William Patrick, along with

13    Tristan Manthey and Alida Wientjes for the debtors.

14            MR. WYATT:  Brent Wyatt, Your Honor, Capital One.

15            MS. HEWITT:  Frances Hewitt for the United States

16    Trustee.

17            MR. PHILLIPS:  Good morning, your Honor.  Louis M.

18    Phillips on behalf of Global Gaming Solutions, Global Gaming

19    Legends, Global Gaming Vicksburg, and Global Gaming Bossier

20    City.  And I have corporate representatives here I'll announce

21    and introduce to the Court later.

22            THE COURT:  Would you just like to be referred to as

23    "Global" hereafter?

24            MR. PHILLIPS:  "Global" will be fine, Your Honor.

25    Thank you.
```

```
 1              THE COURT:  Louis, you've been wanting that for a
 2    long time.  You are from henceforward "Global."
 3              MR. HARNER:  Good afternoon, Your Honor, Paul Harner
 4    of Latham & Watkins on behalf of Wilmington Trust Company as
 5    first lien indentured trustee and the ad hoc first lien lender
 6    group.
 7              THE COURT:  Okay.  The -- yes, sir?
 8              MR. PATRICK:  Whenever you are ready to proceed, Your
 9    Honor.  I was just getting up, Your Honor.
10              THE COURT:  I had two objections filed to the motion,
11    which, for the record, the motion has been properly noticed
12    out.  And there were two -- actually one objection and one
13    response.  And then I've had responses to the objection and to
14    the responses.
15         It looks like, to me, that the first issue that we should
16    perhaps take up would be the opposition filed by the United
17    States Trustee's Office.
18              MR. PATRICK:  Your Honor, could we take up the
19    response -- it wasn't an objection; I think it was a response
20    filed by the Capital Bank One, because we have a resolution of
21    that.
22              THE COURT:  That would be fine.  If we have a matter
23    resolved, we could take it up at this time.  Mr. Wyatt?
24              MR. PATRICK:  I'm going to present to Your Honor a
25    form of the order approving bidding procedures and granting
```

1   certain bid protections that if Your Honor approves the motion

2   today, paragraph 9 is new and it deals with the response filed

3   by Capital Bank with respect -- Capital One with respect to the

4   bid procedures.  It essentially provides that notwithstanding

5   anything else in this order, this order does not alter, amend,

6   or modify any of the terms and conditions of the amended and

7   restated credit agreement dated as of August 31, 2009, among

8   Legends Gaming, LLC, as borrower, the first lien lenders, and

9   Wilmington Trust Company as the administrative agent.  Two,

10   does not constitute the approval of the sale of the debtors'

11   assets including the sale contemplated by the purchase

12   agreement as that term is defined in the debtors' motion.  And,

13   three, does not affect and/or modify in any way the rights of

14   any party, including Capital One National Association, to

15   refuse to consent and/or object to any sale of the debtors'

16   assets under a plan or otherwise.

17      It's essentially a reservation of rights for parties with

18   respect to an ultimate plan of confirmation, plan of

19   reorganization.

20          THE COURT:  The latest response filed by the debtor

21   indicated that Capital One and debtor were working on a

22   resolution of that, and I assume that that's what would be the

23   resolution.

24      Would this apply to other first lienholders or only to

25   Capital One?

```
 1              MR. PATRICK:  It would apply to all first lien
 2    lenders.  The purpose, the purpose of the bid procedures motion
 3    is to set up a process in which there will be a winning bid or
 4    a successful bidder for the assets that would then be included
 5    in a plan and disclosure statement.  And obviously creditors
 6    would have whatever rights they have under the Bankruptcy Code
 7    with respect to the plan, whether they vote for it or against
 8    it.
 9              THE COURT:  You came close to saying it, but you
10    didn't say it outright.
11              MR. PATRICK:  It does apply to others.
12              THE COURT:  No.  In your response to the pleadings.
13              MR. PATRICK:  Oh.
14              THE COURT:  Came close to saying it, but you didn't
15    say it outright, and that's the reason why we're doing it.
16              MR. PATRICK:  Okay.
17              THE COURT:  Okay.
18              MR. WYATT:  We've approved the language in the order,
19    Your Honor.
20              THE COURT:  All right.  Thank you, Mr. Wyatt.
21         And thank you, Mr. Patrick.
22              MR. PATRICK:  Your Honor, it's also my understanding
23    that the ad hoc group of first lien lenders have also approved
24    the addition to that bid procedures order, as has Global,
25    represented by Mr. Phillips.
```

1          I'm not sure precisely who has to approve what under all

2     the documents, but I want to make sure that we advise Your

3     Honor that we believe that the ad hoc group, as well as Global,

4     has approved it as well.

5               MR. HARNER:  Your Honor, on behalf of the first lien

6     ad hoc group, I can confirm that, and also confirm Mr.

7     Patrick's representation and Your Honor's understanding that

8     this reservation of rights, with which we're frankly very

9     pleased, applies to all creditors, not just Cap One,

10    notwithstanding the fact that Cap One did in fact first raise

11    the issue.

12              THE COURT:  Correct.

13              MR. PHILLIPS:  I'm Louis M. Phillips on behalf of

14    Global.  Global understands and is supportive of this

15    resolution.  It does not affect the rights running back and

16    forth within the purchase and sale agreement.

17              THE COURT:  In that the first lienholders is not one

18    entity but numerous entities?

19              MR. PATRICK:  That's correct, Your Honor.

20              THE COURT:  When we get to voting for the plan, we'll

21    have to carry that class.

22              MR. PATRICK:  That's my understanding; and that's

23    what I understand the law and the facts to be.

24              THE COURT:  This proffered order for Capital One,

25    just to make sure that everyone understands, we are not

1    prejudicing your rights at this point in time; we are only

2    setting forth a process to get there.

3              MR. PATRICK:  That's correct.

4              THE COURT:  And if you want to exercise your right,

5    you may.

6              MR. PATRICK:  The proposed sale under the asset

7    purchase agreement to Global, or to any higher or better

8    bidder, is subject to being placed into a plan of

9    reorganization and ultimately confirmed by Your Honor after

10   appropriate notice and hearings.

11             THE COURT:  Okay.  So with this order, if we get

12   through the other issues and all the hurdles that have to be

13   cleared, this would resolve one of the two matters before the

14   Court this afternoon.

15        The other matter would be the United States Trustee's

16   issues?

17             MR. PATRICK:  That is correct.

18             THE COURT:  Putting that aside as this being the

19   resolution, if we get the other matter resolved, would you like

20   to take up the matter with the U.S. Trustee's Office at this

21   time?

22             MR. PATRICK:  I would, Your Honor.

23             THE COURT:  Okay.  Please do.

24             MR. PATRICK:  I'm not sure how you want to proceed.

25   We have a witness that we would like to put on in support of

