Exhibit -S-

**EXECUTION COPY**

# FIRST AMENDMENT TO PURCHASE AGREEMENT

This FIRST AMENDMENT TO PURCHASE AGREEMENT (this "Amendment"), dated as of November 29, 2012, is made by and among Legends Gaming, LLC, a Delaware limited liability company ("Legends Gaming"), Legends Gaming of Louisiana-1, LLC, a Louisiana limited liability company ("Legends LA-1"), Legends Gaming of Louisiana-2, LLC, a Louisiana limited liability company ("Legends LA-2"), Legends Gaming of Mississippi, LLC, a Mississippi limited liability company ("Legends MS" and collectively with Legends Gaming, Legends LA-1 and Legends LA-2, the "Sellers" and each a "Seller"), as sellers, and Louisiana Riverboat Gaming Partnership, a Louisiana general partnership ("Riverboat Gaming"), and Global Gaming Legends, LLC, a Delaware limited liability company ("Global Legends"), Global Gaming Vicksburg, LLC, a Delaware limited liability company ("Global Vicksburg") and Global Gaming Bossier City, LLC, a Delaware limited liability company ("Global Louisiana" and collectively with Global Legends and Global Vicksburg, the "Purchasers" and each a "Purchaser"), as purchasers, and Global Gaming Solutions, LLC, a Delaware limited liability company (the "Guarantor"), as guarantor.  Capitalized terms used but not otherwise defined herein shall have the same meanings ascribed to such terms in the Purchase Agreement (as defined below).

RECITALS:

A.    The Parties are party to that certain Purchase Agreement, dated July 25, 2012 (the "Purchase Agreement"), pursuant to which the Purchasers have agreed to purchase the Purchased Assets and assume the Assumed Liabilities from the Sellers, in each case, on the terms and subject to the conditions set forth in the Purchase Agreement.

B.    The Parties desire to amend the Purchase Agreement as set forth in this Amendment.

NOW, THEREFORE, in consideration of the foregoing and the respective agreements and covenants hereinafter set forth and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, and intending to be legally bound hereby, the Parties hereby amend the Purchase Agreement as follows:

1.    The following definitions in Section 1.1 of the Purchase Agreement are hereby amended and restated to read in their entirety as follows:

"'Cash Purchase Price' means Twenty Four Million Five Hundred Thousand Dollars ($24,500,000)."

"'First Lien Credit Agreement' means that First Lien credit Agreement, substantially in the form attached hereto as Exhibit D, to be executed by the Purchasers and Riverboat Gaming, as borrowers, on the Closing Date, in favor of the administrative agent and the lender party thereto in the principal amount of Sixty Four Million Five Hundred Thousand Dollars ($64,500,000)."

2155828.2

"'Outside Date' means (a) if there is an Auction, the date that is six (6) months after the date on which the Auction is concluded and (b) if there is no Auction, the date that is eight (8) months after the date of this Agreement; provided, however, that in the case of clause (a) or clause (b), as applicable, such date shall be extended for an additional ninety (90) days so long as Purchasers (i) deliver to the Sellers on such date a certificate executed by an executive officer of the Purchasers representing and certifying that all of the conditions set forth in Section 7.2 (other than the conditions set forth in Sections 7.2(g) and 7.2(h) and the portion of the condition set forth in Section 7.2(a) that the Purchasers make the deliveries required under Section 8.3) have been fulfilled as of such date, (ii) are, as of such date, continuing to use their commercially reasonable efforts to obtain the Gaming Approvals as promptly as practicable, and (iii) deposit with the Escrow Agent on such date an additional $1,000,000, which thereupon will become part of the Deposit Escrow Funds for all purposes under this Agreement."

2.      Section 2.5(a) of the Purchase Agreement is hereby amended and restated in its entirety as follows:

"(a)      In connection with the execution and delivery of this Agreement and concurrent with the same, Global Legends, Legends Gaming and JPMorgan Chase Bank, N.A., as escrow agent (the "Escrow Agent") have entered into the Deposit Escrow Agreement attached hereto as Exhibit H (the "Deposit Escrow Agreement"), pursuant to which Global Legends has deposited $6,250,000 (as such amount may be increased pursuant to the provisions contained in the definition of the Outside Date, the "Deposit Escrow Funds") with the Escrow Agent in a non-interest bearing account that is maintained by the Escrow Agent. The Deposit Escrow Funds will be released by the Escrow Agent and delivered to either Global Legends or an account designated in writing by the administrative agent under the Existing First Lien Credit Agreement, in accordance with the provisions of this Agreement and the Deposit Escrow Agreement."

3.      Subject to the terms and conditions set forth in paragraph 9 below, Section 9.2(b) of the Purchase Agreement is hereby amended and restated to read in its entirety as follows:

"(b)      If this Agreement is terminated (i) by the Legends Entities pursuant to Section 9.1(c)(i), Global Legends and Legends Gaming shall deliver joint written instructions to the Escrow Agent to cause the Escrow Agent to release and pay the Deposit Escrow Funds to Legends Gaming, in accordance with the terms of the Deposit Escrow Agreement, and in the case of a termination by the Legends Entities pursuant to Section 9.1(c)(i), such payment shall be the sole and exclusive remedy of the Legends Entities, (ii) by the Legends Entities pursuant to Section 9.1(d)(i), Global Legends and Legends Gaming shall deliver joint written instructions to the Escrow Agent to cause the Escrow Agent to release and pay the Deposit Escrow Funds to Legends Gaming, in accordance with the terms of the Deposit Escrow Agreement, or (iii) by any Party pursuant to any provisions under Section 9.1 other than Sections 9.1(c)(i) or 9.1(d)(i), Global Legends and Legends Gaming shall deliver joint written instructions to the

2

2155828.2

Escrow Agent to cause the Escrow Agent to release and pay the Deposit Escrow Funds to Global Legends."

4.     In the event the Outside Date is extended for an additional ninety (90) days as provided in the proviso to the definition of the Outside Date, Global Legends and Legends Gaming hereby agree (a) to amend, and to cause the Escrow Agent to agree to amend, the Deposit Escrow Agreement so that the definition of the Escrow Deposit (as defined in the Deposit Escrow Agreement) is amended and restated in its entirety to be an amount equal to $7,250,000, and (b) to take such other actions as may be necessary or advisable in order to effectuate or evidence the intent and purposes of the foregoing, including, without limitation, making any necessary filings with, or seeking the approval of, the Bankruptcy Court in respect of the foregoing.

5.     Subject to the terms and conditions set forth in paragraph 9 below, the Purchasers hereby waive the condition to the Closing set forth in Section 7.1(h) of the Purchase Agreement, except to the extent there shall have occurred and be continuing as of the Closing Date a Material Adverse Effect resulting from the destruction of a substantial portion of the Purchased Assets and LRGP Retained Assets, taken as a whole; provided it is understood that the destruction of substantially all of the Purchased Assets or the LRGP Retained Assets, such that either the gaming facility of Legends MS located in Vicksburg, Mississippi or the gaming facility of LRGP located in Bossier City, Louisiana, is unsuitable for its use without substantial reconstruction and discontinuance of operations for at least forty-five (45) consecutive days would constitute a Material Adverse Effect for purposes of this provision.

6.     The Sellers agree to make capital expenditures in respect of the Purchased Assets and the LRGP Assets equal to the Targeted Total Cap Ex Amount (as defined below) on or prior to the Closing.  In the event the Sellers do not make such capital expenditures equal to or in excess of the Targeted Total Cap Ex Amount on or prior to the Closing, an amount equal to the difference between (a) the Targeted Total Cap Ex Amount and (b) the aggregate amount of capital expenditures made by the Sellers in respect of the Purchased Assets and the LRGP Assets from (and including) November 1, 2012 to (and including) the Closing Date (such amount, the "Actual Total Cap Ex Amount"), shall be included as a current liability in the calculation of Closing Date Net Working Capital.  For the avoidance of doubt, if the Actual Total Cap Ex Amount is equal to or in excess of the Targeted Total Cap Ex Amount, no adjustment will be made by the Parties to the calculation of Closing Date Net Working Capital pursuant to this paragraph 6.  For purposes of this paragraph 6, the "Targeted Total Cap Ex Amount" shall mean an amount equal to the product of (x) $3,333.33 and (y) the aggregate number of days from (and including) November 1, 2012 to (and including) the Closing Date.

7.     Exhibit D to the Purchase Agreement is hereby amended and restated to read in its entirety as set forth on Annex A attached hereto.

8.     Exhibit G to the Purchase Agreement is hereby amended and restated to read in its entirety as set forth on Annex B attached hereto.

2155828.2

9.      The provisions contained in paragraphs 3 and 5 of this Amendment are expressly conditioned upon the Bankruptcy Court approving the Joint Disclosure Statement for Joint Chapter 11 Plan for Louisiana Riverboat Gaming Partnership and Affiliates (as amended) that incorporates the terms of this Amendment, and upon such approval by the Bankruptcy Court, the provisions contained in paragraphs 3 and 5 of this Amendment shall be in full force and effect and shall be deemed to have been in full force and effect from and after the date of the Purchase Agreement.

10.      This Amendment shall be considered an amendment to and a part of the Purchase Agreement.  In the event of any inconsistency between this Amendment and the Purchase Agreement, the terms of this Amendment shall prevail.  Except as specifically stated herein, all terms, covenants, and conditions of the Purchase Agreement shall remain in full force and effect.  All references to "the Agreement" in the Purchase Agreement or any other agreements or documents to be executed and delivered in connection with the Purchase Agreement shall be deemed to refer to the Purchase Agreement as amended and modified by this Amendment.

11.      The provisions of Sections 10.4 (Amendment of Agreement), 10.8 (Governing Law; Jurisdiction; Service of Process), 10.11 (Waiver), 10.12 (Assignment), 10.13 (Successor and Assigns), 10.14 (Counterparts) and 10.15 (Guarantee) of the Purchase Agreement shall apply to this Amendment, *mutatis mutandis*, as if set forth herein.

[Signature Page Follows.]

2155828.2

IN WITNESS WHEREOF, the Parties have caused this Amendment to be executed as of the day and year first above written.

SELLERS:

LEGENDS GAMING, LLC

By: _____
Name:  Raymond C. Cook
Title:  President, Chief Financial Officer and Secretary

LEGENDS GAMING OF LOUISIANA-1, LLC

By: _____
Name:  Raymond C. Cook
Title:  President, Chief Financial Officer and Secretary

LEGENDS GAMING OF LOUISIANA-2, LLC

By: _____
Name:  Raymond C. Cook
Title:  President, Chief Financial Officer and Secretary

LEGENDS GAMING OF MISSISSIPPI, LLC

By: _____
Name:  Raymond C. Cook
Title:  President, Chief Financial Officer and Secretary

LOUISIANA RIVERBOAT PARTNERSHIP

By: _____
Name:  Raymond C. Cook
Title:  President, Chief Financial Officer and Secretary

*[Signature Page to First Amendment to Purchase Agreement]*

PURCHASERS:                    GLOBAL GAMING LEGENDS, LLC

                               By: _____
                               Name: John Elliott
                               Title:   Chief Executive Officer


                               GLOBAL GAMING VICKSBURG, LLC

                               By: _____
                               Name: John Elliott
                               Title:   Chief Executive Officer

                               GLOBAL GAMING BOSSIER CITY, LLC

                               By: _____
                               Name: John Elliott
                               Title:   Chief Executive Officer




GUARANTOR:                     GLOBAL GAMING SOLUTIONS, LLC
                               By: _____
                               Name: John Elliott
                               Title:   Chief Executive Officer




*[Signature Page to First Amendment to Purchase Agreement]*

### ANNEX A

### <u>AMENDED AND RESTATED FORM OF FIRST LIEN CREDIT AGREEMENT</u>

See attached.

**EXHIBIT D**

---

**CREDIT AGREEMENT**

**Dated as of [_____], 2012**

**among**

**GLOBAL GAMING LEGENDS, LLC,**
**As Borrower,**

**GGL HOLDINGS, LLC,**

**The Lenders Party Hereto**

**and**

**WILMINGTON TRUST, NATIONAL ASSOCIATION,**
**As Administrative Agent**

---

**Senior Secured First Lien Credit Facility**

---

NY\2522406.16

# TABLE OF CONTENTS

Page

ARTICLE 1 DEFINITIONS AND ACCOUNTING TERMS ................................................................... 2

    1.1    Defined Terms ................................................................................................... 2
    1.2    Use of Defined Terms ..................................................................................... 22
    1.3    Accounting Terms .......................................................................................... 22
    1.4    Rounding ........................................................................................................ 22
    1.5    Exhibits and Schedules .................................................................................. 23
    1.6    Miscellaneous Terms ..................................................................................... 23
    1.7    Louisiana Terms ............................................................................................ 23

ARTICLE 2 LOANS ..................................................................................................... 23

    2.1    Loans – General ............................................................................................. 23
    2.2    Repayment of Loans ...................................................................................... 24
    2.3    Collateral ....................................................................................................... 24

ARTICLE 3 PAYMENTS AND FEES ............................................................................ 24

    3.1    Principal and Interest ..................................................................................... 24
    3.2    Agent Fees ..................................................................................................... 26
    3.3    Increased Commitment Costs ........................................................................ 26
    3.4    Certain Fees and Costs .................................................................................. 26
    3.5    Default Rate ................................................................................................... 27
    3.6    Computation of Interest and Fees .................................................................. 27
    3.7    Non-Business Days ........................................................................................ 27
    3.8    Manner and Treatment of Payments .............................................................. 27
    3.9    Funding Source .............................................................................................. 28
    3.10   Failure to Charge Not Subsequent Waiver .................................................... 28
    3.11   Administrative Agent's Right to Assume Payments Will Be Made by Borrower ........... 28
    3.12   Fee Determination Detail .............................................................................. 28
    3.13   Taxes ............................................................................................................. 28

ARTICLE 4 REPRESENTATIONS AND WARRANTIES ................................................... 30

    4.1    Existence and Qualification; Power; Compliance With Laws ........................ 30
    4.2    Authority; Compliance With Other Agreements and Instruments and Government Regulations ................................................................................. 30
    4.3    No Governmental Approvals Required .......................................................... 31
    4.4    Subsidiaries ................................................................................................... 31
    4.5    Financial Statements ..................................................................................... 31
    4.6    No Other Liabilities ....................................................................................... 32
    4.7    Real Property ................................................................................................. 32
    4.8    Intellectual Property ...................................................................................... 32
    4.9    Litigation ....................................................................................................... 32
    4.10   Binding Obligations ...................................................................................... 32

i

4.11    No Default..........................................................................................................32
4.12    ERISA................................................................................................................32
4.13    Regulations T, U and X; Investment Company Act ........................................32
4.14    Disclosure .........................................................................................................33
4.15    Tax Liability .....................................................................................................33
4.16    Projections ........................................................................................................33
4.17    Employee Matters .............................................................................................33
4.18    Gaming Laws ....................................................................................................33
4.19    Security Interests..............................................................................................33
4.20    Hazardous Materials .........................................................................................34
4.21    Deposit Accounts ..............................................................................................34
4.22    Solvency............................................................................................................34
4.23    Transaction Documents ....................................................................................34

ARTICLE 5 AFFIRMATIVE COVENANTS...................................................................35

5.1     Payment of Taxes and Other Potential Liens....................................................35
5.2     Preservation of Existence..................................................................................35
5.3     Maintenance of Properties ................................................................................35
5.4     Maintenance of Insurance .................................................................................35
5.5     Compliance With Laws .....................................................................................38
5.6     Inspection Rights ..............................................................................................38
5.7     Keeping of Records and Books of Account.......................................................38
5.8     Compliance With Agreements ..........................................................................38
5.9     Hazardous Materials Laws ................................................................................38
5.10    Future Subsidiaries; Additional Security Documentation .................................39
5.11    Additional Real Property ..................................................................................39
5.12    Capital Expenditures.........................................................................................39
5.13    Intercompany Notes ..........................................................................................40
5.14    Debt Rating .......................................................................................................40

ARTICLE 6 NEGATIVE COVENANTS .........................................................................40

6.1     Payment of Subordinated Obligations ..............................................................40
6.2     Prepayment of the Second Lien Term Debt.......................................................40
6.3     Disposition of Property .....................................................................................40
6.4     Investments and Acquisitions; Mergers ............................................................41
6.5     Tender Offers ....................................................................................................41
6.6     Restricted Payments ..........................................................................................41
6.7     ERISA................................................................................................................42
6.8     Change in Nature of Business............................................................................42
6.9     Amendments or Waivers of Organizational Documents, Certain Related
        Agreements and Gaming Approvals..................................................................43
6.10    Liens; Negative Pledges; Sales and Leasebacks ...............................................43
6.11    Indebtedness and Contingent Obligations .........................................................43
6.12    Transactions with Affiliates ..............................................................................44
6.13    Capital Expenditures.........................................................................................45
6.14    Maximum Total Leverage Ratio .......................................................................45
6.15    Amendments to Subordinated Obligations ........................................................46
6.16    Prohibition Against Sale-Leaseback Transactions.............................................46
6.17    Limitation on Certain Restrictive Agreements ..................................................46

-ii-

ARTICLE 7 INFORMATION AND REPORTING REQUIREMENTS ................................................ 46

    7.1      Financial and Business Information ................................................ 46

ARTICLE 8 CONDITIONS ................................................ 49

    8.1      Conditions to Effectiveness ................................................ 49

ARTICLE 9 EVENTS OF DEFAULT AND REMEDIES UPON EVENT OF DEFAULT .................... 52

    9.1      Events of Default ................................................ 52
    9.2      Remedies Upon Event of Default ................................................ 54

ARTICLE 10 THE ADMINISTRATIVE AGENT ................................................ 55

    10.1    Appointment and Authorization ................................................ 55
    10.2    Business Activities with Holdings ................................................ 55
    10.3    Proportionate Interest of the Lenders in any Collateral ................................................ 55
    10.4    Lenders' Credit Decisions ................................................ 56
    10.5    Action by Administrative Agent ................................................ 56
    10.6    Liability of Administrative Agent ................................................ 57
    10.7    Indemnification ................................................ 58
    10.8    Successor Administrative Agent ................................................ 58
    10.9    Collateral Matters; Intercreditor Agreement ................................................ 59
    10.10  Obligations of Borrower ................................................ 59
    10.11  Credit Agreement Controls ................................................ 60
    10.12  Withholding Taxes ................................................ 60

ARTICLE 11 MISCELLANEOUS ................................................ 60

    11.1    Cumulative Remedies; No Waiver ................................................ 60
    11.2    Amendments; Consents ................................................ 60
    11.3    Costs and Expenses ................................................ 61
    11.4    Nature of Lenders' Obligations ................................................ 62
    11.5    Survival of Representations and Warranties ................................................ 62
    11.6    Notices ................................................ 62
    11.7    Execution of Loan Documents ................................................ 62
    11.8    Binding Effect; Assignment ................................................ 63
    11.9    Replacement of Lenders for Unsuitability ................................................ 65
    11.10  Sharing of Setoffs ................................................ 65
    11.11  Indemnity by Borrower and Holdings ................................................ 66
    11.12  Nonliability of the Lenders ................................................ 66
    11.13  No Third Parties Benefited ................................................ 67
    11.14  Confidentiality ................................................ 67
    11.15  Hazardous Materials Indemnity ................................................ 68
    11.16  Further Assurances ................................................ 68
    11.17  Integration; Conflicting Terms ................................................ 69
    11.18  Governing Law ................................................ 69
    11.19  Severability of Provisions ................................................ 69
    11.20  Independent Covenants ................................................ 69
    11.21  Headings ................................................ 69

NY\2522406.16

11.22   Time of the Essence ........................................................................................... 69
11.23   Tax Withholding Exemption Certificates ......................................................... 69
11.24   Replacement of Lenders .................................................................................... 70
11.25   Patriot Act ......................................................................................................... 71
11.26   Consent To Jurisdiction And Service Of Process ............................................. 71
11.27   Jury Trial Waiver .............................................................................................. 71
11.28   Purported Oral Amendments ............................................................................ 72
11.29   Gaming/Liquor Authorities ............................................................................... 72
11.30   Termination of Agreement ................................................................................ 72

-iv-

NY\2522406.16

EXHIBITS

Exhibit A          Assignment Agreement
Exhibit B          Compliance Certificate
Exhibit C          Term Note
Exhibit D          Closing Date Certificate
Exhibit E          Security Agreement

SCHEDULES

Schedule 1.1A       Lenders and Loan Amounts
Schedule 1.1B       Bossier City Real Property
Schedule 1.1C       Vicksburg Real Property
Schedule 4.1        Equity Interests and Ownership
Schedule 4.3        Governmental Approvals
Schedule 4.4        Subsidiaries
Schedule 4.6        Other Liabilities
Schedule 4.7        Leased Real Property
Schedule 4.8        Intellectual Property
Schedule 4.9        Litigation
Schedule 4.12       Employee Benefit Pension Plans
Schedule 4.20       Hazardous Materials
Schedule 4.21       Deposit Accounts
Schedule 6.4        Investments
Schedule 6.10       Existing Liens
Schedule 6.11       Existing Indebtedness and Contingent Obligations
Schedule 6.12       Affiliate Transactions
Schedule 8.1        Schedule of Closing Documents
Schedule 11.6       Notices

-v-

# CREDIT AGREEMENT

THIS CREDIT AGREEMENT, dated as of [_____], 2012, is among GLOBAL GAMING LEGENDS, LLC, a Delaware limited liability company ("Borrower"), GGL HOLDINGS, LLC, a Delaware limited liability company ("Holdings"), the Lenders from time to time party hereto and WILMINGTON TRUST, NATIONAL ASSOCIATION, as Administrative Agent.

W I T N E S S E T H:

WHEREAS, on [_____], 2012, Legends Gaming LLC, Louisiana Riverboat Gaming Partnership, Legends Gaming of Louisiana-1, LLC, Legends Gaming of Louisiana-2, LLC, Legends Gaming of Mississippi, LLC and Legends Gaming of Mississippi RV Park, LLC each filed voluntary petitions for reorganization under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Western District of Louisiana (together with such other courts having jurisdiction over the Chapter 11 Cases, the "Bankruptcy Court"), which cases are jointly administered under Chapter 11 No. [_____] (each, a "Chapter 11 Case" and, collectively, the "Chapter 11 Cases");

WHEREAS, pursuant to the Confirmation Order (as defined below), the Plan of Reorganization (as defined below) has been confirmed in the Chapter 11 Cases;

WHEREAS, it is a condition precedent to the effectiveness of the Plan of Reorganization that the Administrative Agent, the Lenders, Borrower and Holdings enter into this Agreement;

WHEREAS, pursuant to the Asset Purchase Agreement (as defined below) and the Plan of Reorganization, Borrower has agreed to acquire the Assets (as defined in the Asset Purchase Agreement); and

WHEREAS, the Administrative Agent, the Lenders, Borrower and Holdings are willing to enter into this Agreement on the terms and subject to the conditions set forth herein, which will be binding upon and enforceable against all of the Lenders pursuant to the Plan of Reorganization and the Confirmation Order.

NOW, THEREFORE, for and in consideration of the above premises and the mutual covenants and agreements contained herein, the parties hereto hereby agree as follows:

## ARTICLE 1
### DEFINITIONS AND ACCOUNTING TERMS

1.1     Defined Terms.  As used in this Agreement, the following terms shall have the meanings set forth below:

"Acquisition" means any transaction, or any series of related transactions, by which any Person directly or indirectly (i) acquires any ongoing business or all or substantially all of the assets of any firm, partnership, joint venture, limited liability company, corporation or division thereof, whether through purchase of assets, merger or otherwise, or (ii) acquires (in one transaction or as the most recent transaction in a series of transactions) control of at least a majority in ordinary voting power of the securities of a corporation which have ordinary voting power for the election of directors, or (iii) acquires control of a 50% or more ownership interest in any partnership, limited liability company, or other organization or joint venture.

-2-

"<u>Administrative Agent</u>" means Wilmington Trust, National Association, when acting in its capacity as the Administrative Agent under any of the Loan Documents, and any successor or assign of the Administrative Agent.

"<u>Administrative Agent's Office</u>" means the Administrative Agent's address as set forth on the signature pages of this Agreement, or such other address as the Administrative Agent hereafter may designate by written notice to Borrower and the Lenders.

"<u>Affiliate</u>" means, as to any Person, any other Person which directly or indirectly controls, or is under common control with, or is controlled by, such Person.  As used in this definition, "control" (and the correlative terms, "controlling," "controlled by" and "under common control with") shall mean possession, directly or indirectly, of power to direct or cause the direction of management or policies (whether through ownership of securities or partnership or other membership or ownership interests, by contract or otherwise).

"<u>Agreement</u>" means this Credit Agreement as it may be amended, restated, supplemented, extended or otherwise modified from time to time.

"<u>Approved Fund</u>" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"<u>Asset Purchase Agreement</u>" means that certain Purchase Agreement, dated as of [_____], by and among Legends Gaming, LLC, Legends Gaming of Louisiana-1, LLC, Legends Gaming of Louisiana-2, LLC and Legends Gaming of Mississippi, LLC, as sellers, Louisiana Riverboat Gaming Partnership, and Global Gaming Legends, LLC, Global Gaming Vicksburg, LLC and Global Gaming Bossier City, LLC, as the Purchasers, as it may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms hereof.

"<u>Assignment Agreement</u>" means an assignment agreement entered into by a Lender, as assignor, and an Eligible Assignee, as assignee, pursuant to the terms and provisions of <u>Section 11.8</u> (with the consent of any party whose consent is required by <u>Section 11.8</u>), accepted by the Administrative Agent, in substantially the form of <u>Exhibit A</u>.

"<u>Bankruptcy Court</u>" is defined in the recitals hereto.

"<u>Borrower</u>" is defined in the preamble hereto.

"<u>Bossier City Casino</u>" means the casino owned and operated in Bossier City, Louisiana under the DiamondJacks Casino brand.

"<u>Bossier City Facility</u>" means, collectively, the Gaming Facility located in Bossier City, Louisiana comprised of, among other amenities, the Bossier City Casino and the Bossier City Hotel.

"<u>Bossier City Hotel</u>" means the hotel located in Bossier City, Louisiana and related interests in the real property described on <u>Schedule 1.1B</u>.

"<u>Bossier City Mortgages</u>" means, collectively, the two documents entitled "Multiple Indebtedness Mortgage, Collateral Assignment of Leases and Rents, Security Agreement and Fixture Filing" dated as of the Closing Date and executed and delivered by Global Louisiana in respect of the real property

NY\2522406.16

described on Schedule 1.1B to secure its Guarantee, as the same may be amended, extended, restated, supplemented or otherwise modified from time to time.

"Business Day" means any day of the year that is not a Saturday, Sunday or a day on which banks are required or authorized to close in New York, New York.

"Capital Lease" means, as to any Person, a lease of any Property by that Person as lessee that is, or should be in accordance with Financial Accounting Standards Board Statement No. 13, as amended from time to time, or if such Statement is not then in effect, such other statement of GAAP as may be applicable, recorded as a "capital lease" on the balance sheet of that Person prepared in accordance with GAAP.

"Cash" means, when used in connection with any Person, all monetary items owned by that Person that are treated as cash in accordance with GAAP.

"Cash Equivalents" means, when used in connection with any Person, that Person's Investments in:

(a)      Government Securities due within one year after the date of the making of the Investment;

(b)      readily marketable direct obligations of any State of the United States of America or any political subdivision of any such State given on the date of such investment a credit rating of at least P-1 by Moody's or A-1 by S&P, in each case due within one year after the date of the making of the Investment;

(c)      certificates of deposit issued by, bank deposits in, eurodollar deposits through, bankers' acceptances of, and reverse repurchase agreements covering Government Securities executed by, any Lender or any other bank, savings and loan or savings bank doing business in and incorporated under the Laws of the United States of America or any State thereof and having on the date of such Investment combined capital, surplus and undivided profits of at least $500,000,000, in each case due within one year after the date of the making of the Investment;

(d)      certificates of deposit issued by, bank deposits in, eurodollar deposits through, bankers' acceptances of, and reverse repurchase agreements covering Government Securities executed by, any branch or office located in the United States of America of a bank incorporated under the Laws of any jurisdiction outside the United States of America having on the date of such Investment combined capital, surplus and undivided profits of at least $500,000,000, in each case due within one year after the date of the making of the Investment;

(e)      readily marketable commercial paper of corporations doing business in and incorporated under the Laws of the United States of America or any State thereof given on the date of such Investment the highest credit rating by Moody's and S&P, in each case due within 360 days after the date of the making of the Investment; and

(f)      money market accounts or mutual funds which invest exclusively in assets satisfying the foregoing requirements.

