# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### SHREVEPORT DIVISION

|  |  |  |
|---|---|---|
| **GLOBAL GAMING LEGENDS, LLC,** *et al.* | : | |
| | : | |
| | : | |
| | : | **CIVIL ACTION NO. 5:13cv3123** |
| | : | |
| **VERSUS** | : | **JUDGE HICKS** |
| | : | |
| | : | **MAGISTRATE JUDGE HORNSBY** |
| **LEGENDS GAMING OF LOUISIANA-1, LLC,** *et al.* | : | |
| | : | |

**PLAINTIFFS' OPPOSITION TO DEBTORS' AND THE FIRST LIEN PARTIES' MOTION FOR PARTIAL SUMMARY JUDGMENT OF GLOBAL'S BREACH OF CONTRACT CLAIM AND FEASIBILITY DEFENSE AND MOTION IN LIMINE CONCERNING FEASIBILITY**

Respectfully submitted,

**GORDON, ARATA, MCCOLLAM, DUPLANTIS & EAGAN, LLC**

By:   **/s/ Louis M. Phillips**
Louis M. Phillips (La. Bar No. 10505)
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916
Telephone: (225) 381-9643
E-mail: lphillips@gordonarata.com

- AND -

Patrick ("Rick") M. Shelby (La. Bar No. 31963)
Meredith S. Grabill (La. Bar. No. 35484)
201 St. Charles Avenue, 40th Floor
New Orleans, Louisiana 70170-4000
Telephone:  (504) 582-1111
E-Mail:  pshelby@gordonarata.com
E-mail:  mgrabill@gordonarata.com

- AND -

**Dentons US LLP**
C. Michael Moore
Gene R. Besen
2000 McKinney Ave, Suite 1900
Dallas, TX  75201
Telephone:  (214) 259-0900
Facsimile:   (214) 259-0910
Email: mike.moore@dentons.com
Email: gene.besen@dentons.com

*Attorneys for Global Gaming Legends, LLC,
Global Gaming Vicksburg, LLC, Global Gaming
Solutions, LLC and Global Gaming Bossier City,
LLC*

## TABLE OF CONTENTS

**PAGE**

**INTRODUCTION**………………………………………………………………1

**PROCEDURAL BACKGROUND**………………………………………………..6

**FACTUAL BACKGROUND**……………………………………………………...7

**LAW AND ARGUMENT**……………………………………………………**14**

    **I.** **Standard Of Review For Rule 56 MotionS**………………………………..**14**

  **II.** **The Bankruptcy Code Requires That The Debtors' Amended Plan Had To Have Been Feasible**……………………………………………………..**14**

    **A.** **Debtors Are Barred by Judicial Estoppel From Attempting Now To Apply An Alternative, Incorrect Feasibility Standard Concocted To Extinguish The APA Condition Precedent That Their Plan Be Confirmed**…………………**15**

    **B.** **To Prove Feasibility, The Debtors Must Demonstrate That The Amended Plan Offered A Reasonable Probability Of Success**…………………………**19**

    **C.** **The Bankruptcy Code Requires Even A Plan Of Liquidation To Be Feasible When The Successful Performance Of Its Terms Is Dependent Or Contingent Upon Any Future, Uncertain Event**……………………………..**20**

  **III.** **The Debtors' Discussion Of Feasibility Is Fact-Intensive And Premature, Making The Attempted Bar Of The Entire Subject As A Matter Of Law Wholly Inappropriate For Summary Judgment Or A Motion In *Limine* At This Stage.24**

    **A.** **The Subject Of Whether The Amended Plan Was Feasible Is Directly Relevant To The Debtors' Ability To Prove The Elements Of Their Anticipatory Repudiation Claim**……………………………………………**25**

      *1. Whether Global repudiated the APA is an issue of fact for trial as the Debtors failed to meet their burden to show that Global "clearly and unequivocally" repudiated the APA*………………………………………………….......26

      *2. The Debtors must show that they were "ready, willing, and able" to perform their obligations under the APA, but for the alleged repudiation*…………...27

i

*3. To show their readiness, willingness, and ability to perform their obligations under the APA, but for the alleged repudiation by Global, they must show that the Amended Plan was feasible*……………………………………………30

**B. The Prevention Doctrine Does Not Preclude Evidence of Feasibility**………**32**

**IV. The Debtors Waived Their Affirmative Defenses of Novation, and Election of Remedies**……………………………………………………………………**35**

**V. Global Did Not Novate, Waive, Or Otherwise Extinguish The Debtors' Breach Of The APA**……………………………………………………………**36**

**A. The Amendment Is Not A Novation Of The APA As A Matter Of Law**……**36**

*1. The unambiguous language of the Amendment indicates no intent of the parties to effect a novation of the Debtors' obligations under the APA*……..36

*2. The consideration of parole evidence is prohibited when the language of the contract is unambiguous*……………………………………………..40

*3. Even if the Court considers parole evidence, the Debtors still failed to provide evidence that the Amendment is a novation of the APA*……………………..42

**VI. The Waiver Claim Fails**………………………………………………………**45**

**VII.   Global's Execution of the Amendment Did Not Serve as an Election of Its Remedies Precluding a Breach-of-Contract Claim**…………………………**47**

**VIII.   Global's Execution Of The Amendment Does Not Serve To Equitably Estop The Pursuit Of Its Breach-of-Contract Claim**…………………………....**49**

**CONCLUSION**…..……………………………………………………………..**51**

# TABLE OF AUTHORITIES

**PAGE**

## Cases

*A.H.A. Gen. Constr., Inc. v. N.Y. City Housing Auth.*, 699 N.E.2d 368 (1998) ........................... 32

*Airco Alloys Division, Airco Inc. v. Niagara Mohawk Power Corp.*, 430 N.Y.S.2d 179, 184 (N.Y. App. Div. 4th Dep't 1980) ................................................................. 46

*American List Corp. v. U.S. News & World Report*, 549 N.E.2d 1161 (1989) .......................... 29

*Amies v. Wesnofske*, 255 N.Y. 156 (1931) ................................................................. 34

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986) .................................. 14, 43

*Apex Pool Equip. Corp. v. Lee*, 419 F.2d 556, 562 (2d Cir. 1969) ................................. 48

*Argonaut P'ship, L.P. v. Sidek*, S.A. de C.V., No. 96-CIV-1967, 1996 WL 617335 (S.D.N.Y. Oct. 25, 1996) ................................................................. 26, 29

*Ashwood Capital, Inc. v. OTG Mgmt., Inc.*, 948 N.Y.S.2d 292 (N.Y. App. Div. 2012) ............. 37

*Bluebonnet Hotel Ventures, LLC v. Wells Fargo Bank, N.A.*, No. 13-30827, 2014 WL 2565661, at *2 (5th Cir. June 6, 2014) ................................................................. 14

*Bowes & Co. v. Am. Druggists' Ins. Co.*, 460 N.E.2d 1353 (N.Y. 1984) .................................... 37

*Brandon v. Interfirst Corp.*, 858 F.2d 266 (5th Cir. 1988) ................................. 16

*Breed v. Ins. Co. of N. Am.*, 385 N.E.2d 1280, 1283 (N.Y. 1978) ................................. 41

*Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) ................................. 14, 45, 47

*Children of Am. (Cortlandt Manor), LLC v. Pike Plaza Assocs., LLC*, 978 N.Y.S.2d 323 (N.Y. App. Div. 2d Dep't 2014) ................................................................. 26

*Consol. Edison, Inc. v. Ne. Utils.,* 426 F.3d 524 (2d Cir. 2005) ................................. 32

*Décor by Nekkei Int'l, Inc. v. Fed. Republic of Nigeria*, 497 F. Supp. 893, 908 (S.D.N.Y. 1980), *aff'd sub nom., Tex. Trading & Mill. Corp. v. Fed. Republic of Nigeria*, 647 F.2d 300 (2d Cir. 1981) ................................................................. 28

*Deforest Radio Tel. & Tel. Co. v. Triangle Radio Supply Co.*, 153 N.E. 75, 79 (N.Y. 1926) ...... 30

*ESPN, Inc. v. Comm'r of Baseball*, 76 F. Supp. 2d 383, 390 (S.D.N.Y. 1999) .......................... 48

*Ferguson v. Lion Holding, Inc.,* 478 F.Supp.2d 455 (S.D.N.Y. 2007) ................................. 32, 33

*Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgm't., L.P.*, 850 N.E.2d 653, 658 (N.Y. 2006) ................................................................. 45, 46, 47, 49

*Grennfield v. Philles Records*, 98 N.Y.2d 562 (N.Y. 2002) ................................. 40, 41

*Hallinan v. Republic Bank & Trust Co.*, 519 F. Supp. 2d 340, 352 (S.D.N.Y. 2007) ........... 48, 49

*In re 47th & Belleview Partners*, 95 B.R. 117 (Bankr. W.D. Mo. 1988) .................................... 21

iii

*In re Am. Solar King Corp.*, 90 B.R. 808 (Bankr. W.D. Tex. 1988) ............................................ 19

*In re Asia Global Crossing, Ltd.*, 326 B.R. 240 (Bankr. S.D.N.Y. 2005) .................. 26, 27, 28, 30

*In re Asia Global Crossing, Ltd.*, 326 B.R. 240, 252 (Bankr. S.D.N.Y. 2005), *adhered to in part on reargument*, 332 B.R. 520 ............................................................................................ 27

*In re AT&T Latin Am. Corp.*, 2004 Bankr. LEXIS 120, at *10 (Bankr. S.D. Fla. Jan. 26, 2004) 21

*In re Banker's Trust Co.*, 450 F.3d 121 (2d Cir. 2006) ................................................................. 33

*In re Bankston*, No. 09-10675, 2010 WL 1027806 (Bankr. W.D. La. Jan. 15, 2010) ............ 19, 20

*In re Bradlees Stores, Inc.*, 313 B.R. 565 (S.D.N.Y. 2004) ..................................................... 27, 28

*In re Broadway 401 LLC*, 2010 Bankr. LEXIS 2364, at *1 (Bankr. D. Del. Mar. 16, 2010) ...... 21

*In re Caldor, Inc.-NY*, 217 B.R. 121, 133 (Bankr. S.D.N.Y. 1998) ............................................ 46

*In re Coastal Plains, Inc.*, 179 F.3d 197 (5th Cir. 1999) ...................................................... 16, 18

*In re Cross Media Mktg. Corp.*, 367 B.R. 435 (Bankr. S.D.N.Y. 2007) ..................................... 35

*In re Cypresswood Land Partners, I*, 409 B.R. 396 (Bankr. S.D. Tex. 2009) ....................... 20, 21

*In re Food Mgmt. Group, Inc.*, 372 B.R. 171 (Bankr. S.D.N.Y. 2007) ....................................... 34

*In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 725 F.Supp. 712 (S.D.N.Y. 1989) ..................... 34

*In re Heritage Org., L.L.C.*, 375 B.R. 230 (Bankr. N.D. Tex. 2007) .......................................... 21

*In re Holmes*, 301 B.R. 911 (Bankr. M.D. Ga. 2003) ................................................................. 21

*In re Johns-Manville Corp.*, 843 F.2d 636 (2nd Cir. 1988) ................................................... 21, 22

*In re Pero Bros. Farms, Inc.*, 90 B.R. 562 (Bankr. S.D. Fla. 1988) ........................................... 21

*In re Prudential Energy Co.*, 58 B.R. 857 (Bankr. S.D.N.Y. 1986) ............................................ 19

*In re Randall's Island Family Golf Ctrs., Inc.*, 272 B.R. 521 (S.D.N.Y. 2002) .................... 25, 30

*In re Save Our Springs (S.O.S.) Alliance, Inc.*, 632 F.3d 168 (5th Cir. 2011) ................. 17, 18, 19

*In re Superior Crewboats, Inc.*, 374 F.3d 330, 334 (5th Cir. 2004) ...................................... 16, 18

*In re Travelstead*, 227 B.R. 638 (D. Md. 1998) ......................................................................... 21

*In re WorldCom, Inc.*, 06 CIV. 5245, 2007 WL 2049723 (S.D.N.Y. July 13, 2007) ............ 37, 40

*In re Yates Dev., Inc.*, 258 B.R. 36 (Bankr. M.D. Fla. 2000) ..................................................... 21

*JA Apparel Corp. v. Abboud*, 682 F. Supp.2d 294 (S.D.N.Y. 2010) ............................... 40, 42, 46

*Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988) ..................................................... 19

*Kasowitz, Benson, Torres & Friedman, LLP v. Reade*, 950 N.Y.S.2d 8 (N.Y. App. Div. 1st Dep't 2012) ................................................................................................................... 40, 41

*King World Productions, Inc. v. Financial News Network, Inc.*, 660 F. Supp. 1381, 1387 (S.D.N.Y. 1987) ................................................................................................................. 30, 31

*Koenig Iron Works, Inc. v. Sterling Factories, Inc.*, No. 89-CIV-4257, 1999 WL 178785 (S.D.N.Y. Mar. 30, 1999). ......................................................................................................... 38

*LCA Leasing Corp. v. Borvig Corp.*, 826 F. Supp. 776, 779–80 (S.D.N.Y. 1993) ...................... 38

*Lloyds Bank PIC v. Republic of Ecuador*, Nos. 1789-90, 1792-75, 1797, 1998 WL 118170, at *8 (S.D.N.Y. Mar. 16, 1998) ........................................................................................... 41

*Lynn v. Lynn*, 97 N.E.2d 748 (N.Y. 1951) .............................................................. 49, 50

*Mazzei v. Money Store*, 288 F.R.D. 45 (S.D.N.Y. 2012)................................................. 35

*MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*, 842 F. Supp. 2d 682 (S.D.N.Y. 2012) ... 35, 48, 49

*MCI LLC v. Rutgers Cas. Ins. Co.,* No. 06-CIV-4412, 2007 WL 4258190 (S.D.N.Y. 2007)...... 32

*Metropolitan Steel Industries, Inc. v. Fidelity & Deposit Co. of Maryland*, 68 A.D.2d 935, 935 (N.Y. App. Div. 1979) ............................................................................................ 38, 39

*Mobile Commc'ns Corp. of Am. v. MCI Commc'ns Corp.,* No. 81081985, 1985 WL 11574 (Del. Ch. Aug. 27, 1985).................................................................................................... 34

*Nat'l Am. Corp. v. Fed. Republic of Nigeria*, 448 F. Supp. 622, 643–44 (S.D.N.Y. 1978) ......... 42

*Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520 (2d Cir. 2004)................................ 35

*Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp*., 705 N.E.2d 656 (N.Y. 1998) . 26

*Peoples State Bank v. Gen. Elec. Capital Corp. (In re Ark-La-Tex Timber Co.)*, 482 F.3d 319, 332 (5th Cir. 2007)................................................................................................... 17

*Pesa v. Yoma Dev. Grp., Inc*., 965 N.E.2d 228 (N.Y. 2012) ........................................... 28, 29, 30

*Prudential Ins. Co. v. Monnier (In re Monnier Bros.)*, 755 F.2d 1336 (8th Cir. 1985)............... 19

*Rus, Inc. v. Bay Indus., Inc*., 322 F. Supp.2d 302, 310 (S.D.N.Y. 2003) ..................................... 30

*Sci. Applications Int'l Corp. v. State of N.Y.*, 60 A.D.3d 1257 (N.Y. App. Div. 2009) .............. 37

*Scull v. Sicoli*, 668 N.Y.S.2d 827, 828 (N.Y. App. Div. 4th Dep't 1998) .................................... 30

*Seven-Up Bottling Co. (Bangkok) v. Pepsico*, 686 F. Supp. 1015, 1023 (S.D.N.Y. 1988) ......... 48

*Smith v. Amedisys*, 298 F.3d 434, 440 (5th Cir. 2002) ............................................................. 14

*Sudul v. Computer Outsourcing Svcs., Inc.*, 917 F. Supp. 1033 (S.D.N.Y. 1996) .......... 37, 38, 39

*Thorson v. Epps,* 701 F.3d 444, 445 (5th Cir. 2012) ................................................................ 14

*Toto, Inc. v. Sony Music Entm't*, No. 12-CIV-1434, 2012 WL 6136365, at *11 (S.D.N.Y. Dec. 11, 2012) ........................................................................................................... 50

*Tradax Energy, Inc. v. Cedar Petrochemicals, Inc.*, 317 F. Supp.2d 373 (S.D.N.Y. 2004)......... 26

## Statutes

11 U.S.C. § 1129............................................................................................. 15, 18, 19, 21

## Other Authorities

RESTATEMENT (SECOND) OF CONTRACTS § 254 ....................................................... 28

## Rules

FED. R. CIV. P. 56 .............................................................................................. 14, 45, 47

**<u>Treatises</u>**

7 COLLIER ON BANKRUPTCY ¶ 1129.0301 .................................................................. 22

Global Gaming Legends, LLC, Global Gaming Vicksburg, LLC, and Global Gaming Bossier City, LLC, Global Gaming Solutions, LLC (collectively, "Plaintiffs" or "Global") submit this Opposition to *Debtors' and First Lien Parties' Motion for Partial Summary Judgment of Global's Breach of Contract Claim and Feasibility Defense and Motion in Limine Concerning Feasibility*, [ECF Doc. 57] (the "Motion"), and accompanying *Memorandum of Law in Support*, [ECF Doc. 58] ("Mem. In Support") and *Statement of Material Facts Not In Dispute* (with accompanying exhibits.) ("SOF" and "Debtors' Exhibits").[1]  For the following reasons, Global respectfully requests that this Court DENY the Motion, as there exist genuine disputes of material fact which preclude judgment in favor of the Debtors[2] and First Lien Parties[3] as a matter of law.

## INTRODUCTION

To set the context of the disputes in this lawsuit, Global submits the following introduction.  As of 2011, Debtors and the First Lien Parties had already gone through

[1]  This case was commenced by Global as an adversary proceeding (case no. 13-1007) in the bankruptcy case styled as, *In re Louisiana Riverboat Gaming Partnership, et al*., case no. 12-12013, United States Bankruptcy Court, Western District of Louisiana, Shreveport Division (the "Bankruptcy Court").  The case was subsequently consolidated with adversary proceeding No. 13-1008.  The Motion and Mem. In Support were filed by the Debtors and First Lien Parties in the consolidated adversary proceedings on October 23, 2013.  On November 15, 2013, Global filed a *Motion for Mandatory and Discretionary Withdrawal of the Reference* and *Emergency Motion To Stay Proceeding Pending District Court Ruling on Plaintiffs' Motion for Mandatory and Discretionary Withdrawal of the Reference* ("Motion to Stay") in the Bankruptcy Court.  The Bankruptcy Court granted an interim stay and on January 10, 2014, imposed a final stay of all matters concerning the adversary proceeding, including any and all discovery activity between the parties, submission dates concerning any briefs or memoranda involving any pending motions or matters, and ruling on any pending matters, until a ruling was issued by this Court on the Motion to Withdraw the Reference.  In July 2014, the parties jointly consented that the reference of 28 U.S.C. § 157(a) be withdrawn pursuant to 28 U.S.C. § 157(d) for the adversary proceeding, and on July 31, 2014, this Court granted the parties consensual withdrawal request.  [ECF Doc. 16].  The parties agreed to complete briefing on the Motion by September 25, 2014.  [ECF Doc. 18].

[2]  Legends Gaming of Louisiana-1, LLC, Legends Gaming of Louisiana-2, LLC, Legends Gaming, LLC, Legends Gaming of Mississippi, LLC, Legends Gaming of Mississippi RV Park, LLC, and Louisiana Riverboat Gaming Partnership, are collectively referred to as the "Debtors" or "Legends."

[3]  Intervenors Wilmington Trust Company, in its capacity as Administrative Agent under that certain Amended and Restated First Lien Credit Agreement with the Debtors, dated as of August 31, 2009, and the *ad hoc* group of banks and hedge funds joined together under the First Lien Credit Agreement, are collectively referred to as the "First Lien Parties."

1

bankruptcy once (a case in which a plan was confirmed by the Bankruptcy Court in 2008 (No. 08-10824 (Bankr. W.D. La.)).  Notwithstanding its prior bankruptcy case and confirmed plan, Legends could not maintain with its reorganized debt terms with the First Lien Parties and by 2011 Legends and the First Lien Parties were looking for a way out through sale of the Legends properties (two casinos located in Bossier City, Louisiana and Vicksburg, Mississippi) and the further restructuring of Legends' debt, particularly that to the First Lien Parties.  By the end of 2011, Legends and the First Lien Parties had involved Global in discussions concerning the possible purchase by Global of Legends' casino properties.  Those discussions continued until July 25, 2012, the date Global and Legends executed an Asset Purchase Agreement ("APA"). The APA was consented to as well by the First Lien Parties, who agreed to finance the majority of the transaction through a restructuring of their first lien debt to be owed by the particular Global parties who were to be purchasers under the APA (sometimes referred to as "take-back" financing).  This is a case about a deal that fell through because Debtors' and First Lien Parties' deliberately flouted their obligations under the APA.

Critically, the APA contained the requirements, among other things, that Legends (i) continue to operate in the Ordinary Course of Business[4] until closing and (ii) obtain an order of the Bankruptcy Court confirming a plan of reorganization incorporating the APA and its terms (a process that included Legends obtaining approval of a disclosure statement as required under chapter 11 of the Bankruptcy Code).[5]  The Ordinary Course of Business requirement was

---

[4]    The "Ordinary Course of Business" is defined in Section 1.1 of the APA as the "operation and conduct of the affairs of the [Debtors] in the ordinary course of business, **consistent with past practice**," which would operating the casinos as a going-concern, including the adequate capitalization of the casinos.  For this Court's convenience, Global attaches copies of the APA and the *First Amendment to the Purchase Agreement* ("Amendment") to this brief as **Exhibits 1 and 2**.

[5]    Disclosure statement approval is a necessary precondition of a chapter 11 debtor obtaining confirmation of a plan of reorganization.  The purpose of the disclosure statement is to give creditors and parties in interest sufficient

essential.  Prior to confirmation of a plan of reorganization (a process the parties anticipated would take several months), Legends and the First Lien parties would remain in control of the operations of the properties.  Even after confirmation of a plan of reorganization, the parties understood that Global's takeover of the properties would be delayed by the state regulatory process, which required approval by the Louisiana Gaming Control Board.  So, all told, the parties anticipated a 6-8 month delay after execution of the APA before Legends could deliver the properties to Global.

Maintenance of Ordinary Course of Business was, therefore, essential to the integrity of the deal.  Global would be left in limbo for three quarters of a year before it could become owner of the properties.  It was necessary, therefore, that Legends and the First Lien Parties operate the properties so that the casino revenues prior to transfer of the properties would generate the funds sufficient for maintaining the administrative, marketing, and capital expenditures necessary to sustain the businesses so that, as of delivery of the properties to Global, the capital structure, financial condition, and operations of the business would be sufficient to service the debt payments required under the confirmed plan of reorganization (which would have included the restructured debt to the First Lien Parties, all administrative expenses of the Legends bankruptcy case, obligations to employees, payments under assumed contracts, and other payments to other classes of creditors).

---

(truthful) information upon which parties can make an informed decision as to whether the plan should be confirmed and whether they should vote for or against it.  As will be shown before this Court, the Legends disclosure statement initially approved by the Bankruptcy Court contained false information that Legends knew to be false, and upon being made aware of this fact by Global, the Bankruptcy Court, despite having already approved the disclosure statement, granted in part Global's motion seeking relief from the approval order and ordered Legends to supplement the disclosure statement with **actual** financial information.  As will be shown, Legends in fact had violated the terms of the APA during the bankruptcy case, could not confirm a plan of reorganization, and rather than put its case before the Bankruptcy Court, withdrew its plan to avoid an adverse ruling (deciding tactically to sue Global instead).

The Debtors' and First Lien Parties' deliberate failure to maintain the operation of its casinos in the Ordinary Course of Business caused their financial performance to plummet in the second half of 2012, which crushed the viability of the APA, even as it was amended.  Rather than move forward with their plan of reorganization, the Debtors, with the consent of the First Lien Parties, withdrew their plan, thereby insuring that they could not perform their obligations under the APA.  Both the Debtors and the First Lien parties knew that Legends had breached the APA and that Legends would fail to obtain confirmation of a plan of reorganization under the standards imposed by the bankruptcy code and acknowledged by the Debtors themselves, including, without limitation, that the terms of the plan of reorganization be feasible (essentially that the plan would work).

The Debtors now contend, however, that confirmation of the Chapter 11 plan is irrelevant here because Global repudiated the APA before the confirmation hearing would have occurred. Further, the Debtors argue that the feasibility standard advanced by Global is now improper and that this Court should ignore the feasibility standard applicable to plans of reorganization under the bankruptcy code—**even though it is the same feasibility standard put forth by the Debtors themselves before the Bankruptcy Court to obtain approval of their disclosure statement**.  The Debtors ask this court to fashion an entirely new feasibility standard to fit their litigation objective.

To that end, the Debtors argue that Global's confirmation objection and previous filings challenging the accuracy of the financial information the Debtors provided to the Bankruptcy Court constituted a repudiation of the APA,[6] despite the fact that the Bankruptcy Court (i)

---

[6]      Debtors also make references to Global's alleged failure to provide adequate assurances and the hearsay statements of Global's counsel in an alleged telephone conversation (this is mentioned again below).

recognized Global's right as a party in interest to object to the Debtors' financial projections by requiring the Debtors to publish actual financial information upon motion of Global, and (ii) referred the question of whether the Debtors plan was feasible to hearing on confirmation. Finally, according to the Debtors, Global's breach-of-contract claim(s) were also foreclosed when the parties entered into Amendment, that the Debtors and First Lien Parties argue released them from any pre-Amendment breaches of the APA.

The record and controlling law belie the Debtors' theories.  For example, the Debtors are estopped from distorting the applicable feasibility standard after they sought and obtained Bankruptcy Court approval to apply the very feasibility standard they now disavow.  Similarly, the Debtors may not sidestep or avoid proving that they could have closed the transaction.  To recover on their theory of anticipatory repudiation, New York law is clear that the Debtors must prove they were ready, willing, and able to close the transaction, including obtaining a confirmation order from the Bankruptcy Court.  Indeed, belief that the plan of reorganization could not have been confirmed is at the heart of Global's actions, claims, and defenses.  Whether or not the Debtors could have obtained a confirmation order is a question for trial and the evidence will show the Debtors could not have confirmed their plan.

Global is entitled to trial on its breach-of-contract claims.  As a matter of law, the unambiguous post-bankruptcy Amendment to the APA cannot be a novation, because it neither extinguished the Debtors' obligation to operate the casinos in the ordinary course of business, nor released any claims arising from the Debtors prior failure to comply with that obligation. The evidence will show that Global never intended to relinquish its contractual right to pursue claims against the Debtors.  Regardless, intent is a question of fact, not properly decided on a motion for summary judgment.

## PROCEDURAL BACKGROUND

On February 4, 2013, Global commenced this lawsuit against the Debtors as an adversary proceeding in the Bankruptcy Court by filing an Original Complaint seeking a declaration that the APA, dated July 25, 2012, and the Amendment, dated November 29, 2012, executed by and between Global and the Debtors, were breached by the Debtors, entitling Global to the return of its $6.25 million deposit that is currently held in escrow pursuant to an agreement with JP Morgan Chase.  [ECF Doc. 19].  On March 11, 2013, the Debtors filed an Answer and Counterclaim to Original Complaint for Declaratory Judgment (the "Counterclaim").  [ECF Doc. 24].  The Counterclaim seeks damages from Global in addition to the $6.25 million escrow deposit, based entirely upon state-law causes of action for Global's alleged breach of the APA.[7] On May 24, 2013, Global filed the First Amended Complaint, adding a claim for fraudulent inducement.  [ECF Doc. 38].[8]  Global alleged that the Debtors (i) knew the representations regarding current and projected financial conditions were false prior to the execution of the APA, (ii) continued to publish them, (iii) continued to misrepresent both current and projected financial and operational conditions to Global (and to the Court) throughout the bankruptcy proceedings and through the execution of the Amendment, (iv) knew the Amended Plan was based upon false information, and (iv) knew the Amended Plan could not be confirmed (made clear by their decision to withdraw it and to repudiate the Amendment).

On August 19, 2013, the Debtors filed a Motion to Dismiss Global's breach-of-contract and fraud claims pursuant to Rule 12(c) of the Federal Rules of Civil Procedure and Rule

---

[7]     On March 1, 2013, the First Lien Parties filed a Motion to Intervene in this Adversary Proceeding seeking to intervene and join in the Debtors' actions as a matter of right.  [ECF Doc. 22].  The Bankruptcy Court granted the Motion to Intervene on March 5, 2013.  [ECF Doc. 23].  On March 11, 2013, the Interveners also filed a Joinder to Debtors' Answer and Counterclaim.  [ECF Doc. 25].

