# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF LOUISIANA
## SHREVEPORT DIVISION

| | | |
|---|---|---|
| In re | : | Case No.12-12013 |
| | : | |
| LOUISIANA RIVERBOAT GAMING | : | Chapter 11 |
| PARTNERSHIP, *et al.*[1] | : | |
| | : | Jointly Administered |
| Debtors. | : | |

---

| | | |
|---|---|---|
| GLOBAL GAMING LEGENDS, LLC, | : | |
| ET AL. | : | Adversary No. 13-1007 |
| | : | |
| | : | |
| v. | : | CONSOLIDATED WITH |
| | : | |
| | : | |
| | : | Adversary No. 13-1008 |
| | : | |
| LEGENDS GAMING OF LOUISIANA-1, | : | |
| LLC, *et al.* | : | |
| | : | |

---

## DEFENDANTS' MOTION FOR A PROTECTIVE ORDER PRECLUDING DISCOVERY CONCERNING THE FEASIBILITY OF THE DEBTORS' CHAPTER 11 PLAN OF REORGANIZATION

---

[1]       Legends Gaming of Louisiana-1, LLC (12-12014); Legends Gaming of Louisiana-2, LLC (12-12015); Legends Gaming, LLC (12-12017); Legends Gaming of Mississippi, LLC (12-12019); and Legends Gaming of Mississippi RV Park, LLC (12-12020) are being jointly administered with Louisiana Riverboat Gaming Partnership pursuant to order of this Court [Main Case, P-6].

## TABLE OF CONTENTS

**Page**

Table of Authorities ................................................................................................ ii

INTRODUCTION ..................................................................................................... 1

PROCEDURAL HISTORY ........................................................................................ 2

STATEMENT OF FACTS .......................................................................................... 3

A.    The Global Sale ............................................................................................. 3

B.    Global's Covenants And Financial Warranties Under The APA ...................... 3

C.    The Debtors' Covenants Under The APA ....................................................... 4

D.    Conditions to Closing Under the APA ............................................................ 5

E.    The Disclaimers In The APA ......................................................................... 6

F.    The Bankruptcy Proceedings ......................................................................... 6

        1.    The August 22, 2012 hearing ............................................................ 7

        2.    The Amendment to the APA and the  November Disclosure Statement
            and Plan ............................................................................................ 11

G.    The Allegations in Global's FAC .................................................................. 12

LAW AND ARGUMENT .......................................................................................... 12

I.    Standards of Review For Issuance Of A Protective Order ................................. 13

II.    The Feasibility Standard In The FAC Does Not Apply to the November Plan ................ 14

CONCLUSION ......................................................................................................... 19

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Avance v. Kerr-McGee Chemical LLC*,
  No. 04-209, 2005 WL 5315658 (E.D. Tex. July 1, 2005) ......................................................14

*In re 47th & Belleview Partners*,
  95 B.R. 117 (Bankr. W.D. Mo. 1988)...................................................................................15

*In re AT&T Latin Am. Corp.*,
  No. 03-13538-BKC-RAM, 2004 Bankr. LEXIS 120 (Bankr. S.D. Fla. Jan. 26, 2004) ..........15

*In re Broadway 401 LLC*,
  No. 10-10070 (KJC), 2010 Bankr. LEXIS 2364 (Bankr. D. Del. Mar. 16, 2010).................15

*In re Cypresswood Land Partners, I*,
  409 B.R. 396 (Bankr. S.D. Tex. 2009) ...........................................................................16, 18

*In Re Heritage Organization, L.L.C.*,
  375 B.R. 230 (Bankr. N.D. Tex. 2007)...................................................................................17

*In re Pero Bros. Farms, Inc.*,
  90 B.R. 562 (Bankr. S.D. Fla. 1988)......................................................................................15

*In re Reading Broad., Inc.*,
  386 B.R. 562 (Bankr. E.D. Pa. 2008) ...........................................................................16, 18

STATUTES

11 U.S.C. § 363..............................................................................................................................15

11 U.S.C. § 1129(a)(11)...........................................................................................................1, 16

OTHER AUTHORITIES

Fed. R. Bankr. P. 7026..............................................................................................................1, 13

Fed. R. Bankr. P. 9016...................................................................................................................1

Fed. R. Civ. P. 26(b)(2)(C)(iii) ...................................................................................................13

Fed. R. Civ. P. 26(c)(1)(A) ..........................................................................................................13

Fed. R. Civ. P. 26(c)(1)(D) ..........................................................................................................13

ii

**NOW INTO COURT**, through undersigned counsel, come Louisiana Riverboat Gaming Partnership and its affiliates (the "Debtors"), which move this Court for an order pursuant to Rules 7026 and 9016 of the Federal Rules of Bankruptcy Procedure precluding Plaintiffs Global Gaming Legends, LLC and its affiliates ("Global") from demanding that the Debtors or others produce information regarding the feasibility of the Debtors' Chapter 11 Plan of Reorganization (the "November Plan") pursuant to 11 U.S.C. § 1129(a)(11).  As discussed in detail below, the feasibility standard articulated by Global in the First Amended Complaint ("FAC") – the predicate for several of Global's discovery requests – does not apply to the Debtors' November Plan and is therefore irrelevant to this adversary proceeding.  For the reasons set forth below, litigating Global's erroneous feasibility standard will require the parties to incur significant and unnecessary costs in discovery.  Thus, the Debtors seek a determination by the Court pursuant to this Motion for a Protective Order that the Debtors' November Plan was feasible, or, alternatively, that the only feasibility requirement applicable to the November Plan was whether there was a reasonable likelihood that the sale contemplated under the Asset Purchase Agreement (the "APA") would occur.

