**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**SHREVEPORT DIVISION**

|  |  |  |
|---|---|---|
| **GLOBAL GAMING LEGENDS, LLC,** *et al.* | : | **CIVIL ACTION NO. 13-3123** |
|  | : |  |
|  | : |  |
| **VERSUS** | : | **JUDGE HICKS** |
|  | : |  |
| **LEGENDS GAMING OF LOUISIANA-1, LLC,** *et al.* | : | **MAGISTRATE JUDGE HORNSBY** |
|  | : |  |
|  | : |  |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
LEGENDS' AND THE FIRST LIEN PARTIES' MOTION FOR PARTIAL
SUMMARY JUDGMENT OF GLOBAL'S BREACH OF CONTRACT CLAIM
AND MOTION *IN LIMINE* CONCERNING FEASIBILITY**

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1
ARGUMENT ........................................................................................................................ 4
    I.    THE COURT SHOULD GRANT LEGENDS SUMMARY JUDGMENT
         AND RELIEF *IN LIMINE* BASED ON GLOBAL'S UNDISPUTED
         REPUDIATION OF THE APA........................................................................... 4
         A.    Global Unequivocally Repudiated The APA.............................................. 5
         B.    Global's Proferred Declaration Is Irrelevant And Does  Not Create
               A Genuine Issue Of Material Fact. ............................................................ 9
         C.    Because Global Frustrated The Apa Condition Requiring
               Confirmation Of The November Plan, Legends Need Not  Prove
               That The November Plan Would Have Been Confirmed. ....................... 10
               1.    Anticipatory Repudiation Excuses The Non-Breaching
                        Party From Future Performance.................................................... 10
                2.    The Prevention Doctrine Also Excuses Legends From
                        Proving That The November Plan Would Have Been
                        Confirmed. ................................................................................... 13
                3.    Even Assuming *Arguendo* That Legends Must Prove That
                        The November Plan Was Feasible, Legends Need Only
                        Prove That Global Had The Capacity To Close. ......................... 16
    II.    THE AMENDED APA PRECLUDES GLOBAL'S BREACH OF
         CONTRACT CLAIMS AS A MATTER OF LAW. ......................................... 20
         A.    The Amendment Was A Novation Of The Apa......................................... 20
         B.    Global Fails To Raise Any Genuine Issue Of Material Fact
                Regarding Novation. ............................................................................... 24
          C.    On Global's Interpretation Of The Amendment,  No Consideration
                Was Provided In Return For  Significant Concessions By Legends
                And The First Lien Parties. ..................................................................... 25
    III.    GLOBAL'S WAIVER AND ELECTION OF REMEDIES ARGUMENTS
         ARE UNAVAILING; GLOBAL WAIVED PRE AMENDMENT
         BREACHES AND ELECTED TO ACCEPT THE BENEFITS OF THE
         AMENDMENT IN LIEU OF PURSUING TERMINATION OF THE
         APA.............................................................................................................. 25
CONCLUSION.................................................................................................................. 26

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. List Corp. v. U.S. News and World Report, Inc*.,
  75 N.Y.2d 38 (1989) .................................................................................3, 4, 5, 10

*Apex Oil Co. v. DiMauro*,
  822 F.2d 246 (2d Cir. 1987)...................................................................................25

*Argonaut P'shp., L.P. v. Grupo Sidek, S.A. de C.V.*,
  1996 U.S. Dist. LEXIS 15925 (S.D.N.Y. Oct. 24, 1996) ........................................7

*In re Asia Global Crossing, Ltd.*,
  326 B.R. 240 (Bankr. S.D.N.Y. 2005)..................................................2, 12, 17, 20

*BMG Music v. Martinez*,
  74 F.3d 87 (5th Cir. 1996) ......................................................................................9

*In re Bradlees Stores, Inc*.,
  313 B.R. 565 (S.D.N.Y. 2004)...............................................................................13

*Callanan Indus. v. Micheli Contr. Corp.*,
  124 A.D.2d 960 (3d Dep't 1986) ...............................................................20, 21, 24

*Cauff, Lippman & Co. v. Apogee Fin. Grp., Inc.*,
  807 F. Supp. 1007 (S.D.N.Y. 1992).......................................................................13

*Citigifts, Inc. v. Pechnik*,
  67 N.Y.2d 774 (1986) ............................................................................................21

*De Forest Radio Tel. & Tel. Co. v. Triangle Radio Supply Co.*,
  243 N.Y. 283 (1926) ..............................................................................................10

*DiFolco v. MSNBC Cable L.L.C.*,
  622 F.3d 104 (2d Cir. 2010).....................................................................................5

*Eastman Kodak Co. v. Altek Corp.*,
  936 F. Supp. 2d 342 (S.D.N.Y. 2013).....................................................................13

*Fairway Prime Estate Mgt., LLC v. First Am. Int'l Bank*,
  852 N.Y.S.2d 524 (1st Dep't 2012) .......................................................................13

*In re Food Mgmt. Grp., LLC*,
  372 B.R. 171 (S.D.N.Y. 2007)...............................................................................10

*Hagedorn & Co. v. Sofinor Fin., LLC*,
   2006 WL 3164756 (S.D.N.Y. Nov. 1, 2006)..................................................................6

*In re Heritage Organization, LLC*,
   375 B.R. 230 (Bankr. N.D. Tx. 2007)...............................................................16, 17

*Hobson v. Travelstead*,
   227 B.R. 638 (D. Md. 1998) .........................................................................18

*In re Holmes*,
   301 B.R. 911 (Bankr. M.D. Ga. 2003)..............................................................19

*King World Prods., Inc. v. Fin. News Network, Inc.*,
   660 F. Supp. 1381 (S.D.N.Y. 1987).............................................................10, 11

*Koenig Iron Works, Inc. v. Sterling Factories, Inc.*,
   1999 WL 178785 (S.D.N.Y. Mar. 30, 1999) ...................................................22, 23

*LCA Leasing Corp. v. Borvig Corp.*,
   826 F. Supp. 776 (S.D.N.Y. 1993) .................................................................23

*Mallad Const. Corp. v. County Fed. Sav. & Loan Ass'n*,
   32 N.Y.2d 285 (1973) .............................................................................20, 21

*Metro. Steel Indus., Inc. v. Fidelity & Deposit Co.*,
   68 A.D.2d 935 (2d Dep't 1979) ...................................................................23, 24

*Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.*,
   92 N.Y.2d 458 (1998) ...............................................................................5

*Pesa v. Yoma Dev. Group, Inc.*,
   18 N.Y.3d 527 (2012) ................................................................................12

*In re President Casinos, Inc.*,
   419 B.R. 381 (E.D. Mo. 2009).......................................................................15

*Sudul v. Computer Outsourcing Svcs., Inc.*,
   917 F. Supp. 1033 (S.D.N.Y. 1996)..................................................................23

*Sunshine Steak, Salad & Seafood, Inc. v. W.I.M. Realty, Inc.*,
   135 A.D.2d 891, 522 N.Y.S.2d 292 (3d Dep't 1987) ............................................7

*United States v. Lawrence*,
   276 F.3d 193 (5th Cir. 2001) ......................................................................9, 25

*Vais Arms, Inc. v. Vais*,
   383 F.3d 287 (5th Cir. 2004) .........................................................................9

*Wasserstrom v. Interstate Litho Corp.*,
114 A.D.2d 952 (2d Dep't 1985) ..........................................................................25

*In re Yates Development, Inc.*,
258 B.R. 36 (Bankr. M.D. Fla. 2000) ....................................................................18