```
 1   the motion.  We can take the witness first and talk about the
 2   law later; or we can talk about the law now and put on a
 3   witness first.  I'd prefer just to put the witness on and let
 4   Your Honor hear --
 5             THE COURT:  Ms. Hewitt, do you have any preference?
 6             MS. HEWITT:  No, sir.
 7             THE COURT:  Okay.  Please put your witness on, Mr.
 8   Patrick.
 9             MR. PATRICK:  We'd like to call Mr. Evan Harrison to
10   the stand, Your Honor.
11             THE COURT:  Mr. Harrison, please come forward and be
12   sworn again.
13             EVAN PAUL HARRISON, WITNESS FOR DEBTOR, SWORN
14                        DIRECT EXAMINATION
15   BY MR. PATRICK:
16   Q    Mr. Harrison, welcome back.
17        Can you tell the Court what your role in this case is?
18             THE COURT:  Mr. Harrison, please give the -- your
19   full name and current mailing address for the record, if you
20   don't mind, sir.
21             THE WITNESS:  Sure.  My name is Evan Paul Harrison.
22   And my mailing address is P.O. Box 8149, Rancho Santa Fe,
23   California, 92067.
24             THE COURT:  Thank you, sir.
25   BY MR. PATRICK:
```

1    Q     What is your role in this bankruptcy case?

2    A     I'm the financial advisor to the debtor.

3    Q     And tell us about your employment and something about your

4    background.

5    A     Sure.  Many of you may remember me from obviously from the

6    last hearings where I was the managing director and I ran two

7    divisions for Oppenheimer Investment Bank.  The two divisions

8    were gaming and hospitality.  I also ran the restructuring and

9    special situations group within Oppenheimer.

10           In May of 2011 I took my entire team -- or virtually my

11   entire team over to join Seaport Group Securities, LLC.

12   Seaport is a large independent investment bank, over 175

13   people, offices in Los Angeles, New York, and London.

14           Since that time, I've still been actively involved in

15   restructuring a number of different gaming assets, as well as

16   traditional investment banking.

17   Q     And why don't you tell us, since we're here for round two,

18   why don't you tell us something about Legends' financial

19   performance over the last few years.

20   A     Sure.  Well, I could say it simply is, and you know, the

21   revenue and EBITDA for Legends over the last three years has

22   decreased dramatically and has been declining.

23   Q     And do you know any -- do you have an understanding what

24   the reasons are perhaps for that decrease in revenue and

25   EBITDA?

1   A    Sure.  There's a couple different reasons, and both of

2   them are kind of market related.  And I'll talk about Bossier

3   first.

4        You know, one of the things I think that impacted this

5   market the most is that Bossier itself is a gaming market.  Its

6   revenues have declined over the last two to three years.  That

7   is principally -- while this decline has occurred there has

8   actually been an increase in the gaming markets of Oklahoma and

9   border region that draws principally from the Dallas and East

10  Texas market, which is the primary market for Bossier City.

11  That's been correspondingly one of the fastest growing markets;

12  and as a result, we've seen the gaming revenue within the

13  Bossier market decrease like close to $100 million.

14  Q    What about Vicksburg?

15  A    In Vicksburg, a couple of different things.  The first of

16  all is that the gaming market itself, initially after the case,

17  it grew slightly.  It's roughly I think a $275 million market,

18  was at that point in time.  It grew a little bit in the

19  following year with the introduction of Riverwalk as a

20  competitor.  But then it continued to decline.  And what we saw

21  is the revenue in that market has declined a little bit from

22  where it was, but it's a much more competitive market with the

23  introduction of Riverwalk.  As a result, that's impacted the

24  business and their fair share correspondingly and their market

25  share has decreased with the introduction of Riverwalk.

1       In addition, unfortunately, in April and May of 2011 the

2   assets were impacted by the flooding in Mississippi, which shut

3   down the business and operations in April and May.  And they've

4   had a difficult time recovering from that.

5   Q    What is -- give us a brief overview.  What's Legends' debt

6   structure?  What's the amount of the first lien debt and the

7   second lien debt?

8   A    Sure.  The first lien debt is approximately $181 million.

9   The second lien debt I believe is 114 million, with a total

10  combined of roughly $295 million.

11  Q    Has the debt structure, in your view, restricted the

12  ability of Legends to compete to maintain market share?

13  A    Yes.  Well, once again the interest burden has been

14  substantial.  And obviously with the making -- you know, the

15  market's been substantially more competitive.  And as a result,

16  with the decreasing EBITDA performance, they haven't had the

17  capital to reinvest into CAPX into the business.

18  Q    And did they ultimately default in payment on their

19  obligations under their first lien debt?

20  A    Yes.

21  Q    As a result of this financial situation and sort of the

22  deterioration of the assets, did Legends begin exploring the

23  possibility of selling their assets a year and a half or so

24  ago?

25  A    Yes.

13

1  Q    And let's talk about the discussions with Global Gaming,

2  which we're here to talk about today.

3       First, who is Global Gaming?

4  A    Sure.  Global Gaming is a, as I understand, it's an

5  affiliate of the Chickasaw Nation.  The Chickasaw Nation is one

6  of the largest, one of the largest players in the Oklahoma

7  $3.5 billion gaming market.  They operate I believe 13 casinos

8  in Oklahoma, including WinStar, which is on the border, and the

9  second largest casino in the world now.  And the Global Gaming

10 Solutions, which is their affiliate, has been exploring and

11 engaged in gaming activities that are outside of their

12 traditional tribal gaming.

13      They're recently the owner I believe of Lone Star Park,

14 which is a racetrack in Dallas, as well as another one in

15 Oklahoma City.

16 Q    How long has the company been negotiated with Global

17 Gaming with respect to the possible sale of its assets?

18 A    Over a year and a half.

19 Q    Have these been consistent negotiations or are they sort

20 of started and stopped and started and stopped?

21 A    There's been some starts and stops along the way.

22 Q    And are there any reasons that they haven't just been

23 continual negotiations until there was a deal reached?

24 A    Well, sure.  I think that the principal reason where

25 there's been breakdowns has been largely driven as a result of

1    the, you know, declining financial performance of Legends.

2    Q    How did that impact the negotiations with respect to the

3    sale price?

4    A    Well, a couple of different reasons.  Obviously to the

5    extent the asset is underperforming and generating less in

6    revenue and EBITDA, it decreases the amount a person who's

7    willing to pay for it; and as a result, you know, the

8    negotiations went through a number of different permutations.

9    Q    Has a significant amount of time and effort been spent in

10   negotiating with Global and concluding the negotiations of this

11   asset purchase agreement?

12   A    Absolutely.  Yes.

13   Q    And in your view, were -- were all the parties represented

14   by lawyers in those negotiations?

15   A    Yes.

16   Q    Were they represented by financial advisors?

17   A    Yes.

18   Q    Were the ad hoc -- was the first -- was the ad hoc

19   committee of first lien lenders also represented by lawyers in

20   those negotiations?

21   A    Yes, they were.

22   Q    And financial advisors?

23   A    Yes, they were.

24   Q    Did the company ultimately agree on terms of an asset

25   purchase agreement with Global?

1   A     Yes.

2           MR. PATRICK:  Your Honor, with respect to the --

3   BY MR. PATRICK:

4   Q     Well, let me ask you this.  Can you identify this as the

5   asset purchase agreement?

6   A     Yes.

7   Q     Okay.

8           MR. PATRICK:  Your Honor, with permission, can we

9   hand Your Honor a copy of the asset purchase agreement?

10          THE COURT:  Thank you.

11          MR. PATRICK:  Your Honor, we would like to move as

12  Debtors Number 1, introduction of the asset purchase agreement

13  dated, I believe July 25, 2012.

14          THE COURT:  You have that already in the record.

15          MR. PATRICK:  Okay.

16          THE COURT:  And let's make sure --

17          MR. PATRICK:  Can we do it then just by reference?

18          THE COURT:  Yes, sir.  Because if I introduce this

19  printed document, there's going to be a revolution downstairs.

20          MR. PATRICK:  Let me do it by reference, then, Your

21  Honor.  I'd like Your Honor to take judicial notice of the

22  motion to approve bid procedures, which I think includes as an

23  exhibit the asset purchase agreement --

24          THE COURT:  You actually attached the asset purchase

25  agreement to the petition.

1          MR. PATRICK:  Okay.  Well, then I would like to

2   introduce the petition and the asset purchase agreement.

3          THE COURT:  And --

4          MR. PATRICK:  It's docket number 23.

5          THE COURT:  It did not have the exhibits attached.

6   So let's do this.  The document that we do have in the record

7   is number 23, and 23 has exhibits attached to it.  So it would

8   be 23 in its entirety, which would be five separate parts.  And

9   we'll introduce that as the asset purchase agreement by

10  reference to Document 23.  Let it be introduced.

11         MR. PATRICK:  That'll be perfect.  Thank you, Your

12  Honor.

13  BY MR. PATRICK:

14  Q    Can you describe for the Court what the general terms -- I

15  understand you're looking at 250 pages of documents in front of

16  it.  Can you describe the general terms of the asset

17  purchase -- of the sale, the proposed sale to Global under the

18  asset purchase agreement?

19  A    Sure.  The asset purchase agreement provides for Global to

20  apply or the assets of Legends for a consideration of

21  approximately $125 million.  That's comprised of two different

22  components.  The first component is a cash component of roughly

23  27 and a half million dollars, and the residual is take-back

24  financing of approximately $97.5 million.  The take-back

25  financing is in two different tranches.  There is a first lien

1    and a second lien tranche as well.

2    Q    And does the asset purchase agreement provide for payment

3    of trade debt?

4    A    Yes, it does.

5    Q    Does it provide for the retention of almost all of the

6    1,000 plus or minus employees of Legends?

7    A    Yes, it does.

8    Q    And does it provide for honoring the customers' frequent

9    flyer points, or whatever they call them?  I'm sure they've got

10   some marketing program.  But does it provide for honoring the

11   marketing --

12            THE COURT:  You'd think by now you would know what

13   those are called.

14            MR. PATRICK:  I should.  If I gambled, I would.

15            THE COURT:  Frequent flyer miles, I like that.

16            THE WITNESS:  Not the frequent flyers, but their

17   loyalty points under the Diamond Jacks.

18            THE COURT:  The rewards program.

19            THE WITNESS:  The rewards program.

20   BY MR. PATRICK:

21   Q    Does the asset purchase agreement provide that the assets

22   of the company are to be sold through a plan of reorganization?

23   A    Yes, it does.

24   Q    And there's another feature that we are here to talk about

25   today, and that's this:  Does the asset purchase agreement

1   allow for the debtors to try to obtain a higher and better

2   offer for the assets?

3   A    Yes, it does.

4   Q    And does the asset purchase agreement allow the debtor to

5   market the assets in order to do that?

6   A    Yes, it does.

7   Q    Has Global agreed to be a stalking horse bidder under this

8   asset purchase agreement?

9   A    Yes.

10   Q    And what is a "stalking horse bidder"?

11   A    Well, once again, a stalking horse bidder is someone who

12   executes a purchase agreement with the understanding that

13   their's locks up for a certain period of time, in this case for

14   210 days, in order to permit, you know, provide some certainty

15   with respect to the estate.  And then secondarily, it provides

16   a period of time that's designated in which the debtor can go

17   out and obtain better and higher bids.

18   Q    All right.  Let me stop you for a second.  So the asset

19   purchase agreement provides that the plan that incorporates the

20   sale has to be approved within 210 days of the petition date?

21   A    Yes.

22   Q    Does it have a deadline in it for the approval of bid

23   procedures that we're here to talk about today?

24   A    Yes.  I believe within 30 days of the petition date.

25   Q    And by -- is it your understanding that Global remains

1    bound to buy the assets for $125 million subject to, of course,

2    the asset purchase agreement and all the terms and conditions,

3    until the confirmation, as long as confirmation occurs within

4    210 days and as long as the bid procedures are approved within

5    30 days?

6    A    Yes.

7    Q    And does the company believe that it's important to have a

8    stalking horse for the sale of the assets?

9    A    Absolutely.  A stalking horse bid provides a number of

10   important benefits to the company and its constituents.  I

11   mean, the first -- what I would say is that the casino business

12   or the gaming business is very much, and unlike an

13   entertainment business, it's relying upon its customers first

14   and foremost.  So the first thing that a stalking horse bidder

15   agreement like this does, is it provides comfort to people who

16   understand the asset's in financial distress, or in this case

17   that it's filed for bankruptcy.  And it provides comfort to

18   them that there is an end game, that there is someone out there

19   that'll buy the assets.  And ultimately it provides people

20   comfort.  You know, as we said, their loyalty or rewards

21   programs are going to be continued.  As people may recall, I

22   think with the last one, there was, you know, certain

23   competitors who aggressively went after the company's customers

24   and talked about the uncertainty with respect to the rewards

25   programs.  And this provides customers a level of comfort so

1    they can continue to game at the asset.

2    Q    What about employees?  Do you see any -- does the company

3    perceive that there is any value to the employees to have an

4    asset purchase agreement in place with a stalking horse?

5    A    Absolutely.  There's really kind of three legs of the

6    stool.  You know, the first, as any gaming business is, is most

7    concerned with its customers.  The second component is, you

8    know, like any service business, your customers keep coming

9    back as a result of good customer service.  And that's provided

10   by the employees.  So one of the key features here is that

11   obviously it provides comfort to the employees.  Early on, you

12   know, when the assets are in financial distress, it's not

13   uncommon for people to worry about their jobs, you know.  And

14   one of the things is there was even some, you know, minor

15   attrition with respect to Legends; it lost a couple of people.

16   And as a result, one of the things that's important here is

17   that people know and have comfort that they, you know, have a

18   job going for them.  So as a result, you know, they can focus

19   on what they need to, which is day to day providing customer

20   service and keeping the business as usual.

21   Q    Does the asset purchase agreement and the stalking horse

22   also essentially provide a floor purchase price for the assets?

23   A    Absolutely.

24   Q    And so under the asset purchase agreement, there is an

25   opportunity for the price of the assets to go up, but assuming

1    there is no breach in the asset purchase agreement, there is no

2    opportunity for the price to go down?

3    A    Yeah.

4    Q    Was the incremental decreases in the purchase price one of

5    the problems in negotiating a deal sooner with Global because

6    of the financial performance of the company?

7    A    Sure, absolutely.  You know, as the financial performance

8    deteriorated, that was one of the largest issues was, you know,

9    negotiating a fixed purchase price, rather than one that would

10   be subject necessarily to adjustment, or a multiple.

11   Q    And the asset purchase agreement finally locks that up?

12   A    It does lock it up.

13        THE COURT:  So we had a moving target up until the

14   date we executed the agreement, and that moving target got

15   frozen for 210 days from date of filing?

16        THE WITNESS:  Yeah, in essence.  I mean, we agreed on

17   a fixed purchase price, yes.

18        THE COURT:  And that was one of the problems that

19   took a year and a half, the decline, no one understood how long

20   that would go on?

21        THE WITNESS:  Yes.  Yes.  And, you know, to be

22   honest, there was also, you know, the introduction of a new

23   competitor into the Bossier market.  But yes.