-4-

"Cash Interest Charges" means, for any fiscal period, the consolidated Interest Charges of Holdings and its Subsidiaries for that period, to the extent payable in cash during that period or within one month following the last day of that period.

"Catastrophic Event of Default" means any hurricane, flood, tornado, fire or other similar catastrophic event which, after giving effect to (a) all insurance proceeds with respect to such event, (b) any funds provided by Holdings and its Subsidiaries and (c) the ability to repair or rebuild as provided in Section 5.4, renders the Bossier City Facility or the Vicksburg Facility (x) substantially less valuable or (y) substantially unable to be operated in the manner as it was operated immediately before the occurrence of such event.

"Change of Control" means any circumstance or occurrence which results in any of the following:

(a)     at least 51% on a fully diluted basis of the economic and voting interests in the Equity Interests of Holdings shall cease to be owned and controlled, directly or indirectly, by Principal;

(b)     at least 100% on a fully diluted basis of the economic and voting interests in the Equity Interests of Borrower shall cease to be owned and controlled, directly or indirectly, by Holdings;

(c)     Principal shall cease to be entitled, directly or indirectly, to direct or cause the direction of the management and policies of Holdings;

(d)     Holdings shall cease to be entitled, directly or indirectly, to direct or cause the direction of the management and policies of Borrower;

(e)     the majority of the seats (other than vacant seats) on the board of directors (or similar governing body) of Holdings cease to be occupied by Persons who either (a) were members of the board of directors of Holdings on the Closing Date or (b) were nominated for election by the board of directors of Holdings, a majority of whom were directors on the Closing Date or whose election or nomination for election was previously approved by a majority of such directors; or

(f)     (1) the sale, lease, transfer, conveyance or other disposition (other than by way of merger or consolidation), in one or a series of related transactions, of all or substantially all of the assets of Holdings and its Subsidiaries taken as a whole to any "person" (as such term is used in Section 13(d)(3) of the Exchange Act) or (2) any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, but excluding any employee benefit plan of Holdings or its Subsidiaries and any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan) becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934, except that a person or group shall be deemed to have "beneficial ownership" of all securities that such person or group has the right to acquire, whether such right is exercisable immediately or only after the passage of time (such right, an "option right")), directly or indirectly, of 35% or more of the equity securities of Holdings on a fully-diluted basis (and taking into account all such securities that such person or group has the right to acquire pursuant to any option right).

"Chapter 11 Case" and "Chapter 11 Cases" are defined in the recitals hereto.

-5-

"Closing Date" means [_____], 2012.

"Closing Date Certificate" means a Closing Date Certificate substantially in the form of Exhibit D.

"Code" means the Internal Revenue Code of 1986, as amended or replaced and as in effect from time to time.

"Collateral" means, collectively, all of the collateral subject to the Liens, or intended to be subject to the Liens, created by the Collateral Documents.

"Collateral Documents" means, collectively, the Security Agreement, the Trademark Security Agreement, the Mortgages, the Ship Mortgages, the Deposit Account Agreements, and any other pledge agreement, hypothecation agreement, security agreement, assignment, deed of trust, mortgage or similar instrument now or hereafter executed by Holdings or any of its Subsidiaries or by any other Obligor in favor of the Administrative Agent or any predecessor Administrative Agent, on behalf of the Secured Parties, to secure all or any part of the Obligations in each case as the same may be amended, extended, restated, supplemented or otherwise modified from time to time.

"Collateral Questionnaire" means a certificate in form satisfactory to the Administrative Agent that provides information with respect to the personal or mixed property of each Obligor.

"Compliance Certificate" means a certificate in the form of Exhibit B, properly completed and signed by a Senior Officer of Holdings.

"Confirmation Order" means the order of the Bankruptcy Court, dated [_____], and entered on [_____], approving and confirming the Plan of Reorganization in the Chapter 11 Cases, which shall approve this Agreement, the Loan Documents and the transactions contemplated hereby and thereby.

"Consolidated Capital Expenditures" means, for any period, the aggregate amount of all expenditures of Holdings and its Subsidiaries determined on a consolidated basis for fixed or capital assets incurred during such period (including pursuant to capital leases which are capitalized on the consolidated balance sheet of Holdings) which, in accordance with GAAP, would be classified as capital expenditures; provided, however, that in no event shall Consolidated Capital Expenditures include (a) amounts expended in the replacement, repair or reconstruction of any fixed or capital asset which was destroyed, damaged or condemned, in whole or in part, to the extent insurance, condemnation or other similar recoveries or proceeds are receivable or have been received by Holdings or any of its Subsidiaries in respect of such destruction, damage or condemnation or (b) any capital expenditures made or committed to be made with the cash proceeds from any equity offering or capital contribution (other than those committed to be made pursuant to Section 5.12).

"Consolidated EBITDA" means, for any period, the Net Income for such period, plus, without duplication and to the extent deducted in determining such Net Income, (a) Interest Charges, (b) depreciation, depletion, amortization of intangibles and other non-cash expenses, charges or losses deducted in determining Net Income for such period, (c) all fees, costs, expenses, charges and losses incurred on or before the Closing Date (or, with respect to the fees, costs and expenses of professionals, experts and consultants, which are subject to a good faith dispute on or prior to the Closing Date and are resolved or settled subsequent to such date) in connection with or relating to this Agreement, the Second Lien Credit Agreement, the Chapter 11 Cases or the Plan of Reorganization (including all professional

-6-

fees and any expenses, charges or losses resulting from re-evaluations of assets due to "fresh start" accounting to the extent required under GAAP), (d) any extraordinary non-cash loss, (e) all fees, costs and expenses incurred in connection with obtaining and maintaining a rating on the Loans from Moody's or any other similar credit rating service and (f) cash charges in connection with the severance of the Identified Personnel and <u>minus</u>, without duplication and to the extent included in determining Net Income, (x) other non-cash gains (including decreases in expenses resulting from re-valuation of assets due to "fresh start" accounting to the extent required under GAAP) and (y) extraordinary non-cash gains.

"<u>Consolidated Total Debt</u>" means, as at any date of determination, the aggregate stated balance sheet amount of all Indebtedness of Holdings and its Subsidiaries (including Purchase Money Indebtedness (other than Indebtedness represented by Capital Leases) incurred in accordance with <u>Section 6.11(d)</u> but excluding Indebtedness consisting of obligations under Capital Leases incurred in accordance with <u>Section 6.11(d)</u>) or, if higher, the par value or stated face amount of all such Indebtedness (other than zero coupon Indebtedness), determined on a consolidated basis in accordance with GAAP.

"<u>Contingent Obligation</u>" means, as to any Person (without duplication), any (a) direct or indirect guarantee of Indebtedness of, or other obligation performable by, any other Person, including any endorsement (other than for collection or deposit in the ordinary course of business), co-making or sale with recourse of the obligations of any other Person or (b) contractual assurance (not arising solely by operation of Law) given to an obligee with respect to the performance of an obligation by, or the financial condition of, any other Person, whether direct, indirect or contingent, including any purchase or repurchase agreement covering such obligation or any collateral security therefor, any agreement to provide funds (by means of loans, capital contributions or otherwise) to such other Person, any agreement to support the solvency or level of any balance sheet item of such other Person, or any other arrangement of whatever nature having the effect of assuring or holding harmless any obligee against loss with respect to any obligation of such other Person including without limitation any "keep-well", "take-or-pay" or "through put" agreement or arrangement.  As of each date of determination, the amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation (unless the Contingent Obligation is limited by its terms to a lesser amount, in which case to the extent of such amount) or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the Person in good faith.

"<u>Contractual Obligation</u>" means, as to any Person, any provision of any agreement, instrument or undertaking to which that Person is a party or by which it or any of its Property is bound.

"<u>Debtor Relief Laws</u>" means the Bankruptcy Code of the United States of America, as amended from time to time, and all other applicable liquidation, conservatorship, bankruptcy, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws from time to time in effect affecting the rights of creditors generally.

"<u>Default</u>" means any event that, with the giving of any applicable notice or passage of time specified in <u>Section 9.1</u>, or both, would be an Event of Default.

"<u>Default Rate</u>" means the interest rate set forth in <u>Section 3.5</u>.

"<u>Deposit Account Agreement</u>" means, with respect to any deposit, brokerage or similar account maintained by Holdings or any of its Subsidiaries, a customary deposit account control agreement in form and substance reasonably satisfactory to the Administrative Agent, by and among the Administrative Agent, the financial institution or other Person at which such account is maintained and Holdings or any of its Subsidiaries maintaining such account, effective to grant "control" (as defined under the applicable

-7-

Uniform Commercial Code) over such account to the Administrative Agent, which agreement is entered into in accordance with Section 5.10(c) and the Security Agreement (and which is subject to the terms and conditions therein).

"Disclosure Statement" means the Joint Disclosure Statement for Joint Chapter 11 Plan for Louisiana Riverboat Gaming Partnership and Affiliates (as may be amended, restated or otherwise modified from time to time).

"Disposition" means the sale, transfer, lease, sale and leaseback or other disposition in any single transaction or series of related transactions of any individual asset, or group of related assets, of Holdings or of its Subsidiaries that has or have at the date of the Disposition a fair market value (which shall be deemed to be equal to the sales price for such asset or assets upon a sale to a Person that is not an Affiliate of Holdings) of $1,000,000 or more, other than (i) the sale or other disposition of inventory in the ordinary course of business, (ii) the sale or other disposition of equipment or other personal property that is replaced by equipment or personal property, as the case may be, performing substantially the same function not later than 180 days after such sale or disposition, (iii) the sale or other disposition of property from Holdings to any Subsidiary or from any Subsidiary to Holdings or another Subsidiary and (iv) a Loss Event.

"Distribution" means, with respect to any Equity Interest, or any warrant or option to acquire any Equity Interest issued by a Person, (a) the retirement, redemption, purchase or other acquisition for value by such Person of any such security or interest and (b) the payment by such Person of any dividend in Cash or in Property (other than Property which is in the form of like securities or interests of that Person) with respect to any such security or interest and (c) any other payment or Investment by such Person in or to any direct or indirect holder of the Equity Interests of such Person, if a purpose of such Investment is to avoid the characterization of the transaction between such Person and such holder as a Distribution under clause (a) or (b) above.

"Dollars" and the sign "$" means the lawful currency of the United States of America.

"ECF Percentage" means, for any Fiscal Quarter, if, as of the last day of such Fiscal Quarter, the Total Leverage Ratio is (i) greater than 4.75:1.00, 100%; (ii) greater than 3.75:1.00 but less than or equal to 4.75:1.00, 50%; or (iii) less than or equal to 3.75:1.00, 25%.

"Eligible Assignee" means (a) any Lender; (b) an Affiliate of a Lender; or (c) any other Person (other than a natural person) which, as of the date of any proposed assignment pursuant to Section 11.8 has not been found unsuitable by any Gaming Authority; provided, that notwithstanding the foregoing, "Eligible Assignee" shall not include (i) Holdings or any of Holdings' Affiliates or (ii) Principal or any of Principal's Affiliates.

"Enforcement Division" means the Riverboat Gaming Enforcement Division of the Louisiana State Police.

"Equity Interests " means, with respect to any Person, all of the equity interests of that Person, whether consisting of shares, options, warrants, membership interests, preferred membership interests, partnership interest (whether general or limited), participations, or other equivalents (regardless of how designated) of or in that Person, whether voting or nonvoting.

"ERISA" means the Employee Retirement Income Security Act of 1974, and any regulations issued pursuant thereto, as amended or replaced and as in effect from time to time.

-8-

"ERISA Affiliate" means, with respect to any Person, any Person (or any trade or business, whether or not incorporated) that is under common control with that Person within the meaning of Section 414(b) or (c) of the Code.

"Event of Default" is defined in Section 9.1.

"Excess Cash Flow" means, with respect to Holdings and its Subsidiaries on a consolidated basis for any period, (a) the sum of (without duplication) (i) Net Income for such period, (ii) depreciation, depletion, amortization of intangibles and other non-cash expenses, charges or losses deducted in determining Net Income for such period and (iii) Interest Charges for such period, minus (b) the sum of (without duplication) (i) the amount of all non-cash gains, income or other credits included in determining Net Income for such period, (ii) Cash Interest Charges for such period, (iii) scheduled principal repayments of indebtedness (including Capital Leases) during such period, (iv) unfinanced capital expenditures made during such period in compliance with Section 6.13 and (v) the amount of any cash deposits made during such period in compliance with Section 6.13 in respect of the purchase of assets where the purchase of such assets will be treated as a capital expenditure in a subsequent period.

"Excluded Taxes" means, with respect to the Administrative Agent or any Lender or any other recipient of any payment to be made by or on account of any obligation of Holdings or any of its Subsidiaries hereunder, (a) taxes imposed on or measured by its overall net income (however denominated), and franchise taxes imposed on it (in lieu of net income taxes), by the jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable lending office is located, (b) any branch profits taxes imposed by the United States of America or any similar tax imposed by any other jurisdiction in which Borrower and its Subsidiaries are located, (c) any backup withholding tax that is required by the Code to be withheld from amounts payable to a Lender as a result of such Lender's failure to comply with Section 11.23 and (d) any withholding tax that is imposed on amounts payable to a Foreign Lender (other than an assignee pursuant to a request by Borrower under Section 11.24) at the time such Foreign Lender becomes a party hereto (or designates a new lending office) or is attributable to a Foreign Lender's failure or inability (other than as a result of a Special Circumstance (including the adoption of any Law by a Governmental Agency after the date hereof)) to comply with Section 11.23, except to the extent that such Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from Borrower with respect to such withholding tax pursuant to Section 3.13.

"Facility" is defined in Section 8.1(j)(i).

"Federal Funds Rate"   means, as of any date of determination, a fluctuating interest rate per annum equal to the federal funds effective rate for the previous Business Day as quoted by the Federal Reserve Bank of New York or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by the Administrative Agent.

"Fee Letter" means that certain Fee Letter dated [_____], 2012 and executed by Borrower in favor of the Administrative Agent.

"Fiscal Quarter" means the fiscal quarter of Holdings consisting of a three month fiscal period ending on each March 31, June 30, September 30 and December 31.

NY\2522406.16

"Fiscal Year" means the fiscal year of Holdings consisting of a twelve month fiscal period ending on each December 31.

"Flood Certificate" means a "Standard Flood Hazard Determination Form" of the Federal Emergency Management Agency and any successor Governmental Authority performing a similar function.

"Flood Program" means the National Flood Insurance Program created by the U.S. Congress pursuant to the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973, the National Flood Insurance Reform Act of 1994 and the Flood Insurance Reform Act of 2004, in each case as amended from time to time, and any successor statutes.

"Flood Zone" means areas having special flood hazards as described in the National Flood Insurance Act of 1968, as amended from time to time, and any successor statute.

"Foreign Lender" means any Lender that is not a "United States Person" within the meaning of Section 7701(a)(30) of the Code.

"Fund" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"Fund Affiliate" means, as to any Person, any fund, account, investment vehicle or entity of any kind (including "total return swap" facilities), party to a contract (including but not limited to derivatives contracts), or Person that directly or indirectly controls, or is under common control with, or is controlled by, such Person. As used in this definition, "control" (and the correlative terms, "controlling," "controlled by" and "under common control with") shall mean possession, directly or indirectly, of power to direct or cause the direction of management, investment decisions of any kind, policies, voting rights of any sort including voting on any plan of reorganization of Holdings or any of its Affiliates in a case under chapter 11 of title 11 of the United States Code, or any action or failure to take action in a case under chapter 11 of title 11 of the United States Code involving Holdings or any of its Affiliates (whether through ownership of securities or partnership or other membership or ownership interests, by contract or otherwise).

"GAAP" means, as of any date of determination, accounting principles set forth as generally accepted in then currently effective Statements of the Auditing Standards Board of the American Institute of Certified Public Accountants, or if such statements are not then in effect, accounting principles that are then approved by a significant segment of the accounting profession in the United States of America. The term "consistently applied", as used in connection therewith, means that the accounting principles applied are consistent in all material respect to those applied at prior dates or for prior periods.

"Gaming Authorities" means (a) the Mississippi Commission, (b) the Louisiana Gaming Authorities, (c) the staff of the Mississippi Commission and the Louisiana Gaming Authorities and (d) any other Governmental Agency that holds licensing or permit authority over gambling, gaming or casino activities conducted by Holdings or its Subsidiaries within its jurisdiction, including the Bossier City Facility and/or the Vicksburg Facility.

"Gaming Facility" means any gaming establishment and other property or assets directly ancillary thereto or used in connection therewith, including, any casinos, hotels, resorts, theaters, parking facilities,

NY\2522406.16

recreational vehicle parks, timeshare operations, retail shops, restaurants, other buildings, land and other recreation and entertainment facilities, marinas, vessels, barges, ships and related equipment.

"Gaming Laws" means all Laws pursuant to which any Gaming Authority possesses licensing or permit authority over gambling, gaming, or casino activities conducted by Holdings or its Subsidiaries within its jurisdiction.

"Global Louisiana" means Global Gaming Bossier City, LLC, a Delaware limited liability company.

"Global Vicksburg" means Global Gaming Vicksburg, LLC, a Delaware limited liability company.

"Government Securities" means readily marketable direct full faith and credit obligations of the United States of America or obligations unconditionally guaranteed by the full faith and credit of the United States of America.

"Governmental Agency" means (a) any international, foreign, federal, state, county or municipal government, or political subdivision thereof, (b) any governmental or quasi-governmental agency, authority, board, bureau, commission, department, instrumentality or public body, (c) any court, administrative tribunal or public utility or (d) any arbitration tribunal or other non-governmental authority to whose jurisdiction a Person has consented.

"Guarantee" means the guarantee of each Guarantor pursuant to the Security Agreement.

"Guarantor" means each of Holdings and each Subsidiary of Holdings (other than Borrower).

"Hazardous Materials" means any chemical, waste, material or substance, exposure to which or Release of which is prohibited, limited or regulated by any Governmental Agency or which may or could pose a hazard to the human health and safety or to the environment, including, without limitation, those substances defined as hazardous substances pursuant to the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §9601, et seq., as amended, or as hazardous, toxic or pollutant pursuant to the Hazardous Materials Transportation Act, 49 U.S.C. §1801, et seq., as amended, or the Rescue Conservation and Recovery Act, 42 U.S.C. §6901, et seq., as amended, in each case as such laws are amended from time to time.

"Hazardous Materials Laws" means all applicable federal, Mississippi and/or Louisiana state or local laws, ordinances, rules or regulations relating to or imposing liability or standards of conduct concerning protection of human health and safety or the environment or Hazardous Materials or any activity involving Hazardous Materials.

"Holdings" is defined in the preamble hereto.

"Holdings Retained ECF Amount" means, as of any date of determination on or after December 31, 2013, (i) the aggregate cumulative Excess Cash Flow of Holdings and its Subsidiaries for each Fiscal Quarter commencing with the Fiscal Quarter ending [_____][1] and ending at least 45 days prior to such date of determination minus (ii) (x) the aggregate cumulative prepayments of principal of the Loans required to be prepaid pursuant to Section 3.1(d)(iv) commencing with the first such prepayment required

---

[1]    The last day of the first Fiscal Quarter commencing after the first anniversary of the Closing Date.

NY\2522406.16

to be made after December 31, 2013 and ending on the date of such determination, (y) all Restricted Payments theretofore made pursuant to Section 6.6(b) and (z) all prepayments of principal of Indebtedness theretofore made in accordance with Section 6.2.

"Identified Personnel" means those individuals identified as the "Identified Personnel" in a letter from Holdings to the Lenders dated [_____], 2012 and referring to this Agreement. [2]

"Indebtedness" means, as to any Person, (a) all indebtedness of such Person for borrowed money, (b) that portion of the obligations of such Person under Capital Leases which is properly recorded as a liability on a balance sheet of that Person prepared in accordance with GAAP, (c) any obligation of such Person that is evidenced by a promissory note or other instrument representing an extension of credit to such Person, whether or not for borrowed money, (d) any obligation of such Person for the deferred purchase price of Property or services (other than current trade or other accounts payable in the ordinary course of business in accordance with customary terms), (e) any obligation of such Person that is secured by a Lien on assets of such Person, whether or not that Person has assumed such obligation or whether or not such obligation is non-recourse to the credit of such Person, but only to the extent of the fair market value of the assets so subject to the Lien, (f) obligations of such Person arising under acceptance facilities or under facilities for the discount of accounts receivable of such Person, (g) obligations of such Person for unreimbursed draws under letters of credit issued for the account of such Person, (h) all obligations of such Person in respect of Contingent Obligations in respect of any obligations of another Person constituting "Indebtedness" of another Person, (i) all liabilities of such Person which are secured by a Lien on the assets of such Person, including all liabilities in respect of "synthetic leases" and other similar off-balance sheet liabilities and (j) all liabilities of such Person in respect of any obligations of that Person to redeem any of its Equity Interests for any reason other than at the sole option of such Person.

"Indemnified Taxes" means all Taxes other than Excluded Taxes.

"Initial Compliance Period" means the period commencing on the Closing Date and ending on the last day of the eighth complete Fiscal Quarter following the Closing Date.

"Initial Subsidiaries" means, collectively, Global Vicksburg, Global Louisiana and LRGP.

"Intellectual Property" means the collective reference to all rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including all (i) inventions, all improvements thereto, and all patents, patent applications, and patent disclosures, (ii) trademarks and trademark rights, trade names and trade name rights, service marks and service mark rights, service names and service name rights, brand names, trade dress, logos, domain names, corporate names, business names, fictitious business names, and other indicators of source or origin, and all applications, registrations, and renewals in connection therewith, (iii) copyrights and copyright rights, copyrightable works, and all applications, registrations, and renewals in connection therewith, (iv) trade secrets, know how, and confidential business information, (v) any rights in or licenses to or from a third party in any of the foregoing and (vi) all rights to sue at law or in equity for any past, present, or future infringement, misappropriation, dilution, or other violation thereof, including the right to receive all proceeds and damages therefrom.

"Intercreditor Agreement" means that certain Intercreditor Agreement, dated as of [_____], 2012, by and among the Administrative Agent, the Second Lien Agent, Borrower and Holdings, as the

---

[2]     Date of letter must be prior to execution of this Agreement.

NY\2522406.16

same may be amended, extended, restated, supplemented, renewed, extended, replaced or otherwise modified from time to time.

"Interest Charges" means, as of the last day of any period, the sum of (a) all interest, fees, charges and related expenses payable by Holdings and its Subsidiaries with respect to that period to all lenders in connection with borrowed money or the deferred purchase price of assets that is treated as interest in accordance with GAAP (but excluding amortization or write-off of deferred financing costs and debt issuance costs), plus (b) the portion of rent payable by Holdings and its Subsidiaries with respect to that period under Capital Leases of Holdings and its Subsidiaries that should be treated as interest in accordance with GAAP.

"Interest Period" means (a) initially, the period commencing on the Closing Date and ending on the next succeeding Quarterly Payment Date and (b) thereafter, each quarterly period commencing on the then existing Quarterly Payment Date and ending on the next succeeding Quarterly Payment Date; provided, that no Interest Period shall extend beyond the Maturity Date.

"Investment" means, when used in connection with any Person, any investment by or of that Person, whether by means of purchase or other acquisition of capital stock or other Equity Interests of any other Person or by means of loan, advance, capital contribution, guarantee or other debt or equity participation or interest, or otherwise, in any other Person, including any membership, partnership and joint venture interests of such Person in any other Person.  The amount of any Investment shall be the amount actually invested, without adjustment for increases or decreases in the value of such Investment.

"Laws" means, collectively, all international, foreign, federal, state and local statutes, treaties, rules, regulations, ordinances, codes and administrative or judicial precedents.

"Lender" means a Lender that has Loans outstanding, together with its successors and permitted assigns pursuant to Section 11.8.

"Lending Office" means, as to each Lender, its office or branch so designated by written notice to Borrower and the Administrative Agent as its Lending Office.  If no Lending Office is designated by a Lender, its Lending Office shall be its office at its address for purposes of notices hereunder.

"License Revocation" means the revocation of, or failure to renew, any casino, gambling or gaming license issued by any Gaming Authority covering any Gaming Facility to Holdings or its Subsidiaries.

"Lien" means any mortgage, deed of trust, pledge, hypothecation, assignment for security, security interest, encumbrance, lien or charge of any kind, whether voluntarily incurred or arising by operation of Law or otherwise, affecting any Property, including any conditional sale or other title retention agreement and any lease constituting a Capital Lease.

"Liquor Authorities" means, in any jurisdiction in which Holdings or any of its Subsidiaries sells and distributes liquor, the applicable alcoholic beverage commission or other governmental authority responsible for interpreting, administering and enforcing the Liquor Laws.

"Liquor Laws" means the laws, rules, regulations and orders applicable to or involving the sale and distribution of liquor by Holdings or any of its Subsidiaries in any jurisdiction, as in effect from time to time, including the policies, interpretations and administration thereof by the applicable Liquor Authorities.

-13-

"Loans" means the loans described in Section 2.1(c) and deemed to be outstanding on the Closing Date.

"Loan Amount" means, with respect to any Lender, the principal amount set forth opposite such lender's name on Schedule 1.1A hereto under the caption "Loan Amount" and "Loan Amounts" means such amounts collectively, which amounts equal $64,500,000 in the aggregate as of the Closing Date.

"Loan Documents" means, collectively, this Agreement, any Notes, the Collateral Documents, the Intercreditor Agreement, the Fee Letter and any other agreements of any type or nature heretofore or hereafter executed and delivered by Holdings or any of its Affiliates to the Administrative Agent or to any Lender in any way relating to or in furtherance of this Agreement, in each case as the same may be amended, restated, supplemented, extended or otherwise modified from time to time.

"Loss Event" means, with respect to any Property of Holdings or any of its Subsidiaries, any loss, destruction or damage of such Property or any actual condemnation or taking by exercise of the power of eminent domain or other similar taking in respect of such Property.

"Louisiana Board" means the Louisiana Gaming Control Board.

"Louisiana Gaming Authorities" means, collectively, the Louisiana Board and the Enforcement Division and their respective staffs.

"LRGP" means Louisiana Riverboat Gaming Partnership, a Louisiana general partnership.

"Material Adverse Effect" means any set of circumstances or events which (a) has or could reasonably be expected to have any material adverse effect whatsoever upon the validity or enforceability of any Loan Document, (b) is or could reasonably be expected to be material and adverse to the value of the properties, the condition (financial or otherwise), business operations or prospects of Holdings or any of its Subsidiaries, (c) materially impairs or could reasonably be expected to materially impair the ability of Holdings or any of its Subsidiaries to perform its Obligations or (d) materially impairs or could reasonably be expected to materially impair the ability of the Lenders to enforce their legal remedies pursuant to the Loan Documents.

"Material Real Estate Asset" means (i) (a) any fee owned real estate asset having a fair market value in excess of $2,000,000 as of the date of the acquisition thereof and (b) all leasehold properties other than those with respect to which the aggregate payments under the term of the lease are less than $750,000 per annum or (ii) any real estate asset that the Required Lenders have determined is material to the business, operations, properties, assets, condition (financial or otherwise) or prospects of Holdings or any of its Subsidiary, including Borrower.

"Maturity Date" means [_____], 2019[3].

"Minimum Cash Requirement" means the sum of the aggregate amount of cash on hand required under applicable Gaming Laws plus $3,500,000.

"Mississippi Commission" means the Mississippi Gaming Commission and its staff.

"Moody's" means Moody's Investors Service, Inc.

---

[3] The date that is 6.5 years after Closing Date.

-14-

"Mortgages" means, collectively, the Bossier City Mortgages and the Vicksburg Deed of Trust.

"Multiemployer Plan" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA.

"Negative Pledge" means any covenant binding on Holdings or its Subsidiaries that prohibits the creation of Liens on any Property thereof, except (a) a covenant contained in an instrument or document creating an Ordinary Course Encumbrance on Property that prohibits the creation of other Liens; provided, that any such restriction contained therein relates only to the asset or assets subject to such Ordinary Course Encumbrance and (b) pursuant to customary restrictions and conditions relating to the Disposition of Property permitted under Section 6.3, pending the consummation of such sale.