[8]     For the Court's convenience, Global has attached the First Amended Complaint to this Motion as **Exhibit 3**.

7012(c) of the Federal Rules of Bankruptcy Procedure.  [ECF Doc. 51].  For reasons orally assigned at the September 25, 2013 hearing on the Debtors' motion to dismiss, the Bankruptcy Court entered an Order on November 12, 2013, dismissing Global's fraud claim and denying the Debtors' Motion to Dismiss in all other respects.  [ECF Doc. 62].[9]

On October 25, 2013, Debtors and the First Lien Parties filed this Motion, seeking summary judgment in their favor on Global's breach-of-contract claim and its claims and defenses regarding the feasibility of the Amended Plan.  [ECF Docs. 57, 58].

## FACTUAL BACKGROUND

Almost immediately after executing the APA, the Debtors and First Lien Parties began cutting back maintenance, advertising, player promotions, entertainment, food and beverage service, capital improvements, payroll, and any other expense that could be reduced, contrary to the requirement that the Debtors maintain the operations in the Ordinary Course of Business. *See Declaration of John D. Elliott in Support of Global's Opposition to Motion for Partial Summary Judgment and Motion in Limine*, sworn to Sept. 12, 2014 ("Elliott Decl."), ¶¶ 11–14. Moreover, the Debtors (often times at the direction of and/or with the knowledge of the First Lien Parties) repeatedly misrepresented the financial performance of the casinos and the impact of their newly devised operational strategy:  spend as little money as possible.  *See* Elliott Decl. ¶ 23.  Global justifiably and reasonably relied upon the financial information, budgets, and EBITDA[10] projections the Debtors provided not only to Global, but also to the Bankruptcy Court.  *See* Elliott Decl. ¶ 9.

---

[9]      Global has indicated to the Court the possibility that it would file a Motion to Reconsider the Order of the Bankruptcy Court dismissing Global's fraud claims no later than September 12, 2014.  As of now, however, Global, has determined not to file the reconsideration motion, reserving all rights to request the right to amend in light of future developments and discovery, and reserving all rights of appeal.

[10]      EBITDA is an acronym for "earnings before interest, taxes and depreciation."

Debtors breached the APA by failing to operate in the Ordinary Course of Business.  The Debtors' failure to operate in the Ordinary Course of Business is evidenced by, among other things, Debtors' failure to make needed investments in facility maintenance, staffing levels, advertising, entertainment, customer retention programs, employee compensation, amenities, information technology, and others operating costs, ***combined with*** the lack of capital and maintenance expenditures.[11]  *See* Elliott Decl. ¶¶ 11–14.  Debtors' intentional, subpar operation of the casinos drove away customers resulting in an accelerated, exponential decline in the casinos' financial performance throughout the second half of 2012 and into January of 2013.[12]  *See* Elliott Decl. ¶¶ 21–22.  The Debtors' failure to make necessary investments AND failure to operate the business consistent with past practices during July 2012 through December 2012 (and beyond) caused the Debtors' financial performance, as measured by EBITDA, to deviate materially from the financial statements and projections represented to Global in the negotiations of the APA and again during the negotiations of the Amendment.

To Global and to the Bankruptcy Court, the Debtors steadfastly stood behind their projections that the casinos earnings would exceed $14 million in EBITDA (for the year 2012 and through 2015).  Amongst themselves, as early as July 2012, only days after the APA was fully executed, the Debtors' and First Lien Parties' financial advisers were already discussing an implied annual EBITDA of just $11 million.  *See Declaration of Patrick M. Shelby in Support of Global's Opposition to Motion for Partial Summary Judgment and Motion in Limine*, sworn to

---

[11]     Capital expenditures are only one component of the Debtors' requirement to operate in the Ordinary Course of Business and are needed to address deferred maintenance, amenities improvement, and competitive gaming products.  Those capital expenditures are above and beyond the costs to simply run and manage the businesses and the Debtors failed miserably to spend the additional money that it had represented to Global Gaming that it would spend to positively impact net revenue and EBITDA.

[12]     Indeed, the Debtors' Bossier City property has experienced the greatest decline of market share of any gaming property in Bossier City in 2012, and lost market share at a rate far faster than any of its competitors.

Sept. 12, 2014 ("Shelby Decl."), ¶ 3, Ex. 9.   The concealment of the accelerating financial decline was material.  As the APA and record evidence makes clear, Global understood from the Debtors (and structured the APA to reflect) that casinos' projected EBITDA would be sufficient to fund both operations and improvements to the casinos and to service the take-back financing from the First Lien Parties and other debt assumed under the plan.  *See* Elliott Decl. ¶¶ 6–7 & 12.

In October 2012, while visiting the Bossier City casino Global was informed that no money was being spent on capital improvements, save for repairing "breakages."  Elliot Decl. ¶¶ 1–13.

The Debtors' original plan of reorganization and disclosure statement, grounded in the APA were filed on October 26, 2012.  Despite the fact that the Debtors' original disclosure statement contained no financial projections, hearing was set on the disclosure statement for December 3, 2012.  By then, however, Global was concerned that even the most basic capital and maintenance expenditures were not being made and was concerned that the APA was not workable.  *See* Elliott Decl. ¶¶ 12–16 & Exs. 4–5.  So, Global sought relief from the Debtors and First Lien Parties.  Based upon the projected EBITDA and information provided by the Debtors and First Lien Parties, Global still believed that the APA could be salvaged and, rather than declare a breach at that time, pursued the Amendment in an effort to keep the deal alive.  *See* Elliott Decl. ¶¶ 11–17, 25 & Exs. 4–6.  Yet, at the time the Amendment was executed and presented to the Court, Global did not yet know the extent and effects of the Debtors' deliberate and concealed neglect of the properties.  *See* Elliott Decl. ¶¶ 20–23.  The Debtors and First Lien Parties did.

The Amendment became the centerpiece of *Debtors' Joint Chapter 11 Plan for Louisiana Riverboat Gaming Partnership and Its Affiliates as Amended Through November 29,*

2012 ("Amended Plan") [No. 12-12013, ECF Doc. 290 (Bankr. W.D. La.)] (attached without exhibits hereto as **Exhibit 13**), and *Joint Disclosure Statement for Joint Chapter 11 Plan for Louisiana Riverboat Gaming Partnership and Its Affiliates As Amended Through November 29, 2012* ("Amended Disclosure Statement") [No. 12-12013, ECF Doc. 291 (Bankr. W.D. La.)] (Attached without exhibits hereto as **Exhibit 14**).   The Amended Plan and Amendment, however, were doomed from inception.  As the Debtors and First Lien Parties already knew, the casinos were unable to generate sufficient revenue to both operate the properties and service the terms of the take-back financing.  Nevertheless, the Debtors, with full knowledge of the First Lien Parties, continued to assure Global that the casinos' EBITDA would exceed $14 million for 2012 and that the same level would be maintained during 2014 through 2015, and told the Bankruptcy Court the same in the financial projections included in their Amended Disclosure Statement.[13]

The Debtors and the First Lien Parties knew and internally recognized back in July of 2012 that EBITDA might do no better than a paltry $11 million.  *See* Shelby Decl. Ex. 9.  It is clear that the Debtors and the First Lien parties knew, as of November 29, 2012 that (i) the income statement for October 2012 would establish that performance was 80-90% below the level of EBITDA contained in the "projections" filed with the Bankruptcy Court and given to Global, (ii) the November 2012 actual performance would result in zero or negative EBITDA (as opposed to more than $500,000), and (iii) the effect of these two disastrous months would result in a near-zero EBITDA number for December and the Debtors missing their "projected" EBITDA of more than $14 million for 2012 by some $2 million, all attributable to the fourth

---

[13]      The financial projections attached as Exhibit D-2 to the Amended Disclosure Statement is separately attached hereto as **Exhibit 15**.

quarter of 2012.  At the time of the filing of the Amended Plan and Disclosure Statement, the Debtors knew that their performance in the fourth quarter of 2012 would carry forward into 2013, and that the reasonably projected EBITDA for 2013 was closer to $8 million, rather than $14 million.  The Debtors and the First Lien Parties knew that with an $8 million EBITDA for 2013 the plan would fail, and they also knew that the catastrophic failure in the fourth quarter was directly attributable to their failure to operate in the Ordinary Course of Business.

So, rather than come clean, the Debtors told Global and the Bankruptcy Court that their projection of $14.1 million in EBITDA was viable for the year 2012 (despite having actual information that nothing close to this could be achieved), and that their projections, which were not even loosely based on the casinos' actual performance, could be achieved.  The projections were necessary, however, because the actual performance and the irrefutable downward trend would not support  feasibility of the Amended Plan.  However, shortly after the Amendment was executed and the Amended Plan and Disclosure Statement were filed and presented to the Bankruptcy Court on November 29, 2012, Global received the Debtors' final October financial results as well as the unadjusted November 2012 financial results and learned—for the first time—the magnitude of the Debtors' financial collapse during the fourth quarter of 2012—the culmination of the Debtors' persistent breach of the Ordinary Course of Business covenant in the APA, which was unaffected by the Amendment and remained a part of the APA as amended. *See* Elliott Decl. ¶¶ 5–8, 11–14 & 18–21.

Upon discovering the discrepancy between the EBITDA projections in the Amended Disclosure Statement and the Debtors' actual results, on December 20, 2012, Global filed *Global Gaming's Motion for Order Vacating Order Approving Joint Disclosure Statement for the Joint Chapter 11 Plan for Louisiana Riverboat Gaming Partnership and Affiliates as Amended*

*Through November 29, 2012* ("Motion to Vacate") [No. 12-12013, Dkt. No. 313 (Bankr. W.D. La.)] (attached hereto as **Exhibit 16**).  The Motion to Vacate sought to vacate the Bankruptcy Court's order approving the Amended Disclosure Statement on the grounds that the Amended Disclosure Statement contained materially inaccurate information concerning the Debtors' actual and projected financial performance for FY 2012 and beyond and that confirmation of the Amended Plan could be in jeopardy.

On December 27, 2012, the Bankruptcy Court held a hearing on the Motion to Vacate. The Bankruptcy Court recognized Global's standing to file the Motion to Vacate, and, approving Global's position that it, the Bankruptcy Court and the parties in interest were entitled to review actual financial information from which to judge the viability of the Debtors' projections, granted, in part, the Motion to Vacate.  The Debtors were ordered to serve a supplement to the Amended Disclosure Statement with, *inter alia*, actual EBITDA numbers for October and November.  *Order Upon Global Gaming's Motion for Order Vacating Order Approving Joint Disclosure Statement for the Joint Chapter 11 Plan for Louisiana Riverboat Gaming Partnership and Affiliates as Amended Through November 29, 2012* [No. 12-12013, Dkt. No. 329 (Bankr. W.D. La.)] (attached hereto as **Exhibit 17**). In their Supplement to the Joint Disclosure Statement, the Debtors stated that they wanted the "confirmation process [to] continue and any feasibility issues be dealt with at the confirmation hearing."  *Supplement to Joint Disclosure Statement for Joint Chapter 11 Plan for Louisiana Riverboat Gaming Partnership and Affiliates as Amended Through November 29, 2012* ("Supplement") [No. 12-12013, Dkt. No. 327 (Bankr. W.D. La.)] (attached hereto as **Exhibit 18**).   Importantly, in granting this relief upon Global's Motion to Vacate, the Bankruptcy Court recognized (i) Global's right as a contract party to object to the Debtors promulgating false information and materially wrong projections to the

12

Court, and (ii) that, as the Debtors bore the burden of proving that their plan was feasible, Global as a contract party had standing to object to the Debtors failing to make their case that their plan was feasible.

Accordingly, and at the Debtors invitation, Global appropriately raised its concerns about the feasibility of the Amended Plan (which was still grounded in the false projections despite the actual financial condition of the Debtors' business operations), when it filed on January 25, 2013, its *Objection to the Joint Chapter 11 Plan for Louisiana Riverboat Gaming Partnership and Affiliates as Amended Through November 29, 2012 [Dkt. No. 290]* (the "Confirmation Objection") [No. 12-12013, ECF Doc. 353 (Bankr. W.D. La.)] (attached hereto as **Exhibit 19**). Global's Confirmation Objection raised concerns regarding the feasibility of the Amended Plan in light of the Debtors' failure to operate the property in the Ordinary Course of Business and the attendant financial collapse that—while known to the Debtors for months—had not been relayed to Global or the Bankruptcy Court.[14]  Nothing in the APA, law, or equity prohibited Global from raising these legitimate concerns, as was recognized by the Bankruptcy Court when it entertained Global's Motion to Vacate and granted Global partial relief.[15]  The APA cannot be construed to require Global to proceed silently with a transaction without bringing material concerns regarding the viability of the Amended Plan to the Court's attention.  Realizing they could not confirm the Amended Plan over Global's objection, on January 30, 2013, the Debtors filed their *Notice of Withdrawal of Joint Chapter 11 Plan for Louisiana Riverboat Gaming Partnership and Affiliates as Amended through November 29, 2013* ("Notice of Withdrawal") [No. 12-12013,

---

[14]        In fact, the allegations in the Confirmation Objection have been borne out by the Debtors' actual performance.

[15]        Had the Motion to Vacate represented a breach of the APA as amended, it is clear that the Bankruptcy Court would not have granted Global's request, in part, and ordered the Debtors to provide the required supplement, or  referred further discussion feasibility issues raised by the Motion to Vacate to the hearing on confirmation.

ECF Doc. 360 (Bankr. W.D. La.)] (attached hereto as **Exhibit 20**).  When the Debtors decided to withdraw their Amended Plan and terminate the APA, the Debtors had known for months that the Amended Plan was not feasible.

**LAW AND ARGUMENT**

### I.   Standard Of Review For Rule 56 Motions

"[A] court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  Facts are material if they "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  To survive summary judgment, Global must "go beyond the pleadings and present specific facts indicating a genuine issue for trial."  *Bluebonnet Hotel Ventures, LLC v. Wells Fargo Bank, N.A.*, No. 13-30827, 2014 WL 2565661, at *2 (5th Cir. June 6, 2014) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).  Although the Court is to "consider evidence in the record in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party," *id.* (citing *Thorson v. Epps,* 701 F.3d 444, 445 (5th Cir. 2012)), a factual dispute precludes a grant of summary judgment.  *Smith v. Amedisys,* 298 F.3d 434, 440 (5th Cir. 2002).