## INTRODUCTION

The centerpiece of the November Plan was the APA, pursuant to which Global agreed to purchase substantially all of the Debtors' assets and assume certain of the Debtors' liabilities for consideration totaling $125 million.  In the FAC, Global contends that the November Plan was not feasible because Global purportedly would not have been able to meet its "long-term" financial commitments to the First Lien Lenders had the November Plan been confirmed.  Consequently, Global has propounded numerous document requests seeking disclosure on this very point, and Global undoubtedly will pursue depositions and expert discovery on feasibility.

Following their objections to these discovery requests from Global, the Debtors now move this Court for a protective order because Global's discovery requests are predicated on the wrong feasibility standard.  As a matter of law, where, as here, a Chapter 11 plan contemplates an asset sale, the Debtors need only demonstrate that the sale has a reasonable likelihood of closing and the purchaser had the financial wherewithal to consummate the transaction.  Thus, the only feasibility issue is whether Global had the requisite funding to close under the APA (which Global explicitly represented that it would), and Global's purported inability to meet "long-term" financial commitments is irrelevant.

Because Global's stated feasibility standard is erroneous, absent the protective order requested herein, the parties will spend hundreds of thousands of dollars on unnecessary and burdensome party and expert discovery.  The Court should not sanction this result.  Thus, for all of the reasons set forth herein, the Court should issue a protective order and determine that feasibility is beyond the scope of discovery in this action.

## PROCEDURAL HISTORY

On February 4, 2013, Global filed an Original Complaint for Declaratory Judgment [P-1] against the Debtors, seeking a declaration that Global did not breach the APA and, instead, that the Debtors breached the APA and that Global was relieved of all of its contractual obligations.  On February 6, 2013, the Debtors filed a Complaint for breach of contract against Global, seeking damages for Global's breach and repudiation of the APA in an amount to be determined at trial [P-4].  The Debtors further requested that they be awarded the $6.25 million escrow deposit as part of the damages they request.

On March 25, 2013, Global filed a motion to dismiss the Debtors' Counterclaim [P-31].  Following a hearing on the motion, on April 12, 2013, the Court denied Global's motion to dismiss and entered an order [P-43] consolidating adversary proceeding numbers 13-01007 and

2

13-01008.  On April 19, 2013, the Debtors amended their Counterclaim [P-46].  Global filed its Answer to the Debtors' First Amended Counterclaim on May 3, 2013 ("Global's Answer to the FAC") [P-47].

On May 24, 2013, Global filed the FAC asserting claims for breach of contract and fraud in the inducement [P-49].  The Debtors filed their Answer to the FAC on June 7, 2013 [P-52].

## STATEMENT OF FACTS

**A.**    **The Global Sale**

After a year of negotiations and due diligence by Global, the Debtors and Global entered into the APA on July 25, 2012.  (Global's Answer to the FAC, ¶¶ 4, 6, 18, 19.)  Under the APA, Global agreed to purchase substantially all of the Debtors' assets for consideration totaling $125 million.  The consideration was to be paid by a payment of $25 million cash at closing, with the balance to be paid through new debt to be issued in favor of the first lien lenders (the "First Lien Lenders"), for which Wilmington Trust Company served as the administrative agent.  (APA, Ex. D.)  Two of the key provisions of the APA required that (i) the Debtors file a Chapter 11 plan (the "Plan"), which incorporated the APA and (ii) the Plan be confirmed by the Court by a certain date.  Global deposited $6.25 million in escrow and in reliance on the APA, the Debtors immediately commenced their bankruptcy cases to consummate the Global Sale.  (Global's Answer to the FAC, ¶¶ 6, 8.)

**B.**    **Global's Covenants And Financial Warranties Under The APA**

Section 4.2(f) of the APA provides the "Representations and Warranties of the Purchaser - Sufficient Funds":

> The Purchasers, jointly and severally, represent and warrant to the Sellers as follows:
> (f) The Purchasers have or will have prior to the Closing sufficient funds to enable them (i) **to pay all amounts payable by them hereunder, including payment of the Adjusted Cash Purchase**

3

> **Price at the Closing as contemplated herein**, (ii) to make all other necessary payments of fees and expenses in connection with the Transaction contemplated by this Agreement, and (iii) **to perform and discharge their respective obligations under this Agreement and the Transaction contemplated hereby**.  The Purchasers expressly acknowledge that their obligations hereunder are not subject to any conditions, express or implied, regarding the Purchasers' ability to obtain financing for the consummation of the transactions contemplated hereby.