**Statutes**

Section 1129 (a)(11) of the Bankruptcy Code .......................................................17, 19

**Other Authorities**

Rule 9014 of the Federal Rules of Bankruptcy Procedure ............................................6

Rule 56 of the Federal Rules of Civil Procedure .........................................................1

RESTATEMENT (SECOND) OF CONTRACTS § 245 (1981) ................................................15

**THIS MEMORANDUM** is respectfully submitted by and on behalf of the

Debtors/Defendants/Plaintiffs-in-Counter-Claim, Louisiana Riverboat Gaming Partnership;

Legends Gaming of Louisiana–1, LLC; Legends Gaming of Louisiana–2, LLC; Legends

Gaming, LLC; Legends Gaming of Mississippi, LLC; and Legends Gaming of Mississippi RV

Park, LLC (collectively referred to as "Legends" or the "Debtors"), and Wilmington Trust

Company, solely in its capacity as Administrative Agent (the "First Lien Agent") under the

Amended and Restated First Lien Credit Agreement, dated as of August 31, 2009 (the "First

Lien Credit Agreement"), and the ad hoc group of lenders under the First Lien Credit Agreement

who have intervened in the above-captioned adversary proceeding (together with the First Lien

Agent, the "First Lien Parties"), who jointly file this reply memorandum in further support of the

Motion for Partial Summary Judgment of Global's Breach Of Contract Claim and Feasibility

Defense and Motion *In Limine* Concerning Feasibility (the "Motion") pursuant to Rule 56 of the

Federal Rules of Civil Procedure.[1]

## PRELIMINARY STATEMENT

Global devotes no less than 30 pages in its brief to argue that the November Plan would

not have been confirmed by the Bankruptcy Court because it was not feasible.  In so doing,

Global all but ignores the New York law excusing Legends from proving that this closing

condition would have been satisfied because of Global's obvious anticipatory breach in which

Global actively sought to frustrate the Bankruptcy Court's confirmation of the Plan as required

under the APA.

This case is about Global's quest to litigate its way out of a contract through conditions

for which it never bargained.  There are no financial covenants in the APA.  There are no

---

[1]     Capitalized terms not otherwise defined herein have the meaning ascribed to them in Legends' opening brief, filed on October 23, 2013.  The facts herein are set forth in the Debtors' 56.1 Statement of Material Facts Not in Dispute ("SOF"), filed on October 23, 2013, and the Supplemental Statement of Material Facts Not in Dispute ("SSOF") submitted contemporaneously herewith.

minimum revenue, EBITDA or profit conditions in the agreement.  Indeed, the record is very clear that Global – *not Legends* – took the risk of Legends' post-bankruptcy operating performance.  There was one specific dispute concerning the extent – if any – to which Legends was obligated under the APA to invest in CapEx during the bankruptcy proceedings.  That dispute, however, was resolved by the Amendment to the APA.  While Global claims it was duped by Legends about its operating performance and CapEx, the Bankruptcy Court has dismissed Global's fraud claims predicated on alleged misrepresentations concerning the Debtors' financial condition:  Global took that risk with its eyes wide open.

Left with no covenants to extricate itself from the transaction, Global developed a self-described "exit strategy" to walk away in a contemporaneous written memorandum:  Global would claim that Legends could not obtain required approvals for the November Plan.  However, the APA required *Global* to use its best efforts to consummate the APA and seek confirmation of the November Plan, and not take any action to restrain, prevent, or delay the closing of the APA or confirmation.  Global blatantly violated these obligations.  Indeed, days after working with Legends to obtain the Bankruptcy Court's approval, Global filed a Motion to Vacate the order approving the Disclosure Statement.  It then filed an objection to confirmation of the November Plan.  These actions clearly breached Global's obligations under the APA, constituted anticipatory breaches of the APA and intentionally frustrated Legends' ability to satisfy the closing conditions under the APA.  To give Global every opportunity to reverse course, Legends wrote Global twice to give Global an opportunity to cure its repudiation of the APA.  Global refused.  Tellingly, the only support for Global's contention that it did not repudiate is a single conclusory paragraph in a declaration with a general denial of repudiation (not any admissible evidence).  Thus, there is no factual dispute that Global repudiated.

2

Where, as here, a party repudiating a contract actively frustrates a closing condition, New York law excuses the non-breaching party from proving that the condition would have been satisfied.  The reason for this is clear:  a party that breaches its contractual duties should not benefit from the breach.  As one court noted, to hold otherwise would "do[] violence to the settled principles of the doctrine of anticipatory breach."  *Am. List Corp. v. U.S. News and World Report, Inc*., 75 N.Y.2d 38, 44 (1989).  While Global cites the general rule that anticipatory repudiation requires the non-breaching party to prove that it was "ready, willing and able to perform," this does not mean that the non-breaching party must prove that every condition would have been satisfied.  Indeed, Global argues, Legends must still prove that the November Plan would have been confirmed, despite its transparent obstructionist tactics.  Global is wrong as a matter of law and common sense.  Being "ready, willing and able" to close means only that Legends would have satisfied those closing conditions that were not frustrated by Global's breach.  Because the only condition Global cites in opposition is one that Global actively frustrated – confirmation of the November Plan – Legends need not prove that the November Plan would have been confirmed.  And, even assuming Legends were required to prove feasibility, Global has mischaracterized the governing standard.  In a plan contemplating the sale of substantially all of a debtor's assets, the debtor need only prove that the sale would close, not that the post-acquisition entity would be profitable.  That is the buyer's responsibility, not the debtor's.

Global's breach of contract claim should be dismissed now.  Global's claim is predicated on Legends' purported failure to make sufficient capital expenditures under the original APA in violation of the very general covenant to operate the business in the ordinary course pending closing.  Because this dispute was resolved through the Amendment – which established specific

CapEx requirements and reduced the purchase price Global was required to pay – Global cannot maintain a breach of contract claim for any pre-Amendment breaches because the Amendment was a novation that automatically extinguished claims under the provisions that were amended.

Having obtained these obvious benefits to resolve the dispute that precipitated the Amendment, Global seeks to "have its cake and eat it too" by claiming that it was entitled to terminate the APA based on Legends' purported failure to maintain CapEx before the Amendment.  Global claims that a novation must include specific release language to extinguish pre-Amendment claims.  This is wrong.  Under New York law, a novation automatically extinguishes any claims for breaches of the contractual obligations that have been superseded. Here, the Amendment unambiguously reflects that the Amendment controlled in the case of any conflict with the APA.  The APA included no specific CapEx requirements, while the Amendment included very specific requirements and a reduction in the contract price to resolve this dispute once and for all.  These specific CapEx requirements superseded any general pre-Amendment obligations, which precludes any claim or defense based on acts or omissions before the Amendment.  Accordingly, Legends is entitled to summary judgment dismissing Global's breach of contract claim and defense.

## ARGUMENT
## I.

**THE COURT SHOULD GRANT LEGENDS SUMMARY JUDGMENT AND RELIEF *IN LIMINE* BASED ON GLOBAL'S UNDISPUTED REPUDIATION OF THE APA.**

Under New York law, the doctrine of anticipatory breach applies to contracts conditioned on future performance by the non-breaching party.  *Am. List Corp. v. U.S. News and World Report, Inc*., 75 N.Y.2d 38, 44 (1989).  Pursuant to this doctrine, a wrongful repudiation before performance entitles the non-repudiating party to immediately claim damages for a total breach. *Id*.  "A repudiation can be either 'a statement by the obligor to the obligee indicating that the

obligor will commit a breach that would of itself give the obligee a claim for damages for total breach' or 'a voluntary affirmative act which renders the obligor unable or apparently unable to perform without such a breach.'" *Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.*, 92 N.Y.2d 458, 463 (1998).  Where, as here, "the repudiation is in writing, . . . the court may resolve the issue of repudiation 'as a matter of law.'"  *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 112 (2d Cir. 2010).