24   BY MR. PATRICK:

25   Q    Does a stalking horse bid assist in conducting the

1    auction?

2    A    Very much so.

3    Q    How does it do that?  I mean, what value is this asset

4    purchase agreement and this bid to other potential bidders?

5    A    Well, it does it in a number of different manner -- a

6    number of different ways.  The first thing is, is that, you

7    know, obviously Global has devoted a substantial amount of time

8    and effort from their business people, to their legal advisors,

9    into putting together and negotiating a purchase agreement,

10   negotiating the schedules, going through the diligence.

11       Okay.  As a result of the process that we've spent a

12   significant amount of time that we spent negotiating with

13   Global, we, you know, have assembled a large data room.  Okay.

14   And we already have that complete.  We have a purchase

15   agreement that's been fully negotiated with schedules that

16   another purchaser or, you know, prospective bidder can come in

17   and see.

18       So once again, you know, there's been a substantial amount

19   of time and effort creating a document now that other bidders

20   get to benefit from.

21       And lastly, the biggest component would be, or one of the

22   big components was the negotiation of take-back financing.  You

23   know, as part of this, as part of this purchase agreement,

24   there's, and especially with respect to the time and effort

25   that's been devoted by the first lien lenders and -- excuse me,

23

1    the ad hoc committee for the first lien lenders and their legal

2    advisors, we've negotiated, you know, take-back financing for

3    Global, a first and a second lien structure.  And obviously the

4    visibility is provided to bidders with respect to that.

5         So now prospective bidders can come in, see the purchase

6    agreement that's already been negotiated, see the form of

7    take-back financing that at least was acceptable for Global and

8    it gives them a much easier time formulating a bid and putting

9    together a bid for the assets.

10   Q    Does having a base price, sort of a stalking horse bid of

11   $125 million, does that also streamline the process in that the

12   company and the first lien lenders, the ad hoc committee of

13   first lien lenders and the Court don't have to be concerned

14   with "tire kickers" or people who may come in and spend a lot

15   of time and then offer $50 million?

16   A    Absolutely.  I mean, once again, you know, once there's a

17   stalking horse bid, you know, as part of the process, it really

18   culls your universe of buyers down to serious buyers.

19   Q    In the negotiations over the asset purchase agreement, did

20   Global insist on receiving a termination fee in exchange for

21   the benefits of the asset purchase agreement, in exchange for

22   leaving its offer on the table of $125 million for seven

23   months?

24   A    Yes, they did.

25   Q    And what was ultimately negotiated as far as a break-up

1   fee and an expense reimbursement?

2   A    Sure.  As outlined, you know, you'll see that the expense

3   reimburse -- excuse me -- the break-up fee, is at 3 percent,

4   which was roughly 3 percent on 125 million, or $3.75 million;

5   plus up to $500,000 of reimbursement of expenses.

6   Q    And has the company agreed to that termination fee as part

7   of the A.P.A.?

8   A    Yes.

9   Q    And is it your understanding that if the termination fee

10  isn't approved within 30 days of the petition date, that it's a

11  termination event under the A.P.A.?

12  A    Yes.

13  Q    As far as you know, has the ad hoc group representing the

14  first lien lenders, or an ad hoc group of first lien lenders,

15  should I say, have they approved the asset purchase agreement?

16  A    Yes.

17  Q    And they support the payment of the termination fee?

18  A    Yes.

19  Q    If in fact there is a sale -- well, let me ask you this.

20       Under what circumstances is the termination fee payable?

21  A    Once again, I mean the termination fee is going to be

22  payable, okay, in the event that there is a better and higher

23  bid which the company accepts and closes on.

24  Q    So if the assets are sold to Global, as I understand under

25  this asset purchase agreement as-is, then there is no

 1   termination fee payable at all?

 2   A    Nope.  No.

 3   Q    It's only if the company gets more for its assets than the

 4   asset purchase agreement that Global would be paid a

 5   termination fee?

 6   A    Yes.

 7   Q    And where would that money go to otherwise?  I mean, whose

 8   money is it that we're talking about paying Global?  It's not

 9   the debtors' because we're broke, so.

10   A    Well, you know, once again there's $181 million of first

11   lien debt that's for debt outstanding.  So, you know, at this

12   point what I would say is, is that the greatest likelihood is

13   that the people who are going to bear the cost or expense that

14   are associated with that, are mostly likely the first lien

15   lenders.

16   Q    Now, if the judge approves the bidding procedures, we're

17   going to have an auction, correct?

18   A    Yes.

19   Q    And are you familiar with the sale of assets through

20   auctions?

21   A    Yes.  I ran the sale process for the station casino

22   subsidiaries of Green Valley Ranch last year and sold Green

23   Valley Ranch in probably one of the most successful auctions of

24   gaming asset for half a billion dollars.

25   Q    And are you familiar generally with the role of break-up

1   fees and assets and purchase agreements?

2   A     Yes.

3   Q     And are break-up fees standard features in the sale of

4   assets, especially when there's an auction?

5   A     Yes.

6   Q     And do you believe the termination fee here is reasonable?

7   A     Yes.

8   Q     And what do you base your view that the termination fee is

9   reasonable?

10  A     Well, I base it on a couple of different things.  And the

11  first is from, you know, my experience in the business and in

12  the industry derived over 22 years.  You know, and secondarily,

13  looking at other transactions that have been done based on that

14  experience.  And third, you know, I've looked at surveys that

15  have been done, as well as studies that have been done.  One of

16  them that we -- I think it's actually been filed as part of the

17  response.  But we took some excerpts from and put up.  It's

18  actually our colleagues over at Houlihan Lokey do it.  I

19  believe they do it every year.  They did a study, at least for

20  the last couple of years, do a study of termination fees based

21  on public company, you know, merger and acquisition

22  transactions.

23       And what we did here and -- well, what Mr. Patrick has put

24  on the screen is an excerpt from that.  And what it shows in

25  the top corner, transaction termination fees as a percentage of

1    enterprise value, shows that the mean for each of these years,

2    in 2008, it was higher, but in 2011 it was 3.2 percent, with

3    the median being 3.1.

4         But what probably is more relevant, since the study I

5    think covered almost 160 transactions that were done in 2011,

6    the ones probably of greatest importance is the focus on the

7    transaction size which is most applicable to us, which is the

8    50 to $250 million transaction size.  And you can see that the

9    median transaction value was roughly 131 million, and the

10   termination fees were 4.4 in 2011, and in 2010 4.3 or roughly

11   3.5 percent in 2011 versus 3.7 percent in 2010.

12             THE COURT:  Are those numbers exclusive of the

13   expenses, or do they include the expenses?

14             THE WITNESS:  That's an excellent question.  Offhand,

15   I don't know the answer to it.  I believe it may be inclusive.

16             THE COURT:  If we included the 500,000, our 3 percent

17   would be what?

18             THE WITNESS:  It'd be 4.25 divided by $125 million.

19   I don't have my calculator with me.

20             THE COURT:  Well, I've got mine.  Go ahead, please.

21   BY MR. PATRICK:

22   Q    Based on your experience and your review of this chart,

23   it's your view that the fee is reasonable?

24   A    Absolutely.

25   Q    And it's standard?

1    A    Yes.

2    Q    Did the company try to negotiate a lower fee?

3    A    Yes, it did.

4    Q    And did Global try to get a higher fee?

5    A    Yes, it did.

6    Q    And was this ultimately the agreement that was reached?

7    A    Yes.

8    Q    And this was reached with all parties to the transaction

9    being represented by lawyers?

10   A    Yes.

11   Q    And having access to management?

12   A    Yes.

13   Q    And by financial advisors?

14   A    Yes.

15   Q    Do you think that the amount of the break-up fee will

16   chill the bidding process or essentially guarantee that Global

17   would be the winning bidder because the auction is slanted so

18   much in its favor?

19   A    I'm sorry.  Can you repeat the question?

20   Q    Do you believe that the amount of the break-up fee would

21   chill the bidding process or just essentially guarantee that

22   Global would be the winning bidder?

23   A    Not at all.  It won't have a chilling effect on the

24   bidding procedures or the bidding auction process.

25   Q    And why is that?

1    A    Well, because break-up fees are customary.  And it can

2    easily be built into anyone's determination of what the price

3    is that they have to pay for the asset.

4    Q    So the break-up fee wouldn't complicate the auction

5    process either?

6    A    Not at all.

7    Q    We've already talked -- there is no assurance that this

8    termination fee is ever paid, right?

9    A    No assurance it'll be paid.

10   Q    If Global buys the assets in accordance with the asset

11   purchase agreement, it's not paid?

12   A    I'm sorry.  Say that once again.

13   Q    If Global buys the assets in accordance with the asset

14   purchase agreement, then there is no termination fee?

15   A    Correct.

16   Q    And if there is a termination fee, as I understand it,

17   it's paid on the increase -- paid out of the increased part of

18   the purchase price?

19   A    Yes.

20   Q    So the estate can never net less than what it would get

21   under the Global transaction?

22   A    Yes.

23   Q    Do the debtors want to allow Global to walk away from this

24   sale or to renegotiate the purchase price under any

25   circumstances?

1   A    No.

2   Q    And why is that?

3   A    Well, you know, as I indicated before, you know, having a

4   stalking horse in place provides a substantial benefit to the

5   estate as well as its constituents.  And once again, you know,

6   not having a stalking horse agreement in place creates

7   uncertainty with respect to the customers.  That could have an

8   effect on the business.  It also obviously has an effect on

9   employees and employee moral given the uncertainty, so it can

10  cause potential attrition.  And then also with respect to the

11  trade who don't have any assurances on how they are going to be

12  treated going forward.

13  Q    Now, if this asset purchase agreement is terminated, is it

14  likely that the debtors will proceed with an auction?

15  A    You know, my guess is at this point when no formal

16  determination has been made, that they would proceed with an

17  auction.

18  Q    And that would be a -- without a stalking horse, that

19  would be a naked auction?

20  A    Yes.

21  Q    And the company would prefer to have a stalking horse

22  auction rather than a naked auction?

23         THE COURT:  Actually the first lien holders would

24  prefer.

25         THE WITNESS:  Yeah, absolutely.

1  BY MR. PATRICK:

2  Q    Let's talk about the auction process for a minute.  You

3  mentioned that you've run auctions before.  Why don't you give

4  us an overview of how this auction process is to work.  The

5  first step is there was an asset purchase agreement.  And then

6  we filed Chapter 11 and we gave people notice of the proposed

7  sale.  And then what are you doing, if anything, to generate

8  interest in these assets?

9  A    Well, sure.  I mean, the auction process actually, you

10  know, started substantially in advance of that.  I mean, we had

11  a fair amount of time in advance of executing the final

12  agreement with respect to Global that we were able to do a lot

13  of the steps that are necessary to move the auction on an

14  expedited -- or move the auction quickly.  For instance, we did

15  an extensive amount of assembly in the data room, preparing an

16  offering memorandum, preparing what I call teaser letters,

17  which is an introduction into the business to assess people's

18  interest, as well as formulating the list of prospective

19  purchasers.  Once, obviously, the agreement was executed, we

20  began to contact that list of prospective investors.  So,

21  today, I think we've contacted, been in contact with over 90

22  prospective parties.

23      And, you know, in addition, as part of the marketing

24  process, what you go ahead and do is send them teasers, which

25  we had developed, along with confidentiality agreements.  Once

1    they execute the confidentiality agreements, you know, they are

2    entitled to execute or enter into the data room and get the

3    benefit of the additional due diligence, as well as, you know,

4    see the offering memorandum.  And, you know, as part of the

5    process, we also are moving forward to set up property tours

6    and management presentations.

7    Q    Now, are prospective bidders required to submit letters of

8    interest or letters of intent with respect to the assets?

9    A    Sure.  It's basically a two-stage process, which is

10   identical to the ones we've been involved with in the past.

11        The first stage is what we call an L.O.I. submission

12   deadline.  That's the period at which, in essence people

13   formulate and submit their letters of intent.  They include a

14   couple of different things:  (A), the signed confidentiality

15   agreement; (B), they include financial statements.  It could be

16   annual -- it could be their audited financial statements,

17   unaudited quarterlies.  Or if it's an entity that's been formed

18   to complete the acquisition, such financial information that's

19   going to enable us and the consulting parties the ability to

20   assess if they have the financial wherewithal to complete an

21   acquisition.  Lastly, there will be, you know, the letter of

22   intent itself, which will indicate the purchase price, and also

23   with respect to the purchase price, the form of the

24   consideration.  And that'll be, you know, whether it's cash,

25   whether it's in the form of take-back financing.  And in

1    addition, it'll also include any kind of third-party consents

2    that may be necessary in connection with their letter of intent

3    or whether it's board or shareholder, obviously gaming

4    commission approvals.  And lastly, kind of a time frame, a time

5    table for completing diligence, executing the purchase

6    agreements.

7    Q    And the letter of intent essentially is a non-binding

8    indication of interest, correct?

9    A    Yes.

10   Q    And when do prospective bidders have to submit actual bids

11   for the assets?

12   A    September 24th.

13   Q    Okay.  Over a month away?

14   A    Yes.

15   Q    And is that enough time for people to submit bids, in your

16   view?

17   A    Absolutely.

18   Q    And then once bids are submitted, there is a million

19   dollar good faith deposit put up with everybody who submits a

20   bid at that point?

21   A    Yes.

22   Q    Okay.  And then what happens -- what's the next step in

23   the auction?

24   A    Okay.  At that point in time, once again, once we receive

25   the formal bid packages, the bid packages themselves, as Mr.

1    Patrick had indicated have a couple of different features.  The

2    first is there can be no financing contingencies or due

3    diligence outs.  It includes an executed copy of the purchase

4    agreement along with authorization.  And it's also an offer for

5    them to keep their bid open, okay, for a period of time.  I

6    believe it's 180 days after the auction, or 90 days if they are

7    determined to be an alternate bidder.

8         From that point in time, once again, we do the same steps

9    before we review it.  The debtor along with, in consultation

10   with the consulting parties, reviews those bids.  And that bid

11   is going to be required to be -- as indicated before, it's

12   going to have to be above what the termination fee is that's

13   payable along with an overbid, a $250,000 overbid.

14        Now, assuming once again, I mean, assuming that there is a

15   qualified bidder who submitted in a qualified bid that meets

16   the requirements at that point in time, we move to the next

17   stage, which is an auction.  If there is no qualified bidders

18   submitting any qualified bids, at that point in time, you know,

19   we proceed obviously with the Global as a stalking horse.

20             THE COURT:  Does that mean we'd have to start off, a

21   potential bidder, not Global, but a potential bidder would have

22   to start off at a minimum of 129,500,000?

23             THE WITNESS:  Yes.

24             THE COURT:  Okay.  So that would be, if we don't get

25   a bid equal to that, then it goes to Global by default?