"Net Cash Proceeds" means:

(a)      with respect to the issuance of any Equity Interests in Holdings, the gross cash proceeds received by Holdings in consideration of such issuance net of (i) underwriting discounts and commissions actually paid to any Person not an Affiliate of Holdings and (ii) professional fees and disbursements actually paid in connection therewith; and

(b)      with respect to any Disposition, the sum of (i) the gross cash proceeds received by or for the account of Holdings and its Subsidiaries from such Disposition plus (ii) the amount of Cash received by or for the account of Holdings and its Subsidiaries pursuant to policies of insurance or by way of deferred payment of principal pursuant to a note, installment receivable or otherwise pursuant to such Disposition, in each case net of (A) any amount required to be paid to any Person owning an interest in the assets disposed of, (B) any amount applied to the repayment of Indebtedness secured by a Lien permitted under Section 6.10 on the asset disposed of, (C) any transfer, income or other taxes payable as a result of such Disposition and (D) reasonable out-of-pocket professional fees and expenses, fees due to any Governmental Agency, broker's commissions and other out-of-pocket costs of sale, in each case actually paid to any Person that is not an Affiliate of Holdings attributable to such Disposition.

"Net Claim Proceeds" is defined in Section 5.4(h).

"Net Income" means, for any period, the consolidated net income of Holdings and its Subsidiaries from continuing operations for that period, determined in accordance with GAAP, consistently applied during such period; provided, that the net income of any Subsidiary that is not wholly-owned (directly or indirectly) by Holdings shall be included only to the extent of the aggregate cash actually distributed to Holdings by such Subsidiary during such period.

"Notes" means each promissory note executed and delivered by Borrower to a Lender evidencing the Loan of such Lender, substantially in the form of Exhibit C, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"Obligations" means all present and future obligations of every kind or nature of Borrower or any other Obligor at any time and from time to time owed to the Administrative Agent or the Lenders or any one or more of them under any one or more of the Loan Documents, whether due or to become due, matured or unmatured, liquidated or unliquidated, or contingent or noncontingent, including obligations of performance as well as obligations of payment, and including interest that accrues after the commencement of any proceeding under any Debtor Relief Law by or against Holdings or any Affiliate of Holdings.

-15-

"Obligors" means, collectively, Holdings, its Subsidiaries (including the Borrower) and any other Affiliate of Holdings which is or becomes a party to any Loan Document.

"Ordinary Course Encumbrances" means:

(a)       inchoate Liens incident to construction or maintenance of real property, or Liens incident to construction or maintenance of real property, now or hereafter filed of record for which adequate accounting reserves have been set aside and which are being contested in good faith by appropriate proceedings and have not proceeded to judgment; provided, that, by reason of nonpayment of the obligations secured by such Liens, no such real property is subject to a material risk of loss or forfeiture;

(b)       Liens for taxes and assessments on real property which are not yet past due, or Liens for taxes and assessments on real property for which adequate reserves have been set aside and are being contested in good faith by appropriate proceedings and have not proceeded to judgment; provided, that, by reason of nonpayment of the obligations secured by such Liens, no such real property is subject to a material risk of loss or forfeiture;

(c)       minor defects and irregularities in title to any real property which in the aggregate do not materially impair the fair market value, marketability or use of the real property for the purposes for which it is or could reasonably be expected to be held;

(d)       easements, exceptions, reservations, or other agreements granted or for the purpose of pipelines, conduits, cables, wire communication lines, power lines and substations, streets, trails, walkways, drainage, irrigation, water, and sewerage purposes, dikes, canals, ditches, the removal of oil, gas, coal, or other minerals, and other like purposes affecting real property which in the aggregate do not materially burden or impair the fair market value, marketability, or use of such real property for the purposes for which it is or could reasonably be expected to be held;

(e)       rights reserved to or vested in any Governmental Agency by Law to control or regulate, or obligations or duties under Law to any Governmental Agency with respect to, the use of any real property;

(f)       rights reserved to or vested in any Governmental Agency by Law to control or regulate, or obligations or duties under Law to any Governmental Agency with respect to, any right, power, franchise, grant, license, or permit;

(g)       present or future zoning laws and ordinances or other laws and ordinances restricting the occupancy, use, or enjoyment of real property;

(h)       statutory Liens, other than those described in clauses (a) or (b) above, arising in the ordinary course of business with respect to obligations which are not delinquent or are being contested in good faith by appropriate proceedings; provided, that, if delinquent, adequate reserves have been set aside with respect thereto in accordance with GAAP and, by reason of nonpayment, no Property is subject to a material risk of loss or forfeiture;

(i)       Liens consisting of pledges or deposits made (i) in connection with obligations under workers' compensation laws or similar legislation, including Liens of judgments thereunder which are not currently dischargeable, and (ii) to secure letters of credit issued for the benefit of

-16-

workers' compensation insurance, gaming bonds (and other regulatory requirements) and utilities;

(j)     Liens consisting of pledges or deposits of Property to secure performance in connection with operating leases made in the ordinary course of business to which Holdings or any Subsidiary of Holdings is a party as lessee; provided, that the aggregate value of all such pledges and deposits in connection with any such lease does not at any time exceed 10% of the annual fixed rentals payable under such lease;

(k)     Liens consisting of deposits of Property to secure statutory obligations of Holdings or any Subsidiary of Holdings in the ordinary course of its business, but securing in aggregate not more than $500,000;

(l)     Liens consisting of deposits of Property to secure (or in lieu of) surety, appeal, customs or performance bonds in the ordinary course of its business, but securing in aggregate not more than $1,500,000;

(m)     Liens created by or resulting from any litigation or legal proceeding involving Holdings or any Subsidiary of Holdings in the ordinary course of its business which is currently being contested in good faith by appropriate proceedings; provided, that adequate reserves have been set aside with respect thereto in accordance with GAAP, and such Liens are discharged or stayed within 60 days of creation and no Property is subject to a material risk of loss or forfeiture;

(n)     Liens disclosed on the commitments for policies of title insurance delivered to the Administrative Agent;

(o)     Permitted Priority Maritime Liens;

(p)     customary rights of setoff upon deposits of cash in favor of banks or other depository institutions;

(q)     Liens on any property or assets acquired, or on the property or assets of any Person acquired, by any Obligor after the date of this Agreement pursuant to Section 6.4; provided, that (i) such Liens exist at the time such property or assets or such Persons are so acquired and (ii) such Liens were not created in contemplation of such acquisitions; and

(r)     Liens arising by operation of law or by contract in each case encumbering insurance policies and proceeds thereof to secure the financing of premiums payable under such policies.

"Organizational Documents" means (i) with respect to any corporation or company, its certificate, memorandum or articles of incorporation, organization or association, as amended, and its by-laws, as amended, (ii) with respect to any limited partnership, its certificate or declaration of limited partnership, as amended, and its partnership agreement, as amended, (iii) with respect to any general partnership, its partnership agreement, as amended, and (iv) with respect to any limited liability company, its articles of organization, as amended, and its operating agreement, as amended.  In the event any term or condition of this Agreement or any other Loan Document requires any Organizational Document to be certified by a secretary of state or similar governmental official, the reference to any such Organizational Document shall only be to a document of a type customarily certified by such governmental official.

NY\2522406.16

"<u>Other Taxes</u>" means all present or future stamp or documentary taxes or any other excise or property taxes, charge or similar levies arising from any payment made hereunder or any other Loan Document or from the execution, delivery or enforcement of, or otherwise respect to, this Agreement or any other Loan Documents.

"<u>PBGC</u>" means the Pension Benefit Guaranty Corporation or any successor thereof established under ERISA.

"<u>Pension Plan</u>" means any "employee pension benefit plan" that is subject to Title IV of ERISA and which is maintained for employees of Holdings or any of its ERISA Affiliates or which Holdings or its ERISA Affiliates is obligated to contribute to on behalf of its employees, <u>other than</u> a Multiemployer Plan.

"<u>Permitted Dispositions</u>" means the Disposition of Property which, in the reasonable judgment of Borrower, is obsolete, worn-out or no longer useful or necessary in the conduct of Borrower's or any Subsidiary's business.

"<u>Permitted Priority Maritime Liens</u>" means maritime Liens on ships, barges or other vessels for wages of a stevedore, when employed directly by a Person listed in 46 U.S.C. § 31341, crew's wages, salvage and general average, whether now existing or hereafter arising and other maritime Liens which arise by operation of law during the normal operations of such ships, barges or other vessels which (a) are paid in the ordinary course of business and (b) have not been recorded on the General Index or Abstract of Title (U.S.C.G. 1332) of such ships, barges or other vessels or judicially asserted.

"<u>Person</u>" means any entity, whether an individual, trustee, corporation, general partnership, limited liability company, limited partnership, joint stock company, trust, estate, unincorporated organization, business association, tribe, firm, joint venture, Governmental Agency, or otherwise.

"<u>Plan of Reorganization</u>" means that certain Amended Joint Chapter 11 Plan of Reorganization for Louisiana Riverboat Gaming Partnership and Affiliates as of [_____], 2012, filed in the Chapter 11 Cases and approved by the Bankruptcy Court pursuant to the Confirmation Order.

"<u>Principal</u>" means the Person identified as the "Principal" in a letter from Holdings to the Lenders dated [_____], 2012[4] and referring to this Agreement.

"<u>Pro Forma Balance Sheet</u>" is defined in <u>Section 4.5</u>.

"<u>Pro Rata Share</u>" means, with respect to each Lender, the percentage of the Loans held by that Lender from time to time.

"<u>Proceeds</u>" is defined in <u>Section 5.4(h)</u>.

"<u>Projections</u>" means the projections of revenues, expenses, assets, liabilities and cash flows furnished by Holdings to the Lenders on or about the Closing Date.

"<u>Property</u>" means any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible.

---

[4]     Date of letter must be prior to execution of this Agreement.

-18-

"<u>Purchase Money Indebtedness</u>" means Indebtedness (including liability under Capital Leases) incurred at the time of, or within ninety days after, the acquisition, construction, repair or improvement of any assets for the purpose of financing all or any part of the acquisition, construction, repair or improvement cost thereof.

"<u>Quarterly Payment Date</u>" means each March 31, June 30, September 30 and December 31 following the Closing Date, or if any such date is not a Business Day, then on the next succeeding Business Day.

"<u>Real Property</u>" means, collectively, the real property and improvements underlying the Bossier City Facility and the Vicksburg Facility (in each case, including all real property described in the applicable Mortgage).

"<u>Register</u>" is defined in <u>Section 11.8(d)</u>.

"<u>Regulations T, U and X</u>" mean Regulations T, U and X, respectively, of the Board of Governors of the Federal Reserve System, as at any time amended, or any other regulation in substance substituted therefor.

"<u>Related Agreements</u>" means the Asset Purchase Agreement; all employment, compensation and similar agreements between Holdings or any of its Subsidiaries, on the one hand, and any of the Identified Personnel on the other hand; and any other agreement contemplated by the Plan of Reorganization other than the Loan Documents and the Second Lien Loan Documents.

"<u>Release</u>" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing, abandoning or migrating into the environment.

"<u>Required Lenders</u>" means, as of any date of determination, Lenders holding more than 50% of the aggregate principal amount of the Loans outstanding on such date.

"<u>Requirement of Law</u>" means, as to any Person, the Organizational Documents of such Person or other organizational or governing documents of such Person and any Law, judgment, award, decree, writ or determination of a Governmental Agency, in each case applicable to or binding upon such Person or any of its Property or to which such Person or any of its Property is subject.

"<u>Responsible Official</u>" means when used with reference to a Person, any officer of such Person, general partner of such Person, corporate officer of a corporate general partner of such Person, or corporate officer of a corporate general partner of a partnership that is a general partner of such Person, or any other responsible official thereof duly acting on behalf thereof.  Any document or certificate hereunder that is signed or executed by a Responsible Official of a Person shall be conclusively presumed to have been authorized by all necessary corporate, partnership, membership and/or other action on the part of that Person.

"<u>Restricted Payments</u>" means, collectively, (i) all Distributions, (ii) all management or similar fees payable to Principal or any of its Affiliates and (iii) any payment or prepayment of principal of or interest in respect of Second Lien Term Debt.

"<u>S&P</u>" means Standard & Poor's Rating Group, a division of The McGraw Hill Corporation.

-19-

"Second Lien Agent" means Wilmington Trust, National Association, when acting in its capacity as the administrative agent and collateral agent for the lenders under the Second Lien Credit Agreement, and any successor administrative agent and collateral agent thereunder.

"Second Lien Credit Agreement" means that certain Second Lien Credit Agreement dated as of the date hereof among Borrower, Holdings, the lenders described therein and the Second Lien Agent, as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms of the Intercreditor Agreement, and any successive refinancings thereof which do not violate the limitations set forth in Section 6.11.

"Second Lien Loan Documents" means the "Loan Documents" as such term is used and defined in the Second Lien Credit Agreement.

"Second Lien Term Debt" means all obligations and indebtedness incurred under the Second Lien Credit Agreement and the other Loan Documents referred to therein.

"Second Lien Term Loans" means the term loans made to Borrower pursuant to the Second Lien Credit Agreement.

"Secured Parties" means, collectively, the Administrative Agent and the Lenders, and "Secured Party" means any one of the foregoing.

"Securities" means any capital stock, share, voting trust certificate, bonds, debentures, notes or other evidences of indebtedness, Equity Interests, or any warrant, option or other right to purchase or acquire any of the foregoing.

"Security Agreement" means that certain Guarantee and Security Agreement dated as of [_____], 2012 executed and delivered by Holdings and its Subsidiaries in favor of the Administrative Agent for the benefit of the Secured Parties, as the same may be amended, restated, supplemented or otherwise modified from time to time in substantially the form of Exhibit E.

"Senior Officer" means, in respect of Holdings or its Subsidiaries, any of the chairman, chief executive officer, president, chief operating officer, chief financial officer, treasurer, assistant treasurer, controller, executive vice president or vice president of Holdings or its Subsidiaries, as applicable.

"Ship Mortgages" means (a) that certain Preferred Ship Mortgage dated as of [_____], 2012 executed and delivered by [Global Vicksburg] in favor of the Administrative Agent, granting a first priority lien on and security interest in the vessel MARMAC 7, Official No. 648293, (b) that certain Preferred Ship Mortgage dated as of [_____], 2012 executed and delivered by Global Louisiana in favor of the Administrative Agent, granting a first priority lien on and security interest in the vessel THE MARGARET MARY, Official No. 1020786, and (c) any other preferred ship mortgage hereafter executed and delivered by any Obligor in favor of the Administrative Agent, as any of the foregoing in clauses (a)-(c) above may be amended, restated, supplemented or otherwise modified from time to time.

"Special Circumstance" means (a) any change in the interpretation or administration of any existing Law by any Governmental Agency, central bank or comparable authority charged with the interpretation or administration thereof or (b) compliance by any Lender or its Lending Office with any request or directive (whether or not having the force of Law) of any such Governmental Agency, central bank or comparable authority; provided, that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or

-20-

directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Special Circumstance", regardless of the date enacted, adopted or issued.

"Subordinated Obligations" means any Indebtedness of Holdings or its Subsidiaries hereafter approved in writing by the Required Lenders which is subordinated to the Obligations in a manner which is acceptable to the Required Lenders. The Second Lien Term Loans are not Subordinated Obligations.

"Subsidiary" means, as of any date of determination and with respect to any Person, any corporation, limited liability company or partnership (whether or not, in either case, characterized as such or as a "joint venture"), whether now existing or hereafter organized or acquired: (a) in the case of a corporation, of which a majority of the economic interests or securities having ordinary voting power for the election of directors or other governing body (other than securities having such power only by reason of the happening of a contingency) are at the time beneficially owned by such Person and/or one or more Subsidiaries of such Person, (b) in the case of a partnership, of which such Person or a Subsidiary of such Person is a general partner or of which a majority of the economic interests or partnership or other ownership interests are at the time beneficially owned by such Person and/or one or more of its Subsidiaries or (c) in the case of a limited liability or other entity, of which the majority of the economic interests or membership or other ownership interests having ordinary voting power are at the time owned by such Person and/or one or more Subsidiaries of such Person. Any reference to a "Subsidiary" or "Subsidiaries" shall, unless otherwise provided, be deemed to be a reference to a Subsidiary (or Subsidiaries, as the case may be) of Holdings, as the context shall require.

"Suitability Notice" is defined in Section 11.9.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Agency on the Administrative Agent or any Lender, including any interest, additions to tax or penalties applicable thereto.

"Termination Event" means (a) a "reportable event" as defined in Section 4043 of ERISA (other than a reportable event for which the requirement to provide 30 day notice to the PBGC has been waived), (b) the withdrawal of Holdings or any of its ERISA Affiliates from a Pension Plan during any plan year in which it was a "substantial employer" as defined in Section 4001(a)(2) of ERISA, (c) the filing of a notice of intent to terminate a Pension Plan or the treatment of an amendment to a Pension Plan as a termination thereof pursuant to Section 4041 of ERISA, (d) the institution of proceedings to terminate a Pension Plan by the PBGC or (e) any other event or condition which might reasonably be expected to constitute grounds under ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan.

"Total Leverage Ratio" means the ratio as of the last day of any Fiscal Quarter of Holdings of (i) Consolidated Total Debt as of such day to (ii) Consolidated EBITDA for the four-Fiscal Quarter period ending on such day.

"Trigger Event" means that the Consolidated EBITDA for the twelve full calendar month period ending immediately prior to the Closing Date is less than $16,000,000, as reasonably determined by the Required Lenders.

-21-

"Trademark Security Agreement" means that certain Trademark Security Agreement dated as of [_____], 2012 executed and delivered by Holdings and its Subsidiaries in favor of the Administrative Agent for the benefit of the Secured Parties, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"Uniform Commercial Code" means the Uniform Commercial Code as in effect in any applicable jurisdiction.

"Unrestricted Period" means the period commencing on the Closing Date and ending on the last day of the fourth (or, if the Trigger Event shall have occurred, the eighth) complete Fiscal Quarter following the Closing Date.

"Vessels" means, collectively, the vessels "THE MARGARET MARY" (O.N.1020786) and "MARMAC 7" (O.N.648293).

"Vicksburg Casino" means the casino owned and operated in Vicksburg, Mississippi under the DiamondJacks Casino brand.

"Vicksburg Deed of Trust" means that certain Deed of Trust and Leasehold Deed of Trust with Assignment of Rents and Leases, Security Agreement and Fixture Filing dated as of the Closing Date executed and delivered by [Global Vicksburg] in respect of the real property described on Schedule 1.1C to secure its Guarantee, as the same may be amended, extended, restated, supplemented or otherwise modified from time to time.

"Vicksburg Facility" means the Gaming Facility located in Vicksburg, Mississippi comprised of, among other amenities, the Vicksburg Casino and the Vicksburg Hotel.

"Vicksburg Hotel" means the hotel located in Vicksburg, Mississippi and related interests in the real property described on Schedule 1.1C.

1.2     Use of Defined Terms.  Any defined term used in the plural shall refer to all members of the relevant class, and any defined term used in the singular shall refer to any one or more of the members of the relevant class.

1.3     Accounting Terms. All accounting terms not specifically defined in this Agreement shall be construed in conformity with, and all financial data required to be submitted by this Agreement shall be prepared in conformity with, GAAP applied on a consistent basis, except as otherwise specifically prescribed herein.  In the event that GAAP changes during the term of this Agreement such that the financial covenants contained in Section 6.14 would then be calculated in a different manner or with different components, Borrower, Holdings and the Lenders agree to amend this Agreement in such respects as are necessary to conform those covenants as criteria for evaluating Holdings' financial condition to substantially the same criteria as were effective prior to such change in GAAP and, prior to such amendment becoming effective, Holdings shall be deemed to be in compliance with the financial covenants contained in such Sections if and to the extent that Holdings would have been in compliance therewith under GAAP as in effect immediately prior to such change.

1.4     Rounding.  Any financial ratios required to be maintained by Holdings pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed in this Agreement

-22-

and rounding the result up or down to the nearest number (with a round-up if there is no nearest number) to the number of places by which such ratio is expressed in this Agreement.

1.5    Exhibits and Schedules.   All Exhibits and Schedules to this Agreement, either as originally existing or as the same may from time to time be amended, restated, supplemented or otherwise modified, are incorporated herein by this reference.  A matter disclosed on any Schedule shall be deemed disclosed on all Schedules.

1.6    Miscellaneous Terms.   The term "or" is disjunctive; the term "and" is conjunctive.  The term "shall" is mandatory; the term "may" is permissive.  Masculine terms also apply to females, feminine terms also apply to males.  The term "including" is by way of example and not limitation.  The words "herein," "hereto," "hereof" and "hereunder" are words of similar import when used in any Loan Document shall refer to such Loan Document as a whole and not to any particular provision thereof. Article, Section, Exhibit and Schedule references are to the Loan Document in which such reference appears.  The term "documents" include any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.  In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."  Unless otherwise expressly provided herein, references to organization documents, agreements (including the Loan Documents and the Second Lien Loan Documents) and other contractual instruments shall be deemed to include all amendments, restatements, extensions, supplements and other modifications thereto, but only to the extent that such amendments, restatements, extensions, supplements and other modifications are not prohibited by any Loan Document.

1.7    Louisiana Terms.   In Louisiana, "real property" shall include "immovable property"; "easements" shall include "servitudes"; "personal property" shall include "movable property"; "tangible" shall include "corporeal"; "intangible" shall include "incorporeal"; "lien" shall include "privilege"; and "right of set-off" shall include "right of compensation."

ARTICLE 2
LOANS

2.1    Loans – General.

(a)    Loans.   Each Lender shall receive its Loan Amount on the Closing Date in accordance with the Plan of Reorganization and on the terms and subject to the conditions set forth herein and the Loans will be deemed to have been funded prior to the date hereof.  For the avoidance of doubt, there will be no cash funding of the Loans.  No amount of a Loan which is repaid or prepaid by Borrower may be reborrowed hereunder.  Subject to the conditions set forth in Section 3.1, the Loans may be repaid, in whole or in part, without premium or penalty at any time following the Closing Date.

(b)    Notes.   The Loan owing to each Lender may, at the option of that Lender, be evidenced by a Note payable to that Lender in a principal amount equal to the Loan of such Lender.  Each Lender shall record the date and amount of each payment of principal made by Borrower with respect thereto, and may, if such Lender so elects in connection with any transfer or enforcement of its Note, endorse on the schedule forming a part thereof appropriate notations to evidence the foregoing information; provided, that the failure of any Lender to make any such recordation or endorsement shall not affect the obligations of Borrower hereunder or under the

-23-

Notes.  Each Lender is hereby irrevocably authorized by Borrower so to endorse its Note and to attach to and make a part of its Note a continuation of any such schedule as and when required.

2.2     <u>Repayment of Loans</u>.  To the extent not previously paid, all Loans shall be due and payable on the Maturity Date, together with all accrued and unpaid interest on the principal amount paid to but not including the date of payment, but shall otherwise be without premium or penalty.

2.3     <u>Collateral</u>.  Each of the Obligations, including the Loans, shall be entitled to the equal, ratable and pari passu benefits of the Guarantees and shall be secured on an equal, ratable and pari passu basis by the Liens created by the Collateral Documents.

ARTICLE 3
PAYMENTS AND FEES

3.1     <u>Principal and Interest</u>.

(a)     Interest shall be payable on the outstanding daily unpaid principal amount of each Loan from the Closing Date until payment in full is made and shall accrue and be payable at the rates set forth herein before and after default, before and after maturity, before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law, with interest on overdue interest to bear interest at the Default Rate to the fullest extent permitted by applicable Laws.

(b)     Interest accrued on each Loan shall be due and payable on each Quarterly Payment Date and on the Maturity Date.  Except as otherwise provided in <u>Sections 3.4</u> and <u>3.5</u>, the unpaid principal amount of each Loan shall bear interest from and after the Closing Date at a fixed rate per annum equal to 6.00% during the entire term of this Agreement.

(c)     The principal amount of the Loans shall be repaid in U.S. Dollars in consecutive quarterly installments on the last Business Day of each March, June, September and December, in an amount equal to 1.667% of the initial aggregate principal amount of Loans commencing on the first such day following the first anniversary of the Closing Date and on each such day thereafter; <u>provided</u>, that if the Trigger Event shall have occurred, the first such payment shall be due on the first such day following the second anniversary of the Closing Date and on each such day thereafter.  If not sooner paid, the principal amount of the Loans shall be payable in full on the Maturity Date as provided in <u>Section 2.2</u>.

(d)     The outstanding principal amount of the Loans shall be prepaid in accordance with <u>Section 3.1(e)</u> on or before the tenth Business Day following the receipt by Holdings or any of its Subsidiaries of any of the following:

(i)     Net Cash Proceeds from the issuance of Equity Interests of Borrower in an amount which is equal to 75% of such Net Cash Proceeds;

(ii)     Net Cash Proceeds from Dispositions made by Holdings or any of its Subsidiaries in an amount equal to 100% of the amount of such Net Cash Proceeds received by Holdings or any such Subsidiary; <u>provided</u>, that no such prepayment shall be required with respect to up to $1,000,000 in Net Cash Proceeds with respect to any particular Disposition or series of related Dispositions to the extent that Borrower provides notice to the Administrative Agent prior to receipt by Holdings or its

-24-

Subsidiaries of such Net Cash Proceeds that it intends to reinvest such Net Cash Proceeds in productive Property of a kind then used or usable in the business of Holdings and its Subsidiaries within the 180-day period following their receipt (unless such reinvestment does not occur within that period);

(iii)    Net Claim Proceeds received by Holdings or any Subsidiary in connection with any Loss Event in an amount equal to 100% of such Net Claim Proceeds; provided, that, if no Default or Event of Default has then occurred and remains continuing, then:

(A)    in respect of Net Claim Proceeds which are in an amount which is less than $250,000, Borrower may within thirty days following the receipt thereof notify the Administrative Agent that Borrower intends to reinvest such Net Claim Proceeds to repair, reconstruct or replace the Property destroyed, damaged or taken, or reinvest such Net Claim Proceeds in productive assets of a kind then used or usable in the business of Holdings and its Subsidiaries, in which case no repayment with such Net Claim Proceeds shall be required to the extent Holdings and its Subsidiaries commence such reinvestment within 90 days following the receipt of such Net Claim Proceeds and thereafter diligently pursue such reinvestment; and

(B)    in respect of Net Claim Proceeds which are in excess of $250,000 but not in excess of $3,250,000 (and for the avoidance of doubt Net Claim Proceeds in excess of $3,250,000 shall be used to prepay the Loans on or before the tenth Business Day following receipt thereof), Borrower may within thirty days following the receipt thereof notify the Administrative Agent that Borrower intends to reinvest such Net Claim Proceeds to repair, reconstruct or replace the Property destroyed, damaged or taken, or reinvest such Net Claim Proceeds in productive assets of a kind then used or usable in the business of Holdings and its Subsidiaries, in which case no repayment with such Net Claim Proceeds shall be required to the extent that (i) Borrower delivers plans for the repair, replacement or reconstruction of the Property destroyed, damaged or taken, or for the reinvestment of such Net Claim Proceeds in productive assets of a kind used or usable in the business of Holdings and its Subsidiaries, to the Administrative Agent within 180 days of such Loss Event together with a timetable therefor, (ii) such plans and timetable are reasonably acceptable to the Required Lenders and (iii) Holdings and its Subsidiaries thereafter promptly commence and thereafter diligently pursue, the reinvestment of such Net Claims Proceeds in accordance with the related plans and timetable; provided, that pending the application of such Net Claim Proceeds, they shall be held in a cash collateral account securing the Obligations.

(iv)    With respect to each Fiscal Quarter of the Borrower, no later than 5 days after the date on which the financial statements with respect to such period are delivered pursuant to Section 7.1(a) or (b), but in any event no later than 50 days after the end of such Fiscal Quarter (or, in the case of audited financial statements pursuant to Section 7.1(b), 95 days after the end of such Fiscal Year) commencing with the Fiscal Quarter

ending [_____]⁵, Borrower shall prepay outstanding Loans in an aggregate principal amount equal to the ECF Percentage of the amount of Excess Cash Flow for such Fiscal Quarter, but only if after giving effect thereto the Minimum Cash Requirement is met.

(e)       Borrower shall deliver to the Administrative Agent written notice of any prepayment pursuant to clause (d) above prior to 10:00 a.m. New York City local time one Business Day prior to the date of such payment, which notice shall identify the date and amount of Loans to be prepaid.  All prepayments of the Loans made pursuant to clause (d) above shall be allocated pro rata among the Loans based on the then outstanding principal amount of all Loans, shall be allocated pro rata to all remaining scheduled payments of principal of the Loans, including at the Maturity Date, and shall be accompanied by payment of accrued and unpaid interest to but not including the date of payment on the amount of principal paid.  Any voluntary prepayments made pursuant to this Section 3.1(e) shall be applied to the Loans in accordance with Section 3.1(d).