### II.  The Bankruptcy Code Requires That The Debtors' Amended Plan Had To Have Been Feasible

Plainly stated, the question of feasibility is paramount to the resolution of this lawsuit. As the Debtors' counsel explained to Global, feasibility is the ability of the post-confirmation entity to "service the first lien debt under the plan, and operate the business going forward."  The Debtors, however, now disavow this standard, arguing that the feasibility standard advanced in their Amended Disclosure Statement, and which the Bankruptcy Court approved at their request, is no longer the correct standard.  Rather, the Debtors now argue that all that is required to prove

14

feasibility is that (1) the APA had a reasonable likelihood of closing, and (2) that the purchaser had the financial wherewithal to consummate the transaction.  Mem. in Support, at 40.  The Debtors should be estopped from now asserting an alternative feasibility standard that they have fashioned to better comport with their current litigation strategy.  Moreover, the applicable law makes clear that section 1129(a) of the Bankruptcy Code (which includes the feasibility standard for plans under chapter 11) applies to this transaction and that the Bankruptcy Court would have had to make a determination of feasibility at the confirmation hearing.

**A. Debtors Are Barred by Judicial Estoppel From Attempting Now To Apply An Alternative, Incorrect Feasibility Standard Concocted To Extinguish The APA Condition Precedent That Their Plan Be Confirmed**

On October 4, 2012, the Debtors asked Global to prepare projections to support feasibility.  *See* Shelby Decl. ¶ 4, Ex. 10.  Debtors' counsel explained to Global's financial advisor that "[t]he issue is feasibility [and] [t]he Global projections have to support the Debtors' ability to service the first lien debt under the plan, and operate the business going forward."  *Id.*

Clearly the Debtors understand and understood that section 1129(a)(11) of the bankruptcy code controlled whether their Amended Plan could be confirmed.  The Debtors themselves published the feasibility standard as set forth in section 1129(a) as governing whether their Amended Plan could be confirmed—**within their own Amended Disclosure Statement**:

> The Bankruptcy Code requires that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization unless the liquidation of the debtor is provided for in the plan. It is not likely that the confirmation of the Plan will be followed by liquidation or the need for further financial reorganization of the Debtors. Attached as Exhibit D-2 to this Disclosure Statement, entitled, "Financial Projections," is information prepared by the Debtors projecting the Purchasers' projected cash flow from the operation of the Assets after the sale of substantially all of the Debtors' assets under the Plan, demonstrating the ability of the Purchasers to operate their businesses and make the payments required under the Plan.

15

Ex. 14, at D-98 (entitled "Feasibility of Plan").  On January 2, 2013, following the Bankruptcy Court's ruling upon Global's Motion to Vacate, the Debtors filed the Supplement that included actual financial performance for the months of October and November 2012.  *See* Ex. 18.  In the Supplement, the Debtors stated that the "feasibility issue [should] be dealt with in connection with the Confirmation Hearing."  *Id.* at 3.  Moreover, the Debtors directly addressed feasibility of the Plan and the adequacy of its "Financial Projection" to establish that the Plan is feasible. *Id.* at 6–7.  Nowhere in the Supplement did the Debtors disclaim, abandon, or otherwise allude to the position they now assert, that a different feasibility standard should be applied to this transaction.  *Id.*  Having been told to leave issues of feasibility for the Confirmation Hearing, Global filed its Confirmation Objection on January 25, 2013.  *See* Ex. 19.  On January 30, 2013, less than a week before the Confirmation Hearing, the Debtors voluntarily withdrew the Plan and terminated the APA, in favor of filing their lawsuit.  *See* Ex. 20.

"Judicial estoppel is a common law doctrine that prevents a party from assuming inconsistent positions in litigation."  *In re Superior Crewboats, Inc.*, 374 F.3d 330, 334 (5th Cir. 2004) (citing *Brandon v. Interfirst Corp.*, 858 F.2d 266, 268 (5th Cir. 1988)). "The purpose of the doctrine is to protect the integrity of the judicial process by preventing parties from playing fast and loose with the courts to suit the exigencies of self interest."  *Id.* (citing *In re Coastal Plains, Inc.*, 179 F.3d 197, 205 (5th Cir. 1999)). "Importantly, because judicial estoppel is designed to protect the judicial system, not the litigants, detrimental reliance by the party opponent is not required."  *Id.* (citations omitted).  Judicial estoppel is invoked where, as here, "intentional self-contradiction is being used as a means of obtaining unfair advantage in a forum provided for suitors seeking justice."  *Id.*  (citations omitted).

16

As shown below, the Debtors seek to disavow the feasibility analysis they asked the Bankruptcy Court to approve, in favor of a standard that better suits their litigation needs.  Mem. In Support, at 36–41.

It is precisely this type of fast and loose maneuvering, however, that judicial estoppel in intended to foreclose.  To that end, the Fifth Circuit considers three factors when deciding whether judicial estoppel applies:

> (1) whether the party's later position is clearly inconsistent with its earlier position; (2) whether the party has succeeded in persuading a court to accept that party's earlier position; [and] (3) whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

*In re Save Our Springs (S.O.S.) Alliance, Inc.*, 632 F.3d 168, 175 (5th Cir. 2011) (citing *Peoples State Bank v. Gen. Elec. Capital Corp. (In re Ark-La-Tex Timber Co.)*, 482 F.3d 319, 332 (5th Cir. 2007)).

Here, each of those factors supports applying judicial estoppel.  First, the Debtors now attempt to apply an entirely different feasibility standard to the transaction contemplated by the APA.  Mem. In Support, at 40.  The Debtors completely abandon and disclaim the correct feasibility standard that they had previously articulated in the Amended Disclosure Statement and supported with their own financial projections of post-confirmation performance.   Having abruptly and voluntarily terminated the APA and withdrawn the Amended Plan prior to the Confirmation Hearing, the Debtors now advance a position that is directly contrary to the feasibility standard set forth in their own Amended Disclosure Statement.

Second, the Bankruptcy Court adopted the Debtors' position regarding feasibility when it approved the Joint Disclosure Statement.  Importantly, "[a]doption does not require a formal judgment; rather, it only requires 'that the first court [adopt] the position urged by the party,

either as a preliminary matter or as part of a final disposition." *In re Superior Crewboats, Inc.*, 374 F.3d at 335 (quoting *Coastal Plains,* 179 F.3d at 206).   Here, the Bankruptcy Court expressly adopted the Amended Disclosure Statement and feasibility standard set forth therein when it entered an order approving the same.

Finally, the Debtors would derive an unfair advantage if not estopped.  Now, solely to suit their purposes for this litigation, the Debtors ask this Court to adopt and apply an entirely new feasibility standard contrary to the one they themselves advanced in the Amended Disclosure Statement.  Mem. In Support, at 36–41.  Had the Debtors proceeded with the Confirmation Hearing, the Bankruptcy Court would have applied section 1129(a)(11) to the Plan and considered evidence of Global's argument that the Plan was not feasible because it would be unable to generate sufficient revenues to "operate their business and make the payments required under the Plan" due directly to the excessive financial deterioration induced by the Debtors' failure to operate the casinos consistent with historical practices.  Faced with the declaration of Global's expert—whom the Debtors themselves attempted to hire to run the properties as an alternative to proceeding with the APA—the Debtors and First Lien Parties determined that the odds favored this litigation as opposed to rolling the dice on the Confirmation Hearing.  Now, purely as a matter of litigation strategy, the Debtors argue for the first time that section 1129(a)(11) does not apply to the Plan and that the Court should not consider the Plan's feasibility.  That is precisely the "intentional self-contradiction" designed solely to obtain an "unfair advantage" that judicial estoppel is meant to prevent.  *See In re Superior Crewboats, Inc.*, 374 F.3d at 334.

In *In re Save Our Springs (S.O.S.) Alliance, Inc.*, the Fifth Circuit applied the doctrine of judicial estoppel to prevent a debtor that had claimed it was a small business debtor from

subsequently abandoning that designation after it led to adverse consequences.  632 F.3d at 175–76.  Here, likewise, the "timeline shows the opportunistic behavior that judicial estoppel is designed to prevent."  *Id*. at 176.  Accordingly, the doctrine of judicial estoppel should be applied, and the Debtors and First Lien Parties should be estopped from arguing that section 1129(a)(11) does not apply to the Amended Plan or that some feasibility standard different than the standard set forth by the Debtors themselves in their Amended Disclosure Statement applies in this litigation.

### B.  To Prove Feasibility, The Debtors Must Demonstrate That The Amended Plan Offered A Reasonable Probability Of Success

In order to obtain the Bankruptcy Court's confirmation of the Amended Plan the Debtors were required to demonstrate the Amended Plan's "feasibility" pursuant to section 1129(a)(11) of the Bankruptcy Code.  That section requires as a condition of confirmation that the court find that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."  11 U.S.C. § 1129(a)(11). "The feasibility standard is whether the plan offers a reasonable assurance of success," although "[s]uccess need not be guaranteed."  *In re Bankston*, No. 09-10675, 2010 WL 1027806, at *12 (Bankr. W.D. La. Jan. 15, 2010) (citing *Kane v. Johns-Manville Corp*., 843 F.2d 636, 649 (2d Cir. 1988); *Prudential Ins. Co. v. Monnier (In re Monnier Bros.)*, 755 F.2d 1336, 1341 (8th Cir. 1985); *In re Am. Solar King Corp*., 90 B.R. 808, 832–33 (Bankr. W.D. Tex. 1988); *In re Prudential Energy Co*., 58 B.R. 857, 862 (Bankr. S.D.N.Y. 1986)).  Importantly, "a plan based on impractical or visionary expectations cannot be confirmed."  *In re Prudential Energy Co*., 58 B.R. at 862 (emphasis added).

In sum, "feasibility" is understood as "a reasonable likelihood of viability." *In re Bankston*, 2010 WL 1027806, at *12. The Debtors, however, contend that all is required is a reasonable likelihood of closing and evidence that the purchaser had financial wherewithal to close the transaction. Mem. In Support, at 40. The Debtors' reliance on *In re Cypresswood Land Partners, I*, 409 B.R. 396, 432-33 (Bankr. S.D. Tex. 2009), is misplaced. First, the Court in *Cypresswood* set forth a clear feasibility standard: "the [bankruptcy] court need not require a guarantee of success…, [o]nly a reasonable assurance of commercial viability is required…All the Court must find is that the Amended Plan offers a reasonable probability of success." 409 B.R. at 432–33 (internal citations and quotations omitted). Second, based upon testimony at the confirmation hearing the *Cypresswood* court made specific factual findings related to feasibility:

> [T]he Court finds it to be highly likely that the Purchaser, which is assuming the Debtor's obligations with respect to Regions and Wallis, will be able to pay the claims and fund the Adversary Proceeding as set forth in the Amended Plan.

*Id*. at 432. In assessing feasibility the *Cypresswood* court specifically examined if the purchaser would be able to assume the Debtors' obligations, pay the claims of creditors, and make other payments as contemplated by the plan. *Id*. The inquiry would have been no different for the Bankruptcy Court here. Whether or not Global could operate the casinos and service the take-back financing (and other assumed debt), plus ongoing operational expenses as required under the APA as amended and under the Amended Plan are fact issues directly relevant to feasibility that the Bankruptcy Court would have decided at the Confirmation Hearing. In order to confirm the Amended Plan, the Debtors would have been required to demonstrate the feasibility.

**C. The Bankruptcy Code Requires Even A Plan Of Liquidation To Be Feasible When The Successful Performance Of Its Terms Is Dependent Or Contingent Upon Any Future, Uncertain Event**

20

Courts taking the proper statutory view of section 1129(a) of the Bankruptcy Code require a bankruptcy court to examine the feasibility of a proposed plan before it can be confirmed, even if that plan is a liquidating plan designed to sell all of the property of the estate or distribute the property of the estate to creditors, when "the successful performance of its terms is dependent or contingent upon any future, uncertain event." *In re Heritage Org., L.L.C.*, 375 B.R. 230, 311 (Bankr. N.D. Tex. 2007) (citing *In re Holmes*, 301 B.R. 911, 914 (Bankr. M.D. Ga. 2003) and *In re Yates Dev., Inc.*, 258 B.R. 36, 42–44 (Bankr. M.D. Fla. 2000)[16] and, assuming that a feasibility standard applies to confirmation of a liquidating plan, analyzing accordingly).[17]   Further, the court in *In re Travelstead*, analyzed the requirement that a liquidating plan be feasible and found that feasibility is not only applicable, but critical to confirmation of a liquidating plan.  227 B.R. 638 (D. Md. 1998).  That case involved an appeal of an order confirming a liquidating plan.  In analyzing an objection to the plan on the basis of feasibility, the *Travelstead* court found that the test of feasibility "is whether the plan offers a reasonable assurance of success."  *Id.* at 651 (citing *In re Johns-Manville Corp.*, 843 F.2d 636, 649 (2nd Cir. 1988)).   The court further noted that the purpose of section 1129(a)(11)'s

---

[16]    Even the *Cypresswood* decision relied upon by the Debtors for their erroneous feasibility standard recognizes courts have taken different view on the application of Section 1129(a)(11) to liquidating plans, and confirms the plan only after considering its feasibility.  *In re Cypresswood Land Partners, I*, 409 B.R. at 432-33.

[17]    The Debtors rely upon cases which do not address feasibility directly or they rely upon unreported confirmation orders.  For example, the court in *In re AT&T Latin Am. Corp.*, 2004 Bankr. LEXIS 120, at *10 (Bankr. S.D. Fla. Jan. 26, 2004) issued a confirmation order from an unopposed plan which contained, among many other findings, a simple finding that the liquidating plan satisfied the feasibility provisions of Section 1129(a)(11).  Similarly, the court in *In re Broadway 401 LLC*, 2010 Bankr. LEXIS 2364, at *1 (Bankr. D. Del. Mar. 16, 2010) issued a confirmation order from a pre-packaged, unopposed liquidating plan.  In the *Broadway* confirmation order, the court does not find, as the Debtors here propose, that feasibility is irrelevant, but includes a finding that the liquidating plan, which provides for the sale of assets and complete dissolution of the debtor, satisfied the feasibility standard.  *Id.* at *22.  Finally, *In re 47th & Belleview Partners*, 95 B.R. 117 (Bankr. W.D. Mo. 1988) and *In re Pero Bros. Farms, Inc.*, 90 B.R. 562 (Bankr. S.D. Fla. 1988) offer little more in way of support for the Debtors' request to abandon feasibility as a condition of confirmation of a liquidating plan.  Neither of those twenty-five-year-old cases cites any authority or offers anything more than a short conclusory statement that feasibility should not be considered in the liquidating plans before those courts.