(Emphasis added.)  Through this provision of the APA, Global explicitly represented to the

Debtors that it would have sufficient funds by Closing to consummate the Global Sale and to

perform its obligations under the APA and the transaction contemplated thereby.

Section 5.2 of the APA contains the Covenants of the Purchasers.  Section 5.2(b)

provides:

> The Purchasers shall provide, upon the Legends Entities' request, such information reasonably necessary pursuant to Sections 365(b) and 365(f)(2) of the Bankruptcy Code to demonstrate that (i) the applicable Purchasers, beginning as of the Closing Date, **shall have the resources to timely perform all of their obligations under the Assumed Agreements or Assumed Leases**, and (ii) LRGP, beginning as of the Closing Date, shall have the resources to timely perform all of its obligations under the LRGP Assumed Agreements.  In addition, the applicable Purchasers shall provide such other information that shall be reasonably requested by any Person that is a party to any of the Assumed Agreements, Assumed Leases or LRGP Assumed Agreements.

(Emphasis added.)  Again, this provision of the APA does not indicate that Global's obligations

or ability to assume any contracts or leases are subject to the Debtors' pre-sale financial

performance.

## C.     The Debtors' Covenants Under The APA

Section 4.1 of the APA contains the representations and warranties of the Debtors.

Notably, the APA does not contain any representations or warranties concerning the Debtors'

4

EBITDA or any other financial benchmarks that must be met for Global to be required to close the sale.

Section 5.1 of the APA details the Debtors' Covenants, and again the parties chose to omit any language that would impose a duty on the Debtors to realize certain financial targets. As evidenced by the plain language of Section 5.1, the Debtors were not required to provide assurance that they would achieve certain business objectives, that they would maintain certain levels of cash flow, or that they would make certain amounts of capital expenditures.

**D.      Conditions to Closing Under the APA**

Section 7.1 of the APA – a document signed by Global, who was indisputably well-informed on the Debtors' finances after engaging in months of negotiations and due diligence, including posting Global personnel on site at the Debtors' casinos – outlines the conditions to closing.  Such conditions did not include the Debtors achieving any prerequisite financial benchmarks.  The APA is equally silent as to the amount of the Debtors' cash flow and does not condition closing on the Debtors' capital expenditures.

Section 7.1(h) provides that, "[t]here shall not have occurred and be continuing any *Material Adverse Effect* between the date hereof and the Closing Date."   The term *Material Adverse Effect* specifically excludes the financial decline of the Debtors or the Debtors' failure to realize projected revenues.  The APA defines a "material adverse effect" as "a material adverse effect on the Purchased Assets and LRGP Retained Assets taken as a whole, other than such effect arising out of or resulting from… (b) general changes in the industries or markets in which the Legend Entities operate the Business … (h) any failure by the Legends Entities to meet any internal or published industry analyst projections or forecasts or estimates of revenues or earnings for any period."  (APA, § 1.1.)  Thus, the failure of the Debtors to meet any "internal" or "published" industry analyst projections or forecast or estimates of revenue or earnings for

5

any period is, by definition, **not** a *Material Adverse Effect*.   There can be no question that Global

assumed the risk of a decline in the Debtors' EBITDA and financial capabilities.

**E.     The Disclaimers In The APA**

Section 10.1 of the APA expressly provides that the Debtors' assets were being

transferred on an "as is" and "where is" basis "with all faults."  Under that same provision,

Global agreed that it had "adequate opportunities to conduct an independent inspection [and]

investigation" of the assets and all such matters "relating to or affecting" the assets and that any

"claims [Global] may have for breach of Representation shall be based solely on the

representations and warranties of the [Debtors] set forth in this Agreement."  (APA, § 10.1(a).)

Section 10.1(a) of the APA further made clear that "EXCEPT AS SET FORTH IN THIS

AGREEMENT, THE LEGENDS ENTITIES MAKE NO EXPRESS WARRANTY, NO

WARRANTY OF MERCHANTABILITY, NO WARRANTY OF FITNESS FOR A

PARTICULAR PURPOSE, NOR ANY IMPLIED OR STATUTORY WARRANTY

WHATSOEVER (AND EXPRESSLY DISCLAIM ALL SUCH WARRANTIES)" with respect

to any of the assets.  (*Id.*)

Section 10.10 of the APA provided that the APA constituted "the full and entire

agreement between [the Debtors and Global]  . . . and supersedes all prior agreements,

understandings, negotiations and discussions, whether oral or written, with respect thereto made

by any Party . . . and there are no other warranties or representations and no other agreements

between the Parties . . . except as specifically set forth in this Agreement."

**F.     The Bankruptcy Proceedings**

The Debtors commenced their bankruptcy proceedings on July 31, 2012 as required by

the APA.  (Global's Answer, ¶ 6.)