Nothing in Global's opposition controverts the fact that Global repudiated the APA by communicating its unequivocal intent *not* to proceed with the purchase and confirmation of Legends' November Plan.  Because of Global's repudiation, pursuant to New York law, Legends was excused from any further performance under the APA and for this reason, Legends is entitled to dismissal of Global's claim and defenses against Legends, and an order declaring that Legends need not adduce proof that the Bankruptcy Court would have confirmed the November Plan.

**A.    Global Unequivocally Repudiated The APA.**

Global communicated unequivocally, and repeatedly – both verbally and in writing – that it did not intend to perform under the APA.  The APA required, *inter alia*, that Global use its best efforts to consummate the APA and seek confirmation of the Chapter 11 plan, and not take any action to restrain, prevent, or delay the closing of the APA or confirmation of the plan. (SOF ¶ 1, SOF Ex. A at §§ 5.3 & (d).)  Global's first act of repudiation was on December 12, 2012 – less than two weeks after Legends and the First Lien Parties had agreed to significant concessions on material terms of the APA – when Global's counsel announced that Global would be moving to vacate the order approving the November Disclosure Statement, and that the Global sale was a "dead deal."  (SOF ¶ 37; Debtors' FAC ¶ 43.)

5

Just over a week later, on December 20, 2012, Global filed its motion to vacate the order approving the November Disclosure Statement (the "Motion to Vacate").  The Motion to Vacate reaffirmed the sentiments expressed by Global's counsel, stating that, "[t]he sale transaction *cannot be closed* under the terms of the APA."  (Global Opp'n, Ex. 16 [R. No. 88–18] ¶ 12 (emphasis added).)  Thus, Global, rather than meeting its contractual obligation to use best efforts to consummate the APA and to refrain from taking any actions to delay or prevent confirmation, instead commenced litigation against Legends to prevent approval of the November Disclosure Statement and the November Plan.  Simply put:  Global did exactly the opposite of what it was required to do under the APA to support confirmation of the November Plan and consummation of the APA.  Global's actions constitute anticipatory repudiation under New York law.  *Hagedorn & Co. v. Sofinor Fin., LLC*, Nos. 03 Civ. 2609 (TPG), 04 Civ. 2670 (TPG), 2006 WL 3164756, at *6 (S.D.N.Y. Nov. 1, 2006) (concluding that threat of lawsuit concerning transaction constituted anticipatory repudiation); *see also* Fed. R. Bankr. P. 9014 (filing of motion to vacate constitutes commencement of "contested matter" in bankruptcy proceeding tantamount to filing civil complaint).

In light of these events, Legends sought an explanation from Global and confirmation of Global's intentions with respect to the sale.  In a January 2, 2013 letter, Legends' counsel wrote:

> Notwithstanding Global Gaming's breaches of the APA, the Debtors remain ready, able and willing to close the transactions contemplated by the APA if Global Gaming confirms -- clearly, unequivocally and in writing -- that it will (i) comply with all terms of the APA, (ii) refrain from taking any actions that would frustrate the purpose of the APA, (iii) not object to the Plan or support any other party in objecting to the Plan and (iv) timely take all steps necessary to obtain regulatory approval for the transactions contemplated by the APA and the Plan.

(SSOF ¶ 1, Ex. T at 2.)  Global's carefully crafted response conspicuously failed to provide unequivocal assurance of its own performance.  (*See* Global Opp'n, Shelby Decl. Ex. 12, at 1–3.)

6

Where, as here, a party repudiates a contract and fails to provide assurance "clearly, unequivocally and in writing" of its intent to comply with the contract, that party is liable for breach as a matter of law.  *See Argonaut P'shp., L.P. v. Grupo Sidek, S.A. de C.V.*, No 96 Civ. 1967 (MBM), 1996 U.S. Dist. LEXIS 15925, at *20–21 (S.D.N.Y. Oct. 24, 1996) ("[P]laintiffs' continued insistence on performance afforded [defendant] the opportunity to retract its earlier repudiation and continue its performance.  If defendant had done so, plaintiffs would have been precluded from suing for anticipatory breach and would have been required to tender . . . . However, defendants never retracted the repudiation and plaintiffs may thus sue for breach of contract without demonstrating that they performed all of their obligations under the contract.").

On January 7, 2013, Legends again sought Global's reassurance that it intended to go forward with the APA and invited Global to put forward a proposal for the resolution of Global's dispute.  (SSOF ¶ 2, Ex. U at 2–3.)  Global again chose to ignore that direct request and instead, two weeks later, on January 25, 2013, filed its objection (the "Plan Objection") to the November Plan.  (SOF ¶ 34.)  The Plan Objection was calculated to frustrate confirmation by rejecting any possibility of closing the sale and categorically denying that the November Plan could be confirmed based on alleged concerns about Legends' financial performance.  (SSOF ¶ 3).  These actions by Global also constitute anticipatory repudiation under New York law.  *See Sunshine Steak, Salad & Seafood, Inc. v. W.I.M. Realty, Inc.*, 135 A.D.2d 891, 892–93 (3d Dep't 1987) (where defendant "frustrated plaintiff from obtaining a liquor license and it would have been futile for plaintiff to perform the remaining condition precedent, anticipatory repudiation was properly found.").

In addition to these contemporaneous verbal and written statements, made by Global to Legends, confirming that Global had no intention of performing its obligations under the APA,

internal Global documents exchanged in discovery reveal that Global had been planning its "exit strategy" for some time.  Global's alleged concerns about Legends' financial performance were a pretext to extricate Global from its contractual obligations.  For example, in a November 28, 2012 email – on the eve of amending the APA to resolve Global's alleged concerns over CapEx deficiencies – Global talks about "walking away" from the Global Sale, but acknowledges that doing so would "open [Global] up to a lawsuit."  (SSOF ¶ 4, Ex. V.)

Global's December 11, 2012 "exit strategy" was authored by the chairman of Global's Board of Directors.  (SSOF ¶ 5, Ex. W.)  The memorandum states that Global will "*exit the acquisition transaction* as it was previously negotiated," and recommends that Global implement the exit strategy as quickly as possible.  (*Id*. at 2.)  While acknowledging that the "[e]xit is made more complicated by recent amendment to [the] APA," the strategy memo goes on to recommend legal action to "undo" the APA.  (*Id*.)  The memo explains that the legal action would be based on claims such as "impossibility of closure, *e.g*., insolvent under current structure and unlicensable as gaming entity" and alleged failure to operate the business in the "ordinary course."  (*Id*.)