```
 1              THE WITNESS:  Yes.

 2              THE COURT:  Okay.

 3   BY MR. PATRICK:

 4   Q    And if you do get bids, it means that we've got a live

 5   auction going.  We've got Global who's proposed to buy them for

 6   125 million and you've got somebody else who's in the door

 7   trying to buy the assets for at least 129 and a half million?

 8   A    Yes.

 9   Q    And if you don't get bids, it means that the market has

10   decided that the Global offer is, you know, something they

11   don't want to bid against?

12   A    Yes.

13              THE COURT:  And this auction would take place where?

14              THE WITNESS:  Assuming that we do have another

15   qualified bid, the idea is it would take place in New York at

16   the offices of Jenner & Block.

17       And I think the reason why we agreed on doing it in New

18   York was because any bid is going to be done in connection with

19   negotiation and take-back financing provided by the first lien

20   lenders.  And obviously I think it's easier for a lot of that

21   group to be present in New York.

22              THE COURT:  And prospective bidders, if we have any,

23   that would be a good place for them to be also?

24              THE WITNESS:  Yes.

25   BY MR. PATRICK:
```

1   Q      Does the -- do the bid procedures allow secured creditors

2   to credit bid their assets if they choose to do so?

3   A      Yes.

4   Q      And has the ad hoc group of first lien lenders been

5   involved in the process of the bid procedures, creating the bid

6   procedures and discussing those?

7   A      Absolutely.

8   Q      And is it your understanding that they approved the bid

9   procedures?

10  A      Yes.

11  Q      Are the reasons that you've identified in your testimony

12  the reasons that the company has exercised its business

13  judgment to approve the asset purchase agreement, including the

14  termination fee?

15  A      Yes.

16  Q      Does the company believe that the proceeding with the

17  A.P.A., including the termination fee, is in the best interest

18  of the estate?

19  A      Yes.

20  Q      Does the company believe that the termination fee is a --

21  should be approved by the Court?

22  A      Yes.

23         MR. PATRICK:  That's all the questions I have, your

24  Honor.  Tender the witness.

25         THE COURT:  Okay.  Ms. Hewitt, did you have questions

1    you wanted to ask Mr. Harrison?

2              MS. HEWITT:   I just have one, Your Honor.

3                         CROSS-EXAMINATION

4    BY MS. HEWITT:

5    Q    Is the termination fee going to -- (inaudible, off mic).

6    A    Well, it becomes part -- I mean --

7              THE COURT:   It is possible that Global could become

8    involved in the bidding process and bid a higher sum than the

9    one twenty-nine five?

10             THE WITNESS:   Yeah.   Yeah, absolutely.

11   BY MS. HEWITT:

12   Q    So if they have to increase their bid, will they then be

13   paid the termination fee?

14   A    I'm not understanding that piece of the question.   I mean,

15   for instance, they can use that as like -- well, let's say it

16   hypothetically.   Someone puts in a bid of 129-point -- or

17   excuse me, 129.5 million.   Right?   At that point, you know, can

18   they use, in essence, their termination fee as a credit in

19   connection with their bid?   Yes.

20   Q    Okay.   What if someone puts in $135 million bid and they

21   overbid that to 135.1, do they then get the termination fee

22   since the purchase agreement, the original purchase agreement

23   is not the 125?

24   A    Well, I am not sure necessarily -- I mean, if you're

25   asking me if they bid a hundred and -- they're not going to --

1     if you're the bidder and you get to use your credit termination

2     fee as a credit, they're not going to bid 135.1.

3     Q    Well, if someone else bid 130.

4          THE COURT:  That's the question.  Would they be

5     allowed to use as a credit against their bids?

6          THE WITNESS:  Yes.  Absolutely.

7          THE COURT:  So if they go up to $185 million.  Could,

8     you know.

9          THE WITNESS:  Yeah, but it's important to note they

10    could use up to 4.25 million of it.

11         THE COURT:  Right.  But they would be allowed to

12    credit bid for that portion of their bid that was the break-up

13    fee, plus expenses?

14         THE WITNESS:  Yes.  That's my understanding.  Let me

15    pause for a second.  I'll just confirm that in the bidding

16    procedures, but yes.

17         THE COURT:  Is that your understanding, Mr. Phillips?

18         MR. PHILLIPS:  Yes, Your Honor.  It's my

19    understanding that 4.25 would be -- if we bid, we get to use

20    4.25 of that credit plus expense number as part of our bid.

21         THE COURT:  Right.

22         THE WITNESS:  Yes.

23         MR. PHILLIPS:  If we bid $135 million, we would pay

24    130 million point 5 --

25         THE COURT:  You would always receive, if we have a

```
 1   competitive auction and we had multiple bidders and Global

 2   ended up being the purchaser by being the highest bidder at an

 3   auction, Global would be entitled to credit against its bid,

 4   the $3.75 million and up to 500,000 in expenses?

 5          THE WITNESS:  Yes.  That's my understanding.

 6   BY MS. HEWITT:

 7   Q    Okay.  During the 18 months that you have been negotiating

 8   with Global Gaming, were you negotiating with any other

 9   prospective bidders?