(f)       Subject to Section 3.4, the Loans may, at any time and from time to time, at the discretion of Borrower, be voluntarily repaid or prepaid in whole or in part without premium or penalty; provided, that with respect to any voluntary prepayment of the Loans, (i) any partial prepayment of Loans shall be in an integral multiples of $250,000 in a minimum principal amount of $500,000 and (ii) the Administrative Agent shall have received written notice of any prepayment prior to 10:00 a.m. New York City local time one Business Day prior to the date of prepayment, which notice shall identify the date and amount of Loans to be prepaid.

3.2      Agent Fees.  Borrower shall pay to the Administrative Agent the agency fees in the amounts set forth in the Fee Letter.  These agency fees are fully earned as of the date when due, are solely for the account of Administrative Agent and are non-refundable.

3.3      Increased Commitment Costs.  If any Lender shall have determined that, after the Closing Date, the introduction of any applicable law, rule, regulation or guideline regarding capital adequacy, or any change therein or any change in the interpretation or administration thereof by any central bank or other Governmental Agency charged with the interpretation or administration thereof, or compliance by that Lender or any corporation controlling that Lender, with any request, guidelines or directive regarding capital adequacy (whether or not having the force of law) of any such central bank or other authority, affects or would affect the amount of capital required or expected to be maintained by that Lender or any corporation controlling that Lender and (taking into consideration such Lender's or such corporation's policies with respect to capital adequacy and such Lender's desired return on capital) determines that the amount of such capital is increased as a consequence of its obligations under this Agreement, then, within 10 days after demand of such Lender, Borrower shall immediately pay to that Lender, from time to time as specified by that Lender, additional amounts sufficient to compensate that Lender for such increase; provided, that Borrower shall have no obligation to make any payment to any demanding party under this Section 3.3 on account of any such increased costs unless Borrower receives notice of such increased costs from the demanding party within 180 days after they are incurred or realized.  Each demand for compensation under this Section shall be accompanied by a certificate of the Lender claiming such compensation, setting forth in reasonable detail the calculation of the amounts to be paid hereunder.

3.4      Certain Fees and Costs.  If, after the Closing Date, the existence or occurrence of any Special Circumstance shall subject any Lender or its Lending Office to any tax, duty or other charge or

---

⁵         The last day of the first Fiscal Quarter commencing after the first anniversary of the Closing Date.

NY\2522406.16

cost with respect to its Loans, or shall change the basis of taxation of payments to any Lender of the principal of or interest on any Loan or any other amounts due under this Agreement in respect of its Loans (except for Indemnified Taxes or Other Taxes covered by Section 3.13 and the imposition of, or any change in the rate of, any Excluded Tax payable by such Lender) and the result of the foregoing, as determined by such Lender, increases the cost to such Lender or its Lending Office of making or maintaining its Loans or reduces the amount of any sum received or receivable by such Lender or its Lending Office with respect to its Loans, then, within 10 days after demand by such Lender (with a copy to the Administrative Agent), Borrower shall pay to such Lender such additional amount or amounts as will compensate such Lender for such increased cost or reduction; provided, that Borrower shall have no obligation to make any payment to any demanding party under this Section 3.4 on account of any such increased costs or reduced amounts unless Borrower receives notice of such increased costs or reduced amounts from the demanding party within 180 days after they are incurred or realized.  A statement of any Lender claiming compensation under this clause and setting forth the additional amount or amounts to be paid to it hereunder shall be conclusive in the absence of manifest error.  Each Lender agrees to endeavor promptly to notify Borrower of any event of which it has actual knowledge occurring after the Closing Date, which will entitle such Lender to compensation pursuant to this Section, and agrees to designate a different Lending Office promptly if such designation will avoid the need for or reduce the amount of such compensation and will not, in the judgment of such Lender, otherwise be disadvantageous to such Lender.  If any Lender claims compensation under this Section, Borrower may at any time, upon at least three (3) Business Days prior notice to the Administrative Agent and such Lender and upon payment in full of the amounts provided for in this Section through the date of such payment, pay in full the affected Loans of such Lender.

3.5     Default Rate.  Upon the occurrence and during the continuance of any Event of Default, the outstanding principal amount of the Loans shall, at the option of the Required Lenders, thereafter bear interest at a fluctuating interest rate per annum which is 2% per annum higher than the otherwise applicable rate under Section 3.1(b), to the fullest extent permitted by applicable Laws.  Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be compounded quarterly, on the last day of each calendar quarter, to the fullest extent permitted by applicable Laws payable on demand.

3.6     Computation of Interest and Fees.  Computation of interest on Loans shall be calculated on the basis of a year of 360 days and the actual number of days elapsed.

3.7     Non-Business Days.  If any payment to be made by Borrower or any other Obligor under any Loan Document shall come due on a day other than a Business Day, payment shall instead be considered due on the next succeeding Business Day and the extension of time shall be reflected in computing interest.

3.8     Manner and Treatment of Payments.

(a)     Each payment hereunder or on any Notes or under any other Loan Document shall be made to the Administrative Agent for the account of each of the Lenders or the Administrative Agent, as the case may be, in immediately available funds not later than 1:00 p.m., New York City local time, on the day of payment (which must be a Business Day).  Each such payment shall be made to the Administrative Agent at the Administrative Agent's Office.  All payments received after 1:00 p.m., New York City local time, on any particular Business Day, shall be deemed received on the next succeeding Business Day.  The amount of all payments received by the Administrative Agent for the account of each Lender shall be promptly paid (and, in any event, on the same Business Day when deemed received) by the Administrative

-27-

Agent to that Lender in immediately available funds.  All payments shall be made in lawful money of the United States of America.

(b)     Each payment or prepayment on account of any Loan shall be made and applied pro rata according to the respective Pro Rata Shares of each Lender at such time.

(c)     Each Lender shall maintain an account on its books reflecting all Loans owing by Borrower to such Lender and all other payment Obligations owing hereunder or under the other Loan Documents, including accrued interest, fees and expenses due to that Lender (each, a "Loan Account").  Each Lender's Loan Account will be credited with all payments received by that Lender from Borrower or for Borrower's account.  The Administrative Agent shall also keep such a record, reflecting the aggregate of the Loans and other payment Obligations and any such repayments, and shall provide a monthly statement to Borrower, showing the opening balance, advances, payments, ending balance, average balance, and interest.  Each Lender shall provide a statement of its Loan Account to Borrower upon request.  The Loan Accounts and the records of the Administrative Agent shall be presumptive evidence of the amounts owing to the Lenders.  Notwithstanding the foregoing sentence, no Lender shall be liable to any Obligor for any failure to keep such a record, and no such failure shall affect the amount of the Obligations hereunder.

3.9     Funding Source.  Nothing in this Agreement shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

3.10     Failure to Charge Not Subsequent Waiver.  Any decision by the Administrative Agent or any Lender not to require payment of any interest (including interest at the Default Rate), fee, cost or other amount payable under any Loan Document, or to calculate any amount payable by a particular method, on any occasion shall in no way limit or be deemed a waiver of the Administrative Agent's or such Lender's right to require full payment of any interest (including interest at the Default Rate), fee, cost or other amount payable under any Loan Document, or to calculate an amount payable by another method, on any other or subsequent occasion.

3.11     Administrative Agent's Right to Assume Payments Will Be Made by Borrower.  Unless the Administrative Agent shall have been notified by Borrower prior to the date on which any payment to be made by Borrower hereunder is due that Borrower does not intend to remit such payment, the Administrative Agent may, in its discretion, assume that Borrower has remitted such payment when so due and the Administrative Agent may, in its discretion and in reliance upon such assumption, make available to each Lender on such payment date an amount equal to such Lender's share of such assumed payment.  If Borrower has not in fact remitted such payment to the Administrative Agent, each Lender shall forthwith on demand repay to the Administrative Agent the amount of such assumed payment made available to such Lender, together with interest thereon in respect of each day from and including the date such amount was made available by the Administrative Agent to such Lender to the date such amount is repaid to the Administrative Agent at the Federal Funds Rate.

3.12     Fee Determination Detail.  The Administrative Agent, and any Lender, shall provide reasonable detail to Borrower regarding the manner in which the amount of any payment to the Lenders, or that Lender, under Article 3 has been determined.

3.13     Taxes.

-28-

(a)      Payments Free of Taxes.   Any and all payments by or on account of any obligation of Borrower and the other Obligors hereunder or under any other Loan Document shall be made free and clear of and without reduction or withholding for any Indemnified Taxes or Other Taxes; provided, that if Borrower or any other Person shall be required by applicable law to deduct any Indemnified Taxes (including any Other Taxes) from such payments, then (i) the sum payable by Borrower or other Obligor shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section) the Administrative Agent or Lender, as the case may be, receives an amount equal to the sum it would have received had no such deductions been made, (ii) Borrower or such Obligor shall make such deductions and (iii) Borrower or such relevant Obligor shall timely pay the full amount deducted to the relevant Governmental Agency in accordance with applicable law.

(b)      Payment of Other Taxes by Borrower.  Without limiting the provisions of part (a) of this Section, Borrower shall timely pay any Other Taxes to the relevant Governmental Agency.

(c)      Indemnification by Borrower.   Borrower shall indemnify the Administrative Agent and each Lender, within 10 days after demand therefor, for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed on or attributable to amounts payable under this Section) paid by the Administrative Agent or such Lender, as the case may be, and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Agency.  A certificate as to the amount of such payment or liability delivered to Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(d)      Evidence of Payments.  As soon as practicable after any payment of Indemnified Taxes or Other Taxes by Borrower to a Governmental Agency, Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Agency evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)      Treatment of Certain Refunds.   If the Administrative Agent or a Lender determines, in its sole discretion, that it has received a refund of any Taxes or Other Taxes as to which it has been indemnified by Borrower or with respect to which Borrower has paid additional amounts pursuant to this Section, it shall pay to Borrower an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by Borrower under this Section with respect to the Indemnified Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of the Administrative Agent or such Lender, as the case may be, and without interest (other than any interest paid by the relevant Governmental Agency with respect to such refund); provided, that Borrower, upon the request of the Administrative Agent or such Lender, shall repay the amount paid over to Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Agency) to the Administrative Agent for itself or the account of the applicable Lender, as applicable, in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Agency.  This paragraph shall not be construed to require the Administrative Agent or any Lender to make available its tax returns (or any other information relating to its taxes that it deems confidential) to Borrower or any other Person.

(f)      Late Payments.  Any amount payable to the Administrative Agent or any Lender under this Section if not paid when due thereafter shall bear interest at the Default Rate.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES

Holdings represents and warrants to the Lenders and the Administrative Agent as of the Closing Date that:

4.1      Existence and Qualification; Power; Compliance With Laws.  Holdings is a limited liability company duly formed, validly existing and in good standing under the Laws of the State of Delaware.  Holdings is duly qualified to transact business, and is in good standing, in Delaware and each other jurisdiction in which the conduct of its business or the ownership or leasing of its Properties makes such qualification or registration necessary, except where the failure so to qualify or register and to be in good standing could not reasonably be expected to have a Material Adverse Effect.  Holdings has all requisite power and authority to conduct its business, to own and lease its Properties and to execute and deliver each Loan Document to which it is an Obligor and to perform the Obligations to be performed by it.  All outstanding Equity Interests in Holdings are duly authorized, validly issued, fully paid and issued in compliance with all applicable state and federal securities Laws and other Laws.  As of the Closing Date, Schedule 4.1 accurately describes the Persons owning Equity Interests in Holdings, and the nature and extent of the interests held by each such Person, and there are no other holders of Equity Interests in Holdings.  As of the Closing Date, no Person holds any option, warrant or other right to acquire any membership or other Equity Interests in Holdings.  Holdings is in compliance in all material respects with all Laws (including all Gaming Laws) and other legal requirements applicable to its business.  Holdings has obtained all authorizations, consents, approvals, orders, licenses and permits from, and has accomplished all material filings, registrations and qualifications with, or obtained exemptions from any of the foregoing from, any Governmental Agency that are necessary for the transaction of its business, other than (i) the matters disclosed on Schedule 4.3 and (ii) such authorizations, consents, approvals, orders, licenses, permits, filings, registrations, qualifications and exemptions the failure of which to obtain or make, could not reasonably be expected to have a Material Adverse Effect.

4.2      Authority; Compliance With Other Agreements and Instruments and Government Regulations.  The execution, delivery and performance by Holdings and its Subsidiaries of the Loan Documents and the Related Agreements have been duly authorized by all necessary limited liability company, corporate or partnership action, (as the case may be), and do not:

(a)      require any consent or approval not heretofore obtained of any equityholder, security holder, partner or creditor of such Obligor;

(b)      violate or conflict with any provision of such Obligor's operating agreement, bylaws, partnership agreement or other similar formation documents;

(c)      result in or require the creation or imposition of any Lien (other than pursuant to the Loan Documents and the Second Lien Loan Documents) upon or with respect to any Property now owned or leased or hereafter acquired by such Obligor;

(d)      violate any Requirement of Law, including any Gaming Law, applicable to such Obligor in any material respect; or

-30-

(e)     result in a breach of or default under, or would, with the giving of notice or the lapse of time or both, constitute a breach of or default under, or cause or permit the acceleration of any obligation owed under, any indenture or loan or credit agreement in respect of Indebtedness in excess of $1,000,000 or any other material Contractual Obligation to which such Obligor is a party or by which such Obligor or any of its Property is bound or affected;

and, after giving effect to the consummation on the Closing Date of the transactions contemplated by the Plan of Reorganization, Holdings and its Subsidiaries are not in material violation of, or material default under, any material Contractual Obligation, or any indenture, loan or credit agreement described in <u>Section 4.2(e)</u>.

4.3     <u>No Governmental Approvals Required</u>.  Except for the Confirmation Order and except as set forth on <u>Schedule 4.3</u>, no authorization, consent, approval, order, license or permit from, or filing, registration or qualification with, any Governmental Agency is required to authorize or permit under applicable Laws the execution, delivery and performance by Holdings and its Subsidiaries of the Loan Documents or the consummation of the transactions contemplated by the Plan of Reorganization, except for those which have been made or obtained and are in full force and effect.

4.4     <u>Subsidiaries</u>.

(a)     As of the Closing Date, <u>Schedule 4.4</u> correctly sets forth the names, form of legal entity, number and type of Equity Interests issued and outstanding, and jurisdictions of organization of all Subsidiaries of Holdings, and there are no other holders of Equity Interests in any Subsidiary.  Except as set forth on <u>Schedule 4.4</u>, (i) neither Holdings nor any Subsidiary owns any Equity Interest or debt security which is convertible, or exchangeable, for Equity Interests in any Person and (ii) as of the Closing Date, no Person holds any option, warrant or other right to acquire any membership or other Equity Interests in any Subsidiary.

(b)     Each Subsidiary of Holdings is duly formed, validly existing and in good standing under the Laws of the state of its organization, and has all requisite power and authority to conduct its business and to own and lease its Properties.

(c)     Each Subsidiary of Holdings is in compliance in all material respects with all Laws and other requirements applicable to its business and has obtained all authorizations, consents, approvals, orders, licenses, and permits from, and each such Subsidiary has accomplished all filings, registrations, and qualifications with, or obtained exemptions from any of the foregoing from, any Governmental Agency that are necessary for the transaction of its business, other than (i) the matters disclosed on <u>Schedule 4.3</u> and (ii) such authorizations, consents, approvals, orders, licenses permits, filings, registrations, qualifications and exemptions the failure of which to obtain or make, could not reasonably be expected to have a Material Adverse Effect.

4.5     <u>Financial Statements</u>.  Holdings has furnished to the Lenders the pro forma consolidated balance sheet of Holdings (the "<u>Pro Forma Balance Sheet</u>") as of the Closing Date, after giving effect to the consummation of the transactions contemplated to occur on the Closing Date contemplated by this Agreement and the Plan of Reorganization.  The Pro Forma Balance Sheet presents fairly in all material respects on a <u>pro</u> <u>forma</u> basis the estimated consolidated financial position of Holdings and its Subsidiaries as of the Closing Date.

NY\2522406.16

4.6     No Other Liabilities.  Except as reflected in the Pro Forma Balance Sheet delivered pursuant to Section 4.5 and as set forth on Schedule 4.6, or as disclosed in the Disclosure Statement or the Plan of Reorganization, and except for the Indebtedness and other obligations incurred under the Loan Documents and the Second Lien Loan Documents, as of the Closing Date, Holdings and its Subsidiaries do not have any material liabilities or material Contingent Obligations.

4.7     Real Property.  As of the Closing Date, Holdings and its Subsidiaries have good and valid fee simple title to all owned real property and valid leasehold interests in all leased real property used in the operation of the Gaming Facilities, and own or lease all personal property used in the operation of the Gaming Facilities, in each case that is purported to be owned or leased by such entity, and none of such property is subject to any Lien of any nature whatsoever except for Ordinary Course Encumbrances and any Liens and Negative Pledges permitted by Section 6.10. The owned real property described on Schedules 1.1B and 1.1C and the leased real property described on Schedule 4.7 are the only owned or leased property necessary for the operation of the business as currently conducted. All of the real property leases are in full force and effect and enforceable by Holdings or its Subsidiaries in accordance with their terms.

4.8     Intellectual Property.  As of the Closing Date, Holdings and its Subsidiaries own, or possess the right to use to the extent necessary in their business, all Intellectual Property that is used in the conduct of their respective business as now operated and which are material to the condition (financial or otherwise), business or operations of Holdings and its Subsidiaries, including, without limitation, all of the intellectual property described on Schedule 4.8.

4.9     Litigation.  Except (i) for any matter fully covered (subject to applicable deductibles and retentions) by insurance and with respect to which the insurance carrier has not denied coverage, nor issued any denial of claim, nor any other statement that the claim is in excess of coverage, and any matter, or series of related matters, not fully covered by insurance (subject to applicable deductibles and retentions) involving a claim against Holdings and its Subsidiaries which is, in the reasonable opinion of their independent legal counsel, in an amount less than $250,000, (ii) as set forth on Schedule 4.9 and (iii) as provided in the Plan of Reorganization or the Confirmation Order, as of the Closing Date, there are no actions, suits, proceedings or investigations pending as to which Holdings or its Subsidiaries has been served or have received notice or, to the best knowledge of Holdings, threatened against or affecting Holdings or its Subsidiaries or their Property before any Governmental Agency.

4.10     Binding Obligations.  Each of the Loan Documents, when executed and delivered by Holdings or its applicable Subsidiaries, will constitute the legal, valid and binding obligation of such Obligor, enforceable against such Obligor in accordance with its terms, except as enforcement may be limited by Debtor Relief Laws or equitable principles relating to the granting of specific performance and other equitable remedies as a matter of judicial discretion and subject to applicable Laws.

4.11     No Default.  No event has occurred and is continuing that is a Default or an Event of Default.

4.12     ERISA.  Except as set forth on Schedule 4.12, as of the Closing Date, neither Holdings nor any of its ERISA Affiliates maintains, contributes to or is required to contribute to any "employee pension benefit plan" that is subject to Title IV of ERISA.

4.13     Regulations T, U and X; Investment Company Act.  No part of the proceeds of any Loan or other extension of credit hereunder will be used to purchase or carry, or to extend credit to others for the purpose of purchasing or carrying, any "margin stock" (as such term is defined in Regulations U and

-32-

X) in violation of Regulations T, U and X.  Holdings and its Subsidiaries are not engaged principally, or as one of their important activities, in the business of extending credit for the purpose of purchasing or carrying any such "margin stock."  Holdings and its Subsidiaries are not required to be registered as an "investment company" under the Investment Company Act of 1940.

4.14    <u>Disclosure</u>.   No written statement made by a Responsible Official of Holdings or Borrower to the Administrative Agent or any Lender in connection with this Agreement (excluding any projections, pro formas and budgets), when taken as a whole, as of the date such statement was so made, contains any untrue statement of a material fact or omits a material fact necessary in order to make the statement made not misleading in light of all the circumstances existing at the date the statement was made.

4.15    <u>Tax Liability</u>.  Holdings and its Subsidiaries have filed all material tax returns which are required to be filed, and have paid, or made provision for the payment of, all taxes which have become due and payable pursuant to said returns, or pursuant to any assessment received by Holdings or its Subsidiaries, except such taxes, if any, as are being contested in good faith by appropriate proceedings and as to which adequate reserves (determined in accordance with GAAP) have been established and maintained.

4.16    <u>Projections</u>.  The Projections were prepared in good faith on the basis of assumptions and information believed by Holdings to be reasonable at the time such Projections were furnished by Holdings to the Administrative Agent and the Lenders.   It is understood by all parties hereto that uncertainty is inherent in any forecasts or projections and that no assurance can be given that the results set forth in the Projections will actually be obtained and that actual results may differ materially from such Projections.

4.17    <u>Employee Matters</u>.  There is no strike or work stoppage in existence or, to Holdings' knowledge, threatened involving Holdings or its Subsidiaries that could reasonably be expected to have a Material Adverse Effect.

4.18    <u>Gaming Laws</u>.  Holdings and each of its Affiliates are in compliance with all Gaming Laws that are applicable to them, except for any immaterial violations that could not reasonably be expected to result in any sanction upon Holdings and its Subsidiaries, or requiring the cessation or suspension of the gaming operations conducted by Holdings and its Subsidiaries.

4.19    <u>Security Interests</u>.   The Collateral Documents create valid security interests in the Collateral (including the Equity Interests of the Initial Subsidiaries) described therein securing the Obligations described therein (subject only to then existing Ordinary Course Encumbrances and any Liens and Negative Pledges permitted by <u>Section 6.10</u>) and upon (i) the filing of any Uniform Commercial Code financing statements with the appropriate filing offices and the recording of the Trademark Security Agreement at the U.S. Patent and Trademark Office, (ii) the delivery to the Administrative Agent of the certificates evidencing the membership or other equity interests described in such documents and (iii) the execution of control agreements among the applicable Obligor, the Administrative Agent and the applicable depositary bank with respect to each deposit account, all action necessary to perfect the security interests so created and to render them first priority Liens against the Collateral secured thereby shall have been taken and completed.  Upon recording of the Ship Mortgages at the U.S. Coast Guard National Vessel Documentation Center, all actions necessary to perfect the Liens granted thereby and render them first priority Liens against the Vessels shall have been taken and completed.   The measure, admeasure and other statistical references required for the proper issuance of Certificates of Documentation in regard to the Vessels have not changed since issuance in any respect that

-33-

would prevent their recertification.  The Mortgages create valid first priority Liens in the Collateral described therein securing the Obligations (subject only to Ordinary Course Encumbrances and other Liens and Negative Pledges permitted under Section 6.10) and, upon recordation thereof with the appropriate Governmental Agencies, all action necessary to perfect the Lien so created shall have been taken.

4.20    Hazardous Materials.  Except as set forth on Schedule 4.20, neither Holdings nor any of its Subsidiaries (i) is in violation of any Hazardous Materials Laws, (ii) has failed to possess, or be in compliance with, all permits, approvals, licenses, registrations and other governmental authorizations required under any Hazardous Materials Laws in connection with the conduct of their business and the use, ownership and operation of the Real Property, (iii) owns, leases or operates any real property contaminated with any substance that is subject to any Hazardous Materials Laws, (iv) is liable for any off-site disposal or contamination pursuant to any Hazardous Materials Laws or (v) is subject to any claim relating to any Hazardous Materials Laws and Holdings is not aware of any pending investigation which might lead to such a claim, except for any such violation, failure, contamination, liability or claim that could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

4.21    Deposit Accounts.  Each deposit, brokerage or similar account maintained by Holdings or any of its Subsidiaries as of the Closing Date is listed on Schedule 4.21.  Each deposit, brokerage or similar account described on Schedule 4.21 is covered by a Deposit Account Agreement except for (a) zero-balance accounts maintained purely for the payment of payroll and trade payables and (b) those accounts where the granting of such a Lien is prohibited by applicable Laws.

4.22    Solvency.  As to Holdings and its Subsidiaries taken as a whole, giving effect to the transactions contemplated to occur on the Closing Date, as of the Closing Date:

(a)    The fair salable value of its business is not less than the amount that will be required to be paid on or in respect of its probable liability on existing debts and other liabilities (including contingent liabilities) as they become absolute and mature.

(b)    Its assets do not constitute unreasonably small capital to carry out its business as now conducted and as proposed to be conducted including its capital needs, taking into account the particular capital requirements of its business and projected capital requirements and capital availability thereof.

(c)    It does not intend to incur debts beyond its ability to pay its debts as they mature (taking into account the timing and amounts of cash to be received by it, and of amounts to be payable on or in respect of its debts).

4.23    Transaction Documents.  Holdings has delivered to the Administrative Agent a complete and correct copy of the Plan of Reorganization (including all schedules, exhibits, amendments, supplements and modifications thereto) as confirmed by the Bankruptcy Court in the Confirmation Order, which is in full force and effect as of the Closing Date. Neither Holdings nor, to the knowledge of Holdings, any other Person party thereto is in default in the performance or compliance with any material provisions thereof.  The Plan of Reorganization complies in all material respects with all applicable Laws.

-34-

## ARTICLE 5
## AFFIRMATIVE COVENANTS

So long as any Loan remains unpaid, or any other Obligation remains outstanding (other than contingent obligations to the extent no claim giving rise thereto has been asserted), Holdings shall, and shall cause each of its Subsidiaries (including the Borrower) to, unless the Administrative Agent (with the approval of the Required Lenders) otherwise consents:

5.1     Payment of Taxes and Other Potential Liens.  Pay and discharge when due and payable all taxes, assessments and governmental charges or levies imposed upon Holdings and its Subsidiaries or their Property or any part thereof, upon its income or profits or any part thereof, except that Holdings and its Subsidiaries shall not be required to pay or cause to be paid any tax, assessment, charge or levy that is being contested in good faith by appropriate proceedings, so long as Holdings has established and maintained adequate reserves for the payment of the same and by reason of such nonpayment and contest no material item or portion of Property of Holdings or its Subsidiaries is in jeopardy of being seized, levied upon or forfeited.

5.2     Preservation of Existence.  Except as otherwise permitted under Section 6.3 or 6.4, preserve and maintain its existence in its state of organization and all authorizations, rights, franchises, privileges, consents, approvals, orders, licenses, permits, or registrations from any Governmental Agency (including any Gaming Authority) that are necessary for the transaction of its business, and qualify and remain qualified to transact business in each jurisdiction in which such qualification is necessary in view of its business or the ownership or leasing of its Properties except where the failure to preserve and maintain any such authorizations, rights, franchises, privileges, consents, approvals, orders, licenses, permits or registrations or to so qualify or remain qualified could not reasonably be expected to have a Material Adverse Effect; provided, however, that notwithstanding the foregoing, any Subsidiary of Holdings may liquidate and dissolve voluntarily if the continued existence of such Subsidiary is no longer necessary to the business of Holdings and its Subsidiaries.

5.3     Maintenance of Properties.  Maintain, preserve and protect all of its depreciable Properties in good order and condition, subject to ordinary wear and tear, casualty and condemnation, and not permit any waste of its Properties, except that the failure to maintain, preserve and protect a particular item of depreciable Property that is not of significant value, either intrinsically or to the operations of any Subsidiary, shall not constitute a violation of this covenant.

5.4     Maintenance of Insurance.

(a)     Maintain liability, casualty and other insurance (subject to customary deductibles and retention) with responsible insurance companies in such amounts and against such risks as is carried by responsible companies engaged in similar businesses and owning similar assets in the general areas in which Holdings and its Subsidiaries operate. All such insurance shall be carried through insurance companies rated A or better by A.M. Best.

(b)     In any event, Holdings and its Subsidiaries shall maintain and keep in force the following insurance (and the Administrative Agent shall not be responsible for premiums, representations and warranties to underwriters):

(i)     fire and hazards "all risk" insurance providing extended coverage in an amount not less $25,000,000 (on a combined basis for the Bossier City Facility and the

-35-

Vicksburg Facility, in each case calculated on a replacement cost basis (with no co-insurance clause));

(ii)     business interruption insurance (including insurance against income loss during a period of at least one year);

(iii)    commercial liability insurance naming on an "occurrence" basis, against claims for "personal injury" liability, including bodily injury, death or property damage liability, with an aggregate limit of not less than $25,000,000;

(iv)    worker's compensation insurance as may be required by applicable laws and subject to statutory limits (including employer's liability insurance, if required by the Required Lenders), covering all employees of Holdings and its Subsidiaries; and

(v)     if either the Bossier City Facility or the Vicksburg Facility is required to be insured pursuant to the Flood Disaster Protection Act of 1973 or the National Flood Insurance Act of 1968, and the regulations promulgated thereunder, because it is located in an area which has been identified by the Secretary of Housing and Urban Development as a Flood Hazard Area, then Holdings shall provide, maintain and keep in force at all times flood insurance covering the Property in an amount not less than the lesser of (i) the outstanding principal amount of Indebtedness secured by the applicable Mortgage, or (ii) the maximum amount of coverage made available with respect to the particular type of property under the National Flood Insurance Act of 1968, as amended by the Flood Disaster Protection Act of 1973 (or any greater limits to the extent required by applicable law from time to time).