21

feasibility requirement is "to prevent visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation." *Id.* (citing 7 Collier on Bankruptcy ¶ 1129.0301 and cases cited therein).

The Debtors recognized that a demonstration of feasibility was required for the Bankruptcy Court to approve its Amended Plan, as they stated as much in their Amended Disclosure Statement, which was ultimately approved by the Bankruptcy Court:

> At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan if the requirements of Section 1129 of the Bankruptcy Code are met. Among the requirements for confirmation of a plan are that the plan is (i) accepted by all impaired classes of claims or, if rejected by an impaired class, that the plan "does not discriminate unfairly" and is "fair and equitable" as to such class, (ii) feasible, and (iii) in the "best interests" of creditors that are impaired under the plan.
>
> . . . .
>
> The Bankruptcy Code requires that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization unless the liquidation of the debtor is provided for in the plan.

Ex. 14, at D-96 to D-97, D-98 (emphasis added). And the Debtors' explanation in the Amended Disclosure Statement as to why their Plan was feasible shows that they viewed the success of the Plan was contingent upon Global's ability to make the future, post-confirmation debt service payments owed to the First Lien Parties:

> It is not likely that the confirmation of the Plan will be followed by liquidation or the need for further financial reorganization of the Debtors. Attached as Exhibit D-2 to this Disclosure Statement, entitled, "Financial Projections," is information prepared by the Debtors projecting the Purchasers' [a.k.a. Global's] projected cash flow from the operation of the Assets after the sale of substantially all of the Debtors' assets under the Plan, demonstrating the ability of the purchasers to operate their businesses and make the payments required under the Plan.

Ex. 14, at D-99 (emphasis added). Further, after a hearing on the matter, the Bankruptcy Court considered and approved the adequacy of the Debtors' Joint Disclosure Statement, including the

legal standards cited within.  *See* Hr'g Tr., 9:24–10:1, Dec. 3, 2012 (attached hereto as **Exhibit 21**).

To be sure, the APA as amended was an agreement between the parties whereby Global agreed to purchase substantially all of the Debtors' assets (casinos) and to assume certain of the Debtors' liabilities, including the restructured take-back financing, other classes of claims assumed, various contracts assumed, employees taken in, etc.  Because the debt assumed by the Global purchasing parties (Global Gaming Solutions was not a purchasing party) was essentially in-rem debt (the Global purchasers were special purpose entities established to hold the purchased assets), and therefore once the capital, if any, required by the APA had been put into the purchased properties, the properties themselves would have to carry the debt taken out through the Amended Plan.  If the Global Purchasers could not service the Amended Plan debt and all costs and expenses of operation, liquidation or further bankruptcy relief (which would doubtless have an adverse effect on debt holders, employees, vendors, etc.) would necessarily follow.[18]

As early as October 4, 2012, the Debtors were working on financial projections that would support the "feasibility" of the Plan.  Shelby Decl. ¶ 4 & Ex. 10.  The Debtors' counsel articulated the standard for Global's financial advisor:  "The issue is feasibility.  The Global projections have to support the Debtors' ability to service the first lien debt under the plan, and operate the business going forward."  Shelby Decl. ¶ 4 & Ex. 10.  The Debtors pursued feasibility projections from Global to demonstrate the ability of the post-confirmation entity to meet the requirements of section 1129(a)(11) of the Bankruptcy Code:  "[H]ow are you coming

---

[18]      In fact, given the deterioration of the Debtors' operations, if (hypothetically) the APA had closed and been consummated, the likely outcome would have been a bankruptcy and fraudulent transfer action against the Debtors and First Lien parties for receiving transfers that they knew would render the Global purchasing parties insolvent.

23

on projections for feasibility exhibit to [Disclosure Statement]?"  Shelby Decl. ¶ 5 & Ex. 11.
Both Global and the Debtors were keenly aware that part of confirmation included findings of
fact by the Court that the Plan was feasible, meaning, as Debtors describe it, the "ability to
service the first lien debt under the plan, and operate the business going forward."  Shelby Decl.
¶ 4 & Ex. 10.

The provision on feasibility of the Amended Plan contained in the Amended Disclosure
Statement makes clear that at the Debtors did not believe the Plan contemplated simply a
liquidation and, similarly, believed the proper feasibility standard was that "confirmation of a
plan is not likely to be followed by liquidation or the need for further financial reorganization."
Ex. 14, at D-98.  Debtors advocated this position to the Court and won the Court's approval of
the same, they cannot now argue a completely different legal theory.  The bottom line is that the
issue of the feasibility, which certainly is relevant to the resolution of this litigation, is an
evidence-based determination for the fact finder, making it wholly inappropriate for summary
judgment.

### III. The Debtors' Discussion Of Feasibility Is Fact-Intensive And Premature, Making The Attempted Bar Of The Entire Subject As A Matter Of Law Wholly Inappropriate For Summary Judgment Or A Motion In *Limine* At This Stage

Like feasibility, anticipatory repudiation mandates a fact intensive inquiry and is not
properly determined by summary judgment.  Debtors ask this Court, either by granting summary
judgment or by granting a motion in *limine*, to prohibit any discussion or presentation of
evidence on the subject of feasibility.  Mem. In Support, at 2.  Of course they do.  Debtors posit
that the feasibility of the Amended Plan is (i) irrelevant to the resolution of the Debtors' claim of
anticipatory repudiation against Global, and (ii) barred by the application of the prevention
doctrine.  *Id*. at 29–35.  Yet, to prevail on their claim of anticipatory repudiation the Debtors

24

must not only prove an unequivocal repudiation, but also that they were ready, willing, and able to close the transaction.  Here, the Debtors must prove they could have obtained a confirmation order to satisfy a necessary condition precedent to closing the transaction.[19]

Accordingly, feasibility is at the heart of the controversy over the Debtors anticipatory repudiation claim.  Global repeatedly informed the Debtors, First Lien Parties, and, ultimately, the Bankruptcy Court that the Debtors failure to operate the casinos in a manner consistent with past practices resulted in an extraordinary financial collapse that endangered the feasibility of the Amended Plan, and the viability of the entire transaction.  The evidence will show that Global never repudiated its obligations under the APA, but rather expressed its concern that the Amended Plan could not be confirmed and therefore the transaction could not close—a far cry from unequivocally communicating an intent not to perform pursuant to the APA.  For the reasons below, Global asks this Court to deny the Debtors' attempt to preclude use of evidence regarding the feasibility of the Amended Plan, and to deny summary judgment.

## A. The Subject Of Whether The Amended Plan Was Feasible Is Directly Relevant To The Debtors' Ability To Prove The Elements Of Their Anticipatory Repudiation Claim

"Under New York law, an anticipatory breach occurs when a party to a contract repudiates his obligations prior to performance."  *In re Randall's Island Family Golf Ctrs., Inc.*, 272 B.R. 521, 523 (S.D.N.Y. 2002) (citations omitted).  "An anticipatory repudiation occurs when a party to a contract (1) states that he cannot or will not perform his obligations, or (2) commits a voluntary affirmative act that renders the obligor unable or apparently unable to perform his obligations."  *In re Asia Global Crossing, Ltd.*, 326 B.R. 240, 249 (Bankr. S.D.N.Y.

---

[19]     The Debtors Motion seemingly avoids and does not place in controversy whether or not Global actually repudiated the APA.

2005); *see also Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.*, 705 N.E.2d 656, 659 (N.Y. 1998).   "[T]he party asserting the anticipatory repudiation bears the burden of persuasion."   *Tradax Energy, Inc. v. Cedar Petrochemicals, Inc.*, 317 F. Supp.2d 373, 377 (S.D.N.Y. 2004).

> 1.   *Whether Global repudiated the APA is an issue of fact for trial as the Debtors failed to meet their burden to show that Global "clearly and unequivocally" repudiated the APA*

The Debtors misstate the law when they claim that they "need only prove that they were ready, willing and able to perform their obligations under the APA" (and subsequently argue erroneously that the concept of feasibility plays no part in that showing).   Mem. In Support, at 29.   To prevail on an anticipatory repudiation claim, the Debtors must first show that Global's alleged repudiation was "unequivocal, definite, and final."   *Children of Am. (Cortlandt Manor), LLC v. Pike Plaza Assocs., LLC*, 978 N.Y.S.2d 323, 324 (N.Y. App. Div. 2d Dep't 2014); *see also Argonaut P'ship, L.P. v. Sidek*, S.A. de C.V., No. 96-CIV-1967, 1996 WL 617335, at *5 (S.D.N.Y. Oct. 25, 1996).   So,

> [i]f the promisee regards the apparent repudiation as an anticipatory repudiation, terminates his or her own performance and sues for breach, the promisee is placed in jeopardy of being found to have breached if the court determines that the apparent repudiation was not sufficiently clear and unequivocal to constitute an anticipatory repudiation justifying nonperformance.

*Norcon Power Partners, L.P.*, 705 N.E.2d at 659 (internal quotations and citations omitted). "Mere expression of difficulty in tendering the required performance, for example, is not tantamount to a renunciation of the contract."   *Children of Am. (Cortlandt Manor), LLC*, 978 N.Y.S.2d at 324.

Implied as fact throughout the Debtors' Motion for Partial Summary Judgment is Global's repudiation of the APA.   Whether or not Global clearly and unequivocally repudiated

the APA is a question of fact, and not one that the Debtors or First Lien Parties have put before the Court in this Motion.   Although the Debtors allege Global repudiated the APA by questioning the accuracy of the Disclosure Statement, objecting to confirmation, and failing to give the Debtors adequate assurance of their intent to perform, *see* Mem. In Support, at 27 (citing allegations in their Counterclaim), characterizing these allegations as unequivocal repudiations of the APA does not make them so.

Whether Global actually repudiated the APA is a determination of fact.  The Debtors' mere recitation of allegations from their Counterclaim followed by unsupported conclusions is unavailing.  Mem. In Support, at 28 n.7.  In fact, the Debtors present no evidence to support their allegations beyond hearsay statements of Debtors' attorneys.[20]  *See In re Asia Global Crossing, Ltd.*, 326 B.R. 240, 252 (Bankr. S.D.N.Y. 2005), *adhered to in part on reargument*, 332 B.R. 520 (finding no repudiation of the contract in the absence of sworn evidence to support the claim). The Debtors' failure to offer any credible evidence demonstrating an unequivocal repudiation of the APA is an apparent concession that the issue is a fact question best left to the fact finder.

2. *The Debtors must show that they were "ready, willing, and able" to perform their obligations under the APA, but for the alleged repudiation*

Even if a repudiation could be established—the evidence will show otherwise—the Debtors are then obligated to "demonstrate by a preponderance of the evidence that [they] had the ability to tender performance when due."  *In re Bradlees Stores, Inc.*, 313 B.R. 565, 574 (S.D.N.Y. 2004); *see also In re Asia Global Crossing, Ltd.*, 326 B.R. at 249–50 ("To recover

---

[20]      For example, the Debtors cite to Paragraph 43 of their Counterclaim as "evidence" that Global made a positive and unequivocal announcement of an intention not to perform their duties under the APA.  Paragraph 43 states that Global's attorneys "communicated Global's position that the APA was a 'dead deal.'"  Without sworn, authenticated evidence, that statement is merely an unsupported allegation and hearsay and cannot be a component of a summary judgment motion, which requires admissible evidence to form the basis for summary judgment.  Also, while not before the Court at this time, Global submits that if evidence on this alleged discussion is ever adduced, the Debtors' assertion of a content will not be borne out.

damages, however, the non-breaching party must also show that he was ready, willing and able to perform his own obligations but for the repudiation.").  Indeed, "[a]lthough the non-repudiating party may suspend performance following cancellation, the [non-repudiating party is] required to show that performance would have happened absent cancellation." *Id*. at 574 n.1 (citing *Décor by Nekkei Int'l, Inc. v. Fed. Republic of Nigeria*, 497 F. Supp. 893, 908 (S.D.N.Y. 1980), *aff'd sub nom., Tex. Trading & Mill. Corp. v. Fed. Republic of Nigeria*, 647 F.2d 300 (2d Cir. 1981)).

"Under New York law, the party seeking to enforce a contractual duty has the burden of proving the occurrence of any conditions precedent to the performance of the duty." *In re Asia Global Crossing, Ltd.*, 326 B.R. at 248 (citations omitted).  Here "[t]he main issue before us is whether . . . [the Debtors can] show that [they were] ready, willing and able to close the transaction—i.e., that but for [Global's alleged] repudiation, the transaction could and would have closed." *Pesa v. Yoma Dev. Grp., Inc.*, 965 N.E.2d 228, 230 (N.Y. 2012).  As the New York Court of Appeals explained:

> The rule requiring non-repudiating [parties] to show their readiness, willingness and ability to perform is supported by common sense.  It is axiomatic that damages for breach of contract are not recoverable where they were not actually caused by the breach—i.e., where the transaction would have failed, and the damage would have been suffered, even if no breach occurred.

*Id*.  "Thus, even where a party breaches by repudiation, '[h]is duty to pay damages is discharged if it subsequently appears that there would have been a total failure of performance by the injured party.'" *Id*. (citing Restatement (Second) of Contracts § 254(1), cmt a.).

The Debtors cite outdated cases misstating their burden to show that they were "ready, willing and able" to perform their obligations under the APA and are entitled to recover damages for any alleged anticipatory repudiation by Global.  The Debtors rely heavily on *American List*

28

*Corp. v. U.S. News & World Report*, 549 N.E.2d 1161 (1989), for the proposition that a

"nonrepudiating party need not . . . tender performance *nor prove its ability to perform the*

*contract in the future*," arguing that they, therefore, have *no* obligation to show that they were

ready, willing, and able to meet their obligations under the APA.  Mem. In Support, at 29.  But

that case featured unusual facts and was highlighted as an outlier to the rule for that very reason

by the New York Court of Appeals in *Pesa*:

> This allocation of the [non-repudiating party's] burden of proof [to show their
> readiness, willingness, and ability to perform] is not inconsistent with our
> decision in *American List Corp. v. U.S. News & World Report*, [549 N.E.2d 1161
> (1989)].  That case involved the repudiation by a magazine of a contract to rent
> mailing lists from a list supplier "over a 10-year period."  We held that "[t]he
> nonrepudiating party need not . . . prove its ability to perform the contract in the
> future."  In context, this meant that the plaintiff would not be forced to meet the
> perhaps impossible burden of showing what its financial condition would have
> been for many years to come.