1.      **The August 22, 2012 hearing**[2]

In accordance with certain conditions and covenants in the APA, the Debtors sought the Court's approval for specific bid procedures governing the sale/auction process and bid protections for Global-a $4.25 million break-up fee. *See Motion Pursuant to 11 U.S.C. §§105(A) and 363(B) and Federal Rules of Bankruptcy Procedure 2002 and 6004 for Entry of an Order (A) Approving Bidding Procedures, and (B) Granting Certain Bid Protections* [Main Case, P-23] (the "Bidding Procedures Motion").

In *Global's Response In Support of the Bidding Procedures Motion* [Main Case, P-123] ("Global's Response to the Bidding Procedures Motion"), Global averred several times that the Debtors' Plan, while styled as a plan of reorganization, was essentially a sale under §363 of the Bankruptcy Code.  (*See e.g.*, Global's Response to the Bidding Procedures Motion, ¶¶ 11-12, 16.)  For example, Global agreed that because the Debtors' Plan was essentially a sale under §363 of the Bankruptcy Code, the fees payable to Global, as the stalking horse bidder, were subject to the "'business judgment standard' under Bankruptcy Code § 363 as opposed to the more stringent test under Bankruptcy Code § 503."  (Global's Response to the Bidding Procedures Motion, ¶ 12.)  Global concluded that "the Debtors' Motion, including the Termination Fee, should be approved by this Court pursuant to Bankruptcy Code § 363."  (*Id.* at ¶ 16.)

On August 22, 2012, the Court heard oral argument and testimony from the parties in support of the motion.  The Court subsequently approved the bidding procedures and Global's requested break-up fee over the objections of the United States Trustee based upon the representations and assurances made by Global at the hearing.

---

[2]      The transcript of August 22, 2012, hearing is attached hereto as Exhibit 1 and will hereinafter be referred to as the "Transcript."

During the hearing on the bidding procedures, to obtain Court approval of the bidding procedures and the significant break-up fee that it wanted, Global represented itself as a sophisticated party capable of exploiting its "synergies" and vast financial resources, experience, management skills, and talented advisors, consultants and employees to maximize the value of the Debtors' business. (Transcript at 47:1-5.)  In addition, by its own admission, Global expended "more than a year" in performing due diligence in investigating the Debtors' operations and finances before entering into the APA. (*Id.* at 47:12-18.)

Throughout the hearing, the Debtors candidly discussed its financial struggles and business set-backs.  For instance, Eben Perison[3], the Debtors' financial advisor, testified that the "revenue and EBITDA for Legends over the last three years has decreased dramatically and has been declining." (*Id.* at 10: 21-22.).  Mr. Perison further disclosed that "with the market making . . . the market's been substantially more competitive.  And as a result, with the decreasing EBITDA performance, [the Debtors] haven't had the capital to reinvest into CAPX into the business." (*Id.* at 12:14-17.)

Additionally, again to obtain Court approval of the bidding procedures and the significant break-up fee that it wanted, Global testified to its own financial strength, as well as its acceptance of the APA and its commitment to effecting the purchase of the Debtors' assets.  For example, Global's CEO, Mr. John Elliott, acknowledged that the APA did not contain any downward adjustment in purchase price "in the event of decreasing EBITDA or other performance measures or metrics prior to closing" and that the escrow deposit was structured such that Global is "in effect locked in unless it wants to lose" that deposit. (*Id.* at 48:8-16.)  Mr. Elliott further proffered that he was "integrally involved with extensive due diligence performed

---

3        The Transcript incorrectly refers to Eben Perison as Evan Paul Harrison.

by Global Gaming over a period of more than a year" and "was integrally involved with negotiations in the purchase price agreed to," which involved documents "that are and will be publicly available during the bidding process." (*Id.* at 47:12-23.)

Mr. Elliott's proffered testimony also makes it clear that Global anticipated making additional capital infusions into the Debtors' operations as well as other investments in order to invigorate the Debtors' operations and profitability. Through his attorneys, Mr. Elliott testified:

> Global Gaming and the buyers have the financial wherewithal to perform their respective obligations under the asset purchase agreement, which upon closing will provide a workable capital structure for the acquired assets. Indeed, the business will have significantly more access to capital than it had in the years leading up to this bankruptcy.
>
> Global gaming has real turn-around experience, having, for example, successfully increased performance and profitability of the Remington Park Racino in Oklahoma City by 40% during the 2 ½ years of its ownership, while maintaining and growing the employee base. It's also purchased the Lone Star facility in Texas.
>
> The debtor's assets will benefit from the positive-and this is a corporate finance term that I don't often use- ***synergies*** created by Global Gaming's operations, considering the scale in proximity of its Oklahoma operations facilities.
>
> He [John Elliot] was integrally involved with the extensive due diligence performed by Global Gaming over a period of more than a year. And the due diligence process employed by Global Gaming in the debtors created the vast information set to be used by the debtors as the information set to be made available during the due diligence process within the bidding procedures time prior to auction.
>
> He [John Elliot] was integrally involved with negotiations in the purchase price agreed to buy the Debtors, and Global Gaming as the *Stalking Horse bid* and the terms of the purchase agreement. And such documents and related information that are and will be publicly available during the bidding process will greatly assist debtors in the sale of assets."