Global's subsequent court filings stand in stark contrast to Global's contemporaneous internal emails, which reflect Global's confidence that Legends could be operated profitably in the post-bankruptcy period.  On December 6, 2012, Global's Chief Operations Officer, Robert Lannert, predicted the successful growth of Legends' Bossier City casino under Global's stewardship:  "By Labor Day I expect we'll be blowing away 2012 numbers and probably beating 2011 as well."  (SSOF ¶ 6, Ex. X.)  And on December 21, 2012, Lannert noted with respect to Legends' Vicksburg casino:  "With modest improvements and a solid marketing/rebranding, I am certain we'll be able to grow that business."  (SSOF ¶ 7, Ex. Y)

**B.   Global's Preferred Declaration Is Irrelevant And Does
Not Create A Genuine Issue Of Material Fact.**

Global manages to adduce only one conclusory paragraph in its supporting Declaration of

John D. Elliott (the "Elliott Decl.") for the proposition that it did not repudiate the APA.  That

paragraph states:

> Legends claims that Global's communications to the Court show
> that Global did not intend to go forward with the transaction.  This
> is entirely incorrect.  Global never communicated to Legends that
> it did not intend to proceed with the transaction if all conditions of
> the transaction could be met.  Global was simply advising the
> Bankruptcy Court of factual information that had been provided to
> Global by Legends but not disclosed by Legends in its Disclosure
> Statements—information that directly called into question the
> Plan's feasibility.

(Global Opp'n, Elliott Decl. ¶ 25.)  This plainly fails to create a genuine issue of material fact as

to Global's repudiation.  Global's court filings in obstruction of plan confirmation speak for

themselves, and Mr. Elliott's affidavit does not introduce any new facts; instead, it includes only

his gloss on the documents themselves.  *See Vais Arms, Inc. v. Vais,* 383 F.3d 287, 294 (5th Cir.

2004) (concluding that self-serving statements were insufficient to overcome summary

judgment, particularly when faced with "overwhelming evidence" in opposition); *United States

v. Lawrence,* 276 F.3d 193, 197 (5th Cir. 2001) (affirming summary judgment when defendant's

only evidence in opposition was his own "self-serving allegations," which "are not the type of

'significant probative evidence' required to defeat summary judgment"); *BMG Music v.

Martinez,* 74 F.3d 87, 91 (5th Cir. 1996) ("Considering that the only evidence in support of the

defendants' theory is a conclusory, self-serving statement by the defendant Hugo, the inference

that the defendants ask this Court to make is unreasonable.").

Mr. Elliott's affidavit in opposition to this Motion is self-serving and controverted by

Global's contemporaneous verbal and written unequivocal repudiation of the APA.  Once Global

repudiated, Legends was not only excused from further performance, but also entitled to terminate the contract and claim damages for breach.

C.  **Because Global Frustrated The Apa Condition Requiring Confirmation Of The November Plan, Legends Need Not Prove That The November Plan Would Have Been Confirmed.**

   1.  **Anticipatory Repudiation Excuses The Non-Breaching Party From Future Performance.**

Following an anticipatory repudiation, the non-repudiating party is excused from any further performance under the contract. *Am. List Corp. v U.S. News & World Report*, 75 N.Y.2d 38, 44–45 (1989) ("requir[ing] the nonrepudiating party to prove its ability to perform in the future" "does violence to the settled principles of the doctrine of anticipatory breach"); *see also De Forest Radio Tel. & Tel. Co. v. Triangle Radio Supply Co.*, 243 N.Y. 283, 293 (1926) ("Where one party to a contract repudiates it and refuses to perform, the other party by reason of such repudiation is excused from further performance."); *In re Food Mgmt. Grp., LLC*, 372 B.R. 171, 192 (S.D.N.Y. 2007) (holding that defendant's repudiation of the contract "foreclosed the future and rendered it impossible to know whether the debtors could have delivered the other shops and leases in question"). The non-repudiating party need only demonstrate that it was ready, willing and able to perform to prove a breach.[2]  Contrary to Global's suggestion, however, the non-repudiating party is only required to make the "ready, willing and able" showing for contractual conditions *unrelated to the conditions frustrated by the breaching party*.

On this point, *King World Prods., Inc. v. Fin. News Network, Inc.*, 660 F. Supp. 1381 (S.D.N.Y. 1987), eviscerates Global's argument that the Debtors would have been required to prove that the November Plan would have been confirmed. There, a tenant agreed to sublease office space, subject to obtaining the consent of the landlord within forty-five days after

---

[2]  Global raises no disputed issues of fact to refute that Legends was ready, willing and able to perform under the APA (other than failure to confirm the November Plan).  (*See* Global Opp'n at 27–29.)

execution.  *Id.* at 1383.  While the tenant was seeking such approval, the proposed subtenant repudiated by informing the landlord that the sublease was signed without authorization and that the landlord need not consent to the lease.  *Id.*  The proposed subtenant then claimed that the plaintiff-tenant would have had to prove that it would have received the landlord's approval – the condition precedent to the sublease – to prevail on breach of contract claim.  *Id.* at 1386.

Rejecting this contention, the *King World* court held that:

> FNN, having disavowed the sublease, would not have submitted such information as the landlord might have requested in reaching its decision.  Requiring King World to bear the burden of proving what the landlord would have done had FNN not disavowed the sublease would permit FNN to reap an advantage from the situation created by its own unjustified repudiation of the contract.  *Accordingly, although King World is required to prove it was ready, willing, and able to perform its part of the bargain, that proof need only go to matters not created by FNN's act of repudiation.*

*Id.* at 1387 (emphasis added).[3]

This reasoning applies with equal force here:  Global claims that Legends never would have satisfied the condition precedent of plan confirmation.  However, by affirmatively moving to vacate approval of the Disclosure Statement and by objecting to confirmation of the November Plan, *Global frustrated the very conditions that it was obligated to help fulfill.*  As *King World* affirms, seeking confirmation of the November Plan would have been exactly the type of "futile act . . . that the law does not require."  *Id.* at 1386.  Thus, Legends was well within its rights to withdraw the November Plan and terminate the APA and, as a matter of law, Legends need not prove that the November Plan would have been confirmed to prevail on its

---

[3]       Global's claim that *King World* does not require summary judgment because it was decided following trial fails.  (*See* Global Opp'n at 30.)  The court held, as a matter of law, that imposing an evidentiary requirement that a condition precedent frustrated by the breaching party would have been satisfied "*is not required by precedent and would, in fact, be inequitable.*"  *King World*, 660 F. Supp. at 1386 (emphasis added).

breach of contract claim.  For this reason, the Court should grant summary judgment in favor of Legends.

Global cites no authority for the proposition that Legends is required to prove that the November Plan would have been confirmed under New York law.  (*See* Global Opp'n at 29.) The best Global can muster are citations to cases that the non-repudiating party is required to demonstrate an ability to perform *when performance is due,* but none of these cases require proof of future acts.

For example, Global relies on *Pesa v. Yoma Dev. Group, Inc*., 18 N.Y.3d 527 (2012), but there the Court of Appeals reiterated that under New York law a non-repudiating party "*need not . . . prove its ability to perform the contract in the future*."  *Id*. at 532 (emphasis added).  In *Pesa*, the buyers in a real estate transaction was required to obtain a mortgage commitment within 60 days after entering into the contract.  *Id*. at 530.  More than three years later, neither the buyers nor the sellers had taken any steps towards consummating the sale.  *Id.* at 531.  When the sellers transferred the properties that were the subject of the agreement, the buyers claimed damages for anticipatory breach.  *Id.*  The court denied summary judgment because the "evidence was not conclusive" on the issue of the buyers' ability to obtain the required mortgage commitments, but by the time the alleged breach occurred (the proposed transfer of the properties), the buyer's performance was *overdue*.  *Id.* at 533.  Moreover, the court concluded that this condition may have been "caused or consented to" by the buyer.  *Id.* at 534; *see also In re Asia Global Crossing, Ltd.,* 326 B.R. 240, 249–50 (Bankr. S.D.N.Y. 2005) (requiring that non-repudiating party demonstrate it was "ready, willing and able to" accept delivery of goods at times designated in the parties' contracts, which conditions were not frustrated by non-repudiating party).