10   A    No.

11   Q    Okay.

12          MS. HEWITT:  That's all the questions I have, Your

13   Honor.

14          THE COURT:  Anyone else have any questions of Mr.

15   Harrison?

16       I've got a couple of questions, if you don't mind.

17          THE WITNESS:  Sure.

18              EXAMINATION OF MR. EVAN P. HARRISON

19   BY THE COURT:

20   Q    The time frame we're talking about, no one objected to the

21   time frame.  And there's a lot of people involved in this that

22   have a lot more experience than I do.  So my question to you

23   would be:  Of those transactions that took place in 2011 -- 45

24   of them, according to your graph up here -- would that have

25   been in the range?  Thirty days would be the period of time
```

1    that would be marketed prior to the auction?

2    A    (No audible response.)

3    Q    We've got a period of time --

4    A    Yeah.  I mean, I guess, you know, the study was really

5    focused on termination --

6    Q    You answered the question:  Absolutely.  Was 30 days

7    enough time?  Absolutely.

8    A    Yes.

9    Q    With such confidence.  I assume there's a reason you have

10   that ability to say "absolutely"?

11   A    Well, it's -- I mean it's not -- I would actually look at

12   this just a little bit differently.

13        The first is:  It's not just 30 days.  Okay.  I mean,

14   we've been marketing --

15   Q    You've been marketing.

16   A    This process, you know, as I said, began the day after we

17   executed that agreement with Global.  Okay.  And the Global

18   agreement, the asset purchase agreement provides for a 60-day

19   marketing process.  Okay.  60 days is, you know, I believe is

20   more than enough time to be able to successfully market this

21   asset.

22   Q    You said that you sent out like teaser packages?

23   A    Yes.

24   Q    And the potential bidders is not an unlimited group; it's

25   a rather limited group that would be able to qualify for

1   license and be able to arrange financing and qualify for the

2   take-back financing?

3   A    Yes.  Absolutely.

4   Q    So there are some standards, and that eliminates a lot of

5   problems and a lot of potential bidders?

6   A    Yes.

7   Q    And those parties that we're talking about have already

8   received some information?

9   A    Yes.

10  Q    Have they already been given access to all of the

11  information?

12  A    Those who have signed confidentiality agreements have been

13  invited into the data room.

14  Q    So we have a group of prospective bidders that have

15  already done their due diligence?

16  A    Are in the process of doing their due diligence, yes.

17  Q    Okay.  In the process?

18  A    Yes, sir.

19  Q    And do you anticipate there being more, or do you

20  anticipate that group staying rather constant and then just

21  finishing their due diligence?

22  A    There might be a couple here or there that are added to

23  it, but I believe at this point, you know, if there is people

24  added, it's only a few relative to the number that's already in

25  there.

1    Q    So that clears up a portion of my concern, that

2    prospective bidders that we are aiming at are already

3    participating?

4    A    Yes, those that want to, yeah.

5    Q    Yes.  And therefore you believe that the date that they

6    must submit their bid by to be entitled to participate in an

7    auction is not a "too soon" date?

8    A    Yes, I believe it's reasonable.

9    Q    Okay.  And primarily because we already have started the

10   processes.  And if we have any latecomers, come on in, but you

11   do have a bar date that you've got to submit your bid by?

12   A    Absolutely.

13   Q    Okay.  If the number was 3.4, which that's what I ran it

14   up to.  If you got up to the 375 or 3,750,000 plus the 500,000,

15   it would be 3.4 percent?

16   A    Yeah.

17   Q    Would that still be, in your opinion, in the range of

18   median?

19   A    Absolutely.  The other -- you know, one point -- I mean, I

20   was thinking about it when you asked the question.

21        The one thing that's important to note, too, is, is that

22   in a gaming transaction, okay, people are going to have to be,

23   you know, obligated for a much longer period of time than in a

24   traditional M&A transaction.  In the traditional, you know,

25   merger or acquisition, a lot of time the consents that are

1    required are a much shorter of a period.  So in terms of a

2    break-up fee, I would anticipate it would be at the higher end

3    of the range.  That would be my belief from, you know, seeing

4    these types of transactions and knowing what's involved in

5    connection with doing a gaming transaction.

6         And, yes, I do believe it's reasonable.

7              THE COURT:  I don't have any other questions.

8         Anyone else have any other questions?

9         You can step down.  Thank you again, Mr. Harrison.

10        Did you have any other questions, Mr. Patrick?

11             MR. PATRICK:  No, I don't, Your Honor.

12             THE COURT:  You can step down, Evan.  Thank you, sir.

13             THE WITNESS:  Thank you.

14             THE COURT:  Did you have any other evidence --

15             MR. PATRICK:  Your Honor, we don't have any other

16   evidence or any other witnesses.  I don't know if any other

17   parties have anybody that they want to call or any proffers.

18             MR. PHILLIPS:  Your Honor, Louis M. Phillips on

19   behalf of Global.

20        I do have with me in the courtroom present today a couple

21   of gentlemen that I'd like to introduce to the Court so that

22   the Court would know that, first of all, Global takes this

23   motion and its involvement in the purchase and sale agreement

24   very seriously.  It is committed to the process and has made a

25   determination to do what it can to show that to Your Honor by

1    the presence of representatives.

2         We have first -- and I will call for Mr. Brian Gabbard,

3    who is a board member of Global Gaming.  He's a certified

4    public accountant, CEO of his accounting firm, Gabbard &

5    Company.  He lives in Oklahoma City.  He is a tribal member of

6    the Chickasaw Nation.  He is the chairman of the board of Bank

7    Two, which is the Chickasaw Nation bank.  And he has made it

8    his business today to take out of his very busy schedule to

9    attend this hearing to show support of gaming and -- Global

10   Gaming and to show his support -- show the Court his support of

11   the process.  And I would like to introduce Mr. Gabbard to the

12   Court.

13             THE COURT:  Welcome, Mr. Gabbard.  Thank you for

14   being here, sir.

15             MR. PHILLIPS:  I also have with me today, Your Honor,

16   Mr. John Elliott.  Mr. Elliott is -- I would like to proffer

17   Mr. Elliott's testimony.  He is the representative of the

18   buyers under the asset purchase agreement dated July 25, 2012.

19   He is present in the courtroom and I would like to proffer a

20   brief proffer of his testimony and open him up to

21   cross-examination or questions by the Court or Ms. Hewitt or

22   Mr. Patrick.

23             THE COURT:  Okay.

24             MR. PHILLIPS:  If that's acceptable.

25             THE COURT:  Anyone have any opposition to that

1 | procedure?

2 |        MS. HEWITT:  No opposition, Your Honor.

3 |          PROFFERED TESTIMONY OF JOHN ELLIOTT

4 | BY MR. PHILLIPS:

5 |    Mr. Elliott is the present chief executive officer of

6 | Global Gaming Solutions, LLC, in each of the buyers under the

7 | asset purchase agreement.  He has 30 years of experience in

8 | business management and company ownership.  Mr. Elliott has a

9 | bachelors of financial administration, a master's in business

10 | administration and is a charter accountant.  He has been the

11 | chief executive officer of Global Gaming for four years; and in

12 | that position he has primary responsibility for overseeing all

13 | business activities of the company, including acquisitions, in

14 | development activities of the company's various casino and

15 | racing facilities, as well as related restaurant and hotel

16 | facilities.

17 |    Mr. Elliott had primary responsibility for negotiating the

18 | terms of the asset purchase agreement and is familiar with its

19 | terms and its obligations described therein.

20 |    Global Gaming is a wholly-owned subsidiary of the division

21 | of the commerce of the Chickasaw Nation based in Oklahoma.  In

22 | its own right, the Nation is a successful owner and operator of

23 | significant gaming operations.  Global Gaming is an experienced

24 | casino operator with a proven track record of successful

25 | performance.  Global Gaming and its parents successfully

 1   operate casino businesses on a significant scale in Oklahoma.

 2   On a combined basis, Global Gaming and its parent constitute

 3   the largest gaming operator in Oklahoma and one of the state's

 4   largest employers.  They enjoy a reputation for being

 5   outstanding corporate citizens and actively participating in

 6   the communities in which they operate.

 7        Global Gaming and the buyers have the financial

 8   wherewithal to perform their respective obligations under the

 9   asset purchase agreement, which upon closing will provide a

10   workable capital structure for the acquired assets.  Indeed,

11   the business will have significantly more access to capital

12   than it had in the years leading up to this bankruptcy.

13        Global Gaming has real turn-around experience, having, for

14   example, successfully increased the performance and

15   profitability of the Remington Park Racino in Oklahoma City by

16   40 percent during the two and a half years of its ownership,

17   while maintaining and growing the employee base.  It's also

18   purchased the Lone Star facility in Texas.

19        During the last two to three years, during the rough

20   times, recessionary times, Mr. Elliott would testify that

21   Global has not laid off an employee within its operation.

22        The buyers intend to hire the debtor's current employees

23   with only isolated exceptions.  And the buyers expect the

24   existing management team to continue their roles at debtors'

25   facilities so there is no disruption in the debtors' business.

1    The debtors' assets will benefit from the positive -- and

2    this is a corporate finance term that I don't often use --

3    synergies created by Global Gaming's operations, considering

4    the scale and proximity of its Oklahoma operations and

5    facility.

6    Global Gaming has been licensed by the gaming and racing

7    authorities in Oklahoma and by the Texas Racing Commission in

8    Texas.  Global Gaming is prepared to make the required

9    licensing applications at the appropriate time and believes

10   that obtaining the required licenses in Louisiana and

11   Mississippi will be accomplished in a timely fashion.

12   He was integrally involved with extensive due diligence

13   performed by Global Gaming over a period of more than a year.

14   And the due diligence process employed by Global Gaming and the

15   debtors created the vast information set to be used by the

16   debtors as the information set to be made available during the

17   due diligence process within the bidding procedure's time

18   period prior to auction.

19   He was integrally involved with negotiations in the

20   purchase price agreed to by the debtors in Global Gaming as the

21   stalking horse bid and the terms of the purchase agreement.

22   And such documents and related information that are and will be

23   publicly available during the bidding process will greatly

24   assist the debtors in their sale of assets.

25   While the terms of the purchase and sale agreement and

1   related documents speak for themselves, the purchase agreement

2   contains the required capital improvements investment, the

3   lender agreements related to the (indiscernible) purchase and

4   sale agreement contain a required capital improvement

5   investment of $2.5 million within the first year after

6   purchase.  And Global has put up a deposit in excess of

7   $6 million already.

8        The purchase and sale agreement does not contain any

9   downward adjustment in the event of decreasing EBITDA or other

10  performance measures or metrics prior to closing, and is

11  accompanied by financial commitments with lenders to the

12  debtors that are in place, assuming the sale to Global Gaming

13  under purchase agreement.

14       Further, the deposit is structured such that Global Gaming

15  is in effect locked in unless it wants to lose a component of

16  deposit equal to its purchase price.  It can't, for example, if

17  the performance of the casino declines during the licensing

18  process, simply pull up the licensing and say "well, we

19  couldn't get done with licensing."  Because if it does that, it

20  forfeits a component of the purchase price equal to the amount

21  of break-up fee.

22       Finally, Mr -- as set forth in the bidding procedures,

23  Mr. Elliott would testify that the termination payment break-up

24  fee set forth within the purchase and sale agreement is a fixed

25  fee and will not increase in the event of an increased bidding

1   for the asset.

2       And, Your Honor, at this juncture, I would submit

3   Mr. Elliott for cross-examination or additional questions of

4   the Court in connection with his proffered testimony.

5           MR. PATRICK:  I do have one question.  I think Mr.

6   Phillips could perhaps do it at some sort.

7           THE COURT:  If we are going to have questions of

8   Mr. Elliott, we probably need to have Mr. Elliott sworn.

9           MR. PHILLIPS:  We would have to, yes, sir.

10          THE COURT:  Mr. Elliott?

11          MR. PATRICK:  I don't have a question of Mr. Elliott.

12  I have one for Mr. Phillips, and perhaps he can make it part of

13  his proffer.

14      One of the issues that was sort of, I think incorrectly

15  raised or accidentally raised was that Global Gaming was an

16  insider of the debtor.  And I forgot to elicit testimony on

17  direct that indicated that would be that they are not.

18          MR. PHILLIPS:  I will clear that up.  And I meant to

19  make a note of it because we talked about it.

20          THE COURT:  Ms. Hewitt?

21          MS. HEWITT:  Actually, Mr. Phillips and I have

22  already resolved that issue.  And he filed an amended notice of

23  appearance which said they are not an affiliate and we are

24  satisfied --

25          THE COURT:  Okay.  The issue has been raised.

1  Mr. Elliott is here.  I would like the record to be crystal

2  clear that there is no issue of that.

3          MR. PHILLIPS:  We will proffer Mr. Elliott's

4  testimony that neither -- none of the Global -- neither Global

5  Gaming Solutions, Global Legends, Global Bossier City, Global

6  Vicksburg, any of the Global affiliates, any of the Global

7  affiliates who are not participants, are in any way, shape, or

8  form corporately related to any of the debtors.  They are not

9  insiders.  They are only related to the debtors by virtue of

10 being contract parties to the asset purchase agreement.

11         THE COURT:  Parties to the asset purchase agreement.

12         MR. PHILLIPS:  That's the only relationship legally,

13 corporately, of any sort, and I proffer that testimony in

14 addition.

15         THE COURT:  This could go on for days, couldn't it?

16         MR. PHILLIPS:  Not if I'm to catch my plane at 5:15.

17         THE COURT:  Sorry, Louis.

18     Does anyone have any questions, or desire that Mr.

19 Phillips expand the proffer on any issues?

20         MS. HEWITT:  I do not, Your Honor.

21         MR. PATRICK:  Thank you, Your Honor.

22         MR. PHILLIPS:  Global, to the extent it's a party in

23 interest, and we think it is under the motion, rests its case.

24         THE COURT:  Welcome, Mr. Elliott.  Thank you for

25 being here, sir.

1    Now, was there anyone else that had anything to submit in

2    support or in opposition of the motion before the Court?

3            MR. PATRICK:  I think Mr. Harner does, Your Honor.

4            THE COURT:  Okay.

5            MR. HARNER:  Good afternoon, Your Honor.

6        Again, Paul Harner on behalf of the ad hoc group of first

7    lien lenders.  I have not previously been in your courtroom,

8    but thank you very much for having us today.

9            THE COURT:  Thank you for being here, sir.

10           MR. HARNER:  I would like to introduce the Court to

11   Mr. Phillip Preis, who is now standing in the first row of the

12   gallery.  Mr. Preis is a senior vice-president of Houlihan

13   Lokey Capital, Inc., which has been serving as the financial

14   advisory and the investment banking firm that has been advising

15   the ad hoc group of first lien lenders.

16           THE COURT:  Welcome, sir.

17           MR. HARNER:  Your Honor, I have a very brief proffer

18   of testimony that Mr. Preis would be prepared to give if called

19   live.  We have also taken the liberty of summarizing that

20   testimony in a written declaration that, with the Court's

21   permission, we would be prepared to file on the ECF system.  I

22   have given it to other counsel in the courtroom today.  And I

23   have a copy for the Court, if I may approach.

24           THE COURT:  You may, sir.

25               PROFFERED TESTIMONY OF PHILLIP PREIS

1    BY MR. HARNER:

2         Your Honor, if called to testify, Mr. Preis would indicate

3    that he is in fact a senior vice-president of Houlihan Lokey,

4    who, as I indicated, has been financial advisor and investment

5    banking firm for the senior group of first lien lenders.  He