(c)     Such policies shall name the Administrative Agent as an additional insured (except with respect to worker's compensation and employer's liability insurance) or loss payee, as applicable, and shall to the extent relevant, include a waiver of subrogation against the Administrative Agent and the Lenders, contain a provision that provides for a severability of interests, and shall provide that an act or omission by one of the insured shall not reduce or avoid coverage with respect to the other insureds. Such policies shall insure against loss or damage by hazards customarily included within "all risk" and "extended coverage" policies and any other risks or hazards which the Administrative Agent or the Required Lenders may reasonably specify (and shall include boiler and machinery insurance), shall contain a Lender's Loss Payable Endorsement in a form acceptable to the Administrative Agent in favor of the Administrative Agent and shall be primary and noncontributory with any other insurance carried by the Administrative Agent or the Lenders.

(d)     Holdings shall supply the Administrative Agent with certificates of each policy required hereunder and any other policy of insurance maintained in connection with any of the Property, and, if requested, an original or copy of each such policy and all endorsements thereto. Prior to the date when any insurance policy required hereunder expires, Holdings shall furnish the Administrative Agent with proof acceptable to the Administrative Agent that the policy has been reinstated, renewed or a new policy issued, continuing in force the insurance covered by the policy which expired. If Holdings fails to pay any such premium, the Administrative Agent shall have the right, but not the obligation, to obtain reasonable replacement coverage and advance funds to pay the premiums for it on behalf of the Lenders. Holdings shall repay the Administrative Agent immediately on demand for any advance for such premiums, which shall be considered to be an additional Loan bearing interest from the date of demand at the Default Rate.

-36-

(e)     Holdings hereby absolutely and irrevocably assigns to the Administrative Agent, and authorizes the payor to pay to the Administrative Agent, the following claims, causes of action, awards, payments and rights to payment:

(i)     all awards of damages and all other compensation payable directly or indirectly because of a condemnation, proposed condemnation or taking for public or private use which affects all or part of any Real Property or any interest therein;

(ii)     all other awards, claims and causes of action, arising out of any warranty affecting all or any part of any Real Property, or for damage or injury to or decrease in value of all or part of any Real Property or any interest in it;

(iii)     all proceeds of any insurance policies payable because of loss sustained to all or part of the Real Property; and

(iv)     all interest which may accrue on any of the foregoing.

(f)     Borrower shall immediately notify the Administrative Agent in writing if:

(i)     any damage occurs or any injury or loss is sustained in the amount of $1,000,000 or more to all or part of the Real Property, or any action or proceeding relating to any such damage, injury or loss is commenced; or

(ii)     any offer is made, or any action or proceeding is commenced, which relates to any actual or proposed condemnation or taking of all or part of the Real Property.

(g)     If the Administrative Agent chooses to do so, the Administrative Agent may in its own name appear in or prosecute any action or proceeding to enforce any cause of action based on warranty, or for damage, injury or loss to all or part of any Real Property in excess of $1,000,000, and the Administrative Agent may make any compromise or settlement of such action or proceeding.  The Administrative Agent, if it so chooses, may participate in any action or proceeding relating to condemnation or taking of all or part of any Real Property, and may join Holdings in the negotiation of losses or claims in excess of $1,000,000 covered by insurance.  Holdings hereby irrevocably appoints the Administrative Agent its true and lawful attorney in fact for all such purposes.  The power of attorney granted hereunder is coupled with an interest and is irrevocable.  Holdings shall not settle, adjust or compromise any such action or proceeding for damage, injury or loss to any Real Property in excess of $1,000,000 without the prior written consent of the Administrative Agent (not to be unreasonably withheld or delayed).

(h)     All proceeds of the insurance required pursuant to this Section (other than worker's compensation and employer's liability insurance) and proceeds of claims assigned pursuant to this Section (collectively, "Proceeds") less reimbursement of all of the Administrative Agent's reasonable out-of-pocket costs and expenses of recovering the Proceeds, including attorneys' fees, if any (collectively, "Net Claims Proceeds"), shall be applied in accordance with the provisions set forth in Section 3.1(d).

(i)     Holdings hereby specifically, unconditionally and irrevocably waives all rights of a property owner granted under applicable law, which provide for allocation of condemnation proceeds between a property owner and a lienholder, and any other law or successor statute of

-37-

NY\2522406.16

similar import.  Holdings hereby specifically, unconditionally and irrevocably waives all right to recover against the Administrative Agent or any Lender or their affiliates (or any officer, employee, agent or representative of the Administrative Agent or any Lender or its Affiliates) for any loss incurred by Holdings from any cause insured against or required by any Loan Document to be insured against; provided, however, that this waiver of subrogation shall not be effective with respect to any insurance policy if the coverage thereunder would be materially reduced or impaired as a result.

5.5     <u>Compliance With Laws</u>.  Comply with all Laws (including Gaming Laws) in all material respects.

5.6     <u>Inspection Rights</u>.  Upon reasonable prior notice, at any time during regular business hours and as often as requested (but not so as to materially interfere with the business of Holdings and its Subsidiaries), permit the Administrative Agent or any Lender, or any authorized employee, agent or representative thereof, to examine, audit and make copies and abstracts from the records and books of account of, and to visit and inspect the Properties (subject to limitations as to entry of restricted areas imposed under Gaming Laws) of, Holdings and its Subsidiaries and to discuss the affairs, finances and accounts of Holdings and its Subsidiaries with any of its officers, key employees, accountants, customers or vendors, and, upon request, furnish promptly to the Administrative Agent or any Lender true copies of all financial information made available to the senior management of Holdings and its Subsidiaries.  If no Event of Default has occurred and is continuing, the first such inspection, audit and examination by the Administrative Agent during any Fiscal Year shall be at Holdings' expense and all other inspections, audits and examinations conducted by the Administrative Agent and the Lenders during such time shall be at the expense of the Person conducting such inspection, audit or examination.  If any Event of Default has occurred and is continuing, any such inspection, audit and examination shall be at Holdings' expense.

5.7     <u>Keeping of Records and Books of Account</u>.  Keep adequate records and books of account reflecting all financial transactions in conformity with GAAP.

5.8     <u>Compliance With Agreements</u>.  Promptly and fully, in all material respects, comply with (a)  all Contractual Obligations under all material agreements, indentures, leases and/or instruments to which it is a party, whether such material agreements, indentures, leases or instruments are with a Lender or another Person and (b) the Plan of Reorganization, except that Holdings and its Subsidiaries need not comply with Contractual Obligations under any such agreements, indentures, leases or instruments then being contested by it in good faith by appropriate proceedings.

5.9     <u>Hazardous Materials Laws</u>.  Comply, and keep and maintain the Real Property and each portion thereof in compliance, in all material respects with all Hazardous Materials Laws and promptly advise Administrative Agent in writing of (a) any and all material enforcement, cleanup or removal actions instituted, completed or threatened in writing pursuant to any applicable Hazardous Materials Laws, (b) any material Release of Hazardous Materials required to be reported to Governmental Agency under any applicable Hazardous Materials Laws, (c) any and all material claims made or threatened in writing by any third party against Holdings or any of its Subsidiaries or the Real Property relating to damage, contribution, cost recovery, compensation, loss or injury resulting from any Hazardous Materials or compliance with Hazardous Materials Laws and (d) discovery by any Senior Officer of Holdings or its Subsidiaries of any occurrence or condition on any real property adjoining or in the vicinity of the Real Property that could reasonably be expected to cause the Real Property or any part thereof to be subject to any restrictions on the ownership, occupancy, transferability or use of the Real Property under any Hazardous Materials Laws.

NY\2522406.16

5.10    <u>Future Subsidiaries; Additional Security Documentation</u>.   Subject to compliance with applicable Laws:

(a)    promptly and in any event within ten Business Days after the formation or acquisition thereof, cause each Subsidiary hereafter formed or acquired by Holdings to execute and deliver to the Administrative Agent (i) a Counterpart Agreement to the Security Agreement and (ii) such other agreements, financing statements, landlord/mortgagee waivers, mortgages, deeds of trust, Ship Mortgages and other documents as the Administrative Agent or the Required Lenders may reasonably request, together with an opinion of counsel from counsel and in form and substance reasonably acceptable to the Administrative Agent;

(b)    promptly and in any event within ten Business Days after the formation or acquisition thereof, pledge to the Administrative Agent pursuant to the Security Agreement all of the Equity Interests of any Subsidiary formed or acquired after the Closing Date; and

(c)    promptly, and in any event within ten Business Days after the opening thereof, cause each deposit, brokerage or similar account maintained by Holdings or any of its Subsidiaries, other than (i) zero-balance accounts maintained purely for the payment of payroll and trade payables and (ii) those accounts where the granting of such a Lien is prohibited by applicable Laws, to be subject to a Deposit Account Agreement.

In addition to the foregoing, Holdings and its Subsidiaries shall cause such documents and instruments as may be reasonably requested by the Administrative Agent or the Required Lenders from time to time to be executed and delivered and do such further acts and things as reasonably may be required in order for the Administrative Agent to obtain a fully perfected first priority Lien on all property described in the definition of Collateral, subject to Ordinary Course Encumbrances and other Liens and Negative Pledges permitted under <u>Section 6.10</u>, as contemplated under the Plan of Reorganization and the Confirmation Order.

5.11    <u>Additional Real Property</u>.   In the event that any Obligor acquires a Material Real Estate Asset or a real estate asset owned or leased on the Closing Date becomes a Material Real Estate Asset and such interest in such Material Real Estate Asset has not otherwise been made subject to the Lien of the Collateral Documents in favor of the Administrative Agent, for the benefit of the Secured Parties, then such Obligor shall promptly take all such actions and execute and deliver, or cause to be executed and delivered, all such mortgages, documents, instruments, agreements, opinions and certificates, including those similar to those described in <u>Sections 8.1(j)</u> and <u>(k)</u> with respect to each such Material Real Estate Asset that the Administrative Agent or the Required Lenders shall reasonably request to create in favor of the Administrative Agent, for the benefit of the Secured Parties, a valid and, subject to any filing and/or recording referred to herein, perfected first priority security interest in such Material Real Estate Assets. In addition to the foregoing, Holdings shall, at the request of the Administrative Agent, deliver, from time to time, to the Administrative Agent such appraisals as are required by law or regulation of real estate assets with respect to which the Administrative Agent has been granted a Lien.

5.12    <u>Capital Expenditures</u>.   Borrower shall spend not less than $5,500,000 on Consolidated Capital Expenditures during the period commencing on the Closing Date and ending on the first anniversary of the Closing Date[6]; <u>provided</u> that such amount shall be funded only from the cash proceeds of the sale of common Equity Interests.

---

[6]    The quarterly Compliance Certificate will require information with respect to these expenditures.

NY\2522406.16

5.13    <u>Intercompany Notes</u>.  Cause each Subsidiary and Affiliate of Holdings to execute a promissory note (in a form reasonably acceptable to Administrative Agent) evidencing any Indebtedness of such Subsidiary or Affiliate to Holdings or any Subsidiary of Holdings which is in an amount of $250,000 or more and cause each payee of such promissory note to deliver the same to the Administrative Agent, with an endorsement in blank, as pledged Collateral.

5.14    <u>Debt Rating</u>.  Use commercially reasonable efforts to obtain a rating on the Loans from Moody's or any other similar credit rating service and maintain such a rating so long as the Loans remain outstanding.

ARTICLE 6
<u>NEGATIVE COVENANTS</u>

So long as any Loan remains unpaid, or any other Obligation remains outstanding (other than contingent obligations to the extent no claim giving rise thereto has been asserted), Holdings shall not, and shall not permit any of its Subsidiaries (including the Borrower) to, unless the Administrative Agent (with the approval of the Required Lenders) otherwise consents:

6.1    <u>Payment of Subordinated Obligations</u>.  Pay any principal (including sinking fund payments), interest or any other amount with respect to any Subordinated Obligation, or purchase or redeem (or offer to purchase or redeem) any Subordinated Obligation, or deposit any monies, securities or other Property with any trustee or other Person to provide assurance that any amount in respect of any Subordinated Obligation will be paid or otherwise provide for the defeasance of any Subordinated Obligation.

6.2    <u>Prepayment of the Second Lien Term Debt</u>. (a) Make any voluntary prepayment of principal or any payment of interest with respect to the Second Lien Term Debt, or voluntarily purchase or redeem (or offer to purchase or redeem) any of the principal with respect to the Second Lien Term Debt, or deposit any monies, securities or other Property with any trustee or other Person to provide assurance that the principal with respect to the Second Lien Term Debt will be paid when due or otherwise to provide for the defeasance of any of the principal with respect to the Second Lien Term Debt, in each case, except as otherwise not prohibited under the Intercreditor Agreement; <u>provided</u>, <u>however</u>, that so long as no Default or Event of Default has occurred and remains continuing or would result therefrom, (i) Borrower may make regularly scheduled payments of interest with respect to the Second Lien Term Debt and (ii) commencing with the Fiscal Quarter ending [_____][7], Borrower may make such payment, purchase, redemption, offer or deposit in respect of the principal of the Second Lien Term Debt to the extent of the then unutilized Holdings Retained ECF Amount or (b) amend, waive or otherwise modify any term of any Second Lien Loan Document except as permitted by the Intercreditor Agreement.[8]

6.3    <u>Disposition of Property</u>.  Make any Disposition of its Property, whether now owned or hereafter acquired, except for Permitted Dispositions made when no Default or Event of Default exists.

---

[7]    The last day of the first Fiscal Quarter commencing after the first anniversary of the Closing Date.

[8]    Among other restrictions, the Intercreditor Agreement will prohibit amendments to the definition of "Change of Control" in the Second Lien Credit Agreement.

-40-

6.4    <u>Investments and Acquisitions; Mergers</u>.    Make any Acquisition or enter into any agreement to make any Acquisition, or make or suffer to exist any Investment, or enter into any merger or consolidation, except for the following:

(a)    the Acquisition or transfer of property from Holdings to any Subsidiary (if such Subsidiary is an Obligor) or from any Subsidiary to Holdings or another Subsidiary (if such Subsidiary is an Obligor);

(b)    Investments existing on the Closing Date and disclosed on <u>Schedule 6.4</u> (including any reinvestments thereof);

(c)    Investments by the Borrower or any Subsidiary in the Initial Subsidiaries and in other wholly-owned Subsidiaries (which are Obligors);

(d)    Investments by Subsidiaries of Holdings in Borrower;

(e)    Investments consisting of cash and Cash Equivalents;

(f)    Investments consisting of loans and advances to employees for travel and relocation expenses in the ordinary course of business and for other expenses not to exceed $200,000 in the aggregate at any time outstanding;

(g)    credit extensions to gaming customers in the ordinary course of business consistent with industry practices;

(h)    Investments in stock, obligations, or securities received (i) in settlement of debts created in the ordinary course of business and owing to Holdings or any Subsidiary, (ii) in satisfaction of  judgments, or (iii) pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of trade creditors or customers;

(i)    Indebtedness and Contingent Obligations permitted by <u>Section 6.11</u>;

(j)    To the extent any Restricted Payment permitted by <u>Section 6.6</u> would constitute an Investment, such Restricted Payment;

(k)    Other Investments not to exceed $1,500,000 at any one time outstanding; and

(l)    the merger or consolidation of any Subsidiary with Borrower (so long as Borrower is the survivor of such merger or consolidation) or any other Subsidiary (so long as any Subsidiary that is an Obligor is the survivor of such merger or consolidation).

6.5    <u>Tender Offers</u>.    Except for investments permitted by <u>Section 6.4</u>, make any offer to purchase or acquire, or consummate a purchase or acquisition of the capital stock of any corporation or other business entity.

6.6    <u>Restricted Payments</u>.    Make any Restricted Payment, whether from capital, income or otherwise, and whether in Cash or other Property; <u>provided</u>, that:

(a)    any Subsidiary of Holdings may make Distributions to Holdings or to any Subsidiary of Holdings which is an Obligor;

-41-

NY\2522406.16

(b)      so long as no Default or Event of Default has occurred and remains continuing or would result therefrom, Borrower may make Distributions to Holdings and Holdings may make Distributions to the holders of its Equity Interests at any time after the completion of the Fiscal Quarter ending [_____][9] (but not more frequently than once each Fiscal Quarter, and only to the extent all prepayments of the Loans required pursuant to Section 3.1(d)(iv) with respect to such Fiscal Quarter have been made as required by Section 3.1(d)(iv)) in an amount not to exceed the Holdings Retained ECF Amount as of the date of such proposed distribution if, but only if, after giving effect thereto, (1) the Minimum Cash Requirement is met and (2) Holdings shall reasonably believe that all material costs and expenses of Holdings and its Subsidiaries have been paid or accrued and that Holdings and its Subsidiaries have sufficient cash to meet their respective obligations in the ordinary course of business at the time of any such Distribution; and

(c)      Borrower may make Restricted Payments in accordance with Section 6.2.

6.7    ERISA.

(a)      At any time, in such case if to do so could reasonably be expected to have a Material Adverse Effect, to:

(i)      engage in or permit any non-exempt "prohibited transaction", as such term is defined in Section 4975 of the Code, with respect to any Pension Plan;

(ii)      incur or permit the incurrence of any material violation of the minimum funding standard set forth in Section 302 of ERISA, with respect to any Pension Plan; or

(iii)      permit a Termination Event to occur which could reasonably be expected to result in liability of Holdings or any of its ERISA Affiliates to a Pension Plan or to the PBGC or the imposition of a Lien on the Property of Holdings or any of its ERISA Affiliates pursuant to Section 4068 of ERISA.

(b)      Fail, upon a Responsible Official of Holdings becoming aware thereof, promptly to notify the Administrative Agent of the occurrence of any "reportable event" (as defined in Section 4043 of ERISA, other than an reportable event for which the requirement to provide 30-day notice to the PBGC has been waived) or of any non-exempt "prohibited transaction" (as defined in Section 4975 Holdings the Code) with respect to any Pension Plan which is maintained by Holdings or to which Holdings is obligated to contribute on behalf of its employees or any trust created thereunder which may reasonably be expected to give rise to a liability to the Holdings or its Affiliates in an amount which is in excess of $100,000.

(c)      At any time, permit any Pension Plan which is maintained by Holdings or to which Holdings is obligated to contribute on behalf of its employees to fail to comply with ERISA or other applicable Laws in any respect that could reasonably be expected to result in a Material Adverse Effect.

6.8    Change in Nature of Business.    (a) Make any material change in the nature of the business of Holdings and its Subsidiaries as presently conducted; (b) in the case of Holdings, engage in any business or activity or own any assets other than (i) holding 100% of the Equity Interests of the Initial Subsidiaries; (ii) performing its obligations and activities incidental thereto under the Loan Documents,

---

[9]      The last day of the first Fiscal Quarter commencing after the first anniversary of the Closing Date.

NY\2522406.16

and to the extent not inconsistent therewith, the Related Agreements; and (iii) making Restricted Payments and Investments to the extent permitted by this Agreement; or (c) fail to hold itself out to the public as a legal entity separate and distinct from all other Persons.

6.9     <u>Amendments or Waivers of Organizational Documents, Certain Related Agreements and Gaming Approvals</u>.  Amend, restate, supplement, waive or otherwise modify, in any manner adverse to the Lenders (i) any of its Organizational Documents; (ii) any of its material rights under any Related Agreement; or (iii) alter or waive any of its rights under any Gaming Approval.

6.10    <u>Liens; Negative Pledges; Sales and Leasebacks</u>.  Create, incur, assume or suffer to exist any Lien of any nature upon or with respect to any of its Property, whether now owned or hereafter acquired; or suffer to exist any Negative Pledge with respect to any of its Property; or engage in any sale and leaseback transaction with respect to any of its Property, except:

(a)     Ordinary Course Encumbrances;

(b)     Liens and Negative Pledges existing under the Loan Documents;

(c)     Liens and Negative Pledges in favor of the Second Lien Agent and lenders under the Second Lien Loan Documents, securing solely the Second Lien Term Debt, and on collateral which is subject to the Liens granted pursuant to the Loan Documents, which Liens are subordinated in the manner and to the extent described in the Intercreditor Agreement;

(d)     existing Liens and Negative Pledges disclosed on <u>Schedule 6.10</u>; <u>provided</u>, that the obligations secured thereby are not increased;

(e)     Liens securing Purchase Money Indebtedness permitted by <u>Section 6.11(d)</u> and Negative Pledges; <u>provided</u>, that such Liens only attach to the assets purchased, constructed or improved in whole or in part with the proceeds of such Indebtedness;

(f)     Negative Pledges in favor of the Second Lien Term Debt, or successive refinancings thereof, which do not  prohibit the granting of Liens to secure the Obligations or Indebtedness which refinances the Obligations; and

(g)     Liens incurred in connection with the extension, renewal or refinancing of the Indebtedness secured by the Liens described in clauses (c), (d) or (e) above; <u>provided</u>, that any extension, renewal or replacement Lien (i) is limited to the property covered by the existing Lien and (ii) secures Indebtedness which is permitted by <u>Section 6.11</u>.

6.11    <u>Indebtedness and Contingent Obligations</u>.  Create, incur, assume or suffer to exist any Indebtedness or Contingent Obligation, except for the following:

(a)     existing Indebtedness and Contingent Obligations disclosed on <u>Schedule 6.11</u> and refinancings, renewals and replacements thereof which do not increase the amount thereof;

(b)     Indebtedness and Contingent Obligations existing under the Loan Documents;

(c)     the Second Lien Term Debt in an aggregate principal amount not to exceed $36,000,000 <u>plus</u> Contingent Obligations in respect thereof granted by Holdings and its Subsidiaries which have guaranteed the Obligations;

-43-

(d)      (i) Purchase Money Indebtedness (other than Indebtedness represented by Capital Leases) in an aggregate principal amount not to exceed $2,500,000 and Contingent Obligations of Holdings and other Subsidiaries in respect thereof and (ii) Purchase Money Indebtedness represented by Capital Leases in an aggregate principal amount not to exceed $3,500,000 and Contingent Obligations of Holdings and other Subsidiaries in respect thereof;

(e)      Contingent Obligations consisting of customary indemnifications entered into by Holdings or its Subsidiaries in any contract, lease or license entered into in the ordinary course of business;

(f)      Indebtedness of Holdings to any other Guarantor and of any Subsidiary to any Guarantor;

(g)      Indebtedness with respect to surety, appeal, indemnity, performance or other similar bonds in the ordinary course of business (including surety or similar bonds issued in connection with the stay of a proceeding of the type described in Section 9.1(i));

(h)      Indebtedness arising from the endorsement of instruments for collection in the ordinary course of business;

(i)      Contingent Obligations of Holdings or any Subsidiary with respect to Indebtedness permitted under this Section 6.11 or where the primary obligation is permitted by this Agreement;

(j)      Indebtedness and Contingent Obligations in respect of Taxes, assessments or governmental charges to the extent the payment thereof shall not at the time be due and payable or with respect to which any Obligor is contesting the amount or validity thereof in accordance with Section 5.1;

(k)      Indebtedness and Contingent Obligations consisting of the financing of insurance premiums in the ordinary course of business with respect to insurance maintained pursuant to this Agreement;

(l)      reimbursement obligations of Holdings and its Subsidiaries with respect to letters of credit issued for the benefit of workers' compensation insurance, gaming bonds (and other regulatory requirements) and utilities; and

(m)      other Indebtedness in an amount not to exceed $2,000,000 at any one time outstanding; provided, however that Indebtedness represented by Capital Leases shall not reduce amounts available under this clause (m).

6.12   Transactions with Affiliates.  Enter into any transaction of any kind with any Affiliate of Holdings or any of its Subsidiaries which has not guaranteed the Obligations other than (a) transactions on terms at least as favorable to Holdings and its Subsidiaries as would be the case in an arm's-length transaction between unrelated parties of equal bargaining power, the terms of which are disclosed to the Administrative Agent in writing, (b) the transactions consummated in accordance with the Plan of Reorganization and the Confirmation Order, (c) the transactions described on Schedule 6.12 hereto, (d) reasonable salaries and other reasonable employee compensation and benefits provided to officers and directors of Holdings and its Subsidiaries, (e) usual and customary compensation, expense reimbursements for travel expenses and fees to directors, officers and managers of Holdings and its

-44-

Subsidiaries and (f) Investments by Principal in the Real Property in an amount not to exceed $5,000,000. In addition, if any such transaction or series of related transactions involves payments in excess of $100,000 in the aggregate, then either (i) such transaction shall be approved by the board of directors of Holdings and Principal in good faith or (ii) Holdings shall deliver to the Administrative Agent (for delivery to the Lenders) a letter addressed to Holdings from an accounting, appraisal or investment banking firm, in each case of nationally recognized standing that is (A) in the good faith determination of Holdings qualified to render such letter and (B) reasonably satisfactory to the Administrative Agent, which letter states that such transaction is on terms that are no less favorable to Holdings or its relevant Subsidiary, as applicable, than would be obtained in a comparable arm's-length transaction with a Person that is not an Affiliate.

6.13    Capital Expenditures.  Incur Consolidated Capital Expenditures:

(a)    during the remainder of the Fiscal Year following the expiration of the Unrestricted Period, in an aggregate amount more than (i) $5,000,000 minus (ii) the product of (A) the number of complete Fiscal Quarters in such Fiscal Year prior to the expiration of the Unrestricted Period and (B) $1,250,000; and

(b)    in any Fiscal Year, commencing with the first Fiscal Year following the expiration of the Unrestricted Period, in an aggregate amount more than $5,000,000 (the "Capital Expenditure Limit");

provided, however, that the Capital Expenditure Limit for any Fiscal Year may be increased by an amount equal to the excess, if any, of (i) the Capital Expenditure Limit for the immediately preceding Fiscal Year (prior to giving effect to any increase in such Capital Expenditure Limit from any carry-forward from the previous Fiscal Year) over (ii) the actual amount of Consolidated Capital Expenditures made by Borrower and its Subsidiaries during such immediately preceding Fiscal Year; provided, that in no event shall the amount carried forward from any Fiscal Year exceed $1,000,000.

6.14    Maximum Total Leverage Ratio.  Permit the Total Leverage Ratio as of the last day of any Fiscal Quarter, commencing with the Fiscal Quarter ending ____:[10], to exceed the correlative ratio set forth below:

| Each Fiscal Quarter During the Following Periods | Maximum Total Leverage Ratio |
|---|---|
| Initial Compliance Period | [___]:1.00[11] |
| For each Fiscal Quarter subsequent to the expiration of the Initial Compliance Period | The ratio (rounded to two decimal places) of Consolidated Total Debt as of the last day of the last Fiscal Quarter of the Initial Compliance Period to the amount equal to 90% of Consolidated EBITDA for the last four Fiscal Quarters of the Initial Compliance |

---

[10]    Insert last day of the Fiscal Quarter in which the Closing Date occurs.

[11]    The ratio (rounded to two decimal places) of Consolidated Total Debt as of the Closing Date to 90% of Consolidated EBITDA for the 12-month period ending on the last day of such month.

Period

6.15   <u>Amendments to Subordinated Obligations.</u>  (a) Amend or modify any term or provision of or any indenture, agreement or instrument evidencing or governing any Subordinated Obligation in any respect that will or may adversely affect the interests of the Lenders, or (b) in any event make any other amendment or modification thereto without ten Business Days prior written notice thereof to the Administrative Agent (or such shorter period to which the Administrative Agent may agree in its discretion).

6.16   <u>Prohibition Against Sale-Leaseback Transactions</u>.  Enter into any arrangement with any lender or investor or to which such lender or investor is a party providing for the leasing by Holdings or any Subsidiary of Property which has been or is to be sold or transferred by Holdings or any Subsidiary to such lender or investor or to any Person to whom funds have been or are to be advanced by such lender or investor on the security of such property or rental obligations of Holdings or any Subsidiary.