965 N.E.2d at 230–31.  But, like the case at hand:

> No comparable burden falls on the non-repudiating party in a case like this one.
> These [non-repudiating parties] need only show that they would and could have
> closed the transaction if the [repudiating party] had proceeded to a closing as the
> contract required.

*Id*. at 23 (emphasis added).   The New York Court of Appeals has plainly stated that in order to

collect damages, the Debtors must show "that but for [Global's alleged] repudiation, the

transaction could and would have closed."  *Pesa v. Yoma Dev. Grp., Inc*., 965 N.E.2d 228, 230

(N.Y. 2012).[21]   In the instant matter, that means the Debtors must demonstrate that the

transaction would have closed, i.e., the Amended Plan would have been confirmed.

---

[21]    The Debtors also cite *Argonaut Partnership L.P. v. Sidek*, No. 96-CIV-1967, 1996 WL 617335, at *1
(S.D.N.Y. Oct. 25, 1996) for the erroneous proposition that they do not have to show that "all conditions to closing
would have been satisfied."  Mem. In Support, at 29.  That case concerned whether a repudiating party successfully
retracted its repudiation, and stands for the proposition that a non-repudiating party does not have to tender
performance in the presence of an unretracted repudiation.  *Argonaut P'ship L.P*., 1996 WL 617335, at *7.  It does
not address whether a non-repudiating party has to demonstrate that all conditions to closing have to be satisfied in
order to demonstrate that party's readiness, willingness, and ability to perform.

> ### 3. To show their readiness, willingness, and ability to perform their obligations under the APA, but for the alleged repudiation by Global, they must show that the Amended Plan was feasible

Here, then, the Debtors must demonstrate to this Court that they were ready, willing, and able to perform all of their obligations required to close under the APA, but for any alleged anticipatory repudiation by Global.  *Pesa*, 965 N.E.2d at 230.[22]  The Debtors were obligated, among other things, to obtain confirmation of the Amended Plan prior to closing.  *See* Ex. 1 (APA), §§ 7.1(d) (identifying "Conditions to Closing"), 8.2(e) (requiring Debtors to deliver "a certified copy of the Confirmation Order").  Confirmation of the Amended Plan by the Bankruptcy Court was one enumerated condition precedent to closing pursuant to the APA (identified in Articles III and VII of the APA).

The Debtors argue that New York courts would not require them to speculate about the outcome of the Confirmation Hearing that was scheduled to occur only days after they terminated the APA and withdrew the Amended Plan.  The Debtors rely upon the *King World Productions, Inc. v. Financial News Network, Inc.* decision for this erroneous proposition.  660 F. Supp. 1381, 1387 (S.D.N.Y. 1987).  Most importantly, *King World* was decided after a bench trial where the court made findings of fact and conclusions of law on the "ready, willing, and able" requirement.  *Id*. at 1387.  There, a condition precedent to the closing of a sublease was the landlord's approval of the sublessor.  The question of the ability to obtain the landlord's approval

---

[22]    Those obligations for which a non-repudiating party must be ready, willing, and able to perform include those that have not yet occurred, like ability to close on a deal, *see In re Randall's Island Family Golf Ctrs., Inc.*, 272 B.R. at 524; ability to pay money that will be owed under a contract, *see Deforest Radio Tel. & Tel. Co. v. Triangle Radio Supply Co.*, 153 N.E. 75, 79 (N.Y. 1926); ability to take down fiber optic cable capacity, *see In re Asia Global Crossing, Ltd.*, 326 B.R. at 257; ability to satisfy a condition precedent to closing, *see Rus, Inc. v. Bay Indus., Inc.*, 322 F. Supp.2d 302, 310 (S.D.N.Y. 2003); or being financially able to consummate a deal, *see Scull v. Sicoli*, 668 N.Y.S.2d 827, 828 (N.Y. App. Div. 4th Dep't 1998) (finding that plaintiffs failed to meet burden to establish that they were ready, willing and able to perform because they provided "no proof that [they] were financially able at any time to consummate the deal").

was a fact issue heard by the court—it was not decided as a matter of law.[23]  *Id.*  Contrary to the implication of the Debtors' briefing, the court in *King World* substantively evaluated the evidence adduced at trial to establish whether or not the landlord would have approved the lease. *Id.*[24]

Implicit in the *King World* decision is the notion that inability to meet a condition precedent will excuse repudiation.  The Debtors' ability to meet a condition precedent is a question of fact.  Thus, Global should be permitted to present evidence regarding Amended Plan feasibility and confirmation, because if the Amended Plan would not have been confirmed Global's repudiation—if there were one—would be excused.

Moreover, evidence relating to feasibility is not only relevant to Debtors' breach of contract claim, but is also directly relevant to whether Global repudiated the APA merely by raising the issue of feasibility with the Court.  In deciding whoever ultimately prevails, essential

---

[23]    The Debtors' citation to *King World* and their misrepresentation of the same to this Court is disconcerting. There is no question that the *King World* opinion followed a trial and, likewise, there can be no question that *King World* simply does not stand for the proposition (or otherwise support Debtors' arguments) that feasibility should be excluded from this case.  To the contrary, *King World* states that the ability to meet a condition precedent is essential to determining if a non-repudiating party is ready, willing, and able to perform.  New York law, even as cited by the Debtors, makes clear material issues of fact pervade every aspect of the Debtors' breach-of-contract claim and summary judgment on any aspect of the same is simply premature, improper, and in error.

[24]    The *King World* court explained:

FNN has not met that burden. Its portrayal of its own financial condition as so questionable that the landlord would not have approved the sublease is not only conjectural, but highly speculative. FNN's 10Q SEC statement does not reveal FNN as an inherently undesirable subtenant; many large companies have periods of losses, and continue to function for years. Indeed, judicial notice may be taken of the fact that as of the time of trial, FNN's stock is listed on NASDAQ and it appears to be a viable company. Moreover, the master lease attached to the parties' sublease provides that in the event of default by FNN, King World would have remained liable to the landlord for the full rent owed. In the absence of an express agreement by which the landlord releases its primary tenant of such liability, the primary tenant's obligation for the full rent is not extinguished.  Given that King World would have remained liable for the rent, it is not apparent what financial objection the landlord could have had to accepting another party as also liable for the rent. Indeed, it would have the benefit of an additional obligor.

*King World Prods., Inc. v. Fin. News Network, Inc.*, 660 F. Supp. 1381, 1387 (S.D.N.Y. 1987), *aff'd sub nom., King World Prods., Inc. v. Fin. News Network*, 834 F.2d 267 (2d Cir. 1987).

questions of fact revolve around feasibility and confirmation for the fact finder's consideration. Accordingly, granting either Debtors' motion for summary judgment or motion in *limine* is improper and prejudicial because such ruling would exclude evidence, testimony, and discovery regarding feasibility.

### B.  The Prevention Doctrine Does Not Preclude Evidence of Feasibility

The prevention doctrine states that "a party may not avoid performance of a contractual duty by preventing the occurrence of a condition precedent." *Consol. Edison, Inc. v. Ne. Utils.,* 426 F.3d 524, 528 (2d Cir. 2005).  Therefore, "a party cannot insist upon a condition precedent, when its non-performance has been caused by himself." *Ferguson v. Lion Holding, Inc.,* 478 F.Supp.2d 455, 470 (S.D.N.Y. 2007) (quoting *A.H.A. Gen. Constr., Inc. v. N.Y. City Housing Auth.,* 699 N.E.2d 368, 374 (1998)).  A key requirement of the doctrine, however, is that the party "must prevent the occurrence of the condition in bad faith or wrongfully." *MCI LLC v. Rutgers Cas. Ins. Co.,* No. 06-CIV-4412, 2007 WL 4258190, at *10 (S.D.N.Y. 2007) (emphasis added).

Here, the Debtors allege that Global "obstructed approval of the [Amended Plan] by filing the Motion to Vacate, seeking to adjourn indefinitely the confirmation hearing, and filing Global's Plan Objection."  Mem. In Support, at 35.  But the Debtors have offered no evidence that Global's actions were nefarious attempts to avoid its own performance of its obligations under the APA; therefore, Debtors' assertion of the prevention doctrine fails for this reason alone.  Far from acting in bad faith, Global merely alerted the Court of its belief that the financial collapse of the Debtors' Properties jeopardized the feasibility of the Amended Plan:

> The unfortunate situation that exists due to the collapse of the Debtors' business makes a quick return of this business to Chapter 11 (a Chapter 33!) or Chapter 7 bankruptcy a certainty if the [Amended] Plan is confirmed.  If this [Amended] Plan goes forward and the business returns to bankruptcy, many jobs will be lost. In addition, employees, customers, future post-emergence trade, tort or other

creditors, post-confirmation equity and other constituencies would be hurt if there is a future default, foreclosure, further restructuring or bankruptcy.

Ex. 19.

Importantly, however, nothing in the APA prohibited Global from raising feasibility concerns with the Bankruptcy Court. Moreover, no provision of the APA could be construed to require Global to proceed silently with a transaction without bringing material concerns regarding the viability of the Amended Plan to the Bankruptcy Court's attention. Finally here, the Bankruptcy Court (i) itself recognized Global as a contract party had standing to and was correct in alerting the Bankruptcy Court to the Debtors' actual financial performance as being different from the published projections attached to the Amended Disclosure Statement, and (ii) in light of the Global Motion to Vacate, referred feasibility issues to the hearing on confirmation.

Additionally, "[t]he Second Circuit has . . . affirmed that in cases involving prevention, '[w]here a promisor has no duty to bring about the condition precedent to his promise, only *active* conduct by the promisor to frustrate the occurrence of the condition precedent constitutes waiver of that condition precedent.'" *Ferguson,* 478 F.Supp.2d at 470 (quoting *In re Banker's Trust Co.*, 450 F.3d 121, 128 (2d Cir. 2006)). Here, the Debtors withdrew the Amended Plan just days prior to the Confirmation Hearing. Global's Confirmation Objection simply analyzed the Debtors' financials against the terms of the Amended Credit Agreement attached to the APA, and concluded that Global would be unable to operate the properties and meet its required debt service. *See* Ex. 20, at ¶ 14. ("Based upon the Debtors' financial trajectory in 2012, the current trend indicates that EBITDA for 2013 will track far below level[s] needed to comply with the terms of the Credit Agreement or to generate sufficient cash flow to make capital expenditure necessary to reverse the downward trajectory.").

Global's Confirmation Objection is a far cry from actively hindering or obstructing confirmation of the Amended Plan.  Indeed, in the Supplement to the Joint Disclosure Statement the Debtors stated that the "feasibility issue [should] be dealt with in connection with the Confirmation Hearing."  Ex. 18, at 3.  If the Debtors believed the Amended Plan would be confirmed, why did they not proceed to the Confirmation Hearing, confirm the Amended Plan, and demand Global's performance?   The Debtors invited Global to raise feasibility at the Confirmation Hearing, accepting that invitation cannot now be the basis for application of the prevention doctrine.

The Debtors themselves prevented confirmation of the Amended Plan when they voluntarily withdrew the Amended Plan one week prior to the scheduled Confirmation Hearing. The prevention doctrine does not apply unless "the condition would have occurred . . . except for such prevention or hindrance."  *Amies v. Wesnofske,* 255 N.Y. 156, 163 (1931).  Moreover, the prevention doctrine does not apply where, under the contract, one party assumes the risk that fulfillment of the condition precedent will be prevented.  *See In re Gulf Oil/Cities Serv. Tender Offer Litig*., 725 F.Supp. 712, 737 (S.D.N.Y. 1989) (citing *Mobile Commc'ns Corp. of Am. v. MCI Commc'ns Corp.,* No. 81081985, 1985 WL 11574, at *4 (Del. Ch. Aug. 27, 1985) (finding that in contract requiring approval by one party's board of directors, other side assumed risk that fulfillment of the condition precedent would be prevented because management would provide skewed presentation of deal to board)).

At the very least, the Debtors must show that Global repudiated the APA, before they can successfully apply the prevention doctrine.  *See In re Food Mgmt. Group, Inc.*, 372 B.R. 171 (Bankr. S.D.N.Y. 2007) (finding first that the defendant repudiated the contract and then determining whether such repudiation foreclosed the plaintiff's performance).  Debtors cannot

shirk their burden to prove anticipatory repudiation by simply asserting that Global cannot defend its repudiation claim under the prevention doctrine.  To exclude evidence of feasibility from this proceeding would effectively prevent Global from defending the Debtors' repudiation claim, which Global is unquestionably entitled to do.

### IV. The Debtors Waived Their Affirmative Defenses of Novation, and Election of Remedies

First off, the Debtors waived any affirmative defense of novation, waiver, and election of remedies for failing to specifically plead them in their Answer or raise them at any time prior to filing the Motion.  *See Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 526 (2d Cir. 2004) (failure to plead affirmative defense results in waiver); *see also In re Cross Media Mktg. Corp.*, 367 B.R. 435, 446 (Bankr. S.D.N.Y. 2007) ("Unless Defendants can assert that the affirmative defenses now being alleged were not available at the pleading stage, Defendants' failure to plead these defenses should result in a waiver."); *Mazzei v. Money Store*, 288 F.R.D. 45, 64 (S.D.N.Y. 2012) (finding that defendants had waived the defense of novation when they failed to plead the defense in their pleading); *MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*, 842 F. Supp. 2d 682, 709–10 (S.D.N.Y. 2012) (dismissing defendant's election of remedies defense for failure to plead it in its Answer).

The Debtors' Answer asserts neither novation nor election of remedies as affirmative defenses despite being available at the pleading stage.  [*Legends Gaming of La-1, LLC et al.'s Answer To First Amended Complaint*, ECF Doc. 41].  There can be no good cause for failing to assert those defenses until now.  Therefore, those affirmative defenses fail as having been waived.  What follows below is, alternatively, is Global's substantive argument in opposition to the Debtors' affirmative defenses raised by Debtors in their motion, including the two waived, as though they had been raised properly at the pleading stage.  However, Global asserts that the

cited affirmative defenses of novation and election of remedies should be deemed waived, and that there is no need for this Court to further consider these late and improperly raised defenses.

### V.  Global Did Not Novate, Waive, Or Otherwise Extinguish The Debtors' Breach Of The APA

The unambiguous language of the Amendment makes clear the parties did not intend to foreclose the Debtors' obligation to operate the properties in the ordinary course of business or release any claims arising from the Debtors' past, present, or future failure to do so.  The Debtors contend that the Amendment and APA are (1) unambiguous, and (2) that the Amendment was intended to settle or release any alleged pre-Amendment breaches of the APA.  Each of the Debtors' arguments, including novation, waiver, election of remedies, and estoppel are belied by the unambiguous language of the Amendment.