(Transcript at 46-48.)

9

Global's counsel indicated that "the lender agreements related to the purchase and sale agreement contain a required capital improvement investment of $2.5 million within the first year after purchase." (Transcript at 48.)  Global's counsel further stated:

> Global has put up a deposit in excess of $6 million already.
>
> The purchase and sale agreement does not contain any downward adjustments in the event of decreasing EBITDA or other performance measures or metrics prior to closing, and is accompanied by financial commitments with lenders to the debtors that are in place, assuming the sale of Global Gaming under the purchase agreement.
>
> Further, the deposit is structured such that Global Gaming is in effect locked in unless it wants to lose a component of the deposit equal to its purchase price.  It can't, for example, if the performance of the casino declines during the licensing process, simply pull up licensing and say 'well, we couldn't get done with licensing.'  Because if it does, then it forfeits a component of the purchase price equal to the amount of breakup fee.
>
> Finally, as set forth in the bidding procedures, Mr. Elliott would testify that the termination payment breakup fee set forth within the purchase and sale agreement is a fixed fee.  It will not increase in the event of increase bidding for the asset.  *Id.*

Following Mr. Perison and Mr. Elliott's testimony, the Court acknowledged both Global's credentials and its clear understanding of the potential risks:

> We're coming into the bankruptcy with a hard, fast offer.  We were coming into the bankruptcy with a hard, fast offer from a recognized player in the gaming industry who should, without any difficulty, if they are the successful purchasing party, be qualified, certified, and these casinos will continue to operate.  The market is and has been unstable for a period of time.  There are things that are going on in the Shreveport-Bossier City market that cause concern.  Global is well aware of these potential problems, and nonetheless has made a hard, fast offer and started the process."

(*Id.* at 72:4-16.)

2.      The Amendment to the APA and the
        November Disclosure Statement and Plan

Global and the Debtors executed the First Amendment to Purchase Agreement ("Amendment") on November 29, 2012.  (Global's Answer, ¶ 9.)  The Amendment required the Debtors to make minimum monthly capital expenditures through closing but, like the APA, did not require the Debtors to maintain a minimum EBITDA or provide for other such financial benchmarks.  Section 10 of the Amendment specifically provided that "[e]xcept as specifically stated herein, all terms, covenants and conditions of the [APA] shall remain in full force and effect."  (Amendment, § 10.)

On November 29, 2012, the Debtors filed the November Plan and the Amended Disclosure Statement ("Amended Disclosure Statement") [Main Case, P-291], which disclosed the Amendment to the APA and updated the Debtors' financial projections.  (Global's Answer, ¶¶ 37-38.)

On December 6, 2012, the Court entered the *Order Approving Joint Disclosure Statement for the Joint Chapter 11 Plan for Louisiana Riverboat Gaming Partnership and Affiliates as Amended Through November 29, 2012 and on Matters Related Thereto* [Main Case, P-300], approving the Amended Disclosure Statement and scheduling the confirmation hearing on the Plan for February 6, 2013.  (Global's Answer, ¶¶ 40-41.)  Global's counsel fully participated in the Disclosure Statement hearing and supported the approval of the Amended Disclosure Statement.  (Global's Answer, ¶ 40.)

On December 20, 2012, just two weeks after supporting approval of the Amended Disclosure Statement, Global filed the *Motion to Vacate the Disclosure Statement Order* [Main Case, P-313] ("Motion to Vacate"), alleging that the Amended Disclosure Statement did not contain adequate financial information and that the Plan was not feasible, and represented in its

11

filing that the Global Sale "cannot be closed" under the terms of the APA.  (Global's Answer, ¶¶ 14, 44; Motion to Vacate at 7.)  In the Motion to Vacate, Global requested an Order vacating the Amended Disclosure Statement and adjourning the confirmation hearing indefinitely [Main Case, P-313].

On January 25, 2013, Global filed its Objection to the Plan in which it asked the Court to deny confirmation of the Plan [Main Case, P-353].   On January 30, 2013, the Debtors terminated the APA and withdrew the November Plan [Main Case, P-360].

**G.**     **The Allegations in Global's FAC**

The crux of Global's claims for breach of contract and declaratory judgment (and of Global's defenses to the Debtors' FAC) is that the November Plan was not feasible and could not be confirmed, thus Global purportedly was relieved of its contractual obligations under the APA. (FAC, ¶¶ 9, 12, 17, 19, 46.)  As to feasibility, Global specifically alleges that based upon the Debtors' projected revenues, if the APA had closed, Global would have been unable to meet its long-term financial commitments to the First Lien Lenders who were financing a large portion of Global's purchase.  (FAC, ¶¶ 9, 11, 14, 18-19, 48.)  Global then reasons that the November Plan was not feasible, could not be confirmed and therefore Global was relieved of all its obligations under the APA and Amendment.