Global's citation to *In re Bradlees Stores, Inc*. is inapposite.  That case was decided under Massachusetts law, which does not recognize anticipatory repudiation and involved a complex series of issues concerning whether particular contractual provisions were conditioned on each other.  *In re Bradlees Stores, Inc*., 313 B.R. 565, 574 (S.D.N.Y. 2004) (holding that it was "impossible to tell when any of the conditions precedent to the contract became effective," and noting that court was unable to determine when performance was due).  That is not the case here. Global was required to work with Legends to consummate the APA, and not prevent satisfaction of the conditions precedent.

Thus, contrary to Global's assertions, Legends need not prove that the November Plan would have been confirmed by the Bankruptcy Court.  Accordingly, the issue of feasibility is irrelevant to the parties' dispute, and Legends is entitled to summary judgment.[4]

> ### 2.   The Prevention Doctrine Also Excuses Legends From Proving
> ### That The November Plan Would Have Been Confirmed.

Under New York law, a party to a contract may not benefit from conduct that prevents or frustrates the satisfaction of conditions precedent.  *Eastman Kodak Co. v. Altek Corp.*, 936 F. Supp. 2d 342, 348–49 (S.D.N.Y. 2013); *Cauff, Lippman & Co. v. Apogee Fin. Grp., Inc.*, 807 F. Supp. 1007, 1022 (S.D.N.Y. 1992); *Fairway Prime Estate Mgt., LLC v. First Am. Int'l Bank*, 852 N.Y.S.2d 524, 527 (1st Dep't 2012).  This is known as the prevention doctrine, which applies even where – unlike here – there has not been an anticipatory repudiation.  Here, the prevention doctrine precludes Global from relying on Legends' failure or inability to prove the feasibility of the November Plan as a basis for its breach of contract claim or in opposition to Legends' breach of contract claim.

---

[4]       In addition, as set forth in detail in Legends' opening brief, Global asserts a feasibility standard that would not have applied to the Global Sale because Global was purchasing substantially all of Legends' assets.  (Br. at 36–41.)

Confirmation of the November Plan, and approval of the underlying sale of assets to Global, *required* Global's active support and participation.  As Global has readily acknowledged, the November Plan was "premised on the sale to [Global]—*the only hope the Debtors have of confirming a feasible Plan*."  (Global Opp'n, Ex. 16 [R. No. 88–18] ¶ 35 (emphasis added).)  In recognition of that fact, the APA imposed an obligation on Global to use its "best efforts" to consummate the APA and secure Bankruptcy Court approval of the November Plan and the sale to Global.  (SOF ¶ 1, Ex. A at § 5.3.)  Global also agreed not to take any action to restrain, prevent, or delay the closing of the APA or confirmation of the Legends' chapter 11 plan (*id*. § 5.3(d)), and generally to cooperate with Legends to secure confirmation of its chapter 11 plan and approval of the APA. (*id*. §§ 5.2 and 5.3.)  As set forth above and in Legends' opening brief, Global did just the opposite.  Global actively sought to prevent confirmation of the November Plan and approval of the Global Sale by, among other things, filing the Motion to Vacate and Plan Objection.  (SOF ¶ 32–34; SSOF ¶ 3.)

Global advances two arguments to explain why the prevention doctrine does not apply here, both of which fail as a matter of law.  First, Global asserts disingenuously that it was justified in filing the Motion to Vacate and Plan Objection because in doing so, it "merely alerted the Court of its belief that the financial collapse of the Debtors' Properties jeopardized the feasibility of the [November] Plan."  (Opp'n at 32.)

There is no doubt that Global filed the Motion to Vacate and the Plan Objection to further its own goal, *i.e*., to extricate itself from its contractual obligations to Legends.  As set forth above, derailing Legends' confirmation was integral to Global's "exit strategy" and required Global to manufacture a series of illusory breaches to "undo" the APA.  (SSOF ¶ 5, Ex. W.)  The Motion to Vacate and Plan Objection have nothing to do with apprising the Bankruptcy Court of

14

any misrepresentations or "material concerns" regarding viability of the November Plan.  (Opp'n at 33.)[5]  Far from being merely "informational," these actions sought to "undo" the very conditions that Global was contractually obligated to help satisfy.  (*See* Global Opp'n, Ex. 16 [R. No. 88–18]) ¶ 42) ("the Court should enter an Order vacating the Amended Disclosure Statement . . . and adjourning the confirmation hearing"); Global Opp'n, Ex. 19 [R. No. 88–21] at 16 ("Global Gaming requests that this Court deny confirmation of the Plan").)  Thus, there is no genuine issue of material fact as to whether Global sought to prevent satisfaction of the conditions precedent in the APA.[6]

Second, Global argues that the prevention doctrine does not apply unless Legends can establish Global's "nefarious" intent.  (Opp'n at 32.)  This argument misstates the prevention doctrine.  While Global's "exit strategy" demonstrates Global's nefarious and true intent in blocking confirmation, all that is required is proof that Global's conduct "*materially contributed to the failure of the condition.*"  *In re President Casinos, Inc.*, 419 B.R. 381, 386, 392–93 (E.D. Mo. 2009) (emphasis added); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 245 (1981) ("Where a party's breach by non-performance contributes materially to the non-occurrence of a

---

[5]      Throughout its memorandum, Global attempts to perpetuate the canard that it was misled and, in fact, defrauded by the Debtors about their financial situation.  However, as Judge Calloway found in granting Legends Motion to Dismiss all of Global's fraud and misrepresentation claims, [R. Doc. 62], and the undisputed evidence shows, nothing could be further from the truth.  As Judge Calloway found and as the record clearly indicates, Global was at all times fully aware of the financial condition of the Debtors, including their financial decline subsequent to the execution of the APA on July 25, 2012 and prior to the execution of the Amendment on November 29, 2012.  Global received daily financial reports itemizing the Debtor's income and expenditures.  (*See* Global's Answer and Counterclaim to First Amended Complaint For Breach of Contract [R. Doc. 39, ¶¶ 10 and 53] (admitting that Global received daily financial reports following APA's execution).)  Indeed, Global's daily receipt of Legends' financial information is reflected in at least two emails from John Elliott that Global attached to its Opposition.  (*See* Opp'n, Elliott Decl., Exs. 4 and 5.)

[6]      Moreover, Global's assertion that its only choice was to put the brakes on confirmation of the November Plan or lie to the Court is a false dilemma.  Global reversed course days after fully supporting approval of the proposed Disclosure Statement and, in response to its purported concerns, Legends offered to have further discussions about modifications to the November Plan to address Global's concerns.  (SOF ¶ 2, Ex. B at 2–3.)  Global rebuffed these overtures because they were plainly inconsistent with its "exit strategy."  (*See* SSOF ¶ 5, Ex. W at 2.)

15

condition of one of his duties, the non-occurrence is excused.").  As set forth above, the Global

Sale was the linchpin of the November Plan.  Global's unequivocal refusal to move forward with

that sale rendered the November Plan a nullity and prevented Legends from moving forward

with that plan.  On these facts, Global's misconduct "materially contributed" to the failure to

confirm the November Plan.