6    would submit his testimony in support of today's motion, and in

7    particular in support of approval of the bidding procedures as

8    requested by the debtors today.

9         He would indicate that Houlihan has been functioning for

10   the ad hoc group of first lien lenders since March of this year

11   through its counsel Latham & Watkins, and has also been

12   advising Wilmington Trust Company in its capacity as indenture

13   trustee for the ad hoc group -- or I'm sorry, for the first

14   lien lenders generally.  He would further testify that Houlihan

15   Lokey performed a similar role in the debtors' prior Chapter 11

16   cases with which the Court is well familiar.

17        He would provide detailed background with respect to

18   Houlihan Lokey's expertise in these sorts of matters and in

19   particular with respect to his own 10-year plus background as

20   an investment banker and financial adviser in particular in the

21   gaming and other related industries and would provide

22   background with respect to his education, which includes an

23   undergraduate degree from the University of Virginia's McIntire

24   School of Commerce and a subsequent master's of business

25   administration also from the Darden School of Business at the

1    University of Virginia.

2          Your Honor, he would then provide corroborating testimony

3    to that already heard by the Court this afternoon, and in fact

4    authenticate the Houlihan Lokey fee study.  I am prepared, if

5    necessary, to offer that as a formal exhibit; but as the Court

6    is aware, that's already been attached in the form about which

7    Mr. Preis would testify to the debtors' prior reply filed with

8    respect to the motion before the Court today.  He would testify

9    that this is a widely distributed and annually prepared study

10   of termination fees.  And he would then corroborate exactly the

11   evidence that was previously provided to the Court, especially

12   with respect to the reasonableness of the termination fee and

13   the range of termination fees that are typical in transactions

14   of this size, which as the Court has already heard, actually

15   exceed the 3 percent termination fee being proposed in this

16   matter.  He would then provide, as indicated in his

17   declaration, detailed testimony with respect to the background

18   of the preparation of that termination fee study and also in

19   particular its authenticity and comprehensiveness with respect

20   to transactions not only of this kind but of all the kinds

21   described in exhaustive detail in that study.

22          Frankly, he would then -- I'm sorry.  Finally he would

23   then further corroborate --

24              THE COURT:  And frankly.

25              MR. HARNER:  And frankly.

1    He would corroborate the further testimony before the

2   Court that this transaction fee is in fact reasonable.  He

3   would also indicate that it was exhaustively negotiated, not

4   only between Global and the debtors, but with the constant

5   participation of the first lien lenders, and that the ad hoc

6   group of first lien lenders and Wilmington Trust Company do in

7   fact support approval of the termination fee as set forth in

8   the asset purchase agreement and in fact support its approval

9   today as part of the bidding procedures in advance of the

10   expiration of the 30-day period for the approval to do so

11   subsequent to the petition date, which has also been described

12   to the Court this afternoon.

13    With that, Your Honor, I would proffer Mr. Preis'

14   testimony and offer him, because he is in the courtroom, for

15   any cross-examination.

16    Thank you, Your Honor.

17    THE COURT:  Mr. Preis is present.  Does anyone have

18   any questions that they would like to ask Mr. Preis?

19    MS. HEWITT:  I do.

20    THE COURT:  Would you like to ask Mr. Harner if he

21   would like to supplement his proffer like Mr. Phillips did or

22   would you like Mr. Preis to be sworn?

23    MS. HEWITT:  I would like Mr. Preis to be sworn.

24    THE COURT:  Okay.

25    MS. HEWITT:  I would like to ask him about paragraph

1   number 10 where he says that his study does not include

2   bankruptcy transactions.

3              THE COURT:  Mr. Preis, would you please come forward,

4   sir.

5                   PHILLIP W. PREIS, WITNESS, SWORN

6                        CROSS-EXAMINATION

7   BY MS. HEWITT:

8   Q    Good afternoon, Mr. Preis.  My name is Fran Hewitt, and I

9   just wanted to ask you a couple of questions.  In paragraph --

10             THE COURT:  Mr. Preis, before we proceed, would you

11  please state your full name and your current mailing address

12  for the record, sir.

13             THE WITNESS:  Sure.  My full name is Phillip Wesley

14  Preis.  Address is 245 Park Avenue, New York, New York 10167.

15             THE COURT:  Proceed, please, Ms. Hewitt.

16  BY MS. HEWITT:

17  Q    In paragraph 10, you say that your study does not include

18  bankruptcy transactions.  Can you tell us why?

19  A    The study doesn't include bankruptcy transactions because

20  the purpose of the study is to show transactions generally, to

21  show M&A transactions generally.  And it does not include

22  bankruptcy transactions because the group that prepares the

23  study does not have access to the level of detail that is

24  required to evaluate the specific dynamics of a bankruptcy

25  transaction.

1   Q    Have you ever looked at bankruptcy transaction fees to

2   determine what the median is?

3   A    Yes, but not in regards to this case.

4   Q    Okay.  Have you done a study on bankruptcy transaction

5   fees?

6   A    No.

7            MS. HEWITT:  Okay.  Thank you, Your Honor.

8            THE COURT:  Thank you, Ms. Hewitt.

9            MR. HARNER:  Redirect, Your Honor?

10           THE COURT:  Yes, sir.

11                    REDIRECT EXAMINATION

12  BY MR. HARNER:

13  Q    I have just one question.  Mr. Preis, do you have any

14  reason to believe that the median range of transaction fees in

15  a bankruptcy case would be materially lower than the range of

16  fees shown for M&A transactions generally in the Houlihan

17  study?

18  A    No, I do not.

19           MR. PHILLIPS:  Thank you, Your Honor.

20           THE COURT:  Do you have any reason to believe they

21  would be higher?

22           THE WITNESS:  No, I don't.

23           THE COURT:  You have, I believe, some familiarity

24  with bankruptcy-related transactions?

25           THE WITNESS:  I do.

 1              THE COURT:  Okay.  And do you have any knowledge of

 2    bankruptcy-related transactions with break-up fees like we have

 3    here?

 4              THE WITNESS:  Yes.

 5              THE COURT:  Okay.  Percentage-wise, are they in the

 6    range of what we're talking about here, or are they higher or

 7    lower?

 8              THE WITNESS:  They are comparable to what we're

 9    talking here.  They are comparable.

10              THE COURT:  Comparable, okay.

11         Yes, Mr. Patrick?

12              MR. PATRICK:  I just had a couple of questions but

13    I'm --

14              THE COURT:  Please proceed.  That was my only

15    question.

16                        CROSS-EXAMINATION

17    BY MR. PATRICK:

18    Q    Were you involved in negotiation with respect to the asset

19    purchase agreement?

20    A    I was.

21    Q    And were you involved in the negotiation with respect to

22    the termination fee?

23    A    I was.

24    Q    And do you consider that those negotiations were arm's

25    length negotiations?

1   A      I do.

2   Q      Do you consider that they were done between parties who

3   were adequately represented by counsel?

4   A      Absolutely.

5   Q      And by financial advisors?

6   A      Yes.

7   Q      Would you like the fee to be lower?

8   A      Yes, I would.

9   Q      And would Global like the fee to be higher?

10  A      Yes, they would.

11  Q      You haven't always been from New York, have you, Mr.

12  Preis?

13  A      That is true.

14  Q      Where were you born?

15  A      Baton Rouge, Louisiana.

16         MR. PATRICK:  Your Honor, I'd like to argue that that

17  enhances his credibility.

18         THE COURT:  It enhances it to us.

19         MS. HEWITT:  And I can agree with that.

20         THE COURT:  Yes, Mr. Harner?

21         MR. HARNER:  Your Honor, I grew up in New Mexico,

22  which I should assume undermines my credibility.

23         MR. PHILLIPS:  Actually it does not.  My wife is from

24  New Mexico.

25         THE COURT:  That's correct.  That's correct.  You had

1    your's enhanced likewise.

2            MR. HARNER:  Well, I think we're all in a frenzy of

3    agreement as a result.

4        Your Honor, I have nothing further for the witness, if no

5    one else does.  I would like to formally proffer his prior

6    testimony as represented by counsel and also ask the Court's

7    permission to file, as I indicated I would, on the general

8    docket the declaration I handed up earlier.

9            THE COURT:  That document will be filed through the

10   CM/ECF system.

11       If there are no other questions that anyone has of Mr.

12   Preis -- are there?

13       Mr. Preis, again, welcome.  Thank you for being here, sir.

14   I think your services are absolutely necessary and we will see

15   if we can't do the best possible with them.

16           THE WITNESS:  Thank you.

17           MR. HARNER:  Thank you, Mr. Preis.  Your Honor, I

18   would like to reserve any remaining argument I have until after

19   the conclusion of the debtors and the U.S. Trustee's

20   presentation.

21           THE COURT:  Okay, sir.

22           MR. HARNER:  Thank you, Your Honor.

23           THE COURT:  Thank you, sir.

24           MR. PATRICK:  Your Honor, on behalf of the debtor, I

25   don't believe that we have any other testimony or documentary

1    evidence with respect to this motion, and so we would rest.

2              THE COURT:  Thank you, Mr. Patrick.

3              MR. PHILLIPS:  We have nothing further, Your Honor.

4              THE COURT:  Thank you, Mr. Phillips.

5         Ms. Hewitt?

6              MS. HEWITT:  I am (inaudible).

7              THE COURT:  You may proceed.

8              MS. HEWITT:  Frances Hewitt for the United States

9    Trustee Henry Hobbs.

10        Legends I, a former bankruptcy of the same debtor we have

11   here today was filed on March 11, 2008, and an order for final

12   decree was entered on March 28, 2011.

13        Legends II, the instant administratively consolidated six

14   cases, was filed on July -- they were filed on July 31, 2002

15   (sic).  On the same date, among the other first day motions, a

16   motion to limit notice, a motion to extend the date to file

17   schedules and statements, and a motion for the bidding

18   procedures was filed granting certain bid protections with an

19   attached pre-petition purchase agreement that involves a

20   $3,750,000 break-up fee.

21        The bidding motion, which we're here today on, was filed

22   on an "if and only if" basis.  For that reason, the U.S.

23   Trustee filed a limited objection which caused the matter to be

24   set for hearing.  Other responses were filed.

25        The debtor filed its supplemental affiliate schedule on

1    Monday of this week, and it was served on that same day.  The

2    debtor then completed the service of notice of the commencement

3    of case in the 341 meeting on Monday for 25-plus creditors who

4    did not have an address on the original matrix.  There has been

5    no unsecured creditors committee appointed.  Members were

6    solicited 20 days ago after the debtor filed the list of 20

7    largest creditors.  The U.S. Trustee has received one response,

8    acceptance, and a telephone call from another creditor.  Two

9    women appeared yesterday who were trade creditors, in my

10   office.  One inquiring creditor said that the solicitation sent

11   to that creditor was sent to a lock box, and so they had not

12   received it.

13        The 341 meeting is set for August 28th if the schedules

14   are filed by this Friday, August 24th.  Usually an unsecured

15   creditors meeting is formed at the conclusion of the 341

16   meeting.

17        What the U.S. Trustee is requesting by their limited

18   objection is that the Court review the matter and make a

19   determination whether or not the fee, negotiated pre petition,

20   should be fully awarded 22 days after the case was commenced.

21   We recognize that the bidding procedures have to be approved

22   under the purchase agreement within 30 days of the date of

23   filing.

24        We'd like to introduce Number 1 as the entire case by

25   reference as U.S.T. Number 1.  And we argue that the fee should

1    not be approved at this point, but later in the case, after a

2    showing of actual and necessary expenses.

3         The debtor and the disinterested stalking horse, Global

4    Gaming, argue that *ASARCO* -- I hope I'm pronouncing that --

5    which is a Fifth Circuit case, mandates that the Court rely on

6    the business judgment of the debtor and approve the fee today.

7    But *ASARCO* is distinguishable.  There the case was filed in

8    2005; an adversary was filed in 2008 that resulted in a money

9    judgment against the holding company of the debtor.  The debtor

10   chose to sell that judgment, and there was a second phase of

11   bidders set for hearing on July 29, 2009, approximately four

12   years after the case was commenced.

13        Judge Stewart doesn't hold that an initial bidder with a

14   pre-petition purchase agreement allows the break-up fee,

15   allowing a break-up fee only if the stalking horse is not the

16   secured bidder.  It is allowed -- it allowed the full award

17   based on the business judgment of the debtor in the second

18   phase of auctions.

19        In *ASARCO*, the break-up fee was payable from property of

20   the estate regardless of whether or not the bid was successful,

21   where in *O'Brien* and this case, the fee will be payable only if

22   the stalking horse bidder is the unsuccessful bidder.

23        What is the sales price?  Global Gaming has bid 125

24   million, plus trade payable.  We don't know what the trade

25   payables are.  We don't even know who the trade creditors are.

1    There is no Schedule F or G.  If an unknown bidder bids more,

2    they will be required to pay the 3.75 before.  We have no

3    Schedule F, but we are in essence deciding part of their

4    treatment when they haven't even received notice of this

5    hearing.

6         It may well be a great deal to the people standing here

7    today.  The first lienholders agree to it, the debtor, and

8    Global Gaming.

9         The debtor also argues in his response that the purchase

10   agreement is an executory contract executed pre petition.

11   However, the contract was executed in contemplation of a

12   bankruptcy, to be used in a bankruptcy proceeding to auction

13   off all of the assets of the debtor within a very short time.

14        The Bankruptcy Court has jurisdiction over fees and

15   compensation, and to allow the process to be affirmed simply on

16   a business judgment case pre petition takes away that review

17   from the Court, which is why the U.S.T. filed this limited

18   objection and why we're here today.

19        *O'Brien* is a Third Circuit case which has an insider

20   stalking horse.  But it's distinguishable.  But so is the case

21   cited by the debtor in Global Gaming.  Here we have limited

22   information about Legends II, no Schedules and Statements of

23   Financial Affairs.  More than 25 creditors on the initial

24   matrix that had no address and were not served until three days

25   ago, or two days ago Monday.  A committee has not been

1  appointed, but interest in a committee has arisen.  We have two

2  creditors who have committed, one in writing and one on the

3  phone, and all we need to appoint is three.

4      The Court may well decide today that you have sufficient

5  evidence with the proffers, the two different proffers, and the

6  testimony that was offered by the debtor, to approve this fee.

7  If so, we respectfully request that it be approved under the

8  *O'Brien* analysis, based on the evidence presented today, rather

9  than on the sale of a judgment after the case had been in

10  existence for four years and not all the assets of the debtor.

11      This Court needs to maintain its balance of reviewing

12  anything that happens after the commencement of a case.  And

13  the Court does have the right to review all fees and

14  compensation in bankruptcy cases.  And that was the reason for

15  our objection.  Thank you.

16          THE COURT:  Thank you, Ms. Hewitt.

17          MR. PATRICK:  Your Honor, William Patrick for the

18  debtor.

19      First, we welcome the limited objection by the U.S.

20  Trustee.  We think that it was the appropriate thing for the

21  U.S. Trustee to do.  It is early in the case.  The debtor of

22  course filed the motion to approve bid procedures because it's

23  fundamental to the integrity of the asset purchase agreement

24  that the bid procedures be approved within 30 days.  This is a

25  huge step in connection with sort of generating what we can

65

1   from the assets of these debtors.  And so, but we do welcome

2   the opportunity to present evidence and to have it heard what

3   the asset purchase agreement is about and the reasons for the

4   termination fee.

5        We don't necessarily have a view whether Your Honor has to

6   rule under 503(b) or has to rule under 363(b).  We think either

7   one would support this fee under these circumstances.  The idea