6.17   <u>Limitation on Certain Restrictive Agreements</u>.  Holdings will not permit any Subsidiary to enter into or suffer to exist any contractual obligation, which in any way restricts the ability of any Subsidiary to make any dividends or distributions, or to transfer any of its Property to Holdings, except for the following:

(a)   the Loan Documents;

(b)   the Second Lien Loan Documents;

(c)   the Related Agreements;

(d)   provisions contained in agreements governing Purchase Money Indebtedness that impose customary restrictions on the property whose acquisition, repair, improvement or construction is financed by such Purchase Money Indebtedness;

(e)   contracts for the sale of Property permitted to be sold hereunder that impose customary restrictions with respect to the ability to transfer or sell such Property; and

(f)   customary provisions contained in leases, licenses and similar agreements, including with respect to Intellectual Property entered into in the ordinary course of business.

ARTICLE 7
<u>INFORMATION AND REPORTING REQUIREMENTS</u>

7.1   <u>Financial and Business Information</u>.  So long as any Loan remains unpaid, or any other Obligation remains outstanding (other than contingent obligations to the extent no claim giving rise thereto has been asserted), Holdings shall, unless the Administrative Agent (with the approval of the Required Lenders) otherwise consents, deliver to the Administrative Agent, at Holdings' sole expense:

(a)   As soon as practicable, and in any event within 45 days after the end of each of the first three Fiscal Quarters of each Fiscal Year, (i) the consolidated and consolidating balance sheets of Holdings and its Subsidiaries as at the end of such Fiscal Quarter and (ii) consolidated and consolidating statements of income and cash flow of Holdings and its Subsidiaries for such Fiscal Quarter and for the portion of the Fiscal Year ended with such Fiscal Quarter, all in

-46-

reasonable detail.  Such financial statements shall be certified by a Senior Officer of Holdings as fairly presenting the financial condition, results of operations and cash flows of Holdings and its Subsidiaries in accordance with GAAP (other than any requirement for footnote disclosures) consistently applied, as at that date and for such periods, subject only to normal year-end accruals and audit adjustments, and shall be in comparative form with the prior period and to the Projections;

(b)     As soon as practicable, and in any event within 90 days after the end of each Fiscal Year, (i) the consolidated and consolidating balance sheets of Holdings and its Subsidiaries as at the end of such Fiscal Year and (ii) the consolidated and consolidating statements of income and cash flow of Holdings and its Subsidiaries for such Fiscal Year.  Such financial statements shall be prepared in accordance with GAAP, consistently applied (except for any inconsistency to which Holdings' independent public accountants take no exception in their audit report), and shall be accompanied by a report containing the opinion of [_____] or other independent public accountants of recognized standing selected by Holdings and reasonably satisfactory to the Administrative Agent, which report shall be based on an audit conducted in accordance with United States generally accepted auditing standards, and which opinion shall be an unqualified opinion on the basic consolidated financial statements of Holdings and its Subsidiaries;

(c)     Concurrently with the delivery of the financial statements required pursuant to Sections 7.1(a) and (b), a Compliance Certificate signed by a Senior Officer of Holdings;

(d)     Concurrently with the delivery of the financial statements referred to in Sections 7.1(a) and (b), a written discussion and analysis of the financial condition and results of operations of Holdings and its Subsidiaries in reasonable detail, including in the case of any such report delivered in connection with the financial statements referred to in Section 7.1(b), a discussion of the reasons for any significant variations from the projections for such period;

(e)     As soon as practicable, and in any event within 45 days after the commencement of each Fiscal Year, projected financial statements by Fiscal Year for each of the Fiscal Years immediately subsequent to that Fiscal Year to and including Fiscal Year **[2018]** (by Fiscal Quarter for the first such Fiscal Year), including, in each case, projected balance sheets, statements of income and statements of cash flow of Holdings and its Subsidiaries, all in reasonable detail and in any event to include projected capital expenditures;

(f)     Promptly after the same are available, copies of any written communication to Holdings or any of its Subsidiaries from any Gaming Authority relating to any proposed or threatened License Revocation with respect to Holdings or any of its Subsidiaries;

(g)     Promptly after the written request by any Lender, copies of any detailed audit reports or written recommendations submitted to Holdings and its Subsidiaries by independent accountants in connection with the accounts or books of Holdings and its Subsidiaries, or any audit of Holdings or its Subsidiaries;

(h)     Promptly after the written request by any Lender, copies of any other specific report or other document that was filed by Holdings or any of its Subsidiaries with any Governmental Agency with respect to any Gaming Facility;

-47-

(i)      Promptly after the same are filed with the U.S. Department of Labor for each Fiscal Year, a copy of the Form 5500 series report of each Pension Plan maintained by Holdings or its Subsidiaries;

(j)      Promptly upon a Senior Officer of Holdings becoming aware, and in any event within ten Business Days after becoming aware, of the occurrence of any (i) "reportable event" (as such term is defined in Section 4043 of ERISA other than a reportable event for which the requirement to provide 30-day notice to the PBGC has been waived) or (ii) non-exempt "prohibited transaction" (as such term is defined in Section 406 of ERISA or Section 4975 of the Code) in connection with any Pension Plan or any trust created thereunder, written notice specifying the nature thereof and specifying what action Holdings and its Subsidiaries are taking or proposes to take with respect thereto, and, when known, any action taken by the Internal Revenue Service with respect thereto;

(k)      As soon as practicable, and in any event within five Business Days after a Senior Officer of Holdings becomes aware of the existence of any condition or event which constitutes or could reasonably be expected to constitute a Default or Event of Default, written notice specifying the nature and period of existence thereof and specifying what action Holdings and its Subsidiaries are taking or propose to take with respect thereto;

(l)      Promptly after receipt by Holdings, a copy of any notice that Holdings or any Subsidiary is in default of its obligations under the Second Lien Loan Documents, together with a certificate of a Senior Officer of Holdings specifying the nature and period of existence of such condition and specifying what action Holdings has taken, is taking or proposes to take with respect thereto;

(m)      Promptly upon a Senior Officer of Holdings becoming aware that (i) any Person or Governmental Agency has commenced a legal proceeding with respect to a claim against Holdings or its Subsidiaries that is, in the reasonable opinion of their independent legal counsel, $1,000,000 or more in excess of the amount thereof that is fully covered by insurance (subject to applicable deductibles and retentions), (ii) any creditor or lessor under a written credit agreement with respect to Indebtedness in excess of $1,000,000 or lease involving unpaid rent in excess of $1,000,000 has asserted a default thereunder on the part of Holdings or its Subsidiaries, (iii) any Person commenced a legal proceeding with respect to a claim in excess of $1,000,000 against Holdings or its Subsidiaries under a contract that is not a credit agreement or material lease, (iv) any labor union has notified Holdings or its Subsidiaries of its intent to strike Holdings or its Subsidiaries on a date certain, which strike could reasonably be expected to have a Material Adverse Effect or (v) any other event or circumstance occurs or exists (other than matters of a general economic nature) that could reasonably be expected to have a Material Adverse Effect, in each case a written notice describing the pertinent facts relating thereto and what action Holdings and its Subsidiaries are taking or proposes to take with respect thereto; and

(n)      Such other data and information regarding Holdings and its Subsidiaries (including with respect to monthly financial data, information and results of operations) and their businesses as from time to time may be reasonably requested by the Administrative Agent or any Lender.

NY\2522406.16

# ARTICLE 8
## CONDITIONS

8.1    <u>Conditions to Effectiveness</u>.  The effectiveness of this Agreement shall be subject to the fulfillment, at or prior to the Effective Date (as defined in the Plan of Reorganization), of each of the following conditions precedent:

(a)    <u>Credit Agreement</u>.  The Administrative Agent, the Lenders, Borrower and Holdings shall have executed and delivered counterparts of this Agreement.

(b)    <u>Loan Documents</u>.  The Administrative Agent, the Lenders, Holdings and the other Obligors shall have executed and delivered such other Loan Documents and such other transaction documents as are described in the Schedule of Closing Documents attached hereto as <u>Schedule 8.1</u>.

(c)    <u>Confirmation Order</u>.  The Confirmation Order shall have been entered.  The Confirmation Order shall not have been reversed, vacated or stayed by any court, the Confirmation Order shall not have been subject to a pending appeal, and the time to appeal or seek review or rehearing or leave to appeal shall have expired.

(d)    <u>Effective Date</u>.  The Effective Date (as defined in the Plan of Reorganization) shall have occurred or shall occur contemporaneously with the effectiveness of this Agreement.

(e)    <u>Second Lien Loan Documents</u>.  The Administrative Agent shall have received complete, correct and true copies of a fully executed copy of each Second Lien Loan Document and each Second Lien Loan Document shall be in full force and effect.

(f)    <u>Amendment of Second Lien Loan Documents</u>.  Since the date of execution thereof, there shall have been no amendment, restatement, or other modification or waiver of the terms and conditions of any Second Lien Loan Document.

(g)    <u>Organizational Documents; Incumbency</u>.  The Administrative Agent shall have received, in respect of each Obligor, (i) sufficient copies of each Organizational Document as the Administrative Agent shall request, and, to the extent applicable, certified as of the Closing Date by the appropriate Governmental Agency; (ii) signature and incumbency certificates of the Responsible Officials of such Obligor; (iii) resolutions of the board of directors or similar governing body of such Obligor approving and authorizing the execution, delivery and performance of this Agreement and the other Loan Documents and the Related Agreements to which it is a party or by which it or its assets may be bound as of the Closing Date, certified as of the Closing Date by its secretary or an assistant secretary as being in full force and effect without modification or amendment; (iv) a good standing certificate from the applicable Governmental Agency of such Obligor's jurisdiction of incorporation, organization or formation and in each jurisdiction in which it is qualified as a foreign corporation or other entity to do business, each dated the Closing Date or a recent date prior thereto; and (v) such other documents as the Administrative Agent  may reasonably request.

(h)    <u>Governmental Authorizations and Consents</u>.  Each Obligor shall have obtained all authorizations, consents, approvals, orders, licenses and permits (including the Confirmation Order and those set forth on <u>Schedule 4.3</u>) from, and filings, registrations and qualifications with, all Governmental Agencies, and all consents of other Persons, in each case that are necessary or

-49-

advisable in connection with the transactions contemplated by the Loan Documents and the Related Agreements and each of the foregoing shall be in full force and effect and in form and substance reasonably satisfactory to the Administrative Agent and Lenders.   All applicable waiting periods shall have expired without any action being taken or threatened by any competent authority which would restrain, prevent or otherwise impose adverse conditions on the transactions contemplated by the Loan Documents or the Related Agreements or the financing thereof and no action, request for stay, petition for review or rehearing, reconsideration, or appeal with respect to any of the foregoing shall be pending, and the time for any applicable agency to take action to set aside its consent on its own motion shall have expired.

(i)      Related Agreements. Each Related Agreement shall be in full force and effect, shall include terms and provisions reasonably satisfactory to the Administrative Agent and Lenders, no provision thereof shall have been modified or waived in any respect determined by the Required Lenders to be material, in each case without the consent of the Administrative Agent and the transactions contemplated thereby shall have been consummated.

(j)      Real Estate Assets.  The Administrative Agent shall have received from Holdings and each applicable Obligor:

(i)      (A) ALTA mortgagee title insurance policies or unconditional commitments therefor issued by one or more title companies reasonably satisfactory to the Administrative Agent (each, a "Title Policy") with respect to the Bossier City Facility and the Vicksburg Facility (each, a "Facility" and collectively, the "Facilities"), in amounts not less than the fair market value of each Facility, together with a title report issued by a title company with respect thereto, dated not more than thirty days prior to the Closing Date and copies of all recorded documents listed as exceptions to title or otherwise referred to therein, each in form and substance reasonably satisfactory to the Administrative Agent and (B) evidence satisfactory to the Administrative Agent that such Obligor has paid to the title company or to the appropriate Governmental Agencies all expenses and premiums of the title company and all other sums required in connection with the issuance of each Title Policy and all recording and stamp taxes (including mortgage recording and intangible taxes) payable in connection with recording the Mortgages for the Facilities in the appropriate real estate records;

(ii)      (A) a completed Flood Certificate with respect to each Facility, which Flood Certificate shall (x) be addressed to the Administrative Agent and (y) otherwise comply with the Flood Program; (B)  if the Flood Certificate states that such Facility is located in a Flood Zone, Holdings' written acknowledgment of receipt of written notification from the Administrative Agent (x) as to the existence of such Facility and (y) as to whether the community in which each Facility is located is participating in the Flood Program; and (C)  if such Facility is located in a Flood Zone and is located in a community that participates in the Flood Program, evidence that Holdings has obtained a policy of flood insurance that is in compliance with all applicable requirements of the Flood Program; and

(iii)      ALTA surveys of the Facilities certified to the Administrative Agent and dated not more than thirty days prior to the Closing Date.

-50-

(k)     Environmental Reports.  The Administrative Agent shall have received reports and other information, in form, scope and substance satisfactory to the Lenders regarding environmental matters relating to the Real Property or any leased real property.

(l)     Financial Statements; Projections.   The Lenders shall have received from Holdings the Pro Forma Balance Sheet required to be delivered pursuant to Section 4.5 and the Projections.

(m)     Evidence of Insurance.  The Administrative Agent shall have received a certificate from the applicable Obligor's insurance broker or other evidence satisfactory to the Lenders that all insurance required to be maintained pursuant to Section 5.4 is in full force and effect, together with endorsements naming the Administrative Agent, for the benefit of Secured Parties, as additional insured and loss payee thereunder to the extent required under Section 5.4.

(n)     Opinions of Counsel to Credit Parties.  The Administrative Agent shall have received originally executed copies of the favorable written opinions of (i) McAfee & Taft, a P.C., counsel for the Obligors, (ii) [Watkins Ludlam Winter & Stennis, P.A.], Mississippi counsel for the Obligors, (iii) [Taylor Porter Brooks & Phillips, L.L.P.], Louisiana counsel for the Obligors, (iv) Brantley & Associates, a P.L.C., Louisiana gaming regulatory and compliance counsel for the Obligors and (v) [_____], Federal maritime counsel for the Obligors, as to such matters as the Administrative Agent and Lenders may reasonably request, dated as of the Closing Date and in form and substance reasonably satisfactory to the Administrative Agent and Lenders (and each Obligor hereby instructs such counsel to deliver such opinions to the Administrative Agent).

(o)     Fees.  Holdings shall have paid to the Administrative Agent the fees payable on or before the Closing Date referred to in Section 3.2 and all expenses payable pursuant to Section 11.3 which have accrued to the Closing Date.

(p)     Solvency Certificate; Solvency Appraisal.   On the Closing Date, the Administrative Agent shall have received a Solvency Certificate from Holdings in form, scope and substance satisfactory to the Administrative Agent and Lenders, and demonstrating that after giving effect to the transactions contemplated to occur on the Closing Date, Holdings and its Subsidiaries, taken as a whole, satisfy each of the representations set forth in Section 4.22.

(q)     Closing Date Certificate.  Holdings shall have delivered to the Administrative Agent an originally executed Closing Date Certificate, together with all attachments thereto.

(r)     No Litigation.  There shall not exist any action, suit, investigation, litigation, proceeding, hearing or other legal or regulatory developments, pending or threatened in any court or before any arbitrator or Governmental Agency that, in the reasonable opinion of the Administrative Agent, singly or in the aggregate, materially impairs the transactions contemplated by the Related Agreements or any of the other transactions contemplated by the Loan Documents or the Related Agreements, or that could have a Material Adverse Effect.

(s)     PATRIOT Act. At least 10 days prior to the Closing Date, the Lenders shall have received all documentation and other information required by bank regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations, including the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and

-51-

Obstruct Terrorism Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001) the "PATRIOT Act").

(t)      Default; Event of Default. There shall not exist, after giving effect to the Confirmation Order, any default or potential event of default under the Second Lien Credit Agreement or any Default or Event of Default hereunder.

(u)      Representations and Warranties. The representations and warranties of Holdings, its Subsidiaries and its Affiliates contained herein and in the other Loan Documents shall be true and correct in all material respects on and as of the Closing Date to the same extent as though made on and as of that date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects on and as of such earlier date; provided, that, in each case, such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof.

## ARTICLE 9
### EVENTS OF DEFAULT AND REMEDIES UPON EVENT OF DEFAULT

9.1      Events of Default.   The existence or occurrence of any one or more of the following events, whatever the reason therefor and under any circumstances whatsoever, shall constitute an "Event of Default":

(a)      Holdings or Borrower fails to pay any principal on any of the Loans, or any portion thereof, when due; or

(b)      Holdings or Borrower fails to pay any interest or any fees payable under Article 3, or any portion thereof, any other fee or amount payable to the Lenders under any Loan Document, or any portion thereof, within two Business Days after demand therefor; or

(c)      Any failure to deliver a notice of default in the time periods required under Section 7.1(k) that is materially adverse to the interests of the Administrative Agent or the Lenders; or

(d)      Holdings or Borrower fails to perform or observe any of the covenants contained in Section 5.12, Section 7.1(a), (b) or (c) or Article 6; or

(e)      Holdings or any other Obligor fails to perform or observe any other covenant or agreement (not specified in clauses (a) through (d) above) contained in any Loan Document on its part to be performed or observed, and such failure shall not be remedied within thirty days; or

(f)      Any representation or warranty made by any Obligor in any Loan Document, or in any certificate delivered pursuant to any Loan Document by any Obligor, proves to have been incorrect in any material respect when made or reaffirmed; or

(g)      Holdings or any of its Subsidiaries (i) fails to pay the principal, or any principal installment, of any present or future indebtedness for borrowed money of $750,000 or more, or any guarantee of present or future indebtedness for borrowed money of $750,000 or more, on its part to be paid, when due (after giving effect to any applicable grace period), whether at the stated maturity, upon acceleration, by reason of required prepayment or otherwise, or (ii) fails to

-52-

perform or observe any other term, covenant or agreement on its part to be performed or observed, or suffers any event to occur, in connection with any present or future indebtedness for borrowed money of $750,000 or more, or of any guarantee of present or future indebtedness for borrowed money of $750,000 or more, if as a result of such failure or sufferance any holder or holders thereof (or an agent or trustee on its or their behalf) has the right to declare such indebtedness due before the date on which it otherwise would become due; or

(h)     Any Loan Document shall cease for any reason (other than the agreement of the Lenders) to be in full force and effect against any Obligor (other than in accordance with the terms hereof or thereof, or upon satisfaction in full of all Obligations, or as a result of any transaction permitted under <u>Section 5.1</u>, <u>6.3</u> or <u>6.4</u>) or is declared by a court of competent jurisdiction to be null and void, invalid or unenforceable in any respect which, in any such event in the reasonable opinion of the Required Lenders, is materially adverse to the interests of the Lenders; or any Obligor thereto denies that it has any or further liability or obligation under any Loan Document, or purports to revoke, terminate or rescind same; or

(i)     A judgment against Holdings or any of its Subsidiaries is entered for the payment of money in excess of $750,000 (to the extent not covered by independent third-party insurance as to which the insurer does not dispute coverage) and, absent procurement of a stay of execution, such judgment remains unbonded or unsatisfied for thirty calendar days after the date of entry of judgment, or in any event later than five days prior to the date of any proposed sale thereunder; or

(j)     Holdings or any of its Subsidiaries institutes or consents to any proceeding under a Debtor Relief Law relating to it or to all or any material part of its Property, or is unable or admits in writing its inability to pay its debts as they mature, or makes an assignment for the benefit of creditors; or applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer for it or for all or any material part of its Property; or any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer is appointed without the application or consent of Holdings or such Subsidiary and the appointment continues undischarged or unstayed for sixty calendar days; or any proceeding under a Debtor Relief Law relating to Holdings or any of its Subsidiaries or to all or any material part of its Property is instituted without the consent of Holdings or such Subsidiary and continues undismissed or unstayed for sixty calendar days; or any judgment, writ, warrant of attachment or execution or similar process is issued or levied against all or any material part of the Property of Holdings and its Subsidiaries and is not released, vacated or fully bonded within sixty calendar days after its issue or levy; or

(k)     The occurrence of a Termination Event with respect to any Pension Plan if the aggregate liability of Holdings and its ERISA Affiliates under ERISA as a result thereof exceeds $500,000; or the complete or partial withdrawal by Holdings or any of its ERISA Affiliates from any Multiemployer Plan if the aggregate liability of Holdings and its ERISA affiliates as a result thereof exceeds $500,000; or

(l)     The occurrence of an Event of Default (as such term is or may hereafter be specifically defined in any other Loan Document) under any other Loan Document; or

(m)     The occurrence of any Change of Control; or

-53-

(n)     The occurrence of any License Revocation which results in the inability of Holdings and its Subsidiaries to conduct any material portion of their gaming operations for a period of three consecutive days; or

(o)     The occurrence of any event which gives the holder or holders of any Subordinated Obligation (or an agent or trustee on its or their behalf) the right to declare such Subordinated Obligation due before the date on which it otherwise would become due, or the right to require the issuer thereof to redeem or purchase, or offer to redeem or purchase, all or any portion of any Subordinated Obligation; or the trustee for, or any holder of, a Subordinated Obligation breaches any subordination provision applicable to such Subordinated Obligation; or

(p)     A final judgment is entered by a court of competent jurisdiction that any Subordinated Obligation is not subordinated in accordance with its terms to the Obligations; or

(q)     The occurrence of any Catastrophic Event of Default.

9.2     <u>Remedies Upon Event of Default</u>.  Without limiting any other rights or remedies of the Administrative Agent or the Lenders provided for elsewhere in this Agreement, or the Loan Documents, or by applicable Law, or in equity, or otherwise:

(a)     Upon the occurrence, and during the continuance, of any Event of Default other than an Event of Default described in <u>Section 9.1(j)</u>, the Required Lenders may request the Administrative Agent to, and the Administrative Agent thereupon shall, declare all or any part of the unpaid principal of all Loans, all interest accrued and unpaid thereon and all other amounts payable under the Loan Documents to be forthwith due and payable, whereupon the same shall become and be forthwith due and payable, without protest, presentment, notice of dishonor, demand or further notice of any kind, all of which are expressly waived by Holdings.

(b)     Upon the occurrence of any Event of Default described in <u>Section 9.1(j)</u>, the unpaid principal of all Loans, all interest accrued and unpaid thereon and all other amounts payable under the Loan Documents shall be forthwith due and payable, without protest, presentment, notice of dishonor, demand or further notice of any kind, all of which are expressly waived by Holdings.

(c)     Upon the occurrence and during the continuance of any Event of Default, the Administrative Agent may, and shall at the direction of the Required Lenders, in each case without notice to (except as expressly provided for in any Loan Document) or demand upon Borrower, which are expressly waived by Borrower (except as to notices expressly provided for in any Loan Document), proceed in accordance with applicable Laws to protect, exercise and enforce their rights and remedies under the Loan Documents (including the Collateral Documents) against Borrower and any other Obligor and such other rights and remedies as are provided by Law or equity.

(d)     The order and manner in which the Lenders' rights and remedies are to be exercised shall be determined by the Required Lenders in their sole discretion, and all payments received by the Administrative Agent and the Lenders, or any of them, shall be applied first to the fees, costs and expenses (including attorneys' fees and disbursements payable pursuant to <u>Section 11.3</u>) of the Administrative Agent, acting as Administrative Agent, and of the Lenders, and thereafter paid pro rata to the Lenders in the same proportions that the aggregate Obligations owed to each Lender under the Loan Documents bear to the aggregate Obligations owed under

-54-

the Loan Documents to all the Lenders, without priority or preference among the Lenders. Regardless of how each Lender may treat payments for the purpose of its own accounting, for the purpose of computing Borrower's Obligations hereunder and under any Notes, payments shall be applied <u>first</u>, to the fees, costs and expenses of the Administrative Agent, acting as the Administrative Agent, and the Lenders, as set forth above, <u>second</u>, to the payment of accrued and unpaid interest due under any Loan Documents to and including the date of such application (ratably, and without duplication, according to the accrued and unpaid interest due under each of the Loan Documents), and <u>third</u>, to the payment of all other amounts (including principal and fees) then owing to the Administrative Agent, the Lenders or any other Secured Party under the Loan Documents.  No application of payments will cure any Event of Default, or prevent acceleration, or continued acceleration, of amounts payable under the Loan Documents, or prevent the exercise, or continued exercise, of rights or remedies of the Lenders hereunder or thereunder or at law or in equity.

ARTICLE 10
<u>THE ADMINISTRATIVE AGENT</u>

10.1   <u>Appointment and Authorization</u>.   Each Lender hereby irrevocably appoints and authorizes the Administrative Agent to take such action as agent on its behalf and to exercise such powers under the Loan Documents as are delegated to the Administrative Agent by the terms thereof or are reasonably incidental, as determined by the Administrative Agent, thereto.  This appointment and authorization is intended solely for the purpose of facilitating the servicing of the Loans and does not constitute appointment of the Administrative Agent as trustee for any Lender or as representative of any Lender for any other purpose and, <u>except</u> as specifically set forth in the Loan Documents to the contrary, the Administrative Agent shall take such action and exercise such powers only in an administrative and ministerial capacity.  The Administrative Agent is the agent of the Lenders only and does not assume any agency relationship with Holdings, either express or implied.

10.2   <u>Business Activities with Holdings</u>.  Each Lender, including the Administrative Agent, and their Affiliates may accept deposits from, lend money to and generally engage in any kind of banking, trust or other business with Holdings or any Affiliate of Holdings.  The Administrative Agent may engage in these activities in the same manner as the other Lenders as if it was not the Administrative Agent and without any duty to account therefor to the Lenders.  The Administrative Agent (and each successor Administrative Agent) need not account to any other Lender for any monies received by it for reimbursement of its costs and expenses as Administrative Agent hereunder, or for any monies received by it in its capacity as a Lender hereunder.  The Administrative Agent shall not be deemed to hold a fiduciary relationship with any Lender and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or otherwise exist against the Administrative Agent.

10.3   <u>Proportionate Interest of the Lenders in any Collateral</u>.  The Administrative Agent, on behalf of all the Lenders, shall hold in accordance with the Loan Documents all items of any collateral or interests therein received or held by the Administrative Agent.  Subject to the Administrative Agent's and the Lenders' rights to reimbursement for their costs and expenses hereunder (including attorneys' fees and disbursements and other professional services), each Lender shall have an interest in any collateral or interests therein in the same proportions that the aggregate Obligations owed such Lender under the Loan Documents bear to the aggregate Obligations owed under the Loan Documents to all the Lenders, without priority or preference among the Lenders.

NY\2522406.16

10.4    Lenders' Credit Decisions.  Each Lender agrees that it has, independently and without reliance upon the Administrative Agent, any other Lender or the directors, officers, agents, employees or attorneys of the Administrative Agent or of any other Lender, and instead in reliance upon information supplied to it by or on behalf of Borrower and upon such other information as it has deemed appropriate, made its own independent credit analysis and decision to enter into this Agreement.  Each Lender also agrees that it shall, independently and without reliance upon the Administrative Agent, any other Lender or the directors, officers, agents, employees or attorneys of the Administrative Agent or of any other Lender, continue to make its own independent credit analyses and decisions in acting or not acting under the Loan Documents.

10.5    Action by Administrative Agent.

(a)    The Administrative Agent may assume that no Default or Event of Default has occurred and is continuing, unless the Administrative Agent has received notice from Borrower stating the nature of the Default or Event of Default or has received notice from a Lender stating the nature of the Default or Event of Default and that such Lender considers the Default or Event of Default to have occurred and to be continuing.

(b)    The Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing and has only those obligations under the Loan Documents as are expressly set forth therein.

(c)    Except for any obligation expressly set forth in the Loan Documents and as long as the Administrative Agent may assume that no Event of Default has occurred and is continuing, the Administrative Agent may, but shall not be required to, exercise its discretion to act or not act, except that the Administrative Agent shall be required to act or not act upon the instructions of the Required Lenders (or of all the Lenders, to the extent required by Section 11.2) and those instructions shall be binding upon the Administrative Agent and all the Lenders; provided, that the Administrative Agent shall not be required to act or not act if to do so would, in the good faith judgment of the Administrative Agent, be contrary to any Loan Document or to applicable Law or would result, in the good faith judgment of the Administrative Agent, in substantial risk of liability to the Administrative Agent.

(d)    If the Administrative Agent has received a notice specified in clause (a), the Administrative Agent shall give notice thereof to the Lenders and shall act or not act upon the instructions of the Required Lenders (or of all the Lenders, to the extent required by Section 11.2); provided, that the Administrative Agent shall not be required to act or not act if to do so would in the good faith judgment of the Administrative Agent, be contrary to any Loan Document or to applicable Law or would result, in the good faith judgment of the Administrative Agent, in substantial risk of liability to the Administrative Agent, and except that if the Required Lenders (or all the Lenders, if required under Section 11.2) fail, for five Business Days after the receipt of notice from the Administrative Agent, to instruct the Administrative Agent, then the Administrative Agent, in its sole discretion, may act or not act as it deems advisable for the protection of the interests of the Lenders, until such time as it receives such a notice from the Required Lenders.