The Amendment is irrefutably silent regarding Section 5.1(b) of the APA, the provision mandating operation of the property in the ordinary course of business, and is similarly silent regarding the release of any claims arising from the Debtors' pre-Amendment breach(es). Indeed, the Debtors' lawyers drafted the Amendment. Had the Debtors intended to novate existing provisions of the APA or, at least, amend the provision of the APA mandating operation in the ordinary course of business, they would have said so in the Amendment—they did not.

New York law forbids the introduction of extrinsic parole evidence to vary the intent of the parties as reflected in an unambiguous written agreement, yet that is precisely what the Debtors invite the Court to do.  The Court should decline the invitation, enforce the unambiguous language of the Amendment, and deny the Motion.

### A.  The Amendment Is Not A Novation Of The APA As A Matter Of Law

   *1.  The unambiguous language of the Amendment indicates no intent of the parties to effect a novation of the Debtors' obligations under the APA*

The Amendment is not a novation as a matter of law.  Novation turns on the intent of the parties which—in the absence of extrinsic evidence—is a question of law for the court.  *Bowes & Co. v. Am. Druggists' Ins. Co.*, 460 N.E.2d 1353 (N.Y. 1984).  If the language of a contract is clear and unambiguous, courts will not look to extrinsic evidence of intent and should resolve the dispute on summary judgment.  *See In re WorldCom, Inc.*, 06 CIV. 5245, 2007 WL 2049723, at *2 (S.D.N.Y. July 13, 2007).   Here, the parties all agree the Amendment is clear and unambiguous: "Except as specifically stated herein, all terms, covenants, and conditions of the purchase agreement shall remain in full force and effect."  Ex. S to Debtors' SOF, at ¶ 10.  The Amendment's plain language clearly states that the Debtors' obligation to operate the properties in the ordinary course of business, as required by the APA, remained unaffected.  In fact, New York courts have held that when agreements are clear and unambiguous, intent may be determined as a matter of law from documents exclusively.  *See Ashwood Capital, Inc. v. OTG Mgmt., Inc.*, 948 N.Y.S.2d 292, 297–98 (N.Y. App. Div. 2012); *see also Sci. Applications Int'l Corp. v. State of N.Y.*, 60 A.D.3d 1257, 1259 (N.Y. App. Div. 2009).  As a matter of law, the unambiguous Amendment cannot be read as an agreement to extinguish either the Debtors' obligation to operate in the ordinary course of business or its failure to do so.

In order for the Debtors and First Lien Parties to establish a novation—which they cannot—they must prove (1) a previously valid obligation; (2) an agreement of all parties to the extinguishment of the old contract; (3) an agreement of the parties to a new contract; and (4) a valid new contract.  *Sudul v. Computer Outsourcing Svcs., Inc.*, 917 F. Supp. 1033, 1047 (S.D.N.Y. 1996).  The parties, however, never agreed to extinguish the APA.  The Amendment contains no language relating to either Section 5.1(b) of the APA or any language releasing or

discharging any prior breach of the APA.  There cannot be a novation as a matter of law because at least one of the essential elements of novation is missing.

In similar cases, New York courts have been reluctant to find novation.  In one case, the court found as a matter of law that the parties did not intend to create a novation when they did not use unequivocal language that the new agreement should replace the old.  *Koenig Iron Works, Inc. v. Sterling Factories, Inc.*, No. 89-CIV-4257, 1999 WL 178785, at *8 (S.D.N.Y. Mar. 30, 1999).  The court found that the documents affecting the alleged novation "do not contain language which even suggests that the obligations under the original contract are being extinguished; nor is there any reference to a release."  *Id.*  In another case, the court refused to find a novation where the alleged new agreement neither provided for the extinguishment of the existing obligations, nor contained a provision releasing or discharging liability arising from the extinguished obligation.  *LCA Leasing Corp. v. Borvig Corp.*, 826 F. Supp. 776, 779–80 (S.D.N.Y. 1993) (stating that based upon the plain language of the agreements "no rational trier of fact could find novation on these facts").

Moreover, the Debtors' case authority is inapposite.  In *Sudul*, the court found a novation because the plaintiff's salary was expressly reduced in the amended employment agreement.  917 F. Supp. at 1048.  The novation, however, was not found to extinguish claims for the defendant's breach of other non-affected provisions of the plaintiff's employment contract.  *Id.*  Rather, the novation was limited only to the portions of the employment agreement that were expressly changed, i.e., Sudul's salary.  *Id.*  Similarly, in *Metropolitan Steel Industries, Inc. v. Fidelity & Deposit Co. of Maryland*, the court found a novation where the parties had entered into a written settlement agreement that expressly lowered the contract price and discharged earlier obligations.  68 A.D.2d 935, 935 (N.Y. App. Div. 1979).  In both *Sudul* and *Metropolitan Steel*, the written

38

agreements expressly referenced the prior obligations they were found to novate base salary and contract price, respectively, and the courts determined the novations from language employed in the subsequent written agreements. *Sudul*, 917 F. Supp. at 1048 ("[I]t is clear from the language of the Amendment that the parties intended the Amendment to discharge the existing obligations of the Employment Agreement and that the Amendment would be substituted as the new agreement for the future."); *Metro. Steel*, 68 A.D.2d at 935.

Here, the Amendment is unambiguous and does not evidence an intent to novate the APA or release the Debtors' breach of the APA.  Section 5.1(b) of the APA required the Debtors to operate the casinos in the "Ordinary Course of Business," which meant "operat[ing] and conduct[ing] the affairs of the Legends Entities . . . consistent with past practice"—in sum, operating the casinos as a going-concern, including tending to all matter necessary to ensure the continued operation of the casinos. But the Amendment is irrefutably silent regarding Section 5.1(b) and is similarly silent regarding the release of any claims arising from the Debtors' pre-Amendment breach of the APA.  The plain language of the Amendment does, however, preserve the Debtors' obligation to operate the casinos in the ordinary course of business.  The Amendment set forth specific additional capital expenditures to be made by the Debtor and/or credited to Global at closing.  *See* Ex. 2, ¶ 6.  The Amendment did not address or change the APA requirement for the Debtors to operate the casinos in the ordinary course of business.

The Amendment did just what its name suggests: it amended the APA.  Nothing more. Without an express agreement in the Amendment for an existing obligation to be extinguished immediately by the acceptance of a new promise, there can be no novation under New York law. Indeed, if the parties had intended to extinguish all rights and obligations regarding operating the casinos as a matter of law (which included maintaining an adequate working capital structure and

making necessary capital expenditures), they would have indicated that intent in the Amendment. They did not.  The Debtors have presented no competent evidence that the parties intended the Amendment to act as a novation of the APA.  Therefore, as a matter of law, the unambiguous Amendment cannot be read as an agreement to extinguish the Debtors' obligation to operate in the ordinary course of business or excuse its failure to do so.

2.   *The consideration of parole evidence is prohibited when the language of the contract is unambiguous*

Under the same principle, consideration of extrinsic evidence is improper.  Interestingly, the Debtors agree that the language of the Amendment is "unambiguous in its terms" and that "the Court can readily determine the intent of the parties and effect of the Amendment on the original APA," *see* Mem. In Support, at 18, yet they nevertheless improperly attempt to introduce extrinsic evidence.  *See id*. at 21–24 & Debtors' Exs. D–E, G, I, K–R.  But the consideration of extrinsic or parole evidence is prohibited in the presence of an unambiguous contract.  The Debtors' attempt to sidestep the Amendment's unambiguous language by offering inadmissible extrinsic evidence is in contravention of New York law.  *See In re WorldCom, Inc.*, No. 06-Civ-5245, 2007 WL 2049723, at *2 (S.D.N.Y. July 13, 2007); *see also JA Apparel Corp. v. Abboud*, 682 F. Supp.2d 294, 302 (S.D.N.Y. 2010) ("Courts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include."); *Grennfield v. Philles Records*, 98 N.Y.2d 562, 569–70 (N.Y. 2002) ("[I]f the agreement on its face is reasonably susceptible of only one meaning, a court is not free to alter the contract to reflect its personal notions of fairness and equity."); *Kasowitz, Benson, Torres & Friedman, LLP v. Reade*, 950 N.Y.S.2d 8, 11 (N.Y. App. Div. 1st Dep't 2012) (finding that a mere assertion by one party that contract language means something to them does not raise a fact issue in the face of a clear, unequivocal, and understandable written agreement).

Under New York law, courts determining contract disputes "begin[] by examining the language of the contract itself to determine the parties' intent." *Lloyds Bank PIC v. Republic of Ecuador*, Nos. 1789-90, 1792-75, 1797, 1998 WL 118170, at *8 (S.D.N.Y. Mar. 16, 1998). "If the agreement sets forth the parties' intent clearly and unambiguously, the Court need look no further." *Id.* "The fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent and that the best evidence of what parties to a written agreement intends is what they say in their writing." *Kasowitz*, 950 N.Y.S.2d at 11. "A contract is unambiguous if the language it uses has a definite and precise meaning unattended by danger of misconception in the purport of the agreement itself, and concerning which there is no reasonable basis for difference of opinion." *Greenfield*, 780 N.E.2d at 170–71 (citing *Breed v. Ins. Co. of N. Am.*, 385 N.E.2d 1280, 1283 (N.Y. 1978)); *see also Kasowitz*, 950 N.Y.S.2d at 11. Here, the parties unanimously agree that the Amendment is unambiguous, but "[w]hether the text of an agreement is ambiguous or unambiguous is a matter of law to be decided by the Court." *Lloyds Bank PIC*, 1998 WL 118170, at *8.

> Where a contract is negotiated by sophisticated parties at arm's length, as here:
>
> Courts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include. Hence, courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing. *Vt. Teddy Bear Co., Inc. v. 538 Madison Realty Co.*, 1 N.Y.3d 470, 475 (2004) (internal citations omitted); *see also Beth Isr. Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 580 (2d Cir. 2006) ("Under New York law, [c]ourt[s] must enforce contract provisions clearly-expressing parties' intent."); *Terwilliger v. Terwilliger*, 206 F.3d 240, 245 (2d Cir. 2000) ("A court may neither rewrite, under the guise of interpretation, a term of the contract when the term is clear and unambiguous, nor redraft a contract to accord with its instinct for the dispensation of equity upon the facts of a given case."); *Belle Harbor Wash. Hotel, Inc. v. Jefferson Omega Corp.*, 17 A.D.3d 612 (2d Dep't 2005) ("A written agreement that is complete, clear, and unambiguous on its face must be enforced in accordance with the plain meaning of its terms.").

41

*JA Apparel Corp. v. Abboud*, 682 F. Supp.2d 294, 302 (S.D.N.Y. 2010); *see also Nat'l Am. Corp. v. Fed. Republic of Nigeria*, 448 F. Supp. 622, 643–44 (S.D.N.Y. 1978) (finding that the language of the agreement serves as the  best indicator of the parties' intent where agreement acknowledges inability to perform and releases and discharges the same in the express agreement).

The unambiguous language employed in the Amendment makes clear that the parties never intended to discharge or release any liabilities or obligations set forth in the APA, except as expressly enumerated in the Amendment.  Accordingly, as a matter of law, the Court can properly find that the Amendment neither negated the Debtors' obligation to operate the properties in the ordinary course of business pursuant to Section 5.1(b) of the APA, nor released any claims arising from the Debtors' failure to do so.

If this Court finds the Amendment to be unambiguous as a matter of law, then the Debtors are prohibited from introducing and requesting this Court to consider parole evidence on the issue of whether the Amendment operated as a novation to the APA and, therefore, discharged the Debtors' obligation to operate the casinos in the ordinary course.  The Court should disregard any arguments or attempts to introduce extrinsic evidence and deny the Motion.

> ### 3.   *Even if the Court considers parole evidence, the Debtors still failed to provide evidence that the Amendment is a novation of the APA*

The Debtors have failed to provide any evidence that the Amendment is a novation of the APA.  The parole evidence introduced by the Debtors attempts to demonstrate that Global had "serious concerns" about the Debtors' failure to operate the casinos in the ordinary course and wished to "rectify" the situation.  Mem. In Support, at 21 & SOF ¶ 11, Debtors' Ex. E.  The actual extent of the Debtors' failure to operate the casinos in the ordinary course of business and consistent with past practices until closing remained hidden from Global, and the Amendment

did not address, much less extinguish or relinquish, that on-going requirement.  The Debtors (and First Lien Parties) never intended to maintain the financial performance of the casinos as represented to Global prior to execution of the APA and they purposefully failed to disclose the true financial state of the casinos until it could no longer be hidden.  Summary judgment is not appropriate because a genuine issue of material fact exists "such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

In fact, it cannot be disputed that Global wanted the transaction to close—the transaction that it had bargained for when the APA was executed.  But in October 2012, after learning that the Debtors' financial deterioration was continuing (trailing twelve-month EBITDA had dropped from $14.8 million to $14.1 million in a month), Mr. John Elliott, Global's CEO, e-mailed Mr. Tuck Hardie at Houlihan Lockey, who served as the financial advisor to Latham & Watkins, counsel for the First Lien Ad Hoc Group.  *See* Debtors' Ex. E.  Mr. Elliott stated that "[w]e have always said we wanted a workable capital structure . . . ."  *Id.* (emphasis added); *see also* Elliott Decl. ¶ 14.  Again, on October 25, 2012, Mr. Elliott e-mailed Mr. Hardy stating: "The requirement for a workable capital structure, that due to the above performance decline is not workable and cannot be presented to either the court or the licensing commissions."  Debtors' Ex. G (emphasis added); Elliott Decl. ¶ 15.  Yet again, on October 31, 2012, Mr. Elliott e-mailed Mr. Eben Perison, the Debtors' financial advisor with the Seaport Group, stating that Global wants to ensure the deal has a workable capital structure "considering the property circumstances and this is required by the court, commissions etc so we all need to be on the same page."  Elliott Decl. ¶ 15.  Global's intent and focus in negotiating the Amendment was centered on ensuring a workable capital structure as represented in the APA, so that the Amended Plan could be

confirmed, and the transaction would close.  Moreover, the intent and focus was guided by the financial information available to Global at the time the Amendment was executed.