LAW AND ARGUMENT

In a desperate attempt to justify its repudiation and breach of the APA and Amendment, Global completely distorts and misapplies the feasibility standard.  Global erroneously argues that, based upon the Debtors' projected revenues, Global would have been unable to meet its long-term obligations to the First Lien Lenders and, thus, the November Plan – which consummated an asset sale to Global – was not feasible.  (FAC, ¶¶ 9, 11, 14, 18-19, 48.)

12

A ruling by the Court at this time, in connection with this Motion for a Protective Order, on the proper feasibility standard applicable to the November Plan will prevent unnecessary and significant burdens on all parties with respect to discovery, including the collection, review and production of voluminous documents and records, the employment of costly experts, expenses related to depositions, and other related matters.  Global's statement of the feasibility standard is simply wrong and contrary to the Bankruptcy Code for three reasons:  (1) A feasibility analysis was not required for confirmation of the November Plan;  (2) Even if a feasibility analysis were required and proper for confirmation of the November Plan – and it was not – the appropriate feasibility standard would have been whether the APA would likely have closed, not whether Global would have been able to meet its long-term obligations; and (3) Global admits that the APA would have closed, thus admitting that the November Plan was feasible.

## I.      Standards of Review For Issuance Of A Protective Order

Upon a showing of good cause, a court may "issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense," including forbidding the requested disclosure or discovery and forbidding inquiry into certain matters, or limiting the scope of disclosure or discovery to certain matters.  Fed. R. Civ. P. 26(c)(1)(A); Fed. R. Civ. P. 26(c)(1)(D); Fed. R. Bankr. P. 7026.  Further, "the court must limit the frequency or extent of discovery . . . [if] the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues."  Fed. R. Civ. P. 26(b)(2)(C)(iii).

The good cause showing obligation under Rule 26(c) requires the movant in seeking a protective order to "show the necessity of its issuance, which contemplates a particular and specific demonstration of fact as distinguished from stereotyped and conclusory statements."

13

*Avance v. Kerr-McGee Chemical LLC*, No. 04-209, 2005 WL 5315658,  at *2 (E.D. Tex. July 1, 2005) (citation omitted).  In *Avance*, the court granted a motion for a protective order because the information sought was irrelevant to the issues in the case, overbroad, and as requested the production would result in significant expense.  The court also found that whatever relevant documents might be found were outweighed by the "burden and expense of the proposed discovery." *Id.* at 3.

Likewise, here, there is good cause for the Court to issue an Order that the November Plan was feasible as a matter of law, or, in the alternative, that the only feasibility requirement applicable to the November Plan was whether there was a reasonable likelihood that the sale contemplated under the APA would occur.  In order to analyze feasibility under the erroneous standard Global has articulated, the Debtors will need to request, as they have done, all of Global's documents that would support their contention that Global would not have been able to meet its <u>long-term</u> obligations to the First Lien Lenders.  This will necessarily include all of Global's financial documents -- current, historic and projected -- as well as documents reflecting Global's operations.  This discovery is unduly burdensome and entirely unnecessary given Global's admission that it was ready to close the APA.  (FAC, ¶¶ 8, 14, 16, 18, 21.)

Further, at a minimum, both parties may need to employ experts to cull through documents from both sides to opine on Global's future revenues, EBITDA, and assess Global's long-term prospects for paying the First Lien Lenders.  This is inquiry will "result in significant expense" to both sides and, for the reasons discussed below, will not yield any evidence that is material to either side's claims or defenses.

## II.    The Feasibility Standard In The FAC Does Not Apply to the November Plan

Global erroneously invokes the doctrine of feasibility in the context of a sale of the Debtors' assets under the APA.  (FAC, ¶¶ 12, 17, 19, 21, 38, 46.)   But feasibility does not apply

14

under these circumstances.  "[F]easibility, under the literal wording of § 1129(a)(11) of the Bankruptcy Code, is unnecessary to be shown when 'liquidation . . . is proposed in the plan.'"  *In re 47th & Belleview Partners*, 95 B.R. 117, 120 (Bankr. W.D. Mo. 1988); *see also In re Pero Bros. Farms, Inc.*, 90 B.R. 562, 563 (Bankr. S.D. Fla. 1988) ("The feasibility test has no application to a liquidation plan.").