Accordingly, Global may not rely on Legends' failure to prove feasibility as the

foundation for its breach of contract claim.  Thus, evidence of feasibility is irrelevant to Global's

breach of contract claim and, for the reasons set forth in Legend's opening brief, should not be

admissible at the trial in this action.  (Br. at 34–36.)

### 3. Even Assuming *Arguendo* That Legends Must Prove That The November Plan Was Feasible, Legends Need Only Prove That Global Had The Capacity To Close.

Global cites four cases for the proposition that even in a liquidating plan where all of the

debtor's assets are to be sold, the debtor must still show that the third party purchaser will

operate on a profitable basis.  (*See* Global Opp'n at 20-24.)  Global is wrong as a matter of law,

and the cited cases do not support its contention.  Just the opposite:  they prove that the Debtor

need not prove the post-sale viability of the purchaser.

First, Global cites *In re Heritage Organization, LLC*, 375 B.R. 230, 311 (Bankr. N.D. Tx.

2007) (citing *In re Holmes*, 301 B.R. 911 (Bankr. M.D. Ga. 2003). (*See* Global Opp'n at 21.)  In

*Heritage*, the court was only concerned with whether the debtor could meet its obligations under

the plan to transfer assets to a post-liquidation trust, and not whether any third-party purchaser

would be able to operate post-acquisition in a profitable manner.  In fact, the court specifically

noted that post-sale feasibility does not apply in a plan of liquidation:

> The Kornman Parties [objecting parties] failed to distinguish
> between *feasibility of a plan of reorganization and feasibility of a
> plan of liquidation, inappropriately relying on the legal test for*

> *feasibility in a plan of reorganization in their objection to the*
> *second amended plan*.  Therefore, the court does not find the
> Kornman Parties' arguments respecting feasibility persuasive.

375 B.R. at 311, n.100 (emphasis added).  Thus, *Heritage* acknowledges that there is a different test for feasibility in a plan of liquidation (operative here) and a plan of reorganization (which is not applicable).  Similarly, Global fails to make the distinction between a plan of liquidation and a plan of reorganization.

Here, as the *Heritage* court indicated, the Debtors need only show that they could meet their obligations under the November Plan, which include payment of administrative and priority claims and to consummate the sale.  There is no question that Legends would have been able to meet its obligations under the November Plan from the proceeds of Global's initial payment, and Global does not argue to the contrary.[7]

Global erroneously argues that the feasibility standard in a chapter 11 plan would require the debtor to show that *Global, the third party purchaser, not the debtor or successor of the debtor*, would be able to pay its acquisition debt after the purchase of the Debtors' assets.  Global's standard is wrong.  None of the cases cited by Global support its position.

Here, the liquidation itself, *i.e.*, the sale of the assets to Global, is clearly feasible.  In fact, Global warranted that it would be able to meet all of its requirements under the APA, including the payment of the $24.5 million initial payment upon closing of the sales transaction, subject to adjustments under the terms of the plan.  (*See* APA, § 4.2 (f).)  The liquidation is clearly feasible

---

[7]    The *Heritage* court noted that there are two lines of cases concerning feasibility in a liquidating chapter 11 plan:

> Several courts take a narrow approach in interpreting the plain language of §
> 1129(a)(11) to say that feasibility need not be established when liquidation is
> proposed in the plan.. . . noted that, Other courts take a broader approach and
> apply the feasibility test to plan of liquidation focusing their analysis on whether
> the liquidation itself, as proposed in the plan is feasible.

*Heritage*, 375 B.R. at 311.  *Neither of these standards require proof of the post-acquisition success of the acquisition vehicle*.

17

and would have occurred but for Global's repudiation and breaches.

Global also cites *In re Yates Development, Inc.*, 258 B.R. 36, 42–44 (Bankr. M.D. Fla. 2000), but that case does not apply here.  *Yates* did not involve a liquidating plan; instead, it involved a plan for the debtor itself to purchase real property.  Moreover, as the Court noted, whether the purchase would close was contingent on a condition that was inherently speculative:

> The only circumstance under which the plan can be effectuated is a future appellate ruling that the $5,000.00 per day increase is not enforceable.   The court cannot concern itself with the myriad twists and turns the case may take, but must instead concentrate on the facts before it.  The law of the case is that paragraph twelve of the Option Agreement is enforceable.  Accordingly, the debtor's plan, the success of which hinges entirely upon an appellate court ruling that paragraph twelve is not enforceable, is not feasible.

250 B.R. at 44.  There are no such conditions operative to the APA cited by Global.

Another case cited by Global, *Hobson v. Travelstead*, 227 B.R. 638 (D. Md. 1998), is similarly inapposite.  In *Travelstead*, the court did not state – nor even suggest – that in a liquidating chapter 11 plan that the debtor must prove that an asset purchaser would operate profitably post-acquisition.  Rather, the court focused on the ability to implement the liquidation.  The court noted:

> Contrary to Ms. Hobson's assertions, made without citation to legal authority, the feasibility standard does not require a 'guarantee' that the debtor or liquidating agent will be able to cause the debtor's interest in Blockless to be liquidated.  The bankruptcy court found that 'there is a mechanism in place that produces the likelihood that the result will be achievable.'

227 B.R. at 652.  Here, there is no question that the liquidation of the Debtors' assets, the sale to Global, would have been successful.

Finally, *In re Holmes*, 301 B.R. 911 (Bankr. M.D. Ga.  2003) does not stand for the proposition that the Bankruptcy Court must examine the post-sale operating performance of a business sold under a plan of liquidation.  In *Holmes*, confirmation of the debtor's liquidating

plan was predicated upon the debtor's ability to persuade the I.R.S. to agree to the debtor's offer to compromise a tax claim (an offer that the I.R.S. could deny in its discretion); this was highly uncertain given that the United States government objected to confirmation on feasibility grounds.  Ruling on the objection, the court noted:

> The court is persuaded that debtor must be able to perform the obligations called for by its proposed chapter 11 plan.  The court is persuaded that debtor would not be able to perform his obligations under the I.R.S. unless the I.R.S. agrees to accept the debtor's offer to compromise.  It is uncertain whether the I.R.S. will so agree… Since the I.R.S. may not accept or even consider debtor's offer to compromise, the court, for purposes of confirmation, must assume debtor's priority tax obligation to be $9,372,245.00. The court must conclude from the evidence presented that the debtor does not have the ability to pay the I.R.S. priority tax claim of $9,372,245.00 over a term of sixty months as proposed in his chapter 11 plan.  The net proceeds from the sale of the farm property will not be sufficient to satisfy the priority tax claim.

*Id.* at 915.  Here, there is no question that the Debtors would be able to satisfy any and all priority tax claims as well as any other priority claims upon the sale of the Debtors' assets to Global, and it is equally clear that Legends' lenders supported confirmation of the November Plan and were not objecting on feasibility (or any other grounds).  *To the contrary, the only objector was Global*.

Whether Global would have been successful in its post-acquisition operations is not relevant to the "feasibility standard" under Section 1129 (a)(11) of the Bankruptcy Code.  The question is simply whether Legends would have been able to transfer its assets to Global and satisfy any financial obligations that *Legends* had under the November Plan.  There is no question, and Global does not dispute, that Legends would have been able to meet that standard.

Accordingly, even if Legends were required to prove that the November Plan would have been confirmed by the Bankruptcy Court, Legends need not prove that *Global* would have been able to satisfy its post-confirmation payments to the lenders.