8   that it's not an actual and necessary cost and expense of

9   preserving the estate to approve a contingent payment, when the

10  contingent payment is part of an asset purchase agreement that

11  provides for $125 million floor for the assets of the estate,

12  strikes us as a little odd because frankly we do think that it

13  would be approvable under 503(b) as an actual and necessary

14  cost and expense of preserving the estate.  If it's not

15  approved, then an asset of the estate is lost.  The asset

16  purchase agreement evaporates; it is terminated.  We are then

17  in a situation where we have no idea what we get for the assets

18  of the estate.

19       It's to some extent like collision insurance.  You have to

20  pay it.  The obligation to pay it is an actual and necessary

21  expense of the estate.  You don't really want to use it, but if

22  you wreck your car, you need it.  And that's sort of like the

23  way we look at this.  We want to have, we want to have this

24  thing approved so that we can move forward with this sale.

25            THE COURT:  The *O'Brien* case, as Ms. Hewitt stated,

 1   the services were performed subsequent to the case commencing.

 2   That's not the case here.

 3          MR. PATRICK:  Judge, I'm not even talking about

 4   *O'Brien*.  I'm not even talking about *ASARCO*.  I mean those

 5   cases are -- all the facts are so different.

 6          THE COURT:  Well, no, but what I'm saying is:  If you

 7   utilize 503, it's an actual, necessary, reasonable, and a

 8   value --

 9          MR. PATRICK:  Right.

10          THE COURT:  -- service performed for the estate.  The

11   estate was not created until July 31st.

12          MR. PATRICK:  Correct.

13          THE COURT:  So I mean, these arguments, the U.S.

14   Trustee's argument about *O'Brien*, I heard what you've said and

15   I understand that the Court did use 503.  They perhaps had to

16   use 503.  I'm not sure we have the ability to use 503 and award

17   this type of compensation for services rendered, for the most

18   part, pre petition.

19          MR. PATRICK:  Well, I think Your Honor would and I

20   think you could.  I don't think you have to --

21          THE COURT:  Well, the fact whether I would or not,

22   you know what I will do.

23          MR. PATRICK:  I think certainly under *ASARCO*, what

24   *ASARCO* says is that -- and granted, there is no doubt the facts

25   are different under *ASARCO*.  Our facts are much stronger than

1     the facts under *ASARCO*, where ASARCO approved payments to

2     people just to come bid.  It would be as if we're trying to

3     tell Mr. Harrison:  Look, you can go ahead and promise to pay

4     anybody that you can get to sign a confidentiality agreement

5     and go into the data room, money to reimburse their expenses.

6         We're not proposing to do that.  We're proposing:  Only as

7     part of the asset purchase agreement, a termination fee of one

8     company who's leaving a $125 million offer on the table for

9     seven months for anybody to bid against for the first few

10    months, pursuant to an auction where Mr. Harrison is out trying

11    to stir up everybody in the world to come bid against them.  So

12    we think the fee is appropriate.  We think it's fundamental to

13    the success of this case.  And we would ask Your Honor to

14    approve it.  And certainly you have the authority to under

15    *ASARCO*.

16            MR. PHILLIPS:  Your Honor, Louis M. Phillips on

17    behalf of Global.  Very briefly.

18        There is, as we know, one objection to the proposed

19    break-up fee.  As we know, the representative of the counsel

20    for the committee, ad hoc committee of lenders, and the

21    evidence put on the table today shows that the purchase price

22    will leave some $60 million unpaid out of the first lien and

23    will leave some $80 million unpaid out of the second lien.

24    They have the right to bid.  But this purchase price, which is

25    agreed to by the ad hoc committee of first lien lenders, leaves

1    a gigantic gap.  Nobody opposed it.  Nobody opposed the bid.

2    So we're talking about something like 90 million -- 110,

3    20 million dollars worth of debt that's not opposing this bid.

4         THE COURT:  The concerns that Ms. Hewitt expressed

5    about notice, all of the lienholders got notice.

6         MR. PHILLIPS:  Yes, sir.  And we would point out that

7    -- I am a little hazy on this, but I think that the top 30

8    creditors aggregate something like 100 to 150, $160,000.

9    That's 30 of them.  And we think we could go through each and

10   every one of them maybe, but we think that the bulk of those

11   would be taken up by the assumption provisions under the

12   purchase and sale agreement.

13        THE COURT:  Correct.  Many of them are being paid as

14   we speak.

15        MR. PHILLIPS:  Yes.  And the break-up fee being an

16   integral component of the agreement, which as the Court pointed

17   out, was finally executed after a lot of fits and starts

18   because of declining performance.  But that didn't mean and it

19   doesn't mean that the performance decline has stopped.  What

20   Global made a decision to do in connection with the agreement

21   of the committee of first lienholders and the debtor, was to go

22   ahead and go in, given this timetable, because once this

23   timetable gets fixed and the auction process takes place, there

24   will be, we think, a sufficient amount of certainty in the

25   process where we can go through our licensing and we think

 1   we've analyzed the financial conditions satisfactorily to

 2   believe that we'll at least stay even with the decline and we

 3   won't lose money on the decline.  But we have pointed out, we

 4   think, the salient facts.  We've pointed out in our brief what

 5   we think the Court's authority is.  We think the Court probably

 6   does have authority under 503 because the asset on the table is

 7   the purchase and sale agreement, and the break-up fee component

 8   of that is necessary to maintaining that asset.  And it's

 9   necessary, we think, to the value of the preservation of the

10   value of the estate.  So if that asset evaporates --

11          THE COURT:  Even if the services were in part

12   performed pre petition?

13          MR. PHILLIPS:  Yes, sir.

14      If that asset evaporates, as Mr. Patrick has said, he is

15   averse -- the experts have said they are averse to nakedness in

16   the process.  We wish it was lower -- we wish it was higher;

17   they wish it was lower.  In between, professionals on all

18   sides, over $100 million' worth of debt has said, this, if it

19   goes through, won't pay us anything, but we don't oppose the

20   break-up fee.  And we think that's very important.

21          MR. HARNER:  Your Honor, very briefly.  The United

22   States Trustee's objection fundamentally boils down to only two

23   salient points here.  One is the supposed or possible

24   unreasonableness of the break-up fee.  Your Honor has heard a

25   great deal of testimony about it being within the range of

1    reasonableness.  And second, the appropriate timing for the

2    approval of that break-up fee, whether it be today or, we fear,

3    sometime after the expiration of the 30-day period for its

4    approval under the terms of the asset purchase agreement, which

5    would quite frankly give Global Gaming a right to walk, about

6    which we are very, very concerned.

7         In the context of both of those two fundamental and fairly

8    simple objections, I think from all that you've heard today,

9    the Court really only needs to focus on three, four, or five

10   salient pieces of evidence.

11        First, the first lien lenders here hold $181 million in

12   first lien debt.

13        Second, the floor bid here, which may be the highest bid

14   at the end of the day if there are no other bidders brought

15   table, is only $125 million.  As a result, the first lien

16   lenders are substantially underwater here.  What that means is

17   that unless something wildly enhancive to estate value occurs

18   in the course of this auction, we certainly hope it does.  If a

19   break-up fee ever has to be paid here, it's effectively going

20   to be paid with our client's money.

21             THE COURT:  Exactly.

22             MR. HARNER:  The last salient fact, as a result, is

23   that although we may love for the break-up fee to have been

24   negotiated at a lower amount, just like Mr. Phillips and his

25   client may love for it to have been negotiated at a higher

1    amount, it was negotiated at arm's length.

2        As I said earlier, I haven't had the pleasure of being in

3    this courtroom before, but I have had any number of your

4    colleagues on the bench tell me over the course of the last 25

5    years, that very often the very best evidence of commercial

6    reasonableness is what sophisticated parties, represented by

7    sophisticated counsel and other advisors have negotiated at

8    arm's length over a long period of time when they have a direct

9    economic stake in the outcome.

10       That's exactly what's happened here.  We may not like it

11   that the break-up fee negotiation came out where it did, but if

12   the values are substantially enhanced here by another bidder

13   coming to the table, because that break-up fee is there and

14   because that floor bid is there, we're going to be very happy

15   indeed to take part of our own money and pay that fee.

16       Thank you very much, Your Honor.

17           THE COURT:  Thank you, Mr. (inaudible).

18       Anyone else?

19       I think the Capital One issue has been resolved, and I

20   will sign that order, if I'm able to get over this other issue,

21   which I think I can.

22       I don't think we are going to go anywhere in this case

23   without the stalking horse bidder.  I welcomed Mr. Elliott; I

24   welcomed Mr. Preis because they brought something here.  This

25   bankruptcy has to get off on a better footing than the last.

1    We had one disaster after another in the last case, not

2    attributable to any party-in-interest, just a series of

3    national bad events.

4        This is different this time.  We're coming into the

5    bankruptcy with a hard, fast offer.  We are coming into the

6    bankruptcy with a hard, fast offer from a recognized player in

7    the gaming industry who should, without any difficulty, if they

8    are the successful purchasing party, be qualified, certified,

9    and these casinos will continue to operate.  And hopefully the

10   time consumed to get through this will be significantly reduced

11   from what it was last time.

12       The market is and has been unstable for a period of time.

13   There are things that are going on in the Shreveport-Bossier

14   City market that cause concern.  Global is well aware of those

15   potential problems, and nonetheless has made a hard, fast offer

16   and started the processes.

17       We have one of two options today.  Option number 1 would

18   be:  No, we are not going to approve these break-up fees; they

19   are not properly noticed and they are potentially excessive.

20       I can't do that.  That will trip this case at the gate.

21   It'll never even get started.  It has -- A lot of time and

22   effort has been expended to bring us to where we are today.  We

23   have one of two options:  We can proceed and we can see what we

24   can do with this and keep this entity viable -- keep these

25   entities viable and keep them going, or we can get hung up on

1   technicalities.

2       I believe that the debtor's argument that this is, under

3   *ASARCO*, permitted under 363(b), I think that is the proper

4   argument to be made.  We are talking about a sale and we are

5   talking about costs that would be incurred in the marketing and

6   in the consummation of the sale, similar to a realtor's fee.  I

7   would approve a realtor's fee today if we were selling a piece

8   of real property, not an ongoing business, and would ordinarily

9   approve it if it were residential for 6 percent.  If it were

10  commercial, for up to 10 percent.  I would do that before the

11  sale took place, guaranteeing to the realtor that that entity

12  would be paid if we were to consummate.

13      We will consummate this transaction one way or another.

14  We will consummate it by there not being any opposing bids and

15  selling to Global, or we will consummate it through the bid

16  process to the highest bidder, which may ultimately be Global.

17  But we will consummate this transaction if we move forward.

18  And all that Global is asking is that if another party comes in

19  and is the successful bidder, that Global be compensated for

20  the efforts that it has put forth pre and post filing to bring

21  us to this point.

22      This is a significant transaction.  A lot, a tremendous

23  amount of work has gone forward before July 31st.  None of that

24  work would have gone forward absent parties trying to market

25  and finding Global and then Global participating in the

1    processes that brought us here today.  Absent that, we wouldn't

2    be here.

3         The July 31st date was directly related to the execution

4    of the asset purchase agreement.  There are delays set forth in

5    there:  30 days to approve the bid procedures and 210 days to

6    consummate.  Those were all negotiated pre petition.

7         I asked the experts that came in here today -- we didn't

8    qualify you as an expert.  I have before and I probably will

9    again.  And I am sure I could qualify Mr. Preis as an expert

10   also.  Those parties have told me:  These numbers are in the

11   range of what is median average and they're not excessive.

12   They are substantial, yes.  They are substantial because

13   substantial efforts have been expended.  And absent those

14   expenditures, we won't have anything.

15        So I believe under the 363 argument that this is -- the

16   debtor is executing the best business judgment.  It's the only

17   thing we can do.  We had to do this.  And if we don't continue

18   with this, then the local area risks losing a substantial

19   business and 1,000 plus jobs.  So we must do this, and we must

20   do this and we can do this under 363(b).

21        If the argument is necessary to be made -- and Mr.

22   Phillips tells me I can make it.  I trust him when he says that

23   in that, if he's wrong, he'll argue until the day he dies that

24   he's right.  But he tells me that I can use 503 and I can use

25   503 even though a lot of the effort was expended pre petition,

 1   because it is the significant asset.  This offer is why we're

 2   here.  This offer sets a minimum value for this asset and may

 3   be the value of the asset.  If we preserve this asset, this

 4   offer, and if there are costs involved in the creation and

 5   preservation, then those are 503(b) administrative expenses

 6   that can be paid.

 7        Are they going to be paid in advance?  Seeing that they

 8   won't be paid until the sale takes place and they are

 9   conditioned on the sale, no, they won't be paid in advance.  I

10   mean, they will be approved, but they will not be awarded.

11        I always thought you take an award, you can take that to

12   the bank.  An award being proved for a later date, there might

13   be some lenders that would give you money on that, but none

14   here.

15        So I think that whether you call it 363(b) or you call it

16   503(b), I think it can be approved and I think it can be

17   approved at this early date.  It was noticed out.  The parties

18   in interest that should receive the notice would be those that

19   would be adversely impacted by the transaction.

20        Mr. Harner pointed out and Mr. Harrison pointed out that

21   at the time this case commenced, the first lien debt was

22   181 million, the second lien debt was 114 million.  We have

23   secured debt against these assets in excess of $295 million;

24   and that's held by two separate groups:  First lien group and

25   second lien group.  Those groups have received notice of this.

76

1    Not one of those groups has opposed the break-up fee, nor have

2    any of those groups opposed the procedures or processes that we

3    would do, the bid procedures that we're going to approve today.

4         All they have done, through Capital One, is say:  Well,

5    excuse me, just a minute now, wait a minute.  Does this mean

6    that we don't have any rights under 1129?  We do, don't we?

7         Yes, you do.  And those rights will not be prejudiced nor

8    impaired by this Court approving the bid procedures.  And

9    that's it; that's all.  Besides the United States Trustee --

10   and I'm not being critical of the United States Trustee's

11   Office.  This is what they are supposed to be doing.  And I'm

12   doing what I am supposed to be doing.

13        Your bid procedures are approved as prayed for, under both

14   363(b) and/or if necessary 503(b).  I do not think notice was

15   inadequate.  I do not think notice was too short.  I think

16   notice was mandated by the agreement itself, and we work with

17   what we have, and we don't have the ability to make it

18   different, not at this time.

19        So, if you will, Mr. Patrick and Mr. Manthey, if you will,

20   gentlemen and lady, would submit to me whatever I need to sign,

21   I'll sign it.  And I'm going to sign this order that you gave

22   me for Capital One.

23             MR. PHILLIPS:  That's the same order, Your Honor --

24             UNIDENTIFIED SPEAKER:  I think I put a star.

25             THE COURT:  Okay.