(e)    The Administrative Agent shall have no liability to any Lender for acting as instructed by the Required Lenders, or for refraining from acting, if so instructed by the Required Lenders (or, in each case, all the Lenders, if required under Section 11.2), notwithstanding any other provision hereof.

-56-

(f)     The Administrative Agent shall be fully justified as between itself and the Lenders in failing or refusing to take any action under this Agreement or any other Loan Document unless it shall first receive such advice or concurrence of the Required Lenders or such other requisite percentage of the Lenders as is required pursuant to Section 11.2 or it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action.

(g)     The Administrative Agent may execute any of its duties under this Agreement and the other Loan Documents by or through agents or attorneys-in-fact, and shall be entitled to advice of counsel concerning all matters pertaining to such duties.

10.6     Liability of Administrative Agent.  Neither the Administrative Agent nor any of its or its affiliates' respective directors, officers, agents, employees or attorneys shall be liable for any action taken or not taken by them under or in connection with the Loan Documents, except for their own gross negligence or willful misconduct as determined in a final non-appealable decision of a court of competent jurisdiction.  Without limitation of the foregoing, the Administrative Agent and its directors, officers, agents, employees and attorneys:

(a)     May treat the payee of any Note or owner of any interest in the Obligations as set forth in the records of the Administrative Agent as the holder thereof until the Administrative Agent receives notice of the assignment or transfer thereof, in form satisfactory to the Administrative Agent, signed by the payee, and may treat each Lender as the owner of that Lender's interest in the Obligations for all purposes of this Agreement until the Administrative Agent receives notice of the assignment or transfer thereof, in form satisfactory to the Administrative Agent, signed by that Lender.

(b)     May consult with legal counsel (including in-house legal counsel), accountants (including in-house accountants) and other professionals or experts selected by it, or with legal counsel, accountants or other professionals or experts for Holdings and its Subsidiaries or the Lenders, and shall not be liable for any action taken or not taken by it in good faith in accordance with any advice of such legal counsel, accountants or other professionals or experts.

(c)     Shall not be responsible to any Lender for any statement, warranty or representation made in any of the Loan Documents or in any notice, certificate, report, request or other statement (written or oral) given or made in connection with any of the Loan Documents.

(d)     Except to the extent expressly set forth in the Loan Documents, shall have no duty to ask or inquire as to the performance or observance by Holdings or its Affiliates of any of the terms, conditions or covenants of any of the Loan Documents or to inspect any collateral or the Property, books or records of Holdings or its Affiliates.

(e)     Will not be responsible to any Lender for the due execution, legality, validity, enforceability, genuineness, effectiveness, sufficiency or value of any Loan Document, any other instrument or writing furnished pursuant thereto or in connection therewith, or any collateral.

(f)     Will not incur any liability by acting or not acting in reliance upon any Loan Document, notice, consent, certificate, statement, request or other instrument or writing believed by it to be genuine and signed or sent by the proper party or parties.

NY\2522406.16

(g)      Will not incur any liability for any arithmetical error in computing any amount paid or payable by Borrower or any Affiliate thereof or paid or payable to or received or receivable from any Lender under any Loan Document, including, without limitation, principal, interest, Loans and other amounts; provided, that, promptly upon discovery of such an error in computation, the Administrative Agent, the Lenders and (to the extent applicable) Borrower and/or its Affiliates shall make such adjustments as are necessary to correct such error and to restore the parties to the position that they would have occupied had the error not occurred.

10.7    Indemnification.  Each Lender shall, ratably in accordance with its Pro Rata Share, indemnify and hold the Administrative Agent, its affiliates and their respective directors, officers, agents, employees and attorneys harmless against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever (including attorneys' fees and disbursements) that may be imposed on, incurred by or asserted against it or them in any way relating to or arising out of the Loan Documents (other than losses incurred by reason of the failure of Borrower and the other Obligors to pay the indebtedness owed under this Agreement) or any action taken or not taken by it as Administrative Agent thereunder, except such as result from the Administrative Agent's own gross negligence or willful misconduct as determined in a final non-appealable decision of a court of competent jurisdiction.  Without limitation on the foregoing, each Lender shall reimburse the Administrative Agent upon demand for that Lender's ratable share of any cost or expense incurred by the Administrative Agent in connection with the negotiation, preparation, execution, delivery, amendment, waiver, restructuring, reorganization (including a bankruptcy reorganization), enforcement or attempted enforcement of the Loan Documents, to the extent that Borrower or any other Obligor is required by Section 11.3 to pay that cost or expense but fails to do so upon demand.  Nothing in this Section shall entitle the Administrative Agent to recover any amount from the Lenders if and to the extent that such amount has theretofore been recovered from Borrower, and the Administrative Agent shall promptly refund amounts recovered from Borrower to Lenders which have reimbursed expenses under this Section.  The agreements in this Section shall survive the resignation or removal of the Administrative Agent and payment of the Loans and all other amounts payable hereunder.  Notwithstanding anything herein to the contrary, the Administrative Agent shall not be required to act hereunder or to advance funds or otherwise incur any financial liability in the performance of its duties or the exercise of its rights hereunder and under any other agreements or documents to which it is a party and shall in all cases be fully justified in failing or refusing to act hereunder unless it shall receive further assurances to its satisfaction from the Lenders of their indemnification obligations hereunder against any and all liability and expense that may be incurred by it by reason of taking or continuing to take or refraining from taking any such action.

10.8    Successor Administrative Agent.    The Administrative Agent may resign as Administrative Agent (i) upon thirty (30) days' notice to Borrower and the Lenders or (ii) if the Administrative Agent determines that for it to continue as Administrative Agent would result in a conflict of interest affecting the Administrative Agent, or would create an unacceptable risk of significant liability of the Administrative Agent to a third party, or would otherwise be inadvisable under prevailing standards of banking prudence, at any time, and effective immediately upon written notice to Borrower and the Lenders.  The Required Lenders may remove the Administrative Agent for any reason and appoint a successor Administrative Agent; provided, however, that, unless an Event of Default has occurred and is continuing, the consent of Borrower shall be required for such removal and appointment if (i) any Lender and its Affiliates (including its Fund Affiliates) collectively hold more than 50% of the outstanding principal amount of the Loans, or (ii) the proposed successor Administrative Agent is a Lender or an Affiliate or Fund Affiliate of a Lender.  If the Administrative Agent so resigns or is removed, (a) the Required Lenders shall appoint a successor Administrative Agent, who must be reasonably acceptable to Borrower unless an Event of Default has occurred and is continuing; provided, that if the Required

-58-

Lenders have not appointed a successor Administrative Agent within thirty (30) days after the date the resigning Administrative Agent gave notice of resignation or the date of removal, the Required Lenders shall act as Administrative Agent until a successor is chosen; (b) upon a successor's acceptance of appointment as Administrative Agent, the successor will thereupon succeed to and become vested with all the rights, powers, privileges and duties of the resigning Administrative Agent or the removed Administrative Agent; and (c) upon the effectiveness of any resignation, the resigning Administrative Agent thereupon will be discharged from its duties and obligations thereafter arising under the Loan Documents other than obligations arising as a result of any action or inaction of the resigning Administrative Agent prior to the effectiveness of such resignation.

10.9    Collateral Matters; Intercreditor Agreement.

(a)    The Administrative Agent is authorized by each Lender, without the necessity of any notice to or further consent from any Lender, and without the obligation to take any such action, to take any action with respect to any Collateral or any Collateral Document which may from time to time be necessary to perfect and maintain perfected the Liens of the Collateral Documents.

(b)    Each Lender (on its own behalf and on behalf of any Affiliate of such Lender that is a Secured Party) hereby irrevocably directs and authorizes the Administrative Agent to release any Lien granted to or held by the Administrative Agent under the Loan Documents: (i) against all of the Collateral upon the payment in full of all Loans and all other Obligations payable under this Agreement and under the other Loan Documents; (ii) against any part of the Collateral constituting Property of Holdings or its Affiliates which is sold, transferred or otherwise disposed of in connection with any transaction not prohibited by this Agreement; (iii) against any part of the Collateral constituting Property leased to Holdings or its Subsidiaries under a lease which has expired or been terminated in a transaction not prohibited by this Agreement or which will concurrently expire and which has not been and is not intended by Holdings or its Subsidiaries to be, renewed or extended; (iv) against any part of the Collateral consisting of an instrument, if the Indebtedness evidenced thereby has been paid in full; (v) against any Collateral acquired by Holdings or any of its Subsidiaries after the Closing Date and at least 80% of the cost of acquisition or construction therefor is financed with Purchase Money Indebtedness permitted by Section 6.11(d) and secured by a Lien permitted by Section 6.10(e); or (vi) if approved or consented to by those of the Lenders required by Section 11.2. Each Lender (on its own behalf and on behalf of any Affiliate of such Lender that is a Secured Party) hereby directs the Administrative Agent (and the Administrative Agent hereby agrees) to execute and deliver such termination and partial or full release statements or instruments, as applicable, and such other agreements, documents and instruments as are necessary to release Liens to be released pursuant to this Section promptly upon the effectiveness of any such release. Upon request by the Administrative Agent, the Lenders will confirm in writing the Administrative Agent's authority to release particular types or items of Collateral pursuant to this Section.

(c)    Each Lender hereby authorizes the Administrative Agent to enter into the Intercreditor Agreement, to make the representations, warranties and covenants on behalf of the Lenders therein contained, and to take such actions as it is required or authorized to take thereunder (and such other actions as are reasonably incidental thereto). Each Lender agrees to be bound by the terms of the Intercreditor Agreement.

10.10    Obligations of Borrower. Where any provision of this Agreement relating to the payment of any amounts due and owing under the Loan Documents provides that such payments shall be made by

-59-

Borrower to the Administrative Agent for the account of the Lenders, Borrower's obligations to the Lenders in respect of such payments shall be deemed to be satisfied upon the making of such payments to the Administrative Agent in the manner provided by this Agreement; provided, that nothing in this Article 10 shall otherwise limit Borrower's other obligations and duties under this Agreement and the other Loan Documents.

10.11    Credit Agreement Controls.  Insofar as the interests of the Lenders are concerned, in the event of any conflict between the terms of this Article 10 and any other provisions of this Agreement or any other Loan Document, with respect to the duties, rights and obligations of the Administrative Agent, the terms of this Article 10 shall govern and control.

10.12    Withholding Taxes.  To the extent required by any applicable law, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding tax.  If any payment has been made to any Lender by the Administrative Agent without the applicable withholding tax being withheld from such payment and the Administrative Agent has paid over the applicable withholding tax to the Internal Revenue Service, or the Internal Revenue Service or any other Governmental Agency asserts a claim that the Administrative Agent did not properly withhold tax from amounts paid to or for the account of any Lender because the appropriate form was not delivered or was not properly executed or because such Lender failed to notify the Administrative Agent of a change in circumstances which rendered the exemption from or reduction of withholding tax ineffective or for any other reason, such Lender shall indemnify the Administrative Agent fully for all amounts paid, directly or indirectly, by the Administrative Agent as Taxes or otherwise, including any penalties or interest and together with any all expenses incurred.

## ARTICLE 11
## MISCELLANEOUS

11.1    Cumulative Remedies; No Waiver.  The rights, powers, privileges and remedies of the Administrative Agent and the Lenders provided herein or in any Note or other Loan Document are cumulative and not exclusive of any right, power, privilege or remedy provided by Law or equity.  No failure or delay on the part of the Administrative Agent or any Lender in exercising any right, power, privilege or remedy may be, or may be deemed to be, a waiver thereof; nor may any single or partial exercise of any right, power, privilege or remedy preclude any other or further exercise of the same or any other right, power, privilege or remedy.  The terms and conditions of Article 8 hereof are inserted for the sole benefit of the Administrative Agent and the Lenders; the same may be waived in whole or in part, with or without terms or conditions, in respect of any Loan without prejudicing the Administrative Agent's or the Lenders' rights to assert them in whole or in part in respect of any other Loan.

11.2    Amendments; Consents.  (a) No amendment, modification, supplement, extension, termination or waiver of any provision of this Agreement or any other Loan Document (other than the Fee Letter), and no consent to any departure by Borrower or any other Obligor therefrom, may in any event be effective unless in writing signed by Borrower or other relevant Obligor and the Required Lenders, and then only in the specific instance and for the specific purpose given; and, without the approval in writing of each directly adversely affected Lender, no amendment, modification, supplement, termination, waiver or consent may be effective:

(i)    to decrease the principal of, or the rate of interest payable on, any Loan, or any fee or amount payable to any Lender under the Loan Documents;

NY\2522406.16

(ii)     to postpone any date fixed for any payment of principal of, or any installment of interest on, any Loan, or extend the Maturity Date;

(iii)     to release any obligor under the Security Agreement or to release all or substantially all of the Collateral or all or substantially all of the Guarantors from the Guarantee except as expressly provided in the Loan Documents and except in connection with a "credit bid" undertaken by the Administrative Agent at the direction of the Required Lenders pursuant to Section 363(k), Section 1129(b)(2)(a)(ii) or otherwise of the Bankruptcy Code or other sale or disposition of assets in connection with an enforcement action with respect to the Collateral permitted pursuant to the Loan Documents (in which case only the consent of the Required Lenders will be needed for such release);

(iv)     to amend or modify the provisions of the definition of "Required Lenders" or "Pro Rata Share;

(v)     to amend or modify the provisions of Sections 6.17 or 11.8 or this Section 11.2(a) or any other provision of this Agreement that expressly provides that the consent of all directly adversely affected Lenders is required; or

(vi)     to consent to the assignment or transfer by any Obligor of any of its rights and obligations under any Loan Document.

Any amendment, modification, supplement, termination, waiver or consent pursuant to this Section 11.2 shall apply equally to, and shall be binding upon, all the Lenders and the Administrative Agent; provided, however, that Borrower shall provide prompt notice to the Administrative Agent of any such amendment, supplement, termination, waiver or consent to which it is not a party.  No amendment, supplement, termination, waiver or consent pursuant to this Section 11.2 may adversely affect the rights, duties or obligations of the Administrative Agent hereunder without its prior written consent.

(b)     No amendment, modification, termination or waiver of any provision of the Loan Documents, or consent to any departure by any Obligor therefrom, shall increase any commitment of any Lender over the amount thereof then in effect without the consent of such Lender; provided, no amendment, modification or waiver of any condition precedent, covenant, Default or Event of Default shall constitute an increase in any commitment of any Lender.

11.3     Costs and Expenses.  Borrower shall pay on demand the reasonable out-of-pocket costs and expenses of the Administrative Agent in connection with the negotiation, preparation, execution and delivery of the Loan Documents, and of the Administrative Agent and the Lenders in connection with the amendment, waiver, refinancing, restructuring, reorganization (including a bankruptcy reorganization) and enforcement or attempted enforcement of the Loan Documents, and any matter related thereto, including filing fees, recording fees, title insurance fees, appraisal fees, search fees and other out-of-pocket expenses and the reasonable fees and out-of-pocket expenses of any legal counsel, independent public accountants and other outside experts retained by the Administrative Agent or any Lender, and including any costs, expenses or fees incurred or suffered by the Administrative Agent or any Lender in connection with or during the course of any bankruptcy or insolvency proceedings of Holdings; provided, that (a) Administrative Agent and the Lenders shall, in connection with any such amendment, waiver, refinancing, restructuring, reorganization, enforcement or attempted enforcement of the Loan Documents, use their best efforts to avoid duplicative efforts by legal counsel on behalf of Administrative Agent and one or more Lenders, and (b) in the event that Borrower is the prevailing party in any proceeding referred

-61-

to above (other than any proceeding commenced or maintained after any bankruptcy or insolvency proceeding with respect to Holdings or any other Obligor), Borrower shall be entitled to reimbursement by the Lenders of its reasonable attorney's fees and costs.  Borrower shall pay any and all costs, expenses, fees and charges payable or determined to be payable in connection with the filing or recording of this Agreement, any other Loan Document or any other instrument or writing to be delivered hereunder or thereunder, or in connection with any transaction pursuant hereto or thereto, and shall reimburse, hold harmless and indemnify the Administrative Agent and the Lenders from and against any and all loss, liability or legal or other expense with respect to or resulting from any delay in paying or failure to pay any such cost, expense, fee or charge or that any of them may suffer or incur by reason of the failure of any Obligor to perform any of its Obligations.  Any amount payable to the Administrative Agent or any Lender under this Section shall be due and payable within ten days following the date of a written demand for payment and, if not paid when due, that thereafter shall bear interest at the Default Rate.

      11.4   <u>Nature of Lenders' Obligations</u>.  The obligations of the Lenders hereunder are several and not joint or joint and several.  Nothing contained in this Agreement or any other Loan Document and no action taken by the Administrative Agent or the Lenders or any of them pursuant hereto or thereto may, or may be deemed to, make the Lenders a partnership, an association, a joint venture or other entity, either among themselves or with Holdings or any Affiliate of Holdings.  Each Lender's obligation to make any Loan pursuant hereto is several and not joint or joint and several.  A default by any Lender will not increase the percentage of the Obligations attributable to any other Lender.  Any Lender not in default may, if it desires, assume in such proportion as the nondefaulting Lenders agree the obligations of any Lender in default, but is not obligated to do so.

      11.5   <u>Survival of Representations and Warranties</u>.  All representations and warranties made on the Closing Date and contained herein or in any other Loan Document, or in any certificate or other writing delivered by or on behalf of any one or more of the Obligors to any Loan Document, will survive the Closing Date and shall terminate one year after full payment of the Loans; <u>provided</u>, that the indemnification provided by <u>Section 11.11</u> shall survive until the expiration of all related statutes of limitation and periods of repose.  All representations and warranties contained herein or in any other Loan Document, or in any certificate or other writing delivered by or on behalf of any one or more of the Obligors to any Loan Document have been or will be relied upon by the Administrative Agent and each Lender, notwithstanding any investigation made by the Administrative Agent or any Lender or on their behalf.

      11.6   <u>Notices</u>.  Except where telephonic instructions or notices are authorized to be given herein or in any Loan Document:  (a) all notices, requests, demands, directions and other communications provided for hereunder or under any other Loan Document must be in writing and shall be personally delivered or sent by facsimile, overnight delivery, or registered or certified mail, return receipt requested to the respective addresses set forth on <u>Schedule 11.6</u> hereto or in any other applicable Loan Document or, as to any party to any Loan Document, at any other address as may be designated by it in a written notice sent to all other parties to such Loan Document in accordance with this Section.  Notice shall be effective:  (a) if personally delivered, when delivered; (b) if by facsimile, on the day of transmission thereof on a facsimile machine with confirmed answerback; (c) if by overnight delivery, the day after delivery thereof to a reputable overnight courier service, delivery charges prepaid; and (d) if mailed, at midnight on the third Business Day after deposit in the mail, postage prepaid.

      11.7   <u>Execution of Loan Documents</u>.  Unless the Administrative Agent otherwise specifies with respect to any Loan Document, this Agreement and any other Loan Document may be executed in any number of counterparts and any party hereto or thereto may execute any counterpart, each of which when executed and delivered will be deemed to be an original and all of which counterparts of this

NY\2522406.16

Agreement or any other Loan Document, as the case may be, when taken together will be deemed to be but one and the same instrument.  The execution of this Agreement or any other Loan Document by any party hereto or thereto will not become effective until counterparts hereof or thereof, as the case may be, have been executed by all the parties hereto or thereto.

11.8    Binding Effect; Assignment.

(a)     This Agreement and the other Loan Documents shall be binding upon and shall inure to the benefit of the parties hereto and thereto and their respective successors and assigns, except that Holdings and/or its Affiliates may not assign their rights hereunder or thereunder or any interest herein or therein without the prior written consent of all the Lenders.   Any assignment by Holdings or its Affiliates without the prior written consent of the Lenders shall be void; provided, that no Person other than the Lenders shall have any rights under this sentence. Each Lender represents that it is not acquiring its Loans with a view to the distribution thereof within the meaning of the Securities Act of 1933, as amended (subject to any requirement that disposition of its Loan or Loans must be within the control of such Lender).  Any Lender may at any time pledge its Loan or Loans or any instrument evidencing its rights as a Lender under this Agreement to a Federal Reserve Bank, but no such pledge shall release that Lender from its obligations hereunder or grant to such Federal Reserve Bank the rights of a Lender hereunder absent foreclosure of such pledge.

(b)     From time to time following the Closing Date, each Lender may assign to one or more Eligible Assignees all or any portion of its Loans; provided, that (i) such assignment shall be evidenced by an Assignment Agreement, a copy of which shall be furnished to the Administrative Agent and Borrower, (ii) except in the case of an assignment to an Affiliate of the assigning Lender or to another Lender, the assignment shall be in a minimum principal amount of $1,000,000, and (iii) the effective date of any such assignment shall be as specified in the Assignment Agreement, but unless the Administrative Agent otherwise agrees not earlier than the date which is five Business Days after the date the Administrative Agent has received the Assignment Agreement and the non-refundable assignment fee of $3,500 referred to below. Upon the effective date of such Assignment Agreement, the Eligible Assignee named therein shall be a Lender for all purposes of this Agreement, with the Pro Rata Share of the relevant Loans set forth therein and, to the extent of such Pro Rata Share, the assigning Lender shall be released from its further obligations under this Agreement.  Borrower agrees that it shall, if requested by the assignee Lender, execute and deliver (against delivery by the assigning Lender to Borrower of its relevant Note, if any) to such assignee Lender, a Note evidencing that assignee Lender's Pro Rata Share, and to the assigning Lender, if requested by such Lender, a Note evidencing the remaining balance Pro Rata Share retained by the assigning Lender.  Each purported transferee of any Loans shall be required to represent and warrant that it is an Eligible Assignee in the Assignment Agreement that it executes and furnishes to the Administrative Agent.

(c)     By executing and delivering an Assignment Agreement, the Eligible Assignee thereunder acknowledges and agrees that: (i) other than the representation and warranty that it is the legal and beneficial owner of the Pro Rata Share being assigned thereby free and clear of any adverse claim, the assigning Lender has made no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement or the execution, legality, validity, enforceability, genuineness or sufficiency of this Agreement or any other Loan Document; (ii) the assigning Lender has made no representation or warranty and assumes no responsibility with respect to the financial

-63-

condition of Holdings and its Subsidiaries or the performance by Holdings of the Obligations; (iii) it has received a copy of this Agreement, together with copies of the most recent financial statements delivered pursuant to Section 7.1 and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment Agreement; (iv) it will, independently and without reliance upon the Administrative Agent or any Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement; (v) it appoints and authorizes the Administrative Agent to take such action and to exercise such powers under this Agreement as are delegated to the Administrative Agent by this Agreement; and (vi) it will perform in accordance with their terms all of the obligations which by the terms of this Agreement are required to be performed by it as a Lender.

(d)     The Administrative Agent, acting for this purpose as an agent of Borrower, shall maintain at the Administrative Agent's Office a copy of each Assignment Agreement delivered to it and a register for the recordation of the names and addresses of the Lenders, and the commitment of, and principal amount of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive absent manifest error and Borrower, Holdings, the Administrative Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice. After receipt of a completed Assignment Agreement executed by any Lender and an Eligible Assignee, and receipt of an assignment fee of $3,500 from such Eligible Assignee, Administrative Agent shall provide notice thereof to Borrower and the Lenders.  In the case of concurrent assignments to Approved Funds of a Lender, only one such fee shall apply.

(e)     Each Lender may grant participations from time to time in a portion of its Pro Rata Share of the Loans to one or more banks or other financial institutions (including another Lender); provided, however, that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) the participating bank or financial institution shall not be a Lender hereunder for any purpose except, if the participation agreement so provides, for the purposes of Sections 3.3, 3.4, 11.12 and 11.16, (iv) Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement, (v) the participation interest shall be expressed as a percentage of the granting Lender's Pro Rata Share as it then exists and shall not restrict an increase in the applicable Loan, or in the granting Lender's Pro Rata Share, so long as the amount of the participation interest is not affected thereby and (vi) the consent of the holder of such participation interest shall not be required for amendments or waivers of provisions of the Loan Documents other than those which (A) extend the Maturity Date, or any date upon which any payment of any principal, fees or interest are due to the Lenders, (B) reduce any installment of principal due with respect to the Loans, the rate of interest on the Loans, or any fee payable to the Lenders, or (C) increase the amount of the Loans (only if the holder of such participation interest's Loan is also increased).  Each purported transferee of any participations in any Loans shall be required to represent and warrant that it is an Eligible Assignee in the Assignment Agreement that it executes and furnishes to the Administrative Agent.

(f)     Notwithstanding anything in this Section to the contrary, the rights of the Lenders to make assignments of, and grant participations in, their Pro Rata Shares of the Loans

-64-

shall be subject to the approval of any Gaming Authority, to the extent required by applicable Gaming Laws.

(g)     Each Lender shall promptly make such assignments of its Loans and other Obligations as may be required by the provisions of Section 11.9.

11.9     Replacement of Lenders for Unsuitability.  If pursuant to any applicable Gaming Laws, a Gaming Authority requires that a Lender be licensed, qualified or found suitable as a lender to Holdings and its Subsidiaries, and Borrower gives written notice thereof to such Lender and the Administrative Agent (the "Suitability Notice"), and such Lender fails to take such actions as may be required by such Gaming Authority pursuant to applicable Gaming Laws within thirty days after receipt of the Suitability Notice, or if such Lender is not so licensed, qualified or found suitable within the period proscribed by Gaming Laws, such Lender shall assign its interest to a willing Lender or other Eligible Assignee designated by Borrower; provided, that no Lender shall be obligated to accept any such assignment. Each such assignment shall be made pursuant to an Assignment Agreement (and without representation, warranty or covenant except as set forth in the form thereof), and shall be accompanied by the payment at par of all principal, interest, fees, expenses and other amounts owed to the assigning Lender by the assignee lender.

11.10     Sharing of Setoffs.  Each Lender severally agrees that if it, through the exercise of any right of setoff, banker's lien or counterclaim against Holdings or its Subsidiaries, or otherwise, receives payment of the Obligations held by it that is ratably more than any other Lender, through any means, receives in payment of the Obligations held by that Lender, then:  (a) the Lender exercising the right of setoff, banker's lien or counterclaim or otherwise receiving such payment shall notify the Administrative Agent and thereafter shall purchase, and shall be deemed to have simultaneously purchased, from the other Lender a participation in the Obligations held by the other Lender and shall pay to the other Lender a purchase price in an amount so that the share of the Obligations held by each Lender after the exercise of the right of setoff, banker's lien or counterclaim or receipt of payment shall be in the same proportion that existed prior to the exercise of the right of setoff, banker's lien or counterclaim or receipt of payment; and (b) such other adjustments and purchases of participations shall be made from time to time as shall be equitable to ensure that all of the Lenders share any payment obtained in respect of the Obligations ratably in accordance with each Lender's share of the Obligations immediately prior to, and without taking into account, the payment; provided, that, if all or any portion of a disproportionate payment obtained as a result of the exercise of the right of setoff, banker's lien, counterclaim or otherwise is thereafter recovered from the purchasing Lender by Holdings or its Subsidiaries or any Person claiming through or succeeding to the rights of Holdings or its Subsidiaries, the purchase of a participation shall be rescinded and the purchase price thereof shall be restored to the extent of the recovery.  Each Lender that purchases a participation in the Obligations pursuant to this Section shall from and after the purchase have the right to give all notices, requests, demands, directions and other communications under this Agreement with respect to the portion of the Obligations purchased to the same extent as though the purchasing Lender were the original owner of the Obligations purchased.  Borrower expressly consents to the foregoing arrangements and agrees that any Lender holding a participation in an Obligation so purchased may exercise any and all rights of setoff, banker's lien or counterclaim (to the extent allowed by law) with respect to the participation as fully as if the Lender were the original owner of the Obligation purchased; provided, however, that each Lender agrees that it shall not exercise any right of setoff, banker's lien or counterclaim without first obtaining the consent of the Administrative Agent.  No Lender shall exercise any right of set-off, banker's lien or counterclaim in respect of the Obligations unless an Event of Default has occurred and is continuing. Each Lender agrees to promptly notify Borrower after any such set-off or application made by such Lender; provided, that the failure to notify Borrower thereof will not affect the validity of such set-off or application.