The Amendment was executed in response to Global's concerns that the casinos were in decline after a meeting at the Bossier City casino in October 2012.   What Global ascertained from that meeting was that the Debtors were making only limited and absolutely necessary capital expenditures and deferring all others.   Importantly, the sole intent of Paragraph 6 of the Amendment, which established a minimum amount of funding to be spent on capital expenditures, was to ensure that the Debtors maintained some level of capital expenditures to offset the mounting capital expenditures that Global would need to make after the transaction closed.  Elliott Decl. ¶ 17.

But the Debtors purposefully hid the true financial decline that was precipitated by more than simply the Debtors' failure to meet minimum capital expenditure requirements—it was actually fueled by the Debtors' failure to operate in the Ordinary Course of Business and to continue operating the casinos as a going concern.  *See* Elliott Decl. ¶¶ 11–17 & 21–22.

If the Debtors' parole evidence is allowed, it actually demonstrates that the Debtors cannot meet their burden to show as a matter of law that the parties intended for the Amendment to act as a novation.  Indeed, the Amendment "shall be considered an amendment to and a part of the Purchase Agreement" and "[e]xcept as specifically stated herein, all terms, covenants, and conditions of the Purchase Agreement shall remain in full force and effect."  *Id.*  Global did not intend to release the Debtors from their obligation to operate in the ordinary course of business from July 25, 2012 through closing of the APA.  Elliott Decl. ¶¶ 18–19.  Likewise, it was not Global's intent that paragraph six of the Amendment would supplant, extinguish, or replace the Debtors' obligations as provided in Section 5.1(b) of the APA.  *Id.*  Nothing in the Amendment

can be read to effect Section 5.1(b) of the APA or to release any breach of the same.  In fact, the Debtors have failed to adduce any evidence that negotiations for the Amendment contemplated or even related to the Debtors' obligation under Section 5.1 (b) of the APA.  *Id*.  The Debtors' parole evidence coupled with Mr. Elliot's Declaration raises genuine issues of material fact regarding Global's intent in entering the Amendment.  In light of the fact issues raised, the Motion should be denied.  *See* FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## VI. The Waiver Claim Fails

The Debtors' waiver claim fails because they cannot show that Global intended to knowingly relinquish its right to pursue claims against the Debtors for failing to operate in the ordinary course of business.  *See Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgm't., L.P.*, 850 N.E.2d 653, 658 (N.Y. 2006) (contractual rights may be waived only when knowingly, voluntarily, and intentionally abandoned.).  Here, the APA contained a "no-waiver" provision that protected both parties from inadvertently waiving their rights under the agreement by requiring waivers to be in writing to be effective.  *See* Ex. 1 (APA), § 10.11.  Although the Amendment is a writing, it clearly and unambiguously identified only those provisions in the APA which the parties intended to amend—the cash purchase price and credit terms—and clarified the Debtors' obligations already agreed upon in the APA without altering or forgiving the Debtors' obligation to operate the casinos in the ordinary course of business as required by Section 5.1(b) of the APA:  "Except as specifically stated herein, all terms, covenants, and conditions of the Purchase Agreement shall remain in full force and effect."  Ex. 2, ¶ 10.  The unambiguous Amendment simply does not contemplate the extinguishment of any obligations under the APA.

45

As explained by the court in *Airco Alloys Division, Airco Inc. v. Niagara Mohawk Power Corp.*, a case cited by the Debtors, "the rule is well settled that the construction of a plain and unambiguous contract is for the court to pass on, and that circumstances extrinsic to the agreement will not be considered when the intention of the parties can be gathered from the instrument itself."  430 N.Y.S.2d 179, 184 (N.Y. App. Div. 4th Dep't 1980) (internal quotations and citations omitted); *see also JA Apparel Corp.*, 682 F. Supp.2d at 302.  The Debtors are precluded from introducing parole evidence in support of its waiver argument because the Amendment is unambiguous.  Nevertheless, "[g]enerally, the existence of an intent to forgo such a right is a question of fact" and, therefore, any claim for waiver of any contractual right should be reserved for trial.  *Fundamental Portfolio Advisors*, 850 N.E.2d at 658.

Global negotiated for, retained, and sought to protect its rights to enforce Section 5.1(b) of the APA.  Elliot Decl. at ¶¶ 5–7 & 19.  *See Fundamental Portfolio*, 7 N.Y.3d at 105; *see also In re Caldor, Inc.-NY*, 217 B.R. 121, 133 (Bankr. S.D.N.Y. 1998) (waiver particularly ill-suited for summary judgment because it is based on intent and often a fact question).  The unambiguous Amendment simply does not contemplate the extinguishment of obligations or the release or discharge of any claims.  The Debtors' arguments are unavailing and fail for the same reason their novation argument fails.  Accordingly, the Debtors' waiver argument should be denied.

Further, the execution of the Amendment is not evidence of Global's knowing, voluntary, and intentional relinquishment of its rights pursuant to Section 5.1(b) of the APA.  *Fundamental Portfolio*, 7 N.Y.3d at 105.  Global's focus in connection with the Amendment was on a workable capital structure.  Elliot Decl. ¶ 6–7.  Global negotiated the terms of the Amendment based upon the Debtors' representation that $14.1 million of EBITDA for 2012 was an attainable target.  Elliot Decl. ¶¶ 11–18.  The Debtors' financial projections in support of the Amended

Disclosure Statement, again, projected $14.1 million of EBITDA for 2012.  Ex. 15.  Global entered into the Amendment assuming that the disclosed EBITDA level was attainable and would support the feasible capital structure they had negotiated.  As of November 29, 2012, Global did not yet fully understand the cataclysmic impact of the Debtors' failure to operate the properties in the ordinary course of business, because they had not yet grasped the magnitude of the financial decline.  *See* Elliott Decl. ¶¶ 20–23.

Global did not intend to release the Debtors from its obligation to operate in the ordinary course of business from July 25, 2012 through the closing of the APA.  Elliot Decl. ¶¶ 18–19.  Likewise, it was not Global's intent that paragraph six of the Amendment would supplant, extinguish, or replace the Debtors' obligations as provided in Section 5.1(b) of the APA.  *Id*.  In fact, the Debtors failed to adduce any evidence that negotiations for the Amendment contemplated or otherwise even related to the Debtors' obligation under Section 5.1(b) of the APA.  *Id*.

Mr. Elliot's Declaration, coupled with the Amendment's silence regarding Section 5.1(b) of the APA, foreclose a determination that Global knowingly and intentionally relinquished its rights under Section 5.1(b) of the APA.  *See Fundamental Portfolio*, 7 N.Y.3d at 106 (refusing to grant summary judgment where evidence did not establish an intent to relinquish contractual rights because intent was a question of fact).  As a direct result of these material issues of fact, summary judgment is improper.  *See* Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## VII.    Global's Execution of the Amendment Did Not Serve as an Election of Its Remedies Precluding a Breach-of-Contract Claim

To the extent the Debtors' waiver argument is actually an "election of remedies" argument, it too misconstrues and misapplies New York law.  The "election-of-remedies"

doctrine "is based on the concept that a party may not 'exercise two alternative or inconsistent rights or remedies.'"  *MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*, 842 F. Supp. 2d 682, 709 (S.D.N.Y. 2012) (quoting *Apex Pool Equip. Corp. v. Lee*, 419 F.2d 556, 562 (2d Cir. 1969)).  As explained:

> Election applies in the absence of waiver when one party has, in fact, breached the agreement.  Election has no effect on the parties' "rights" under the agreement, nor does it in any way limit the party's "right" to pursue available remedies. Rather it demands that the party exercise its rightful remedies in a consistent and binding manner.  The party must either terminate or continue, but not both.  Nor may the party choose one avenue and then change its mind.

*ESPN, Inc. v. Comm'r of Baseball*, 76 F. Supp. 2d 383, 390 (S.D.N.Y. 1999).  Here, Global has not attempted to exercise alternative or inconsistent rights or remedies.  Global's election to continue under the Amendment and the APA had no effect on its rights under the agreements or its rights to pursue available remedies now.  "Good faith attempts to realize contractual benefits by negotiating with a counterparty, rather than immediately filing suit, do not constitute an election of remedies."  *MBIA Ins. Corp.*, LLC, 842 F. Supp. 2d at 711 (citing *Seven-Up Bottling Co. (Bangkok) v. Pepsico*, 686 F. Supp. 1015, 1023 (S.D.N.Y. 1988) ("[A] party's reluctance to terminate a contract upon a breach and its attempts to encourage the breaching party to adhere to its obligations under the contract do not necessarily constitute a waiver of the innocent party's rights in the future.").

"Furthermore, an election of remedies requires an affirmative action of some kind."  *Id.* at 710 (citing *Hallinan v. Republic Bank & Trust Co.*, 519 F. Supp. 2d 340, 352 (S.D.N.Y. 2007)).  Here, Global informed the Debtors on January 4, 2013, that they breached the APA by failing to operate in the Ordinary Course of Business and by submitting an Amended Plan that could not be confirmed due to lack of feasibility.  *See* Shelby Decl. ¶ 6, Ex. 12.  Despite the Debtors' breaches, Global refrained from terminating the APA as amended, optimistic that the

transaction could be saved.  But Global never stated that it would forego the Debtors' breach.

Moreover, "the doctrine of election of remedies typically only applies when the non-breaching

party continued to receive benefits under the contract." *Id*. at 711 (citing *Hallinan*, 519 F. Supp.

2d at 352).  Global did not receive any benefits under the APA or the Amendment after learning

of the Debtors' breach of the APA.  Global was prepared to close on the transaction if the

Debtors could fulfill the APA requirement to confirm the Amended Plan.  Unfortunately,

however, the transaction halted when the Debtors withdrew the Amended Plan and terminated

the APA.

Because the Debtors have not established that Global pursued two opposing courses of

action after the Debtors breached the APA, the election of remedies doctrine does not bar

Global's claim for breach of contract.  Therefore, summary judgment should be denied.

### VIII.   Global's Execution Of The Amendment Does Not Serve To Equitably Estop The Pursuit Of Its Breach-of-Contract Claim

The Debtors' equitable estoppel argument is unfounded and meritless.  "In the absence of

evidence that a party was misled by another's conduct or that the Party significantly and

justifiably relied on the conduct to its disadvantage, 'an essential element of estoppel is

lacking.'"  *Fundamental Portfolio Advisors, Inc.*, 850 N.E.2d at 659 (quoting *Lynn v. Lynn*, 97

N.E.2d 748 (N.Y. 1951)).

The Debtors' claim fails because they cannot satisfy their burden and show as a matter of

law all of the required elements for their estoppel defense.  Indeed, the Debtors merely provide

one e-mail evidencing the parties' negotiations relating to the Amendment, which actually

highlights Global's desire for the Debtors to perform their obligations to operate the casinos in

the ordinary course.  *See* Debtors' Ex. O ("It is an integral issue to [Global] that the business

49

continue to be operated in the ordinary course.").  That e-mail provides no evidence of any of the elements required for an equitable estoppel defense.

The Debtors provide no evidence that Global expressly stated, either in the negotiations leading to the execution of the Amendment or in the Amendment itself, that it intended to forgo any breach of contract claim against the Debtors for their failure to operate the casinos in the ordinary course in exchange for executing the Amendment.   There is no evidence of a "settlement" releasing or discharging the Debtors' obligations under Section 5.1(b) of the APA or any other evidence that Global intentionally and knowingly relinquished its rights under that provision.

In fact, the plain language of the Amendment reveals no intention for Global to forgive the Debtors' breach or affect Section 5.1(b) of the APA.  Likewise, there is no evidence that negotiations for the Amendment contemplated or otherwise even related to the Debtors' obligation under Section 5.1(b) of the APA.  Therefore, the Debtors have no basis for invoking equitable estoppel.  *See Toto, Inc. v. Sony Music Entm't*, No. 12-CIV-1434, 2012 WL 6136365, at *11 (S.D.N.Y. Dec. 11, 2012) (finding no basis for asserting equitable estoppel defense in the absence of express promises or representations to forgo a right of action).  Because the Debtors have presented no evidence that they were misled by, or significantly and justifiably relied on, any alleged statements made by Global outside of or within the Amendment to its disadvantage, an essential element of estoppel is lacking.  *See Lynn*, 97 N.E.2d at 754.

In light of no evidentiary support, the Debtors make an unsubstantiated claim that they "modified the deal terms to Global's benefit in reliance on Global's representations that the parties were 'amending' any term that could be read into the APA regarding CapEx . . . ."  Mem. In Support, at 27.  The Debtors mere assertion of erroneous reliance in its moving papers does

50

establish reliance, itself a question of fact that precludes summary judgment.  The lack of any evidence supporting the Debtors' equitable estoppel defense highlights the weakness of their argument, rendering summary judgment clearly improper.

## CONCLUSION

For the foregoing reasons, Global respectfully request this Court DENY the *Debtors' and the First Lien Parties' Motion for Partial Summary Judgment of Global's Breach of Contract Claim and Feasibility Defense and Motion in* Limine *Concerning Feasibility*, on the basis of the cited applicable law and as applicable the existence of exist genuine disputes of material fact which preclude judgment in favor of the Debtors and First Lien Parties as a matter of law without trial.

Respectfully submitted,

**GORDON, ARATA, MCCOLLAM,
DUPLANTIS & EAGAN, LLC**

By: **_/s/ Louis M. Phillips_____**
Louis M. Phillips (La. Bar No. 10505)
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916
Telephone: (225) 381-9643
E-mail: lphillips@gordonarata.com

- AND -

Patrick ("Rick") M. Shelby (La. Bar No. 31963)
Meredith S. Grabill (La. Bar. No. 35484)
201 St. Charles Avenue, 40th Floor
New Orleans, Louisiana 70170-4000
Telephone:  (504) 582-1111
E-Mail:  pshelby@gordonarata.com
E-mail:  mgrabill@gordonarata.com

- AND –

**Dentons US LLP**
C. Michael Moore
Gene R. Besen
2000 McKinney Ave, Suite 1900
Dallas, TX  75201
Telephone:  (214) 259-0900
Facsimile:    (214) 259-0910
Email: mike.moore@dentons.com
Email: gene.besen@dentons.com

*Attorneys for Global Gaming Legends, LLC, Global Gaming Vicksburg, LLC, Global Gaming Solutions, LLC and Global Gaming Bossier City, LLC*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of foregoing pleading was served upon those parties below receiving electronic notification via the District Court's CM/ECF System, on the 12th day of September 2014.

*/s/ Louis M. Philips*
Louis M. Phillips (La. Bar No. 10505)

52