It is undisputed that the Debtors' November Plan was essentially a liquidation plan under § 363 of the Bankruptcy Code.  In Global's Response to the Bidding Procedures Motion [Main Case, P-123], Global represented several times that the Debtors' Plan was essentially a sale under § 363 of the Bankruptcy Code and asked the Court to approve the Debtors' Bidding Procedures Motion, including the Termination Fee, pursuant to Bankruptcy Code § 363.  (*See, e.g.*, Global's Response to the Bidding Procedures Motion, ¶¶ 11-12, 16.)  Because the November Plan revolved around a sale of the Debtors' assets, liquidation was clearly "proposed in the plan," and thus the Court did not need to engage in any analysis of feasibility.  *In re AT&T Latin Am. Corp.*, No. 03-13538-BKC-RAM, 2004 Bankr. LEXIS 120, at *10 (Bankr. S.D. Fla. Jan. 26, 2004) (bankruptcy plan "provides for the liquidation of all of the Debtors' assets and therefore the provisions of 11 U.S.C. § 1129(a)(11) have been satisfied"); *In re Broadway 401 LLC*, No. 10-10070 (KJC), 2010 Bankr. LEXIS 2364, at *22 (Bankr. D. Del. Mar. 16, 2010) (holding that where all of the Debtors' assets are being sold "the Debtors satisfy the requirements of section 1129(a)(11) of the Bankruptcy Code because the liquidation of the Debtors is contemplated and permitted pursuant to the Plan.").

And even if feasibility were an issue relevant to the Debtors' November Plan, the only inquiry would be whether the sale contemplated by the APA had a reasonable likelihood of closing and the purchaser had the financial wherewithal to consummate the transaction to satisfy

the feasibility requirements of 11 U.S.C. § 1129(a)(11).  *In re Cypresswood Land Partners, I*,

409 B.R. 396, 432-33 (Bankr. S.D. Tex. 2009) ("[T]he Court finds that there is a reasonable

likelihood that the Amended Plan will be successfully effectuated because the asset sale will

move forward and the Purchaser has the financial strength" to effectuate the sale of the Property

from the reorganized Debtor to the Purchaser.);  *In re Reading Broad., Inc.*, 386 B.R. 562, 574

(Bankr. E.D. Pa. 2008) ("While I acknowledge that there is no guarantee that [the purchaser] will

complete the purchase of the . . . assets …, section 1129(a)(11) does not impose such a high

standard.  Rather . . . the evidence at the confirmation hearing was sufficient to demonstrate that

the sale had a probability of closing and that the trustee's plan would be consummated.").  Thus,

the only inquiry that is relevant to the feasibility of the November Plan is whether there was a

reasonable likelihood that the Global Sale would have closed – a fact that Global has expressly

admitted and plead in multiple filings, including in the FAC:  "If the Court determined the

[November] Plan was feasible and confirmed the [November] Plan and if all other conditions to

closing were satisfied, then Global Gaming would have been prepared to close the APA."  (FAC,

¶ 21.)

Further, Global expressly warranted in the APA that it had the ability to fund the

payments due at closing, including the initial $25 million cash portion of the purchase price.

(*See* APA § 4.2 (f), Sufficient Funds.)  As the proffered testimony of Global's CEO Mr. Elliot

makes clear, Global had no doubt it could properly fund the closing.  "Global gaming and the

buyers have the financial wherewithal to perform their respective obligations under the asset

purchase agreement, which upon closing will provide a workable capital structure for the

acquired assets.  Indeed, the business will have significantly more access to capital than it had in

the years leading up to this bankruptcy."  (Transcript at 46:7-12.)  Global's warranties in the

16

APA, its testimony in open court, and now its express admissions in its pleadings reveal unfettered confidence that closing the sale was not a reasonable likelihood, rather, it was a certainty.  Therefore, the November Plan was indisputably feasible.  *In Re Heritage Organization, L.L.C.*, 375 B.R. 230, 311 (Bankr. N.D. Tex. 2007) (holding that "Plan is feasible because the successful performance of its terms is not dependent or contingent upon any future, uncertain event.").

Even putting aside Global's admission that the APA likely would have closed, Global has not pleaded – because it cannot – that Global lacked sufficient capital to deliver the balance of the purchase price.  In fact, Global's representatives testified at length that Global was financially sound and had access to the necessary funding to close the sale.  "Global Gaming is an experienced casino operator with a proven track record of successful performance . . . Global gaming and the buyers have the financial wherewithal to perform their respective obligations under the asset purchase agreement … [a]nd Global has put up a deposit in excess of $6 million already." (Transcript at 45-48.)  Because the only issue relevant to feasibility is whether Global had the funds required to close under the APA, the standard for feasibility has been satisfied because Global has admitted it did.

Global's allegation that it would not have been able to meet its long-term financing obligations under the new debt in favor of the First Lien Lenders is not material to the feasibility analysis applicable to the Debtors' November Plan, which was simply a sale under a chapter 11 plan, and not a traditional plan of reorganization.