## II.

## THE AMENDED APA PRECLUDES GLOBAL'S BREACH
## OF CONTRACT CLAIMS AS A MATTER OF LAW.

The Amendment to the APA was a novation of the parties' original agreement in the

APA.  Thus, as a matter of law, the novation released and discharged Legends from liability for

any alleged pre-Amendment breaches of the APA.  (Br. at 19–25.)  Ignoring the clear and

unambiguous terms of the Amendment, Global argues that the parties "never agreed to

extinguish the APA," and that the Amendment contains no language "releasing or discharging

any prior breach of the APA."  (Opp'n at 37.)  New York law, however, contradicts Global's

argument.

**A.**     **The Amendment Was A Novation Of The Apa.**

Under New York law, the novation of an agreement is established when four elements

are present:  (1) a previously valid obligation; (2) agreement of all parties to a new contract; (3)

extinguishment of the old contract; and (4) a valid new contract.  *Callanan Indus. v. Micheli*

*Contr. Corp.*, 124 A.D.2d 960, 961 (3d Dep't 1986).  Global does not dispute that the elements

(1), (2), and (4) are present, but disputes (3), the extinguishment of the APA.  Whether a later

agreement extinguished an earlier agreement is ultimately a question of the parties' intent.  *See,*

*e.g.*, *Mallad Const. Corp. v. County Fed. Sav. & Loan Ass'n*, 32 N.Y.2d 285, 291 (1973).

Where, as here, an agreement is unambiguous (*see* Opp'n at 37), courts examine the four corners

of the agreement to establish the parties' intent without reference to extrinsic evidence.

Summary judgment is appropriate where, as here, the contract is a novation.  *Citigifts, Inc. v.*

*Pechnik*, 67 N.Y.2d 774 (1986).

Here, the parties agreed that, "[i]n the event of any inconsistency between this

Amendment and the [APA], *the terms of this Amendment shall prevail*."  (SOF ¶ 26, Ex. S § 10

(emphasis added).)  This language reflects an *unqualified* intention to replace the parties' original

agreement with the provisions of the Amendment.  Considered in light of the surrounding circumstances – Global's allegations of deficiencies in Legends' CapEx and the parties' common interest in closing the sale – the unavoidable conclusion is that the Amendment effected a novation, resulting in an immediate discharge of any prior breaches.  *Mallad Const. Corp.*, 32 N.Y.2d at 292 ("succession of substituted agreements . . . and the evident common interest in working out a facile accommodation to the financial needs of the construction project . . . supports the inference that all rights derived from the earlier agreements were released."); *Citigifts*, 67 N.Y.2d at 774 ("The Appellate Division properly concluded that there was a novation which extinguished the old agreement and relegated plaintiffs to an action for breach of the new agreement.").

Global has not submitted any admissible evidence that raises a genuine issue of material fact concerning the parties' intent with respect to the Amendment.  The Elliott Declaration submitted with Global's opposition makes the conclusory assertion that Global never intended to relieve Legends of its purported obligation to make capital expenditures in the ordinary course. (Global Opp'n, Elliott Decl. ¶ 19.)  This self-serving, unsupported statement by an interested party is insufficient to raise a triable issue of fact regarding the parties' intent.  *Callanan Indus., Inc.*, 124 A.D.2d at 962 (3d Dep't 1986) ("Accordingly, while the question of whether a substituted agreement effects a discharge of a prior agreement constitutes a triable issue of fact if the opponent offers relevant extrinsic evidence, such an issue of fact does not arise when the opponent offers no evidence as to the parties' intent in making the agreement.'").

Global asserts that the Amendment was not a novation because it did not amend Legends' obligation to continue operating its business in the "ordinary course" and did not contain specific "releasing" language (Opp'n at 37–38.)  Both arguments fail as a matter of law.

21

First, Global argues that the Amendment could not have effected a novation because it did not address § 5.1(b), the "ordinary course" provision that Legends allegedly breached. (Opp'n at 39.)  This argument is deliberately misleading.  Global's breach of contract claim is premised solely on allegations of pre-Amendment CapEx deficiencies.  (Global FAC ¶¶ 7–8, 31–39.)  And Global has made several judicial admissions confirming that Legends' alleged CapEx deficiencies were the sole impetus for the Amendment it sought.  (Global Opp'n, Ex. 16 [R. No. 88–18], Cary Decl. ¶¶ 6–7, 11–14.)  That complaint was cured by adding an entirely new provision to the parties' agreement requiring Legends to meet minimum CapEx obligations.  The fact that section 5.1(b) is not addressed in the Amendment is, therefore, irrelevant.

Second, Legends' release from liability is a consequence of the novation.  As set forth above, all the elements of a novation have been met here and, as a result, Legends is released from liability for any pre-Amendment breaches.  None of the authorities Global cites support its position that New York courts require specific terms or language to establish a release in these circumstances.

In *Koenig Iron Works, Inc. v. Sterling Factories, Inc*., 89 CIV. 4257 (THK), 1999 WL 178785 (S.D.N.Y. Mar. 30, 1999), there was no subsequent agreement for the court to examine in deciding whether the parties had intended a novation.  *Koenig*, 1999 WL 178785 at *4. Instead, the court was forced to piece together the terms of the later agreement from correspondence between the parties.  *Id.* at *7–9.  Naturally, this exercise made it difficult for the court to find any language suggesting a novation.  After reviewing the parties' correspondence, the court concluded that the parties' had always intended to adhere to the performance required by the original contract.  *Id.* at *9. For this reason, there was no novation.

22

*LCA Leasing Corp. v. Borvig Corp.*, 826 F. Supp. 776 (S.D.N.Y. 1993), is equally unavailing.  In that case, the latter of the parties' agreements was a standard form lease agreement that made no reference to the terms of the parties' original agreement.  *LCA Leasing*, 826 F. Supp. at 777–80.  Absent even a reference to the original agreement between the parties, it would have been unreasonable to conclude that the parties intended a novation.

Global's attempts to distinguish *Sudul v. Computer Outsourcing Svcs., Inc.*, 917 F. Supp. 1033 (S.D.N.Y. 1996) and *Metro. Steel Indus., Inc. v. Fidelity & Deposit Co.*, 68 A.D.2d 935 (2d Dep't 1979) do not carry its argument any further.  Global argues that in *Sudul*, "the court found a novation because the plaintiff's salary was expressly reduced in the amended employment agreement, the novation was not found to extinguish claims for the defendant's breach of other non-affected provisions of the plaintiff's employment contract, and the novation was limited only to the portions of the employment agreement that were expressly changed."  (Opp'n at 38.) Global misstates the decision in *Sudul*.  Here, the court held that it was "clear from the language of the Amendment . . . that the parties intended the Amendment to discharge the[ir] existing obligations."  *Sudul*, 917 F. Supp. at 1048.  The amendment in this case was a "simple two sentence Amendment" that reduced the plaintiffs' salary.  Thus, the decision in *Sudul* confirms that a novation does not require any special "releasing" language to discharge the parties' prior obligations.

Global cites *Metro. Steel* for the proposition that "the court found a novation where the parties had entered into a written settlement agreement that expressly lowered the contract price and discharged earlier obligations" (Opp'n at 38.)  In that case, the court found that

> A review of the evidence in this case reveals that the settlement
> agreement was reached because of the plaintiff's failure to fully
> perform its duties under the original subcontract.  In recognition of
> this deficiency, the parties negotiated and agreed upon a new,

> lower contract price.  The accommodation which they thus
> arranged constituted a new and superseding agreement which
> settled what would have otherwise been a disputed claim.  As such,
> the agreement discharged the earlier obligation and became
> substituted therefor.