```
 1              (No voice audio 3:50:37 to 3:51:42 p.m.)
 2         MR. PATRICK:  Your Honor, I think that that the -- I
 3    hope that the order requires that the actual bid procedures be
 4    attached to it.  We had some...
 5         THE COURT:  Excuse me just a moment and I'll let you
 6    know for sure.
 7       The bidding procedures set forth in Exhibit 1 annexed to
 8    the motion.
 9         MR. PATRICK:  That's correct, although I think we
10    have some very minor revisions to the bid procedures to take
11    into account some discussions that I had with Ms. Hewitt with
12    respect to the good faith deposit, and also to omit --
13         THE COURT:  Bidding procedures notice annexed to the
14    motion as Exhibit 3 as approved, is approved as adequate and
15    appropriate under the circumstances and the debtors are
16    directed and authorized to serve the bidding procedures notice
17    within three business days of the date of this order is
18    entered.  I don't see anything -- I don't see what you are
19    requesting or seeking.
20         MS. HEWITT:  (Inaudible.)
21         THE COURT:  Well, seeing the document I'm looking at
22    is only 4 pages long, I --
23         MR. PATRICK:  He's looking at the order.  You're
24    talking about the bid procedures.
25       Yeah, this order needs to -- let us look at the order.  We
```

1    can upload it if you like.  What we need to do is have the

2    order refer to the actual revised version of the bid

3    procedures.  As I said, the very immaterial changes to the bid

4    procedures from what was filed --

5              THE COURT:  If that is the case then, it says under

6    -- on page 2, dispositive paragraph number 3 --

7              MR. PATRICK:  It should be annexed to this order.  To

8    this order.

9              THE COURT:  The bidding procedures set forth in

10   Exhibit 1 annexed to this order -- and not motion?

11             MR. PATRICK:  Order, right.  That's correct.

12             THE COURT:  Okay.

13             MR. PATRICK:  But let us do that and we'll upload

14   this, if it's okay with Your Honor and everybody, we'll upload

15   this order with the bid procedures with the minor modifications

16   to it so we'll have everything correct.

17             THE COURT:  Tristan, we're going to get this done?

18             MR. MANTHEY:  Yes, sir.

19             THE COURT:  Okay.  Fine.  That's all right.  That's

20   all right with me.

21        I've got somebody like Tristan in his office, too.

22        The authority is granted as prayed for under 363(b) and/or

23   503(b).  And I've reviewed the order.  And if you will revise

24   the order as we discussed and attach to it the revised bidding

25   procedures exhibit that has the corrections and revisions that

1    are requested by United States Trustee's Office.  And I think

2    the order has the language in it already that Capital One

3    requested.

4               MR. PATRICK:  That's correct, Your Honor.

5               THE COURT:  Okay.  And that does not need to be a

6    portion of the bidding procedures?

7               MR. PATRICK:  No, sir.  That's -- I think that's in

8    the appropriate place.

9               THE COURT:  Okay, great.  So Mr. Manthey and I will

10   stay in contact with one another; and as soon as he let's me

11   know it's there, I will put my facsimile CM/ECF signature on it

12   and we'll be there.  And I do understand that you've got to get

13   this noticed out.

14              MR. PATRICK:  Great.  Thank you, Your Honor.

15              THE COURT:  Okay.

16              MR. PATRICK:  Appreciate it.

17              MR. PHILLIPS:  Thank you, Your Honor.

18              MS. HEWITT:  Thank you, Your Honor.

19              THE COURT:  Thank you, Ms. Hewitt.  And thank you all

20   the rest.

21        And if I -- want to make sure I state this again.  All of

22   those that are players, participants in this matter, welcome.

23   We very much appreciate the work that's been done already to

24   bring this matter into the court and to bring it into the court

25   in the status it's in versus the status we've done on the last

1    case.  This is much preferrable.  And I think Global has made a

2    significant contribution.  And if Global is a successful

3    purchaser, I would welcome Global again to our community if

4    that is the way it turns out.

5              MR. PATRICK:  Thank you, Your Honor.

6              THE COURT:  Thank you.

7              MR. PATRICK:  And appreciate it very much.

8         (end of proceeding, 3:56 p.m., FTR recording time.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           CERTIFICATE

2          I, Richard A. Simpson, certify that the foregoing pages

3     numbered 1 through 80 do constitute a true and correct

4     transcription from the official electronic sound recording of

5     the proceedings in the above-entitled matter, to the best of my

6     ability and understanding.

7          I certify that the transcript fees and format comply with

8     those prescribed the Court and the Judicial Conference of the

9     United States.

10         Subscribed and sworn to this 12th day of September, 2012.

11

12

13                                          s/Richard A. Simpson
      _____
14                                          Richard A. Simpson
                                            Transcriber
15                                          1120 Hallmark Dr.
                                            Shreveport, Louisiana   71118
16                                          318) 688-1860

17

18

19

20

21

22

23

24

25