-65-

11.11   <u>Indemnity by Borrower and Holdings</u>.   Each of Borrower and Holdings agrees to indemnify, save and hold harmless the Administrative Agent and each Lender and their Affiliates, directors, officers, agents, attorneys, employees, auditors, controlling persons and their successors and assigns of the Administrative Agent and each Lender (collectively the "<u>Indemnitees</u>") from and against: (a) any and all claims, demands, actions or causes of action that are asserted against any Indemnitee by any Person if the claim, demand, action or cause of action directly or indirectly relates to a claim, demand, action or cause of action that such Person asserts or may assert against Borrower, any Affiliate of Borrower or any officer, director or shareholder, manager or member of Borrower or Holdings in relation to the transactions described herein; (b) any and all claims, demands, actions or causes of action if the claim, demand, action or cause of action arises out of or relates to either commitment, the use or contemplated use of proceeds of any Loan, the relationship of Borrower and Holdings, on the one hand, and the Lenders under this Agreement, on the other hand, or the execution, delivery, performance, or enforcement of the Loan Documents by any party or any transaction contemplated by this Agreement; (c) any administrative or investigative proceeding by any Governmental Agency arising out of or related to a claim, demand, action or cause of action described in clauses (a) or (b) above; and (d) any and all liabilities, losses, costs or expenses (including attorneys' fees and disbursements and other professional services) that any Indemnitee suffers or incurs as a result of the assertion of any foregoing claim, demand, action or cause of action; <u>provided</u>, that no Indemnitee shall be entitled to indemnification for any loss caused by its own gross negligence or willful misconduct as determined in a final non-appealable decision of a court of competent jurisdiction.   If any claim, demand, action or cause of action is asserted against any Indemnitee, such Indemnitee shall notify Borrower, but the failure to so promptly notify Borrower shall not affect Borrower's or Holdings' obligations under this Section (but shall reduce such obligations to the extent of any increase in those obligations caused solely by such failure or delay).   Each Indemnitee may, and if requested by Borrower in writing shall, in good faith (and <u>provided</u>, that Borrower provides assurances in the form of a bond or other source of funds satisfactory to such Indemnitee of its ability to pay all amounts related to such contest) contest the validity, applicability and amount of such claim, demand, action or cause of action with counsel selected by such Indemnitee and reasonably acceptable to Borrower, and shall permit Borrower to participate in such contest.   Any Indemnitee that proposes to settle or compromise any claim or proceeding for which Borrower or Holdings may be liable for payment of indemnity hereunder shall give Borrower or Holdings, as applicable, written notice of the terms of such proposed settlement or compromise reasonably in advance of settling or compromising such claim or proceeding.   Each Indemnitee is authorized to employ counsel in enforcing its rights hereunder and in defending any claim, demand, action or cause of action covered by this Section; <u>provided</u>, that each Indemnitee shall endeavor, but shall not be obligated, in connection with any matter covered by this Section which also involves other Indemnitees, to use reasonable efforts to avoid unnecessary duplication of effort by counsel for all Indemnitees.   Any obligation or liability of Borrower or Holdings to any Indemnitee under this Section shall survive the expiration or termination of this Agreement, the resignation or removal of the Administrative Agent and the repayment of all Loans and the payment and performance of all other Obligations owed to the Lenders; <u>provided</u>, <u>however</u>, that such obligations or liabilities shall not, from and after the date on which the Loans are fully paid, be deemed Obligations for any purpose under the Loan Documents.

11.12   <u>Nonliability of the Lenders</u>.   Each of Borrower and Holdings acknowledges and agrees that:

(a)      Any inspections of any Property of Holdings or its Subsidiaries made by or through the Administrative Agent or the Lenders are for purposes of administration of the Loan Documents only and Borrower is not entitled to rely upon the same;

-66-

(b)     By accepting or approving anything required to be observed, performed, fulfilled or given to the Administrative Agent or the Lenders pursuant to the Loan Documents, neither the Administrative Agent nor the Lenders shall be deemed to have warranted or represented the sufficiency, legality, effectiveness or legal effect of the same, or of any term, provision or condition thereof, and such acceptance or approval thereof shall not constitute a warranty or representation to anyone with respect thereto by the Administrative Agent or the Lenders; and

(c)     The relationship between Borrower and the Administrative Agent and the Lenders is, and shall at all times remain, solely that of a borrower and lenders; neither the Administrative Agent nor the Lenders shall under any circumstance be construed to be partners or joint venturers of Borrower or its Affiliates; neither the Administrative Agent nor the Lenders shall under any circumstance be deemed to be in a relationship of confidence or trust or a fiduciary relationship with Borrower or its Affiliates, or to owe any fiduciary duty to Borrower or its Affiliates; neither the Administrative Agent nor the Lenders undertake or assume any responsibility or duty to Borrower or its Affiliates to select, review, inspect, supervise, pass judgment upon or inform Borrower or its Affiliates of any matter in connection with their Property or the operations of Borrower or its Affiliates; Borrower and its Affiliates shall rely entirely upon their own judgment with respect to such matters; and any review, inspection, supervision, exercise of judgment or supply of information undertaken or assumed by the Administrative Agent or the Lenders in connection with such matters is solely for the protection of the Administrative Agent and the Lenders and neither Borrower nor any other Person is entitled to rely thereon.

11.13   No Third Parties Benefited.  This Agreement is made for the purpose of defining and setting forth certain obligations, rights and duties of Borrower, Holdings, the Administrative Agent and the Lenders in connection with the Loans, and is made for the sole benefit of Borrower, Holdings, the Administrative Agent and the Lenders, and the Administrative Agent's and the Lenders' successors and assigns.  Except as specifically provided herein, no other Person shall have any rights of any nature hereunder or by reason hereof.

11.14   Confidentiality.  Each Lender and Administrative Agent agrees to hold any confidential information that it may receive from Borrower pursuant to this Agreement in confidence, except for disclosure:  (a) to other Lenders; (b) to legal counsel, accountants and other professional advisors to Borrower, the Administrative Agent or any Lender; (c) to regulatory officials having jurisdiction over the Administrative Agent or such Lender; (d) to the extent required by Law or legal process or purported to be so required by a Governmental Agency (provided, that in the event the Administrative Agent or any Lender is required or purported to be required to disclose any such confidential information, the Administrative Agent or such Lender shall endeavor promptly to notify Borrower, so that Borrower may seek a protective order or other appropriate remedy) or in connection with any legal proceeding to which the Administrative Agent or such Lender and Borrower are adverse parties; (e) to another financial institution in connection with a disposition or proposed disposition to that financial institution of all or part of such Lender's interests hereunder or a participation interest in its Loans; provided, that such disclosure is made subject to an appropriate confidentiality agreement on terms substantially similar to this Section; and (f) to prospective purchasers of any Collateral in connection with any disposition thereof; provided, that such disclosure is made subject to an appropriate confidentiality agreement on terms substantially similar to this Section.  For purposes of the foregoing, "confidential information" shall mean all information respecting Borrower, other than (i) information previously filed with any Governmental Agency and available to the public, (ii) information previously published in any public medium from a source other than, directly or indirectly, that Lender and (iii) information which becomes available to the Administrative Agent, any Lender or their respective Affiliates on a non-confidential

-67-

basis from a source other than Holdings and its Subsidiaries (unless the recipient has a reasonable basis to know that the relevant information is subject to confidentiality restrictions).  Nothing in this Section shall be construed to create or give rise to any fiduciary duty on the part of the Administrative Agent or the Lenders to Holdings or its Subsidiaries.

11.15   _Hazardous Materials Indemnity_.   Without limiting the indemnity contained in Section 11.11, Borrower hereby agrees to indemnify, hold harmless and defend (by counsel reasonably satisfactory to the Administrative Agent) each Indemnitee from and against any and all claims, losses, damages, liabilities, fines, penalties, charges, administrative and judicial proceedings and orders, judgments, remedial action requirements, enforcement actions of any kind, and all costs and expenses incurred in connection therewith (including reasonable attorneys' fees and expenses to the extent that the defense of any such action has not been assumed by Borrower), to the extent arising out of or relating to:

(a)   the presence on or under the Real Property of any Hazardous Materials, or any Releases or discharges of any Hazardous Materials on, under or from the Real Property or by Holdings or its Subsidiaries;

(b)   any contamination on or under the Real Property or affecting any natural resources, and to any contamination of any property or natural resources arising in connection with the generation, use, handling, storage, transport or disposal of any Hazardous Materials on the Real Property (irrespective of whether any of such activities were or will be undertaken in accordance with applicable Hazardous Materials Laws); and

(c)   any non-compliance with Hazardous Materials Laws by Holdings or its Subsidiaries; and

(d)   any activity carried out or undertaken on or off the Real Property in connection with the Release, handling, treatment, removal, storage, decontamination, clean-up, transport or disposal of any Hazardous Materials at any time located or present on or under the Real Property, whether by Holdings, its Affiliates or any of their respective predecessors in title, any of their respective employees, agents, contractors or subcontractors, or any third persons at any time occupying or present on the Real Property, and whether prior to or during the term of this Agreement;

provided, that no Indemnitee shall be entitled to indemnification for any losses caused by its own gross negligence or willful misconduct or for any Hazardous Materials the presence of which is caused by that Indemnitee.

11.16   _Further Assurances_.   Holdings shall (and shall cause its Subsidiaries to), at its sole expense and without expense to the Lenders or the Administrative Agent, promptly do such further acts and execute, acknowledge and deliver such further documents as the Required Lenders or the Administrative Agent from time to time reasonably requires for the assuring and confirming unto the Lenders or the Administrative Agent of the rights hereby created or intended now or hereafter so to be, or for carrying out the intention or facilitating the performance of the terms of any Loan Document.  In furtherance of and not in limitation of the foregoing, each Obligor shall take such actions as the Administrative Agent may reasonably request from time to time to ensure that the Obligations are guaranteed by all Persons required by the Loan Documents to be Guarantors and are secured by substantially all of the assets of Holdings and its Subsidiaries including all of the outstanding Equity Interests of Borrower and its Subsidiaries.

11.17   <u>Integration; Conflicting Terms</u>.   This Agreement, together with the other Loan Documents, comprises the complete and integrated agreement of the parties on the subject matter hereof and supersedes all prior agreements, written or oral, on the subject matter hereof.  In the event of any conflict between the provisions of this Agreement and those of any other Loan Document, the provisions of this Agreement shall control and govern; <u>provided</u>, that the inclusion of supplemental rights or remedies in favor of the Administrative Agent or the Lenders in any other Loan Document shall not be deemed a conflict with this Agreement.  Each Loan Document was drafted with the joint participation of the respective parties thereto and shall be construed neither against nor in favor of any party, but rather in accordance with the fair meaning thereof.

11.18   <u>Governing Law</u>.  Except to the extent otherwise expressly provided therein, each Loan Document and the rights and obligations of the parties thereunder shall be governed by, and shall be construed and enforced in accordance with, the Laws of the State of New York without regard to conflict of laws principles (other than Sections 5-1401 and 5-1402 of the New York General Obligations Law) thereof.

11.19   <u>Severability of Provisions</u>.   Any provision in any Loan Document that is held to be inoperative, unenforceable or invalid as to any party or in any jurisdiction shall, as to that party or jurisdiction, be inoperative, unenforceable or invalid without affecting the remaining provisions or the operation, enforceability or validity of that provision as to any other party or in any other jurisdiction, and to this end the provisions of all Loan Documents are declared to be severable.

11.20   <u>Independent Covenants</u>.  Each covenant in Articles 5, 6 and 7 is independent of the other covenants in those Articles; the breach of any such covenant shall not be excused by the fact that the circumstances underlying such breach would be permitted by another such covenant.

11.21   <u>Headings</u>.   Article and Section headings in this Agreement and the other Loan Documents are included for convenience of reference only and are not part of this Agreement or the other Loan Documents for any other purpose.

11.22   <u>Time of the Essence</u>.  Time is of the essence of the Loan Documents.

11.23   <u>Tax Withholding Exemption Certificates</u>.  Each Foreign Lender party from time to time to this Agreement that is entitled to a complete exemption from withholding tax with respect to payments hereunder shall deliver to Borrower (with a copy to the Administrative Agent), at the time or times prescribed by applicable law or reasonably requested by Borrower or the Administrative Agent, such properly completed and executed documentation prescribed by applicable law to evidence the right of Borrower and the Administrative Agent to permit such payments to be made without withholding.  In addition, any Lender, if requested by Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by Borrower or the Administrative Agent as will enable Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Without limiting the generality of the foregoing, any Foreign Lender shall deliver to Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the request of Borrower or the Administrative Agent), whichever of the following is applicable:

(a)   duly completed copies of Internal Revenue Service Form W-8BEN claiming eligibility for benefits of an income tax treaty to which the United States is a party;

-69-

(b)       duly completed copies of Internal Revenue Service Form W-8ECI;

(c)       in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under section 881(c) of the Code, (x) a certificate to the effect that such Foreign Lender is not (A) a "bank" within the meaning of section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of Borrower within the meaning of section 881(c)(3)(B) of the Code, or (C) a "controlled foreign corporation" described in section 881(c)(3)(C) of the Code and (y) duly completed copies of Internal Revenue Service Form W-8BEN; or

(d)       any other form prescribed by applicable law as a basis for claiming complete exemption from United States Federal withholding tax duly completed together with such supplementary documentation as may be prescribed by applicable law to permit Borrower to determine the withholding or deduction required to be made.

Each Lender that is not a Foreign Lender shall deliver to Borrower (with a copy to the Administrative Agent) duly completed copies of Internal Revenue Service Form W-9 (or successor form) on or prior to the Closing Date or on or prior to the date on which such Lender becomes a Lender under this Agreement (if after the Closing Date). Borrower shall not be required to pay any amount to a Lender under Section 3.13 to the extent that the obligation to pay such amount would not have arisen but for the failure of that Lender to comply with this Section. For the avoidance of doubt, this Section shall not require any Lender to deliver any documentation which it is not legally entitled to deliver.

11.24    Replacement of Lenders.  If any Lender requests compensation under Section 3.3, or if Borrower is required to pay any additional amount to any Lender or any Governmental Agency for the account of any Lender pursuant to Section 3.4, or if any Lender refuses to consent to any proposed amendment, consent or waiver, then Borrower may, at its sole expense and effort and so long as no Event of Default has occurred and is continuing, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 11.8), all of its interests, rights and obligations under this Agreement and the related Loan Documents to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided, that:

(a)       Borrower shall have paid to the Administrative Agent the assignment fee specified in Section 11.8(d);

(b)       such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under Section 3.3) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or Borrower (in the case of all other amounts);

(c)       in the case of any such assignment resulting from a claim for compensation under Section 3.4 or payments required to be made pursuant to Section 3.1, such assignment will result in a reduction in such compensation or payments thereafter; and

(d)       such assignment does not conflict with applicable Laws.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling Borrower to require such assignment and delegation cease to apply.

NY\2522406.16

     11.25   <u>Patriot Act</u>.  Each Lender that is subject to the Act (as hereinafter defined) and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "<u>Act</u>"), it is required to obtain, verify and record information that identifies each Obligor, which information includes the name and address of each Obligor and other information that will allow such Lender or the Administrative Agent, as applicable, to identify each Obligor in accordance with the Act.

     11.26   <u>Consent To Jurisdiction And Service Of Process</u>.  ALL JUDICIAL PROCEEDINGS BROUGHT AGAINST ANY OBLIGOR ARISING OUT OF OR RELATING HERETO OR ANY OTHER LOAN DOCUMENT, OR ANY OF THE OBLIGATIONS, MAY BE BROUGHT IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN THE BOROUGH OF MANHATTAN, CITY AND STATE OF NEW YORK.  BY EXECUTING AND DELIVERING THIS AGREEMENT, EACH PARTY, FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, IRREVOCABLY (A) ACCEPTS GENERALLY AND UNCONDITIONALLY THE NONEXCLUSIVE JURISDICTION AND VENUE OF SUCH COURTS; (B) WAIVES ANY DEFENSE OF FORUM NON CONVENIENS; (C) AGREES THAT SERVICE OF ALL PROCESS IN ANY SUCH PROCEEDING IN ANY SUCH COURT MAY BE MADE BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO THE APPLICABLE OBLIGOR AT ITS ADDRESS PROVIDED IN ACCORDANCE WITH <u>SECTION 11.6</u> OR ON CT CORPORATION, LOCATED AT 111 EIGHTH AVENUE, NEW YORK, NEW YORK 10011, AND HEREBY APPOINTS CT CORPORATION AS ITS AGENT TO RECEIVE SUCH SERVICE OF PROCESS; (D) AGREES THAT ANY AND ALL SERVICE OF PROCESS AND ANY OTHER NOTICE IN ANY SUCH ACTION, SUIT OR PROCEEDING SHALL BE EFFECTIVE AGAINST SUCH OBLIGOR IF GIVEN BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, OR BY ANY OTHER MEANS OR MAIL WHICH REQUIRES A SIGNED RECEIPT, POSTAGE PREPAID, MAILED AS PROVIDED, ABOVE. IN THE EVENT CT CORPORATION SHALL NOT BE ABLE TO ACCEPT SERVICE OF PROCESS AS AFORESAID AND IF ANY OBLIGOR SHALL NOT MAINTAIN AN OFFICE IN NEW YORK CITY, HOLDINGS SHALL, AND SHALL CAUSE ANY SUCH OBLIGOR TO, PROMPTLY APPOINT AND MAINTAIN AN AGENT QUALIFIED TO ACT AS AN AGENT FOR SERVICE OF PROCESS WITH RESPECT TO THE COURTS SPECIFIED IN THIS SECTION ABOVE, AND ACCEPTABLE TO THE ADMINISTRATIVE AGENT, AS SUCH OBLIGOR'S AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON SUCH OBLIGOR'S BEHALF SERVICE OF ANY PROCESS WHICH MAY BE SERVED IN ANY SUCH ACTION, SUIT OR PROCEEDING; (E) AGREES THAT SERVICE AS PROVIDED IN CLAUSE (C) ABOVE IS SUFFICIENT TO CONFER PERSONAL JURISDICTION OVER THE APPLICABLE OBLIGOR IN ANY SUCH PROCEEDING IN ANY SUCH COURT, AND OTHERWISE CONSTITUTES EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT; AND (F) AGREES THAT THE ADMINISTRATIVE AGENT AND THE LENDERS RETAIN THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO BRING PROCEEDINGS AGAINST ANY OBLIGOR IN THE COURTS OF ANY OTHER JURISDICTION.

     11.27   <u>Jury Trial Waiver</u>.  EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER ANY LOAN DOCUMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTY HERETO OR ANY OF THEM WITH RESPECT TO ANY LOAN DOCUMENT, OR THE TRANSACTIONS RELATED THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS

AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE SIGNATORIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

11.28   <u>Purported Oral Amendments</u>.   BORROWER, HOLDINGS AND THE LENDERS EXPRESSLY ACKNOWLEDGE THAT THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS MAY ONLY BE AMENDED OR MODIFIED, OR THE PROVISIONS HEREOF OR THEREOF WAIVED OR SUPPLEMENTED, BY AN INSTRUMENT IN WRITING THAT COMPLIES WITH <u>SECTION 11.2</u>. EACH OF BORROWER AND HOLDINGS AGREES THAT IT WILL NOT RELY ON ANY COURSE OF DEALING, COURSE OF PERFORMANCE, OR ORAL OR WRITTEN STATEMENTS BY ANY REPRESENTATIVE OF ADMINISTRATIVE AGENT OR ANY LENDER THAT DOES NOT COMPLY WITH <u>SECTION 11.2</u> TO EFFECT AN AMENDMENT, MODIFICATION, WAIVER OR SUPPLEMENT TO THE AGREEMENT OF THE OTHER LOAN DOCUMENTS.

11.29   <u>Gaming/Liquor Authorities</u>.  The Lenders acknowledge that the exercise of their rights, remedies and powers under this Agreement may be subject to the approval of relevant governmental authorities pursuant to Gaming Laws and Liquor Laws, and that (i) they may be subject to being called forward by the Gaming Authorities or the Liquor Authorities, in their discretion, for licensing or a finding of suitability, to file applications or provide other information, and (ii) such rights, remedies and powers may be exercised only to the extent that the exercise thereof does not violate any applicable provisions of the Gaming Laws and the Liquor Laws and that approvals (including prior approvals) required under applicable Gaming Laws and Liquor Laws have been obtained.  The Lenders and the Administrative Agent agree to provide all cooperation required by applicable law to the Gaming Authorities and the Liquor Authorities.

11.30   <u>Termination of Agreement</u>.   This Agreement shall terminate when all outstanding Obligations (other than any unasserted contingent or indemnification obligations) and Loans have been paid in full; <u>provided</u>, <u>however</u>, that the rights and remedies of the Administrative Agent and each Lender with respect to any representation and warranty made by any Obligor pursuant to this Agreement or any other Loan Document, and the indemnification provisions contained in this Agreement and any other Loan Document, shall be continuing and shall survive any termination of this Agreement or any other Loan Document.  Upon such termination, all Liens created under the Loan Documents shall automatically terminate and the Administrative Agent agrees to execute such lien release documentation as Borrower may reasonably request at Borrower's sole cost and expense.

[*Remainder of this page intentionally left blank; signature pages follow*]

-72-

IN WITNESS WHEREOF, the parties hereto have caused this Credit Agreement to be duly executed and delivered as of the date first above written.

BORROWER:

GLOBAL GAMING LEGENDS, LLC

By: _____
Name: _____
Title: _____

HOLDINGS:

GGL HOLDINGS, LLC

By: _____
Name: _____
Title: _____

-73-

WILMINGTON TRUST, National Association, as Administrative Agent

By:    _____
Name:  _____
Title: _____

Wilmington Trust, National Association
50 South Sixth Street, Suite 1290
Minneapolis, MN 55402
Attention:  Meghan H. McCauley
Telecopy:  (612) 217-5647
Telephone:  (612) 217-5651
Email: mmccauley@wilmingtontrust.com

NY\2522406.16

**[LENDER]**

By: _____
Name: _____
Title: _____

*Lenders:*

-75-

NY\2522406.16

<u>Schedule 8.1</u>

1. Security Agreement
2. Trademark Security Agreement
3. Multiple Indebtedness Mortgage, Collateral Assignment of Leases and Rents, Security Agreement and Fixture Filing with respect to *[Bossier City property address to be inserted]*
4. Multiple Indebtedness Mortgage, Collateral Assignment of Leases and Rents, Security Agreement and Fixture Filing with respect to *[Bossier City property address to be inserted]*
5. Vicksburg Deed of Trust
6. Preferred Ship Mortgage executed and delivered by [Global Vicksburg] in favor of the Administrative Agent, granting a first priority lien on and security interest in the vessel MARMAC 7, Official No. 648293
7. Preferred Ship Mortgage executed and delivered by [Global Louisiana] in favor of the Administrative Agent, granting a first priority lien on and security interest in the vessel THE MARGARET MARY, Official No. 1020786
8. Deposit Account Agreements *[individual DACAs to be listed once account details are obtained]*
9. Intercreditor Agreement
10. Fee Letter
11. Notes *[if any]*
12. Collateral Questionnaire
13. UCC-1 Financing Statements
14. UCC Fixture Filings
15. Pledged limited liability company/partnership certificates and related membership/partnership interest powers
16. Gaming Approval – Louisiana Gaming Control Board
17. Gaming Approval – Mississippi Gaming Commission
18. **[**Additional documents to be added as necessary**]**

NY\2522406.16

**ANNEX B**

**AMENDED AND RESTATED TERM SHEET FOR
SECOND LIEN CREDIT AGREEMENT**

See attached.

## EXHIBIT G

## SUMMARY OF CERTAIN TERMS AND CONDITIONS OF THE SECOND LIEN CREDIT AGREEMENT [1]

| | |
|---|---|
| Parties: | Global Gaming Legends, LLC ("Borrower"); GGL Holdings, LLC ("Holdings"); Wilmington Trust, National Association, as administrative agent (the "Agent"); and the lenders party thereto (each, a "Lender"). |
| Type and Amount of Facility: | A second lien facility in an aggregate principal amount of $36.0 million (the "Second Lien Facility"). |
| Loans: | Each Lender shall receive its Loan Amount on the Closing Date in accordance with the Plan of Reorganization and on the terms and subject to the conditions set forth herein and the Loans will be deemed to have been funded prior to the Closing Date.  For the avoidance of doubt, there will be no cash funding of the Loans. |
| Maturity Date: | 8 years from the Closing Date. |
| Principal Amortization: | None. |
| Interest Rate: | 10.0% from the Closing Date to the second anniversary of the Closing Date and 12.0% thereafter. |
| Payment of Interest: | Interest accrued shall be due and payable on each Quarterly Payment Date and on the Maturity Date.  Computation of interest shall be calculated on the basis of a year of 360 days and the actual number of days elapsed.  For any interest period occurring entirely after the second anniversary of the Closing Date, the Borrower may elect to pay interest -in-kind ("PIK Interest"); provided (i) Consolidated EBITDA is less than $14,000,000 for the four fiscal quarter period ending immediately prior to the conclusion of such interest period and (ii) the amount of PIK interest in any twelve month period shall not exceed $1,000,000.  If the Borrower elects to pay PIK Interest, the principal amount of the Second Lien Facility will automatically increase in an amount equal to the amount of such PIK Interest.  The Second Lien Facility shall thereafter bear interest on such increased principal amount. |

---

[1]  Capitalized terms used but not defined herein have the meanings given to them in the form of first lien credit agreement that is annexed to the Purchase Agreement as Exhibit D (the "First Lien Credit Agreement").  This summary is not intended to describe all the principal terms of the second lien credit agreement.  The terms set forth in this summary are subject in their entirety to the terms and conditions of the definitive second lien credit agreement that will be executed, which will be in form and substance substantially identical to the First Lien Credit Agreement, subject to changes necessary to accommodate the terms and concepts set forth herein.

NY\3617121.4

| | |
|---|---|
| <u>Default Interest</u>: | Upon the occurrence and during the continuance of any Event of Default, the outstanding principal amount of the Loans shall, at the option of the Required Lenders, thereafter bear interest at a fluctuating interest rate per annum which is 2% per annum higher than the otherwise applicable rate, to the fullest extent permitted by applicable laws. |
| <u>Guarantees</u>: | The obligations under the Second Lien Facility will be guaranteed by the same entities that guarantee the obligations under the First Lien Credit Agreement. |
| <u>Security</u>: | The obligations under the Second Lien Facility will be secured by a perfected second priority lien on the same assets that secure the obligations under the First Lien Facilities.  The priority of such liens and related creditors' rights will be set forth in an intercreditor agreement in form and substance reasonably acceptable to the administrative agents under the First Lien Credit Agreement and the Second Lien Facility, respectively. |
| <u>Excess Cash Flow Distributions</u>: | Substantially identical to the First Lien Credit Agreement but subject to the terms of the First Lien Credit Agreement. |
| <u>Fees, Expenses, Costs Indemnification, and Agent Fees</u>: | Substantially identical to the First Lien Credit Agreement. |
| <u>Representations and Warranties</u>: | Substantially identical to those in the First Lien Credit Agreement. |
| <u>Affirmative Covenants</u>: | Substantially identical to those in the First Lien Credit Agreement. |
| <u>Negative Covenants</u>: | Substantially identical to those in the First Lien Credit Agreement, provided that financial covenants, baskets, thresholds and comparable terms will be set back from the corresponding terms in the First Lien Credit Agreement by a percentage to be agreed. |
| <u>Total Leverage Ratio Covenant</u>: | Terms to be determined.  Expected to be somewhat more permissive than such covenant in the First Lien Credit Agreement. |
| <u>Information & Reporting Requirements</u>: | Substantially identical to those in the First Lien Credit Agreement. |
| <u>Conditions to Effectiveness</u>: | Substantially identical to those in the First Lien Credit Agreement. |
| <u>Events of Default and Remedies</u>: | Terms to be determined, but expected to be substantially similar to those in the First Lien Credit Agreement.  The Second Lien Facility will cross-default to the First Lien Credit Agreement if and only if a default thereunder is not cured or waived within a |

2

|  | 60-day period (other than upon a payment default under or acceleration of the First Lien Credit Agreement, which cross-default would be immediate). |
|---|---|
| <u>Administrative Agent Provisions</u>: | Substantially identical to the First Lien Credit Agreement. |
| <u>Governing Law</u>: | Except to the extent otherwise expressly provided in the applicable loan documents, each loan document and the rights and obligations of the parties thereunder shall be governed by, and shall be construed and enforced in accordance with, the Laws of the State of New York without regard to conflict of laws principles (other than Sections 5-1401 and 5-1402 of the New York General Obligations Law) thereof. |

3

NY\3617121.4