Furthermore, Global's future projections of the post-sale revenues are erroneously based solely upon the faulty premise that the Debtors, with their limited resources and inability to make sufficient capital expenditures or obtain any significant capital infusions, would continue to

17

operate the casinos. This hypothetical factual scenario is contradicted by the express terms of the APA, which provided that Global, and not the Debtors, would operate the casinos after the closing of the sale, and by Global's representations to the Court that it would inject capital into the casinos. Global pledged that "the business will have significantly more access to capital than it had in the years leading up to this bankruptcy" and that "obtaining the required licenses in Louisiana and Mississippi will be accomplished in a timely fashion." (Transcript at 46-47.) Global assured the Court that they were "an experienced casino operator with a proven track record of successful performance" with "real turn-around experience", while lauding their successful acquisitions in Oklahoma and Texas. (*Id.* at 45-46.) There was no doubt that Global intended to purchase, control, and "turn-around" the Debtors' assets, and any financial projections based upon the Debtors' resources would be disingenuous and fundamentally flawed.[4]

Global did not – and cannot – allege that the sale of the Debtors' assets to Global as proposed in the November Plan was not reasonably likely to occur, and thus the parties should not be required to litigate the feasibility of the November Plan. *In re Cypresswood Land Partners I*, 409 B.R. at 433; *In re Reading Broad., Inc.*, 386 B.R. at 574.

Accordingly, the Debtors request that this Court enter an order that the Debtors' November Plan was feasible as a matter of law or, in the alternative, that the only feasibility requirement applicable to the November Plan was whether there was a reasonable likelihood that the sale contemplated under the APA would occur.

---

[4] In fact, the First Lien Lenders, who were financing Global's purchase of the assets, agreed to make certain concessions under the financing arrangement and to work with Global to assure its success. Attached as Exhibit 2 is a letter dated January 29, 2013, from the Debtors' attorney to Global's attorneys, which was authorized and approved by the First Lien Lenders, and which contains substantial concessions to Global and expresses a willingness to work with Global.

18

## CONCLUSION

In light of the foregoing, the Debtors respectfully submit that this Court should determine that feasibility is beyond the scope of discovery in this action, and grant the Motion for a Protective Order precluding all demands for discovery regarding the feasibility of the Debtors' Chapter 11 Plan of Reorganization.

This 19th day of August, 2013

Respectfully submitted,

/s/ Barry W. Miller

_____
William H. Patrick, III, La. Bar No. 10359
Barry W. Miller, La. Bar No.  09678
**Heller, Draper, Patrick & Horn, L.L.C.**
650 Poydras Street, Suite 2500
New Orleans, Louisiana 70130-6103
Telephone: (504) 299-3300
Fax: (504) 299-3399
**Counsel for Debtors**

_/s/Andrew K. Glenn_____
Andrew K. Glenn (admitted *pro hac vice*)
Olga L. Fuentes-Skinner (admitted *pro hac vice*)
**Kasowitz, Benson, Torres & Friedman LLP**
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
**Counsel for Debtors**

19

## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF LOUISIANA
## SHREVEPORT DIVISION

| | | |
|---|---|---|
| In re | : | Case No.  12-12013 |
| | : | |
| **LOUISIANA RIVERBOAT GAMING** | : | **Chapter 11** |
|    **PARTNERSHIP,** *et al.*[1] | : | |
| | : | **Jointly Administered** |
|    **Debtors.** | : | |

_____

| | | |
|---|---|---|
| **GLOBAL GAMING LEGENDS, LLC,** | : | |
|    **ET AL.** | : | **Adversary No. 13-1007** |
| | : | |
| **v.** | : | **CONSOLIDATED WITH** |
| | : | |
| | : | **Adversary No. 13-1008** |
| | : | |
| **LEGENDS GAMING OF LOUISIANA-1,** | : | |
|    **LLC,** *et al.* | : | |

_____

### CERTIFICATE OF SERVICE

I, Barry W. Miller, attorney for the above captioned debtors / defendants, do hereby certify that the attached Motion was served on August 19, 2013, through the court's electronic court filing system on:

Louis M. Phillips on behalf of Global Gaming Legends, LLC, et al via.
lphillips@gordonarata.com

William H. Patrick, III on behalf of Legends Gaming of Louisiana-1, LLC, et al,  via.
wpatrick@hellerdraper.com

_____

[1] Legends Gaming of Louisiana-1, LLC (12-12014); Legends Gaming of Louisiana-2, LLC (12-12015); Legends Gaming, LLC (12-12017); Legends Gaming of Mississippi, LLC (12-12019); and Legends Gaming of Mississippi RV Park, LLC (12-12020) have been jointly administered with Louisiana Riverboat Gaming Partnership pursuant to order of this Court [Main Case, P-6].

{00336095-1}

S. Ault Hootsell, IIII on behalf of Intervenors, Ad Hoc Group of First Lien Lenders, via.
 hootsela@phelps.com

Barry W. Miller on behalf of Legends Gaming of Louisiana-1, LLC via.
 bmiller@hellerdraper.com.

This 19th day of August, 2013.

Respectfully submitted,

/s/Barry W. Miller
William H. Patrick, III, La. Bar No. 10359
Barry W. Miller, La. Bar No. 09678
Tristan Manthey, La. Bar No. 24539
**HELLER, DRAPER, PATRICK & HORN, L.L.C.**
9311 Bluebonnet Blvd.
Baton Rouge, Louisiana 70810
Telephone: 225.767.1499 // Fax: 225.761.0760
**Counsel for Defendants / Debtors**

2

{00336095-1}