*Metro. Steel*, 68 A.D.2d at 935.  Similarly, here, Global expressed concerns about Legends'

financial performance, specifically alleged CapEx deficiencies, which prompted the Amendment

to the APA.  (Global Opp'n, Ex. 16 [R. No. 88–18]; Cary Decl. ¶¶ 11–14.)  As a result, the

parties agreed to significant changes in the material terms of the contract – price, financing

terms, a new minimum CapEx requirement – all of which were intended to provide a new and

superseding agreement that would resolve Global's alleged concerns.

**B.** **Global Fails To Raise Any Genuine Issue Of Material Fact Regarding Novation.**

"In order to defeat summary judgment, 'the opponent must present evidentiary facts

sufficient to raise a triable issue of fact, and averments merely stating conclusions, of fact or of

law, are insufficient.'  Accordingly, while the question of whether a substituted agreement

effects a discharge of a prior agreement constitutes a triable issue of fact if the opponent offers

relevant extrinsic evidence, such an issue of fact does not arise when the opponent offers no

evidence as to the parties' intent in making the agreement." *Callanan Indus., Inc*, 124 A.D.2d at

961–62.  This is the case here.  Global has alleged in conclusory terms that it did not intend to

discharge Legends, based in part on the declaration of John Elliott.  But Global has offered no

evidence in support of that conclusion.  Global has failed to controvert the facts alleged and

admissible evidence adduced in Legends' opening brief with anything other than general denials.

This is patently insufficient.  *See, e.g.*, *United States v. Lawrence*, 276 F.3d at 197 (affirming

summary judgment for the plaintiff when defendant's only evidence in opposition was his own

"self-serving allegations," which "are not the type of 'significant probative evidence' required to

defeat summary judgment").

24

**C.     On Global's Interpretation Of The Amendment,
        No Consideration Was Provided In Return For
        Significant Concessions By Legends And The First Lien Parties.**

Global's interpretation of the Amendment suggests that Legends (and the First Lien

Parties) agreed to material changes in the APA without seeking any consideration in return.

(Opp'n at 36-40.)  On a summary judgment motion, the non-moving party is entitled to the

benefit of any *reasonable* inferences that may be drawn from the facts.  *Apex Oil Co. v.

DiMauro*, 822 F.2d 246, 252–53 (2d Cir. 1987) (citing *Matsushita Elec. Indus. v. Zenith Radio

Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 1356 (1986)).  On the undisputed facts in this record, it

would be patently unreasonable to conclude that Legends and the First Lien Lenders –

sophisticated parties represented by counsel – agreed to all of Global's terms with no *quid pro

quo*.  Here, the *quid pro quo* was the release and discharge of any pre-Amendment claims Global

may have had.  *See Wasserstrom v. Interstate Litho Corp.*, 114 A.D.2d 952, 955 (2d Dep't 1985)

(discharge of original contract is sufficient consideration for substituted contract).[8]

### III.

**GLOBAL'S WAIVER AND ELECTION OF REMEDIES ARGUMENTS ARE
UNAVAILING; GLOBAL WAIVED PRE AMENDMENT BREACHES AND ELECTED
TO ACCEPT THE BENEFITS OF THE AMENDMENT IN LIEU OF PURSUING
TERMINATION OF THE APA.**

Global erroneously argues that Legends waived its affirmative defenses and is not

entitled to argue waiver, election of remedies, or estoppel.  But Legends' Answer asserted *all*

affirmative defenses that may be supported by the allegations pled in support of its

counterclaims, and specifically asserted waiver and estoppel.  (Answer at 6 & 7.)  Accordingly,

---

[8]     Global obtained significant benefits from the Amendment, specifically, a lower purchase price and interest
rate along with specific CapEx requirements to compensate for the alleged decrease in Legends' EBITDA due to
CapEx deficiencies.  (SOF ¶ 23, Ex. P (Nov. 20, 2012 e-mail from W. Hardie to J. Cary, affirming that the First Lien
Lenders were willing to accept most of the terms in Global's November 19th Proposal).)  Mr. Elliott reported on the
Debtors' acceptance of the modifications to the APA, citing the "concessions" by Legends and the First Lien
Lenders on price and credit terms as being "as close to the pin as you can get" and characterizing the Amendment as
one that "improves [Global's] position" with a "*focus on forcing [the Debtors and First Lien Lenders] to continue to
manage the properties in the ordinary course of business.*"  (SOF ¶ 24, Ex. Q at GBL00042344 (Nov. 20, 2012 e-
mail from J. Elliott to R. Lannert *et al.*) (emphasis added).)

Legends has not waived any of its affirmative defenses.  Moreover, as set forth herein and in Legends' opening brief (Br. at 25–26), Global cannot assert pre-Amendment CapEx deficiencies as the basis for a breach of contract claim against Legends:  Global chose to pursue an Amendment to cure this complaint.  It would be unreasonable to conclude that Legends would agree to the significant changes brought about by the Amendment without a corresponding agreement to obviate any claims that may have arisen from the dispute that took the parties to the negotiating table in November 2012.

Global, after agreeing to, and accepting the significant benefits of the Amendment, elected to forgo disputed litigation to terminate the APA and chose to proceed with the confirmation of the November Plan, as amended, and consummation of the APA.  Indeed, Global appeared at the December 3, 2012, disclosure statement hearing and advised the Bankruptcy Court that it had no objection to its approval.  Global therefore waived any pre-Amendment claims and is estopped from raising any such alleged and disputed pre-Amendment breaches as a defense to Legends' claims.

## CONCLUSION

For the reasons set forth above, it is respectfully requested that Global's claim for breach of contract, and Global's defenses based upon that claim, and Global's feasibility defense be dismissed.  It is further respectfully requested that the Court preclude evidence concerning the feasibility of the November Plan at trial, or in the alternative, determine that Global's articulated standard of feasibility is erroneous.

[SIGNATURES APPEAR ON NEXT PAGE.]

This 3rd day of October, 2014.

Respectfully submitted,

BY:  /s/ Barry W. Miller
William H. Patrick, III, La. Bar No. 10359
Barry W. Miller, La. Bar No.  09678
**Heller, Draper, Patrick & Horn, L.L.C.**
650 Poydras Street, Suite 2500
New Orleans, Louisiana 70130-6103
Telephone:(504)299-3300
Fax: (504) 299-3399


BY:  */s/Andrew K. Glenn*
Andrew K. Glenn (admitted *pro hac vice*)
Shalini Kisten Rajoo (admitted *pro hac vice*)
**Kasowitz, Benson, Torres & Friedman LLP**
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
**ATTORNEYS FOR LEGENDS GAMING
OF LOUISIANA-1, LLC**


**LATHAM & WATKINS LLP**

BY:   /s/ Robert J. Malionek
Robert J. Malionek
(admitted *pro hac vice*)
885 Third Avenue
New York, New York 10022
Telephone: (212) 906-1200
Telecopier: (212) 751-4864
Robert.Malionek@lw.com


HARGROVE, SMELLEY,
STRICKLAND & LANGLEY
(A Professional Law Corporation)

Glenn L. Langley, Bar Roll No. 8019
401 Market Street, Suite 600
American Tower
 Post Office Box 59

27

Shreveport, Louisiana 71161-0059
(318) 429-7200
(318) 429-7201 (Telecopy)

**ATTORNEYS FOR WILMINGTON TRUST COMPANY AND THE *AD HOC* GROUP OF FIRST LIEN LENDERS**